ROB BONTA, State Bar No. 202668
Attorney General of California
BENJAMIN M. GLICKMAN, State Bar No. 247907
Supervising Deputy Attorney General
MARLA R. WESTON, State Bar No. 209460
Deputy Attorney General
SARAH M. BARNES, State Bar No. 235587
Deputy Attorney General
NATASHA SAGGAR SHETH, State Bar No. 282896
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA  94102-7004
 Telephone:  (415) 510-3818
 Fax:  (415) 703-5480
 E-mail:  Natasha.Sheth@doj.ca.gov
*Attorneys for Defendants Rob Bonta, in his official
capacity as Attorney General of California, Karen
Ross, in her official capacity as Secretary of the
California Department of Food and Agriculture, and
Dr. Tomás J. Aragón, in his official capacity as
Director of the California Department of Public
Health*

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **IOWA PORK PRODUCERS ASSOCIATION,**<br><br>Plaintiff,<br><br>v.<br><br>**ROB BONTA, in his official capacity as Attorney General of California, KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and TOMÁS ARAGÓN, in his official capacity as Director of the California Department of Public Health,**<br><br>Defendants. | Case No. 21-1044<br><br>**NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. § 1441(a) (FEDERAL QUESTION)**<br><br>Action Filed:  November 9, 2021<br><br>[Removed from Superior Court of California, Fresno County, Case No. 21CECG03339] |

1

**TO THE CLERK OF THE COURT:**

**PLEASE TAKE NOTICE** that, pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, Defendants Rob Bonta, in his official capacity as Attorney General of California, Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture, and Dr. Tomás J. Aragón, in his official capacity as Director of the California Department of Public Health hereby remove this action from the Superior Court of California, County of Fresno, to the United States District Court for the Eastern District of California.  In support of removal, Defendants state as follows:

1.      On November 9, 2021, the removed civil action *Iowa Pork Producers Association v. in his official capacity as Attorney General of California, Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture, and Tomás Aragón, in his official capacity as Director of the California Department of Public Health,* Case No. 21CECG03339, was commenced in the Superior Court of California, County of Fresno.

2.      On November 10, 2021, Defendants' counsel accepted electronic service of the summons and complaint on behalf Defendant Bonta.  On November 15, 2021, Defendants' counsel accepted electronic service of the summons and complaint on behalf Defendants Ross and Aragón.  This Notice is filed within thirty days of receipt of the initial pleading by Defendants, and is therefore timely.  28 U.S.C. § 1446(b).

3.      Defendants have not appeared in this action in state court.  The following motions and applications, all filed on November 12, 2021, are pending in state court:

   a.  Plaintiff's Motion for Preliminary Injunction and Request for Expedited Relief and Hearing;

   b.  Plaintiff's Ex Parte Application for Leave to File Memorandum in Support of Motion for Preliminary Injunction in Excess of Local Rule Requirements;

   c.  Plaintiff's Ex Parte Applications: (1) To Advance Hearing Regarding Motion for Preliminary Injunction and Request for Expedited Relief and Hearing; and (2) To Advance Hearing on Pro Hac Vice Applications, Which Are Unopposed.

4. Copies of all pleadings, process, and orders filed in the state court case are attached herewith as follows:

- Exhibit A: Verified Complaint for Preliminary Injunction and Permanent Injunctive and Declaratory Relief; Civil Case Cover Sheet; Summons;

- Exhibit B: Plaintiff's Notice of Motion and Motion for Preliminary Injunction and Request for Expedited Relief and Hearing; [Proposed] Order Granting Motion for Preliminary Injunction;

- Exhibit C: Plaintiff's Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction and Request for Expedited Relief and Hearing;

- Exhibit D: Declaration of Pat McGonegle In Support of Plaintiff's Motion for Preliminary Injunction and Request for Expedited Relief and Hearing;

- Exhibit E: Declaration of Dr. Janeen Salak-Johnson, Ph.D., In Support of Plaintiff's Motion for Preliminary Injunction and Request for Expedited Relief and Hearing;

- Exhibit F: Declaration of Dr. Glynn T. Tonsor, Ph.D., In Support of Plaintiff's Motion for Preliminary Injunction and Request for Expedited Relief and Hearing;

- Exhibit G: Plaintiff's Ex Parte Application for leave to File Memorandum in Support of Motion for Preliminary Injunction in Excess of Local Rule Requirements; Supporting Declaration of Ryann A. Glenn; [Proposed] Order Granting Plaintiff's Ex Parte Application for Leave to File;

- Exhibit H: Plaintiff's Ex Parte Applications: (1) To Advance Hearing Regarding Motion for Preliminary Injunction and Request for Expedited Relief and Hearing; and (2) To Advance Hearing on Pro Hac Vice Applications, Which Are Unopposed; Supporting Declaration of Ryann T. Glenn; [Proposed] Order Granting Plaintiff's Ex Parte Applications to Advance Hearings.

*See* 28 U.S.C. § 1446(a). Defendants have presently only been served with the Summons and Verified Complaint contained in Exhibit A; the additional pleadings attached herewith were downloaded from the state court website and have not yet been served on Defendants.

5. Plaintiff's complaint "challenges the constitutionality of California's Proposition 12 Farm Animal Confinement Initiative . . . which imposes confinement requirements on out-of-state pork producers and prohibits the sale of pork meat within the state of California from animals confined in a manner inconsistent with California's requirements, regardless of where in the nation the animal was raised." Ex. A, ¶ 1. Plaintiff seeks injunctive and declaratory relief based on purported violations of the Due Process Clause (Counts I & II), the Privileges and Immunities Clause (Count III), the Supremacy Clause as related to the Packers and Stockyards Act,

3

7 U.S.C. § 192 et seq. (Count IV), and the Commerce Clause (Count V, Ex. A at ¶¶ 201–217) of the United States Constitution.  Ex. A, ¶¶ 126–217; *id.* at 33–34.

6. Plaintiff asserts only federal constitutional causes of action, with the exception of a single cause of action for declaratory relief under California Code of Civil Procedure section 1060.  Ex. A., ¶¶ 218–228.  Constitutional challenges to the enforcement of a state law, like those asserted by Plaintiff, raise federal questions over which this Court has original jurisdiction.  *See* 28 U.S.C. § 1331.  It is therefore an action that Defendants may remove to this Court under 28 U.S.C. § 1441(a).

7. Venue is proper in the Eastern District of California because it is the district embracing the Superior Court of California, County of Fresno, in which the removed action is pending.  28 U.S.C. § 1441(a).

8. The undersigned attorneys represent all Defendants, all of whom consent to removal. 28 U.S.C. § 1441(b)(2)(A).

9. In filing this Notice of Removal, Defendants do not waive, but expressly reserve, any and all available objections and defenses which are or will be applicable to this Action.

10. Written notice of this Notice of Removal will be promptly given to Plaintiff and filed with the Superior Court of California, County of Fresno, in accordance with 28 U.S.C. § 1446(d).

1 | Dated:  November 16, 2021

Respectfully submitted,

ROB BONTA
Attorney General of California
BENJAMIN M. GLICKMAN
Supervising Deputy Attorney General
MARLA R. WESTON
Deputy Attorney General
SARAH M. BARNES
Deputy Attorney General


 */s/ Natasha Saggar Sheth*
NATASHA SAGGAR SHETH
Deputy Attorney General
*Attorneys for Defendants Rob Bonta, in his*
*official capacity as Attorney General of*
*California, Karen Ross, in her official*
*capacity as Secretary of the California*
*Department of Food and Agriculture, and*
*Dr. Tomás J. Aragón, in his official*
*capacity as Director of the California*
*Department of Public Health*

SA2021305217
35664476.docx

5

# EXHIBIT A

1  TRENTON H. NORRIS (SBN 164781)
   PEG CAREW TOLEDO (SBN 181227)
2  WILLIS M. WAGNER (SBN 310900)
   Arnold & Porter Kaye Scholer LLP
3  Three Embarcadero Center, 10th Floor
   San Francisco, California 94111
4  Telephone: +1 415.471.3100
   Facsimile: +1 415.471.3400
5  E-mail: Trent.Norris@arnoldporter.com
           Peg.Toledo@arnoldporter.com
6          Will.Wagner@arnoldporter.com

7  ELDON MCAFEE (*pro hac vice pending*)
   JULIE VYSKOCIL(*pro hac vice pending*)
8  BRICK GENTRY, P.C.
   6701 Westown Parkway, Suite 100
9  West Des Moines, Iowa 50266
   Telephone: 515.271.5916
10 Facsimile: 515.274.1488
   E-mail: eldon.mcafee@brickgentrylaw.com
11         julie.vyskocil@brickgentrylaw.com

E-FILED
11/9/2021 2:20 PM
Superior Court of California
County of Fresno
By: Jamie Nelson, Deputy

MARNIE A. JENSEN (*pro hac vice pending*)
RYANN A. GLENN (*pro hac vice pending*)
Husch Blackwell LLP
13330 California Street, Suite 200
Omaha, Nebraska 68154
Telephone: 402.964.5000
Facsimile: 402.964.5050
E-mail: marnie.jensen@huschblackwell.com
        ryann.glenn@huschblackwell.com

12

13  Attorneys for Plaintiff
    IOWA PORK PRODUCERS ASSOCIATION

14           **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                        **COUNTY OF FRESNO**

16

17  IOWA PORK PRODUCERS
    ASSOCIATION,                              Case No.  21CECG03339
18
                 Plaintiff,
19
        v.                                    **VERIFIED COMPLAINT FOR**
20                                            **PRELIMINARY AND PERMANENT**
                                              **INJUNCTIVE AND DECLARATORY**
21  ROB BONTA, in his official capacity as    **RELIEF**
    Attorney General of California, KAREN
22  ROSS, in her official capacity as Secretary
    of the California Department of Food and   Unlimited Civil Case
23  Agriculture, and TOMAS ARAGON, in his
    official capacity as Director of the       Dept.:
24  California Department of Public Health,     Judge:
                                               Trial Date:  Not Assigned
25               Defendants.

26                                             Action Filed:  November __, 2021

27

28

                                        1

Plaintiff Iowa Pork Producers Association, in a representative capacity for its members, ("IPPA" or "Plaintiff"), by and through its counsel of record, for its Complaint for Declaratory and Injunctive Relief against Defendants Rob Bonta, in his official capacity as Attorney General of California ("Bonta"), Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture ("Ross"), and Tomas Aragon, in his official capacity as Director of the California Department of Public Health ("Aragon") (collectively, "Defendants"), respectfully states to the Court as follows:

## INTRODUCTION

1.      This case challenges the constitutionality of California's Proposition 12 Farm Animal Confinement Initiative ("Proposition 12" or "Prop 12" or the "Act"), which imposes confinement requirements on out-of-state pork producers and prohibits the sale of pork meat within the state of California from animals confined in a manner inconsistent with California's requirements, regardless of where in the nation the animal was raised.

2.      Proposition 12 poses a current and imminent risk of criminal prosecution and civil enforcement against Plaintiff's members, as the Act imposes both criminal and civil penalties on any non-compliant business owner or operator who is "engaged in the sale" of whole pork meat within California.

3.      Iowa, where Plaintiff and its members are located, is the largest pork producing state in the United States and is the leading state for pork exports.

4.      California residents consume an estimated 13-15% of the overall national pork consumption in the U.S.

5.      Despite its behemoth status as a consumer of pork, California has as few as 8,000 breeding pigs in the entire state. Only approximately 1,500 of these breeding pigs are used in commercial breeding in the state and are situated in a handful of very small farms. This equates to California production making up less than 1% of the total U.S. pork production. If California were to meet its own in-state pork demand, it would require production from approximately 673,000 breeding pigs annually. In other words, California cannot feed itself without massive agricultural imports from other states, including, most importantly, from Iowa and Plaintiff's members.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

6.      On November 6, 2008, California voters passed Proposition 2.  Proposition 2 created confinement requirements for in-state producers in California.  Proposition 2 required that breeding pigs in California be housed in a manner that permits the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions (the "Turn Around Requirements").  Prop 2 provided in-state producers more than six years to comply with the Turn Around Requirements, as the effective date was set at January 1, 2015.

7.      On November 6, 2018, California voters passed Proposition 12 and extended these Turn Around Requirements that California producers were now in compliance with to be effective upon out-of-state producers, making them effective on December 19, 2018.  This gave the rest of the country's pork producers only six *weeks* to comply with the same requirements that California had provided over six years to in-state-producers.

8.      Proposition 12 also added a second requirement, the square footage requirements, and specified an effective date of "after December 31, 2021" for breeding pigs.  These separate requirements state that a breeding pig must be provided with at least 24 square feet of usable floorspace per pig (the "Square Footage Requirements").

9.      Recognizing the vagueness of the Act, Proposition 12 required that California's Department of Food and Agriculture ("CDFA") and Department of Public Health ("CDPH") jointly promulgate rules and regulations to implement Proposition 12 and provide adequate notice of compliance requirements to those subject to Proposition 12 by September 1, 2019 ("Final Regulations").

10.      However, while Proposition 12 mandated Final Regulations for the *entirety* of the Act, the December 19, 2018 effective date of the Turn Around Requirements was immediate and left no time for the CDFA and CDPH to promulgate the Final Regulations and certainly no time for out-of-state producers to comply.

11.      Further, Proposition 12's mandated deadline of September 19, 2019 for the Final Regulations passed without even draft regulations issued, let alone Final Regulations.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

12.     Just this year, on May 28, 2021, the CDFA finally published draft rules and regulations to consider for Proposition 12, one year and nine months past the voters' statutory deadline (the "Proposed Regulations").

13.     After a public comment period and required public hearing, CDFA now has stated that Proposed Regulations will not be finalized.  According to Defendant CDFA, *new* proposed draft rules and regulations are forthcoming again and will not be finalized until, at the earliest, sometime into later 2022.   Thus now, the second provision of Proposition 12, the Square Footage Requirements, will go into effect on January 1, 2022 without the Final Regulations and without any of the clarification needed for the underlying vague Act.

14.     Proposition 12 allows for criminal and civil penalties for any person found to be in violation of either the Turn Around Requirements or the Square Footage Requirements, or any provisions of the Act, including criminal misdemeanor convictions, with penalties of a fine of up to $1,000 or 180 days imprisonment.  These criminal penalties can be assessed against both business owners and operators who are non-compliant with Proposition 12 who choose to "engage in a sale" of non-compliant pork meat within California.

15.     It will take years and cost at least tens of millions of dollars for Plaintiff's members to come into compliance with Proposition 12's Final Regulations once they are finally known.

16.     In the meantime – and even according to Defendants – any district attorney or local prosecutor in the state of California, in addition to the Attorney General's Office, can prosecute Proposition 12 now even without the Final Regulations and without leaving the industry any time to comply.  Owners, operators – and anyone who "aids and abets" or "conspires" with them within the food chain, is at imminent risk for criminal prosecution.

17.     Proposition 12's Turn Around Requirements and Square Footage Requirements are inconsistent with pork industry practices and standards, generations of producer experience, scientific research, and the consensus standards of other states. Proposition 12 will impose costly mandates that substantially interfere with commerce among the states in hogs and whole pork meat markets. It will impose enormous costs on Iowa pork producers, ultimately having a direct impact on the price of pork for all Americans, the vast majority of whom had no say in Proposition 12.

4

18.     Most breeding pigs that will produce hogs sold as meat product in 2022 *are already alive* at Iowa farms. The breeding cycle of the pigs is four months, followed by the piglets being raised for three to four weeks before they are weaned and ultimately, farrow to finish takes approximately 24-26 weeks.

19.     Proposition 12 will force the unnecessary slaughter of these breeding pigs, the same pigs that California voters were told Proposition 12 will help.

20.     Through Proposition 12, California seeks to unilaterally impose sweeping changes across the national pork production industry and subject out-of-state individuals in the production market to criminal penalties. Currently, an estimated 4% of pork producers nationwide could satisfy California's onerous standards. California also cannot meet its state's pork demand or feed itself. Due to the proportion of the national pork supply destined for California—and the significant integration and coordination of national pork production and distribution system—it is neither feasible nor practical for producers to segregate their product from California markets. Not selling to California is not an option. As a result, California has attempted to create a national regulation on breeding pig housing through the passage of Proposition 12.

21.     Proposition 12's assertion that non-compliant pork meat "threatens the health and safety of California consumers, and increases the risk of foodborne illness" is false and inconsistent with scientific studies surrounding housing breeding pigs in group pen settings.  In fact, by California's own admission in the Proposed Regulations, Proposition 12 provides no real health or safety benefit to residents. *See* 2021 CA REG TEXT 584571 (NS) at 14 ("This proposal does not directly impact human health and welfare of California residents, worker safety, or the State's environment.").

22.     Within the Standardized Regulatory Impact Assessment (the "SRIA") of Proposition 12, it was confirmed there is no conclusive, scientific link between animal housing space allocation and human food-borne illness, or other human health or safety.

23.     Economic research indicates implementation of Proposition 12 will actually have *adverse* fiscal impacts on residents in California. California residents comprise a large market of

pork consumers who will face higher pork prices following implementation of Proposition 12. Thus, any alleged negative fiscal impact that led to the passage of Proposition 12 lacks support.

24.     Currently in the United States, an estimated 42 million people may experience food insecurity in 2021. Pork ranks third in the United States for meat consumption. Proposition 12 threatens to significantly increase the cost of pork for consumers, which will make it even more difficult for economically-distressed families and those already facing food insecurity to afford this critical source of protein.

25.     Proposition 12 also threatens the public supply of pork within California, which is necessary to satisfy the needs of the businesses and state facilities, including hospitals, schools, and prisons.

26.     Without immediate and permanent injunctive relief from this Court, Proposition 12 will unconstitutionally and irreparably risk and injure breeding pigs, piglets, and Iowa pork producers, their livelihoods, liberty and their property.

## PARTIES

27.     Plaintiff IPPA serves as a unified voice for its Iowa pork producer members. It is a grassroots organization that consists of approximately 70 structured county associations across the state, with more than 4,000 affiliated and associate members that are overwhelmingly individual producers. Every producer-member, regardless of size, has a voice in IPPA through a county-elected delegate system. IPPA has members in nearly every county within Iowa.

28.     Plaintiff's members produce the whole pork that their processors and packers sell directly into California.

29.     Defendant Bonta is the Attorney General of the State of California.  Bonta is responsible for the enforcement of Proposition 12 and is sued in his official capacity only.

30.     Defendant Ross is the Secretary of the California Department of Food and Agriculture, which is responsible for implementation of Proposition 12.  Ross is sued in her official capacity only.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

31.    Defendant Aragon is the Director of the California Department of Public Health, which is responsible for implementation of Proposition 12.  Aragon is sued in his official capacity only.

## JURISDICTION AND VENUE

32.    This Court has jurisdiction over this complaint for declaratory and injunctive relief pursuant to sections 525, 526, and 1060 of the California Code of Civil Procedure.

33.    The Court has authority to enjoin enforcement of Proposition 12's sales ban under 42 U.S.C. § 1983 and state law.

34.    Venue is proper in this county pursuant to sections 395 and 401 of the California Code of Civil Procedure because this is an action against the State, or a department, officer or other agency thereof, that may be commenced in the County of Sacramento, and therefore may also be commenced in any county in which the California Attorney General has an office. The California Attorney General has an office in this county.

## BACKGROUND ON PROPOSITION 12

35.    In 2008, California enacted California Health and Safety Code Section 25990 through ballot initiative Proposition 2, for California *in-state* pork producers to require breeding pigs in California be housed in a manner that permitted the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions known as the Turn Around Requirements.

36.    Proposition 2 provided in-state producers more than six years to comply with these Turn Around Requirements, as the requirements did not go into effect for California in-state pork producers and packers until January 1, 2015.  Cal. Health & Safety Code § 25990(a).

37.    On November 6, 2018, California enacted another amendment to California Health and Safety Code Section 25990-25993 through ballot initiative, Proposition 12.  Proposition 12, in stark contrast to the time allowed for California in-state producers and packers, went into effect just six *weeks* later on December 19, 2018 for out-of-state producers.  Cal. Health & Safety Code §§ 25990(a) – 25994.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

38.     The California Constitution, Article II, Section 10, provides that unless a statute otherwise specifies a date, a ballot initiative "takes effect on the fifth day after the Secretary of State files the statement of the vote for the election at which the measure is voted on, but the measure may provide that it becomes operative after its effective date."  According to the Defendants, Proposition 12's Turn Around Requirements do not have a separately specified effective date and the Turn Around Requirements went into effect December 19, 2018 and are in effect now.  Cal. Health & Safety Code § 25991(e)(1).

39.     After California allowed over six years for their own in-state producers and packers to comply, for the first time, California's Turn Around Requirements were *immediately* imposed upon the entire out-of-state industry to sell whole pork meat within the state of California, regardless of where the hog was raised and regardless of providing the pork industry almost no time to comply.  It immediately became a crime for the Plaintiff's members –and the out-of-state pork industry to sell into California.

40.     Proposition 12 also added a second set of requirements, the Square Footage Requirements, and specified an effective date of "after December 31, 2021."  These separate requirements state that a breeding pig must be provided with at least 24 square feet of usable floorspace per pig. Cal. Health & Safety Code § 25991(e)(3).

41.     The limited exceptions as applicable here include only the five-day period prior to the expected date of giving birth, during nursing, and for only temporary periods of less than six hours for breeding purposes. Cal. Health & Safety Code § 25992.

42.     Proposition 12 is both a criminal and civil statute. The statute imposes criminal exposure on any person found to be in violation of either the Turn Around Requirements or the Square Footage Requirements, or any provisions of the Act, including penalties against individuals and entities for criminal misdemeanor convictions, a fine of up to $1,000 and/or 180 days imprisonment. Cal. Health & Safety Code § 25993.

43.     These criminal penalties can be assessed against both business owners and operators who are non-compliant with Proposition 12 who choose to "engage in a sale" of pork meat into California. Cal. Health & Safety Code § 25990(a) and (b)(2).

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

44.     The California Penal Code further permits prosecution of individuals outside the state of California who aid and abet those engaged in the sale of meat in violation of Proposition 12.  Under, California Penal Code Section 27(a)(1), "being without this state, cause or aid, advise or encourage, another person to commit a crime within [California], and are afterwards found therein" … "are liable to punishment under the laws of [California]."  Under California Penal Code Section 31, any person aiding and abetting in the commission of a misdemeanor may be charged as a principal of the crime.

45.     The California Penal Code also permits prosecution of individuals outside the state of California who conspire with those engaged in the sale of meat in violation of Proposition 12. Under California Penal Code Section 181, if two or more persons conspire to commit "any act injurious to the public health, the public morals … or the due administration of the laws" they could be punished by imprisonment in county jail for up to one year or by a fine not exceeding $10,000 or by both the imprisonment and fine.

46.     Under California Penal Code Section 184, "[n]o agreement amounts to a conspiracy, unless some act, beside such agreement, be done within [California] to effect the object thereof, by one or more of the parties to such agreement . . .."

47.     Proposition 12 does not define what it means for an individual to be "engaged in" a sale within the State of California, and by Proposition 12's plain language, an out-of-state producer is potentially subject to criminal prosecution for being "engaged in" the chain of sale of non-compliant pork meat into the State of California. Cal. Health & Safety Code § 25990(a) and (b)(2).

48.     Facilities and housing conditions for breeding pigs and piglets are complex animal care conditions and based on years of continuous scientific improvement.  Proposition 12 does not define what it means for facilities to comply with one or either of the two requirements.

49.     Proposition 12 does not clearly define whether the requirements apply to the life of the breeding pig or whether moving a breeding pig to a new compliant facility will suffice for the production of compliant whole pork for sale into California.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

50.     Further, Proposition 12 does not define what qualifies as specific violation of the Act. For example, it remains vague as to whether a single violation is based on each sale, each pound or piece of meat, or each breeding pig.

51.     Due to the vagueness of these requirements in the Proposition 12 statute – and the nuances of the appliable exceptions – Proposition 12 mandated that "the Department of Food and Agriculture and the State Department of Public Health shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019." Cal. Health & Safety Code § 25993.

52.     Additionally, the sale of non-compliant pork meat qualifies as unfair competition, as defined in Section 17200 of the Business and Professions Code, and is punishable as prescribed in Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code.  It provides violators are separately subject to a $2,500 fine per violation under the state Consumer Protection Act. Cal. Health & Safety Code § 25993.

53.     Unfair competition shall mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter 1 (commencing with Section 17500) of Part 3 of Division 7 of the Business and Professions Code. Cal. Bus. & Prof. Code § 17200.

54.     The California Business and Professions Code permits the California attorney general, any district attorney, county counsel, city attorney, city prosecutor, and even *any person* who can meet standing requirements to file a lawsuit to enforce the provisions of the chapter.  Cal. Bus. & Prof. Code § 17203.

55.     While Proposition 12 mandated Final Regulations for the Act, the Turn Around Requirements' effective date of December 19, 2018 was immediate and left no time for the CDFA and CDPH to promulgate the rules and regulations, let alone time for Plaintiff's members or the out-of-state pork industry to comply.

56.     Proposition 12's mandated deadline of September 1, 2019 for the Final Regulations passed without even *draft* rules or regulations published, let alone Final Regulations.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

57.     On March 5, 2021 of this year, CDFA issued FAQs to the public. *See* CDFA AHFSS Animal Care Program Prop 112 FAQ, (March 5, 2021), https://www.cdfa.ca.gov/AHFSS/pdfs/Prop_12_FAQ_March_2021.pdf. These FAQs did not address the most material questions by Plaintiffs or the industry ("CDFA FAQs").  The short document failed to provide any guidance needed for compliance with Proposition 12.

58.     Within the CDFA FAQs, a question was posed regarding potential sell through of whole pork meat that was non-compliant with the Square Footage Requirements.  CDFA stated that because the effective date of the Square Footage Requirements goes into effect on January 1, 2022, pork meat in inventory or commerce on December 31, 2021 would be legal to sell in California. However, this month CDFA has consistently said to the public that their position, like their FAQ answer, only applies to the Square Footage Requirements and that whole pork meat cannot be sold into California now or after January 1, 2022 that is not incompliance with the Turn Around Requirements as of December 19, 2018.  This requirement renders all current whole pork meat for out-of-state producers non-compliant, not even allowing legal sell through for current pigs born prior to January 1, 2022, currently alive on farms or within the supply chain.

59.     One year and nine months past the statutory deadline, just this year, on May 28, 2021, the CDFA published the Proposed Regulations to consider for Proposition 12.

60.     After a public comment period and required public hearing, CDFA now has stated to numerous companies in the industry that the current Proposed Regulations will not be finalized. According to CDFA, *new* draft rules and regulations are forthcoming again and, thus, will not be finalized until, at the earliest, some time into 2022.   Thus now, the second set of requirements of Proposition 12, the Square Footage Requirements, will go into effect on January 1, 2022 without the Final Regulations and without any of the clarification or cure needed for the underlying vague statute.

61.     In the meantime, the threat of enforcement of the Act remains and is imminent, as any district attorney, local prosecutor or the Attorney General's office, can criminally indict those selling – or involved in the food supply chain selling – into California. Further, the risk of civil enforcement and private party claims under the California Business & Professions Code also are

imminent risks. On information and belief, no statutory enforcer of Proposition 12 has disclaimed its authority or ability to initiate criminal or civil actions.

62.     Even the current Proposed Regulations demonstrate the discriminatory intent of Defendants as they threaten to impose onerous registration and certification requirements on out-of-state producers and directly regulate extraterritorial conduct. For example, the Proposed Regulations make clear that California intends to require out-of-state producers to comply with certification requirements through private third-party certifiers, and to keep up with recordkeeping and reporting requirements including annual distributor registration and renewal forms submitted to the department in order to sell into the state. *See* 2021 CA REG TEXT 584571 (NS) at 13.

63.     Not only are out-of-state producers required to comply with registration and certification requirements according to the current Proposed Regulations, but any producer wishing to sell into the state will be subject to the Departments' "routine and risk-based audits and inspections of farms." This means that California currently plans to have California state officials or direct third-party certifiers go on to out-of-state farms to ensure that they are in compliance with Proposition 12.

64.     Proposition 12's vague language and CDFA and CDPH's failure to publish the Final Regulations, unquestionably leaves the law vague for any reasonable compliance by Plaintiff's members and anyone selling or supplying whole pork for sale into California.

65.     Because California producers were already required to comply with the Turn Around Requirements since the passage of Proposition 2, Proposition 12 targeted and applied Turn Around Requirements only for *out-of-state* producers.

66.     The California Legislature recognized that out-of-state producers were at an advantage within the California market and thus enacted Assembly Bill 1437 ("AB1437") with the protectionist intent of leveling the playing field and imposing California's confinement requirements for egg-laying hens on out-of-state producers as well.

67.     AB1437 did *not* apply to pork meat.

68.     After AB1437 was enacted, California proposed Proposition 12, drafted and primarily sponsored by the Humane Society of the United States, which would, like AB1437,

12

regulate pork produced outside of California and, for the first time, subject out-of-state pork producers to California's Turn Around Requirements for breeding pigs if the producer, business owner, or operator desired to sell whole pork meat into or within California.

69.     By California's own admission, if California did not impose Proposition 12's confinement requirements on out-of-state producers as well, in-state farms would "find it more costly to compete with farms outside of the state when selling…whole pork meat…" *See* 2021 CA REG TEXT 584571 (NS) at 13.

70.     Proposition 12 also unquestionably directly and intentionally targeted out-of-state activity, and directly regulates extraterritorial activity, both through the confinement, inspection, and registration requirements and by stifling interstate commerce through the prohibition of sale of non-compliant pork meat into and within California.

## IMMEDIATE IMPACTS OF PROPOSITION 12 ON THE IOWA PORK PRODUCTION INDUSTRY

71.     Nearly one-third of the nation's hogs are raised in Iowa—more than twice the amount of its runner up state—and Iowa has more than 5,400 hog farms, with producers in nearly every county.

72.     In 2020, Iowa sales for the pork industry including hog production totaled $40.8 billion. It also generated $893 million in state and local taxes and $1.3 billion in federal taxes.

73.     In 2020, Iowa had 960,000 breeding pigs and more than 22 million hogs and pigs total on Iowa farms.

74.     The Iowa hog inventory has been growing at a rate of 3% annually for the past decade, compared to a 2% growth rate nationally in the United States market.

75.     As of 2017, 45% of farming operations in Iowa are on farms with between 1,000 and 5,000 hogs and pigs.

76.     The number of smaller farming operations in Iowa has been dwindling since 1997.

77.      Nearly 150,000 jobs within Iowa are associated with the Iowa pork industry, and nearly 1 in 10 working Iowans have a job tied to the pork industry.

78.     Compliance with Proposition 12 requires significant and extremely costly changes

13

to the farming operations of Iowa's pork producers, including Plaintiff's members.

79.     Sows are female pigs utilized for breeding and give birth to the piglets that ultimately become hogs sent to market. Sows are usually maintained on sow-specific farms that are commonly separated from other hog facilities, to prevent the spread of disease, for the safety of the sows, and to increase efficiency. Sows are generally artificially inseminated, litters of piglets are born, and the piglets are raised for three to four weeks before they are weaned.

80.     An overwhelming majority of sow farms use some type of indoor confinement for sow operations, utilizing the benefit of year-round production and protection from seasonal weather changes, disease exposure, and external predators.

81.     Only a small portion of the pigs that are harvested for meat are sows that have been kept for reproduction.

82.     Pursuant to decades of scientific research, industry practice is that the vast majority of all producers house pregnant sows in individual stalls for insemination, throughout pregnancy, and for the first 30 to 40 days after weaning. This practice helps prevent pregnancy loss, critically permits the attachment of embryos, and guards against the high risk of loss of pregnancy caused by aggressive behavior that commonly occurs within larger pens or open/group housing.

83.     The individual stalls also permit sows to recover from weaning, experience reduced stress levels, and receive a proper amount of individualized nutrition at a time when they are vulnerable.

84.     Specifically, housing sows in individual stalls permits producers to carefully provide each sow with the right amount of feed to achieve optimal nutrition. This is difficult in a group housing system and is especially critical to maintain the appropriate body condition right after weaning.

85.     Housing sows in a group pen also threatens worker safety, given the large size of the animals and the need for farm hands to enter the pens with multiple 400-pound animals.

86.     Proposition 12 imposes restrictions that are contrary to current time-tested, science-based, best practices for pork production. Proposition 12, in practical effect, bans the use of individual stalls during breeding and most of the gestation period.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

87.     Further, one interpretation of Proposition 12 means that, after December 31, 2021, Proposition 12 requires that each breeding pig must be allotted at least 24 square feet of usable floor space in the group pen, per pig, subject to limited exceptions.

88.     The offspring of sows are raised to market weight in separate, specialized production facilities, including: (1) feeder pig producers or nurseries; (2) feeder pig finishers; and (3) farrow-to-finish operations. Farrow to finish takes approximately 24-26 weeks.

89.     Once hogs reach harvest weight, they are sent to packing facilities throughout the country. Packing facilities receive hogs from multiple farms, in multiple locations, operated by multiple producers.

90.     A packing facility typically harvests thousands, or even tens of thousands, of hogs daily. Packers process the harvested pigs into whole pork cuts or send them to separate processing facilities. The meat is packed and delivered to wholesale or to large retail customers throughout the entire country and abroad.

91.     Pork product from one hog is cut into many different cuts of meat and shipped to many end users across the country and internationally.

92.     Thus, it is not currently possible to segregate only the pork meat that will ultimately make it to the California market, because packing facilities receive meat from producers nationally, and each hog is cut into many different cuts of meat.

93.     Further, this means that it would be impossible for certain producers to forego the California market because packing facilities cannot track which hogs came from producers complying with Proposition 12. Packing facilities cannot realistically track meat that should go to California, just as it cannot track which meat should not go to California. Practically speaking, this means that packing facilities will need to obtain either all Proposition 12-compliant meat or stop providing pork to California.

94.     Proposition 12 confinement restrictions would require significant changes to the vast majority of pork production operations throughout Iowa, including significant structural changes and the requirement to reduce the number of pigs at the facility. At this time, only an estimated 4% of breeding pigs in the United States are confined in a manner consistent with

15

Proposition 12.

95.     Proposition 12 will also create negative impacts on the breeding pigs that are confined within a group pen, likely resulting in significant health risks and piglet loss.

96.     Group confinement requirements mandated by Proposition 12 create significant ongoing harm to breeding pigs.  Breeding pigs are subject to physical aggression, abuse, losing fetuses in utero, lameness and the inability to obtain proper nutrition when confined in group systems.

97.     Due to not being able to build new barns or retrofit existing barns, it will not be feasible for many members to ever come into compliance with Proposition 12 requirements for a variety of reasons, including lack of space and financial inability. It is expected that smaller pork producers will be those unable to comply with Proposition 12, pushing smaller producers, which are often family farms, out of the industry. This will result in a consolidation of the industry into large producers and will significantly harm many small producers located in Iowa.

98.     Small farm operations are already threatened by bigger producers and small producers have been on the decline for the last twenty-five years. *See* Table, 2020 Iowa Pork Industry Report, May 2020, 21:

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF



**Figure 18, Number of Iowa Hog Operations by Size (1997-2017)**

99.    Producers cannot realistically forego the California market, as the California market makes up 13-15% of the nation's pork consumption market. If forced to exit the California market, many farmers' operations will become cost prohibitive based on loss in revenue from California consumers. Any increased price of pork in California will not be sufficient to offset the cost to come into compliance with Proposition 12. This is because it is impossible to segregate which portions of meat will be sold into the California market alone.

100.    For the minority of producers who may be able to come into compliance, it is estimated that it will cost these producers an increase in capital costs of approximately 50% reflecting the shift from 16 to 24 square feet. Conservatively presuming changes in feed costs, labor costs, herd health, and other expenses besides capital costs, it has been estimated that costs overall would increase by 21% for farrowing operations in Iowa who convert production systems.

101.    In comparison, California producers who already converted sow housing to be compliant with Turn Around Requirements benefitted from the lead time allowed through implementation of Proposition 2. For example, the SRIA (2020) report admitted that California

17

producers who must transition their operations from 20 (the average turn around stall) to 24 square feet only face a 4% increase in total costs and only a 20% increase in capital costs.

102.   Combining the cost of farrow-to-wean operations in Iowa of $33.59 per weaned pig, with the increased percentage costs for compliance with Proposition 12, a conservative estimate results in the cost of producing a weaned pig in Iowa compliant with Proposition 12 to increase by at least $7.05 per weaned pig.

103.   Considering the aggregate number of weaned pigs being 25 million per year in Iowa, this results in an annual approximate aggregate cost impact to Iowa pork producers of at least $176 million.

104.   This increased cost cannot be recovered from Defendants due to California's sovereign immunity, precluding the recovery of monetary damages by Plaintiff's members.

105.   Or, alternatively, to come into compliance, many producers will need to limit their supply so that their pigs will have more space, as many do not have the option to buy more real estate. This means that the national pork supply will drop.

## IMMEDIATE NATIONWIDE IMPACTS OF PROPOSITION 12 ON PORK PRODUCTION INDUSTRY

106.   Proposition 12's application to out-of-state producers will have a direct impact on nationwide pricing of pork, the national pork supply and consumers nationwide.

107.   The sale of whole pork meat is a nationwide, regulated commodity, which requires nationwide regulation rather than state-by-state mandates.

108.   The implementation and enforcement of Proposition 12 would result in higher pork prices for consumers nationwide and less pork being available for purchase.

109.   Annual consumer losses of over $34 million would occur across four California retail pork markets, in comparison to $303 million dollars in annual consumer losses across 47 examined U.S. markets outside of California, directly as a result of Proposition 12 being implemented.

110.   Even if producers were able to forego the California market, there would be drastic impacts on the nationwide pork industry and further irreparable harm to small pork producers. The

18

remaining nation would need to absorb the additional supply of pork, which would result in a 25% reduction in farm receipts. Again, the smaller producers are most threatened, likely unable to sustain the losses and would be forever forced out of the market.

111.   Plaintiff's members are further at risk of being subject to conflicting laws throughout the remaining United States. The conduct that California seeks to prohibit actually occurs primarily out of state, and for the Plaintiff members, it occurs primarily in Iowa. Plaintiff members' sow housing is not subject to Turn Around Requirements or Square Footage Requirements in Iowa. As a result, California is attempting to regulate sow confinement everywhere in the country because of the nature of the pork industry where pork processors are dividing cuts of a hog into multiple different cuts that are sent to multiple different locations nationwide. This necessarily creates a national regulation that invites inconsistent regulation of activities that are inherently national or require a uniform system of regulation.

112.   Thus, Plaintiff's members face immediate and irreparable harm if Proposition 12 continues to go into effect as planned and further enforced. Injunctive relief will remedy this harm.[1]

## STANDING

113.    IPPA brings this suit on behalf of its members.  Plaintiff's members have suffered, and will continue to suffer, concrete and particularized injuries that are a direct result of Proposition 12. Their injuries will be redressed by a decision of this Court.

114.   IPPA has associational standing to challenge Proposition 12 on behalf of its members and on behalf of the entity itself.

115.   One or more IPPA members has standing to bring this action in their own right. Thousands of IPPA members are directly subject to Proposition 12 because they breed or raise pigs that are being sold into and within California.

116.   The interests Plaintiff seeks to protect are germane to Plaintiff's mission statement and purpose.

117.   Individual participation by Plaintiff's members is not required for the claims asserted or the relief requested.

---

[1] Plaintiff will separately file a Motion for Preliminary and Permanent Injunction following service on Defendants.

19

118.    Plaintiff's members supply pork to be sold into and within California, and expect to continue to do so after January 1, 2022. A criminal prosecution or enforcement by Defendants against Plaintiff's members is not required to challenge the constitutionality of Proposition 12. A person or entity is not required to suffer the irreparable harm of being criminally accused and charged before raising a challenge to unconstitutionally vague law.

119.    The vast majority of Plaintiff's members are currently raising breeding pigs that do not meet Proposition 12's requirements.

120.    Plaintiff's members cannot realistically change the confinement of these breeding pigs to come into compliance with Proposition 12's Square Footage Requirements or Turn Around Requirements as required on or before December 31, 2021.

121.    In California, meat cannot be sold if it comes from a breeding pig that has been in confinement contrary to Proposition 12.

122.    Plaintiff's members thus face imminent and irreparable Hobson's choice of: (1) being forced to harvest their breeding pigs in order to enter the California market, which makes up 13-15% of the national market, (2) ceasing operations, or (3) being forced to forgo one of the largest pork consumption markets in the nation at crippling expense.

123.    California has admitted the Turn Around Requirements went into effect December 19, 2018, thereby creating immediate risk for criminal and civil prosecution for all of Plaintiff's members.

124.    Further, the entire national market for pork is threatened to be irreparably harmed if Proposition 12 goes into effect, with impacts on nationwide consumers who had no involvement in the passage of Proposition 12.

125.    These injuries will be remedied by the relief sought in this action.

**FIRST CAUSE OF ACTION**
**VIOLATION OF THE DUE PROCESS CLAUSE (42 U.S.C. § 1983)**
**(FACIAL AND AS APPLIED CHALLENGE)**

126.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-125 as though fully set forth herein.

20

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

127.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff, including by violating Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

128.    Proposition 12 violates the Due Process Clause because it is unconstitutionally vague on its face and criminalizes behavior without giving individuals of ordinary intelligence a reasonable opportunity to know what conduct is prohibited, so that they may act accordingly.

129.    Proposition 12 is also unconstitutionally vague as applied to Plaintiff's members' specific conduct in pig production, because under the plain text of the Act, it is unclear whether Plaintiff's members' specific actions are currently subject to criminal prosecution and penalties if their pork is sold into California.

130.    Proposition 12 does not define the conduct it prohibits with sufficient definiteness and does not establish minimum guidelines to govern law enforcement.

131.    Proposition 12 fails to define the material words and terminology in the statute so that Plaintiff's members and the pork industry can comply with the legal requirements and not inadvertently violate the law.

132.    For a statute to be unconstitutional for due process, a criminal prosecution or enforcement is not required, enforcement must just be imminent or the legal authority to enforce must be available to the law enforcement authorities.   A person and entity is not required to suffer the irreparable harm of being criminally accused and charged before raising a challenge to an unconstitutionally vague law.

133.    Proposition 12 itself recognized the vagueness of the Act and mandated the CDFA and CDPH to jointly promulgate rules and regulations for the implementation of the Act by September 1, 2019.

134.    Proposition 12's mandate for the promulgation of the Final Regulations functions as its own admission of the vagueness of the Act.

135.    Because the Turn Around Requirements went into effect just six weeks after Proposition 12 passed by ballot imitative, CDFA and CDPH did not have time to promulgate the rules.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

136.    Proposition 12's effective date of December 19, 2018 is contradictory to its own mandate to promulgate Final Regulations for the entirety of "this Act," i.e. *both* requirements of the Act, by December 19, 2018.

137.    Proposition 12's Turn Around Requirements went into immediate effect without giving the public, including the Plaintiff, an opportunity to be heard in the rule and regulation process.

138.    Proposition 12's Turn Around Requirements went into immediate effect without allowing time for compliance or time for the promulgation of the needed rules to cure the underlying vague statute so that out-of-state producers could comply.

139.    The CDFA and CDPH further failed to implement the mandated rules and regulations by the Act's deadline September 1, 2019.

140.    On January 1, 2022, just weeks away, the Square Footage Requirements will go into effect without the Final Regulations to cure the unconstitutionally vague Act.

141.    Proposition 12 is a criminal statute. The text of Proposition 12 provides that "any person who violates any of the provisions of this chapter is guilty of a misdemeanor" and subjects those persons upon conviction to a fine of up to $1,000 or by imprisonment for a period not to exceed 180 days.

142.    Proposition 12 threatens to criminally punish conduct in which the Plaintiff's members are engaged.

143.    California aiding, abetting and conspiracy statutes further extend the enforcement capabilities of the Act to unknown persons and parties.

144.    The current Proposed Regulations, at a minimum, make clear of Defendants' intent to reach well into the supply chain and down into the farms of the Plaintiff's members, directly reaching beyond its borders.

145.    Any district attorney, local prosecutor or the Attorney General's Office can enforce Proposition 12. CDFA itself has warned of this imminent risk of prosecution and enforcement by law enforcement agencies, despite the Final Regulations not yet being issued.

146.    Defendant CDFA has no control over these enforcement agencies who have

22

1    authority under the Act for enforcement of Proposition 12.

2       147.    Further, Defendant CDFA's Animal Care Program (ACP), which was formed to

3    implement Proposition 12, issued FAQs on March 5, 2021, *See* CDFA AHFSS Animal Care

4    Program       Prop       112       FAQ,       (March       5,       2021),

5    https://www.cdfa.ca.gov/AHFSS/pdfs/Prop_12_FAQ_March_2021.pdf.    Within    the    FAQs,    a

6    question was posed regarding potential sell through of whole pork meat that was non-compliant

7    with the Square Footage Requirements. It states, Q. "Will inventory of shell eggs, liquid eggs and

8    pork meat already in stock prior to January 1, 2022 need to be discarded if this covered product

9    originated from animals not raised according to the confinement standards of cage-free for hens

10   and twenty-four square feet per breeding pig?"  A. "No. The definition of "confined in a cruel

11   manner" changes at the end of the day on December 31, 2021 for egg-laying hens and breeding

12   pigs. Therefore, the shell eggs, liquid eggs and pork meat already in inventory or commerce on

13   December 31, 2021 will still be legal to sell in California." While this FAQ speaks to the Square

14   Footage Requirements, it does not speak to the Turn Around Requirements.  Defendant CDFA's

15   position is that pork not compliant with the Turn Around Requirements cannot be sold now or after

16   January 1, 2022.  Thus, this sell through allowed for existing inventory that is not compliant with

17   the Square Footage Requirements is meaningless to Plaintiff's members, as only California in-state

18   producers are in compliance with the Turn Around Requirements. Yet, there is confusion amongst

19   Plaintiff's members and the industry.

20      148.    The Defendants do not have the authority to amend the effective dates of the Act.

21   The effective dates of both the two Proposition 12 requirements can only be changed by a vote of

22   4/5ths of the legislature, and even that is arguably not possible, as Proposition 12 states that "any

23   amendment of this act shall be consistent with and further the purposes of this act."

24      149.    As of the date of filing this Complaint, no pending bill exists before the California

25   Legislature to amend the effective date of either the Turn Around Requirements or Square Footage

26   Requirements.

27      150.    Despite the failure to promulgate the rules, CDFA's ACP informed the public that

28   "with the respect to a delay in enforcement, ACP does not have authority to extend the compliance

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

deadlines provided for in the statute established under Proposition 12 for covered animals and covered products."

151.    Proposition 12 allows for arbitrary, inconsistent, and discriminatory enforcement by Defendants, by other parties, and law enforcement authorities who are left to determine who and when they can prosecute the Act.  Each can proceed without the promulgation of the Final Regulations.

152.    California has failed to cure the unconstitutional vagueness of Proposition 12 with the promulgation of the rules.  Due to CDFA and CDPH's failure to promulgate the rules as mandated by Proposition 12, and due to the length of time involved in the breeding cycle for sows and the time from farrowing to finish for pork processing, a person of ordinary intelligence does not have adequate notice of or time to comply with either the Turn Around Requirements that CDFA states are in effect now or the Square Footage Requirements going into effect on January 1, 2022.

153.    As a result of CDFA and CDPH's failure to promulgate the Final Regulations as mandated by its own ballot initiative passed by its citizens, Proposition 12 lacks sufficient definiteness and specificity to inform those who may be subject to the law to avoid violating the law or provide persons of ordinary intelligence adequate notice to know what conduct is criminalized and what constitutes a violation of the statute.

154.    Plaintiff's members have a constitutional right to liberty to be free from the risk of imminent criminal prosecution and the consequences of the enforcement of a facially vague law.

**SECOND CAUSE OF ACTION**
**VIOLATION OF THE DUE PROCESS CLAUSE (42 U.S.C. § 1983) (FAILURE TO PROMULGATE THE RULES AS MANDATED)**

155.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-154 as though fully set forth herein.

156.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff, including by violating Plaintiff's rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

24

157.    Proposition 12 violates the Due Process Clause because the CDFA and CDPH failed to promulgate the Final Regulations as of the date of this filing as mandated by the Act and required by law.

158.    The Turn Around Requirements went into immediate effect on December 19, 2018 and the Square Footage Requirements will go into effect on January 1, 2022 without the mandated promulgation of the Final Regulations or allowing any period of time for Plaintiff's members or the industry to comply.

159.    Proposition 12 mandated CDFA and CDPH to jointly promulgate the Final Regulations for the implementation of the Act by September 1, 2019.

160.    Yet, because the Turn Around Requirements went into effect just six weeks after Proposition 12 passed by ballot initiative, CDFA and CDPH did not have time to promulgate the Final Regulations.

161.    Proposition 12's effective date of December 19, 2018 for the Turn Around Requirements is contradictory to its own mandate to promulgate Final Regulations for the entirety of "this Act," i.e. *both* requirements of the Act, by September 1, 2019.

162.    Proposition 12's Turn Around Requirements went into immediate effect without giving the public, including the Plaintiff, an opportunity to be heard in the required rule and regulation making process.  Proposition 12's Turn Around Requirements also went into immediate effect without allowing time for compliance with the Act or any forthcoming Final Regulations.

163.    The CDFA and CDPH further failed to implement the mandated Final Regulations by the Act's deadline of September 1, 2019.  The deadline passed without CDFA or CDPH even issuing draft Proposed Regulations.

164.    On May 28, 2021, CDFA and CDPH issued draft Proposed Regulations.  However, CDFA stated just this month that these will not be finalized and that new draft Proposed Regulations will be issued and *if* these can be finalized, the Final Regulations will not be published and promulgated until later in 2022.

165.    CDFA and CDPH failed to promulgate the Final Regulations as of the date of this filing or issue the draft, revised Proposed Regulations.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

166.    On January 1, 2022, just weeks away, Proposition 12's second requirement, the Square Footage Requirements, will go into effect without the required Final Regulations.

167.    Even just for the Square Footage Requirements, California voters approved Proposition 12 with the mandate that an absolute minimum of two years and four months be given to pork producers to comply after the Final Regulations were published.

168.    However, because of the Act's contradictory nature of an immediate effective date of the Turn Around Requirements – and because CDFA and CDPH failed to otherwise promulgate the Final Regulations by the Act's deadline or even by the Square Footage Requirements' effective date, the entire Act will be in effect without the Final Regulations and without giving Plaintiff's members or the pork industry any time to comply, providing any district attorney, local prosecutor or the Attorney General's Office the authority to enforce Proposition 12 against the Plaintiff's members or those producing and selling meat into California throughout the industry.

169.    The Defendants do not have the authority to amend the effective dates of the Act. The effective dates of Proposition 12 requirements can only be changed by a vote of 4/5ths of the legislature, and even that is arguably not possible, as Proposition 12 states that "any amendment of this act shall be consistent with and further the purposes of this act." Cal. Health & Safety Code 25993.

170.    As of the date of filing this Complaint, no pending bill exists before the California Legislature to amend the effective date of either the Turn Around Requirements or Square Footage Requirements.

171.    Despite the failure to promulgate the Final Regulations, CDFA informed the public that "with the respect to a delay in enforcement, [CDFA] does not have authority to extend the compliance deadlines provided for in the statute established under Proposition 12 for covered animals and covered products."

## THIRD CAUSE OF ACTION
## VIOLATION OF THE PRIVILEGES AND IMMUNITIES CLAUSE (42 U.S.C. § 1983)

172.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-171 as though fully set forth herein.

COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

173.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against IPPA individual members, including by violating these individual members' rights under the Privileges and Immunities Clause at Article IV, Section 2 of the United States Constitution.

174.    Article IV, § 2 of United States Constitution states "[t]he Citizens of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

175.    The right to pursue a common calling, such as to pursue a trade, practice an occupation, or pursue a common calling within the state is a fundamental right protected by the Privileges and Immunities Clause.

176.    Prior to the passage of Proposition 12, pork producers within California had already been subject to the Turn Around Requirements since 2015 through the enactment of Proposition 2.

177.     Proposition 12 was passed on November 18, 2018, and for the first time targeted out-of-state producers by subjecting them to the onerous Turn Around Requirements and additional Square Footage Requirements in order to sell pork into and within California.

178.    Proposition 12 discriminates against out-of-state producers by immediately prohibiting the sale of whole pork within California that does not comply with the Turn Around Requirements, without providing out-of-state producers with the same six years to come into compliance with these Turn Around Requirements that was afforded to in-state producers.

179.    Proposition 12 thus serves as a proxy for differential treatment and discriminates in practical effect against out-of-state producers.

180.    Proposition 12 further carries a facial discriminatory purpose in avoiding "negative fiscal impacts" to the State of California.

181.    Proposition 12 was designed to take away an economic advantage that out-of-state pork producers had by not being required to comply with the Turn Around Requirements in order to sell whole pork meat into California.  Proposition 12 favors in-state pork producers, who had been subject to Turn Around Requirements since January 1, 2015, and on notice of the Turn Around Requirements since 2008, by giving them an advantage in the California market to continue to sell pork while having a significantly longer time to come into compliance.

182.   Proposition 12, on its face, does not delay the enforcement of the Turn Around Requirements for breeding pigs or their offspring sold within California to out-of-state producers.

183.   Accordingly, Proposition 12 provided no time for out-of-state producers to come into compliance with the Turn Around Requirements allowed to in-state producers.

184.   Sufficient justification does not exist to discriminate against out-of-state producers.

**FOURTH CAUSE OF ACTION**
**PREEMPTION BY PACKERS AND STOCKYARDS ACT**
**(42 U.S.C. § 1983)**

185.   Plaintiff incorporates the facts set forth in Paragraph Nos. 1-184 as though fully set forth herein.

186.   Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff's members, including by violating Plaintiff's members' rights under the Supremacy Clause at Article VI, Clause 2 of the United States Constitution.

187.   The Supremacy Clause of the United States Constitution provides that the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that conflicts with a federal law.

188.   A state law conflicts with federal law and thus is preempted when it is not possible for an individual to comply with both state and federal law.

189.   California enacted Proposition 12 on November 6, 2018, which prohibits the sale of meat by any business owner or operator from an animal that was not confined in accordance with Proposition 12.

190.   California pork producers have been on notice since 2008 that they will need to come into compliance with the Turn Around Requirements.

191.   Out-of-state pork producers are unable to come into compliance and thus will not be able to sell their meat into or within the California market.

192.   Proposition 12 therefore requires business owners and operators engaged in the sale of meat to favor in-state producers who were allowed six years to come into compliance with

28

Proposition 2 Turn Around Requirements.

193.    This favoritism toward California producers will create unfair competition with out-of-state producers, potentially regardless of the price of meat.

194.    The Packers and Stockyards Act, 7 U.S.C. § 192(b) prohibits any wholesaler of meat from providing any preference to a particular locality and from subjecting any particular locality to a "disadvantage" in the sale of meat.

195.    Proposition 12 directly requires wholesalers to favor in-state pork producers and to disadvantage the out-of-state pork producers who have not had as much time to come into compliance with the Turn Around Requirements and now, the Square Footage Requirements.

196.    Thus, it is impossible for a wholesaler to comply with both Proposition 12 and the Packers and Stockyards Act.

197.    At a minimum, Proposition 12 creates hurdles to comply with the Packers and Stockyards Act and Proposition 12.

198.    Further, the Packers and Stockyards Act prohibits wholesalers from taking action that will result in a restraint on Trade, 7 U.S.C. §§ 192 (c)-(e).

199.    By refusing to sell meat from animals that were not confined in accordance with Proposition 12, wholesalers will be engaged in conduct that restrains trade based on the impacts on interstate commerce in the pork industry. These impacts include forcing small businesses out of the market, passing along increased costs to consumers, and reducing the supply of pork meat in the market.

200.    Proposition 12 is therefore preempted by the Packers and Stockyards Act.

**FIFTH CAUSE OF ACTION**
**VIOLATION OF THE COMMERCE CLAUSE (42 U.S.C. § 1983)**

201.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-200 as though fully set forth herein.

202.    Defendants, acting under color of state law, have committed, and will continue to commit, multiple constitutional torts against Plaintiff, including by violating Plaintiff's rights under the Commerce Clause at Article I, Section 8 of the United States Constitution.

29

203. Proposition 12 violates the Commerce Clause, as it includes both a discriminatory purpose and effect.

*Proposition 12 Discriminates Against Out-of-State Producers in Practical Effect*

204. California enacted Proposition 12 on November 6, 2018, which, for the first time, prohibits business owners and operators from engaging in the sale of whole pork meat from animals confined in a cruel manner, regardless of where the animal was confined.

205. Prior to the passage of Proposition 12, pork producers within California were already subject to the Turn Around Requirements through the enactment of Proposition 2.

206. Proposition 12's effect thus unlawfully favors in-state pork producers, who had been on notice of the Turn Around Requirements since 2008, by giving them an advantage in the California market to continue to sell pork while having until 2015 to come into compliance with the Turn Around Requirements.

*Proposition 12's Purpose is to Discriminate Against Out-of-State Producers, and it is Facially Discriminatory*

207. The Proposed Regulations acknowledge Proposition 12 is a protectionist trade barrier with a discriminatory purpose.

208. For example, the CDFA explicitly noted that, unless out-of-state farmers are required to comply with the confinement requirements as well, "[i]n-state farms will find it more costly to compete with farms outside of the state when selling…whole pork meat to an out of state buyer compared to farms located in states that do not have the same animal confinement standards as described in the Act." 2021 CA REG TEXT 584571 (NS) at 13.

209. This, combined with one singular stated purpose within the Act to "avoid negative fiscal impacts to the State of California," portrays the discriminatory purpose.

210. Further, the ballot initiative record was devoid of actual proof that Proposition 12 would actually accomplish the goals it intended (i.e. to protect farm animals from cruel confinement practices, avoid foodborne illness and negate negative fiscal impacts to California).

211. By California's own admission, Proposition 12 provides no real health or safety benefit to its residents. See 2021 CA REG TEXT 584571 (NS) at 14 ("This proposal does not

directly impact human health and welfare of California residents, worker safety, or the State's environment.").

*Proposition 12 Unlawfully Regulates Conduct Extraterritorially and Any Local Benefits are Outweighed by the Burdens Imposed on Interstate Commerce*

212.    The Act and corresponding Proposed Regulations directly regulate extraterritorial conduct wholly outside of California by placing onerous certification, registration, and recordkeeping requirements on out-of-state producers to force out-of-state merchant[s] to seek regulatory approval [within California] before undertaking a transaction in California.

213.    Even further, the Proposed Regulations also require out-of-state producers to open up their farms—regardless of where in the country they are located—to inspections by California officials and potentially third-party certifiers. These Proposed Regulations were only proposed in May of 2021 and indicated for the first time just how far beyond California's borders Proposition 12 intends to reach.

214.    The Act itself further targets and regulates extraterritorial conduct through having a direct impact on both the price of pork and the pork consumer, nationwide.

215.    Proposition 12 has other impacts on out-of-state commerce in a manner that wholly regulates conduct that occurs extra-territorially. If Proposition 12 goes into effect, it will have an impact on the national market of pork production, including: decreasing supply, forcing small pork producers out of the market, consolidating pork production into large producers, altering sales in all remaining states to conform to Proposition 12 confinement standards, altering packers' practices to conform to Proposition 12 confinement standards, and ultimately resulting in nationwide increases in the costs of pork meat that will be passed along to consumers nationwide.

216.    In effect, California is forcing the entire nation's pork production chain to adopt its regulations for pork production and is no longer permitting each state to set its own regulatory scheme.

217.    These burdens on commerce, which impact all stages of the pork production market, clearly outweigh any local benefit—which benefit does not exist.

1

2

## SIXTH CAUSE OF ACTION
## DECLARATORY RELIEF (CALIFORNIA CODE OF CIVIL PROCEDURE § 1060)

3      218.    Plaintiff incorporates the facts set forth in Paragraph Nos. 1-217 as though fully set

4  forth herein.

5      219.    An actual controversy has arisen and now exists between Plaintiff's members and

6  Defendants concerning whether Proposition 12 violates Plaintiff's members' due process rights

7  both facially and as applied as set forth in the First Cause of Action, both under the U.S.

8  Constitution's Due Process Clause and under Article 1, Section 7 of the California Constitution.

9      220.    An actual controversy has arisen and now exists between Plaintiff's members and

10  Defendants concerning whether because Proposition 12 is already in effect, and the Square Footage

11  Requirements go into effect January 1, 2022, Defendants' failure to promulgate Final Regulations

12  as mandated by September 1, 2019 violates Plaintiff's members' due process rights as set forth in

13  the Second Cause of Action, both under the U.S. Constitution's Due Process Clause and under

14  Article 1, Section 7 of the California Constitution.

15      221.    An actual controversy has arisen and now exists between Plaintiff's members and

16  Defendants concerning whether Proposition 12 violates Plaintiff's members' privileges and

17  immunities as set forth in the Third Cause of Action, both under the U.S. Constitution's Privileges

18  and Immunities Clause and under Article 3, Section 1 of the California Constitution.

19      222.    An actual controversy has arisen and now exists between Plaintiff's members and

20  Defendants concerning whether Proposition 12 is preempted by federal law as set forth in the

21  Fourth Cause of Action, both under the U.S. Constitution's Supremacy Clause and under Article 3,

22  Section 1 of the California Constitution.

23      223.    An actual controversy has arisen and now exists between Plaintiff's members and

24  Defendants concerning whether Proposition 12 is a violation of the dormant Commerce Clause as

25  set forth in the Fifth Cause of Action, both under the U.S. Constitution's Commerce Clause and

26  under Article 3, Section 1 of the California Constitution.

27      224.    An actual controversy has arisen and now exists between Plaintiff's members and

28

32

Defendants concerning Proposition 12 enforcement, as the Defendants' position is that Proposition 12 can be immediately enforced—and the requisite enforcement agencies and private parties have the authority to enforce currently any violations of the Turn Around Requirements; and will have the expanded authority to enforce the Square Footage Requirements after January 1, 2022.

225.    When California voters approved Proposition 12, the statutory text stated that CDFA and CDPH "shall" promulgate regulations by September 1, 2019 for "this Act." Yet, the Turn Around Requirements went into effect almost immediately for out-of-state producers and no time was given to allow for the Final Regulations to be published to guide those "engaged in the sale" of whole pork meat. The voters also clearly contemplated allowing *at least* two years and four months for compliance with Square Footage Requirements by mandating publication of the Final Regulations by September 1, 2019 and not having the Square Footage Requirements effective until January 1, 2022. Yet, California did not promulgate the Final Regulations by September 1, 2019, or even by the date of this filing, and have stated that Final Regulations will not be published by January 1, 2022 when the second provision of Proposition 12, the Square Footage Requirements, now goes into effect.

226.    Given Defendants' failure to promulgate Final Regulations by the statutory deadline, let alone even by the Square Footage Requirement effective date, those affected by Proposition 12, including Plaintiff's members, will not have regulations in place to know what constitutes a violation of Proposition 12, not to mention the two years and four months the voters specifically approved.  The Plaintiff's members—and those they partner with within the supply chain—are left fully exposed against the risk of immediate enforcement of the Act.

227.    Plaintiff's members have no plain, speedy, and adequate remedy in the ordinary course of law.

228.    Plaintiff's members are therefore entitled to a judicial declaration of their rights and the duties of Defendants under Section 1060 of the Code of Civil Procedure.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court set this matter for hearing on a preliminary injunction following review of Plaintiff's separate Motion for Preliminary and Permanent

33

1    Injunction, and award the following relief:

2       1.    At a minimum, issue an immediate stay of enforcement of Proposition 12 for a

3             minimum period of two years and four months from the date the Final Regulations

4             are promulgated.

5       2.    Issue a preliminary and permanent injunction prohibiting the enforcement of

6             Proposition 12, its policies, practices and customs by Defendants, employees and

7             agents, and all persons acting in privity and/or in concert with them (including

8             private enforcers bringing claims pursuant to the Unfair Competition Law or any

9             other applicable law);

10      3.    Issue an emergency restraining order temporarily enjoining the enforcement of

11            Proposition 12 if the preliminary injunction hearing cannot occur prior to January 1,

12            2022;

13      4.    Enter judgment declaring that Proposition 12 and related policies, practices and

14            customs of the Defendants violate the United States Constitution and may not be

15            lawfully enforced, both now and in the future;

16      5.    Grant Plaintiff reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988

17            and Section 1021.5 of the California Code of Civil Procedure; and

18      6.    Any further relief that the Court deems just and equitable.

19   Dated: November 9, 2021.

20
                                        IOWA PORK PRODUCERS
21                                      ASSOCIATION,  Plaintiff.

22                                      By: */s/  Trenton H. Norris*
                                            Trenton H. Norris (SBN 164781)
23                                          Peg Carew Toledo (SBN 181227)
                                            Willis M. Wagner (SBN 310900)
24                                          Arnold & Porter Kaye Scholer LLP
                                            Three Embarcadero Center, 10th Floor
25                                          San Francisco, California 94111
                                            Telephone: +1 415.471.3100
26                                          Facsimile: +1 415.471.3400
                                            Trent.Norris@arnoldporter.com
27                                          Peg.Toledo@arnoldporter.com
                                            Will.Wagner@arnoldporter.com
28

                                        34
     COMPLAINT FOR PRELIMINARY AND PERMANENT INJUNCTIVE AND DECLARATORY RELIEF

and

Marnie A. Jensen (NE 22380)
(*pro hac vice pending*)
Ryann A. Glenn (NE 26160)
(*pro hac vice pending*)
HUSCH BLACKWELL LLP
13330 California Street, Suite 200
Omaha, NE 68154
Telephone:  (402) 964-5000
Facsimile:  (402) 964-5050
marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com

and

Eldon L. McAfee (AT0004987)
(*pro hac vice pending*)
Julie L. Vyskocil (AT0009711)
(*pro hac vice pending*)
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
Telephone: (515) 271-5916
Facsimile: (515) 274-1488
eldon.mcafee@brickgentrylaw.com
julie.vyskocil@brickgentrylaw.com

*Attorneys for Iowa Pork Producers
Association*

35

1

### **VERIFICATION**

2    I, Pat McGonegle, am the Chief Executive Officer of Plaintiff Iowa Pork Producers

3 Association. I have read the foregoing Verified Complaint for Preliminary and Permanent

4 Injunctive and Declaratory Relief ("Complaint") and am familiar with its contents. I am informed

5 and believe that the matters set forth in the Complaint are true and on that ground allege them to

6 be true.

7    I declare under penalty of perjury under the laws of the State of California that this

8 verification is true and correct and was executed by me on November _8_, 2021, in

9 _Clive_, Iowa.

10

11

12                                             Pat McGonegle / IPPA Chief Executive Officer

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

VERIFICATION

CM-010

| ATTORNEY OR PARTY WITHOUT ATTORNEY (Name, State Bar number, and address): | FOR COURT USE ONLY |
|---|---|
| Trenton H. Norris (SBN 164781); Peg Toledo (SBN 181227); Willis Wagner (SBN 310900)<br>Arnold & Porter Kaye Scholer LLP<br>Three Embarcadero Center, 10th Floor, San Francisco, CA 94111<br>TELEPHONE NO.: 415-471-3100 FAX NO. (Optional):<br>E-MAIL ADDRESS: trent.norris@arnoldporter.com, peg.toledo@arnoldporter.com<br>ATTORNEY FOR (Name): IOWA PORK PRODUCERS ASSOCIATION | E-FILED<br>11/9/2021 2:20 PM<br>Superior Court of California<br>County of Fresno<br>By: Jamie Nelson, Deputy |

SUPERIOR COURT OF CALIFORNIA, COUNTY OF FRESNO
STREET ADDRESS: 1130 O Street
MAILING ADDRESS:
CITY AND ZIP CODE: Fresno, CA 93724
BRANCH NAME: B.F.Sisk Courthouse

CASE NAME:
IOWA PORK PRODUCERS ASSOCIATION v. ROB BONTA, et al.

| CIVIL CASE COVER SHEET | | Complex Case Designation | | CASE NUMBER: |
|---|---|---|---|---|
| ☒ Unlimited<br>(Amount<br>demanded<br>exceeds $25,000) | ☐ Limited<br>(Amount<br>demanded is<br>$25,000) | ☐ Counter ☐ Joinder<br>Filed with first appearance by defendant<br>(Cal. Rules of Court, rule 3.402) | | 21CECG03339 |
| | | | | JUDGE:<br>DEPT.: |

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
☐ Auto (22)
☐ Uninsured motorist (46)
**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
☐ Asbestos (04)
☐ Product liability (24)
☐ Medical malpractice (45)
☐ Other PI/PD/WD (23)
**Non-PI/PD/WD (Other) Tort**
☐ Business tort/unfair business practice (07)
☐ Civil rights (08)
☐ Defamation (13)
☐ Fraud (16)
☐ Intellectual property (19)
☐ Professional negligence (25)
☐ Other non-PI/PD/WD tort (35)
**Employment**
☐ Wrongful termination (36)
☐ Other employment (15)

**Contract**
☐ Breach of contract/warranty (06)
☐ Rule 3.740 collections (09)
☐ Other collections (09)
☐ Insurance coverage (18)
☐ Other contract (37)
**Real Property**
☐ Eminent domain/Inverse condemnation (14)
☐ Wrongful eviction (33)
☐ Other real property (26)
**Unlawful Detainer**
☐ Commercial (31)
☐ Residential (32)
☐ Drugs (38)
**Judicial Review**
☐ Asset forfeiture (05)
☐ Petition re: arbitration award (11)
☐ Writ of mandate (02)
☒ Other judicial review (39)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
☐ Antitrust/Trade regulation (03)
☐ Construction defect (10)
☐ Mass tort (40)
☐ Securities litigation (28)
☐ Environmental/Toxic tort (30)
☐ Insurance coverage claims arising from the above listed provisionally complex case types (41)
**Enforcement of Judgment**
☐ Enforcement of judgment (20)
**Miscellaneous Civil Complaint**
☐ RICO (27)
☐ Other complaint (not specified above) (42)
**Miscellaneous Civil Petition**
☐ Partnership and corporate governance (21)
☐ Other petition (not specified above) (43)

2. This case ☐ is ☒ is not complex under rule 3.400 of the California Rules of Court. If the case is complex, mark the factors requiring exceptional judicial management:
   a. ☐ Large number of separately represented parties
   b. ☐ Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
   c. ☐ Substantial amount of documentary evidence
   d. ☐ Large number of witnesses
   e. ☐ Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
   f. ☐ Substantial postjudgment judicial supervision
3. Remedies sought (check all that apply): a. ☐ monetary b. ☒ nonmonetary; declaratory or injunctive relief c. ☐ punitive
4. Number of causes of action (specify): 6
5. This case ☐ is ☒ is not a class action suit.
6. If there are any known related cases, file and serve a notice of related case. (You may use form CM-015.)
Date: November 9, 2021

Trenton H. Norris
(TYPE OR PRINT NAME) ► (SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**
• Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
• File this cover sheet in addition to any cover sheet required by local court rule.
• If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
• Unless this is a collections case under rule 3.740 or a complex case, this cover sheet will be used for statistical purposes only.

Page 1 of 2

**CIVIL CASE COVER SHEET**

Cal. Rules of Court, rules 2.30, 3.220, 3.400–3.403, 3.740;
Cal. Standards of Judicial Administration, std. 3.10
www.courts.ca.gov

American LegalNet, Inc.
www.FormsWorkFlow.com

Case 1:21-cv-01044 Document 1 Filed 11/16/21 Page 44 of 549

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on page 1. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $25,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**CASE TYPES AND EXAMPLES**

**Auto Tort**
Auto (22)—Personal Injury/Property Damage/Wrongful Death
Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
Asbestos (04)
  Asbestos Property Damage
  Asbestos Personal Injury/ Wrongful Death
Product Liability *(not asbestos or toxic/environmental)* (24)
Medical Malpractice (45)
  Medical Malpractice— Physicians & Surgeons
  Other Professional Health Care Malpractice
Other PI/PD/WD (23)
  Premises Liability (e.g., slip and fall)
  Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  Intentional Infliction of Emotional Distress
  Negligent Infliction of Emotional Distress
  Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
Business Tort/Unfair Business Practice (07)
Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
Defamation (e.g., slander, libel) (13)
Fraud (16)
Intellectual Property (19)
Professional Negligence (25)
  Legal Malpractice
  Other Professional Malpractice *(not medical or legal)*
Other Non-PI/PD/WD Tort (35)

**Employment**
Wrongful Termination (36)
Other Employment (15)

**Contract**
Breach of Contract/Warranty (06)
  Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  Negligent Breach of Contract/ Warranty
  Other Breach of Contract/Warranty
Collections (e.g., money owed, open book accounts) (09)
  Collection Case–Seller Plaintiff
  Other Promissory Note/Collections Case
Insurance Coverage *(not provisionally complex)* (18)
  Auto Subrogation
  Other Coverage
Other Contract (37)
  Contractual Fraud
  Other Contract Dispute

**Real Property**
Eminent Domain/Inverse Condemnation (14)
Wrongful Eviction (33)
Other Real Property (e.g., quiet title) (26)
  Writ of Possession of Real Property
  Mortgage Foreclosure
  Quiet Title
  Other Real Property *(not eminent domain, landlord/tenant, or foreclosure)*

**Unlawful Detainer**
Commercial (31)
Residential (32)
Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
Asset Forfeiture (05)
Petition Re: Arbitration Award (11)
Writ of Mandate (02)
  Writ–Administrative Mandamus
  Writ–Mandamus on Limited Court Case Matter
  Writ–Other Limited Court Case Review
Other Judicial Review (39)
  Review of Health Officer Order
  Notice of Appeal–Labor Commissioner Appeals

**Provisionally Complex Civil Litigation (Cal. Rules of Court Rules 3.400–3.403)**
Antitrust/Trade Regulation (03)
Construction Defect (10)
Claims Involving Mass Tort (40)
Securities Litigation (28)
Environmental/Toxic Tort (30)
Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
Enforcement of Judgment (20)
  Abstract of Judgment (Out of County)
  Confession of Judgment *(non-domestic relations)*
  Sister State Judgment
  Administrative Agency Award *(not unpaid taxes)*
  Petition/Certification of Entry of Judgment on Unpaid Taxes
  Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
RICO (27)
Other Complaint *(not specified above)* (42)
  Declaratory Relief Only
  Injunctive Relief Only *(non-harassment)*
  Mechanics Lien
  Other Commercial Complaint Case *(non-tort/non-complex)*
  Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
Partnership and Corporate Governance (21)
Other Petition *(not specified above)* (43)
  Civil Harassment
  Workplace Violence
  Elder/Dependent Adult Abuse
  Election Contest
  Petition for Name Change
  Petition for Relief From Late Claim
  Other Civil Petition

American LegalNet, Inc.
www.FormsWorkFlow.com

**SUM-100**

# SUMMONS
### *(CITACION JUDICIAL)*

*FOR COURT USE ONLY*
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
Rob Bonta, in his official capacity as Attorney General of California (Additional
Parties Attachment form is attached)

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
IOWA PORK PRODUCERS ASSOCIATION

E-FILED
11/10/2021
Superior Court of California
County of Fresno
By: Jamie Nelson, Deputy

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.
*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

| The name and address of the court is: | CASE NUMBER: |
|---|---|
| *(El nombre y dirección de la corte es):* | *(Número del Caso):* |

Fresno County Superior Court
B.F. Sisk Courthouse
1130 O Street
Fresno, CA 93724

**21CECG03339**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
Trenton H. Norris (SBC 164781) Peg Toledo (SBN 181227) Will Wagner (SBN 310900)
Arnold & Porter Kaye Scholer LLP, Three Embarcadero Center, 10th Floor, San Francisco, CA  94111
415-471-3100

| DATE: | | Clerk, by | J. Nelson | , Deputy |
|---|---|---|---|---|
| *(Fecha)* | 11/10/2021 | *(Secretario)* | | *(Adjunto)* |

*(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)       ☐ CCP 416.60 (minor)
   ☐ CCP 416.20 (defunct corporation)       ☐ CCP 416.70 (conservatee)
   ☐ CCP 416.40 (association or partnership)       ☐ CCP 416.90 (authorized person)
   ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

American LegalNet, Inc.
www.FormsWorkflow.com

Code of Civil Procedure §§ 412.20, 465
*www.courtinfo.ca.gov*

SUM-200(A)

| SHORT TITLE:<br>IOWA PORK PRODUCERS ASSOCIATION v. ROB BONTA, et al. | CASE NUMBER: |
|---|---|

**INSTRUCTIONS FOR USE**

➔ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

➔ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.):*

☐ Plaintiff   ☒ Defendant   ☐ Cross-Complainant   ☐ Cross-Defendant

KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and TOMAS ARAGON, in his official capacity as Director of the California Department of Public Health

Page 1 of 1

**Page 1 of 1**

Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

American LegalNet, Inc.
www.FormsWorkflow.com

# EXHIBIT B

1
TRENTON H. NORRIS (SBN 164781)
PEG CAREW TOLEDO (SBN 181227)

2
WILLIS M. WAGNER (SBN 310900)
Arnold & Porter Kaye Scholer LLP

3
Three Embarcadero Center, 10th Floor
San Francisco, California 94111

4
Telephone: +1 415.471.3100
Facsimile: +1 415.471.3400

5
E-mail: Trent.Norris@arnoldporter.com
Peg.Toledo@arnoldporter.com

6
Will.Wagner@arnoldporter.com

E-FILED
11/12/2021 10:27 PM
Superior Court of California
County of Fresno
By: Louana Peterson, Deputy

7
ELDON MCAFEE (*pro hac vice pending*)
JULIE VYSKOCIL(*pro hac vice pending*)

8
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100

9
West Des Moines, Iowa 50266
Telephone: 515.271.5916

10
Facsimile: 515.274.1488
E-mail: eldon.mcafee@brickgentrylaw.com

11
julie.vyskocil@brickgentrylaw.com

MARNIE A. JENSEN (*pro hac vice pending*)
RYANN A. GLENN (*pro hac vice pending*)
Husch Blackwell LLP
13330 California Street, Suite 200
Omaha, Nebraska 68154
Telephone: 402.964.5000
Facsimile: 402.964.5050
E-mail: marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com

12
Attorneys for Plaintiff
IOWA PORK PRODUCERS ASSOCIATION

13

14
**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15
**COUNTY OF FRESNO**

16

17
IOWA PORK PRODUCERS
ASSOCIATION,

18
Plaintiff,

19

20
v.

21

22
ROB BONTA, in his official capacity as
Attorney General of California, KAREN

23
ROSS, in her official capacity as Secretary
of the California Department of Food and

24
Agriculture, and TOMAS ARAGON, in his
official capacity as Director of the

25
California Department of Public Health,

26
Defendants.

27

28

Case No.  21CECG03339

**PLAINTIFF'S NOTICE OF MOTION AND
MOTION FOR PRELIMINARY
INJUNCTION AND REQUEST FOR
EXPEDITED RELIEF AND HEARING**

[Filed concurrently with Memorandum of Points
and Authorities in Support of Motion for
Preliminary Injunction and Request for Expedited
Relief and Hearing Requested; [proposed] Order;
and Declarations In Support Thereof]

Date:  May 18, 2022
Time:  3:30 p.m.
Dept.:  502

Complaint Filed:  November 9, 2021

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

**TO DEFENDANTS:**

**PLEASE TAKE NOTICE** that on May 18, 2022 at 3:30 p.m. or as soon thereafter as this matter may be heard in Dept. 502 of the above-entitled Court located at 1120 O Street, Fresno, California 93724, Plaintiff Iowa Pork Producers Association ("IPPA" or "Plaintiff") will and hereby does move for an order granting preliminary injunction and expedited relief in their favor against Defendants Rob Bonta, in his official capacity as Attorney General of California ("Bonta"), Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture ("Ross"), and Tomas Aragon, in his official capacity as Director of the California Department of Public Health ("Aragon") (collectively, "Defendants").

Pursuant to Cal. Civ. Proc. Code §§ 526 and 527 Plaintiff, in a representative capacity for its members, by and through its counsel of record, hereby respectfully moves this Court for a preliminary injunction order to prevent Defendants and their officers, agents, servants, employees, attorneys and any other persons who are in active concert or participation with Defendants, from enforcing California's Proposition 12 Farm Animal Confinement Initiative ("Proposition 12") against Plaintiff. The justification for the requested preliminary injunction is more completely explained in the accompanying memorandum of points and authorities in support of this motion. Summarized, the particular facts and law relied upon in support of this request are as follows:

1.     Plaintiff has brought an action under 42 U.S.C. § 1983 against Defendants, challenging the constitutionality of Defendants' Proposition 12, facially and as-applied to Plaintiff's members.  As shown in the operative pleading and in the materials submitted in support of this motion, Proposition 12 imposes confinement requirements on out-of-state pork producers and prohibits the sale of pork meat within the State of California from animals confined in a manner inconsistent with California's restrictions, regardless of where in the nation the animal was raised.

2.     Pursuant to Cal. Civ. Proc. Code §§ 526 and 527, a preliminary injunction may be entered on notice to the adverse party.

3.     In granting a preliminary injunction, a trial court must consider the following factors: "(1) the likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is likely to result from the granting or denial of interim injunctive relief." *White v.*

1

*Davis*, 30 Cal. 4th 528, 554, 68 P.3d 74, 91 (2003). The second factor "involves consideration of such things as the inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the status quo." *Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach*, 232 Cal. App. 4th 1171, 1177, 181 Cal. Rptr. 3d 577, 581–82 (2014) (quoting *14859 Moorpark Homeowner's Assn. v. VRT Corp.*, 63 Cal.App.4th 1396, 1402, 74 Cal. Rptr. 2d 712 (1998)).

4.     Plaintiff's Complaint demonstrates Plaintiff's entitlement to a preliminary injunction order preventing the implementation and enforcement of Proposition 12 before it wreaks devastating and unconstitutional irreparable harm upon Plaintiff's members and the nationwide pork production industry. The declarations submitted contemporaneously with this Motion confirm this showing, in accordance with Cal. Civ. Proc. Code § 527.

5.     Iowa is the leading pork producing state in the United States and is the top state for pork exports. Complaint, ¶ 3.

6.     It will cost at least tens of millions of dollars annually for Iowa pork producers, Plaintiff's members among them, to come into compliance with Proposition 12's confinement restrictions. Complaint, ¶ 15.

7.     Estimates suggest California residents consume 13-15% of the pork consumed nationally in the U.S. Complaint, ¶ 4.

8.     Despite its behemoth status as a consumer of pork, California has only as few as 8,000 breeding pigs in the entire state. Only approximately 1,500 of these pigs are used in commercial breeding in the state, and are situated in a handful of very small farms. This equates to California production making up less than 1% of the total U.S. pork production. If California were to meet its own in-state pork demand, it would require production from approximately 673,000 breeding pigs annually. In other words, California cannot feed itself without massive agricultural imports from other states, including, most importantly, from Iowa. Complaint, ¶ 5.

9.     In 2018, California voters passed amendments to the Farm Animal Confinement Act through ballot initiative, Proposition 12 (the "Act"). For the first time, California's previous confinement restrictions which regulated in-state producers only (the "Turn Around Requirements") were immediately imposed on *all* whole pork meat sold within the state of

California, regardless of where the hog was raised. These Turn Around Requirements require that breeding pigs (sows) in California must be housed in a manner that permits the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions. Complaint, ¶ 7.

10.     Proposition 12 imposes criminal penalties on any person found to be in violation of any provisions of the Act, with penalties of a fine up to $1,000 or 180 days imprisonment. These criminal penalties can be assessed against both business owners and operators who are non-compliant with Proposition 12 who choose to "engage in a sale" of non-compliant pork meat within California. Additionally, the sale of non-compliant pork meat qualifies as an unfair business practice under California law, and violators are separately subject to a $2,500 fine per violation under the state Consumer Protection statute. Complaint, ¶¶ 14, 52.

11.     Proposition 12 went into effect December 19, 2018, as the California Constitution, Article II, Section 10, provides that unless a statute otherwise specifies a date, a ballot initiative "takes effect on the fifth day after the Secretary of State files the statement of the vote for the election at which the measure is voted on, but the measure may provide that it becomes operative after its effective date." Complaint, ¶ 38.

12.     Proposition 12's Turn Around Requirements do not have a separately specified effective date in the text and thereby went into effect on December 19, 2018. Complaint, ¶ 38.

13.     Defendants have for the first time admitted that the Turn Around Requirements went into effect on December 19, 2018. Complaint, ¶ 123.

14.     Proposition 12 prohibits confining a breeding pig inconsistent with the Turn Around Requirements. Second, Proposition 12 prohibits confining a breeding pig after December 31, 2021, if that breeding pig is in a space less than twenty-four (24) square feet of usable floorspace per pig (the "Square Footage Requirements"). Complaint, ¶ 8.

15.     The January 1, 2022, effective date for the Square Footage Requirements is just over six weeks away without the final promulgation of the regulations as mandated by the underlying Act to provide producers with adequate notice of how to comply with Proposition 12 in order to avoid criminal prosecution. Producers do not have time to comply with this provision. Due to the

3

1    breeding cycle, pigs that are currently pregnant are the source of the pork that will be sold after

2    January 1, 2022. California can, and plans to, begin enforcement of this provision on January 1,

3    2022, even though California has failed to promulgate Proposition 12's mandated regulations for

4    compliance. Complaint, ¶ 168.

5            16.     California was required to promulgate Final Regulations to implement Proposition

6    12 and provide adequate notice of compliance requirements to those subject to Proposition 12's

7    criminal penalties by September 1, 2019. Cal. Health & Safety Code, § 25993. California directly

8    recognized that Proposition 12 was facially vague, and its very terms mandated that the Department

9    of Food and Agriculture and the State of Department of Health jointly promulgate regulations for

10   compliance by this date. Complaint, ¶ 9.

11           17.     On May 28, 2021, the CDFA published draft proposed regulations to implement

12   Proposition 12, one year and nine months past the promulgation deadline set forth in the Act (the

13   "Proposed Regulations"). Complaint, ¶ 12.

14           18.     These Proposed Regulations made clear for the first time that Defendants intend to

15   reach beyond California's borders and subject out-of-state pork producers to onerous registration

16   requirements and even open their farms up to inspection by California officials. Complaint, ¶ 213.

17           19.     The Proposed Regulations also show that Proposition 12 was intended to protect

18   California farmers, stating: "In-state farms will find it more costly to compete with farms outside

19   of the state when selling shell eggs, liquid eggs, whole veal meat, and whole pork meat to an out of

20   state buyer compared to farms located in states that do not have the same animal confinement

21   standards as described in the Act. Food processing facilities based in the State will have to use more

22   expensive ingredients, shell eggs, liquid eggs, whole veal meat, and whole pork meat, that are

23   compliant with the Act compared to food processing facilities located outside the State." *See* 2021

24   CA REG TEXT 584571 (NS) at 10. Complaint, ¶¶ 69, 208.

25           20.     As of the date of this Motion, California has not yet promulgated Final Regulations

26   despite making clear that the enforcement of Proposition 12 would not be delayed. This means that

27   as of today, individuals are potentially subject to criminal penalties—including jail time—without

28   having yet received final notice of how to comply with Proposition 12's requirements with just

4

over six weeks before California intends to enforce Proposition 12. **Complaint,** ¶165.

21.     Neither the text of Proposition 12 nor the Proposed Regulations define what it means for an individual to be "engaged in" a sale within the State of California, and by Proposition 12's plain language, an out-of-state producer is potentially subject to criminal prosecution for being "engaged in" the chain of sale of non-compliant pork meat into the State of California. **Complaint,** ¶ 47.

22.     Under California Penal Code § 31, any person aiding and abetting in the commission of a misdemeanor may be charged as a principal of the crime. Complaint, ¶ 44.

23.     California Penal Code § 184 creates additional potential liability for out-of-state producers under a conspiracy theory charge, which states "[n]o agreement amounts to a conspiracy, unless some act, beside such agreement, be done within [California] to effect the object thereof, by one or more of the parties to such agreement . . .." *See also* Cal. Penal Code § 181. Complaint, ¶ 46.

24.     In short, Proposition 12 makes Iowa pork producers unable to sell their pork for consumption into California unless those out-of-state pork producers comply with both California's Turn Around Requirements and Square Footage Requirements. Complaint, ¶ 121.

25.     The vast majority of Iowa pork producers are not currently in compliance with California's Turn Around Requirements or Square Footage Requirements, and the estimated cost to come into compliance with these requirements could reach millions of dollars for a single pork producer to comply. Complaint, ¶¶ 16, 97, 119.

26.     Proposition 12's confinement restrictions are inconsistent with industry practices and standards, generations of producer experience, scientific research, and the consensus standards of other states. Proposition 12 will impose costly mandates that substantially interfere with commerce among the states in hogs and whole pork meat markets. It will impose enormous costs on Iowa pork producers, ultimately having a direct impact on the price of pork for all Americans, the vast majority of whom had no say in Proposition 12. Complaint, ¶ 17.

27.     Most breeding pigs that will produce hogs sold as meat product in 2022 *are already alive* at Iowa farms. The breeding cycle of the pigs is four months, followed by the piglets being

raised for three to four weeks before they are weaned and ultimately, farrow to finish takes approximately 24-26 weeks. Complaint, ¶ 18.

28.     Without immediate injunctive relief, Proposition 12 will cause annual consumer loss of over $34 million across the four evaluated California retail pork markets. The impact on consumers outside of California, who had no vote on Proposition 12, is larger. Annual consumer losses would exceed $303 million in the 47 examined U.S. markets outside of California following Proposition 12 being implemented.[1] Accordingly, Proposition 12 will create a nationwide rippling effect of economic consumer losses and a nationwide increase of pork production costs.  Tonsor Decl., ¶ 27.

29.     Without immediate and permanent injunctive relief from this Court, Proposition 12 will unconstitutionally and irreparably injure Iowa pork producers, the breeding pigs themselves, their livelihoods, and their property. Complaint, ¶ 26.

30.     Plaintiff is likely to succeed on each of their claims.

a.     <u>Violation of the Due Process Clause</u>—Plaintiff is likely to succeed on its claim that Proposition 12 violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution on its face and as applied to Plaintiff. Proposition 12 violates the Due Process Clause on its face because it does not provide out-of-state producers adequate notice or time to have a reasonable opportunity to know what conduct is prohibited prior to the effective date of the requirements but subjects Plaintiff's members to criminal enforcement nonetheless.  Proposition 12 is also vague as applied to Plaintiff's specific conduct, because under the plain text, it is unclear whether Plaintiff's specific actions are currently subject to criminal penalties, Proposition 12 does not define the conduct that it prohibits with sufficient definiteness, and it does not establish minimum guidelines to govern law enforcement and therefore invites arbitrary enforcement. The text of Proposition 12 also does not clearly define *when* the violation subject to criminal liability occurs or *who* throughout the supply chain can be criminally prosecuted. Proposition 12 also potentially criminalizes behavior of an individual at the beginning of the production chain based

---

[1] Additional consumer losses would occur in other markets as about one-third of the total U.S. population resides outside of the 51 evaluated markets in this report.  Moreover, these impacts are simply for domestic retail markets and do not incorporate domestic food service or export market impacts.

1    on decisions and actions by those elsewhere in the production chain.   Proposition 12 lacks sufficient

2    definiteness and specificity to provide those persons of ordinary intelligence who may be subject

3    to the law a reasonable opportunity to know what conduct is criminalized and what punishment

4    applies. Finally, Proposition 12 violates the Due Process Clause because it criminalizes behavior

5    and California failed to promulgate the Final Regulations as the Act required. In sum, California

6    and Proposition 12 fails to give individuals of ordinary intelligence a reasonable opportunity to

7    know what conduct is prohibited, so that they may act accordingly.

8            b.      Violation of the Commerce Clause—Plaintiff is likely to succeed on its claim that

9    Proposition 12 violates the Commerce Clause of Article I, Section 8 of the Constitution for several

10   reasons. First, Proposition 12 discriminates against out-of-state producers on its face in that one of

11   its stated purposes is to prevent negative fiscal impacts on California. Furthermore, it is apparent

12   from the written statements of the California Department of Food and Agriculture and proponents

13   of Proposition 12 that Proposition 12's purpose is to discriminate against out-of-state producers.

14   Proposition 12 is also discriminatory in practical effect by imposing Turn Around Requirements

15   on out-of-state producers that are significantly more onerous than the corresponding requirement

16   previously imposed on in-state producers. *See United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid*

17   *Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007). Second, the Commerce Clause likewise forbids the

18   states from engaging in extraterritorial regulation or from creating national regulations. *Brown-*

19   *Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476 U.S. 573, 579 (1986); *Daniels Sharpsmart,*

20   *Inc. v. Smith*, 889 F.3d 608, 616 (9th Cir. 2018*)*. Proposition 12 violates both of these principles. It

21   constitutes economic protectionism, blatant extraterritorial regulation, and seeks to implement

22   nationwide regulations by forcing Plaintiff and other pork producers to, among other things, submit

23   to Proposition 12 confinement regulations in order to access the California market. As such,

24   Proposition 12 imposes an extraterritorial regulatory authority and burdens commerce occurring

25   wholly outside California. Finally, Proposition 12's burden on interstate commerce outweighs any

26   purported, legitimate governmental benefit that may apply here in violation of the *Pike v. Bruce*

27   *Church,* 397 U.S. 137 (1970). It is likely the Court will agree and find Proposition 12

28   unconstitutional on this basis.

1          c.          Violation of the Privileges and Immunities Clause—Plaintiff is likely to succeed on

2    its claim that Proposition 12 violates the Privileges and Immunities Clause at Article IV, Section 2

3    of the United States Constitution. Article IV, § 2 of United States Constitution states "[t]he Citizens

4    of each State shall be entitled to all Privileges and Immunities of Citizens in the several States."

5    Proposition 12 discriminates against out-of-state producers by immediately prohibiting the sale of

6    whole pork within California that does not comply with the Turn Around Requirements, without

7    providing out-of-state producers with the same six years to come into compliance with these Turn

8    Around Requirements that was afforded to California producers. Proposition 12 thus imposes

9    differentiated treatment on California producers versus out-of-state producers like Plaintiff. It is

10   likely the Court will agree and find Proposition 12 unconstitutional.

11          d.          Violation of the Supremacy Clause on the Basis that Proposition 12 is Preempted

12   by the Packers and Stockyards Act—Plaintiff is likely to succeed on its claim that Proposition 12

13   is preempted by federal law. The Supremacy Clause of the United States Constitution provides that

14   the laws of Congress are the "Supreme Law of the Land." A state may not enact a statute that

15   conflicts with a federal law. A state law conflicts with federal law and thus is preempted when it is

16   not possible for an individual to comply with both state and federal law, or the state law provides a

17   substantial obstacle or hurdle to comply with the federal law. Proposition 12 requires business

18   owners and operators engaged in the sale of meat to favor in-state producers who were allowed six

19   years to come into compliance with California's Turn Around Requirements. This favoritism

20   toward California producers will create unfair competition with out-of-state producers, potentially

21   regardless of the price of meat. The Packers and Stockyards Act, 7 U.S.C. § 192(b) prohibits any

22   wholesaler of meat from providing any preference to a particular locality and from subjecting any

23   particular locality to a "disadvantage" in the sale of meat. Proposition 12 directly allows (if not

24   requires) wholesalers to favor in-state pork producers and to disadvantage the out-of-state pork

25   producers who cannot immediately come into compliance with the Turn Around Requirements and

26   now, the square footage confinement requirements. Wholesalers who ignore Proposition 12 will

27   face criminal prosecution, fines and automatically be found to have engaged in unfair competition

28   in violation of the California Business and Professions Code. The Packers and Stockyards Act

prohibits wholesalers from taking action that will result in a restraint on trade. By refusing to sell meat from animals that are not compliant with Proposition 12, regardless of price in comparison to out-of-state pork, wholesalers will be engaged in conduct that restrains trade based on the impacts of interstate commerce in the pork industry. Thus, it is impossible for a wholesaler to comply with both Proposition 12 and the Packers and Stockyards Act. It is likely the Court will agree and find Proposition 12 unconstitutional on this additional basis.

e.    <u>Declaratory Relief</u> — Plaintiff is likely to succeed on its declaratory relief claim declaring Proposition 12 to be invalid and unenforceable because (i) Defendants' failure to promulgate Final Regulations as mandated by September 1, 2019 violates Plaintiff's members' due process rights both under the U.S. Constitution's Due Process Clause and under Article 1, Section 7 of the California Constitution; (ii) Proposition 12 violates Plaintiff's members' privileges and immunities both under the U.S. Constitution's Privileges and Immunities Clause and under Article 3, Section 1 of the California Constitution; (iii) Proposition 12 is preempted by federal law both under the U.S. Constitution's Supremacy Clause and under Article 3, Section 1 of the California Constitution; (iv) Proposition 12 violates the dormant Commerce Clause both under the U.S. Constitution's Commerce Clause and under Article 3, Section 1 of the California Constitution; and (v) Defendants' failure to promulgate Final Regulations by the statutory deadline results in Plaintiff's members not having regulations in place to know what constitutes a violation of Proposition 12 and leaves them fully exposed to the risk of immediate enforcement.

31.    Additionally, in the absence of a preliminary injunction, Plaintiff's members will suffer irreparable harm on a massive and unprecedented scale. Plaintiff's members are facing immediate, imminent risk of criminal prosecution as Defendants have made it clear that the Turn Around Requirements are in effect *now* and the Square Footage Requirements will go into effect January 1, 2022. Plaintiff's members have no Final Regulations promulgated despite a clear mandate to do so by September 1, 2019 in the underlying Act. Further, in order to comply with Proposition 12's science-free animal cruelty restrictions, if compliance is at all possible, Plaintiff's members will incur devastating expenses felt throughout the entire supply chain or choose to somehow cease selling into California altogether, thus foregoing millions in future revenues.

1    Moreover, due to the combined cycle time for breeding pig gestation and preparation for slaughter,

2    most breeding pigs who will produce hogs sold as meat product in 2022 *are already alive* at Iowa

3    farms.  As the supporting economic evidence shows, Proposition 12 would cause cascading and

4    catastrophic harm to Iowa's overall economic health, rendering numerous producers insolvent,

5    causing incalculable employment losses, and inflicting major damage to the health and stability of

6    public revenues. Tonsor Decl. ¶ 31.  Further, the implementation and enforcement of Proposition

7    12 will have devastating effects on consumers nationwide. Tonsor Decl. ¶ 24.  This combined harm

8    would irreparably harm Plaintiff and similarly situated non-California entities involved with the

9    production of pork meat products for sale in California, ultimately landing on the pork consumer

10   nationwide.

11        32.    Finally, in light of the circumstances facing the parties, preliminary injunctive relief

12   is warranted as no other remedy at law is available. The harm facing Plaintiff far outweighs any

13   alleged harm California will suffer if the injunction is granted. Proposition 12 poses objective,

14   existential harm to vast swathes of the nation's pork production sector. Expert analysis has

15   projected that less than 4% of pork producers nationwide could currently satisfy Proposition 12's

16   onerous requirements. Tonsor Decl, ¶ 28; Complaint, ¶ 20. On the other hand, the Defendants face

17   minimal, if any, harm from the issuance of a preliminary injunction and the near-term preservation

18   of the status quo as the Court considers the underlying constitutional issues. The fact that California

19   has not even promulgated Final Regulations supports the contention that Defendants will face

20   minimal harm from the issuance of a preliminary injunction. The public interest—including the

21   need for protecting the nation's production agriculture sector against unconstitutional disruptions,

22   and also the need for food price and supply stability for consumers—strongly favors preliminary

23   injunctive relief.

24        33.    This Motion is supported by the accompanying memorandum of points and

25   authorities and the Declarations of Dr. Janeen Salak-Johnson, Dr. Glynn Tonsor, Pat McGonegle,

26   President of Iowa Pork Producers Association,  and the documentary evidence attached thereto,

27   which are all submitted contemporaneously.

28        34.    Plaintiff requests that the Court set a hearing on this motion on an expedited basis,

1   as reflected in the Ex Parte Application to Advance Hearing Date filed concurrently with this

2   Motion.

3          WHEREFORE, Plaintiff respectfully requests the Court enter a preliminary injunction order

4   as set forth herein. Specifically, the Court should issue an order prohibiting the enforcement of

5   Proposition 12, its policies, practices and customs by Defendants, employees and agents, and all

6   persons acting in privity and/or in concert with them (including private enforcers bringing claims

7   pursuant to the Unfair Competition Law or any other applicable law).

8          Further, this Court should issue a temporary restraining order enjoining the enforcement of

9   Proposition 12 if the preliminary injunction hearing cannot occur prior to January 1, 2022.  Finally,

10  this Court should issue a temporary restraining order enjoining the enforcement of Proposition 12

11  from the date of the hearing until the time of the Court's ruling on this Motion for Preliminary

12  Injunction.

13  Dated: November 12, 2021.

14                                                IOWA PORK PRODUCERS
                                                  ASSOCIATION,  Plaintiff.

15                                                By: */s/ Willis M. Wagner*

16                                                Trenton H. Norris (SBN 164781)
                                                  Peg Carew Toledo (SBN 181227)
17                                                Willis M. Wagner (SBN 310900)
                                                  Arnold & Porter Kaye Scholer LLP
18                                                Three Embarcadero Center, 10th Floor
                                                  San Francisco, California 94111
19                                                Telephone: +1 415.471.3100
                                                  Facsimile: +1 415.471.3400
20                                                Trent.Norris@arnoldporter.com
                                                  Peg.Toledo@arnoldporter.com
21                                                Will.Wagner@arnoldporter.com

22                                                and

                                                  Marnie A. Jensen (NE 22380)
23                                                (*pro hac vice pending*)
                                                  Ryann A. Glenn (NE 26160)
24                                                (*pro hac vice pending*)
                                                  HUSCH BLACKWELL LLP
25                                                13330 California Street, Suite 200
                                                  Omaha, NE 68154
26                                                Telephone:  (402) 964-5000
                                                  Facsimile:  (402) 964-5050
27                                                marnie.jensen@huschblackwell.com
                                                  ryann.glenn@huschblackwell.com
28

                                         11

1                                   and

2                                   Eldon L. McAfee (AT0004987)
                                  *(pro hac vice pending)*

3                                   Julie L. Vyskocil (AT0009711)
                                  *(pro hac vice pending)*

4                                   BRICK GENTRY, P.C.
                                  6701 Westown Parkway, Suite 100

5                                   West Des Moines, IA 50266
                                  Telephone: (515) 271-5916

6                                   Facsimile: (515) 274-1488
                                  eldon.mcafee@brickgentrylaw.com

7                                   julie.vyskocil@brickgentrylaw.com

8                                   *Attorneys for Iowa Pork Producers*
                                  *Association*

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION

1    TRENTON H. NORRIS (SBN 164781)
     PEG CAREW TOLEDO (SBN 181227)
2    WILLIS M. WAGNER (SBN 310900)
     Arnold & Porter Kaye Scholer LLP
3    Three Embarcadero Center, 10th Floor
     San Francisco, California 94111
4    Telephone: +1 415.471.3100
     Facsimile: +1 415.471.3400
5    E-mail: Trent.Norris@arnoldporter.com
             Peg.Toledo@arnoldporter.com
6            Will.Wagner@arnoldporter.com

7    ELDON MCAFEE (*pro hac vice pending*)
     JULIE VYSKOCIL(*pro hac vice pending*)
8    BRICK GENTRY, P.C.
     6701 Westown Parkway, Suite 100
9    West Des Moines, Iowa 50266
     Telephone: 515.271.5916
10   Facsimile: 515.274.1488
     E-mail: eldon.mcafee@brickgentrylaw.com
11           julie.vyskocil@brickgentrylaw.com

12   Attorneys for Plaintiff
     IOWA PORK PRODUCERS ASSOCIATION

     MARNIE A. JENSEN (*pro hac vice pending*)
     RYANN A. GLENN (*pro hac vice pending*)
     Husch Blackwell LLP
     13330 California Street, Suite 200
     Omaha, Nebraska 68154
     Telephone: 402.964.5000
     Facsimile: 402.964.5050
     E-mail: marnie.jensen@huschblackwell.com
             ryann.glenn@huschblackwell.com

RECEIVED
11/12/2021 10:27 PM
FRESNO COUNTY SUPERIOR COURT
By: Louana Peterson, Deputy

13

14    **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15    **COUNTY OF FRESNO**

16

17   IOWA PORK PRODUCERS
     ASSOCIATION,

18                  Plaintiff,

19         v.

20
     ROB BONTA, in his official capacity as
21   Attorney General of California, KAREN
     ROSS, in her official capacity as Secretary
22   of the California Department of Food and
     Agriculture, and TOMAS ARAGON, in his
23   official capacity as Director of the
     California Department of Public Health,
24
                    Defendants.
25

26

27

28

Case No.  21CECG03339

**[*PROPOSED*] ORDER GRANTING
MOTION FOR PRELIMINARY
INJUNCTION**

Action Filed:  November 9, 2021

1

2      Plaintiff's Motion for Preliminary Injunction came on for hearing before this Court on

3   _____, 2021, at _____ a.m. After consideration of the briefs and arguments of

4   counsel, the evidence filed in support of and opposition to this motion, and being fully advised,

5   the Court finds that Plaintiff has demonstrated both a likelihood of success on the merits and the

6   possibility of irreparable harm should injunction not issue. At minimum, this case raises serious

7   questions of constitutional importance, the balance of equities tips sharply in Plaintiff's favor and

8   preliminary injunction is in the public interest. Accordingly, Plaintiff is entitled to temporary

9   injunctive relief to preserve the status quo pending resolution of this case on the merits, and the

10  Court GRANTS Plaintiff's motion as follows:

11      1.      Upon finding that Plaintiff has met its burden of showing a likelihood of success

12          on the merits and the possibility of irreparable harm, or alternatively that this case raises

13          serious questions and the balance of equities tips sharply in Plaintiff's favor, a preliminary

14          injunction is granted pursuant to California Code of Civil Procedure §§ 395, 401. 525,

15          526, and 1060 and 42 U.S.C. § 1983.

16      2.      The Court hereby preliminarily ENJOINS Defendants Rob Bonta, Karen Ross, and

17          Tomas Aragon, from enforcing sections 25990-25994 of the California Health & Safety

18          Code [and the California Department of Food and Agriculture's Proposed Regulations

19          regarding the same], and any other enforcer from using a violation of sections 25900-

20          25994 to support an Unfair Competition Law claim (or similar claim), pending resolution

21          of the merits of this case or until further order of this Court.

22      3.      This preliminary injunction shall take effect immediately and shall remain in effect

23          pending resolution of the merits of this case or until further order of this Court.

24      4.      The Court further finds that the balance of potential hardships each party will

25          suffer as a result of preliminary injunction weighs overwhelmingly in Plaintiff's favor and

26          that Plaintiff has established a strong likelihood of success on the merits. As such, the

27          Court hereby exercises its discretion to waive the bond requirement for this preliminary

28          injunction.

ORDER OF PRELIMINARY INJUNCTIVE RELIEF

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

5.      Plaintiff is directed to file proof of bond, in the amount of $_____ , within three court days of this Order. The bond shall serve as security for all claims with respect to this preliminary injunction and any additional injunctive relief order by the Court in this action.

**IT IS SO ORDERED** this ___ day of December, 2021.

_____

Honorable Rosemary T. McGuire

ORDER FOR PRELIMINARY INJUNCTIVE RELIEF

# EXHIBIT C

1   TRENTON H. NORRIS (SBN 164781)
PEG CAREW TOLEDO (SBN 181227)
2   WILLIS M. WAGNER (SBN 310900)
Arnold & Porter Kaye Scholer LLP
3   Three Embarcadero Center, 10th Floor
San Francisco, California 94111
4   Telephone: +1 415.471.3100
Facsimile: +1 415.471.3400
5   E-mail: Trent.Norris@arnoldporter.com
        Peg.Toledo@arnoldporter.com
6        Will.Wagner@arnoldporter.com

7   ELDON MCAFEE (*pro hac vice pending*)
JULIE VYSKOCIL(*pro hac vice pending*)
8   Brick  Gentry, P.C.
6701 Westown Parkway, Suite 100
9   West Des Moines, Iowa 50266
Telephone: 515.271.5916
10  Facsimile: 515.274.1488
E-mail: eldon.mcafee@brickgentrylaw.com
11       julie.vyskocil@brickgentrylaw.com

MARNIE A. JENSEN (*pro hac vice pending*)
RYANN A. GLENN (*pro hac vice pending*)
Husch Blackwell LLP
13330 California Street, Suite 200
Omaha, Nebraska 68154
Telephone: 402.964.5000
Facsimile: 402.964.5050
E-mail: marnie.jensen@huschblackwell.com
       ryann.glenn@huschblackwell.com

Attorneys for Plaintiff
IOWA PORK PRODUCERS ASSOCIATION

E-FILED
11/12/2021 10:27 PM
Superior Court of California
County of Fresno
By: Louana Peterson, Deputy

## SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF FRESNO

| | |
|---|---|
| IOWA PORK PRODUCERS ASSOCIATION,<br><br>        Plaintiff,<br><br>     v.<br><br>ROB BONTA, in his official capacity as Attorney General of California, KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and TOMAS ARAGON, in his official capacity as Director of the California Department of Public Health,<br><br>        Defendants. | Case No. 21CECG03339<br><br>**Hon. Rosemary T. McGuire**<br><br>**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED RELIEF AND HEARING**<br><br>[Filed concurrently with Notice of Motion and Motion; [proposed] Order; and Declarations In Support Thereof]<br><br>Date:  May 18, 2022<br>Time:  3:30 p.m.<br>Dept: 502<br><br>Action Filed: November 9, 2021 |

1

1

**TABLE OF CONTENTS**

2

INTRODUCTION ................................................................................................................ 9

3

FACTUAL BACKGROUND .............................................................................................. 10

4

History of Proposition 12 through the lens of Proposition 2 ....................................... 10

5

The Plain Text of Proposition 12 ................................................................................. 12

6

Proposition 12 Criminal and Civil Enforcement .......................................................... 14

7

Protectionist Intent of Proposition 12 and Lack of Evidence Regarding Legitimate

8

Governmental Purpose ................................................................................................. 15

9

Pork Production in Iowa: Statistics and Industry Practices ....................................... 17

10

LEGAL STANDARD ........................................................................................................ 19

11

ARGUMENT ..................................................................................................................... 19

12

13

I. Plaintiff Is Likely to Succeed on the Merits of Its Claims. ...................................... 19

14

    A. Plaintiff is Likely to Succeed on Its Due Process Clause Claims ...................... 19

15

        1. Proposition 12 is unconstitutionally vague on its face and does not provide notice as to
        what conduct is criminalized ........................................................................................ 20

16

        2. Proposition 12 violates due process as applied to Plaintiff's members' conduct ......... 25

17

        3. California has failed to timely promulgate Final Regulations as mandated ................ 30

18

    B. Plaintiff is Likely to Succeed on Its Commerce Clause Claim ........................... 34

19

20

        1. Proposition 12 discriminates on its face against interstate commerce and favors in-state
        commerce in its purpose and effects, rendering it *per se* invalid ....................................... 35

21

        2. Proposition 12 burdens interstate commerce in a manner excessive to the local benefits
        ........................................................................................................................................ 38

22

23

        3. Proposition 12 regulates wholly extraterritorial conduct and seeks to create a national
        regulation on breeding pig confinement practices ........................................................... 40

24

II. Plaintiff—and the Nation's Pork Production Sector as a Whole—Will Suffer
Immediate and Irreparable Harm Absent a Preliminary Injunction to Preserve the

25

Status Quo ..................................................................................................................... 44

26

III. The Balance of the Equities Tips in Favor of Plaintiff ............................................ 49

27

CONCLUSION .................................................................................................................. 50

28

2

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*14859 Moorpark Homeowner's Assn. v. VRT Corp.*,
  63 Cal.App.4th 1396 (1998) ................................................................ 19

*Allison v. Block*,
  723 F.2d 631 (8th Cir. 1983) ............................................................... 32

*Am. Trucking Associations, Inc. v. City of Los Angeles*,
  559 F.3d 1046 (9th Cir. 2009) ............................................................. 44

*Arizona Dream Act Coal. v. Brewer*,
  757 F.3d 1053 (9th Cir. 2014) ............................................................. 44

*Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*,
  729 F.3d 937 (9th Cir. 2013) ............................................. 36, 41, 42, 43

*Associated General Contractors v. Coalition For Economic Equity*,
  950 F.2d 1401 (9th Cir. 1991) ............................................................. 44

*Baldwin v. G.A.F. Seeling, Inc.*,
  294 U.S. 511 (1935) ............................................................................. 40

*BNSF Ry. Co. v. California Dep't of Tax & Fee Admin.*,
  904 F.3d 755 (9th Cir. 2018) ............................................................... 19

*Borja v. Miles*,
  No. D.C. CIV. 85-0081A, 1986 WL 68917 (D. Guam App. Div. Oct. 22, 1986) ................... 32

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
  476 U.S. 573 (1986) ...................................................................... 35, 43

*Butt v. State of California*,
  4 Cal. 4th 668 (1992) .......................................................................... 19

*California Hosp. Ass'n v. Maxwell-Jolly*,
  776 F. Supp. 2d 1129 (E.D. Cal. 2011) (vacated and remanded on other grounds .................. 45

*City of Chicago v. Morales*,
  527 U.S. 41 (1999) .................................................................. 21, 23, 24

*City of Philadelphia v. New Jersey*,
  437 U.S. 617 (1978) ............................................................................. 39

*Coates v. City of Cincinnati*,
  402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) .............................................. 21

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

*Connally v. General Constr. Co.*,
   269 U.S. 385 (1926).......................................................................................... 9

*Cook Family Foods, Ltd. v. Voss*
   781 F.Supp. 1458 (C.D. Cal. 1991)............................................................... 32

*Craigmiles v. Giles*,
   312 F.3d 220 (6th Cir. 2002).......................................................................... 39

*Daniels Sharpsmart, Inc. v. Smith*,
   889 F.3d 608 (9th Cir. 2018)............................................................... 34, 40, 43

*Dean Milk Co. v. City of Madison, Wis.*,
   340 U.S. 349 (1951)........................................................................................ 39

*Desertrain v. City of Los Angeles*,
   754 F.3d 1147 (9th Cir. 2014)................................................................... 21, 22

*Dimaya v. Lynch*,
   803 F.3d 1110 (9th Cir. 2015)........................................................................ 22

*Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach*,
   232 Cal. App. 4th 1171 (2014) ..................................................................... 19

*Fulton Corp. v. Faulkner*,
   516 U.S. 325 (1996)........................................................................................ 34

*Galbreath v. City of Oklahoma City*,
   568 Fed.Appx. 534 (10th Cir. 2014).............................................................. 24

*H.P. Hood & Sons, Inc. v. Du Mond*,
   336 U.S. 525 (1949)................................................................................. 34, 40

*Hall v. De Cuir*,
   95 U.S. 485 (1877)......................................................................................... 38

*Healy v. Beer Institute, Inc.*,
   491 U.S. 324 (1989)........................................................................... 40, 41, 42

*Holmes v. New York City Hous. Auth.*,
   398 F.2d 262 (2d Cir. 1968)........................................................................... 32

*Hughes v. Oklahoma*,
   441 U.S. 322 (1979)........................................................................................ 37

*Hunt v. City of Los Angeles*,
   638 F.3d 703 (9th Cir. 2011).......................................................................... 26

*In re Focus Media*,
   387 F.3d 1077 (9th Cir. 2004)........................................................................ 19

4

*International Mill. Co. v. Columbia Transportation Co.*,
  292 U.S. 511 (1934) ........................................................................... 39

*Int'l Franchise Ass'n, Inc. v. City of* Seattle,
  97 F. Supp. 3d 1256 (W.D. Wash. 2015) ......................................... 37

*Iowa Utilities Board v. Federal Comm.,*
  *Commn.*, 109 F.3d 418 (8th Cir. 1996) ............................................. 44

*Johnson v. United States*,
  576 U.S. 591 (2015) ..................................................................... 9, 20

*King v. Meese*,
  43 Cal.3d 1217 (1987) ....................................................................... 19

*Lair v. Bullock*,
  697 F.3d 1200 (9th Cir. 2012) ........................................................... 19

*Lanzetta v. New Jersey*,
  306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939) ............................ 21

*Lawson v. Kolender*,
  658 F.2d 1362 (9th Cir. 1981) ........................................................... 20

*Leiva-Perez v. Holder*,
  640 F.3d 962 (9th Cir. 2011) (per curiam ......................................... 19

*Merrifield v. Lockyer*,
  547 F.3d 978 ....................................................................................... 35

*Monterey Mech. Co. v. Wilson*,
  125 F.3d 702 (9th Cir. 1997) ............................................................. 44

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
  22 F.3d 546 (4th Cir. 1994) ............................................................... 45

*N. Am. Meat Inst. v. Becerra*,
  420 F. Supp. 3d 1014 (C.D. Cal. 2019) ....................................... 36, 42

*N. Am. Meat Inst. v. Bonta*,
  141 S. Ct. 2854 (2021) ................................................................. 36, 42

*Nat'l Ass'n of Optometrists & Opticians v. Harris*,
  682 F.3d 1144 (9th Cir. 2012) ........................................................... 34

*Nat'l Collegiate Athletic Ass'n v. Miller*,
  10 F.3d 633 (9th Cir. 1993) ............................................................... 44

*Nelson v. NASA*,

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

530 F.3d 865 (9th Cir. 2008) .................................................................................... 45

*Oregon Waste Systems, Inc. v. Department of Environmental Quality of,*
*Ore.*, 511 U.S. 93 (1994) ........................................................................................... 35

*Pike v. Bruce Church, Inc.,*
397 U.S. 137 (1970) ........................................................................................... 38, 39

*Public Utilities Commission v. R.I. of Attleboro Steam & Elec. Co.,*
271 U.S.  (1927) ...................................................................................................... 38

*Publius v. Boyer-Vine,*
237 F. Supp. 3d 997 (E.D. Cal. 2017) ..................................................................... 42

*Ramos v. Wolf,*
975 F.3d 872 ............................................................................................................ 49

*Real Silk Hosiery Mills v. City of Portland,*
268 U.S. 325 (1925) ................................................................................................ 39

*Rent-A-Ctr., Inc. v. Canyon Television & Appliance Rental, Inc.,*
944 F.2d 597 (9th Cir. 1991) ................................................................................... 44

*S.D. Myers, Inc. v. City and Cty. of San Francisco,*
253 F.3d 461 (9th Cir. 2001) ............................................................................ passim

*Sam Francis Found. v. Christies, Inc.,*
784 F.3d 1320 (9th Cir. 2015) .......................................................................... 34, 43

*Sattler v. Foster,*
37 Fed.Appx. 311 (9th Cir. 2002) ..................................................................... 25, 31

*Sessions v. Dimaya,*
138 S. Ct. 1204 (2018) ............................................................................................ 26

*Shanko v. Lake Cty.,*
116 F. Supp. 3d 1055 (N.D. Cal. 2015) .................................................................. 33

*Stahl v. City of St. Louis,*
687 F.3d 1038 (8th Cir. 2012) .......................................................................... 23, 24

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas,*
139 S. Ct. 2449 (2019) .............................................................................................. 9

*U & I Sanitation v. City of Columbus,*
205 F.3d 1063 (8th Cir. 2000) ................................................................................. 42

*United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Management Authority,*
550 U.S. 330 (2007) .......................................................................... 34, 35, 36, 38

6

*United States v. Kozminski*,
    487 U.S. 931 (1988)................................................................. 25

*United States v. Parrel*,
    2:12-cr-0244 (E.D. Cal. May 24, 2013) ................................. 20

*United States v. Shetler*,
    665 F.3d 1150 (9th Cir. 2011)........................................... 20, 25

*Univ. of Hawaii Professional Assembly v. Cayetano*,
    183 F.3d 1096 (9th Cir. 1999)............................................... 49

*Valle Del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013)............................................... 22

*West Lynn Creamery, Inc. v. Healy*,
    512 U.S. 186 (1994)............................................................. 34

*Western Pioneer, Inc. v. U.S.*,
    709 F.2d 1331 (9th Cir. 1983)............................................... 32

*White v. Davis*,
    30 Cal. 4th 528 (2003) ......................................................... 19

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)................................................................. 19

**Statutes**

18 U.S.C § 2 ............................................................................. 27

18 U.S.C. § 371 ....................................................................... 27

Cal. Bus. & Prof. Code § 17203 ............................................. 14

Cal. Health & Safety Code § 25881(e)(1)................................ 25

Cal. Health & Safety Code § 25990....................................... passim

Cal. Health & Safety Code § 25990(a) ................................... 11

Cal. Health & Safety Code § 25990(b) ................................... 21

Cal. Health & Safety Code § 25990(b)(2) .......................... 11, 22

Cal. Health & Safety Code § 25991........................................ 22

Cal. Health & Safety Code § 25991(e) ............................... 11, 13

Cal. Health & Safety Code § 25991(e)(1)................................ 10

7

Cal. Health & Safety Code § 25991(e)(2) ................................................................. 26

Cal. Health & Safety Code § 25991(e)(3) ............................................................. 12, 14

Cal. Health & Safety Code § 25991(f) ...................................................................... 10

Cal. Health & Safety Code § 25991(q) ..................................................................... 25

Cal. Health & Safety Code § 25992 ..................................................................... 13, 39

Cal. Health & Safety Code § 25993 .............................................................. 13, 15, 20

Cal. Health & Safety Code § 25993(a) ...................................................................... 31

Cal. Health & Safety Code § 25993(b) ................................................... 14, 21, 24, 25

Cal. Health & Safety Code § 25993.1 ....................................................................... 30

Cal. Health & Safety Code § 25994 ........................................................................ 9, 13

California Penal Code § 27(a)(1) ............................................................................... 29

California Penal Code § 31 .................................................................................... 23, 29

California Penal Code § 181 ...................................................................................... 23

California Penal Code § 184 ...................................................................................... 28

sections 25990 through 25994 of the California Health and Safety Code ............................. passim

subdivision (b) of Section 25990 ......................................................................... 12, 13

United States Constitution25 ...................................................................................... 6

**Rules**

Rule 65 of the Federal Rules of Civil Procedure ..................................................... 8, 18

California L.R. 231 ................................................................................................... 48

**Other Authorities**

Assembly Bill 1437 ................................................................................................... 11

2021 CA REG TEXT 584571 ............................................................................... passim

Art. I, § 8, United States Constitution ....................................................................... 32

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

**INTRODUCTION**

Plaintiff Iowa Pork Producers Association, in a representative capacity for its members, ("IPPA" or "Plaintiff"), submits this Memorandum of Points and Authorities in Support of its Motion for Preliminary Injunction under Rule 65 of the Federal Rules of Civil Procedure. Plaintiff seeks a preliminary injunction to prohibit Defendants, Rob Bonta ("Bonta"), Karen Ross ("Ross") and Tomas Aragon ("Aragon") (collectively, "Defendants"), from enforcing California's Proposition 12 Farm Animal Confinement Initiative's ("Proposition 12"), and Chapter 13.8, sections 25990 through 25994 of the California Health and Safety Code.

The due process protected by the Constitution is fundamental to our system of laws, particularly in the criminal context. Those guarantees provide that no person may be deprived of life, liberty, or property by the government without the due process of law. "[T]he prohibition of vagueness in criminal statutes 'is a well-recognized requirement, consonant alike with ordinary notions of fair play and the settled rules of law,' and a statute that flouts it 'violates the first essential of due process.'" *Johnson v. United States*, 576 U.S. 591, 595-96 (2015) (quoting *Connally v. General Constr. Co.*, 269 U.S. 385, 391 (1926)). Proposition 12 disrupts the fundamental due process protections that guard against arbitrary enforcement and the immediate risk of criminal prosecution through the entire pork supply chain that exists <u>today</u> and will only worsen after January 1, 2022.

The authority of sovereign states to regulate conduct within their borders is beyond dispute, as it must be under our federalist system of government. But just as the Constitution protects states' police power in their own jurisdictions, so does it establish necessary limitations on their ability to burden interstate commerce or to extraterritorially regulate conduct in other states. This prohibition on state laws that unduly restrict interstate commerce is known as the "dormant Commerce Clause." And as Justice Alito summarized only a few years ago, the proposition that it "by its own force restricts state protectionism is deeply rooted in [the Supreme Court's] case law." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 139 S. Ct. 2449, 2460 (2019).California's Proposition 12 runs headlong against these and other constitutional principles. Lacking any basis in science or animal welfare reality, Proposition 12 would force America's pork producers to adhere to an onerous new

9

regulatory scheme that would force massive facility overhauls, raise costs on consumers, and place animals and humans at risk. It would dismantle tried-and-true industry practices established for generations, and substitute the political views of animal rights activists for the expertise of the agriculture professionals who steward Iowa's and the nation's pork production system, all while using the state's police powers to enforce vague regulations. And it would have pernicious effect on already cost-burdened California families and businesses by forcing them to pay dramatically higher costs for a critical food staple. *See*, *e.g.*, Alicia Wallace, *Pork is already super expensive. This new animal-welfare law could push prices higher*, CNN (last updated Oct. 17, 2021), available at https://cnn.it/3EoaH78.

This case—and the underlying preliminary injunction motion specifically—asks the Court to use its authority to bring California's illegal and unscientific experiment to a halt. This case presents a constitutional challenge to Proposition 12's confinement requirements and prohibition of the sale of pork meat within the State of California derived from breeding pigs confined in a manner inconsistent with Proposition 12. These arbitrary restrictions apply to *any* pork producer— regardless of where in the nation the producer operates—who is engaging, aiding, abetting or conspiring in the sale of whole pork meat into California, a state that is a massive consumer of America's overall pork supply. California's arbitrary and vague confinement requirements deviate from time-tested and scientifically supported national industry standards and pose immediate threat of irreparable harm not only to pork producers and pork consumers within Iowa and across the nation, but also to the wellbeing of the breeding pigs currently being raised.

Proposition 12 threatens the nation's food supply. America's agriculture industry and the public at large have a vital interest in maintaining the status quo on pork production methodologies in Iowa during the pendency of this action. Accordingly, Plaintiff's Motion for Preliminary and Permanent Injunction should be granted to protect the constitutional rights of the Plaintiff's members and those similarly situation in the industry, but also to avoid devastating, cascading effects on the nation's pork industry and the consumers who rely on it across the country.

## FACTUAL BACKGROUND

### *History of Proposition 12 through the lens of Proposition 2*

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

1    In 2008, California passed Proposition 2, a ballot initiative that imposed confinement

2  requirements on California pork producers. Cal. Health & Safety Code § 25990(a). Proposition 2

3  prohibited California pork producers from confining breeding pigs in a manner that does not allow

4  them to turn around freely, lie down, stand up, or fully extend their limbs (the "Turn Around

5  Requirements"). Cal. Health & Safety Code § 25991(e)(1). Proposition 2 gave California producers

6  significant time—over six years—to comply with these confinement requirements, with an

7  effective date of January 1, 2015. Cal. Health & Safety Code § 25990.

8    Out-of-state pork producers were not initially subject to these requirements. Cal. Health &

9  Safety Code § 25990(a). As the California Legislature recognized, out-of-state producers were at

10  an advantage over California in-state producers because they could raise animals and sell meat and

11  eggs at a cost lower than in-state producers. *See* Hearing before the Committee on Appropriations

12  on Assembly Bill 1437 (May 13, 2009) ("[Proposition 2] only applies to in-state producers."). To

13  rectify this ostensible disadvantage to California producers, the Legislature enacted Assembly Bill

14  1437 ("AB1437"), with a protectionist intent to impose certain confinement requirements for egg-

15  laying hens on out-of-state producers. *Id.* ("The intent of this legislation is to level the playing field

16  so that in-state producers are not disadvantaged."). AB1437 did not apply to calves raised for veal

17  or to breeding pigs.

18    After AB1437 passed, after being promoted and propagandized by animal rights activists

19  like the "Humane Society of the United States," Proposition 12 was submitted to the California

20  voters as a ballot initiative in 2018. *See* California Department of Food and Agriculture, Proposition

21  12  Implementation,  https://www.cdfa.ca.gov/ahfss/Prop12.html  ("CDFA  Proposition  12

22  Implementation"). Proposition 12's purpose and effect was to subject out-of-state pork and veal

23  producers to the Turn Around Requirements and further expand confinement restrictions to pork

24  producers nationwide through the adoption of Square Footage Requirements (hereafter defined).

25  Thus, Proposition 12's sole change to the Turn Around Requirements for breeding pigs was

26  targeted squarely (and exclusively) at out-of-state producers, as California producers had been

27  subject to these provisions since 2015. Cal. Health & Safety Code § 25990(b)(2). On November 6,

28  2018, California passed Proposition 12 as a ballot initiative. Although Proposition 2 allowed in-

11

state producers six years to comply before subjecting them to the Turn Around Requirements, Proposition 12 passed on November 8, 2018 and went into effect just six *weeks* later on December 19, 2018. As a result, Proposition 12 Turn Around Requirements became effective almost immediately upon out-of-state producers giving the pork industry no time to comply.

California also did not stop with the Turn Around Requirements and instead went a step further on imposing additional confinement restrictions described below. Health & Safety Code § 25991(e)(3). To continue to sell pork into California, out-of-state pork producers must comply with an onerous regulatory regime on which they had no input and which will create an intense pork shortage for California consumers beginning on January 1, 2022. *See* Declaration of Dr. Glynn T. Tonsor, ⁋ 26.

California is such a major consumer in the pork market that most producers will be forced to overhaul their entire facilities to comply. *Id.* ¶ 14. A single farm conversion may cost millions of dollars for one family owned farm.  Complaint, ¶ 103. The impact is billions upon the entire mid-west pork industry. Complaint, ¶ 72. California has thus effectively foisted its unscientific policy preferences upon the rest of the country.

### *The Plain Text of Proposition 12*

Chapter 13.8 of the California Health and Safety Code, created by Proposition 2 and amended by Proposition 12, prohibits "farm animal cruelty":

(a) A farm owner or operator within the state shall not knowingly cause any covered animal to be confined in a cruel manner.

(b) A business owner or operator shall not knowingly engage in the sale within the state of any of the following:

(1) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner.

(2) Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner.

(3) Shell egg that the business owner or operator knows or should know is the product of a covered animal who was confined in a cruel manner.

12

(4) Liquid eggs that the business owner or operator knows or should know are the product of a covered animal who was confined in a cruel manner.

Cal. Health & Safety Code § 25990.

Proposition 12 also implements an enforcement mechanism so California may criminally and civilly punish those who purportedly violate the prohibitions on "farm animal cruelty." It states:

(a) The Department of Food and Agriculture and the State Department of Public Health shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019.

(b) Any person who violates any of the provisions of this chapter is guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not to exceed one thousand dollars ($1,000) or by imprisonment in the county jail for a period not to exceed 180 days or by both such fine and imprisonment. In addition, a violation of subdivision (b) of Section 25990 constitutes unfair competition, as defined in Section 17200 of the Business and Professions Code, and is punishable as prescribed in Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code.

(c) The provisions of this chapter relating to cruel confinement of covered animals and sale of products shall supersede any conflicting regulations, including conflicting regulations in Chapter 6 (commencing with Section 40601) of Subdivision 6 of Division 2 of Title 22 of the California Code of Regulations.

Cal. Health & Safety Code § 25993.

California voters passed Proposition 12 on November 6, 2018. Cal. Health & Safety Code §§ 25990-25994. Proposition 12 amended the California Health and Safety Code Section 25990 (which had been enacted through the passage of Proposition 2) to prohibit the sale of any whole pork meat which the business owner knows or should know is the meat of a breeding pig, or the immediate offspring of a breeding pig, that was confined "in a cruel manner." *Id*. Confinement in a cruel manner is defined in two ways. Cal. Health & Safety Code § 25991(e). First, Proposition 12 prohibits confining a breeding pig inconsistent with the Turn Around Requirements. *Id*. Second, Proposition 12 prohibits confining a breeding pig after December 31, 2021, if that breeding pig is in a space less than twenty-four (24) square feet of usable floorspace per pig (the "Square Footage Requirements"). *Id*. This prohibits the confinement of breeding pigs in individual gestation stalls,

13

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

except for limited circumstances including short periods for insemination, during nursing, and for the five days leading up to the expected date of birth.

Proposition 12 was passed with an effective date of December 19, 2018. Cal. Health & Safety Code § 25990. It specified that the Square Footage Requirements would not go into effect until January 1, 2022. Health & Safety Code § 25991(e)(3). Proposition 12 did not have a delayed date for the Turn Around Provisions or the sale prohibition. As Defendants have publicly acknowledged, these Turn Around Requirements have been in effect since December 19, 2018. *See* Daniel A. Sumner *et al.*, Standardized Regulatory Impact Assessment of Proposed Regulations to Implement Proposition 12, July 2, 2020 ("SRIA") p. 6. This means that California producers had been provided six years to come into compliance with the Turn Around Requirements by the implementation of Proposition 2, while out-of-state producers were given six weeks to comply.

### *Proposition 12 Criminal and Civil Enforcement*

As is clear from its text, Proposition 12 imposes the threat of *criminal* prosecution on any "person who violates any of the provisions of this chapter" and subjects those persons to a fine of up to $1,000 or up to 180 days in county jail, or both. Cal. Health & Safety Code § 25993(b).  Any district attorney, local prosecutor, or the Attorney General's Office can prosecute Proposition 12 in regards to the Turn Around Requirements today and in regard to the Square Footage Requirements after January 1, 2022. Complaint, ¶ 168.

Besides criminal prosecution, Proposition 12 also provides that violating § 25993(b) *automatically* constitutes unfair competition, and is punishable under California's Consumer Protection Statute, under Division 7, Part 2, Chapter 5 of the Business and Professions Code, which imposes a fine of up to $2,500 per violation. Cal. Health & Safety Code § 25993(b). The California Business and Professions Code permits the California attorney general, any district attorney, county counsel, city attorney, city prosecutor, and even *any person* who can meet standing requirements to file a lawsuit to enforce the provisions of the chapter.  Cal. Bus. & Prof. Code § 17203.

Due to the vagueness of the underlying Act, the nuances of the appliable exceptions, and the potential criminal and civil enforcement that face any business owner or operator who merely "engages in the sale" of whole pork meat within California, Proposition 12 mandated that "the

14

Department of Food and Agriculture and the State Department of Public Health shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019" (the "Final Regulations").  Cal. Health & Safety Code § 25993. The mandate for the regulations inherently recognizes the vagueness of the statute and the need for clarification and guidance for compliance and for enforcement. The deadline of September 1, 2019 passed over two years ago without any Final Regulations.  On May 28, 2021, California's Department of Food and Agriculture ("CDFA") and Department of Public Health ("CDPH") finally published draft regulations, approximately one year and nine months past the statutory deadline identified in the Act (the "Proposed Regulations"). Despite this mandate, the CDFA and CDPH have failed to promulgate *any* Final Regulations as of the date of filing this action. The CDFA has publicly stated they will not promulgate even the Proposed Regulations, instead they are intending to submit new draft regulations for consideration. Complaint ¶ 13. The egregious nature of the failure to promulgate Final Regulations should not go unnoticed, as the Plaintiff's members could be deemed to be "engaged in the sale" of whole pork meat within California or otherwise aiding, abetting or conspiring to sell whole pork meat within California. The Plaintiff's members – and the rest of the pork production industry nationwide – are left without any understanding of how to comply and any district attorney or local prosecutor can unilaterally choose to enforce the Act because the law is in effect and they have the authority to do so.

### *Protectionist Intent of Proposition 12 and Lack of Evidence Regarding Legitimate Governmental Purpose*

Proposition 12 was drafted and will be implemented with a protectionist intent. One need not look any further than the stated purposes in Proposition 12 itself to find evidence of the Act's protectionist intent. One express purpose of Proposition 12 is to "prevent negative fiscal impacts" on the State of California. 2018 Cal. Legis. Serv. Prop. 12 (PROPOSITION 12) (WEST), Section 2. California passed Proposition 12 knowing full well that, unless out-of-state pork producers were subject to the same confinement requirements as those implemented through Proposition 2, in-state producers would be severely disadvantaged. Indeed, the Proposed Regulations published on May 28, 2021, confirm the protectionist intent behind Proposition 12. These explicitly noted that, unless

1    out-of-state farmers are required to comply with the confinement requirements as well, "[i]n-state

2    farms will find it more costly to compete with farms outside of the state when selling…whole pork

3    meat to an out of state buyer compared to farms located in states that do not have the same animal

4    confinement standards as described in the Act." 2021 CA REG TEXT 584571 (NS) at 10. The

5    FAQ's (hereinafter defined) further confirm the protectionist intent for allowing immediate

6    offspring of breeding pigs who do not meet Square Footage Requirements who are already in the

7    supply chain in 2021 but not yet sold, to be allowed to be sold in California. California did *not* grant

8    the same exception for whole pork meat that is non-compliant with the Turn Around Requirements

9    that have been in effect since December 18, 2018.  Because the Turn Around Requirements have

10   been in effect for *California producers* since January 1, 2015, these FAQ's allowing sell through

11   for non-compliance whole pork meat for the *new* Square Footage Requirements is clearly

12   protectionist in favor of those producers. California intended the extraterritorial nature of

13   Proposition 12 and for its regulations to apply across the country to benefit its own producers.

14       The Defendants' protectionist, far-reaching intent becomes increasingly clear when looking

15   to the California pork industry and economic impact Proposition 12 will have on its own producers.

16   California cannot come close to producing enough pork to meet the pork demand within California

17   borders. Complaint, ¶ 5; Declaration of Pat McGonegle, ¶ 10. California producers do not have

18   sufficient facilities to produce pork that would satisfy the demand for pork within California, and

19   thus, California consumers are heavily reliant on out-of-state producers. Complaint, ¶ 5. Because

20   the vast majority of pork needed for California consumers comes from out-of-state producers, the

21   resulting economic impact will fall on those who had no vote in passing Proposition 12. Besides its

22   protectionist purpose, there is a dearth of evidence that Proposition 12 will actually accomplish any

23   stated purpose of Proposition 12, which, in part, is to prevent animal cruelty. *See* Declaration of

24   Dr. Janeen Salak-Johnson, ¶ 22-25.

25       Finally, Proposition 12 sponsor materials disseminated throughout California before voting

26   in November 2018, were drafted and primarily sponsored by the animal activist organization

27   Humane Society of the United States ("HSUS"). HSUS materials display a protectionist intent to

28   reach  out-of-state  producers,  and  to  extend  Proposition  2's  confinement  restrictions

1   extraterritorially, well beyond California's borders. For example, a HSUS-sponsored editorial

2   indicated the HSUS was well aware California did not have a sizeable pork industry and that the

3   sales ban would prohibit out-of-state producers from selling into the California market if they did

4   not comply with Proposition 12. *See* Anna Keeve, "Farm Animal Rights Bill, Proposition 12:

5   Everything You Need to Know", *LA Progressive* (August 30, 2018), https://perma.cc/6G64-

6   AHUZ, (Humane League activist states that Proposition 12 "has the potential to be the biggest

7   legislative victory for animals in history, not just in the state but in the country."); Charlotte

8   Simmonds, "'History in the Making': California Aims for World's Highest Farm Animal Welfare

9   Law", *The Guardian* (March 7, 2018), https://perma.cc/6RL3-99ZL (The vice-president of farm

10  animals' protection for HSUS claims that Proposition 12 "is history in the making"). Overall,

11  through a brief review of the plain text of Proposition 12, the supporting Proposed Regulations and

12  ballot sponsorship materials, the protectionist intent to guard in-state producers and the economic

13  well-being of the State of California is prominently displayed.

14  ### *Pork Production in Iowa: Statistics and Industry Practices*

15  Iowa is the leading pork producing state in the United States and is the top state for pork

16  exports. Nearly one-third of the nation's hogs are raised in Iowa, and Iowa has approximately 5,418

17  hog farms, as well as an estimated 980,000 breeding pigs. *See* Declaration of Pat McGonegle, ¶¶ 6,

18  12. The Iowa pork industry is a major contribution to the state's economy. In 2020, pork sales in

19  Iowa totaled $40.8 billion, and generated at least $893 million in state and local taxes. *See* Ex. A to

20  McGonegle Decl. at p. 7. Last year, for example, there were an estimated 24 million total hogs and

21  pigs on Iowa farms. McGonegle Decl. ¶ 12. Nearly 150,000 jobs within the state are associated

22  with the Iowa pork industry, accounting for nearly 1 in 10 jobs for working Iowans. *Id*. ¶ 8.

23  The vast majority of Iowa pork producers do not currently comply with Proposition 12

24  confinement restrictions. *Id*. ¶ 17. Producers would need to substantially alter their practices to

25  come into compliance—either increasing the facility sizes, at a cost prohibitive to most farming

26  operations, or substantially decreasing the number of pigs on their farms, which translates to

27  crippling lost profits, waste and pork shortages. *Id*. ¶ 16.

28  Under current operations, breeding pigs (known also as breeding sows) are maintained on

1  sow-specific farms that are separated from other hog facilities. Declaration of Dr. Janeen Salak-

2  Johnson, ¶ 13. The gestation length of a pig is about 114 days, and average farrowing will occur

3  114 days after breeding. *Id.* ¶ 14. Piglets are then generally raised for three to four weeks before

4  they are weaned. *Id.* It takes another 24-26 weeks to continue raising and finishing the piglets until

5  they are ready to be slaughtered. *Id.* ¶ 15. Most breeding pigs are confined in 14-16 square foot

6  individual gestations stalls, because industry practice dictates that this is better for the health and

7  safety of both the pigs and their offspring. *Id.* ¶¶ 19; 43;45. When pregnant pigs are confined in

8  group confinement, it can be very harmful. *Id.* ¶¶ 30-41. Breeding pigs can be aggressive, and many

9  pigs will often fight or bully other pigs. *Id.* Aggression and the associated fear are among the main

10  sources of stress, and aggression negatively impacts reproductive performance and lower litter

11  performance. *Id.* ¶ 36.

12  Further, group confinement results in competition for food among breeding pigs, Johnson

13  Decl. ¶ 35, whereas individual confinement permits each pig to get optimal food individually. This

14  is significantly safer for both the breeding pigs themselves and for farmworkers. *Id.* ¶ 25. Group

15  confinement also results in additional welfare challenges to breeding pigs, including lameness,

16  body condition, and chronic stress. *Id.* ¶¶ 30-41. Breeding pigs moved from individual pens and

17  mixed into group pens at 25 days post-breeding had higher lesion scores, poor reproductive

18  performance, and more chronic stress. *Id.* ¶ 37. It is well known that chronic stress increases

19  stillborn piglets, and negatively impacts offspring behavior, stress-coping abilities, and immune

20  function, with these effects persisting throughout adult maturity. *Id.* ¶ 38. Lameness also reduces

21  pigs' lifespan and performance measures, including the number of lifetime piglets born alive. *Id.* ¶

22  40. Preventing lameness is critical because it severely compromises the health of the breeding pig

23  and her offspring. *Id.* Group confinement, by its very nature, also contributes to higher or faster

24  transmission of diseases, because it enables more nose-to-nose, nose-to-genital, and body-to-body

25  contact, as well as more oral contact with feces and urine. *Id.* ¶¶ 59-60.

26  Group confinement also threatens the safety of workers and requires substantially more

27  training that cannot be learned overnight. *Id.* ¶¶ 22-24. Breeding pigs can weigh up to 600 pounds

28  and when they are confined in group settings, they pose a potent risk of injury to their human

1  handlers. *Id.* ¶ 25. Because of the substantial harms associated with group confinement, the time-

2  tested practice in the pork production industry is to confine breeding pigs in individual stalls. *Id.* ¶

3  71. Not only would Iowa pork producers have to undergo massive efforts to comply with

4  Proposition 12, but they would also be required to implement practices which are not time-tested,

5  would not improve the lives of the breeding pigs and could instead harm breeding pigs, and would

6  not affect public health or safety.

7  **LEGAL STANDARD**

8  Plaintiff's Motion and Supporting Memorandum of Points and Authorities are filed under

9  Cal. Civ. Proc. Code §§ 526 and 527, under which the Court is afforded substantial discretion to

10  grant a preliminary injunction to preserve the status quo.

11  In granting a preliminary injunction, a trial court must consider these factors: "(1) the

12  likelihood that the plaintiff will prevail on the merits, and (2) the relative balance of harms that is

13  likely to result from the granting or denial of interim injunctive relief." *White v. Davis*, 30 Cal. 4th

14  528, 554, 68 P.3d 74, 91 (2003). The second factor "'involves consideration of such things as the

15  inadequacy of other remedies, the degree of irreparable harm, and the necessity of preserving the

16  status quo.'" *Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach*, 232 Cal. App. 4th 1171,

17  1177, 181 Cal. Rptr. 3d 577, 581–82 (2014) (quoting *14859 Moorpark Homeowner's Assn. v. VRT*

18  *Corp.*, 63 Cal.App.4th 1396, 1402, 74 Cal. Rptr. 2d 712 (1998)).

19  **ARGUMENT**

20  **I.   Plaintiff Is Likely to Succeed on the Merits of Its Claims.**

21  In evaluating the likelihood of success, "The trial court's determination must be guided by

22  a "mix" of the potential-merit and interim-harm factors; the greater the plaintiff's showing on one,

23  the less must be shown on the other to support an injunction." <u>Butt v. State of California</u>, 4 Cal. 4th

24  668, 678, 842 P.2d 1240, 1246 (1992) (citing *King v. Meese*, 43 Cal.3d 1217, 1227–1228, 240

25  Cal.Rptr. 829, 743 P.2d 889 (1987)). Here, Plaintiff is likely to succeed on the merits of its claim

26  in establishing that California's Proposition 12 is unconstitutional.

27  **A.   Plaintiff is Likely to Succeed on Its Due Process Clause Claims.**

28  Proposition 12 suffers from several constitutional defects, but most notable among them are

1    its due process violations. Although it criminalizes certain conduct, Proposition 12 fails to place

2    persons on notice as to what that conduct is prohibited, what conduct constitutes a violation, to

3    whom it applies within the supply chain, and what may deem out-of-state producers to be "engaged

4    in" the sale chain of pork when meat from their breeding pigs is sold into California. These failures

5    are apparent both on the face of the Act and as applied to Plaintiff's members' specific conduct in

6    the pork production industry. The facial and as-applied due process violations are only compounded

7    by the egregious disregard of an explicit statutory mandate to promulgate Final Regulations needed

8    for the vague Act, and Plaintiff's members are left without *any* Final Regulations with not only the

9    Turn Around Requirements in effect but now also the Square Footage Requirements going into

10   effect in just weeks. Complaint, ¶ 12; Cal. Health & Safety Code § 25993.

11       A statute violates due process when: (1) the state has passed a criminal statute; and (2) the

12   criminal statute fails to provide adequate notice to a person of ordinary intelligence of what conduct

13   is prohibited. *Lawson v. Kolender*, 658 F.2d 1362 (9th Cir. 1981). If a statute does not implicate

14   First Amendment concerns, the Court will evaluate a vagueness challenge as applied to Plaintiff's

15   specific conduct. *United States v. Parrel*, No. 2:12-cr-00244 (E.D. Cal. May 24, 2013). "In an as-

16   applied challenge, a statute is void for vagueness and thus unconstitutional under due process if the

17   statute: (1) does not define the conduct it prohibits with sufficient definiteness; and (2) does not

18   establish minimum guidelines to govern law enforcement." *United States v. Shetler*, 665 F.3d 1150

19   (9th Cir. 2011) (internal citations omitted). Proposition 12 fails under both standards, which each

20   present free-standing grounds for the finding that Plaintiff is likely to succeed on the merits of its

21   claims.

22       **1. Proposition 12 is unconstitutionally vague on its face and does not provide notice as**

23   **to what conduct is criminalized.**

24       The Fifth Amendment to the United States Constitution provides that "no person shall…be

25   deprived of life, liberty, or property, without due process of law." The government "violates this

26   guarantee by taking away someone's life, liberty, or property under a criminal law so vague that it

27   fails to give ordinary people fair notice of the conduct it punishes, or so standardless that it invites

28   arbitrary enforcement." *Johnson*, 576 U.S. at 595 (2015). "The prohibition of vagueness in criminal

20

1  statutes is a well-recognized requirement, consonant alike with ordinary notions of fair play and

2  the settled rules of law, and a statute that flouts it violates the first essential of due process." *Id*.

3  (internal citations omitted). "These principles apply not only to statutes defining elements of

4  crimes, but also to statutes fixing sentences." *Id*. at 596.

5     Proposition 12 is a criminal statute and states that "a business owner or operator shall not

6  knowingly engage in the sale within the state of … [w]hole pork meat that the business owner or

7  operator knows or should know" is meat of an animal confined in a cruel manner. Cal Health &

8  Safety Code § 25990(b). Proposition 12 further provides that "any person who violates any of the

9  provisions of this chapter is guilty of a misdemeanor" and subjects those persons upon conviction

10  to a fine of up to $1,000 or imprisonment for a period of up to 180 days, and that such violation

11  automatically constitutes unfair competition. Cal Health & Safety Code § 25993(b) This violates

12  the Due Process clause in multiple respects.

13     First, and most alarmingly, Proposition 12 imposes criminal penalties based upon facially

14  vague language. A statute is vague on its face when "no standard of conduct is specified at all. As

15  a result, men of common intelligence must necessarily guess at its meaning." *Desertrain v. City of*

16  *Los Angeles*, 754 F.3d 1147, 1155 (9th Cir. 2014) citing *Coates v. City of Cincinnati,* 402 U.S. 611,

17  614, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971) (internal quotation marks omitted)."Vagueness may

18  invalidate a criminal law for either of two independent reasons. First, it may fail to provide the kind

19  of notice that will enable ordinary people to understand what conduct it prohibits; second, it may

20  authorize and even encourage arbitrary and discriminatory enforcement." *Id.* citing *Morales,* 527

21  U.S. at 56, 119 S.Ct. 1849 (citation omitted). Ultimately, "[T]he purpose of the fair notice

22  requirement is to enable the ordinary citizen to conform his or her conduct to the law." *Id.* at 58,

23  119 S.Ct. 1849. A penal statute cannot require the public to speculate as to its meaning while risking

24  life, liberty, and property in the process. *Id.* at 1155, citing *Lanzetta v. New Jersey,* 306 U.S. 451,

25  453, 59 S.Ct. 618, 83 L.Ed. 888 (1939).

26     Here, the Act prohibits the sale of non-compliant whole pork meat through the threat of

27  criminal penalties on anyone "engaged in" the sale of meat within California but fails to define the

28  term "engaged in." Cal. Health & Safety Code §§ 25990(b)(2) and 25991. This term is facially

1    overbroad and requires the entire pork supply chain, including Plaintiff's members, to speculate as

2    to its meaning while concurrently risking their livelihoods and liberty to be free from criminal

3    prosecution. Because of the complexities of the supply chain, any number of those within the chain

4    know that the pork is going to California.  California is the largest consumer of pork in the country.

5    Many specifically know their pork is going to processors and packers who will sell it to California.

6    Thus, the Attorney General's Office, but also any district attorney in whom they have no control,

7    has the authority to criminally indict anyone "engaged in the sale" and this can apply to the

8    Plaintiff's members.

9         Proposition 12 does not clearly define when the violation subject to criminal liability occurs

10   or who throughout the supply chain can be criminally prosecuted. Statutes have been struck down

11   as violative of due process rights within the Ninth Circuit for similar circumstances.  For example,

12   in *Desertrain v. City of Los Angeles,* a California statute prohibiting any person from utilizing a

13   vehicle "as living quarters either overnight, day-by-day, or otherwise" without defining "living

14   quarters" or specifying how long—when—is "otherwise" was found to violate due process as

15   unconstitutionally vague. *Desertrain*, 754 F.3d at 1156. The Court reasoned the plaintiffs would be

16   kept guessing as to what conduct would subject them to citation and arrest by an officer. *Id.  See

17   also Dimaya v. Lynch*, 803 F.3d 1110 (9th Cir. 2015) (definition of "violent felony"

18   unconstitutionally vague); *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006 (9th Cir. 2013) (statute's

19   definition unconstitutionally vague). Similarly, Plaintiff's members are left guessing whether

20   supplying non-compliant whole pork meat to a packer who ultimately sells into California is

21   considered "engaging in the sale" of whole pork meat that the Plaintiff's members "know or should

22   know" is non-compliant with Proposition 12 because of the facially vague language of the Act

23   itself. Cal. Health & Safety Code § 25990(b)(2).

24        The risk of criminal enforcement is compounded when further evaluating due to the

25   standard criminal conspiracy and aiding and abetting standards within the California Penal Code.

26   For example, under California Penal Code § 181, if two or more persons conspire to commit "any

27   act injurious to the public health, the public morals … or the due administration of the laws" they

28   could be punished by imprisonment in county jail for up to one year or by a fine not exceeding

1   $10,000 or by both the imprisonment and fine. It is possible that an out-of-state producer not in

2   compliance with Proposition 12 and a packer who sells that producer's meat in California could be

3   charged and/or found to "conspire" to commit an act injurious to the administration of the laws. In

4   addition, under California Penal Code § 31, "All persons concerned in the commission of a crime,

5   whether it be felony or misdemeanor, and whether they directly commit the act constituting the

6   offense, or aid and abet in its commission" are considered and charged as *principals* in the crime

7   committed. Under this provision, an out-of-state producer could similarly be found to aid and abet

8   in a misdemeanor—a penalty for violating Proposition 12—if selling its meat to a packer who may

9   eventually sell such meat in California is considered "aiding and abetting" the violation of

10  Proposition 12. This means that Proposition 12 potentially criminalizes behavior of an individual

11  at the beginning of the production chain who knows that the packer will sell their pork to California

12  but has no authority to tell them not to do so. *Stahl v. City of St. Louis*, 687 F.3d 1038, 1041 (8th

13  Cir. 2012) is on point regarding this ambiguity. *See also City of Chicago v.* Morales, 527 U.S. 41,

14  55 (1999) (holding a vague law with no *mens rea* requirement that infringes on a constitutional

15  right "is subject to facial attack"). Stahl involved a statute that criminalized conduct that had the

16  consequence of impeding pedestrians or vehicular traffic. The Court found this to be

17  unconstitutional because, at the time an individual would engage in the relevant criminal conduct,

18  that individual would have no way of knowing whether the conduct or speech would have the effect

19  of obstructing such traffic until after the obstruction occurred.

20          Similarly, Proposition 12 does not contain a true *mens rea* requirement because an owner

21  or operator can be in violation of Proposition 12 without knowing it at the time of the violation or

22  intending the violation. Section 25990 prohibits a "business owner or operator from *knowingly*

23  engaging in the sale" within California of whole pork meat "that the business owner or operator

24  knows *or should know* is the meat of a covered animal who was confined in a cruel manner. Cal.

25  Health & Safety Code § 25990 (Emphasis added). The language "should know" combined with the

26  complexity of the supply chain and the size of the California market removes any purposeful *mens*

27  *rea* requirement and criminalizes conduct that an owner or operator may not purposefully and

28  knowingly engage in – nor which they have any authority to stop. Proposition 12 only imposes

23

1    regulations on out-of-state producers where their pork product is sold "within" the state of

2    California, but the nature of pork production is such that a producer will have no way of tracking

3    which portions of their product will make its way to California until *after* that meat has entered the

4    California market. *See* Declaration of Pat McGonegle, ¶ 19. Likewise, many packers often sell

5    whole pork meat to additional processors who process the meat into additional products that are

6    subject to Proposition 12 (e.g. bacon, sausage). *Id.* By the language of Proposition 12, a producer

7    or packer will not know whether they must comply with the requirements of Proposition 12 and

8    relevant regulations for *any* breeding pig in confinement due to the nature of pork production. Thus,

9    the violation does not hinge on the producer's actions, but instead hinges on what happens down

10   the line in the production change after multiple third parties have intervened. *Stahl,* 687 F.3d at

11   1041 ("[T]he problem is that the ordinance does not provide people with fair notice of *when* their

12   actions are likely to become unlawful.") (emphasis added). *See also City of Chicago v. Morales*,

13   527 U.S. at 59 ("Because an officer may issue an order only *after* prohibited conduct has already

14   occurred, it cannot provide advanced notice to potential violators of the ordinance."); *Galbreath v.*

15   *City of Oklahoma City*, 568 Fed.Appx. 534, 541 (10th Cir. 2014) (finding that because an ordinance

16   that contained undefined phrases and lacked a scienter requirement, a reasonable jury could find

17   the ordinance violated the Due Process Clause).

18       Finally, Proposition 12 does not provide a person of ordinary intelligence sufficient notice

19   as to what constitutes a "violation" under "this chapter," and thus, a person of ordinary intelligence

20   cannot discern precisely what conduct will lead to a punishment. Proposition 12 fails to satisfy due

21   process in this regard because it vaguely states that any person who violates any of the provisions

22   of "this chapter" shall be punished criminally. Cal. Health & Safety Code § 25993(b).

23       Additionally, Proposition 12's two requirements, the Turn Around Requirements and the

24   Square Footage Requirements, are only mentioned in one phrasing in the statute, providing no

25   further definition of what these terms even mean.  Cal. Health & Safety Code § 25881(e)(1) and

26   (3). The practical implication of how to implement these two sets of requirements is complex.

27   Proposition's own mandate within the Act requiring Final Regulations, is a per se admission, of the

28   vagueness of the underlying statute.

1    Proposition 12 fails to give the public "fair notice of prohibited conduct," yet California has

2    stated that the Turn Around Requirements are in effect now and any district attorney in California

3    can prosecute and enforce Proposition 12 and can further do so after the Square Footage

4    Requirements go into effect January 1, 2022.Complaint, ¶¶ 58, 60. *Sattler v. Foster*, 37 Fed.Appx.

5    311, 312 (9th Cir. 2002) (citing *United States v. Kozminski*, 487 U.S. 931, 949-50 (1988)). Each of

6    these vague, undefined terms in Proposition 12 fails to give ordinary people fair notice of the

7    conduct it punishes and prevents pork producers from conforming their conduct to act in accordance

8    with Proposition 12, leaving the public to guess what is or is not prohibited.

9    **2. Proposition 12 violates due process as applied to Plaintiff's members' conduct.**

10   Proposition 12 also violates the Due Process Clause through an as-applied challenge to

11   Plaintiff's members' conduct because it (1) does not define the conduct it prohibits with sufficient

12   definiteness; and (2) does not establish minimum guidelines to govern law enforcement." *United*

13   *States v. Shetler*, 665 F.3d 1150 (9th Cir. 2011) (internal citations omitted). For the first prong of

14   an as-applied challenge, for judicial economy purposes, Plaintiffs refer the Court to the immediate

15   prior section outlining the vagueness of the underlying Act. In addition, and specifically when

16   considering how producers are forced to speculate how to comply with Proposition 12, Proposition

17   12 also fails to address how producers are to comply with *both* Turn Around Requirements and

18   Square Footage Requirements in actual real-world practice. A sale could be compliant with the

19   Turn Around Requirements of Proposition 12 by selling whole pork meat from a breeding sow who

20   was able to "turn around freely" (an additional defined term in Proposition 12), while *not* being in

21   compliance with the Square Footage Requirements of Proposition 12. Cal. Health & Safety Code

22   § 25991(q). In short, Proposition 12 fails to give adequate notice as to how the two "cruel

23   confinement" prohibitions work in tandem with each other in practice.  For example, a breeding

24   sow must be able to turn around freely without touching the sides of an enclosure *or another animal*

25   to satisfy the Turn Around Requirements. *Id.* In contrast, the Square Footage Requirements require

26   a breeding sow to be housed within a space that contains 24 square feet of usable floorspace per

27   sow. Cal. Health & Safety Code § 25991(e)(2). These types of group housing environments

28   undoubtedly will result in breeding sows being placed in large group pens together where they

1  *cannot* turn around freely without touching the sides of an enclosure or another animal. Johnson

2  Decl., ¶ 21.

3      Proposition 12 also has failed to establish *any* minimum guidelines to govern law

4  enforcement, making the risk of arbitrary enforcement immediate and imminent. First, Proposition

5  12 fails to guide officials on *how* to enforce the penalties in the Act, thus inviting arbitrary

6  enforcement. The prohibition against vagueness in criminal statutes not only gives ordinary people

7  fair notice of the proscribed conduct, but it also "guards against arbitrary or discriminatory law

8  enforcement" by requiring that statutes "provide standards to govern the actions of police officers,

9  prosecutors, juries, and judges." *Sessions v. Dimaya*, 138 S. Ct. 1204, 1212 (2018). Proposition 12

10  directly violates this principle.

11      Second, Proposition 12 fails to guide enforcement officials on how Proposition 12 is to be

12  enforced on out-of-state producers, business owners and operators who are "engaged in" the sale

13  of whole pork meat in California and further how that is to be interpreted and applied. The vague

14  definitions and language of Proposition 12 will certainly invite arbitrary enforcement—both within

15  California and at its borders at the time of entry of non-compliant whole pork meat.  This type of

16  regulation was stricken *in Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011), where

17  the Court ruled that because "the line between allowable and prohibited sales of merchandise is so

18  murky, enforcement of the ordinance poses a danger of arbitrary and discriminatory application."

19  There, the Court reasoned that a police officer "would have to engage in a 'highly fact-specific

20  analysis' to determine whether a person selling merchandise is relaying a message, whether that

21  message qualifies as being religious, political, philosophical, or ideological, and whether that

22  message is inextricably intertwined with the products being sold. Without any clear guidance from

23  § 42.15 (2004) on these issues, such determinations would necessarily be left to the subjective

24  judgment of the officer."

25      CDFA's Animal Care Program (ACP), which was formed to implement Proposition 12,

26  issued FAQs on March 5, 2021, in an attempt to try to clarify some of the confusion created by

27  Proposition 12's underlying vague statute ("FAQs"). *See* CDFA AHFSS Animal Care Program

28  Prop          112          FAQ,          (March          5,          2021),

1    https://www.cdfa.ca.gov/AHFSS/pdfs/Prop_12_FAQ_March_2021.pdf.

2         CDFA's FAQs state that pork in inventory is legal to sell through to California after January

3    1, 2022 that is not otherwise complaint with the Square Footage Requirements. Specifically, the

4    FAQs state: Q. "Will inventory of shell eggs, liquid eggs and pork meat already in stock prior to

5    January 1, 2022 need to be discarded if this covered product originated from animals not raised

6    according to the confinement standards of cage-free for hens and *twenty-four square feet per*

7    *breeding pig*?" A. "No. The definition of "confined in a cruel manner" changes at the end of the

8    day on December 31, 2021 for egg-laying hens and breeding pigs. Therefore, the shell eggs, liquid

9    eggs and pork meat already in inventory or commerce on December 31, 2021 will still be legal to

10   sell in California." *Id.* at Question/Answer 4 (emphasis added).

11        While this FAQ provides relief for the sale of pork inventory not otherwise compliant with

12   the Square Footage Requirements, it does provide relief for the same pork that is not compliant

13   with the Turn Around Requirements.  CDFA's position is that pork not compliant with the Turn

14   Around Requirements cannot be sold now or after January 1, 2022 because the effective date for

15   the Turn Around Requirements was December 19, 2018. Complaint, ¶ 58. Thus, this sell through

16   allowed for existing inventory that is not compliant with the Square Footage Requirements is

17   meaningless to Plaintiff's members, as only California in-state producers are in compliance with

18   the Turn Around Requirements after enjoying their six years before the Turn Around Requirements

19   went into effect after Proposition 2 was passed on November 6, 2008 for California producers --

20   and fourteen years since then.

21        As a  result, Proposition 12 and CDFA have rendered all pork non-compliant for sell

22   through *other than for California producers* who are already in compliance with the Turn Around

23   Requirements, as discussed in more detail below.  This protectionist intent and agenda by the state

24   of California also culminates into a due process violation because it creates inconsistent and

25   arbitrary enforcement against out-of-state producers.  Because six years was given to in-state

26   California producers and processors to comply with Turn Around Requirements (and 14 years since

27   the initiative was passed), California in-state producers and processors are in compliance with the

28   Turn Around Requirements and the FAQs provide relief for their sell through to California after

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

January 1, 2022.  Thus, the only legal pork that can be sold in California is pork produced within the state of California.  Out-of-state producers, who were faced with an immediate effective date of the Turn Around Requirements, are not allowed the same sell through as California in-state producers and processors.  This renders the vast majority of the industry's pork illegal to sell into California and exposes out-of-state producers and processors to criminal exposure and penalties that in-state California producers and processors will not face.

Informally, CDFA is also issuing inconsistent guidance to the public on whether sell through will be allowed for pork born prior to January 1, 2022 that is not compliant with the Turn Around Requirements.  The inconsistent guidance on this specific issue is extremely problematic, because enforcement of these provisions in an arbitrary manner could bring serious harm to those in the pork supply chain.

This also creates the risk of arbitrary enforcement and it is further compounded when considering the additional risk of prosecution through conspiracy and aiding and abetting charges that any city or county prosecutor or Attorney General can file, as discussed above. The fact the CDFA and CDPH currently say they will not enforce in Iowa does not matter. They are not a criminal enforcement agency and have no authority or control over the criminal enforcement agencies, as they have continued to state to the industry. The fact that CDFA and CDPH state that they will not implement the regulations until they are final, does not matter. The most acute risk to Plaintiff's and the industry is by the criminal enforcement agencies and private parties, not CDFA or CDPH.  Any district attorney or the Attorney General's office can enforce Proposition 12 now, not to mention private parties who can file actions.  Proposition 12 is in effect without the Final Regulations and CDFA has stated that they will not issue Final regulations before the final statutory provisions go into effect January 1, 2022.  CDFA, despite their own failure to promulgate the Final Regulations, has warned of the imminent risk of prosecution against the industry and including against Midwest pork producers, including the Plaintiff. Due Process is about the authority to enforce – and the imminent risk that it creates.  Here, the risk is imminent for the Turn Around Requirements and will further expand after January 1, 2022 for the Square Footage Requirements, which is just weeks away as of this filing.  California's state prosecutors have the authority to

1    enforce and Plaintiff's members and the industry face current risk of enforcement.

2        The California Penal Code § 27(a)(1) states as follows: "[a]ll [persons] who, being within

3    this state, cause or aid, advise or encourage, another person to commit a crime within [California],

4    and are afterwards found therein" "are liable to punishment under the laws of [California]."); §184

5    ("No agreement amounts to a conspiracy, unless some act, beside such agreement, be done within

6    [California] to effect the object thereof, by one or more of the parties to such agreement . . .").

7        Again, under California Penal Code § 31, any person aiding and abetting in the commission

8    of a misdemeanor may be charged as a principal of the crime.  Under California's Jury Instructions,

9    a defendant is guilty of aiding and abetting a crime if:  (1) [a] perpetrator commits the crime;  (2)

10   [t]he defendant knew that the perpetrator intended to commit the crime;  (3) [b]efore or during the

11   commission of the crime, the defendant intended to aid and abet the perpetrator in committing the

12   crime;  and (4) [t]he defendant's words or conduct did in fact aid and abet the perpetrator's

13   commission of the crime.  Someone aids and abets a crime if he or she knows of the perpetrator's

14   unlawful purpose and he or she specifically intends to, and does in fact, aid, facilitate, promote,

15   encourage, or instigate the perpetrator's commission of that crime.  If all of these requirements are

16   met, the defendant does not need to actually have been present when the crime was committed to

17   be guilty as an aider and abettor.  Again, it is plain to see how Plaintiff's members could incur

18   liability under the Act by aiding and abetting if the producer aided, facilitated, promoted,

19   encouraged, or instigated an entity in the sale of pork to sell non-compliant pork in California and

20   they knew that the entity sold the non-compliant pork into California.

21       Proposition 12's good faith defense, when applied in conjunction with the currently draft

22   Proposed Regulations (which are still yet to change again and are not final in nature), will further

23   compound arbitrary enforcement issues due to a clear lack of minimum guidance for law

24   enforcement. The Proposed Regulations detail that the "certification" requirements are to go into

25   effect January 1, 2023. Cal. Dept. of Feed and Agric., Animal Confinement Proposed Text, May

26   25, 2021, at 30. Yet, the prohibited sale of whole pork meat in violation of the Turn Around

27   Requirements are already in effect and the new Square Footage Requirements will go into effect

28   on January 1, 2022. *Id.* at 29; Complaint, ¶ 58. One means of avoiding criminal prosecution is

1    through the good faith defense exception present within the Act itself. It states,

2         "It shall be a defense to any action to enforce subdivision (b) of Section 25990 that a

3    business owner or operator relied in good faith upon a written certification by the supplier that the

4    whole veal meat, whole pork meat, shell egg, or liquid eggs at issue was not derived from a covered

5    animal who was confined in a cruel manner, or from the immediate offspring of a breeding pig who

6    was confined in a cruel manner."

7         Cal. Health & Safety Code § 25993.1.

8         This defense presumes a valid certification system exists at the time Proposition 12 is in

9    effect and business owners and operators are subject to potential enforcement action. The sheer

10    timing of introduction of a certification system not until January 1, 2023 will remove the ability of

11    a producer, business owner or operator to raise any good faith defense to a violation of the Act

12    because no certifications of compliance with Proposition 12 will be issued until January 1, 2023.

13    Without this mechanism, processors and distributors who ultimately complete the final sale into

14    California are left without a valid good faith defense to rely upon. Further, producers are left

15    without a means to obtain a certification of compliance and are left without notice of how to comply

16    with Proposition 12.

17         One final, yet significant example of the Proposed Regulations' wholesale failure to guide

18    enforcement officials, and thus inviting arbitrary enforcement, is under Section 1322.4 of the

19    Proposed Regulations. Under this Section, beginning on January 1, 2022, all shipping invoices,

20    bills of lading, and shipping materials for all shipments of whole pork meat entering the state shall

21    include the statement "California 24+ Compliant." Cal. Dept. of Food and Agric., Animal

22    Confinement Proposed Text, May 25, 2021, at 32. However, without Final Regulations, no person

23    would be able to actually affirm that the whole pork meat entering the state is "California 24+

24    Compliant" and no enforcement official could understand how to fairly and consistently enforce

25    the Act to ensure compliance.   This will only exacerbate an already ripe situation for arbitrary

26    enforcement.

27         **3. California has failed to timely promulgate Final Regulations as mandated.**

28         Proposition 12 mandated that "the Department of Food and Agriculture and the State

1   Department of Public Health *shall* jointly promulgate rules and regulations for the implementation

2   of *this act* by September 1, 2019." Cal. Health & Safety Code § 25993(a)(emphasis added). This

3   mandate would have provided producers a minimum of two years and four months from the time

4   Final Regulations were promulgated until the Square Footage Requirements become effective on

5   January 1, 2022. Despite this express mandate within the Act, California has promulgated no Final

6   Regulations related to *either* the Turn Around Requirements or the Square Footage Requirements.

7        Proposition 12 mandated Final Rules for "this act" – the entire act, yet the Turn Around

8   Requirements went into effect just *six weeks* later on December 19, 2018 failing to provide CDFA

9   with even an opportunity to promulgate them. Cal. Health & Safety Code §§ 25990(a) - 25994.

10  Thus, the vast majority of whole pork meat sold into California does not currently comply with the

11  Turn Around Requirements, placing those supplying the state's pork demand at immediate risk for

12  criminal prosecution. Cal. Health & Safety Code § 25990; McGonegle Decl. ¶ 17.

13       Defendant's deadline came and went on September 1, 2019 without even draft Proposed

14  Regulations being issued, let alone Final Regulations.   It was not until May 28, 2021 that draft

15  Proposed Regulations were issued.  Yet, Defendants have stated that the Proposed Regulations will

16  *not* be promulgated and new draft regulations will be forthcoming.  Yet, the January 1, 2022,

17  effective date for the Square Footage Requirements is less than two months away with no Final

18  Regulations.  This egregious disregard of California law by Defendants is unprecedented and

19  violates the Due Process clause by failing to provide individuals of ordinary intelligence a

20  reasonable opportunity to know what conduct is actually prohibited, so they may act to avoid

21  criminal prosecution.  Further, California's failure to promulgate the Final regulations as required

22  has created a ripple of risk throughout the entire supply chain which is now paralyzed as a result of

23  California's negligence to adhere to their own law.

24       Defendants' egregious conduct is unprecedented that Plaintiff could not locate any other

25  instance within the country in which a state was mandated by statute to promulgate regulations

26  mandated, failed to do so and left the threat of immediate enforcement. However, it is undeniable

27  that due process requires fair notice of prohibited criminal conduct  *See Sattler*, 37 Fed. Appx. at

28  312 (9th Cir. 2002) ("Due process requires fair notice of prohibited conduct before a sanction can

1   be imposed."). In the absence of any analogous situation as egregious as Defendants', the failure to

2   promulgate any Final Regulations whatsoever or to provide any standard of enforcement, despite

3   an explicit statutory obligation to do so, necessarily results in a due process violation on its own. A

4   review of precedent that has determined even deficient regulations that could not put individuals

5   on notice of prohibited conduct should allow this Court to conclude the failure to promulgate *any*

6   Final Regulations where mandated by statute constitutes a *per se* violation of the Due Process

7   clause when the statute is in effect and can be enforced.

8       For example, in *Cook Family Foods, Ltd. v. Voss*, 781 F.Supp.1458, 1471-72 (C.D. Cal.

9   1991), a pork producer challenged California's regulations, methods, and procedures used to test

10  weight of water added to ham products. The Court held that a regulation that lacked numerical

11  standards regarding the weight of water added to ham products and permitted the inspectors (those

12  enforcing the regulations) to develop their own standard on a case-by-case basis failed to provide

13  the public with fair notice and therefore violated the plaintiff's due process rights. In so holding,

14  the Court said, "The lack of standards is unfair to Plaintiff and inspectors alike" because the

15  processors could not predict what the inspectors could allow, and the inspectors were uncertain as

16  to how much allowance to provide in enforcing the regulations. *Id.*

17      *See also Borja v. Miles*, No. D.C. CIV. 85-0081A, 1986 WL 68917 (D. Guam App. Div.

18  Oct. 22, 1986) (finding that employee was deprived of due process where a state police department

19  fails to provide specific procedures and policies regarding separation from the service of employees

20  as required by statute); *Western Pioneer, Inc. v. U.S.*, 709 F.2d 1331 (9th Cir. 1983) (holding that

21  the Coast Guard's failure to promulgate enforcement guidelines was not a violation of due process

22  because the Coast Guard had discretion to promulgate such guidelines); *Allison v. Block*, 723 F.2d

23  631 (8th Cir. 1983) (holding that the Secretary of Agriculture's failure to promulgate regulations

24  for creating a program for loan deferrals under a federal statute violated that statute and resulted in

25  a denial of due process); *Holmes v. New York City Hous. Auth.*, 398 F.2d 262 (2d Cir. 1968) (finding

26  that a Housing Authority's alleged lack of adopted standards for allocating housing was sufficient

27  to state a claim for relief under the due process clause).

28      Defendants have continued to confirm, what is certainly true, that local district attorneys

32

and prosecutors, and private parties, can immediately and currently enforce Proposition 12 despite their own failure to promulgate the Final Regulations, but that they have no authority to extend the effective dates of the two requirements. The FAQ's state that "with respect to a delay in enforcement, ACP does not have authority to extend the compliance deadlines provided for in the statute established under Proposition 12 for covered animals and covered products." *See* CDFA AHFSS Animal Care Program Prop 112 FAQ, (March 5, 2021), https://www.cdfa.ca.gov/AHFSS/pdfs/Prop_12_FAQ_March_2021.pdf. This is because only 4/5ths of the legislature is required to amend the Act itself. Complaint ¶ 148; 2018 Cal. Legis. Serv. Prop. 12 (PROPOSITION 12) (WEST), Section 8 ("This Act shall be amended only by a statute approved by a vote for four fifths of the members of both houses of the Legislature.") There is no proposal to amend the Act before the California legislature.  This, however, is even unlikely to occur because any amendment made under this authority must be consistent with the underlying purpose of the Act itself. *Id.* ("Any amendment of this Act shall be consistent with and further the purposes of this Act.") Due to California's failure to promulgate the Final Regulations, and due to the time involved in the breeding cycle for pigs and the time from farrowing, Plaintiff has neither enough notice nor time to comply with Proposition 12 and does not know how to do so without the required regulatory guidance.

Failure to comply with Proposition 12 potentially results in criminal prosecution for out-of-state producers and processors and undoubtedly threatens to take away the livelihoods and liberty of those within the  out-of-state industry without providing adequate notice. *See generally Shanko v. Lake Cty.*, 116 F. Supp. 3d 1055, 1064-65 (N.D. Cal. 2015) (the due process provisions prohibit a state from depriving a person of a property interest without notice and an opportunity to be heard). Plaintiff's members have a legally protected property interest in their farming operations and the proceeds of their labor. The failure to timely promulgate Final Regulations threatens immediate criminal prosecution that will take away a constitutional right to be free from the consequences of criminal prosecution through the enforcement of a facially vague law. This unprecedented, flagrant disregard for those working and living within the pork industry threats the constitutional rights that Due Process Clause exists to protect.

1    **B.**    **Plaintiff is Likely to Succeed on Its Commerce Clause Claim.**

2          Article I, § 8 of the Constitution provides that Congress shall have the power to regulate

3    commerce among the several states. This clause has been interpreted to mean that, because

4    Congress has the power to regulate interstate commerce, the states specifically cannot take actions

5    that limits, discriminates, or burdens interstate commerce. *See United Haulers Ass'n, Inc. v.*

6    *Oneida-Herkimer Solid Waste Management Authority*, 550 U.S. 330 (2007). This doctrine is known

7    as the "dormant Commerce Clause." *Id*. The dormant Commerce Clause carries out "the Framers'

8    purpose to prevent a state from retreating into economic isolation of jeopardizing the welfare of the

9    Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across

10   its borders that commerce wholly within those borders would not bear." *Fulton Corp. v. Faulkner*,

11   516 U.S. 325, 330-31 (1996). "Our system, fostered by the Commerce clause, is that every farmer

12   shall be encouraged to produce by certainty that he will have free access to every market in the

13   Nation. . .'" *West Lynn Creamery, Inc. v. Healy*, 512 U.S. 186, 206-07 (1994) (quoting *H.P. Hood*

14   *& Sons, Inc. v. Du Mond*, 336 U.S. 525, 539 (1949)).

15         Dormant Commerce Clause jurisprudence recognizes three ways a state statute may violate

16   the dormant Commerce Clause: (1) the law discriminates on its face, in its purpose or effects,

17   against interstate commerce and favors in-state commerce; (2) the law has a substantial burden on

18   out-of-state commerce; and (3) the law regulates extraterritorial conduct or seeks to regulate an

19   activity nationwide. *See generally Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323-24

20   (9th Cir. 2015*); Nat'l Ass'n of Optometrists & Opticians v. Harris*, 682 F.3d 1144, 1148 (9th Cir.

21   2012); *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 616 (9th Cir. 2018). The Ninth Circuit

22   follows a two-tiered approach when reviewing challenges to local regulations

23         [1] When a statute directly regulates or discriminates against interstate commerce, or when

24   its effect is to favor in-state economic interests over out-of-state interests, we have generally struck

25   down the statute without further inquiry.

26         [2] When, however, a statute has only indirect effects on interstate commerce and regulates

27   evenhandedly, we have examined whether the State's interest is legitimate and whether the burden

28   on interstate commerce clearly exceeds the local benefits.

1    *S.D. Myers, Inc. v. City and Cty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001)

2    (internal citations omitted) (quoting *Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*, 476

3    U.S. 573, 579 (1986)).

4        Proposition 12 fails under each of the three aspects of the dormant Commerce Clause

5    because: (1) it discriminates on its face, purpose and effects against interstate commerce; (2) it

6    creates an excessive burden on out-of-state producers who had substantially less notice to come

7    into compliance with confinement requirements; and (3) it seeks to create nationwide pork industry

8    regulations. Furthermore, Proposition 12 cannot survive rational basis review because economic

9    protectionism is not a legitimate governmental interest.

10       **1.    Proposition 12 discriminates on its face against interstate commerce and favors**

11   **in-state commerce in its purpose and effects, rendering it *per se* invalid.**

12       "To determine whether a law violates this so-called 'dormant' aspect of the Commerce

13   Clause [courts] first ask whether it discriminates on its face against interstate commerce." *Haulers*,

14   550 U.S. at 338. To determine whether a statute discriminates against out-of-state commerce, the

15   Court first determines "whether it discriminates on its face against interstate commerce." *Id.*

16   Discrimination in this context means differential treatment of in-state and out-of-state economic

17   interests that benefits the former and burdens the latter." *Id.* (quoting *Oregon Waste Systems, Inc.*

18   *v. Department of Environmental Quality of Ore.*, 511 U.S. 93, 99 (1994)). "Discriminatory laws

19   motivated by simple economic protectionism are subject to a virtually *per se* rule of invalidity,

20   which can only be overcome by a showing that the State has no other means to advance a legitimate

21   local purpose." *Id.* at 338-39 (internal citations omitted). The Ninth Circuit has concluded that

22   "economic protectionism for its own sake, regardless of its relation to the common good, cannot be

23   said to be in furtherance of a legitimate governmental interest." *Merrifield v. Lockyer*, 547 F.3d

24   978, 991 n. 15 (9th Cir. 2008) (holding that exemption in statutory licensing scheme, which created

25   different licensing categories for different types of exterminators, failed rational basis review

26   because it had no purpose other than helping some exterminators and harming others).

27       Proposition 12 and the Proposed Regulations contain language—both explicitly and

28   implicitly—targeting out-of-state entities or entities engaged in interstate commerce, amounting to

facial discrimination toward out-of-state entities. Here, Proposition 12 and the Proposed Regulations treat in-state and out-of-state economic interests differently and that in-state interests are benefited while out-of-state interests are burdened. *See Haulers*, 550 U.S. at 338. First, the "purpose" language expressly states that it is designed to prevent "negative fiscal impacts on the State of California." 2018 Cal. Legis. Serv. Prop. 12 (PROPOSITION 12) (WEST), Section 2. Second, Proposition 12 implicitly targets out-of-state entities by requiring the Turn Around Provisions to go into effect a month following the passage of Proposition 12. Proposition 12 was passed with an effective date of December 19, 2018. Cal. Health & Safety Code § 25990; Daniel A. Sumner *et al.*, Standardized Regulatory Impact Assessment of Proposed Regulations to Implement Proposition 12, July 2, 2020 ("SRIA") p. 6. In comparison, Proposition 2 gave in-state entities six years to come into compliance. This difference in lead time was not confirmed by Defendants in *N. Am. Meat Inst. v. Becerra* and was recognized, if there is a difference between in and out-of-state producers for compliance with the Turn Around Requirements, that could be a basis for establishing a discriminatory purpose or effect that is distinct from that shown in *Eleveurs*. *N. Am. Meat Inst. v. Becerra,* 420 F. Supp. 3d 1014 (C.D. Cal. 2019), *aff'd*, 825 F. App'x 518 (9th Cir. 2020), *cert. denied sub nom. N. Am. Meat Inst. v. Bonta*, 141 S. Ct. 2854 (2021) ("This Court acknowledges that, in this respect, the present facts *could be* distinguishable from those raised in *Eleveurs*. In that case, the sales prohibition came into effect against in-state and out-of-state producers at the same time, so the 'lead time' allotted for compliance was not an issue in the discrimination analysis…in contrast… plaintiffs *could* have an arguable basis to claim that Proposition 12 discriminates against out-of-state commerce.").

Proposition 12 is also discriminatory both in its purpose and its effects. *See S.D. Myers, Inc. v. City & Cty. of San Francisco*, 253 F.3d 461, 467 (9th Cir. 2001) (considering the "practical effect" of an ordinance when analyzing whether an ordinance violates the dormant Commerce Clause). The significant difference in "lead time" between in-state and out-of-state producers is discriminatory in practical effect because it provides a substantially shorter period for out-of-state producers to come into compliance with Turn Around Provisions than California producers had. California producers have been on notice since 2008 they would need to change their confinement

36

1    practices, while out-of-state producers were given a mere month to comply with Turn Around

2    Provisions. Complaint, ¶¶ 35-37. The lack of a similar "lead time" for out-of-state producers creates

3    a heightened burden on interstate commerce and a direct impact on the "free flow of goods and

4    services through the several states." *S.D. Myers, Inc.*, 253 F.3d at 471; Tonsor Decl., ¶ 8. This "lead

5    time" granted to California producers becomes incredibly compelling when reviewing the FAQ's

6    that were discussed above. Because California producers have been on notice of the Turn Around

7    Requirements since their passage in 2008, and have been subject to those requirements since

8    January 1, 2015, the fact that the FAQ's do not provide an exception to allow legal sell through of

9    whole pork meat that is non-compliant with the Turn Around Requirements is of no consequence

10   to the California producers. On the other hand, allowing legal sell for whole pork meat that is non-

11   compliant with the Square Footage Requirements after January 1, 2022, will *only* benefit the

12   California producers and be meaningless to out-of-state producers. This shortchanging of

13   compliance time has forced out-of-state producers into a Hobson's choice of either: (1) culling a

14   significant amount of their breeding pigs to make sufficient room for spacing restrictions, ultimately

15   resulting in decreased pork supply for the nation, or (2) expending millions of dollars in an

16   incredibly short time period to completely reconstruct their facilities (an option that is not even

17   available to a number of farming operations).

18        This protectionist treatment is exactly what the dormant Commerce Clause was designed to

19   prevent. *See Hughes v. Oklahoma*, 441 U.S. 322, 336 (1979) ("when considering the purpose of a

20   challenged statute, the Court is not bound by the name, description, or characterization given by

21   the legislature or courts of the state, but will determine for itself the practical impact of the law.").

22        And multiple statements by Proposition 12 supporters indicate that it would directly affect

23   out-of-state producers for the first time. *See Int'l Franchise Ass'n, Inc. v. City of* Seattle, 97 F. Supp.

24   3d 1256, 1268 (W.D. Wash. 2015) (looking to statements made by proponents of an ordinance as

25   evidence of a discriminatory intent). Proposition 12 appears to have been motivated in part by a

26   desire to level the playing field for California pork producers subject to Proposition 2 Turn Around

27   Requirements since 2015. The California Department of Food and Agriculture explicitly noted that,

28   unless out-of-state farmers are required to comply with the confinement requirements like in-state

1  farmers are, "[i]n-state farmers will find it more costly to compete with farms outside of the state

2  when selling … whole pork meat to an out of state buyer compared to farms located in states that

3  do not have the same animal confinement standards as described in the Act." 2021 CA REG TEXT

4  584571 (NS) at 10. Proposition 12 was clearly motivated by "simple economic protectionism,"

5  which renders the law *per se* unconstitutional. *See Haulers*, 550 U.S. at 338-39.

6      The discriminatory effects imposed on these out-of-state producers are solely to benefit

7  California producers. Adding to this benefit is that it will cost less for California producers to come

8  into compliance with the January 1, 2022 requirements than for out-of-state producers. For

9  California breeding pig operations to shift from their 20 square feet requirement to the 24 square

10  feet requirement, estimated capital costs are estimated to increase by about 15%. Tonsor Decl., ¶

11  11-12. However, the rest of the country typically houses breeding pigs in 14 or 16 square feet

12  enclosures, and the shift from a 16 square feet enclosure to a 24 square feet enclosure is estimated

13  to result in a capital cost increase of 50% for Iowa producers. *Id.* at ¶ 13. California cannot satisfy

14  its own pork needs from in-state production. Its demand for pork consumption could never be met

15  without out-of-state producers, thus again representing a favoritism for California residents at the

16  expense of out-of-state residents. Complaint, ¶ 5. Such favoritism unquestionably runs afoul of the

17  constitutional requirements described above. *S.D. Myers, Inc.*, 253 F.3d at 467 (9th Cir. 2001)

18  (statute violates the dormant Commerce Clause where it favors in-state residents).

19      Because Proposition 12 discriminates against out-of-state commerce and favors California

20  pork producers and California consumers, the Court is likely to conclude that Proposition 12

21  violates the Commerce Clause.

22      **2.**      **Proposition 12 burdens interstate commerce in a manner excessive to the local**

23  **benefits.**

24      A statute may also violate the dormant Commerce Clause when it imposes an incidental

25  burden on interstate commerce that is clearly excessive in relation to the putative local benefits.

26  *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Supreme Court has used varying

27  language to describe when a burden is too high, including striking down burdens that are "direct,"

28  "undue," "unreasonable," or "material." *See generally Hall v. De Cuir*, 95 U.S. 485 (1877); *Public*

38

1    *Utilities Commission v. R.I. of Attleboro Steam & Elec. Co.*, 271 U.S. 83 (1927); *Dean Milk Co. v.*

2    *City of Madison, Wis.*, 340 U.S. 349 (1951); *International Mill. Co. v. Columbia Transportation*

3    *Co.*, 292 U.S. 511 (1934); *Real Silk Hosiery Mills v. City of Portland*, 268 U.S. 325 (1925).

4        To determine whether a statute imposes an excessive burden on out-of-state commerce, the

5    Ninth Circuit applies the *Pike* balancing test and holds that state legislation will be struck down "if

6    the burden it imposes on interstate commerce is clearly excessive in relation to its putative local

7    benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). If Proposition 12 is found to

8    regulate even-handedly—which it does not—its excessive burdens on interstate commerce

9    unconstitutionally exceed the local benefits.  *S.D. Myers, Inc.*, 253 F.3d at 467 (9th Cir. 2001).

10       Here, California has conceded that Proposition 12 will advance no real health or safety

11   benefit. *See* 2021 CA REG TEXT 584571 (NS) at 11 ("This proposal does not directly impact

12   human health and welfare of California residents, worker safety, or the State's environment.").

13   Moreover, the ballot initiative record was devoid of actual proof that Proposition 12 would

14   accomplish the goals it intended (i.e., to protect farm animals from cruel confinement practices,

15   avoid foodborne illnesses, and negate negative fiscal impacts to California). 2018 Cal. Legis. Serv.

16   Prop. 12 (PROPOSITION 12) (WEST), Section 2. It is widely accepted that longstanding industry

17   best practices of individual gestation confinement is better for the health and safety of both breeding

18   pigs and their offspring. Johnson Decl., ¶¶ 24, 60. Group confinement poses significant risks to the

19   health and safety of pregnant pigs, including dominance and fighting by other breeding pigs in here,

20   creating a high risk of loss of offspring. *Id.* ¶¶ 46, 48.  Research demonstrates that too much space

21   per pig is detrimental to the sow's longevity and reproductive health. *Id.* ¶ 25. There is no evidence

22   that ties current confinement practices to foodborne illnesses or any other health or food safety

23   concern. Thus, *no* local benefits will be served by Proposition 12.

24       Proposition 12's only theoretical benefit is the unconstitutional leveling of the economic

25   playing field for in-state producers, which is not a legitimate interest. "Courts have repeatedly

26   recognized that protecting a discrete interest group from economic competition is not a legitimate

27   governmental purpose." *Craigmiles v. Giles*, 312 F.3d 220, 224 (6th Cir. 2002); *City of*

28   *Philadelphia v. New Jersey*, 437 U.S. 617, 624 (1978) ("Thus, where simple economic

1  protectionism is effected by state legislation, a virtually per se rule of invalidity has been erected.

2  The clearest example of such legislation is a law that overtly blocks the flow of interstate commerce

3  at a State's borders."); *H.P. Hood & Sons, Inc.*, 336 U.S. at 532 (a "State may not promote its own

4  economic advantages by curtailment or burdening of interstate commerce.").

5        Even if Proposition 12 served a legitimate state interest—which it does not—the impacts

6  on interstate commerce are clearly excessive and outweigh such interest. Proposition 12 will have

7  devastating effects on the interstate pork market, creating nationwide increases in pork prices over

8  4%. Tonsor Decl. ¶ 24  Additionally, the annual consumer loss for consumers outside of California

9  would exceed $303 million following higher pork prices due to Proposition 12 being implemented.

10  *Id.* ¶ 27. Proposition 12 will result in a shortage of pork to California consumers with cascading

11  effects across the county, with producers bearing the brunt of both increased costs to convert to the

12  Square Footage Requirements and of operating in markets where there may be too much pork

13  supply because the meat cannot be sold in California. *Id.* ¶¶ 30-31.  Furthermore, under the

14  Proposed Regulations, an enforcement officer can block the sale of meat into California if it is not

15  in compliance with Proposition 12 and hold the product at the California border. Cal. Dept. of Food

16  and Agric., Animal Confinement Proposed Text, May 25, 2021, at 34. This creates an additional

17  and excessive burden on out-of-state producers and interstate commerce in that California officials

18  can cause the interstate pork supply chain to grind to a halt if an enforcement officer has reasonable

19  cause to believe the meat violates Sections 25990-25992 of the Health and Safety Code. *Id.*

20        Because Proposition 12 cannot be justified by any legitimate benefit or purpose, because

21  the detrimental interstate effects are so vast and clearly outweigh any purported benefit, Plaintiff is

22  likely to succeed on the merits of its dormant Commerce Clause claim.

23       **3.**     **Proposition 12 regulates wholly extraterritorial conduct and seeks to create a**

24  **national regulation on breeding pig confinement practices.**

25        Finally, statutes that regulate wholly extraterritorial conduct also violate the dormant

26  Commerce Clause. *See Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989); *Baldwin v. G.A.F.*

27  *Seeling, Inc.*, 294 U.S. 511 (1935). Similarly, state statutes that seek to create national regulations

28  violate the dormant Commerce Clause. *See Daniels Sharpsmart, Inc.*, 889 F.3d at 616. Because the

40

Turn Around Requirements only affect out-of-state producers and Proposition 12 seeks to create a national regulation on sow confinement practices, Proposition 12 violates the dormant Commerce Clause.

The practical effect of Proposition 12 is that it will demand that prices in other states are increased, as pork producers will have no choice but to pass on their increased costs to consumers via increased pork prices. *See Healy*, 491 U.S. at 336 ("The critical inquiry is whether the practical effect of the regulation is to control conduct beyond the boundaries of the State."). Tonsor Decl., ¶ 24. *Healy* is directly on point with the facts at issue here. In *Healy*, the price of beer in Connecticut was higher than in bordering states, which resulted in Connecticut residents crossing state lines to purchase beer at lower prices. *Id.* at 326. In response to this, and in an effort to eliminate the differential between Connecticut and the states bordering it, Connecticut enacted a statute tying Connecticut's beer prices to the surrounding states' prices, required brewers and out-of-state shippers to post prices for each brand of beer sold in Connecticut, and required out-of-state shippers to affirm that their prices would not remain higher than the lowest prices they charged for each beer product in the border states. *Id.* at 326-27. The Court further explained that the statute violated the Commerce Clause because if other states enacted contemporaneous affirmation statutes similar to Connecticut's, prices in one state would necessarily be affected by the price in another and would result in a "price gridlock." *Id.* at 340. The exact same set of circumstances is set to happen if Proposition 12 is permitted to go into effect further and be enforced. If multiple other states passed requirements on breeding pig confinement, the result would be mass confusion in that no producer would know how to comply with all regulations given likely conflicts or could not comply with the same. Such "regional and even national regulation" in the confinement practices of breeding pigs "is reserved by the Commerce Clause to the Federal Government and may not be accomplished piecemeal through the extraterritorial reach of individual state statutes." *Id.*

"Contrasting with *Healy* and sharply departing from dormant Commerce Clause jurisprudence in the Supreme Court is the Ninth Circuit's opinion in *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, which Defendants have relied upon heavily in prior litigation challenging Proposition 12. *Ass'n des Eleveurs de Canards et d'Oies du Quebec v. Harris*, 729 F.3d

1    937, 942 (9th Cir. 2013). *Eleveurs* broadly—and incorrectly—held that *Healy* only applies to price

2    fixing statutes. 729 F.3d at 951. But that is not what *Healy* says. *Cf. U & I Sanitation v. City of*

3    *Columbus*, 205 F.3d 1063 (8th Cir. 2000) (applying *Healy* to a statute that is not a direct price fixing

4    statute). Instead, *Healy* broadly directs courts to evaluate the practical effect of a challenged statute

5    "not only by considering the consequences of the statute itself, but also by considering… what

6    effect would arise if not one, but many or every, state adopted similar legislation." *See Healy*, 491

7    U.S. at 336. The Central District of California evaluated the application of the extraterritoriality

8    doctrine and the current state of its application within the Ninth Circuit in *N. Am. Meat Inst. v.*

9    *Becerra*, 420 F. Supp. 3d 1014 (C.D. Cal. 2019), *aff'd*, 825 F. App'x 518 (9th Cir. 2020), *cert.*

10   *denied sub nom. N. Am. Meat Inst. v. Bonta*, 141 S. Ct. 2854 (2021).

11         In that case, the Court began to analyze whether the extraterritoriality doctrine could be

12   extended to non-price setting statute situations when evaluating the Plaintiff's request for a

13   Preliminary Injunction to suspend enforcement of Proposition 12 under the dormant Commerce

14   Clause, but stopped short of doing so. Instead, it stated "[w]hether or not *Christie's* implicitly

15   revived the extraterritoriality doctrine's application to non-price regulations – a proposition the

16   Court hesitates to accept given the en banc panel's silence, the Supreme Court's holding in *Walsh*,

17   and the persuasive opinions in *Epel* and *American Beverage* discussed above – NAMI arguably

18   has, at the very least, raised an argument that the doctrine *could* apply to Proposition 12. *Id.* (internal

19   citations omitted); *See e.g. Publius v. Boyer-Vine*, 237 F. Supp. 3d 997, 1023-1024 (E.D. Cal. 2017)

20   (concluding that *Christie's* 'makes clear that [the] extraterritoriality doctrine applies beyond

21   statutes that regulate out-of-state prices"). Plaintiff contends the extraterritoriality doctrine

22   absolutely can and should apply for non-price setting statutes.  If every state passed legislation and

23   regulations similar to Proposition 12 and the Proposed Regulations, the result would be mass

24   confusion not only regarding which breeding pig confinement practices apply, but also as a result

25   cause the pork industry to crumble due to the confusion or impossibility of complying with multiple

26   confinement requirements and regulations. Under *Healy*'s analysis, this Court should evaluate the

27   practical effect of Proposition 12 by considering the result of Proposition 12 beyond whether it is

28   a price fixing statute.

In *Brown-Forman Distillers Corp. v. New York State Liquor Authority*, 476 U.S. 573, 580 (1986), the Supreme Court held that while "a State may seek lower prices for its consumers, it may not insist that consumers in other states surrender whatever competitive advantages they may have." That is precisely what California has sought to do here, as they recognized that unless out-of-state producers are also subject to the confinement requirements imposed by Proposition 12, in-state farmers will be severely disadvantaged. 2021 CA REG TEXT 584571 (NS) at 11. This blatantly violates the Commerce Clause.

Proposition 12 seeks to create a nationwide regulation on breeding pig confinement practices in violation of the dormant Commerce Clause. The nature of the pork industry distinguishes the case from *Eleveurs*. *Eleveurs* concerned the foie gras industry, which is fundamentally different than the pork industry, and the Court in that case found that the Plaintiffs did not demonstrate that a nationally uniform production method was required to produce foie gras. *Eleveurs*, 729 F.3d at 950. Conversely, the manner in which the pork industry operates makes it inherently a national industry (e.g., pork is publicly traded as a national commodity). Johnson Decl. ¶ 28. Any requirement regarding confinement practices in one state would require a uniform system of regulation, and it would be difficult, if not impossible, to regulate the pork industry on a state-by-state basis. *Id.* Many farming enterprises span more than one state meaning that such operations will be forced to comply with Proposition 12, and regulations regarding breeding pig confinement practices in one state will necessarily disrupt the national pork industry. *Id.*

Proposition 12 signifies California's unilateral attempt to impose a uniform system of regulation on the rest of the country, notwithstanding non-Californians' lack of any say in the matter. It runs headlong against fundamental principles of federalism by seeking to regulate procedures *everywhere*. More specifically, such an imposition is a direct violation of the dormant Commerce Clause. *See Daniels Sharpsmart, Inc.*, 889 F.3d at 616 (holding that California's attempt to regulate waste treatment everywhere in the country constitutes a violation of the Commerce Clause); *Sam Francis*, 784 F.3d at 1323-24 (holding that a statute that regulates out-of-state sales is an "impermissible regulation of wholly out-of-state commerce"). The potential of inconsistency in regulating breeding pig confinement activities due to the subjective interpretation of breeding

1 pig confinement including during on-site inspections conducted by third-party certifiers, as

2 provided for in the Proposed Regulations, creates an additional violation of the Commerce Clause.

3 *See Nat'l Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 639 (9th Cir. 1993) ("The practical

4 requirement that the NCAA would have to use the Statute in enforcement proceedings in every

5 state in the union runs afoul of the Commerce Clause …").[1] Cal. Dept. of Food and Agric., Animal

6 Confinement Proposed Text, May 25, 2021, at 40.[2]

7 **II.** **Plaintiff—and the Nation's Pork Production Sector as a Whole—Risks**

8 **Suffering Immediate and Irreparable Harm Absent a Preliminary Injunction to Preserve the**

9 **Status Quo.**

10 Irreparable harm occurs when a party has no adequate remedy at law, typically because its

11 injuries cannot be fully compensated through an award of damages. *See Arizona Dream Act Coal.*

12 *v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (citing *Rent-A-Ctr., Inc. v. Canyon Television &*

13 *Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991)). To demonstrate irreparable harm, "a

14 party must show that the harm is certain and great and of such imminence that there is a clear and

15 present need for equitable relief." *Iowa Utilities Board v. Federal Comm. Commn.*, 109 F.3d 418,

16 425 (8th Cir. 1996). As the Ninth Circuit has recognized, harm caused by a governmental entity

17 due to its constitutional violations is *per se* irreparable. *See e.g., Am. Trucking Associations, Inc. v.*

18 *City of Los Angeles*, 559 F.3d 1046, 1059 (9th Cir. 2009) (quoting *Nelson v. NASA*, 530 F.3d 865,

19 882 (9th Cir. 2008)) ("Unlike monetary injuries, constitutional violations cannot be remedied

20 through damages and therefore generally constitute irreparable harm"); *Monterey Mech. Co. v.*

21

22 [1] It is likely that Plaintiff will prevail on its Privileges & Immunities Clause and Supremacy Clause claims as well.
First, Defendants are stripping the right to enter the market by surrendering any competitive advantage out-of-state

23 producers had in California by virtue of not being subject to Proposition 2 and further being provided a month to
comply with Proposition 12 Turn Around Requirements. Second, Proposition 12 is preempted by the Packers &

24 Stockyards Act by providing an obstacle or making it impossible for wholesalers to comply with both Proposition 12
and the Packers & Stockyards Act due to the fact only 4% of the nation's pork producers are likely to be compliant

25 with Proposition 12 by January 1, 2022. Tonsor Decl., ¶¶ 28-29. In the interest of judicial economy, Plaintiff is
directing the Court to its primary claims of Due Process Clause and dormant Commerce Clause.

26 [2] It is further likely that Plaintiff will prevail on its Declaratory Judgment claim as well. As the Declaratory Judgment
claims are reiterations of the unconstitutionality of Proposition 12 as referenced in the first five claims, for the sake of

27 judicial economy Plaintiff incorporates by reference those arguments to support its Declaratory Judgment claim for
purposes of this Motion for Preliminary Injunction. Additionally, Plaintiff is entitled to a declaration from the Court

28 that enforcement of the Square Footage Requirements cannot commence until two years and four months after the
Final Regulations are promulgated and become effective.

44

1  *Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (citing *Associated General Contractors v. Coalition For*

2  *Economic Equity*, 950 F.2d 1401, 1412 (9th Cir. 1991) ("We have stated that an alleged

3  constitutional infringement will often alone constitute irreparable harm").

4        Plaintiff's members face immediate and irreparable harm in that producers, processors, and

5  packers all imminently face criminal enforcement and liability in addition to civil enforcement and

6  injunctive relief suspending their entry into the California market. Those who violate the breeding

7  pig confinement requirements in Proposition 12 could be found guilty of a misdemeanor and

8  punished by a fine up to $1,000 or imprisonment up to 180 days or both. Cal. Health & Safety Code

9  § 25993(b). Producers, processors, and packers could face criminal liability for both conspiracy

10 and aiding and abetting misdemeanors regarding violations of Proposition 12. The Proposed

11 Regulations permit enforcement officials to seize and hold pork meat which they have reasonable

12 cause to believe violate Proposition 12, effectively denying producers, processors, or packers from

13 selling the goods not only in California but anywhere else, as well. Cal. Dept. of Food Agric.,

14 Animal Confinement Proposed Text, May 25, 2021, at 34. Enforcement of Proposition 12 is set to

15 begin in just two months despite each of the constitutional violations that Proposition 12 introduces.

16       In addition to potential criminal enforcement, pork producers are also facing immediate and

17 irreparable harm to their breeding operations. Those who do not have the means to restructure their

18 facilities may need to decrease their overall herd size, by culling breeding pigs early, and the

19 devastating financial costs of doing so may force many producers into bankruptcy. Tonsor Decl. ¶

20 19. Due to Proposition 12 and the Proposed Regulations' ambiguities, it is possible that producers

21 will be required to engage in early culling of breeding pigs on December 31, 2021 that are

22 potentially at the prime of their productivity in order to comply with Proposition 12's requirements.

23 Tonsor Decl. ¶ 23; Johnson Decl., ¶ 29. Absent a preliminary injunction, this early culling will

24 occur and result in substantial loss of property. *Id.*

25       The threat of unrecoverable economic loss qualifies as irreparable harm. *See Multi-Channel*

26 *TV Cable Co. v. Charlottesville Quality Cable Operating Co.*, 22 F.3d 546, 552 (4th Cir. 1994))

27 (holding that permanent loss of customers satisfies the irreparable injury prong). Here specifically,

28 Plaintiff will suffer irreparable harm absent a preliminary injunction because they cannot recover

1    monetary damages from Defendants due to sovereign immunity. *See California Hosp. Ass'n v.*

2    *Maxwell-Jolly*, 776 F. Supp. 2d 1129, 1157 (E.D. Cal. 2011) (vacated and remanded on other

3    grounds) (finding that plaintiff could show likelihood of irreparable harm by establishing that its

4    members would lose considerable revenue which were unrecoverable due to sovereign immunity).

5         First, absent a preliminary injunction, producers will suffer immediate and extended

6    irreparable economic harm. California's confinement restrictions would prohibit Iowa pork

7    producers from using current, tried-and-true industry practices utilizing individual gestation stalls,

8    except for limited circumstances. Johnson Decl. ¶ 71. Such requirements would not only disrupt

9    production, but they would also threaten the safety of breeding pigs, their offspring, and the workers

10   at the production facilities. *See generally* Johnson Decl. ¶¶ 25-41; As even recognized by HSUS

11   sponsors, emboldened by the Defendants' enforcement of Proposition 12, California recognizes

12   compliance with Proposition 12 will place a steep—and perpetual—increased cost burden on pork

13   producers. *See* Anna Keeve, "Farm Animal Rights Bill, Proposition 12: Everything You Need to

14   Know", *LA Progressive* (August 30, 2018), https://perma.cc/6G64-AHUZ, ("Enforcing the

15   measure may cost up to ten million dollars annually."); SRIA at 147-148. Although the SRIA only

16   conservatively estimated the cost of conversion from 20 to 24 square feet pens, the true reality

17   facing the Plaintiff and the nation's pork production sector as a whole, is much graver. *Id.*; Tonsor

18   Decl. ¶ 7.

19        Thus, Plaintiff faces irreparable harm that even California conservatively acknowledges in

20   its SRIA economic impact analysis that can never be recovered, either for initial conversion or

21   ongoing irreparable economic harm going forward. *See* 2021 CA REG TEXT 584571 (NS), at 12

22   ("Estimated ongoing cost is greater than the initial cost of conversion at $100,000 per year for a

23   typical breeding pig farm…"). Such costs threaten the viability of farming operations and will result

24   in bankruptcy for many producers. Tonsor Decl. ¶ 19.

25        For example, production costs would increase by at least 21% for farrowing operations who

26   convert production systems to comply with Proposition 12. Tonsor Decl. ¶ 8. Currently, the costs

27   of farrow-to-wean operations in Iowa average about $33.59 per weaned pig. *Id.* ¶ 10. Given

28   profitability varies over time for a multitude of reasons, it is further worth noting over the 2016-

46

1   2020 period, costs averaged $33.13/weaned pig and profit averaged $5.39/weaned pig. *Id.* When

2   considering Iowa producers will be required to transition breeding pig housing from 16 to 24 square

3   feet, the costs to the Plaintiff rise substantially in comparison to the conservative estimates found

4   within the SRIA. *Id.* ¶ 8. For example, the SRIA notes a 20% cost increase from transitioning

5   between 20 to 24 square feet per breeding pig. *Id.* ¶ 7. In comparison, Iowa producers transitioning

6   from 16 square feet to 24 square feet face a 50% cost increase to come into compliance. *Id.* ¶ 8.

7   When the figures are taken together, operational costs for Iowa producers would be increased by *at*

8   *least* a cost of $7.05 per pig. *Id.* ¶ 10.

9       Iowa produces an estimated 25 million weaned pigs annually in farrow-to-finish operations.

10  *Id.* ¶ 14. This does not include weaned pigs that are imported into Iowa solely to be finished but

11  would still need to be tracked for purposes of compliance with Proposition 12 sales into California.

12  This means that compliance with Proposition 12 will increase costs statewide for solely farrow-to-

13  wean operations by at least $176.46 million *each year*. *Id*. These figures are staggering considering

14  the slim profit margin already reported for Iowa producers.

15      Further, operators must make major, costly facility overhauls to come into compliance with

16  Proposition 12. Tonsor Decl., ¶ 14. Currently, many breeding producers use indoor confinement

17  facilities in order to permit year-round production and to protect the breeding pigs from inclement

18  weather. To come into compliance, many producers may have to construct entirely new facilities

19  in order to maintain their existing herd size. Tonsor Decl. ¶ 19. Many facilities may not even have

20  sufficient land to increase their facilities, meaning they will now need to build more facilities—an

21  option that may not even be available to many. McGonegle Decl. ¶ 16. In fact, evidence indicates

22  that less than 4% of the United States currently has the housing capacity to be able to meet

23  Proposition 12 requirements. Tonsor Decl. ¶ 25. Further, the costs of such renovations may be cost

24  prohibitive—especially for smaller producers. *Id*.  ¶ 19; McGonegle Decl. ¶ 18. Those who do not

25  have the means to restructure their facilities may need to decrease their overall herd size, by culling

26  breeding pigs early, and the devastating financial costs of doing so may force many producers into

27  bankruptcy. Tonsor Decl. ¶ 19.

28      Foregoing the California market is not a realistic option given the reality of the national

47

1  pork production system. *Id*. ¶ 23. Once a hog is ready for harvesting, its meat is divided into several

2  cuts and sent to various production facilities nationwide. *Id*. ¶ 24. Further, packers will require

3  Plaintiff to come into compliance with Proposition 12. McGonegle Decl. ¶ 21. Thus, any argument

4  that a producer can simply choose not to sell into California ignores reality. To simply not sell into

5  California is a decision to exit the pork market.  California's confinement requirements require

6  significantly more space per breeding pig to comply with both the Turn Around Requirements and

7  Square Footage Requirements than industry standards of 16 square feet. Johnson Decl. ¶ 43. These

8  confinement restrictions will have a direct, irreparable effect on Iowa pork producers, the entire

9  pork supply chain, and ancillary industries, as more fully explained below.

10  The above-described harmful effects are not remotely theoretical or contingent. Not only

11  does the statute, by its terms, come into full effect in just two months on January 1, 2022, but

12  producers across Iowa are already being told by the packers to which they sell product that their

13  Proposition 12 compliance will be required. McGonegle Decl. ¶ 21. California's grand experiment

14  with the science-based, widely accepted pork production standards will not only directly,

15  irreparably harm Plaintiff's members, but it will create a cascading effect across the entire supply

16  chain leading to pork shortages and significantly increase costs nationwide. *See generally* Tonsor

17  decl. ¶¶ 24-31.  For example, the irreparable economic loss from Proposition 12 will be felt across

18  the country. Consumer loss due to increased prices nationwide is estimated to exceed $303 million

19  in 47 examined U.S. markets outside of California. *Id.* ¶ 24. Proposition 12 will create a nationwide

20  rippling effect of unrecoverable economic loss on consumers and long-term increased pork

21  production costs to IPPA members. *Id.*

22  Finally, because of the above-described market effects, the supply of pork within California

23  itself will significantly decrease, Tonsor Decl., ¶ 29, even though pork is necessary to satisfy the

24  needs of hospitals, schools, and prisons in California. Complaint, ¶ 25. Without adequate pork

25  supply, these institutions are threatened irreparably. Several IPPA members have been contacted

26  by pork packers to whom they sell market hogs, and such packers have informed IPPA members

27  that they will have to comply with Proposition 12. McGonegle Decl., ¶ 19. Many packers are

28  suppliers for these federal and state institutions and may face debarment if they cannot fulfill their

PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES

1    contracts. The Plaintiff has demonstrated that irreparable harm will result if this Court does not

2    grant the Motion for Preliminary Injunction to halt any further enforcement or implementation of

3    Proposition 12 during the pendency of this proceeding.

4         **III.     The Balance of the Equities Tips in Favor of Plaintiff.**

5         To determine the balance of the equities, the court must weigh the possible harm caused by

6    the grant or denial of injunctive relief. *See Univ. of Hawaii Professional Assembly v. Cayetano*, 183

7    F.3d 1096, 1108 (9th Cir. 1999). Because the only "harm" California will face is its inability to

8    enforce a transformative new law that at best would wreak economic harm across the national pork

9    production system, the balance of harms clearly weighs in favor of Plaintiff.

10        If left unchallenged, Proposition 12 will force an immediate pork shortage within California

11   of compliant pork for sale, which Dr. Tonsor estimates at over a 70% reduction in available pork

12   for one of the United States' largest consumers. Tonsor Decl. ¶ 26. This will have a domino effect,

13   creating a pork surplus in the remainder of the country which will drive down prices. *Id*. Thereafter,

14   the price of pork is estimated to increase by at least an average of 4%, creating average annual

15   consumer losses across 47 markets examined nationwide of over $303 million per year. Tonsor

16   Decl. ¶¶ 23-24. And this is only the harm to the consumer. As noted previously, the economic harm

17   to the Plaintiff – and likely similarly situated pork producers across the country – is insurmountable,

18   irreparable harm. *Supra*. at 12-16. Maintaining the status quo, particularly when doing so will not

19   prejudice the non-moving party, is a central justification for granting preliminary injunctive relief.

20   *See Ramos v. Wolf*, 975 F.3d 872. 887 (9th Cir. 2020).  Given the fact Proposition 12 will actually

21   *harm* California consumers by creating an immediate pork shortage, no prejudice to California

22   exists in light of the overwhelming harms ahead for Plaintiff and nationwide pork consumers.

23        The requested preliminary injunction merely preserves the status quo. Without it, California

24   voters and the Defendants who embolden the voters through enforcement of Proposition 12 would

25   be permitted to gamble with the national pork production system. Such gamble imposes dramatic

26   costs and onerous requirements on participants at all levels of that system, including national pork

27   consumers. With an injunction, the near-term result will simply be that tried-and-true industry

28   standards and practices will remain unchanged for the time being, at least until this Court can fully

evaluate the constitutionality of California's experiment with America's pork production system.

## CONCLUSION

Plaintiff has demonstrated a likelihood of success on the merits, a threat of substantial and irreparable harm, and that the balance of harms tips greatly in its favor. Therefore, Plaintiff requests this Court issue a preliminary injunction prohibiting the enforcement of Proposition 12, its policies, practices and customs by Defendants, employees and agents, and all persons acting in privity and/or in concert with them (including private enforcers bringing claims pursuant to the Unfair Competition Law or any other applicable law). In addition, Plaintiff requests this Court issue an emergency restraining order temporarily enjoining the enforcement of Proposition 12 if the preliminary injunction cannot be ruled upon prior to January 1, 2022.

Dated: November 12, 2021.

IOWA PORK PRODUCERS
ASSOCIATION, Plaintiff.

By: */s/ Trenton H. Norris*
   Trenton H. Norris (SBN 164781)
   Peg Carew Toledo (SBN 181227)
   Willis M. Wagner (SBN 310900)
   Arnold & Porter Kaye Scholer LLP
   Three Embarcadero Center, 10th Floor
   San Francisco, CA 94111-4024
   Telephone: (415) 471-3100
   Facsimile: (415) 471-3400
   Trent.Norris@arnoldporter.com
   Peg.Toledo@arnoldporter.com
   Will.Wagner@arnoldporter.com

and

Marnie A. Jensen (NE 22380)
(*pro hac vic pending*)
Ryann A. Glenn (NE 26160)
(*pro hac vice pending*)
HUSCH BLACKWELL LLP
13330 California Street, Suite 200
Omaha, NE 68154
Telephone: (402) 964-5000
Facsimile: (402) 964-5050
marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com

and

Eldon L. McAfee (AT0004987)
(*pro hac vice pending*)

50

Julie L. Vyskocil (AT0009711)
(*pro hac vice pending*)
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
Telephone: (515) 271-5916
Facsimile: (515) 274-1488
eldon.mcafee@brickgentrylaw.com
julie.vyskocil@brickgentrylaw.com

*Attorneys for Iowa Pork Producers
Association*

51

# EXHIBIT D

1
2
3
4
5
6

TRENTON H. NORRIS (SBN 164781)
PEG CAREW TOLEDO (SBN 181227)
WILLIS M. WAGNER (SBN 310900)
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111
Telephone: +1 415.471.3100
Facsimile: +1 415.471.3400
E-mail: Trent.Norris@arnoldporter.com
        Peg.Toledo@arnoldporter.com
        Will.Wagner@arnoldporter.com

E-FILED
11/12/2021 10:27 PM
Superior Court of California
County of Fresno
By: Louana Peterson, Deputy

7
8
9
10
11

ELDON MCAFEE (*pro hac vice pending*)
JULIE VYSKOCIL(*pro hac vice pending*)
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, Iowa 50266
Telephone: 515.271.5916
Facsimile: 515.274.1488
E-mail: eldon.mcafee@brickgentrylaw.com
        julie.vyskocil@brickgentrylaw.com

MARNIE A. JENSEN (*pro hac vice pending*)
RYANN A. GLENN (*pro hac vice pending*)
Husch Blackwell LLP
13330 California Street, Suite 200
Omaha, Nebraska 68154
Telephone: 402.964.5000
Facsimile: 402.964.5050
E-mail: marnie.jensen@huschblackwell.com
        ryann.glenn@huschblackwell.com

12
13

Attorneys for Plaintiff
IOWA PORK PRODUCERS ASSOCIATION

14
15

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

16

**COUNTY OF FRESNO**

17
18
19
20
21
22
23
24
25
26
27

| | |
|---|---|
| IOWA PORK PRODUCERS ASSOCIATION,<br><br>              Plaintiff,<br><br>     v.<br><br>ROB BONTA, in his official capacity as Attorney General of California, KAREN ROSS, in her official capacity as Secretary of the California Department of Food and Agriculture, and TOMAS ARAGON, in his official capacity as Director of the California Department of Public Health,<br><br>              Defendants. | Case No. 21CECG03339<br><br>**DECLARATION OF PAT MCGONEGLE IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED RELIEF AND HEARING**<br><br>**DATE:   May 18, 2022**<br>**TIME:   3:30 p.m.**<br>**DEPT.:   502**<br>**JUDGE:  Rosemary T. McGuire**<br><br>Complaint Filed:  November 9, 2021 |

28

DECLARATION OF PAT MCGONEGLE

I, Pat McGonegle, hereby state and declare as follows:

1.      I am over the age of majority and am competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration.  If called as a witness, I could and would competently testify to the same.

2.      I am the Chief Executive Officer of the Iowa Pork Producers Association ("IPPA") and submit this Declaration in support of Plaintiff's Motion for Preliminary Injunction.

3.      IPPA serves as a unified voice for its Iowa pork producer-members.  IPPA is a grassroots organization that consists of approximately 70 structured county associations across Iowa, with more than 4,000 affiliated and associated members.  Every producer-member, regardless of size, has a voice in IPPA through a county-elected delegate system.  IPPA has members in nearly every county within Iowa.

2.      IPPA's qualifications for membership are:

a.      An individual who is actively engaged in the production of swine in Iowa, or a spouse of the individual, is eligible to become a voting member of IPPA.  An individual is actively engaged in the production of swine if the individual is an owner, operator, contract feeder, manager or employee of an enterprise involved in the production of swine.

b.      An individual, company or other organization with an interest in the pork industry may become a nonvoting associate or allied member.

3.      In 2020 IPPA published the "2020 Iowa Pork Industry Report" (the "Report") that was prepared for IPPA to identify various annual statistics that relate to Iowa pork producers.

4.      For example, the Report identified approximately 5,418 hog farms located throughout Iowa.  As of December 2019, hog inventory numbers reached a new record high of 24.8 million hogs on Iowa farms representing 32% of the U.S. hog inventory.  Further, the Iowa hog industry contributed an estimated $40.8 billion in sales output.  A true and accurate copy of the Report can be found at https://www.iowapork.org/wp-content/uploads/2020/08/200615-2020_Iowa-Pork-Industry-Report_State_FINAL.pdf and is also attached hereto and incorporated by reference herein as Exhibit "A" to this Declaration.

5.      In addition, the Report reported the pork industry contributed to $6.8 billion dollars in Iowan household income annually.  This included payroll related to hog production, slaughter, processing and other related activities.  This also includes employee wages, salaries, and benefits, in addition to payments received by self-employed owners.

6.      The Report identified approximately 147,105 jobs exist in Iowa directly because of the pork industry.  These jobs include both full and part-time jobs within Iowa that are created by the pork industry, including those throughout production, slaughter, and processing.

7.      Although the number of hog operations that maintain over 5,000 head is increasing each year throughout Iowa, the Report estimates that overall, the average inventory of hogs per Iowa farm is at 4,578.

8.      With respect to the volume of hogs harvested within Iowa processing facilities, it is significant.  In 2019, Iowa harvested an estimated 39.117 million hogs, which represented approximately 30% of the hogs harvested in the United States that year.

9.      An additional reliable report within the pork industry is that the USDA National Agricultural Statistics Service Quarterly Hogs and Pigs Report, released December 23, 2020 (the "NASS Report").  A true and accurate copy of the NASS Report is attached hereto and incorporated by reference herein as Exhibit "B" to this Declaration.

10.     The NASS Report identified approximately 980,000 breeding sows in Iowa on December 1, 2020, and approximately 24 million market hogs.  In comparison, California is reported to have approximately 9,000 breeding sows and a mere 90,000 market hogs on December 1, 2020.

11.     These factors surrounding the volume of breeding sows and hogs to market translate to Iowa being the largest pork producing state in the nation.  It provides nearly a third of the nation's pork supply to feed the rest of the nation, as well as international customers.

12.     IPPA's members have breeding sows in Iowa and these breeding sows produce offspring ultimately harvested and sold into multiple markets, including California.

13.     The issues addressed in this action are germane to IPPA's mission statement.

14.     Compliance with Proposition 12 requires significant and extremely costly changes

3

DECLARATION OF PAT MCGONEGLE

1  to the farming operations of Iowa's pork producers, including IPPA's members.

2       15.    The vast majority of IPPA's members are currently not in compliance with either

3  the Turn Around Requirements or the Square Footage Requirements of Proposition 12.[1]

4       16.    Many IPPA members will be unable to afford the costly alterations to their existing

5  infrastructure, in addition to significant additional training and labor needs associated with group

6  sow housing.

7       17.    IPPA and its members will suffer substantial, irreparable injuries that are a direct

8  result of Proposition 12.

9       18.    IPPA members are directly subject to Proposition 12 because they breed or raise

10  hogs that are being sold into and within California.  IPPA members have no voice on where their

11  meat is ultimately sold to because of the nature of pork processing.  For example, one hog can

12  ultimately be distributed to many different buyers after the various cuts are processed and sold.

13  This does not even consider those additional cuts that are utilized in further processed pork

14  products.

15       19.    Several IPPA members have contacted me stating that the packers whom they sell

16  market hogs to have informed them that they will have to comply with Proposition 12.

17       20.    If the existing Proposed Regulations published May 28, 2021, go into effect, many

18  IPPA members will be subject to certification and audit tracing requirements as early as January 1,

19  2022.  This is impossible to certify to, as the vast majority of IPPA members will be unable to come

20  into compliance by January 1, 2022.

21       21.    IPPA as an organization will suffer because Proposition 12 will ultimately result in

22  a significant amount of Iowa pork producers to cease doing business because the financial cost to

23  come into compliance with Proposition 12, if at all possible, will outweigh the benefit of

24  transitioning their respective operations to group housing.  This will especially be the issue for

25  many small to medium sized Iowa producers.  Less pork producers in Iowa ultimately results in

26  less IPPA members as a whole, causing the organization to suffer.

27

28  [1] Turn Around Requirements and the Square Footage Requirements of Proposition 12 referred to in this Declaration carry the same definition as referenced in the Complaint (ECF 1, ¶¶ 6, 8).

4

DECLARATION OF PAT MCGONEGLE

22.    IPPA members' ongoing injuries would be redressed by a decision declaring Proposition 12 unconstitutional and/or vacating Proposition 12.

23.    All individual members of IPPA have an interest in pursuing their livelihoods in the manner that best suits their particular operations.

24.    IPPA, as an organization, has an interest in ensuring its members are productive and able to fulfill their livelihoods.

25.    IPPA's individual producer members face imminent harm if Defendants are not enjoined as requested, as they will face excessive burdens to come into compliance with Proposition 12 to certify to various processors that have requested compliance with Proposition 12.  Many of IPPA's individual producer members face imminent harm in being forced out of the marketplace if they can neither afford the cost to retrofit or build new confinement facilities nor maintain any level of profit by virtue of being forced to substantially decrease their breeding sow herd size. Further, IPPA's members may face an impossible choice by the end of 2021 to cull breeding pigs early in order to ensure that the immediate offspring that already exists in 2021 can be sold into California.

26.    The statements made in this Declaration are true and accurate statements.

27.    I declare under penalty of perjury and pursuant to the laws of the state of California that the preceding is true and correct, and that this declaration was made on this 9th day of November 2021, at ____Clive____, Iowa.

_____
Pat McGonegle

DECLARATION OF PAT MCGONEGLE



EXHIBIT A

# 2020 Iowa Pork Industry Report

**Prepared for:**



*Successful farmers. Enriched lives.*

**Prepared by:**



**May 2020**

# Contents

List of Figures ............................................................................................................. 3

List of Tables .............................................................................................................. 5

Executive Summary ..................................................................................................... 6

    Key Findings .......................................................................................................... 7

Hog Industry Trends ................................................................................................... 8

    Inventory .............................................................................................................. 8

    Hog Slaughter Facility Capacity ......................................................................... 26

    Hog Production ................................................................................................... 29

    Hog Prices .......................................................................................................... 33

    Cash Receipts ..................................................................................................... 39

    Production/Feed Costs and Returns ................................................................... 41

    Pork Consumption .............................................................................................. 43

    Iowa Feeder Pig Imports .................................................................................... 46

    U.S. Pork Exports ............................................................................................... 46

    Iowa Pork Exports .............................................................................................. 52

Economic Contribution of Hog Production and Related Industries ............................. 56

State Level Results .................................................................................................... 56

    State Jobs ........................................................................................................... 56

    State Value-Added ............................................................................................. 57

    State Sales (Output) ........................................................................................... 58

    State Labor Income ............................................................................................ 59

    Tax Summary ..................................................................................................... 60

Economic Impact Study – 2,400-Head Wean-to-Finish Hog Farm ............................. 61

Appendix A - Methodology ........................................................................................ 65

Economic Impact Study vs. Economic Contribution Study .......................................... 66

Defining Hog Production and Related Industries ........................................................ 67

Appendix B – State Summary .................................................................................... 68

## List of Figures

Figure 1, Iowa Hog Inventory and Share of U.S. Hogs .................................................................... 8

Figure 2, Iowa Hog December 1 Inventory by Class ...................................................................... 9

Figure 3, U.S. and Iowa Quarterly Hogs and Pigs Inventories (Dec 1) ........................................ 10

Figure 4, Hog Inventory: Selected States and Years .................................................................... 11

Figure 5, Iowa Hog Inventory by Selected Size (End of December) ............................................ 12

Figure 6, Share of Hog Inventory by Selected Size of Total Inventory (End of December) .......... 12

Figure 7, Iowa Number of Farms with Hog Inventories by Selected Size (End of December) ..... 13

Figure 8, Iowa Hog Farms with Inventories with Selected Sizes as a Share of Iowa Total Hog Farms (End of December) ............................................................................................................. 13

Figure 9, Number of Hog Operations by County (2017) ............................................................... 14

Figure 10, Percent Change in Number of Hog Operations by County (2012-2017) .................... 15

Figure 11, Value of Hog Sales by County (2017) .......................................................................... 16

Figure 12, Number of Hogs Sold by County (2017) ..................................................................... 17

Figure 13, Hog Operations by Type & Size, Farrow-to-Feeder (2017) .......................................... 18

Figure 14, Hog Operations by Type & Size, Farrow-to-Finish (2017) ........................................... 19

Figure 15, Hog Operations by Type & Size, Farrow-to-Wean (2017) ........................................... 19

Figure 16, Hog Operations by Type & Size, Independent Grower (2017) ..................................... 20

Figure 17, Hog Operations by Type & Size, Nursery Operations (2017) ....................................... 20

Figure 18, Number of Iowa Hog Operations by Size (1997-2017) ................................................ 21

Figure 19, Iowa Hog Inventory by Bracket Size, Share of Number of Hogs in Each Bracket Relative to Total Inventory, and Number of Counties within Each Bracket (2017 Estimate) ...... 23

Figure 20, Iowa Hog Inventory by Bracket Size, Share of Number of Hogs in Each Bracket Relative to Total Inventory, and Number of Counties within Each Bracket (2019 Estimate) ...... 24

Figure 21, County Hog Inventory in 35 Focus Counties (Head/County, 2017 and 2019)............ 25

Figure 22, Number of Hog Farms per County in 35 Focus Counties (2017 and 2019) ................ 26

Figure 23, Federally Inspected Weekly Hog Slaughter (2019) & Percent of Capacity Utilization 28

Figure 24, Hog Production for U.S. and Selected States, 2018 (Billion Pounds) ......................... 29

Figure 25, IA Hog Production and Share of U.S. Hog Production ................................................. 30

Figure 26, MN Hog Production and Share of U.S. Hog Production .............................................. 31

Figure 27, NC Hog Production and Share of U.S. Hog Production................................................ 32

Figure 28, Iowa-Minnesota Barrow and Gilt Prices (Carcass Equivalent) ................................... 33

Figure 29, Iowa- Minnesota Barrow and Gilt Annual Average Prices (Carcass Equivalent) ......... 34

Figure 30, Wholesale Price of Hams, 20-23 lb. Trimmed ........................................................... 35

Figure 31, Wholesale Price of Loins, 14-19 lb. ¼" Trim .............................................................. 35

Figure 32, Wholesale Price of Bellies, 10-12 lb. Skin on Trimmed ............................................. 36

Figure 33, Pork Monthly Farm to Wholesale Spread................................................................... 37

Figure 34, Composite Pork Carcass Cutout Value (2018 and 2019) ............................................ 38

Figure 35, Hog Receipts: U.S. and Top Three Hog State Producers (Billion Dollars) .................... 40

Figure 36, Iowa Cash Receipts: Selected Commodities (Billion Dollars, 2012-2019*) ................ 40

Figure 37, Iowa Hogs, Corn, Soybeans, and Cattle & Calves Cash Receipts Shares of Iowa Cash Receipts from All Agricultural Commodities.................................................................................. 41

Figure 38, 2018 and 2019 Iowa Average Cost of Hog Production (Wean-to-Finish, $/head) ...... 42

Figure 39, Iowa Average Estimated Annual Returns to Wean-to-Finish ($/Head)....................... 42

Figure 40, Iowa Hog Production Costs and Selling Price: Wean-to-Finish (Annual Average) ...... 43

Figure 41, U.S. Annual Per Capita Disappearance of Pork, Beef, and Broiler (CWE)................... 44

Figure 42, Average U.S. Per Capita Pork, Beef, and Broiler Disappearance (1970-1979 through 2010-2019, Pounds- CWE) ............................................................................................................ 45

Figure 43, 2019 Iowa Feeder Pig Imports (Head) ........................................................................ 46

Figure 44, U.S. Pork Exports (1,000 Metric Tons) ....................................................................... 47

Figure 45, U.S. Pork Export Value (Billion USD) .......................................................................... 47

Figure 46, U.S. Monthly Pork Exports (1,000 Metric Tons) ......................................................... 48

Figure 47, U.S. Pork Exports to Selected Markets (1,000 Metric Tons)....................................... 50

Figure 48, U.S. Monthly Pork Exports to China (1,000 Metric Tons)........................................... 50

Figure 49, U.S. Monthly Pork Exports to Mexico (1,000 Metric Tons) ........................................ 51

Figure 50, U.S. Pork Export Value (Billion USD) .......................................................................... 52

Figure 51, State of Iowa Pork Industry Jobs Summary ................................................................ 56

Figure 52, State of Iowa Pork Industry Value-Added Summary ................................................... 57

Figure 53, State of Iowa Pork Industry Sales (Output) Summary ................................................ 58

Figure 54, State of Iowa Pork Industry Labor Income Summary ................................................. 59

Figure 55, State of Iowa Pork Industry Tax Summary.................................................................. 60

## List of Tables

Table 1, Acronyms ................................................................................................................. 5

Table 2, Iowa Hog Inventory Share of U.S. Hog Inventory by Size of Operation (Census of Agriculture: 1997, 2002, 2007, 2012, 2017) ................................................................. 22

Table 3, Iowa Estimated Daily Hog Slaughter Capacity by Plant (Fall 2019) ............................... 27

Table 4, Focus Counties: Inventory, Exports, and County Share of Total Exports (January to December 2019) ................................................................................................................. 55

Table 5, Total Effect of Constructing and Operating a 2,400 Head Wean-to-Finish Barn for First Year ................................................................................................................................. 61

Table 6, Total Effect of Constructing a 2,400-Head Wean-to-Finish Barn .................................. 62

Table 7, Top 10 Sectors Impacted by Value-Added of Constructing a 2,400-Head Wean-to-Finish Barn for First Year ............................................................................................................ 62

Table 8, Tax Impacts of Constructing a 2,400-Head Wean-to-Finish Barn .................................. 63

Table 9, Total Effect of Operating a 2,400-Head Wean-to-Finish Barn for First Year ................. 63

Table 10, Top 10 Sectors Impacted by Value-Added of Operating a 2,400-Head Wean-to-Finish Barn for First Year ............................................................................................................ 64

Table 11, Tax Impacts of Operating a 2,400-Head Wean-to-Finish Barn for First Year .............. 64

## Table 1, Acronyms

| Acronym | Description |
|---------|-------------|
| Cwt | Hundredweight |
| DIS | Decision Innovation Solutions |
| DDGs | Dried Distillers Grains |
| ERS | Economic Research Service |
| IDALS | Iowa Department of Agriculture and Land Stewardship |
| LMIC | Livestock Marketing Information Center |
| MT | Metric ton |
| NASS | National Agricultural Statistics Service |
| PCC | Pork Carcass Cutout |
| PEDv | Porcine Epidemic Diarrhea virus |
| RWE | Retail Weight Equivalent |
| SBM | Soybean meal |
| USDA | United States Department of Agriculture |
| USDA-FAS | United States Department of Agriculture – Foreign Agricultural Service |
| WASDE | World Agricultural Supply and Demand Estimates |
|  |  |

# Executive Summary

The Iowa pork industry is a robust industry that continues to expand and increasingly contribute to the Iowa economy. Hog inventory numbers reached a new record high with 24.8 million hogs on Iowa farms in December 2019. Iowa holds 32% of the U.S. hog inventory. Iowa's hog breeding herd (1.01 million head) continues to decline despite growth in the U.S. hog breeding herd (6.46 million head). Nationally, the breeding herd grew by 1.2% annually over the past decade, while Iowa's breeding herd declined by 0.1% annually. Iowa's market hog herd (23.79 million head) has increased by 5.51 million head in the past decade, a 3% annual growth rate.

Decision Innovation Solutions (DIS) estimates that in 2019 there were 5,418 hog farms in Iowa. The size of hog farms in Iowa continues to increase. Sixty-nine percent of Iowa's hog inventory is now (2017 Census of Agriculture) on farms with 5,000 or more head. That is up from 54% a decade ago and 26% in 1997.The most common commercial-size hog farm in Iowa is 2,000-4,999 head with 32% of Iowa hog farms in this size category. Farms with 5,000 or more head comprise 20% of all farms, and farms of 1,000-1,999 head account for 13% of hog farms.

The 5 counties in Iowa with more than 1 million hogs hold 25% of Iowa's hog inventory. These are: Washington, Sioux, Lyon, Hamilton, and Plymouth counties. The average county hog inventory was 250,505 head, while the average number of hog farms per county was 55. This results in an average inventory per Iowa hog farm of 4,578 head.

Iowa has 14 commercial hog slaughter facilities with an estimated daily slaughter capacity of 152,050 head and an annual slaughter capacity of 42,695,640 head. In 2019, Iowa's hog slaughter plants operated at 91.6% capacity for all of 2019. Iowa slaughtered 39.117 million hogs in 2019, which represents about 30.11% of the total number (129.915 million) of hogs slaughtered in the U.S. In December 2019, national hog slaughter capacity utilization was nearly 100% of calculated weekly capacity.

The 35 focus counties selected for specific analysis represent 35.2% of the counties in Iowa; however, these 35 counties have hog inventories that account for 59% of the total hog inventory for the state of Iowa. Additionally, these 35 counties represent 53% of the hog farms in Iowa, with an average inventory per farm of 5,022 head, which is more than the statewide average head per farm (4,578 head). All 35 counties saw growth in hog inventory between the years of 2017 and 2019.

## Key Findings

In 2020 (brought forward from 2018 estimates), hog production, slaughter, further processing and other related economic activity in Iowa are estimated to contribute:

- $11.9 billion in value-added
- 147,105 in jobs
- $40.8 billion in sales (output)
- $6.84 billion in labor income
- $893 million in state and local taxes
- $1.3 billion in federal taxes

Of the $40.8 billion in output from the hog industry in the state of Iowa:

- Hog production contributed $13.8 billion
- Hog slaughtering contributed $22.3 billion
- Hog processing contributed $4.7 billion

In addition to analyzing hog production, processing, and related economic activity at the state level, an economic impact study for a new 2,400-head finishing unit to a local community would generate the following:

| Combined Effect of Construction and Operations for First Year | | | | |
|---|---|---|---|---|
| Impact Type | Employment | Labor Income | Value-Added | Sales |
| Direct Effect | 7 | $347,430 | $591,083 | $1,473,695 |
| Indirect Effect | 3 | $178,506 | $312,437 | $711,754 |
| Induced Effect | 3 | $110,606 | $201,693 | $362,444 |
| Total Effect | 12 | $636,541 | $1,105,213 | $2,547,892 |

| Construction | | | | |
|---|---|---|---|---|
| Impact Type | Employment | Labor Income | Value-Added | Sales |
| Direct Effect | 4 | $232,666 | $325,646 | $757,228 |
| Indirect Effect | 1 | $78,992 | $134,342 | $269,034 |
| Induced Effect | 2 | $65,264 | $119,070 | $213,930 |
| Total Effect | 6 | $376,921 | $579,058 | $1,240,193 |

| Operations for First Year | | | | |
|---|---|---|---|---|
| Impact Type | Employment | Labor Income | Value-Added | Sales |
| Direct Effect | 3 | $114,764 | $265,437 | $716,467 |
| Indirect Effect | 2 | $99,514 | $178,095 | $442,719 |
| Induced Effect | 1 | $45,342 | $82,623 | $148,513 |
| Total Effect | 6 | $259,620 | $526,155 | $1,307,699 |

# Hog Industry Trends

## Inventory

Iowa's hog inventory data for the last 20 years has varied, but numbers have consistently increased, particularly since 2015. On December 1, 2019, Iowa's hog inventory reached a record high of 24.8 million head (see Figure 1). Inventory data (on December 1) from 2000 to 2019 shows that, on average, Iowa's hog inventory share of U.S. total inventory was equal to 28.7% (see Figure 1). Hog inventory grew from 15.1 million in 2000 to 24.8 million on December 1, 2019. Hog inventories briefly declined in 2013 to 20.2 million hogs due to PEDv. This outbreak caused significant morbidity and mortality, particularly in young piglets. Iowa's December 1, 2013 inventory of under-50-pound hogs (4.840 million head) was 5.5% below its December 1, 2012 level (see Figure 2). Since then, all weight classes of hogs have experienced significant increases. Over the past ten years, on average, Iowa's inventory of under-50-pound hogs has been 24.7% of Iowa's total hog inventory. Over the past 10 years, U.S. hog inventory has grown at a 1.8% annual average rate, while Iowa hog inventory has increased 2.8% annually.



**Figure 1, Iowa Hog Inventory and Share of U.S. Hogs**



Figure 2, Iowa Hog December 1 Inventory by Class

## U.S. and Iowa Inventory (December 1, 2019)

The USDA's Hogs and Pigs data released December 23, 2019, indicated the U.S. inventory of hogs and pigs on December 1, 2019, was 77.3 million head, up 3% year-over-year, but down marginally from the previous quarter (77.6 million head). In the December 2019 survey, Iowa hogs and pigs inventory share of total U.S. hogs and pigs was estimated at 32.1%. For Iowa, total hog inventory was 24.8 million head, up 5.1% from a year ago but unchanged from the September 1, 2019 count (see Figure 3).

The U.S. breeding inventory on December 1, 2019, grew 2.1% to 6.5 million head, relative to the same period last year and slightly up from the count on September 1, 2019. On the other hand, Iowa's breeding inventory was down 1% to 1.0 million head in the latest survey compared with December 1, 2018, but unchanged from the previous quarter (September 1, 2019). Over the past decade, the U.S. hog breeding inventory annual growth rate has averaged 1.2%; the Iowa hog breeding herd has slightly declined. The annual decline has averaged 0.1%.

In addition, the December 2019 report showed the U.S. hog market inventory was 70.9 million head, up 3.1% from the previous year (December 1, 2018), but down less than 0.5% from the previous quarter (71.1 million head). Iowa's market hog inventory was 23.8 million head, an increase of 5.4% from last year (see Figure 2) and unchanged from September 1, 2019. The inventory of market pigs weighing less than 180 pounds climbed 4.5% in Iowa compared to

December 1, 2018. Over the past decade, the U.S. market hog inventory has grown by 2.0% annually; the Iowa market hog inventory has grown by 3.0% annually, on average.

The September-November 2019 Iowa pig crop, at 6.0 million head, was down 6% from last year. Sows farrowing during this period totaled 530,000 head, down 7% from 2018. The sows farrowed during this quarter were 52% of the breeding herd. The average pigs saved per litter was a record high of 11.35 for the September-November period, relative to 11.2 last year.



**Figure 3, U.S. and Iowa Quarterly Hogs and Pigs Inventories (Dec 1)**

As Figure 4 shows, U.S. hog operations are mostly concentrated in the Midwest (Iowa and Southern Minnesota, particularly) and in eastern North Carolina. Among main hog producers, Iowa holds the largest inventories. In 2019, Iowa hog inventory was 2.7 times higher than the inventories in North Carolina and Minnesota. When compared with Illinois and Indiana, Iowa inventory was 4.6 and 5.8 times higher, respectively.



**Figure 4, Hog Inventory: Selected States and Years**

### *Inventory and Farm Distribution (State)*

Iowa has hog farm inventories in every county with numbers ranging from less than 1,000 head (inventory) in Mills County to more than 1.3 million head in Washington County. USDA Census data indicates Iowa hog inventories have grown 8.2 million head from 14.513 million head in 1997 to 22.730 million head in 2017. Hog inventories on farms with 5,000 or more head have substantially increased during that period, from 3.8 million head in 1997 to 15.6 million head in 2017. On the other hand, inventory on hog farms holding between 1,000 to 1,999 head declined during the same period (see Figure 5). Inventories with 5,000 or more head comprised 69% of total Iowa inventory compared with 26% in 1997 (see Figure 6).

Iowa's overall number of farms with hog inventories fell from 17,585 operations in 1997 to 5,660 in 2017. Note that the number of hog farms holding 1,000 to 1,999 head experienced a 67% decline during that period; however, hog operations holding 2,000 or more head rose during the same time (see Figure 7). Farms with 5,000 or more head represented just 2% of all Iowa hog farms in 1997, whereas they comprise 20% of Iowa hog farms in 2017. Hog farms holding 2,000 to 4,999 head are the most numerous size farms with a 32% share of the total number of Iowa hog farms, according to the last Census of Agriculture (see Figure 8).

2020 Iowa Pork Industry Report                                    May 2020



Figure 5, Iowa Hog Inventory by Selected Size (End of December)



Figure 6, Share of Hog Inventory by Selected Size of Total Inventory (End of December)

2020 Iowa Pork Industry Report                                               May 2020



Figure 7, Iowa Number of Farms with Hog Inventories by Selected Size (End of December)



Figure 8, Iowa Hog Farms with Inventories with Selected Sizes as a Share of Iowa Total Hog Farms (End of December)

According to the 2017 USDA Census of Agriculture, Sioux County leads Iowa in the number of hog farms with 435 operations, and Monroe and Fremont counties share the status of having the fewest number of hog operations at 11 operations in each county (see Figure 9).



**Figure 9, Number of Hog Operations by County (2017)**

Based on the percent change in the number of hog operations from 2012 to 2017, the two counties with the largest percentage drop were Guthrie and Ida counties with 58% decline each (Figure 10). On the other hand, Fremont County experienced the largest percentage increase in the number of hog operations during these two census years with a 129% change. Other counties with large percentage increases in the number of hog operations are: Dickinson (113%), Montgomery (83%), Wayne (71%), Decatur (67%), and Monroe (63%).



**Figure 10, Percent Change in Number of Hog Operations by County (2012-2017)**

As Figure 11 indicates, Washington County had the largest value of hog sales with more than $480 million in hog sales, followed by Sioux ($445.7 million) and Lyon ($378.1 million).  *Note: Lack of data for a county denotes that due to small number of respondents, data for this county was not disclosed by USDA to protect privacy of respondents.*



**Figure 11, Value of Hog Sales by County (2017)**

2020 Iowa Pork Industry Report                                                May 2020

Washington, Lyon, and Sioux counties each sold more than 3 million hogs (Figure 12). Plymouth and Hamilton counties sold more than 2 million hogs. Counties selling more than 1 million hogs include: Buchanan, Carroll, Delaware, Franklin, Hardin, Kossuth, Osceola, O'Brien, Palo Alto, Pocahontas, and Sac.



**Figure 12, Number of Hogs Sold by County (2017)**

As reported by the 2017 USDA Census of Agriculture, there were 113 operations designated as farrow-feeder operations. Of these, 22 operations were in the 1 to 24 head size; 16 had 200 to 499 head; 16 had 5,000 or more head. The smallest number of farrow-to-feeder operations (7) were those with 1,000 to 1,999 head (see Figure 13).

There were 1,217 farrow-to-finish operations in Iowa. Those with 5,000 head or more are the largest category with a total number of 261 operations. The next highest number of operations (221) were those with 1 to 24 head (see Figure 14).In Iowa, 58 percent of the farrow-to-finish operations are less than 1,000 head and 42% are 1,000 head or larger.

There are 217 farrow-to-wean operations in Iowa. Of these, 150 were large farms managing 5,000 or more head. (see Figure 15).

The majority of independent hog growers in Iowa are those with operations ranging in size from 1 to 24 head. In 2017, there were 888 of this type of operation. There were also 689 operations reported as independent growers with 5,000 or more head (see Figure 16). Most of the hog nursery operations in Iowa were managing 5,000 or more head (see Figure 17).



**Figure 13, Hog Operations by Type & Size, Farrow-to-Feeder (2017)**

2020 Iowa Pork Industry Report                                                          May 2020



Figure 14, Hog Operations by Type & Size, Farrow-to-Finish (2017)



Figure 15, Hog Operations by Type & Size, Farrow-to-Wean (2017)



**Figure 16, Hog Operations by Type & Size, Independent Grower (2017)**



**Figure 17, Hog Operations by Type & Size, Nursery Operations (2017)**

In 2017, there were 5,660 hog operations of several sizes and types in Iowa compared with 17,585 in 1997. Most of the operations in Iowa were those managing 200 to 499 head in 1997. The number of operations of this size declined from 4,664 in 1997 to 372 in 2017. The majority of hog operations in 2017 were those with 2,000 to 4,999 head. This size grew from 1,224 in 1997 to 1,794 in 2017. The number of hog operations with 5,000 or more head rose to 1,131 in 2017 from 308 in 1997. There was a 93% reduction in the number of hog operations with 100 to 199 head between 1997 and 2017. Hog operations with 500 to 999 head fell from 3,403 in 1997 to 429 in 2017 (see Figure 18).



**Figure 18, Number of Iowa Hog Operations by Size (1997-2017)**

Iowa hog inventory share of U.S. hog inventory by size of operation has increased throughout the years for large hog operations. In particular, the share of hog operations with 5,000 or more head increased from 17% in 1997 to 31% in 2017. However, this share fell between 2012 (35%) and 2017. Iowa's share relative to the national level has stayed fairly steady across the five agricultural censuses for operations with 1 to 24 head, 200 to 499 head, 500 to 999 head, and 1,000 to 1,999 head (see Table 2).

**Table 2, Iowa Hog Inventory Share of U.S. Hog Inventory by Size of Operation (Census of Agriculture: 1997, 2002, 2007, 2012, 2017)**

| Inventory Size (Head) | 1997 | 2002 | 2007 | 2012 | 2017 |
|---|---|---|---|---|---|
| 1 TO 24 | 3% | 2% | 2% | 2% | 2% |
| 25 TO 49 | 9% | 5% | 6% | 4% | 4% |
| 50 TO 99 | 14% | 9% | 11% | 7% | 7% |
| 100 TO 199 | 21% | 16% | 20% | 13% | 12% |
| 200 TO 499 | 28% | 26% | 29% | 28% | 26% |
| 500 TO 999 | 33% | 34% | 33% | 35% | 33% |
| 1,000 TO 1,999 | 34% | 38% | 32% | 37% | 36% |
| 2,000 TO 4,999 | 28% | 32% | 35% | 38% | 38% |
| 5,000 OR MORE | 17% | 22% | 28% | 35% | 31% |

Source: USDA, Census of Agriculture



2019 county hog inventory was estimated by applying the 2017 county inventory distribution (county share) to the December 1, 2019 Iowa total hog inventory (24.8 million head) as reported by USDA-NASS. Note that 2017 county inventory data contained two counties (Polk and Warren) for which data was withheld to protect individual producer's inventory information. To estimate the 2017 hog inventory for these two counties, the 2012 share of total Iowa inventory by these two counties was applied to the difference between the reported 2017 total Iowa inventory and the sum of inventories for the 97 counties that had reported data (i.e., all Iowa counties excluding Polk and Warren).

The annual decline in the number of Iowa hog farms (121) between the last two censuses (2012 and 2017) was used to estimate the 2018 and 2019 number of hog farms in Iowa. The 2017 county distribution of the number of hog farms was used to estimate the county distribution of the number of hog farms in 2019.

The counties with inventory over 1.0 million head held 20.6% of total state inventory in 2017 (see Figure 19). These counties include Washington, Sioux, Lyon, and Hamilton (USDA-NASS 2017). In 2019, Plymouth County was added to the 2017 list of counties with inventories above 1.0 million hogs. The share of Iowa hog inventory from these five counties grew to 24.6% (see Figure 20). The number of hog farms in Iowa in 2019 was estimated at 5,418. The average county hog inventory was 250,505 head, while the average number of hog farms per county was 55. This resulted in an average inventory per Iowa hog farm of 4,578 head.



**Figure 19, Iowa Hog Inventory by Bracket Size, Share of Number of Hogs in Each Bracket Relative to Total Inventory, and Number of Counties within Each Bracket (2017 Estimate)**



Figure 20, Iowa Hog Inventory by Bracket Size, Share of Number of Hogs in Each Bracket Relative to Total Inventory, and Number of Counties within Each Bracket (2019 Estimate)

### Inventory and Farm Distribution and Inventory Size (Selected Counties)

In addition to an overall look at all Iowa counties, 35 have been identified as "focus" counties and will be addressed in more detail here. These counties are:

| | | | |
|---|---|---|---|
| Allamakee | Dubuque | Kossuth | Scott |
| Audubon | Fayette | Lucas | Sioux |
| Buchanan | Floyd | Lyon | Wapello |
| Buena Vista | Hamilton | Marshall | Washington |
| Butler | Hardin | Mitchell | Webster |
| Calhoun | Howard | O'Brien | Winneshiek |
| Carroll | Iowa | Page | Woodbury |
| Chickasaw | Jefferson | Plymouth | Wright |
| Clayton | Jones | Pocahontas | |

The 35 focus counties selected for specific analysis represent 35.2% of the counties in Iowa; however, these 35 counties have inventories that account for 59% of the total hog inventory for the state of Iowa. Additionally, these 35 counties represent 53% of the hog farms in Iowa, with an average inventory per farm of 5,022 head, which is more than the statewide average head per farm (4,578 head). All 35 counties saw growth in hog inventory between the years of 2017 and 2019. Washington County's increase in inventory during this period was estimated at

121,274 head, which was up from 1.332 million head in 2017 to 1.453 million head in 2019 (see Figure 21).



**Figure 21, County Hog Inventory in 35 Focus Counties (Head/County, 2017 and 2019)**

There was an estimated reduction of 129 hog farms among these 35 counties between 2017 and 2019. The three counties with the largest number of hogs farms are Sioux County, Lyon County and Plymouth County. The number of farms in Sioux County declined from 167 in 2017 to 160 in 2019; Lyon County had a reduction of 10 farms and Plymouth County had a reduction of 8 farms (see Figure 22).



Figure 22, Number of Hog Farms per County in 35 Focus Counties (2017 and 2019)

## Hog Slaughter Facility Capacity

Based on the USDA-NASS monthly report, "Livestock Slaughter" (February 2019 to January 2020), Iowa slaughtered 39.117 million hogs in 2019, which represents about 30.11% of the total number (129.915 million) of hogs slaughtered in the U.S. in 2019. Iowa's December 1, 2019 hog inventory was 24.800 million hogs. Assuming each hog space turns 2.2 times per year, an estimated 54.6 million hogs can be raised annually in Iowa. This indicates that 15.4 million (28.3% of production) hogs leave Iowa to be slaughtered elsewhere.

Iowa has 14 commercial hog slaughter facilities with an estimated daily slaughter capacity of 152,050 head (see Table 3). If operated 5.4 days per week for 52 weeks per year, this would equal an annual slaughter capacity of 42,695,640 head. Based on USDA's estimate of 39.117 million hogs slaughtered, Iowa's hog slaughter plants operated at 91.6% capacity for all of 2019.

**Table 3, Iowa Estimated Daily Hog Slaughter Capacity by Plant (Fall 2019)**

| Company | City | County | State | Daily Plant Capacity |
|---|---|---|---|---:|
| Farmland (Smithfield) | Denison | Crawford | IA | 10,450 |
| Pine Ridge Farms (Smithfield) | Des Moines | Polk | IA | 4,000 |
| JBS | Marshalltown | Marshall | IA | 21,000 |
| JBS | Ottumwa | Wapello | IA | 20,000 |
| Tyson Foods | Waterloo | Black Hawk | IA | 19,500 |
| Tyson Foods | Storm Lake | Buena Vista | IA | 17,000 |
| Tyson Foods | Columbus Junction | Louisa | IA | 10,100 |
| Tyson Foods | Perry | Dallas | IA | 8,250 |
| Seaboard Triumph Foods | Sioux City | Plymouth | IA | 20,400 |
| Prestage Foods of Iowa | Eagle Grove | Wright | IA | 10,000 |
| Sioux-Preme Packing Co | Sioux Center | Sioux | IA | 4,600 |
| Premium Iowa Pork | Hospers | Sioux | IA | 3,150 |
| Redwood Farms (Farmes Union Industries) | Estherville | Emmet | IA | 2,400 |
| Verschoor Meats | Sioux City | Plymouth | IA | 1,200 |
| Total | | | | 152,050 |

Source: Pork.org



Decision
Innovation
Solutions

On a national basis, weekly hog slaughter capacity was about 2.689 million head at the beginning of 2019, and was estimated to be 2.755 million head by the end of 2019. Figure 23 shows weekly national hog slaughter and the percent utilization of national slaughter capacity. As can be seen in the graphic, capacity utilization reached 99.9% in late December 2019. The average for the year was about 91%.



**Figure 23, Federally Inspected Weekly Hog Slaughter (2019) & Percent of Capacity Utilization**

## Hog Production

Iowa is the largest hog producer in the U.S. (see Figure 24). Feed cost is the largest cost component in a hog production enterprise and Iowa's cost-effective situation is supported by its position as a top corn and soybean producer in the country. Hog production in Iowa has increased from 6.48 billion pounds in 2000 to 14.487 billion in 2018 (see Figure 24). Among large hog producers, Iowa's hog production share of total U.S. hog production has consistently increased over the past 20 years, from 25% in 2000 to 37% in 2018 (see Figure 25). For Minnesota, a distant competitor, hog production share of total U.S. production grew from 10% to 12% over the 20-year span (see Figure 26), whereas, for North Carolina, the share of hog production declined from 14% to 11% during the same period (see Figure 27).



**Figure 24, Hog Production for U.S. and Selected States, 2018 (Billion Pounds)**



Figure 25, IA Hog Production and Share of U.S. Hog Production

2020 Iowa Pork Industry Report                                           May 2020



Figure 26, MN Hog Production and Share of U.S. Hog Production



**Figure 27, NC Hog Production and Share of U.S. Hog Production**

## Hog Prices

Hog prices substantially increased in 2014 (see Figure 28) due to concern over PEDv. July 2014 Iowa-Minnesota barrow and gilt price (carcass basis) reached a record high average price of $122.51/hundredweight (cwt). This resulted in high profits for portions of the industry with hogs to sell, but losses for producers of young pigs since these animals were vulnerable to PEDv. After the industry recovered and a large supply returned to the market, Iowa hog prices fell and have remained below pre-PEDv levels.



**Figure 28, Iowa-Minnesota Barrow and Gilt Prices (Carcass Equivalent)**

Figure 29 shows 2019 Iowa-Minnesota barrow and gilt prices averaged $67.58/cwt and were up 4.7% year-over-year but down 33% from 2014 ($100.67/cwt).



**Figure 29, Iowa- Minnesota Barrow and Gilt Annual Average Prices (Carcass Equivalent)**

Demand for hams increased in November 2019 reflecting expanded demand for export and for domestic holiday consumption. As Figure 30 shows, in response to the increased demand, average November 2019 ham price ($90.53/cwt) was up 40% from the previous months and up 63% year-over-year. November 2019 ham average price was the highest of the year as well. In addition, as Figure 31 and Figure 32 indicate, other pork cuts also experienced improved prices in November 2019.

USDA-ERS pork price spread data indicates pork net farm value declined 5.2% from October to November 2019 to $73.6/pound retail weight equivalent (RWE) due to seasonally large supplies of slaughter hogs. At the same time, the wholesale pork value increased 5.6% to $153.1/pound RWE, indicating a strong pork demand (particularly hams). The effect of November 2019 price changes at the farm and wholesale level, led to the widest farm-wholesale spread of the year. The farm-wholesale value in November (2019) was estimated at $79.5/cwt RWE which was up 18.1% month-over-month and 39.8% compared with November 2018 ($56.8/cwt RWE) (see Figure 33).



Figure 30, Wholesale Price of Hams, 20-23 lb. Trimmed



Figure 31, Wholesale Price of Loins, 14-19 lb. ¼" Trim



Figure 32, Wholesale Price of Bellies, 10-12 lb. Skin on Trimmed



**Figure 33, Pork Monthly Farm to Wholesale Spread**

A plant cutout value of an individual pork carcass is based on the amounts of the various cuts produced by that carcass and the prices of those cuts. According to USDA, a plant's cutout value is confidential, proprietary information and is the single most important determinant of the price the plant will pay for hogs.

USDA's estimated pork carcass cutout (PCC) is the estimated value of a standardized pork carcass (currently 55-56% lean, 215 lbs.) and it is based on industry-average cut yields and average market prices of sub-primal pork cuts (i.e., PCC is the value of a 55-56% lean, 215 lb. hog based on current wholesale prices being paid for sub-primal pork cuts). USDA updates the industry-average cut yields in January of each year. The update is based on a survey of packers conducted the preceding July. Market prices are published by USDA in wholesale pork, lard, and meat and bone meal price reports. The PCC indicates the overall supply and demand condition for wholesale pork cuts. Figure 34 shows the PCC values for 2018 and 2019. On average, 2019 PCC values were 1.4% up from a year earlier.



**Figure 34, Composite Pork Carcass Cutout Value (2018 and 2019)**

In its March 2020 pork price projections, USDA indicated even with stronger-than-expected numbers of slaughter-ready hogs in January and February 2020, and the anticipation of this trend to continue throughout the end of March, first-quarter prices (national base cost, 51-52% lean, live equivalent) are projected to average $42/cwt, which are about 3.3% above year-ago average ($40.67/cwt) due to robust domestic and export demand. As indicated by USDA, despite the expansion in hog prices, they remain below most producers' cost of production breakeven (as per ISU estimates), an indication that many hog producers will not have covered first-quarter 2020 costs of production by the end of March.

USDA's March forecast indicated U.S. pork exports during the first quarter of 2020 would grow 31% to 1.9 billion pounds compared with the previous year on account of large import demand from China, whose pork production has dropped due to African swine fever. First-quarter exports are also expected to increase because of robust shipments to Mexico during the first two months of 2020. Overall, annual pork exports are forecast to grow 22.6% to 7.750 billion pounds (carcass weight equivalent) year-over-year.

## Cash Receipts

Hog sales (cash receipts[1]) in Iowa grew 7% to $7.62 billion in 2018 from the previous year (see Figure 35), while Iowa hog marketings[2] (expressed in pounds, not in U.S. dollars) in 2018 increased 13% to 15.07 billion pounds year-over-year. In contrast, 2018 sales for Minnesota and North Carolina declined 3% and 9%, respectively. Minnesota's volume of hogs marketed experienced a 1% increase, while for North Carolina the volume fell 3%.

As the No. 1 hog producer in the U.S., Iowa continued retaining the largest share of the market (36%) in 2018 from a cash receipt perspective. Minnesota and North Carolina sales represented 12.0% and 10%, respectively, of the total U.S. hog sales in 2018 ($21.10 billion) (see Figure 35). Overall, U.S. hog marketings totaled 40.07 billion pounds in 2018 and were up 5.3% from the previous year. On the other hand, 2018 U.S. cash from hogs slightly increased (0.3%) to $21.10 billion year-over-year (see Figure 35). This reflects that among the 10 states that generated 87% of 2018 hog receipts, only for Iowa and Oklahoma, which had 6% of the market, sales were above the previous year, with Iowa having the largest contribution to the U.S. hog cash receipts.

USDA-ERS's latest Farm Income and Wealth Statistics data published on February 5, 2020, indicated 2019 U.S. hog cash receipts increased 8% to $22.859 billion as national hog prices rose 4.4%. USDA has not published yet the 2019 state cash receipt data. 2019 hog cash receipts for Iowa, Minnesota, and North Carolina were estimated based on the five-year average share of U.S. hog receipts for each of these states multiplied by the 2019 U.S. sales estimated by USDA. 2019 Iowa hog receipts for Iowa, Minnesota, and North Carolina were estimated at $7.94 billion, $2.84 billion, and $2.48, correspondingly. This estimate pegs 2019 Iowa hog sales up 4.2% from last year (see Figure 35).

Since 2011, Iowa's hog sales have generated the second-largest cash receipts in the state (after cash receipts from corn sales), and in 2014 cash receipts from hogs temporarily exceeded those from corn. In 2018, hog cash receipts ($7.62 billion) made up 53.3% of all cash receipts from animals and products ($14.29 billion) in the state and 27.7% of cash receipts from all agricultural commodities cash receipts ($27.47 billion) in Iowa.

As state cash receipt data is available through 2018, 2019 data was estimated by using Iowa five-year share average of U.S. cash receipts for hogs, cattle & calves, corn, and soybeans, and applied those shares to USDA 2019 cash receipt estimates for each of those commodities in

---

[1] Cash receipts are the receipts from marketings and any sale of farm-slaughtered hogs and pigs, including an allowance for feeder pig out-shipments.

[2] Marketings (includes animals for slaughter market and younger animals shipped to other states for feeding and breeding purposes, and excludes inter-farm sales within the same state and farm slaughter. Data for marketings is in pounds not in U.S. dollars.

2019. The results indicate Iowa hog sales ($7.935 billion) would be about 96% of corn cash receipts ($8.23 billion) (see Figure 36).

The results indicate that the gap between Iowa corn cash receipts and hog cash receipts has been narrowing particularly since 2017, making hogs a more prominent commodity in the state, in terms of cash receipts generation. As Figure 37 shows, the largest gap between hogs and corn cash receipts happened in 2012 when corn prices were record high.



**Figure 35, Hog Receipts: U.S. and Top Three Hog State Producers (Billion Dollars)**



**Figure 36, Iowa Cash Receipts: Selected Commodities (Billion Dollars, 2012-2019*)**



Source: USDA/ERS
*2019 Iowa cash receipts estimated based on Iowa five-year share average of U.S. receipts for the corresponding commodity multiplied by the 2019 U.S. value estimated by USDA.

Figure 37, Iowa Hogs, Corn, Soybeans, and Cattle & Calves Cash Receipts Shares of Iowa Cash Receipts from All Agricultural Commodities

## Production/Feed Costs and Returns

Changes in feed costs have a considerable impact on the profitability of pig production due to the large proportion of feed costs relative to total production costs. In Iowa, feed costs were about 47% of total production costs related to producing wean-to-finish hogs (270 pound-hog) during 2019. Overall, corn cost was the largest feed expense, representing 44% of total feed cost and 21% of total cost (see Figure 38, Panel B) in 2019.

Despite lower soybean meal and DDGs cost in 2019 compared with the previous year (see Figure 38, Panel A), the average total cost of producing a wean-to-finish hog (finishing a weaned 12-pound hog) in Iowa was up 4% to $143.07/head in 2019 from $138.02/head in 2018. The cost of soybean meal and DDGs represented a smaller proportion (9% and 6%, respectively) of feed cost associated with total production cost. Corn cost, the largest feed expense, increased 9.6% to $30.03/head in 2019 compared with the previous year. Total cost comprises the cost of a 12-pound weaned pig, which in 2019 was up 9% to an average of $43.83/head compared the previous year ($40.32/head).

Figure 39 shows that the large profits realized in 2014 by Iowa hog producers (wean-to-finish) as a result of PEDv were reduced in 2015 and 2016 to the point that by the end of 2016 the annual returns were negative. As Figure 40 indicates, despite lower production costs in 2015

and 2016, particularly due to lower corn and soybean meal prices compared with 2014, hog producers have seen reduced profit margins as a reduction in production costs were offset by falling hog selling prices brought by large supplies. 2017 showed positive returns with stronger hog selling prices, combined with lower feed costs. The last two years have brought negative returns with expanding supplies and lower hog prices, particularly in 2018.



Figure 38, 2018 and 2019 Iowa Average Cost of Hog Production (Wean-to-Finish, $/head)



Figure 39, Iowa Average Estimated Annual Returns to Wean-to-Finish ($/Head)



**Figure 40, Iowa Hog Production Costs and Selling Price: Wean-to-Finish (Annual Average)**

## Pork Consumption

U.S. per capita pork consumption ranks third after beef and broiler meat (see Figure 41). Although per capita pork consumption has fallen from 72.9 pounds (carcass weight equivalent - CWE) in 1970, when pork was the second most consumed meat in the U.S., to 65.5 pounds (CWE) in 2018, the figure indicates that the difference between per capita pork consumption and per capita beef consumption has declined. There has been a substantial shift in the types of meat consumed since the 1970s, specifically a decrease in per capita beef, relatively steady per capita pork consumption, and a significant increase in per capita broiler consumption. More recently, per capita pork consumption has increased since 2014.



**Figure 41, U.S. Annual Per Capita Disappearance of Pork, Beef, and Broiler (CWE)**

Figure 42 shows average U.S. per capita consumption of pork, beef, and broiler meat throughout the last five decades (1970-1979 to 2010-2019). Overall, U.S. pork consumption has remained fairly stable compared with beef and broiler meat during that 50-year period. U.S. pork consumption declined 5% from 66.1 pounds CWE per capita, on average in the 1970-1979 decade to 62.6 pounds CWE per capita, on average, in the 2010-2019 decade.

In contrast, U.S. beef consumption fell 30% from the first decade (116.2 pounds CWE per capita, on average) to the last decade (80.9 pounds CWE per capita, on average). At the same time, U.S. broiler consumption grew 157%, on average, from 1970-1979 to 2010-2019. Because of the changes in meat (pork and beef) and broiler consumption patterns during this 50-year period, on average, for each pound of beef consumed in the 1970-1979 decade, 0.57 pound of pork was consumed. In contrast, 0.77 pound of pork was consumed for each pound of beef consumed in the 2010-2019 decade. This reflects a narrowing of the gap between pork and beef consumption during that period.

The consumption pattern between pork and broiler meat substantially reversed during the past 50 years. For each pound of broiler meat consumed in the 1970-1979 decade, 1.68 pounds of pork were consumed, while in the most recent decade, only 0.62 pound of pork was consumed per pound of broiler meat consumed.



**Figure 42, Average U.S. Per Capita Pork, Beef, and Broiler Disappearance (1970-1979 through 2010-2019, Pounds- CWE)**

## Iowa Feeder Pig Imports

Figure 43 shows Iowa imported 35.796 million head feeder pigs in 2019. Imports were originated from Canada plus 26 U.S. states. Iowa's top five suppliers of feeder pigs were Illinois (16%), Missouri (16%), Oklahoma (13%), Nebraska (11%), and Minnesota (9%). Canada shipped 8% of total feeder pigs imported by Iowa in 2019.



**Figure 43, 2019 Iowa Feeder Pig Imports (Head)**

## U.S. Pork Exports

U.S pork muscle cut exports are a part of total U.S. pork exports with a share of about 80% of total U.S. pork exports. The remainder of U.S. pork exports are in the form of variety meats. U.S. pork muscle cuts exported during 2019 reached a record volume of 2.176 million metric tons (MT), increasing 10% and 14% from 2018 and 2017, respectively (see Figure 44). The 2019 export value ($5.947 billion) was up 11% year-over-year (see Figure 45).

Pork exports in 2019 started to exceed the corresponding monthly volume of the previous two years in June and registered the highest volume in December, up 36% compared with December 2018 (see Figure 46). U.S. pork exports soared in 2019 with substantial volumes shipped to China, whose swine herd has been significantly cut by African swine ever (ASF), resulting in lower Chinese pork production while increasing domestic pork prices. Note that exports to China grew despite high retaliatory tariffs on U.S. pork.



Figure 44, U.S. Pork Exports (1,000 Metric Tons)



Figure 45, U.S. Pork Export Value (Billion USD)

Recent data shows that during the first five months of 2020, U.S. pork exports reached 1.134 million MT, up 36% year-over-year (see Figure 46), with China as the largest driver of U.S. pork exports during 2020[3].



**Figure 46, U.S. Monthly Pork Exports (1,000 Metric Tons)**

*U.S. Pork Exports to Main Destinations*

Overall, Mexico has been the top volume market for U.S. pork followed by Japan. On average in 2017 and 2018, Mexico and Japan accounted for 34% and 20% of U.S. total pork exported volume, respectively. South Korea and Canada each had about 10% share of the U.S. total exports during those two years. On the other hand, China's share was 6%, on average, making China the 5th largest market for U.S. pork during 2017 and 2018.

In 2019, Mexico continued as the main market for U.S. pork shipments, while China, surpassed Japan in volume terms (see Figure 47). U.S. pork exports to China increased 258% year-over-year, while shipments to Canada were up 5%. On a monthly basis, U.S. pork exports to China consistently exceeded previous year's volumes beginning in March 2019 (14,288 MT). In

---

[3] China's duty rate on frozen pork muscle cuts was lowered twice within the first two months of 2020; yet it remains at 63%. Before retaliatory tariffs were imposed in April 2018, the tariff on frozen pork muscle cuts was 12%.

December 2019, the U.S. exported to China the largest volume of the year at 82,659 MT, which was about nine times higher than the volume exported a year earlier (9,335 MT) (see Figure 48). Although declining 10% compared to the previous month, January 2020 U.S. pork exports (74,350 MT) to China were up about 10 times the volume exported in January 2019. The disruption on China's pork industry brought by ASF in that country has opened considerable opportunities for U.S. pork exports. From January to May 2020, U.S. pork (muscle pork cuts) exports to China were over five times higher than last year's volume (up 463%) (see Figure 48) and accounted for 34% of total U.S. pork exports (muscle cuts).

In contrast, compared with the previous year, 2019 total U.S. pork shipments to Mexico, Japan, South Korea, and Hong Kong were down 10.7%, 6.0%, 13.5%, and 13.4%, correspondingly. Exports to Mexico were restrained in 2019 as Mexico retaliatory tariffs on U.S. pork persisted during the first five months of the year.

It should be noted that U.S. pork exports to some of these markets improved during the last part of 2019. For instance, starting in August 2019, U.S. monthly pork exports to Hong Kong exceeded previous year volumes and scored the largest volume of the year in November (2,675 MT), which was up 85% from November 2018.

Also, December exports to Mexico jumped 10% to 55,667 MT year-over-year. Exports consistently increased since November 2019. This trend continued during the first three months of 2020. From January to March exports exceeded previous year's volumes (see Figure 49). In January and March exports were each up 12% year-over-year, while February's exports were up 20%.

Current data indicates U.S. muscle pork cut exports to Mexico from January to May 2020 reached 230,704 MT, up 2% year-over-year; however, as Figure 49 shows, pork exports to Mexico lost momentum during April and May. As indicated by the U.S. Meat Export Federation (USMEF), Mexico's pork production increased while prices declined during this spring, which encouraged price-driven competition.

U.S. pork shipments to Japan were down 31% in May 2020 compared with the previous month (38,758 MT), but January through May exports were up 8% relative to the same period in 2019. The U.S.-Japan agreement that took effect at the beginning of the year is boosting U.S. pork exports to that important value market.



**Figure 47, U.S. Pork Exports to Selected Markets (1,000 Metric Tons)**



**Figure 48, U.S. Monthly Pork Exports to China (1,000 Metric Tons)**



Figure 49, U.S. Monthly Pork Exports to Mexico (1,000 Metric Tons)

As Figure 50 shows, Japan is the leading value market for U.S. pork. Although Japan imports both fresh-chilled pork and frozen pork products, the U.S. is the main supplier of fresh pork products including higher-priced cuts such as loins. In 2017 and 2018, one third of the total value of U.S. pork exports was generated by the value of shipments to Japan. With the substantial increase in exports to China in 2019, and the 5.9% decline in exports to Japan, Japan's share of U.S. total value of pork exports declined to 25.2% in 2019.

The value of exports to China was four times higher in 2019 compared with the preceding year. Although the value of U.S. pork exports to Mexico fell 3% in 2019, Mexico continued as the second-largest value market for U.S. pork exports (see Figure 50).



**Figure 50, U.S. Pork Export Value (Billion USD)**

The approval of the U.S.-Mexico-Canada Agreement (USMCA) at the beginning of the year (2020) is expected to boost U.S. pork exports to these two important markets (Canada and Mexico), while the U.S.-China "Phase One" trade agreement signed on January 15, 2020, expands the permissible product range for U.S. pork and pork products, including bungs and intestines and processed products.

With important developments in U.S. pork trade agreements such as these, 2020 pork exports are projected to increase this year. In addition, the ASF adverse impact on China hog/pork production is expected to contribute to the expansion in U.S. pork exports in 2020. USDA's latest forecast (July 2020) indicates 2020 U.S. pork exports would grow 19% to 7.523 billion pounds (carcass weight equivalent) compared with last year (6.321 billion pounds, carcass weight equivalent). Projections indicate U.S. pork exports would account for 26% of production, up from 23% during 2019.

## Iowa Pork Exports

Key data to estimate Iowa pork muscle cut exports was:

 1) the 2017 USDA Census Iowa county hog inventory share to total Iowa hog inventory that year.

2) Iowa's percent of market hog inventory (32.846%) to total U.S. market hog inventory in December 2018, and

3) Iowa's percent of market hog inventory (33.037%) to total U.S. market hog inventory in June 2019.

4) 2019 U.S. pork muscle cut exports: January to June 2019 (1.006 million MT) and July to December 2019 (1.170 million MT)

We applied the following procedure:

### *Iowa Market Hog Inventory Data by County: December 1, 2018 and June 1, 2019*

December 1, 2018 USDA Survey market hog inventory data for Iowa was not available at the county level. To estimate Iowa's Dec 1, 2018 market hog inventory data by county, we applied the 2017 USDA Census Iowa county hog inventory share to total Iowa hog inventory that year (see Table 4) to Iowa's December 1, 2018 market hog inventory (22.580 million head). We used the December 1, 2018 market hog inventory data because historically in Iowa, on average, 95% of December 1 inventory is composed of market hog inventory, which are the hogs that enter processing plants within the next six months (January to June).

June 1, 2019 USDA Survey market hog inventory data for Iowa was not available at the county level. To estimate Iowa June 1, 2019 market hog inventory data by county, we applied the 2017 USDA Census Iowa county hog inventory share to total Iowa hog inventory that year to Iowa's June 1, 2019 market hog inventory (22.900 million head). (see Table 4). We used the June 1, 2019 market hog inventory data since historically in Iowa, on average, 95% of June 1 inventory is composed of market hog inventory, which are the hogs that enter processing plants within the next six months (July to December).

### *Iowa 2019 Pork Muscle Cut Exports: January to June and July to December*

To estimate January through December 2019 Iowa pork muscle cut exports (referred from here on as Iowa pork exports), we assumed that the percent of Iowa's pork exports from January to June 2019 to U.S. pork exports during that period (1,006,479 MT), was the same as Iowa's percent of market hog inventory (32.846%) to total U.S. market hog inventory in December 2018. Based on this percentage, Iowa exported 330,590 MT (1,006,479 MT * 32.846%) of pork muscle cuts from January to June 2019. In addition, we assumed that the percent of Iowa's pork exports from July to December 2019 to U.S. pork exports during that period (1,170,005 MT), was the same as Iowa's percent of market hog inventory (33.037%) to total U.S. market hog inventory in June 2019. Based on this percentage, Iowa exported 386,538 MT (1,170,005 MT * 33.037%) of pork from July to December 2019. Iowa pork exports from January to December 2019 was assessed at 717,128 MT.

### *2019 Iowa County Pork Muscle Cut Exports*

To estimate Iowa pork muscle cut exports from January to June 2019 at the county level, we applied the 2017 USDA Census Iowa county hog inventory share to total Iowa hog inventory that year to the estimated Iowa January to June 2019 exports (350,590 MT). To estimate Iowa pork muscle cut exports from July to December 2019 at the county level, we applied the 2017 USDA Census Iowa county hog inventory share to total Iowa hog inventory that year to the

estimated Iowa July to December 2019 exports (386,538 MT). Iowa pork exports for the entire 2019 year at the county level are the sum of January-June plus July to December 2019 county level data (see Table 4).

Among the selected 35 Iowa counties, five counties exported 24.6% of total Iowa pork muscle cut exports in 2019, with Washington and Sioux counties exporting 42,025 MT (5.9%) and 39,725 MT (5.5%), respectively. The selected 35 Iowa counties exported about one-fifth (19.6%, 425,889 MT) of all U.S. pork muscle cut exports from January to December 2019.

**Table 4, Focus Counties: Inventory, Exports, and County Share of Total Exports (January to December 2019)**

| Selected County | December 1, 2018 Iowa Market Hog Inventory (Head) | June 1, 2019 Iowa Market Hog Inventory (Head) | January to June 2019 Pork Muscle Cut Exports by Selected County (MT) | July to December 2019 Pork Muscle Cut Exports by Selected County (MT) | January to December 2019 Pork Muscle Cut Exports by Selected County (MT) | County Share of Iowa Total Pork Muscle Cut Exports (January to December 2019, %) | County Share of U.S. Total Pork Muscle Cut Exports (January to December 2019, %) |
|---|---|---|---|---|---|---|---|
| Washington | 1,323,226 | 1,341,979 | 19,373 | 22,652 | 42,025 | 5.9% | 1.9% |
| Sioux | 1,250,794 | 1,268,520 | 18,313 | 21,412 | 39,725 | 5.5% | 1.8% |
| Lyon | 1,065,734 | 1,080,837 | 15,603 | 18,244 | 33,847 | 4.7% | 1.6% |
| Hamilton | 1,004,646 | 1,018,884 | 14,709 | 17,198 | 31,907 | 4.4% | 1.5% |
| Plymouth | 918,218 | 931,231 | 13,443 | 15,719 | 29,162 | 4.1% | 1.3% |
| Carroll | 744,518 | 755,070 | 10,900 | 12,745 | 23,645 | 3.3% | 1.1% |
| Hardin | 624,780 | 633,634 | 9,147 | 10,695 | 19,843 | 2.8% | 0.9% |
| Kossuth | 592,170 | 600,562 | 8,670 | 10,137 | 18,807 | 2.6% | 0.9% |
| O'Brien | 501,013 | 508,113 | 7,335 | 8,577 | 15,912 | 2.2% | 0.7% |
| Wright | 480,325 | 487,132 | 7,032 | 8,222 | 15,255 | 2.1% | 0.7% |
| Pocahontas | 396,179 | 401,793 | 5,800 | 6,782 | 12,582 | 1.8% | 0.6% |
| Buchanan | 365,546 | 370,726 | 5,352 | 6,258 | 11,610 | 1.6% | 0.5% |
| Buena Vista | 346,050 | 350,954 | 5,066 | 5,924 | 10,990 | 1.5% | 0.5% |
| Howard | 316,966 | 321,458 | 4,641 | 5,426 | 10,067 | 1.4% | 0.5% |
| Calhoun | 314,110 | 318,561 | 4,599 | 5,377 | 9,976 | 1.4% | 0.5% |
| Butler | 283,253 | 287,267 | 4,147 | 4,849 | 8,996 | 1.3% | 0.4% |
| Clayton | 278,561 | 282,509 | 4,078 | 4,769 | 8,847 | 1.2% | 0.4% |
| Audubon | 264,594 | 268,344 | 3,874 | 4,529 | 8,403 | 1.2% | 0.4% |
| Scott | 254,143 | 257,744 | 3,721 | 4,351 | 8,071 | 1.1% | 0.4% |
| Chickasaw | 242,210 | 245,643 | 3,546 | 4,146 | 7,692 | 1.1% | 0.4% |
| Floyd | 235,545 | 238,883 | 3,449 | 4,032 | 7,481 | 1.0% | 0.3% |
| Fayette | 230,559 | 233,826 | 3,376 | 3,947 | 7,322 | 1.0% | 0.3% |
| Mitchell | 191,949 | 194,670 | 2,810 | 3,286 | 6,096 | 0.9% | 0.3% |
| Marshall | 176,469 | 178,970 | 2,584 | 3,021 | 5,605 | 0.8% | 0.3% |
| Webster | 172,444 | 174,888 | 2,525 | 2,952 | 5,477 | 0.8% | 0.3% |
| Dubuque | 139,989 | 141,973 | 2,050 | 2,396 | 4,446 | 0.6% | 0.2% |
| Iowa | 126,970 | 128,770 | 1,859 | 2,174 | 4,033 | 0.6% | 0.2% |
| Winneshiek | 124,646 | 126,412 | 1,825 | 2,134 | 3,959 | 0.6% | 0.2% |
| Jones | 107,951 | 109,481 | 1,580 | 1,848 | 3,428 | 0.5% | 0.2% |
| Allamakee | 82,883 | 84,058 | 1,213 | 1,419 | 2,632 | 0.4% | 0.1% |
| Jefferson | 82,165 | 83,330 | 1,203 | 1,407 | 2,610 | 0.4% | 0.1% |
| Woodbury | 68,808 | 69,783 | 1,007 | 1,178 | 2,185 | 0.3% | 0.1% |
| Lucas | 44,204 | 44,831 | 647 | 757 | 1,404 | 0.2% | 0.1% |
| Wapello | 36,859 | 37,382 | 540 | 631 | 1,171 | 0.2% | 0.1% |
| Page | 21,358 | 21,660 | 313 | 366 | 678 | 0.1% | 0.0% |
| Other | 9,170,165 | 9,300,123 | 134,259 | 156,980 | 291,239 | 40.6% | 13.4% |
| STATE TOTAL | 22,580,000 | 22,900,000 | 330,590 | 386,538 | 717,128 | 100.0% | 32.9% |
| U.S. TOTAL | 68,744,600 | 69,315,600 | 1,006,479 | 1,170,005 | 2,176,484 | | |

Source: Inventory data: USDA CENSUS and Survey data

Export Data: USDA-FAS

 Decision Innovation Solutions

# Economic Contribution of Hog Production and Related Industries

## State Level Results

After identifying the three IMPLAN sectors to be studied, a state model was created and modified according to the IMPLAN-recommended methodology. The 2018 data model was utilized (the most current) and, where appropriate, adjusted to 2020 dollars. Further details on methodology can be found in Appendix A. Results are presented for the following three (adjusted) industries:

- Hog Production
- Hog Slaughtering
- Hog Processing

## State Jobs

'Jobs' represents an estimate of the number of positions (jobs) currently filled in an area and/or industry. The estimates provided here originate with the IMPLAN input-output model database. 'Jobs' includes positions whether they are full or part time, so care must be used in making comparisons. As shown in Figure 51, Iowa's hog production, slaughtering, processing and related economic activities contribute significantly to Iowa's total jobs with about 147,105 jobs. Of this amount, 46% comes from hog production, 45% from hog slaughtering, and about 9% from hog processing.



Figure 51, State of Iowa Pork Industry Jobs Summary

## State Value-Added

'Total value-added' refers to that portion of the value of total sales (output) beyond the cost of inputs used in the production process from other industries. Hog production, slaughtering, processing and related economic activities make a sizeable contribution to the economy in Iowa with about $11.9 billion in value-added. As shown in Figure 52, about 46% of this amount comes from hog production, 9% from hog slaughtering, and about 45% from hog processing.



Figure 52, State of Iowa Pork Industry Value-Added Summary

## State Sales (Output)

'Total sales' refers to the total value of all the sales (also known as output) of a study area and/or industry. This is a total number that does not make deductions for the cost or origination of inputs that were used in the production process. Figure 53 illustrates the contribution of hog production, slaughtering, processing, and other related economic activities to Iowa's economy. As shown, Iowa's hog industry contributes about $40.8 billion in total sales. Of this amount, about 34% comes from hog production, 55% from hog slaughtering, and about 11% from hog processing.



**Figure 53, State of Iowa Pork Industry Sales (Output) Summary**

## State Labor Income

'Labor income' is the sum of employee compensation (work for hire) and proprietor income (self-employed) and is a sub-component of value-added. Hog production, slaughtering, processing and related economic activities make a significant contribution to the economy in Iowa with $6.8 billion in labor income. As shown in Figure 54, 40% of this amount comes from hog production, 49% from hog slaughtering and 11% from hog processing.



**Figure 54, State of Iowa Pork Industry Labor Income Summary**

## Tax Summary

Iowa's hog production, slaughtering, processing, and related economic activities are also a significant source of tax revenue, contributing $2.2 billion in taxes at jurisdictions. About $893 million (41%) of that amount goes to the state and local levels and about $1.3 billion (59%) is paid at the federal level. Estimates of taxes paid are shown in Figure 55.



Figure 55, State of Iowa Pork Industry Tax Summary

# Economic Impact Study – 2,400-Head Wean-to-Finish Hog Farm

The 2018 IMPLAN data package was also used for this portion of the analysis and, where appropriate, adjusted to 2020 dollars. The entry of a new 2,400-head wean-to-finish hog farm causes a measurable increase in economic activity within the state of Iowa, both in terms of construction and annual operations. When a hog farm enters a local economy, it causes a series of new economic activities (impacts) to take place. For this summary, we break the impacts into one-time construction impacts and ongoing annual operations impacts. The magnitude of these new economic activities is largely related to the presence of industries which supply the needed inputs for a new hog farm. A wean-to-finish facility in Iowa sources roughly 35.5% of all operation's inputs locally.

The construction of a new hog farm requires several purchases such as steel, concrete, and equipment; once construction is completed, hog farms purchase feed, veterinary and other professional services, and many other inputs to produce hogs for sale. The direct purchase of supplies and equipment are known as direct effects. The suppliers and vendors used by the hog farm then must purchase inputs to supply the hog farm; these are known as indirect effects. Those who work in the construction of the farm, for the hog farm once it has been completed, and for the farm's suppliers and vendors then use their additional income to make household purchases; these are known as household, or induced effects. Taken together, the sum of direct, indirect and induced effects is known as total effects and accounts for the total multiplier effect present from the construction and operations of a new hog farm. Value-added numbers are a better way to represent the economic impact of a certain event because it is a summation of all value-added to inputs. Sometimes the total sales (output) number is used because it's bigger but it inherently includes some double counting since it sums inputs for each round of value-added as it moves through the chain.

A new 2,400-head hog wean-to-finish farm's total impact of construction and operations for the first year in Iowa would generate $1.1 million in total value-added or 12 total jobs. In terms of labor income nearly $637 thousand and $2.5 million in total sales would be added to Iowa.

**Table 5, Total Effect of Constructing and Operating a 2,400 Head Wean-to-Finish Barn for First Year[4]**

| Combined Effect of Construction and Operations for First Year | | | | |
|---|---|---|---|---|
| Impact Type | Employment | Labor Income | Value-Added | Sales |
| Direct Effect | 7 | $347,430 | $591,083 | $1,473,695 |
| Indirect Effect | 3 | $178,506 | $312,437 | $711,754 |
| Induced Effect | 3 | $110,606 | $201,693 | $362,444 |
| Total Effect | 12 | $636,541 | $1,105,213 | $2,547,892 |

---

[4] Totals may not add up to the totals presented in the report due to rounding

Constructing a 2,400-head deep pit barn in Iowa will create economic impacts through every phase of construction. A construction cost of $316/head was used to determine the cost to construct the facility. Looking at Table 6, this would create a total value-added impact of $579,058 or 6 total jobs with labor income of nearly $377,000. In addition, $1.2 million in total sales are added to the Iowa economy.

**Table 6, Total Effect of Constructing a 2,400-Head Wean-to-Finish Barn**

| Construction | | | | |
|---|---|---|---|---|
| **Impact Type** | **Employment** | **Labor Income** | **Value-Added** | **Sales** |
| **Direct Effect** | 4 | $232,666 | $325,646 | $757,228 |
| **Indirect Effect** | 1 | $78,992 | $134,342 | $269,034 |
| **Induced Effect** | 2 | $65,264 | $119,070 | $213,930 |
| **Total Effect** | 6 | $376,921 | $579,058 | $1,240,193 |

As shown in Table 7, the economic sector impacted the most through total value-added by constructing a wean-to-finish farm in Iowa is "construction of new commercial structures, including farm structures" with a total value-added effect of nearly $172,000. The second largest impacted economic sector is "ready-mix concrete manufacturing" with a total value-added effect of nearly $104,000.

**Table 7, Top 10 Sectors Impacted by Value-Added of Constructing a 2,400-Head Wean-to-Finish Barn for First Year**

| Construction Top 10 Sectors Impacted – Value-Added | | | | | |
|---|---|---|---|---|---|
| **Sector #** | **Sector** | **Direct** | **Indirect** | **Induced** | **Total** |
| 55 | **Construction of new commercial structures, including farm structures** | $171,957 | $0 | $0 | $171,957 |
| 204 | **Ready-mix concrete manufacturing** | $101,210 | $2,338 | $30 | $103,578 |
| 260 | **Farm machinery and equipment manufacturing** | $37,219 | $105 | $1 | $37,325 |
| 240 | **Ornamental and architectural metal work manufacturing** | $15,260 | $114 | $2 | $15,376 |
| 203 | **Cement manufacturing** | $0 | $12,601 | $6 | $12,607 |
| 417 | **Truck transportation** | $0 | $8,823 | $994 | $9,817 |
| 441 | **Monetary authorities and depository credit intermediation** | $0 | $4,260 | $4,181 | $8,441 |
| 396 | **Wholesale - Other durable goods merchant wholesalers** | $0 | $7,801 | $440 | $8,241 |
| 29 | **Sand and gravel mining** | $0 | $8,189 | $5 | $8,194 |
| 490 | **Hospitals** | $0 | $0 | $6,153 | $6,153 |

Construction of a 2,400-head wean-to-finish site will create tax impacts at both the state and local level and the federal level. As shown in Table 8, nearly $37,000 are added to state and local taxes and nearly $72,000 are added to federal taxes.

Table 8, Tax Impacts of Constructing a 2,400-Head Wean-to-Finish Barn

| Tax Impacts of Construction | |
|---|---|
| Total | $108,243 |
| State and Local | $36,699 |
| Federal | $71,544 |

Operating the wean-to-finish farm would contribute economic impacts to Iowa's economy through the production of market pigs. A 2,400-head site was expected to have two turns of pigs marketed per year with a mortality of 4.67%. This would result in just over 4,500 head of pigs marketed. Market pigs were assumed to have a sales price of $68/cwt on a carcass basis with the average carcass weight of marketed pigs being 213 pounds. As shown in Table 9, this would support $526,000 in total value-added and nearly $260,000 in labor income to Iowa's economy. This would also support 6 total jobs, and in terms of total sales $1.3 million would be contributed to Iowa.

Table 9, Total Effect of Operating a 2,400-Head Wean-to-Finish Barn for First Year

| Operations for First Year | | | | |
|---|---|---|---|---|
| Impact Type | Employment | Labor Income | Value-Added | Sales |
| Direct Effect | 3 | $114,764 | $265,437 | $716,467 |
| Indirect Effect | 2 | $99,514 | $178,095 | $442,719 |
| Induced Effect | 1 | $45,342 | $82,623 | $148,513 |
| Total Effect | 6 | $259,620 | $526,155 | $1,307,699 |

As shown in Table 10, by operating a wean-to-finish farm in Iowa, the economic sector impacted the most through total value-added was "animal production, except cattle and poultry and eggs" with a total value-added effect of $268,000. The second-largest impacted economic sector was "wholesale – other nondurable goods merchant wholesalers" with a total value-added effect of nearly $37,000.

**Table 10, Top 10 Sectors Impacted by Value-Added of Operating a 2,400-Head Wean-to-Finish Barn for First Year[5]**

| | Operations Top 10 Sectors Impacted – Value-Added | | | | |
|---|---|---|---|---|---|
| Sector # | Sector | Direct | Indirect | Induced | Total |
| 14 | Animal production, except cattle and poultry and eggs | $240,423 | $27,739 | $59 | $268,221 |
| 400 | Wholesale - Other nondurable goods merchant wholesalers | $0 | $35,697 | $1,076 | $36,773 |
| 167 | Nitrogenous fertilizer manufacturing | $25,014 | $561 | $2 | $25,578 |
| 417 | Truck transportation | $0 | $12,314 | $689 | $13,003 |
| 64 | Other animal food manufacturing | $0 | $11,846 | $17 | $11,863 |
| 447 | Other real estate | $0 | $7,975 | $1,668 | $9,643 |
| 444 | Insurance carriers, except direct life | $0 | $4,188 | $2,756 | $6,944 |
| 19 | Support activities for agriculture and forestry | $0 | $6,750 | $12 | $6,762 |
| 441 | Monetary authorities and depository credit intermediation | $0 | $3,119 | $2,915 | $6,034 |
| 490 | Hospitals | $0 | $0 | $4,296 | $4,296 |

Operations for the first year of a 2,400-head wean-to-finish farm will create tax impacts at both the state and local level and the federal level. As shown in Table 11, $32,000 are added to state and local taxes and $49,000 are added to federal taxes.

**Table 11, Tax Impacts of Operating a 2,400-Head Wean-to-Finish Barn for First Year**

| Tax Impacts of Operations | |
|---|---|
| Total | $81,433 |
| State and Local | $32,095 |
| Federal | $49,338 |

---

[5] For additional details on IMPLAN sectors please see IMPLAN's website

## Appendix A - Methodology

The 2020 Iowa Pork Industry Economic Contribution Study was completed with a combination of the 2018 Iowa IMPLAN[6] dataset, data from the USDA 2017 Census of Agriculture and other USDA/NASS sources. The IMPLAN modeling system and Microsoft Excel were used for calculating and tabulating the results of this analysis. Results, shown as 2019 values throughout this report, are presented using these common economic modeling terms:

- **Value-Added**
  - Sales (output) minus the cost of inputs
- **Sales (Output)**
  - The broadest measure of economic activity – sometimes referred to as "output"
- **Employment (Jobs)**
  - A measure of job positions without regard to whether they are full-time equivalents
- **Household Income**
  - Income from all sources that accrues to individuals as payment for personal employment (earnings or labor income), payment for ownership interests or capital provision (dividends, interest and rents), or as transfer payments (payments to individuals for which nothing is offered in return)

---

[6] IMPLAN is a platform that combines a set of extensive databases, economic factors, multipliers, and demographic statistics with a highly refined modeling system that is fully customizable.



## Economic Impact Study vs. Economic Contribution Study

The term "Economic Impact Study" implies a change has taken place within a local economy. The change in a local economy typically comes from one of the following sources:

- Entrance/departure of a new business or industry
- Expansion/contraction of an existing business or industry

While estimating a change (economic impact study) such as the entrance or departure of industry activity is a worthwhile endeavor in many instances, this is not how the contribution of the agri-food sector in this analysis was estimated.

This analysis is an effort to evaluate the structure of existing industries within an existing economy. As a result, shocking the economy to create or eliminate parts of the industry is not appropriate. For that reason, this study is called an "economic contribution analysis;" in other words, we are interested in understanding what Iowa agriculture currently contributes to the overall economy. This is a key difference from what is traditionally termed an "economic impact study." With a contribution analysis, the sum of individual industry estimates will never differ from the total of what actually exists in a given study area.

## Defining Hog Production and Related Industries

When completing an economic contribution study, there are generally questions as to how far up and down the value chain should be included for a particular industry. Outlined below is the process used in this study for defining hog production and related industries.

The 2018 IMPLAN data package was used for this portion of the analysis. Within the IMPLAN modeling system are 536 industries which are aggregations of all North American Industry Classification System (NAICS) codes. Within the 536 industries are many that deal with crops, livestock and processing of these commodities. We have chosen to include the following industries in this contribution analysis.

- **Sector 14, Animal Production, Except Cattle and Poultry and Eggs (Hog Production)**

  We recognize that more than hogs are included in this IMPLAN sector. To separate hogs from the rest of what is included here, we used sales figures by livestock species from the 2017 Census of Agriculture to calculate the share of value attributed to hogs.

- **Sector 89, Animal, Except Poultry, Slaughtering (Hog Slaughtering)**

  This IMPLAN sector includes all red meat slaughter. We utilized slaughter and processing location data from the Iowa Economic Development Authority and other sources to estimate the total portion devoted to hog slaughter.

- **Sector 90, Meat Processed from Carcasses (Hog Processing)**

  This IMPLAN sector includes all red meat processing. We utilized slaughter and processing location data from the Iowa Economic Development Authority and other sources to estimate the total portion devoted to hog processing.

The inclusion of these industries follows our overarching reasons for other studies of this nature, which is that the production of the commodity plus its first round of added-value activity are normally included.

# 2020 IOWA PORK
## ECONOMIC CONTRIBUTION STUDY

 **STATE OF IOWA**



## 24.8
**(MILLION)**
### NUMBER OF HOGS

Based on the USDA 2017 Census of Agriculture and adjusted for the statewide rate of change for Iowa shown in the Dec. 1, 2019 NASS Hogs & Pigs Report.*



## 5,418
### NUMBER OF HOG FARMS

Based on the USDA 2017 Census of Agriculture and adjusted for the statewide rate of change for Iowa shown in the Dec. 1, 2019 NASS Hogs & Pigs Report.*

## 147,105
### JOBS

A measure of the full and part-time jobs in the state created directly by the pork industry including those in hog production, slaughter, processing, and related activities.*

## $11.9
**(BILLION)**
### VALUE-ADDED ACTIVITY

The difference between sales from pork production, slaughter, processing, and related activities, and the cost of the inputs. Inputs include Household Income, Taxes, and other economic activity.*

## $40.8
**(BILLION)**
### PORK PRODUCTION & PROCESSING SALES

Represents current annual revenue projections for the pork industry based on the USDA 2017 Census of Agriculture. It is adjusted for 2019 by calculating the rate of change determined by the IMPLAN calculator for projected revenues of Iowa's hog production, slaughter, and processing activity, as well as other related activities.*

## $6.8
**(BILLION)**
### HOUSEHOLD INCOME

The total payroll related to hog production, slaughter, processing, and other related activities. This includes employee wages, salaries, and benefits, in addition to payments received by self-employed owners.*

## 3,021,320
**(ACRES)**
### CORN CONSUMPTION
**(22% of Iowa corn acres)**




## 2,234,234
**(ACRES)**
### SOYBEAN CONSUMPTION
**(23% of Iowa soybean acres)**

These are the number of crop acres in the county needed to feed the pigs raised here. Consumption estimates are based on average yields (bu./acre) from the NASS 2019 report on county acreage, production, and yields. From wean to market weight, a pig, on average, will consume 12 bu. of corn and 2.5 bu. of soybeans. Two groups of pigs are raised each year.

## IOWA PORK INDUSTRY TAX SUMMARY

## $893
**(MILLION)**
**STATE/LOCAL TAXES**


**$2.193 (BILLION) Total**

## $1.3
**(BILLION)**
**FEDERAL TAXES**

This chart shows the distribution of tax dollars generated by the pork industry and related activities.*



**iowapork.org**

*This study was conducted by Decision Innovation Solutions (decision-innovation.com) in 2020. It was completed with a combination of the 2018 Iowa IMPLAN dataset, data from the USDA 2017 Census of Agriculture, and other National Agricultural Statistics Service (NASS) sources.

### OVERVIEW of METHODOLOGY:

The purpose of this economic contribution analysis is to evaluate the impact of Iowa's pork industry on the local economy. This study is based on the 2018 IMPLAN modeling system, USDA 2017 Census of Agriculture, and USDA/NASS datasets. In this study, we focus on activities within the pork industry. These activities, also referred to as Industries in IMPLAN, are aggregations of all relevant North American Industry Classification System (NAICS) codes. This study evaluated the following economic activities:

- Animal production, Except Cattle and Poultry (IMPLAN Sector 14)
- Animal, Except Poultry, Slaughtering (IMPLAN Sector 89)
- Meat Processed from Carcasses (IMPLAN Sector 90)a

By default, the above sectors include animals other than hogs in the initial results. Therefore, the hog share was estimated for each industry at the state and county level (35 counties). Below is a brief description of how this allocation was applied.

5. IMPLAN Sector 14: Using 2017 Census of Agriculture sales figures by species, we calculated the production value attributed to hogs.
6. IMPLAN Sector 89: we extracted the hog share of animal slaughter by utilizing processing and slaughter data from sources such as the Iowa Economic Development Authority to identify locations of animal slaughter facilities in Iowa. We estimated the total portion of animal slaughter facilities for hogs using the information regarding location and types of animal slaughter facilities in Iowa.
7. IMPLAN Sector 90: We also allocated a hog share of Sector 90, which includes all red meat processing by utilizing slaughter and processing location data and type of processor from Iowa Economic Development Authority and other sources at the county level. Pork processing on the state level was calculated by determining the pork share of 99 counties as a function of the state total.
8. Once all allocations for hog share of each of the previously mentioned industries were calculated, they were applied to the economic activities within the industries. Economic activity for Iowa's pork industry is measured by: Employment (jobs), Labor Income (Household Income), Value-Added, and Output (sales), Federal Tax, and State & Local Tax.

Our calculations from the 2019 IMPLAN results estimates the economic footprint of Iowa's hog production, slaughter, and processing. Economic activity from Iowa's hog/pork industry supports many industries. The local jobs created, labor income, sales, and value-added from the hog production, slaughter, and processing are the *direct* effects of Iowa's pork industry. When businesses within these sectors purchase goods and services from local industries this becomes the *indirect effect* of Iowa's pork industry, and supports a range of industries from crop farming, warehousing and storage, grocery and product wholesale, truck transportation and more. The effect on the economy which occurs from household spending of the labor income earned from these industries becomes the *induced effect*. This analysis reflects the importance of Iowa's hog/pork industry to the overall economy.



# Quarterly Hogs and Pigs

ISSN: 1949-1921

**EXHIBIT**

**B**

Released December 23, 2020, by the National Agricultural Statistics Service (NASS), Agricultural Statistics Board, United States Department of Agriculture (USDA).

### United States Hog Inventory Down 1 Percent

**United States inventory** of all hogs and pigs on December 1, 2020 was 77.5 million head. This was down 1 percent from December 1, 2019, and down 1 percent from September 1, 2020.

**Breeding inventory,** at 6.28 million head, was down 3 percent from last year, and down 1 percent from the previous quarter.

**Market hog inventory,** at 71.2 million head, was down 1 percent from last year, and down 1 percent from last quarter.

**The September-November 2020 pig crop,** at 35.0 million head, was down 1 percent from 2019. Sows farrowing during this period totaled 3.16 million head, down 1 percent from 2019. The sows farrowed during this quarter represented 50 percent of the breeding herd. The average pigs saved per litter was 11.05 for the September-November period, compared to 11.09 last year.

## Quarterly Hogs and Pigs Inventory - United States: December 1



**Million Head**

**United States hog producers** intend to have 3.12 million sows farrow during the December 2020-February 2021 quarter, up 2 percent from the actual farrowings during the same period one year earlier, and up 1 percent from the same period two years earlier. Intended farrowings for March-May 2021, at 3.12 million sows, are down 1 percent from the same period one year earlier, and down slightly from the same period two years earlier.

The total number of hogs under contract owned by operations with over 5,000 head, but raised by contractees, accounted for 48 percent of the total United States hog inventory, unchanged from the previous year.

## Revisions

All inventory and pig crop estimates for March 2019 through September 2020 were reviewed using final pig crop, official slaughter, death loss, and updated import and export data. The revision made to the September 2020 all hogs and pigs inventory was 0.8 percent. A revision of 2.7 percent was made to the June-August 2020 pig crop. The net revision made to the June 2020 all hogs and pigs inventory was 2.9 percent. A net revision of 0.8 percent was made to the March-May 2020 pig crop. The net revision made to the March 2020 all hogs and pigs inventory was 1.9 percent. A net revision of 2.8 percent was made to the December 2019-February 2020 pig crop. The net revision made to the December 2019 all hogs and pigs inventory was 1.2 percent. A net revision of 1.0 percent was made to the September-November 2019 pig crop.

## Records

Record highs for all hogs and pigs, market hogs, pig crop and pigs per litter, by quarter, can be found on page 15.

---

This report was approved on December 23, 2020.

Secretary of Agriculture
Designate
Robert Johansson

Agricultural Statistics Board
Chairperson
Joseph L. Parsons

# Contents

Hogs and Pigs Inventory by Class, Weight Group, and Quarter – United States: 2019 and 2020 ........................................ 4

Sows Farrowing, Pig Crop, and Pigs per Litter – United States: 2019-2021 ........................................................................ 5

Monthly Sows Farrowing, Pigs per Litter, and Pig Crop – United States: December-November 2019 and 2020 ............... 5

Breeding, Market, and Total Inventory – States and United States: December 1, 2019 and 2020 ..................................... 6

Market Inventory by Weight Group – States and United States: December 1, 2019 and 2020 ........................................... 7

Breeding, Market, and Total Inventory – States and United States: March 1, 2019 and 2020 ........................................... 8

Market Inventory by Weight Group – States and United States: March 1, 2019 and 2020 ................................................. 8

Breeding, Market, and Total Inventory – States and United States: June 1, 2019 and 2020 ............................................. 9

Market Inventory by Weight Group – States and United States: June 1, 2019 and 2020 ................................................... 9

Breeding, Market, and Total Inventory – States and United States: September 1, 2019 and 2020 .................................... 10

Market Inventory by Weight Group – States and United States: September 1, 2019 and 2020 .......................................... 10

Annual Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States:
December-November 2019 and 2020 ................................................................................................................................ 11

Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States: December-February 2019-2021 ................... 12

Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States: March-May 2019-2021 ................................. 12

Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States: June-August 2019 and 2020 ........................ 13

Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States:
September-November 2019 and 2020 ............................................................................................................................... 13

Statistical Methodology ...................................................................................................................................................... 14

Reliability of Quarterly Hog Estimates ............................................................................................................................... 14

Records by Quarter – United States: 1866 to Present ....................................................................................................... 15

Information Contacts .......................................................................................................................................................... 15

**Hogs and Pigs Inventory by Class, Weight Group, and Quarter – United States: 2019 and 2020**

[May not add due to rounding]

| Item | 2019 | 2020 | 2020 as percent of 2019 |
|---|---|---|---|
| | (1,000 head) | (1,000 head) | (percent) |
| March 1 inventory ................................................ | | | |
| All hogs and pigs ........................................ | 74,661 | 76,179 | 102 |
| Kept for breeding ................................... | 6,349 | 6,375 | 100 |
| Market ........................................................ | 68,313 | 69,804 | 102 |
| | | | |
| Market hogs and pigs by weight groups ............... | | | |
| Under 50 pounds ..................................... | 21,373 | 21,571 | 101 |
| 50-119 pounds ......................................... | 19,168 | 19,353 | 101 |
| 120-179 pounds ....................................... | 15,001 | 15,086 | 101 |
| 180 pounds and over ................................ | 12,771 | 13,793 | 108 |
| | | | |
| June 1 inventory .................................................. | | | |
| All hogs and pigs ........................................ | 75,725 | 77,364 | 102 |
| Kept for breeding ................................... | 6,410 | 6,326 | 99 |
| Market ........................................................ | 69,316 | 71,038 | 102 |
| | | | |
| Market hogs and pigs by weight groups ............... | | | |
| Under 50 pounds ..................................... | 22,210 | 22,110 | 100 |
| 50-119 pounds ......................................... | 19,693 | 19,890 | 101 |
| 120-179 pounds ....................................... | 14,396 | 15,240 | 106 |
| 180 pounds and over ................................ | 13,017 | 13,797 | 106 |
| | | | |
| September 1 inventory ........................................ | | | |
| All hogs and pigs ........................................ | 78,583 | 78,434 | 100 |
| Kept for breeding ................................... | 6,431 | 6,333 | 98 |
| Market ........................................................ | 72,153 | 72,101 | 100 |
| | | | |
| Market hogs and pigs by weight groups ............... | | | |
| Under 50 pounds ..................................... | 23,376 | 23,144 | 99 |
| 50-119 pounds ......................................... | 21,224 | 21,020 | 99 |
| 120-179 pounds ....................................... | 14,654 | 14,867 | 101 |
| 180 pounds and over ................................ | 12,899 | 13,069 | 101 |
| | | | |
| December 1 inventory ......................................... | | | |
| All hogs and pigs ........................................ | 78,228 | 77,502 | 99 |
| Kept for breeding ................................... | 6,471 | 6,276 | 97 |
| Market ........................................................ | 71,757 | 71,226 | 99 |
| | | | |
| Market hogs and pigs by weight groups ............... | | | |
| Under 50 pounds ..................................... | 22,048 | 21,739 | 99 |
| 50-119 pounds ......................................... | 20,636 | 20,260 | 98 |
| 120-179 pounds ....................................... | 15,256 | 15,246 | 100 |
| 180 pounds and over ................................ | 13,816 | 13,980 | 101 |

**Sows Farrowing, Pig Crop, and Pigs per Litter – United States: 2019-2021**

[December preceding year. Blank data cells indicate estimation period has not yet begun]

| Item | 2019 | 2020 | 2021 | 2020 as percent of 2019 | 2021 percent of 2020 |
|---|---|---|---|---|---|
| | (1,000 head) | (1,000 head) | (1,000 head) | (percent) | (percent) |
| Sows farrowing ......................................... | | | | | |
| December-February [2] ........................... | 3,098 | 3,068 | 3,118 | 99 | 102 |
| March-May [2] ......................................... | 3,132 | 3,149 | 3,123 | 101 | 99 |
| December-May [1] ................................... | 6,231 | 6,217 | 6,241 | 100 | 100 |
| | | | | | |
| June-August ......................................... | 3,274 | 3,260 | | 100 | |
| September-November ............................ | 3,197 | 3,164 | | 99 | |
| June-November [1] ................................. | 6,471 | 6,424 | | 99 | |
| | | | | | |
| Pig crop .................................................. | | | | | |
| December-February ............................. | 33,164 | 33,745 | | 102 | |
| March-May ........................................... | 34,455 | 34,644 | | 101 | |
| December-May [1] ................................. | 67,619 | 68,389 | | 101 | |
| | | | | | |
| June-August ......................................... | 36,370 | 36,056 | | 99 | |
| September-November ............................ | 35,459 | 34,973 | | 99 | |
| June-November [1] ................................. | 71,829 | 71,030 | | 99 | |
| | | | | | |
| | (number) | (number) | (number) | (percent) | (percent) |
| Pigs per litter ......................................... | | | | | |
| December-February ............................. | 10.70 | 11.00 | | 103 | |
| March-May ........................................... | 11.00 | 11.00 | | 100 | |
| December-May ...................................... | 10.85 | 11.00 | | 101 | |
| | | | | | |
| June-August ......................................... | 11.11 | 11.06 | | 100 | |
| September-November ............................ | 11.09 | 11.05 | | 100 | |
| June-November ...................................... | 11.10 | 11.06 | | 100 | |

[1] May not add due to rounding.
[2] Intentions for 2021.


**Monthly Sows Farrowing, Pigs per Litter, and Pig Crop – United States: December-November 2019 and 2020**

[December preceding year]

| Month | Sows farrowing [1] | | Pigs per litter | | Pig crop [1] | |
|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 |
| | (1,000 head) | (1,000 head) | (number) | (number) | (1,000 head) | (1,000 head) |
| December ...................... | 1,041 | 1,049 | 10.72 | 10.98 | 11,153 | 11,517 |
| January ........................ | 1,036 | 1,026 | 10.68 | 10.95 | 11,071 | 11,235 |
| February ...................... | 1,021 | 993 | 10.71 | 11.07 | 10,939 | 10,994 |
| March .......................... | 1,074 | 1,085 | 10.86 | 10.72 | 11,662 | 11,636 |
| April ............................ | 1,027 | 1,039 | 11.02 | 11.13 | 11,310 | 11,556 |
| May ............................. | 1,031 | 1,025 | 11.13 | 11.17 | 11,482 | 11,452 |
| June ............................ | 1,115 | 1,100 | 11.03 | 10.94 | 12,294 | 12,038 |
| July ............................. | 1,086 | 1,086 | 11.10 | 11.05 | 12,048 | 11,999 |
| August ......................... | 1,073 | 1,074 | 11.21 | 11.19 | 12,027 | 12,020 |
| September ..................... | 1,097 | 1,085 | 11.00 | 10.89 | 12,075 | 11,820 |
| October ........................ | 1,064 | 1,044 | 11.10 | 11.07 | 11,806 | 11,561 |
| November ...................... | 1,036 | 1,034 | 11.18 | 11.21 | 11,577 | 11,592 |
| | | | | | | |
| Total ............................ | 12,701 | 12,641 | 10.98 | 11.03 | 139,449 | 139,418 |

[1] Monthly values may not add to quarterly or annual totals due to rounding.

**Breeding, Market, and Total Inventory – States and United States: December 1, 2019 and 2020**
[May not add due to rounding]

| | Breeding | | | Market | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2020 as percent of 2019 |
| | (1,000 head) | (1,000 head) | (percent) | (1,000 head) | (1,000 head) | (percent) | (1,000 head) | (1,000 head) | (percent) |
| Alabama .................. | 10.0 | 4.0 | 40 | 26.0 | 8.0 | 31 | 36.0 | 12.0 | 33 |
| Alaska ................... | 0.3 | 0.4 | 133 | 1.6 | 1.5 | 94 | 1.9 | 1.9 | 100 |
| Arizona .................. | 16.0 | 15.0 | 94 | 145.0 | 126.0 | 87 | 161.0 | 141.0 | 88 |
| Arkansas ................ | 39.0 | 43.0 | 110 | 78.0 | 83.0 | 106 | 117.0 | 126.0 | 108 |
| California ............... | 12.0 | 9.0 | 75 | 94.0 | 90.0 | 96 | 106.0 | 99.0 | 93 |
| Colorado ................ | 155.0 | 155.0 | 100 | 605.0 | 475.0 | 79 | 760.0 | 630.0 | 83 |
| Connecticut ............ | 0.7 | 0.5 | 71 | 3.3 | 3.5 | 106 | 4.0 | 4.0 | 100 |
| Delaware ................ | 2.5 | 2.5 | 100 | 4.5 | 4.5 | 100 | 7.0 | 7.0 | 100 |
| Florida .................. | 4.0 | 4.0 | 100 | 6.0 | 9.0 | 150 | 10.0 | 13.0 | 130 |
| Georgia ................. | 20.0 | 10.0 | 50 | 42.0 | 28.0 | 67 | 62.0 | 38.0 | 61 |
| Hawaii ................... | 3.0 | 3.0 | 100 | 8.0 | 7.0 | 88 | 11.0 | 10.0 | 91 |
| Idaho .................... | 7.0 | 7.0 | 100 | 28.0 | 25.0 | 89 | 35.0 | 32.0 | 91 |
| Illinois ................... | 590.0 | 570.0 | 97 | 4,860.0 | 4,880.0 | 100 | 5,450.0 | 5,450.0 | 100 |
| Indiana .................. | 250.0 | 250.0 | 100 | 4,150.0 | 4,200.0 | 101 | 4,400.0 | 4,450.0 | 101 |
| Iowa ..................... | 1,010.0 | 980.0 | 97 | 23,890.0 | 23,820.0 | 100 | 24,900.0 | 24,800.0 | 100 |
| Kansas .................. | 180.0 | 170.0 | 94 | 1,980.0 | 1,870.0 | 94 | 2,160.0 | 2,040.0 | 94 |
| Kentucky ............... | 50.0 | 45.0 | 90 | 385.0 | 415.0 | 108 | 435.0 | 460.0 | 106 |
| Louisiana ............... | 2.0 | 2.0 | 100 | 4.0 | 4.0 | 100 | 6.0 | 6.0 | 100 |
| Maine ................... | 1.1 | 1.2 | 109 | 3.5 | 3.8 | 109 | 4.6 | 5.0 | 109 |
| Maryland ................ | 3.5 | 3.0 | 86 | 16.5 | 15.5 | 94 | 20.0 | 18.5 | 93 |
| Massachusetts ........ | 2.0 | 2.0 | 100 | 6.0 | 7.0 | 117 | 8.0 | 9.0 | 113 |
| Michigan ................ | 120.0 | 120.0 | 100 | 1,120.0 | 1,180.0 | 105 | 1,240.0 | 1,300.0 | 105 |
| Minnesota .............. | 570.0 | 540.0 | 95 | 8,830.0 | 8,860.0 | 100 | 9,400.0 | 9,400.0 | 100 |
| Mississippi ............. | 53.0 | 49.0 | 92 | 137.0 | 61.0 | 45 | 190.0 | 110.0 | 58 |
| Missouri ................. | 490.0 | 450.0 | 92 | 2,860.0 | 3,300.0 | 115 | 3,350.0 | 3,750.0 | 112 |
| Montana ................ | 37.0 | 41.0 | 111 | 173.0 | 164.0 | 95 | 210.0 | 205.0 | 98 |
| Nebraska ............... | 440.0 | 430.0 | 98 | 3,360.0 | 3,220.0 | 96 | 3,800.0 | 3,650.0 | 96 |
| Nevada .................. | 0.2 | 0.1 | 50 | 4.8 | 2.4 | 50 | 5.0 | 2.5 | 50 |
| New Hampshire ...... | 0.8 | 0.6 | 75 | 2.6 | 3.2 | 123 | 3.4 | 3.8 | 112 |
| New Jersey ............ | 1.0 | 1.0 | 100 | 6.5 | 6.5 | 100 | 7.5 | 7.5 | 100 |
| New Mexico ........... | 0.7 | 0.4 | 57 | 1.3 | 0.9 | 69 | 2.0 | 1.3 | 65 |
| New York ............... | 5.0 | 8.0 | 160 | 48.0 | 61.0 | 127 | 53.0 | 69.0 | 130 |
| North Carolina ........ | 900.0 | 840.0 | 93 | 8,500.0 | 8,160.0 | 96 | 9,400.0 | 9,000.0 | 96 |
| North Dakota .......... | 35.0 | 36.0 | 103 | 107.0 | 107.0 | 100 | 142.0 | 143.0 | 101 |
| Ohio ..................... | 210.0 | 210.0 | 100 | 2,540.0 | 2,440.0 | 96 | 2,750.0 | 2,650.0 | 96 |
| Oklahoma ............... | 450.0 | 465.0 | 103 | 1,820.0 | 1,615.0 | 89 | 2,270.0 | 2,080.0 | 92 |
| Oregon .................. | 2.0 | 2.0 | 100 | 9.0 | 7.0 | 78 | 11.0 | 9.0 | 82 |
| Pennsylvania .......... | 140.0 | 150.0 | 107 | 1,190.0 | 1,240.0 | 104 | 1,330.0 | 1,390.0 | 105 |
| Rhode Island .......... | 0.3 | 0.2 | 67 | 1.3 | 1.3 | 100 | 1.6 | 1.5 | 94 |
| South Carolina ........ | 10.0 | 8.0 | 80 | 185.0 | 180.0 | 97 | 195.0 | 188.0 | 96 |
| South Dakota .......... | 280.0 | 285.0 | 102 | 1,720.0 | 1,735.0 | 101 | 2,000.0 | 2,020.0 | 101 |
| Tennessee .............. | 26.0 | 25.0 | 96 | 224.0 | 235.0 | 105 | 250.0 | 260.0 | 104 |
| Texas .................... | 155.0 | 140.0 | 90 | 985.0 | 940.0 | 95 | 1,140.0 | 1,080.0 | 95 |
| Utah ..................... | 80.0 | 90.0 | 113 | 880.0 | 910.0 | 103 | 960.0 | 1,000.0 | 104 |
| Vermont ................ | 1.0 | 1.0 | 100 | 2.6 | 3.0 | 115 | 3.6 | 4.0 | 111 |
| Virginia ................. | 5.0 | 4.0 | 80 | 335.0 | 306.0 | 91 | 340.0 | 310.0 | 91 |
| Washington ............ | 3.0 | 3.0 | 100 | 14.0 | 14.0 | 100 | 17.0 | 17.0 | 100 |
| West Virginia .......... | 1.0 | 1.0 | 100 | 2.0 | 2.0 | 100 | 3.0 | 3.0 | 100 |
| Wisconsin .............. | 60.0 | 58.0 | 97 | 305.0 | 342.0 | 112 | 365.0 | 400.0 | 110 |
| Wyoming ................ | 37.0 | 41.0 | 111 | 57.0 | 54.0 | 95 | 94.0 | 95.0 | 101 |
| United States .......... | 6,471.1 | 6,275.9 | 97 | 71,756.5 | 71,226.1 | 99 | 78,227.6 | 77,502.0 | 99 |

**Market Inventory by Weight Group – States and United States: December 1, 2019 and 2020**

[Weight groups may not add to market inventory due to rounding]

| State | Under 50 pounds | | 50-119 pounds | | 120-179 pounds | | 180 pounds and over | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 |
| | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) |
| Alabama ..................... | 15.0 | 1.0 | 2.0 | 1.0 | 5.0 | 1.0 | 4.0 | 5.0 |
| Alaska ....................... | 0.5 | 0.5 | 0.5 | 0.4 | 0.3 | 0.3 | 0.3 | 0.3 |
| Arizona ..................... | 49.0 | 37.0 | 32.0 | 29.0 | 32.0 | 29.0 | 32.0 | 31.0 |
| Arkansas ................... | 63.0 | 66.0 | 8.0 | 9.0 | 3.0 | 2.0 | 4.0 | 6.0 |
| California .................. | 26.0 | 24.0 | 22.0 | 23.0 | 24.0 | 20.0 | 22.0 | 23.0 |
| Colorado ................... | 280.0 | 255.0 | 130.0 | 100.0 | 100.0 | 50.0 | 95.0 | 70.0 |
| Connecticut ............... | 1.5 | 1.5 | 0.4 | 0.5 | 0.3 | 0.3 | 1.1 | 1.2 |
| Delaware ................... | 3.0 | 3.0 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Florida ...................... | 3.0 | 5.0 | 1.0 | 2.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Georgia ..................... | 27.0 | 12.0 | 5.0 | 5.0 | 6.0 | 4.0 | 4.0 | 7.0 |
| Hawaii ...................... | 3.0 | 2.5 | 2.0 | 1.5 | 2.0 | 1.5 | 1.0 | 1.5 |
| Idaho ........................ | 16.0 | 14.0 | 5.0 | 4.0 | 4.0 | 4.0 | 3.0 | 3.0 |
| Illinois ...................... | 1,455.0 | 1,440.0 | 1,630.0 | 1,550.0 | 965.0 | 1,040.0 | 810.0 | 850.0 |
| Indiana ..................... | 1,100.0 | 1,030.0 | 1,170.0 | 1,260.0 | 920.0 | 860.0 | 960.0 | 1,050.0 |
| Iowa ......................... | 5,840.0 | 5,800.0 | 7,720.0 | 7,620.0 | 5,750.0 | 5,790.0 | 4,580.0 | 4,610.0 |
| Kansas ...................... | 475.0 | 435.0 | 475.0 | 485.0 | 420.0 | 360.0 | 610.0 | 590.0 |
| Kentucky ................... | 119.0 | 123.0 | 106.0 | 115.0 | 77.0 | 75.0 | 83.0 | 102.0 |
| Louisiana .................. | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 | 1.0 |
| Maine ....................... | 1.4 | 1.4 | 0.8 | 0.9 | 0.7 | 0.8 | 0.6 | 0.7 |
| Maryland ................... | 4.5 | 4.0 | 4.0 | 4.0 | 4.0 | 3.5 | 4.0 | 4.0 |
| Massachusetts ........... | 2.0 | 2.5 | 1.4 | 2.0 | 0.8 | 1.1 | 1.8 | 1.4 |
| Michigan ................... | 340.0 | 360.0 | 310.0 | 330.0 | 220.0 | 245.0 | 250.0 | 245.0 |
| Minnesota ................. | 2,750.0 | 2,840.0 | 2,770.0 | 2,760.0 | 1,860.0 | 1,840.0 | 1,450.0 | 1,420.0 |
| Mississippi ................ | 116.0 | 43.0 | 6.0 | 7.0 | 5.0 | 7.0 | 10.0 | 4.0 |
| Missouri .................... | 1,250.0 | 1,540.0 | 620.0 | 640.0 | 520.0 | 640.0 | 470.0 | 480.0 |
| Montana .................... | 82.0 | 83.0 | 34.0 | 34.0 | 27.0 | 23.0 | 30.0 | 24.0 |
| Nebraska ................... | 1,180.0 | 1,100.0 | 875.0 | 860.0 | 640.0 | 710.0 | 665.0 | 550.0 |
| Nevada ...................... | 0.2 | 0.1 | 1.7 | 0.9 | 1.6 | 0.8 | 1.3 | 0.6 |
| New Hampshire .......... | 0.4 | 0.4 | 0.8 | 1.0 | 0.7 | 0.8 | 0.7 | 1.0 |
| New Jersey ................ | 1.3 | 1.4 | 1.9 | 1.5 | 1.5 | 1.3 | 1.8 | 2.3 |
| New Mexico ............... | 0.4 | 0.2 | 0.5 | 0.2 | 0.1 | 0.2 | 0.3 | 0.3 |
| New York ................... | 11.0 | 23.0 | 10.5 | 12.0 | 12.5 | 16.0 | 14.0 | 10.0 |
| North Carolina ........... | 3,350.0 | 2,985.0 | 2,030.0 | 1,915.0 | 1,610.0 | 1,570.0 | 1,510.0 | 1,690.0 |
| North Dakota ............. | 56.0 | 54.0 | 23.0 | 23.0 | 15.0 | 15.0 | 13.0 | 15.0 |
| Ohio ......................... | 690.0 | 750.0 | 710.0 | 660.0 | 550.0 | 480.0 | 590.0 | 550.0 |
| Oklahoma .................. | 780.0 | 740.0 | 470.0 | 350.0 | 255.0 | 205.0 | 315.0 | 320.0 |
| Oregon ...................... | 2.5 | 2.0 | 2.5 | 2.0 | 1.5 | 1.0 | 2.5 | 2.0 |
| Pennsylvania .............. | 305.0 | 335.0 | 340.0 | 360.0 | 275.0 | 275.0 | 270.0 | 270.0 |
| Rhode Island ............. | 0.3 | 0.3 | 0.4 | 0.5 | 0.2 | 0.2 | 0.4 | 0.3 |
| South Carolina ........... | 24.0 | 21.0 | 54.0 | 52.0 | 54.0 | 54.0 | 53.0 | 53.0 |
| South Dakota ............. | 680.0 | 690.0 | 400.0 | 400.0 | 320.0 | 325.0 | 320.0 | 320.0 |
| Tennessee ................. | 78.0 | 48.0 | 39.0 | 66.0 | 55.0 | 54.0 | 52.0 | 67.0 |
| Texas ........................ | 300.0 | 280.0 | 275.0 | 225.0 | 170.0 | 185.0 | 240.0 | 250.0 |
| Utah ......................... | 320.0 | 350.0 | 185.0 | 185.0 | 185.0 | 185.0 | 190.0 | 190.0 |
| Vermont .................... | 0.7 | 0.8 | 0.7 | 0.9 | 0.6 | 0.6 | 0.6 | 0.7 |
| Virginia ..................... | 79.0 | 56.0 | 84.0 | 83.0 | 83.0 | 81.0 | 89.0 | 86.0 |
| Washington ................ | 4.0 | 5.0 | 4.0 | 4.0 | 3.0 | 2.0 | 3.0 | 3.0 |
| West Virginia ............. | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 | 0.5 |
| Wisconsin .................. | 110.0 | 122.0 | 68.0 | 72.0 | 72.0 | 83.0 | 55.0 | 65.0 |
| Wyoming ................... | 52.0 | 50.0 | 3.0 | 1.0 | 1.0 | 1.0 | 1.0 | 2.0 |
| United States ............. | 22,048.2 | 21,739.1 | 20,636.1 | 20,260.3 | 15,255.8 | 15,246.4 | 13,816.4 | 13,980.3 |

**Breeding, Market, and Total Inventory – States and United States: March 1, 2019 and 2020**

[May not add due to rounding]

| State | Breeding | | | Market | | | Total | | |
|-------|------|------|------|------|------|------|------|------|------|
| | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2020 as percent of 2019 |
| | (1,000 head) | (1,000 head) | (percent) | (1,000 head) | (1,000 head) | (percent) | (1,000 head) | (1,000 head) | (percent) |
| Colorado ...................... | 155 | 155 | 100 | 645 | 555 | 86 | 800 | 710 | 89 |
| Illinois .......................... | 560 | 580 | 104 | 4,690 | 4,570 | 97 | 5,250 | 5,150 | 98 |
| Indiana ......................... | 260 | 250 | 96 | 3,940 | 3,750 | 95 | 4,200 | 4,000 | 95 |
| Iowa ............................. | 1,030 | 980 | 95 | 22,670 | 23,420 | 103 | 23,700 | 24,400 | 103 |
| Kansas ......................... | 170 | 180 | 106 | 1,880 | 1,910 | 102 | 2,050 | 2,090 | 102 |
| Michigan ....................... | 120 | 120 | 100 | 1,110 | 1,120 | 101 | 1,230 | 1,240 | 101 |
| Minnesota ..................... | 580 | 560 | 97 | 8,220 | 8,440 | 103 | 8,800 | 9,000 | 102 |
| Missouri ........................ | 470 | 470 | 100 | 3,080 | 3,130 | 102 | 3,550 | 3,600 | 101 |
| Nebraska ...................... | 450 | 440 | 98 | 3,150 | 3,310 | 105 | 3,600 | 3,750 | 104 |
| North Carolina .............. | 900 | 870 | 97 | 8,100 | 8,230 | 102 | 9,000 | 9,100 | 101 |
| Ohio .............................. | 190 | 200 | 105 | 2,460 | 2,450 | 100 | 2,650 | 2,650 | 100 |
| Oklahoma ...................... | 450 | 450 | 100 | 1,720 | 1,800 | 105 | 2,170 | 2,250 | 104 |
| Pennsylvania ................ | 120 | 150 | 125 | 1,150 | 1,200 | 104 | 1,270 | 1,350 | 106 |
| South Dakota ................ | 245 | 285 | 116 | 1,595 | 1,725 | 108 | 1,840 | 2,010 | 109 |
| Texas ............................ | 150 | 155 | 103 | 940 | 955 | 102 | 1,090 | 1,110 | 102 |
| Utah .............................. | 80 | 80 | 100 | 670 | 870 | 130 | 750 | 950 | 127 |
| Other States [1] .............. | 419 | 450 | 108 | 2,293 | 2,369 | 103 | 2,711 | 2,819 | 104 |
| United States ............... | 6,349 | 6,375 | 100 | 68,313 | 69,804 | 102 | 74,661 | 76,179 | 102 |

[1] Individual State estimates not available for the 34 Other States.


**Market Inventory by Weight Group – States and United States: March 1, 2019 and 2020**

[Weight groups may not add to market inventory due to rounding]

| State | Under 50 pounds | | 50-119 pounds | | 120-179 pounds | | 180 pounds and over | |
|-------|------|------|------|------|------|------|------|------|
| | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 |
| | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) |
| Colorado ........................ | 290 | 280 | 135 | 100 | 105 | 60 | 115 | 115 |
| Illinois ............................ | 1,415 | 1,260 | 1,555 | 1,515 | 1,000 | 995 | 720 | 800 |
| Indiana ........................... | 1,040 | 910 | 1,100 | 1,050 | 920 | 920 | 880 | 870 |
| Iowa ............................... | 5,510 | 5,830 | 7,510 | 7,460 | 5,630 | 5,500 | 4,020 | 4,630 |
| Kansas ........................... | 480 | 455 | 440 | 495 | 395 | 390 | 565 | 570 |
| Michigan ......................... | 330 | 335 | 300 | 300 | 225 | 230 | 255 | 255 |
| Minnesota ....................... | 2,590 | 2,700 | 2,400 | 2,460 | 1,890 | 1,850 | 1,340 | 1,430 |
| Missouri .......................... | 1,555 | 1,440 | 560 | 630 | 505 | 565 | 460 | 495 |
| Nebraska ........................ | 1,060 | 1,130 | 880 | 885 | 690 | 690 | 520 | 605 |
| North Carolina ................ | 3,190 | 3,150 | 1,700 | 1,780 | 1,590 | 1,690 | 1,620 | 1,610 |
| Ohio ................................ | 720 | 680 | 640 | 640 | 520 | 550 | 580 | 580 |
| Oklahoma ........................ | 800 | 825 | 360 | 360 | 210 | 250 | 350 | 365 |
| Pennsylvania .................. | 315 | 335 | 325 | 350 | 245 | 250 | 265 | 265 |
| South Dakota .................. | 590 | 695 | 390 | 385 | 320 | 335 | 295 | 310 |
| Texas .............................. | 275 | 280 | 260 | 265 | 180 | 185 | 225 | 225 |
| Utah ................................ | 295 | 325 | 120 | 180 | 130 | 180 | 125 | 185 |
| Other States [1] ................ | 918 | 941 | 493 | 498 | 446 | 446 | 436 | 483 |
| United States ................. | 21,373 | 21,571 | 19,168 | 19,353 | 15,001 | 15,086 | 12,771 | 13,793 |

[1] Individual State estimates not available for the 34 Other States.

**Breeding, Market, and Total Inventory – States and United States: June 1, 2019 and 2020**

[May not add due to rounding]

| State | Breeding | | | Market | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2020 as percent of 2019 |
| | (1,000 head) | (1,000 head) | (percent) | (1,000 head) | (1,000 head) | (percent) | (1,000 head) | (1,000 head) | (percent) |
| Colorado ...................... | 160 | 155 | 97 | 620 | 545 | 88 | 780 | 700 | 90 |
| Illinois ......................... | 590 | 570 | 97 | 4,760 | 4,780 | 100 | 5,350 | 5,350 | 100 |
| Indiana ....................... | 260 | 250 | 96 | 4,040 | 4,150 | 103 | 4,300 | 4,400 | 102 |
| Iowa ............................ | 1,000 | 960 | 96 | 22,900 | 23,340 | 102 | 23,900 | 24,300 | 102 |
| Kansas ........................ | 175 | 180 | 103 | 1,845 | 2,010 | 109 | 2,020 | 2,190 | 108 |
| Michigan ..................... | 120 | 120 | 100 | 1,130 | 1,060 | 94 | 1,250 | 1,180 | 94 |
| Minnesota ................... | 570 | 550 | 96 | 8,230 | 8,450 | 103 | 8,800 | 9,000 | 102 |
| Missouri ...................... | 480 | 475 | 99 | 3,170 | 3,325 | 105 | 3,650 | 3,800 | 104 |
| Nebraska .................... | 460 | 440 | 96 | 3,290 | 3,360 | 102 | 3,750 | 3,800 | 101 |
| North Carolina ............ | 900 | 880 | 98 | 8,300 | 8,420 | 101 | 9,200 | 9,300 | 101 |
| Ohio ............................ | 200 | 210 | 105 | 2,550 | 2,540 | 100 | 2,750 | 2,750 | 100 |
| Oklahoma .................... | 445 | 460 | 103 | 1,715 | 1,720 | 100 | 2,160 | 2,180 | 101 |
| Pennsylvania .............. | 120 | 150 | 125 | 1,100 | 1,260 | 115 | 1,220 | 1,410 | 116 |
| South Dakota .............. | 265 | 280 | 106 | 1,605 | 1,780 | 111 | 1,870 | 2,060 | 110 |
| Texas .......................... | 155 | 130 | 84 | 935 | 920 | 98 | 1,090 | 1,050 | 96 |
| Utah ............................ | 80 | 80 | 100 | 750 | 910 | 121 | 830 | 990 | 119 |
| Other States [1] .......... | 430 | 436 | 102 | 2,376 | 2,468 | 104 | 2,805 | 2,904 | 104 |
| United States ............... | 6,410 | 6,326 | 99 | 69,316 | 71,038 | 102 | 75,725 | 77,364 | 102 |

[1] Individual State estimates not available for the 34 Other States.


**Market Inventory by Weight Group – States and United States: June 1, 2019 and 2020**

[Weight groups may not add to market inventory due to rounding]

| State | Under 50 pounds | | 50-119 pounds | | 120-179 pounds | | 180 pounds and over | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 |
| | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) |
| Colorado ...................... | 295 | 275 | 130 | 95 | 100 | 70 | 95 | 105 |
| Illinois ......................... | 1,465 | 1,400 | 1,530 | 1,555 | 945 | 1,035 | 820 | 790 |
| Indiana ....................... | 1,090 | 1,010 | 1,180 | 1,310 | 840 | 910 | 930 | 920 |
| Iowa ............................ | 5,920 | 5,780 | 7,520 | 7,520 | 5,430 | 5,500 | 4,030 | 4,540 |
| Kansas ........................ | 460 | 510 | 490 | 480 | 385 | 395 | 510 | 625 |
| Michigan ..................... | 320 | 310 | 320 | 290 | 230 | 220 | 260 | 240 |
| Minnesota ................... | 2,630 | 2,800 | 2,590 | 2,430 | 1,730 | 1,820 | 1,280 | 1,400 |
| Missouri ...................... | 1,590 | 1,690 | 530 | 565 | 525 | 600 | 525 | 470 |
| Nebraska .................... | 1,135 | 1,160 | 875 | 865 | 630 | 690 | 650 | 645 |
| North Carolina ............ | 3,370 | 3,100 | 1,830 | 1,920 | 1,500 | 1,730 | 1,600 | 1,670 |
| Ohio ............................ | 730 | 710 | 660 | 650 | 590 | 580 | 570 | 600 |
| Oklahoma .................... | 800 | 770 | 365 | 380 | 220 | 230 | 330 | 340 |
| Pennsylvania .............. | 305 | 375 | 345 | 385 | 235 | 270 | 215 | 230 |
| South Dakota .............. | 580 | 725 | 430 | 420 | 290 | 340 | 305 | 295 |
| Texas .......................... | 285 | 220 | 235 | 295 | 145 | 185 | 270 | 220 |
| Utah ............................ | 325 | 365 | 150 | 180 | 140 | 180 | 135 | 185 |
| Other States [1] .......... | 910 | 910 | 513 | 550 | 461 | 485 | 492 | 522 |
| United States ................ | 22,210 | 22,110 | 19,693 | 19,890 | 14,396 | 15,240 | 13,017 | 13,797 |

[1] Individual State estimates not available for the 34 Other States.

**Breeding, Market, and Total Inventory – States and United States: September 1, 2019 and 2020**

[May not add due to rounding]

| State | Breeding | | | Market | | | Total | | |
|-------|------|------|----------------------------|------|------|----------------------------|------|------|----------------------------|
| | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2020 as percent of 2019 |
| | (1,000 head) | (1,000 head) | (percent) | (1,000 head) | (1,000 head) | (percent) | (1,000 head) | (1,000 head) | (percent) |
| Colorado ...................... | 160 | 165 | 103 | 630 | 485 | 77 | 790 | 650 | 82 |
| Illinois ........................... | 590 | 580 | 98 | 4,910 | 4,820 | 98 | 5,500 | 5,400 | 98 |
| Indiana ......................... | 250 | 250 | 100 | 4,150 | 4,200 | 101 | 4,400 | 4,450 | 101 |
| Iowa ............................. | 1,010 | 980 | 97 | 23,990 | 23,820 | 99 | 25,000 | 24,800 | 99 |
| Kansas ......................... | 175 | 175 | 100 | 1,915 | 1,915 | 100 | 2,090 | 2,090 | 100 |
| Michigan ...................... | 120 | 120 | 100 | 1,120 | 1,100 | 98 | 1,240 | 1,220 | 98 |
| Minnesota .................... | 580 | 530 | 91 | 8,620 | 8,570 | 99 | 9,200 | 9,100 | 99 |
| Missouri ....................... | 490 | 470 | 96 | 3,160 | 3,430 | 109 | 3,650 | 3,900 | 107 |
| Nebraska ...................... | 450 | 430 | 96 | 3,350 | 3,370 | 101 | 3,800 | 3,800 | 100 |
| North Carolina .............. | 900 | 870 | 97 | 8,700 | 8,730 | 100 | 9,600 | 9,600 | 100 |
| Ohio ............................. | 200 | 220 | 110 | 2,600 | 2,580 | 99 | 2,800 | 2,800 | 100 |
| Oklahoma ..................... | 460 | 450 | 98 | 1,790 | 1,650 | 92 | 2,250 | 2,100 | 93 |
| Pennsylvania ................ | 120 | 150 | 125 | 1,140 | 1,290 | 113 | 1,260 | 1,440 | 114 |
| South Dakota ............... | 265 | 285 | 108 | 1,735 | 1,765 | 102 | 2,000 | 2,050 | 103 |
| Texas ........................... | 155 | 140 | 90 | 1,045 | 920 | 88 | 1,200 | 1,060 | 88 |
| Utah ............................. | 80 | 85 | 106 | 880 | 955 | 109 | 960 | 1,040 | 108 |
| Other States [1] ............. | 426 | 433 | 102 | 2,418 | 2,501 | 103 | 2,843 | 2,934 | 103 |
| United States ............... | 6,431 | 6,333 | 98 | 72,153 | 72,101 | 100 | 78,583 | 78,434 | 100 |

[1] Individual State estimates not available for the 34 Other States.


**Market Inventory by Weight Group – States and United States: September 1, 2019 and 2020**

[Weight groups may not add to market inventory due to rounding]

| State | Under 50 pounds | | 50-119 pounds | | 120-179 pounds | | 180 pounds and over | |
|-------|------|------|------|------|------|------|------|------|
| | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 | 2019 | 2020 |
| | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) | (1,000 head) |
| Colorado ........................... | 305 | 260 | 130 | 100 | 95 | 50 | 100 | 75 |
| Illinois .............................. | 1,510 | 1,390 | 1,650 | 1,540 | 900 | 1,070 | 850 | 820 |
| Indiana ............................. | 1,110 | 1,040 | 1,230 | 1,380 | 860 | 820 | 950 | 960 |
| Iowa ................................. | 6,360 | 6,440 | 8,010 | 7,780 | 5,520 | 5,480 | 4,100 | 4,120 |
| Kansas ............................. | 490 | 500 | 510 | 475 | 375 | 410 | 540 | 530 |
| Michigan ........................... | 310 | 325 | 310 | 305 | 225 | 225 | 275 | 245 |
| Minnesota ......................... | 2,950 | 2,850 | 2,850 | 2,820 | 1,710 | 1,720 | 1,110 | 1,180 |
| Missouri ........................... | 1,530 | 1,600 | 590 | 690 | 545 | 690 | 495 | 450 |
| Nebraska .......................... | 1,190 | 1,170 | 890 | 890 | 670 | 690 | 600 | 620 |
| North Carolina ................... | 3,440 | 3,350 | 2,140 | 2,130 | 1,580 | 1,610 | 1,540 | 1,640 |
| Ohio ................................. | 780 | 770 | 690 | 760 | 540 | 490 | 590 | 560 |
| Oklahoma .......................... | 805 | 765 | 465 | 350 | 225 | 185 | 295 | 350 |
| Pennsylvania .................... | 315 | 355 | 330 | 410 | 265 | 275 | 230 | 250 |
| South Dakota .................... | 655 | 700 | 450 | 435 | 305 | 320 | 325 | 310 |
| Texas ............................... | 345 | 305 | 290 | 215 | 185 | 140 | 225 | 260 |
| Utah ................................. | 355 | 370 | 175 | 195 | 175 | 195 | 175 | 195 |
| Other States [1] ................. | 926 | 954 | 514 | 545 | 479 | 497 | 499 | 504 |
| United States .................... | 23,376 | 23,144 | 21,224 | 21,020 | 14,654 | 14,867 | 12,899 | 13,069 |

[1] Individual State estimates not available for the 34 Other States.

**Annual Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States: December-November 2019 and 2020**

[December preceding year. May not add due to rounding]

| State | Sows farrowing | | | Pigs per litter | | Pig crop | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2019 | 2020 | 2020 as percent of 2019 |
| | (1,000 head) | (1,000 head) | (percent) | (number) | (number) | (1,000 head) | (1,000 head) | (percent) |
| Alabama ........................... | 16.00 | 14.50 | 91 | 11.06 | 10.97 | 177.00 | 159.00 | 90 |
| Alaska ............................. | 0.40 | 0.40 | 100 | 8.00 | 7.57 | 2.80 | 2.80 | 100 |
| Arizona ............................ | 30.50 | 27.50 | 90 | 9.77 | 10.11 | 298.00 | 278.00 | 93 |
| Arkansas ......................... | 93.00 | 78.00 | 84 | 10.90 | 11.30 | 1,017.00 | 885.00 | 87 |
| California ......................... | 12.50 | 14.50 | 116 | 4.72 | 4.14 | 59.00 | 60.00 | 102 |
| Colorado .......................... | 310.00 | 298.00 | 96 | 10.30 | 10.10 | 3,193.00 | 3,009.00 | 94 |
| Connecticut ...................... | 0.60 | 0.50 | 83 | 8.17 | 7.80 | 4.90 | 3.90 | 80 |
| Delaware .......................... | 4.00 | 4.00 | 100 | 10.00 | 10.00 | 40.00 | 40.00 | 100 |
| Florida ............................. | 4.00 | 4.00 | 100 | 6.25 | 6.00 | 25.00 | 24.00 | 96 |
| Georgia ............................ | 36.00 | 28.00 | 78 | 9.86 | 10.04 | 355.00 | 281.00 | 79 |
| Hawaii .............................. | 2.00 | 2.00 | 100 | 5.30 | 6.00 | 11.00 | 12.00 | 109 |
| Idaho ............................... | 9.90 | 12.00 | 121 | 8.79 | 9.58 | 87.00 | 115.00 | 132 |
| Illinois ............................. | 1,115.00 | 1,145.00 | 103 | 10.83 | 10.81 | 12,074.00 | 12,380.00 | 103 |
| Indiana ............................ | 485.00 | 490.00 | 101 | 10.60 | 10.88 | 5,139.00 | 5,332.00 | 104 |
| Iowa ................................ | 2,120.00 | 2,120.00 | 100 | 11.34 | 11.31 | 24,037.00 | 23,981.00 | 100 |
| Kansas ............................ | 354.00 | 349.00 | 99 | 10.74 | 10.63 | 3,802.00 | 3,709.00 | 98 |
| Kentucky .......................... | 99.00 | 97.00 | 98 | 9.80 | 9.96 | 970.00 | 966.00 | 100 |
| Louisiana ......................... | 0.40 | 0.40 | 100 | 7.25 | 6.75 | 2.90 | 2.70 | 93 |
| Maine ............................... | 0.90 | 0.90 | 100 | 7.10 | 7.20 | 6.40 | 6.50 | 102 |
| Maryland .......................... | 3.70 | 4.00 | 108 | 10.00 | 10.00 | 37.00 | 40.00 | 108 |
| Massachusetts .................. | 1.60 | 1.60 | 100 | 8.13 | 7.50 | 13.00 | 12.00 | 92 |
| Michigan .......................... | 221.00 | 221.00 | 100 | 10.96 | 11.15 | 2,423.00 | 2,465.00 | 102 |
| Minnesota ........................ | 1,195.00 | 1,160.00 | 97 | 11.83 | 11.81 | 14,131.00 | 13,703.00 | 97 |
| Mississippi ....................... | 89.00 | 117.00 | 131 | 11.50 | 11.00 | 1,021.00 | 1,283.00 | 126 |
| Missouri ........................... | 1,012.00 | 1,000.00 | 99 | 10.86 | 11.08 | 10,990.00 | 11,075.00 | 101 |
| Montana ........................... | 64.00 | 69.50 | 109 | 10.92 | 11.04 | 699.00 | 767.00 | 110 |
| Nebraska .......................... | 769.00 | 760.00 | 99 | 11.60 | 11.52 | 8,920.00 | 8,753.00 | 98 |
| Nevada ............................ | 0.40 | 0.40 | 100 | 6.25 | 4.00 | 2.50 | 1.60 | 64 |
| New Hampshire ................. | 0.60 | 0.40 | 67 | 8.00 | 8.00 | 4.80 | 3.20 | 67 |
| New Jersey ....................... | 0.80 | 0.80 | 100 | 7.00 | 6.88 | 5.60 | 5.50 | 98 |
| New Mexico ...................... | 0.40 | 0.40 | 100 | 8.50 | 6.00 | 3.40 | 2.40 | 71 |
| New York .......................... | 5.20 | 6.00 | 115 | 9.04 | 7.83 | 47.00 | 47.00 | 100 |
| North Carolina .................. | 1,885.00 | 1,820.00 | 97 | 10.37 | 10.53 | 19,544.00 | 19,156.00 | 98 |
| North Dakota .................... | 73.00 | 72.00 | 99 | 10.99 | 11.18 | 802.00 | 805.00 | 100 |
| Ohio ................................ | 396.00 | 405.00 | 102 | 11.16 | 10.79 | 4,420.00 | 4,369.00 | 99 |
| Oklahoma ......................... | 870.00 | 845.00 | 97 | 10.74 | 10.68 | 9,345.00 | 9,023.00 | 97 |
| Oregon ............................ | 1.30 | 1.60 | 123 | 7.69 | 8.13 | 10.00 | 13.00 | 130 |
| Pennsylvania .................... | 217.00 | 218.00 | 100 | 11.09 | 11.06 | 2,407.00 | 2,410.00 | 100 |
| Rhode Island .................... | 0.40 | 0.40 | 100 | 7.25 | 8.00 | 2.90 | 3.20 | 110 |
| South Carolina .................. | 18.50 | 15.50 | 84 | 8.54 | 8.58 | 158.00 | 133.00 | 84 |
| South Dakota .................... | 509.00 | 562.00 | 110 | 11.90 | 12.20 | 6,065.00 | 6,857.00 | 113 |
| Tennessee ........................ | 54.50 | 60.50 | 111 | 10.29 | 11.16 | 561.00 | 675.00 | 120 |
| Texas .............................. | 270.00 | 261.00 | 97 | 10.51 | 10.44 | 2,837.00 | 2,726.00 | 96 |
| Utah ................................ | 168.00 | 167.00 | 99 | 10.62 | 10.92 | 1,784.00 | 1,824.00 | 102 |
| Vermont ........................... | 0.80 | 0.80 | 100 | 6.75 | 6.50 | 5.40 | 5.20 | 96 |
| Virginia ............................ | 6.70 | 6.00 | 90 | 10.00 | 10.67 | 67.00 | 64.00 | 96 |
| Washington ....................... | 3.20 | 3.20 | 100 | 8.13 | 8.13 | 26.00 | 26.00 | 100 |
| West Virginia .................... | 0.70 | 0.60 | 86 | 7.71 | 8.17 | 5.40 | 4.90 | 91 |
| Wisconsin ......................... | 99.00 | 105.00 | 106 | 11.00 | 11.40 | 1,085.00 | 1,197.00 | 110 |
| Wyoming .......................... | 72.50 | 70.50 | 97 | 10.01 | 10.24 | 726.00 | 722.00 | 99 |
| United States ................... | 12,701.45 | 12,640.87 | 100 | 10.98 | 11.03 | 139,449.00 | 139,417.90 | 100 |

**Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States: December-February 2019-2021**

[December preceding year. May not add due to rounding]

| State | Sows farrowing | | | | Pigs per litter | | Pig crop [1] | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 [2] | 2021 as percent of 2020 | 2019 | 2020 | 2019 | 2020 | 2020 as percent of 2019 |
| | (1,000 head) | (1,000 head) | (1,000 head) | (percent) | (number) | (number) | (1,000 head) | (1,000 head) | (percent) |
| Colorado ................... | 78 | 72 | 70 | 97 | 9.20 | 10.30 | 718 | 742 | 103 |
| Illinois ....................... | 270 | 285 | 290 | 102 | 10.65 | 10.95 | 2,876 | 3,121 | 109 |
| Indiana ..................... | 125 | 115 | 120 | 104 | 10.20 | 10.60 | 1,275 | 1,219 | 96 |
| Iowa ......................... | 530 | 500 | 530 | 106 | 11.20 | 11.25 | 5,936 | 5,625 | 95 |
| Kansas ..................... | 86 | 87 | 84 | 97 | 10.60 | 10.40 | 912 | 905 | 99 |
| Michigan ................... | 56 | 57 | 55 | 96 | 10.90 | 11.10 | 610 | 633 | 104 |
| Minnesota ................. | 300 | 270 | 275 | 102 | 11.60 | 11.90 | 3,480 | 3,213 | 92 |
| Missouri .................... | 245 | 250 | 235 | 94 | 10.55 | 11.00 | 2,585 | 2,750 | 106 |
| Nebraska .................. | 185 | 190 | 190 | 100 | 11.55 | 11.60 | 2,137 | 2,204 | 103 |
| North Carolina .......... | 455 | 430 | 440 | 102 | 9.90 | 10.50 | 4,505 | 4,515 | 100 |
| Ohio ......................... | 93 | 96 | 105 | 109 | 10.70 | 11.00 | 995 | 1,056 | 106 |
| Oklahoma ................. | 205 | 205 | 210 | 102 | 10.65 | 10.40 | 2,183 | 2,132 | 98 |
| Pennsylvania ............ | 55 | 53 | 53 | 100 | 10.80 | 11.00 | 594 | 583 | 98 |
| South Dakota ........... | 119 | 141 | 138 | 98 | 11.85 | 12.10 | 1,410 | 1,706 | 121 |
| Texas ....................... | 66 | 68 | 66 | 97 | 10.20 | 10.35 | 673 | 704 | 105 |
| Utah ......................... | 40 | 40 | 45 | 113 | 9.20 | 11.00 | 368 | 440 | 120 |
| Other States [3] .......... | 190 | 209 | 212 | 101 | 10.02 | 10.51 | 1,907 | 2,197 | 115 |
| United States ............ | 3,098 | 3,068 | 3,118 | 102 | 10.70 | 11.00 | 33,164 | 33,745 | 102 |

[1] Number of pigs born December-February that were still on hand March 1, or had been sold.
[2] Intentions.
[3] Individual State estimates not available for the 34 Other States.

**Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States: March-May 2019-2021**

[May not add due to rounding]

| State | Sows farrowing | | | | Pigs per litter | | Pig crop [1] | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2021 [2] | 2021 as percent of 2020 | 2019 | 2020 | 2019 | 2020 | 2020 as percent of 2019 |
| | (1,000 head) | (1,000 head) | (1,000 head) | (percent) | (number) | (number) | (1,000 head) | (1,000 head) | (percent) |
| Colorado ................... | 78 | 74 | 71 | 96 | 10.70 | 10.10 | 835 | 747 | 89 |
| Illinois ....................... | 275 | 275 | 285 | 104 | 10.75 | 10.80 | 2,956 | 2,970 | 100 |
| Indiana ..................... | 120 | 125 | 120 | 96 | 10.70 | 10.60 | 1,284 | 1,325 | 103 |
| Iowa ......................... | 530 | 500 | 530 | 106 | 11.45 | 11.40 | 6,069 | 5,700 | 94 |
| Kansas ..................... | 86 | 89 | 84 | 94 | 10.70 | 10.70 | 920 | 952 | 103 |
| Michigan ................... | 54 | 54 | 54 | 100 | 11.00 | 10.60 | 594 | 572 | 96 |
| Minnesota ................. | 295 | 290 | 260 | 90 | 11.85 | 11.60 | 3,496 | 3,364 | 96 |
| Missouri .................... | 242 | 255 | 245 | 96 | 10.65 | 11.00 | 2,577 | 2,805 | 109 |
| Nebraska .................. | 200 | 200 | 190 | 95 | 11.50 | 11.10 | 2,300 | 2,220 | 97 |
| North Carolina .......... | 460 | 460 | 440 | 96 | 10.50 | 10.60 | 4,830 | 4,876 | 101 |
| Ohio ......................... | 98 | 96 | 105 | 109 | 11.20 | 11.10 | 1,098 | 1,066 | 97 |
| Oklahoma ................. | 215 | 215 | 215 | 100 | 10.55 | 10.80 | 2,268 | 2,322 | 102 |
| Pennsylvania ............ | 54 | 57 | 53 | 93 | 11.10 | 11.10 | 599 | 633 | 106 |
| South Dakota ........... | 123 | 139 | 138 | 99 | 11.95 | 12.30 | 1,470 | 1,710 | 116 |
| Texas ....................... | 66 | 68 | 68 | 100 | 10.50 | 11.00 | 693 | 748 | 108 |
| Utah ......................... | 43 | 43 | 45 | 105 | 10.70 | 10.80 | 460 | 464 | 101 |
| Other States [3] .......... | 193 | 209 | 220 | 105 | 10.37 | 10.39 | 2,006 | 2,170 | 108 |
| United States ............ | 3,132 | 3,149 | 3,123 | 99 | 11.00 | 11.00 | 34,455 | 34,644 | 101 |

[1] Number of pigs born March-May that were still on hand June 1, or had been sold.
[2] Intentions.
[3] Individual State estimates not available for the 34 Other States.

**Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States: June-August 2019 and 2020**

[May not add due to rounding]

| State | Sows farrowing | | | Pigs per litter | | Pig crop [1] | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2019 | 2020 | 2020 as percent of 2019 |
| | (1,000 head) | (1,000 head) | (percent) | (number) | (number) | (1,000 head) | (1,000 head) | (percent) |
| Colorado ....................... | 79 | 79 | 100 | 10.70 | 10.00 | 845 | 790 | 93 |
| Illinois ......................... | 290 | 290 | 100 | 10.95 | 10.70 | 3,176 | 3,103 | 98 |
| Indiana ....................... | 120 | 125 | 104 | 11.00 | 11.30 | 1,320 | 1,413 | 107 |
| Iowa ........................... | 550 | 560 | 102 | 11.35 | 11.30 | 6,243 | 6,328 | 101 |
| Kansas ....................... | 90 | 88 | 98 | 10.90 | 10.70 | 981 | 942 | 96 |
| Michigan ..................... | 55 | 54 | 98 | 11.10 | 11.40 | 611 | 616 | 101 |
| Minnesota ................... | 300 | 310 | 103 | 11.95 | 11.90 | 3,585 | 3,689 | 103 |
| Missouri ...................... | 260 | 255 | 98 | 11.10 | 11.20 | 2,886 | 2,856 | 99 |
| Nebraska ..................... | 194 | 180 | 93 | 11.65 | 11.70 | 2,260 | 2,106 | 93 |
| North Carolina .............. | 500 | 490 | 98 | 10.50 | 10.50 | 5,250 | 5,145 | 98 |
| Ohio ............................ | 102 | 108 | 106 | 11.30 | 10.50 | 1,153 | 1,134 | 98 |
| Oklahoma .................... | 230 | 215 | 93 | 10.90 | 10.80 | 2,507 | 2,322 | 93 |
| Pennsylvania ................ | 51 | 56 | 110 | 11.30 | 11.10 | 576 | 622 | 108 |
| South Dakota ............... | 129 | 143 | 111 | 11.85 | 12.20 | 1,529 | 1,745 | 114 |
| Texas .......................... | 71 | 61 | 86 | 10.90 | 10.60 | 774 | 647 | 84 |
| Utah ........................... | 44 | 43 | 98 | 11.00 | 11.00 | 484 | 473 | 98 |
| Other States [2] ............... | 209 | 203 | 97 | 10.47 | 10.46 | 2,190 | 2,125 | 97 |
| United States ................ | 3,274 | 3,260 | 100 | 11.11 | 11.06 | 36,370 | 36,056 | 99 |

[1] Number of pigs born June-August that were still on hand September 1, or had been sold.
[2] Individual State estimates not available for the 34 Other States.

**Sows Farrowing, Pigs per Litter, and Pig Crop – States and United States: September-November 2019 and 2020**

[May not add due to rounding]

| State | Sows Farrowing | | | Pigs per litter | | Pig crop [1] | | |
|---|---|---|---|---|---|---|---|---|
| | 2019 | 2020 | 2020 as percent of 2019 | 2019 | 2020 | 2019 | 2020 | 2020 as percent of 2019 |
| | (1,000 head) | (1,000 head) | (percent) | (number) | (number) | (1,000 head) | (1,000 head) | (percent) |
| Colorado ....................... | 75 | 73 | 97 | 10.60 | 10.00 | 795 | 730 | 92 |
| Illinois ......................... | 280 | 295 | 105 | 10.95 | 10.80 | 3,066 | 3,186 | 104 |
| Indiana ....................... | 120 | 125 | 104 | 10.50 | 11.00 | 1,260 | 1,375 | 109 |
| Iowa ........................... | 510 | 560 | 110 | 11.35 | 11.30 | 5,789 | 6,328 | 109 |
| Kansas ....................... | 92 | 85 | 92 | 10.75 | 10.70 | 989 | 910 | 92 |
| Michigan ..................... | 56 | 56 | 100 | 10.85 | 11.50 | 608 | 644 | 106 |
| Minnesota ................... | 300 | 290 | 97 | 11.90 | 11.85 | 3,570 | 3,437 | 96 |
| Missouri ...................... | 265 | 240 | 91 | 11.10 | 11.10 | 2,942 | 2,664 | 91 |
| Nebraska ..................... | 190 | 190 | 100 | 11.70 | 11.70 | 2,223 | 2,223 | 100 |
| North Carolina .............. | 470 | 440 | 94 | 10.55 | 10.50 | 4,959 | 4,620 | 93 |
| Ohio ............................ | 103 | 105 | 102 | 11.40 | 10.60 | 1,174 | 1,113 | 95 |
| Oklahoma .................... | 220 | 210 | 95 | 10.85 | 10.70 | 2,387 | 2,247 | 94 |
| Pennsylvania ................ | 57 | 52 | 91 | 11.20 | 11.00 | 638 | 572 | 90 |
| South Dakota ............... | 138 | 139 | 101 | 12.00 | 12.20 | 1,656 | 1,696 | 102 |
| Texas .......................... | 67 | 64 | 96 | 10.40 | 9.80 | 697 | 627 | 90 |
| Utah ........................... | 41 | 41 | 100 | 11.50 | 10.90 | 472 | 447 | 95 |
| Other States [2] ............... | 213 | 199 | 94 | 10.51 | 10.83 | 2,234 | 2,154 | 96 |
| United States ................ | 3,197 | 3,164 | 99 | 11.09 | 11.05 | 35,459 | 34,973 | 99 |

[1] Number of pigs born September-November that were still on hand December 1, or had been sold.
[2] Individual State estimates not available for the 34 Other States.

**Statistical Methodology**

**Survey Procedures:** A random sample of roughly 6,000 United States producers was surveyed to provide data for these estimates. Survey procedures ensured that all hog and pig producers, regardless of size, had a chance to be included in the survey. Large operations were sampled more heavily than small operations. During the first half of December 2020, data were collected from about 4,500 operations, 70.7 percent of the total sample. The data collected were received by electronic data reporting, mail, and telephone. Regardless of when operations responded, they were asked to report inventories as of December 1, 2020.

**Estimating Procedures:** Hogs and pigs estimates were prepared by the Agricultural Statistics Board after reviewing recommendations and analysis submitted by each regional field office. National and State survey data were reviewed for reasonableness with each other and with estimates from past years using a balance sheet. The balance sheet begins with the previous inventory estimate, adds the estimates of births and imports, and subtracts the estimates of slaughter, exports, and deaths. This indicated ending inventory level is compared to the Agricultural Statistics Board estimate for reasonableness.

**Revision Policy:** Revisions to previous estimates are made to improve quarter to quarter relationships. Estimates for the previous four quarters are subject to revision when current estimates are made. In December, estimates for all quarters of the current and previous year are reviewed. The reviews are primarily based on hog check-off receipts and slaughter. Estimates will also be reviewed after data from the Department of Agriculture five-year Census of Agriculture are available. No revisions will be made after that date.

**Reliability:** Since all operations raising hogs are not included in the sample, survey estimates are subject to sampling variability. Survey results are also subject to non-sampling errors such as omissions, duplication, and mistakes in reporting, recording, and processing the data. The effects of these errors cannot be measured directly. They are minimized through rigid quality controls in the data collection process and through a careful review of all reported data for consistency and reasonableness.

To assist users in evaluating the reliability of the estimates in this report, the **"Root Mean Square Error"** is shown for selected items in the following table. The "Root Mean Square Error" is a statistical measure based on past performance and is computed using the difference between first and final estimates. The "Root Mean Square Error" for hog inventory estimates over the past 20 quarters is 1.2 percent. This means that chances are 2 out of 3 that the final estimate will not be above or below the current estimate of 77.5 million head by more than 1.2 percent. Chances are 9 out of 10 that the difference will not exceed 2.1 percent.

**Reliability of Quarterly Hog Estimates**

[Based on data for the previous 20 quarters]

| Item | Root mean square error | 90 percent confidence level | Difference between first and latest estimate | | | | |
|------|------|------|------|------|------|------|------|
| | | | Average | Smallest | Largest | Quarters | |
| | | | | | | Below latest | Above latest |
| | (percent) | (percent) | (1,000) | (1,000) | (1,000) | (number) | (number) |
| All hogs and pigs ............................ | 1.2 | 2.1 | 712 | 60 | 2,270 | 9 | 11 |
| Pig crop  ......................................... | 1.7 | 2.9 | 461 | 13 | 1,064 | 11 | 9 |
| Expected farrowings | | | | | | | |
| Second intentions  ..................... | 2.2 | 3.8 | 54 | 2 | 137 | 16 | 4 |
| First intentions ............................ | 2.3 | 4.0 | 56 | 2 | 145 | 15 | 5 |

**Records by Quarter – United States: 1866 to Present**

[This table provides data users with record high estimates of all hogs and pigs, market hogs, pig crop, and pigs per litter since each data series began]

| Item | Estimate | Record high | Series began |
|---|---|---|---|
| | (1,000 head) | (year) | (year) |
| All hogs and pigs ............................................... | | | |
| March 1 ............................................... | 76,179 | 2020 | 1988 |
| June 1 ............................................... | 77,364 | 2020 | 1964 |
| September 1 ............................................... | 78,583 | 2019 | 1988 |
| December 1 ............................................... | 83,741 | 1943 | 1866 |
| Market ............................................... | | | |
| March 1 ............................................... | 69,804 | 2020 | 1988 |
| June 1 ............................................... | 71,038 | 2020 | 1964 |
| September 1 ............................................... | 72,153 | 2019 | 1988 |
| December 1 ............................................... | 71,757 | 2019 | 1963 |
| Pig crop ............................................... | | | |
| December-February[1] ............................... | 33,745 | 2020 | 1970 |
| March-May ............................................... | 34,644 | 2020 | 1970 |
| June-August ............................................... | 36,370 | 2019 | 1970 |
| September-November ............................... | 35,459 | 2019 | 1970 |
| | (number) | (year) | (year) |
| Pigs per litter ............................................... | | | |
| December-February[1] ............................... | 11.00 | 2020 | 1970 |
| March-May ............................................... | 11.00 | 2020 | 1970 |
| June-August ............................................... | 11.11 | 2019 | 1970 |
| September-November ............................... | 11.09 | 2019 | 1970 |

[1] December preceding year.


## Information Contacts

Listed below are the commodity specialists in the Livestock Branch of the National Agricultural Statistics Service to contact for additional information. E-mail inquiries may be sent to nass@usda.gov.

Travis Averill, Chief, Livestock Branch ........................................................................................... (202) 692-0069

Scott Hollis, Head, Livestock Section ............................................................................................. (202) 690-2424
    Sherry Bertramsen – Livestock Slaughter ................................................................................ (202) 690-8632
    Holly Brenize – Sheep and Goats .............................................................................................. (202) 720-0585
    Ryan Cowen – Cattle, Cattle on Feed ........................................................................................ (202) 720-3040
    Mike Miller – Milk Production and Milk Cows ........................................................................... (202) 720-3278
    Suzanne Richards – Dairy Products ........................................................................................... (202) 720-4448
    Seth Riggins – Hogs and Pigs ................................................................................................... (202) 720-3106

**Access to NASS Reports**

For your convenience, you may access NASS reports and products the following ways:

➢ All reports are available electronically, at no cost, on the NASS web site: www.nass.usda.gov

➢ Both national and state specific reports are available via a free e-mail subscription. To set-up this free subscription, visit www.nass.usda.gov and click on "National" or "State" in upper right corner above "search" box to create an account and select the reports you would like to receive.

➢ Cornell's Mann Library has launched a new website housing NASS's and other agencies archived reports. The new website, https://usda.library.cornell.edu. All email subscriptions containing reports will be sent from the new website, https://usda.library.cornell.edu. To continue receiving the reports via e-mail, you will have to go to the new website, create a new account and re-subscribe to the reports. If you need instructions to set up an account or subscribe, they are located at: https://usda.library.cornell.edu/help. You should whitelist notifications@usda-esmis.library.cornell.edu in your email client to avoid the emails going into spam/junk folders.

For more information on NASS surveys and reports, call the NASS Agricultural Statistics Hotline at (800) 727-9540, 7:30 a.m. to 4:00 p.m. ET, or e-mail: nass@usda.gov.

The U.S. Department of Agriculture (USDA) prohibits discrimination against its customers, employees, and applicants for employment on the basis of race, color, national origin, age, disability, sex, gender identity, religion, reprisal, and where applicable, political beliefs, marital status, familial or parental status, sexual orientation, or all or part of an individual's income is derived from any public assistance program, or protected genetic information in employment or in any program or activity conducted or funded by the Department. (Not all prohibited bases will apply to all programs and/or employment activities.)

If you wish to file a Civil Rights program complaint of discrimination, complete the USDA Program Discrimination Complaint Form (PDF), found online at www.ascr.usda.gov/filing-program-discrimination-complaint-usda-customer, or at any USDA office, or call (866) 632-9992 to request the form. You may also write a letter containing all of the information requested in the form. Send your completed complaint form or letter to us by mail at U.S. Department of Agriculture, Director, Office of Adjudication, 1400 Independence Avenue, S.W., Washington, D.C. 20250-9410, by fax (202) 690-7442 or email at program.intake@usda.gov.



Registration is Now Open

to USDA's 97th Agricultural Outlook Forum!

# Building on Innovation: A Pathway to Resilience

Join us for this virtual event on February 18-19, 2021

The Forum is free to attend

Register Today

# EXHIBIT E

1  TRENTON H. NORRIS (SBN 164781)
   PEG CAREW TOLEDO (SBN 181227)
2  WILLIS M. WAGNER (SBN 310900)
   Arnold & Porter Kaye Scholer LLP
3  Three Embarcadero Center, 10th Floor
   San Francisco, California 94111
4  Telephone: +1 415.471.3100
   Facsimile: +1 415.471.3400
5  E-mail: Trent.Norris@arnoldporter.com
           Peg.Toledo@arnoldporter.com
6          Will.Wagner@arnoldporter.com

E-FILED
11/12/2021 11:49 PM
Superior Court of California
County of Fresno
By: Louana Peterson, Deputy

7  ELDON MCAFEE (*pro hac vice pending*)
   JULIE VYSKOCIL(*pro hac vice pending*)
8  BRICK GENTRY, P.C.
   6701 Westown Parkway, Suite 100
9  West Des Moines, Iowa 50266
   Telephone: 515.271.5916
10 Facsimile: 515.274.1488
   E-mail: eldon.mcafee@brickgentrylaw.com
11         julie.vyskocil@brickgentrylaw.com

   MARNIE A. JENSEN (*pro hac vice pending*)
   RYANN A. GLENN (*pro hac vice pending*)
   Husch Blackwell LLP
   13330 California Street, Suite 200
   Omaha, Nebraska 68154
   Telephone: 402.964.5000
   Facsimile: 402.964.5050
   E-mail: marnie.jensen@huschblackwell.com
           ryann.glenn@huschblackwell.com

12
13 Attorneys for Plaintiff
   IOWA PORK PRODUCERS ASSOCIATION

14        **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                        **COUNTY OF FRESNO**

16

17 IOWA PORK PRODUCERS
   ASSOCIATION,
18
              Plaintiff,
19
20         v.
21
22 ROB BONTA, in his official capacity as
   Attorney General of California, KAREN
23 ROSS, in her official capacity as Secretary
   of the California Department of Food and
24 Agriculture, and TOMAS ARAGON, in his
   official capacity as Director of the
25 California Department of Public Health,
26            Defendants.
27

Case No.  21CECG03339

**DECLARATION OF DR. JANEEN SALAK-JOHNSON, Ph.D., IN SUPPORT OF PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION AND REQUEST FOR EXPEDITED RELIEF AND HEARING**

**DATE:   May 18, 2022**
**TIME:   3:30 p.m.**
**DEPT.:   502**
**JUDGE:  Rosemary T. McGuire**

Complaint Filed:  November 9, 2021

28

1

I, Dr. Janeen Salak-Johnson, hereby state and declare as follows:

1.      I am over the age of majority and am competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration.  If called as a witness, I could and would competently testify to the same.

**Qualifications**

2.      I received my Doctor of Philosophy degree in Animal Science with a minor in Neuroscience from Texas Tech University in Lubbock, TX.

3.      I received a 3-year National Institute of Health Postdoctoral Training Fellowship in Psychoneuroimmunology at the University of Minnesota.

4.      In late 1999, I joined the Animal Sciences faculty at the University of Illinois, where I held a research and teaching appointment and received tenure.

5.      In 2018, I joined the animal science faculty at Oklahoma State University, where I hold the Temple Grandin Endowed Professorship in Animal Behavior and Well-being.

6.      Throughout my career, including at Oklahoma State University, I have served on several committees.  These include Farm Animal Care Training & Auditing (FACTA), American Society of Animal Science (ASAS) Delegate to AAALAC International, Center for Food Integrity Expert Animal Care Review Panel, the University of Illinois Institutional Animal Care and Use Committee, and elected as Board of Director and Agricultural Animal Science sub-Committee to AAALAC International.

7.      I served as chair for the 3rd Edition (Swine Chapter; 2010) and 4th Edition (Environmental Enrichment Chapter; 2020) of the Guide for the Care and Use of Agricultural Animals in Research and Teaching, commonly known as the Ag Guide, and chaired the Sow Housing Section in Chapter 2 for the Swine Care Handbook, 2018 ed. Also, I served as chair or committee member for ASAS National Animal Behavior and Wellbeing Committee and ASAS Midwest Section on Animal Behavior and Housing Committee for multiple 3-year terms.

8.      I serve on numerous professional and industry-related advisory boards, provide animal care and well-being advice and regularly conduct on-farm animal welfare assessments for swine industry participants.

2

DECLARATION OF DR. JANEEN SALAK-JOHNSON

9.      At Oklahoma State University, I lead a research laboratory that is one of the most active interdisciplinary programs in the country, using the most innovative approaches contributing to alternative ways to improve pig well-being and safeguarding sow and piglet welfare.

10.     My research findings were some of the first in the country to show improved sow well-being based on multiple welfare metrics. In short, these studies identified some important physical (e.g., stall and floor space allowances) and biological components (e.g., nutrition, social rank) of housing environments that can affect sow and piglet well-being.

11.     Further information regarding my presentations and peer-reviewed articles that have been published are identified in the attached true and correct copy of my curriculum vitae attached hereto and incorporated by reference as Exhibit "A" to this Declaration.

**Assignment**

12.     I have been asked by Plaintiffs to determine the impact Proposition 12 has on the well-being of breeding sows based upon my education, experience and training.

**Findings**

13.     Sows are female breeding pigs that give birth to piglets that ultimately become hogs finished and sent to market for both US and exported pork consumption. Under current operations, sows are maintained on sow-specific farms that are separated from other hog facilities.

14.     Sows most productive "days" especially for low-prolific sows are parity 2 to parity 6; with parities 2 through 4 being most productive.  This means the sow is most productive between the second and fourth times of being bred during her lifetime.

15.     The gestation length of a pig is about 114 days, and average farrowing will occur 114 days after breeding.  Piglets are generally raised for three to four weeks before weaned.

16.     It then takes another 24-26 weeks to continue raising and finishing the piglets until the piglets are ready to be slaughtered at a processing plant.

17.     California Proposition 12 effectively prevents individualized stalls except during the five-day period prior to the expected day of giving birth, during nursing, and only for temporary periods of less than six hours for breeding and animal husbandry purposes.

18.     Proposition 12 prevents individualized stalls by imposing a 24 square feet

3

1  requirement per breeding pig and separately, by imposing a requirement that all breeding pigs must

2  be able to fully lie down, stand up, extend their limbs and turn around freely without touching the

3  sides of an enclosure or another animal.

4       19.     Currently, most breeding pigs within the industry are confined in 14-16 square feet

5  individualized gestation pens.

6       20.     Research shows that turn around stalls are not always voluntarily chosen by the sow

7  or the best option for sows.

8       21.     Additionally, it is unrealistic to assume that the sow is capable of turning in a

9  complete 360-degree manner, based on its anatomical and morphological features of being a pig

10  (especially a pregnant pig) and its motivation.  It would not be able to perform this behavior,

11  smoothly, easily, or often (if at all) and as pregnancy progresses it is almost null that it would

12  attempt to initiate turning around.  Moreover, it is likely that if the sow was to even half turn around

13  it would not be capable of doing this without touching another sow or the sides of the enclosure the

14  sow is kept-in.  This is an arbitrary identified behavioral need—it is unrealistic to think that a sow

15  could perform a full circle easily and/or naturally.  In reality, when sows make postural changes

16  they have to transition between postural behaviors.  For example, a sow cannot simply go from

17  standing to lying (vice versa), it has to transition to a sitting position with a time delay before

18  attempting to progress to the next postural behavior.  Performing this sequence of behaviors to

19  transition from one postural behavior to another occurs regardless of the space per sow provided—

20  it performs these sequences whether it is at 14, 16, 18, 24, 36, or 100 sq. ft. per sow.  Thus, it is

21  unlikely that simply providing 24 sq. ft. per sow would make it any easier for it to perform these

22  behaviors, even if it was motivated to do so.

23       22.     Placing a quantifiable number such as 24 sq. ft. as a minimum standard of floor

24  space provided per sow along with a behavioral movement that is not part of a sow's behavioral

25  budget is not practical.

26       23.     Implying adding 24 sq. ft. of usable space as a provision because Prop 2 emphasized

27  animal behavior and movement (hence turnaround) is an arbitrary number and does not equate to

28  better welfare.  The means by which sows are fed and the interactive effects between housing and

4

feeding systems complicate the problem of identifying the best system.  In fact, turn around and floor space allowance further exacerbates these problems.  Making it more difficult for producers to comply to both provisions especially when this number is not based on science or improved welfare—housing systems are not a jigsaw puzzle—not all pieces fit appropriately together.  For example, 24 sq. ft. per sow may be quality space in one system and just a number in another system because so many other factors influence the effects of space allowance on welfare these include group size, feeding system, management, etc. –just to name a few because they all influence one another – hence ambiguous outcomes.   (Data show that pregnant sows kept in a large space may have a sense of fear or insecurity, resulting in low productivity due to compromised welfare—Lee et al., 2016—thus mandating a number that is not scientifically validated could lead to poorer welfare because one cannot move the pendulum backwards)

24.    It is not as simple as providing sows with 24 sq. ft. of usable space and the space to allow them to turn around; these provisions require changes to the entire infrastructure of the US Pork Production.  The infrastructure does not enable pork to be segregated.  Modifications that optimize individual welfare, management/labor, and lifetime productivity.  It is unethical to ask producers to raise animals in a way that does not improve individual welfare and that restricts their ability to do what is best for the animal.

25.    Since sow housing systems are not jigsaw puzzles there is a learning curve and there will be unintended negative consequences on the welfare of the animals—not only sows but piglets too.  It is important to note that providing sows and her piglets this much space can also result in unintended negative consequences such as increase in piglet mortality. Banning the confinement of breeding pigs and their immediate offspring in areas with less than 24 sq. feet of usable floor space per pig – this will increase pig mortality of crushing and lying on pigs there is a reason that sows behaviorally not possible to be able to lying down once again which protects piglets from being crushed. Increase floor space in farrowing is negatively correlated with survival rate of the piglets (Lee et al., 2016).

26.    State-by-state referendums results in a patchwork of inconsistent guidelines – problematic for farming enterprises that span more than one state and may limit access to markets

exacerbating the problem – that is exactly what Prop 12 is doing.  State by state referendums do not provide standards or criteria for farm animal care.  Lack of consistency has implications for interstate commerce. Uniform approach to be developed in setting of regulated standards across US that is what industry/research guidelines does. Federal law = level playing field; disadvantage polarization, protracted political  transaction time to initiate change, negative social stigma generated toward the affected industry, the potential that politically negotiated AW standards may either generate no net benefit to animals or not be practically achievable and the difficulty of changing involuntary law based on new scientific or practical information.  State laws seriously disadvantage farmers when marketing across state boundaries.

27.     My review of the Proposition 12 Voter Guide shows a clear lack of scientific support submitted to California voters at the time Proposition 12 was being considered.  For example, within the Voter Guide, proponents stated "Voting YES prevents…mother pigs…from being crammed inside tiny cages for their entire lives. It will eliminate inhumane and unsafe products from these abused animals from the California marketplace. Voting YES reduces the risk of people being sickened by food poisoning…. Scientific studies repeatedly find that packing animals in tiny, filthy cages increases the risk of food poisoning."  Attached as Exhibit "B" is a copy of the Voter Guide for Proposition 12.

28.     Unfortunately, process regulations can have counterintuitive effects. In particular, process regulations often do not completely specify the alternative systems that could be adopted. Bans on production processes cannot guarantee improvements in farm animal welfare without other regulations. It is possible that open barn systems used for chickens kept for egg production achieve lower levels of hen welfare than some enhanced or enriched cage systems. Moreover, with the absence of trade restrictions, banning a practice in one state or location serves to change where food products come from but not how animals are raised (Sumner et al. 2008). This violates the ethical obligation of farmers, researchers, etc., essentially the state of California legislators are dictating beyond their jurisdiction what it is not about space, they are arbitrarily redefining words and practices – some which also violate the swine care hand book.  This is not just about the amount of space you are giving them.

DECLARATION OF DR. JANEEN SALAK-JOHNSON

29.     There are significant effects that will be felt throughout the pork industry if Proposition 12 goes into effect, as potentially early as December 31, 2021. For example, assume that no relief to prevent enforcement of Proposition 12 is granted in 2021. In that case, it is plausible that it will result in unintended negative welfare consequences on sows and potentially their piglets. Producers will face decisions that will impact their moral and ethical obligation to ensure sow and piglet well-being. Female pigs are born with most of the follicles that will become their future piglets. Their most productive days are parity 2 through 6. Some of their progeny will become replacement females. If Proposition 12 goes into full effect and is enforced after January 1, 2022, a producer may be forced to sacrifice the sow and her progeny because progeny from her can no longer be sold as a product to California after January 1, 2022 if the breeding pig is not compliant with Proposition 12. As a result, it is also plausible that her female progeny that may be used for replacement gilts may also have to be sacrificed through early culling in 2021. This is more disturbing if the sow that farrows now in 2021 is a younger sow, since her most productive days are 2 to 6 parities and this is true whether a sow herd is considered high or low prolific. This is especially true with sows that are considered low prolific, meaning that their first litter is their least productive time.  Even feral sows naturally have two litters per year.  Another concern that needs to be considered in this scenario is that piglets may have to be weaned early. Once again, this results in welfare concerns mainly for the piglets but can also compromise sow welfare.  Weaning a pig prior to 21 days of age can negatively impact welfare.  This is especially so in terms of increased use of antibiotics, unwanted behaviors develop, and reduced growth.  Delaying weaning results in improved piglet welfare in the long term, less unwanted behaviors, and less use of antibiotics—to name a few benefits.

**Stockmanship Effects of Proposition 12 and Group Sow Housing**

30.     Proposition 12 will have significant effects on stockmanship skills and risks throughout the pork production industry.

31.     Three essential skills for a successful stockperson are good observation skills to identify sow's problems, farm management knowledge, and skills to solve significant problems to promptly fix the given problem. There are substantial learning curves in stockmanship in managing

groups of aggressive sows, identifying sick animals, and providing for their individual needs.

32.     Upon conversion from individual gestation stalls to group housing, several larger commercial producers have reported sow mortality rates of up to 30%.  Increased sow mortality rates in large sow populations are associated with caretaker experience (Supakorn et al., 2019); thus those with less experience are less likely to recognize a sow at risk and intervene with treatment or decide to cull the sow.

33.     Welfare at the group level takes a whole different level of stockmanship that cannot be learned overnight. There will be a substantial increase in ill and injured stockpersons who are tasked with caring for these sows.

34.     In addition to the human risk of injury, sows housed in group-housed systems suffer more injuries when compared to sows housed in individual gestation stalls because of aggressive interactions such as vulva biting and fighting for feed to establish a new sow social hierarchy (Spoolder et al., 2009; Livestock Sci 125:1-14).  These injuries can be extended to the piglets as well. Too much space for the sow when housed with her piglets can also result in welfare concerns for the piglets because of the anatomical and morphological features of the sow; the more space she has in which the piglets can roam, the incidence of crushing her piglets increases resulting in increased piglet mortality.

35.     Although few studies have assessed the Stockperson factor, Willgert et al. 2014 (Prev Vet Med, 113:268-272), reported an increased risk of lameness when the number of sows per stockman is high, suggesting that stockman's availability affects the detection and management of these disorders.

36.     Indeed, increasing the number of sows per stockman decreases the observation time available per animal, resulting in increased risk to the sows.

37.     Careful attention needs to be given to the location and design of the eating, drinking, dunging, lying, and walking areas to reduce aggressive interaction among sows within the pen. In poorly designed and managed indoor group-housing systems, there is great potential for very poor sow welfare.

38.     Simply attempting to retrofit the gestational stall system to accommodate the group

8

pen system takes time and if not done properly will have a direct negative impact on sow welfare including increased lesion scores and aggression resulting in some sows having poorer welfare (Pacheco et al., 2021 Front Anim Sci 2:719136). Moreover, sows that have been raised in gestation stalls well-being can be compromised initially when moved into group pens as measured by reduced performance and productivity and greater stress responsiveness (DeDecker, 2011 University of Illinois, Thesis).

**Additional Common Welfare Risks in Group Sow Housing**

39.     There are more risk factors associated with group housing systems than individual stall housing for reproductive performance.  For example, the most common welfare challenges associated with group housing include aggression, lameness, body condition, and chronic stress.

40.     Body condition is a physical assessment of body composition based on nutrition level, often visually scored on a scale of 1 (thin) to 5 (obese), with 3 being the desired score.  This welfare measure is one of the most variable measures among group-housed sows due to aggression at feeding, which results in some sows consuming too much (5) and some consuming too little (1), which both scores equate to welfare concerns.

41.     Moreover, body condition correlates with lameness, which inhibits or modifies an animal's gait. It is a clinical sign associated with a range of conditions and is used as a failure criterion for animal welfare audits.

42.     Skin lesions result from aggression at mixing and feeding that result from sows fighting to establish social hierarchy and acquire limited resources.  These are much more prevalent in group housing settings for sows.

43.     Skin lesions are highly correlated with the level of aggression. Aggression is influenced by numerous animal, management, and housing factors. Aggression post-mixing is largely attributed to aggressive animals engaging in fights for dominance (Verdon et al., 2016, J Anim Sci 94:1203-14), with those achieving dominant status following mixing continue to deliver aggression to lower-ranking conspecifics (Brouns and Edwards, 1994, Appl Anim Behav Sci 39:215-223; Verdon et al., 2016, J Anim Sci 94:1203-14). Unfortunately, the aggressive behavior sows display at mixing is related to their aggressive behavior throughout gestation (Verdon et al.,

2016, J Anim Sci 94:1203-14).

44.     Sows compete for feed; aggression around feeding remains high at least a week post-mixing but does not stabilize until at least 28 days following mixing (Verdon et al., 2016, J Anim Sci 94:1203-14). Also, sows in group pens with short feeding partitions aggressive encounters continue until the end of the gestational period (Pacheco and Salak-Johnson, 2016, J Vet Res Anim Husb 1:103-110)

45.     Aggression and the associated fear and injury are among the main sources of stress and major welfare concern for group-housed sows. Aggression negatively impacts reproductive performance and lower litter performance (Tonepohl et al., 2013, Appl Anim Behav Sci 144:108-115).

46.     Sows moved from individual pens and mixed into group pens at 25 days post-breeding had higher lesion scores 3-weeks post mixing, poor reproductive performance, and more chronic stress (Logoda et al. 2021, Livestock Prod 246:104463).

47.     The chronic stress caused by sustained aggression negatively impacts the sow's reproductive performance but can negatively impact the offspring (Kranendonk et al., 2008, Exp Clin Endocrinol Diabetes 116:413-422). Prenatal stress reduces the number of piglets born alive (Greenwood et al., 2019, Animals 9:658-678) and negatively affects offspring behavior, stress-coping abilities, and immune function, with these effects persisting throughout adult maturity (Rutherford et al., 2009, Biol Lett 5:452-454; Brajon et al., 2017, Appl Anim Behav Sci 197:15-23).

48.     Moreover, social rank and housing environment also compromise her progeny's stress and immune responsiveness (Granger and Salak-Johnson, 2021, EC Vet Sci 6: 3-10), resulting in major welfare concerns of the future breeding animals.

49.     Lameness reduces sows' longevity and lifetime-performance measures, such as the number of parities at culling and lifetime piglets born alive (Sasaki and Koketus, 2011, J Swine Health Prod 19:284-291).  Lame sows also have a higher risk of being culled within 350 days of diagnosis (Anil et al., 2009, JAVMA 235:734-738) and more mummified fetuses than non-lame sows (Pluym et al., 2013, Animal 7:1174-1181).  Therefore, preventing lameness is critical when

10

housing sows in group pens because it severely compromises her health (Maes et al., 2016, Procine Health Management 2:17) and subsequent longevity and lifetime performance.

50.     In another study discussing lameness in sows, there was higher sow mortality in a 5,200 sow herd than expected, with most sow deaths occurring in gestation and lactation phases. In gestation, 64% were euthanized for locomotor disturbances. About 45% of the sows were parity 1 and 2, and among parity 2, most of those sows were euthanized (Sanz et al. 2007, J Swine Health Prod 15:30-36).  This sets the stage for future productivity.

**24 Square Foot Requirement**

51.     Space for accessing necessary resources and opportunities to avoid or escape from potential aggressors is essential for the well-being of low-ranking sows in group housing.

52.     Space should be adequate to avoid physical injury. The minimum floor space allowance should be 1.49 m$^2$ (16 ft2) per sow on partly slatted floors (Salak-Johnson et al., 2007, J Anim Sci 90:3232-3242). Sows mixed at 2.4 m$^2$ (25.8 ft²) of floor space per sow through gestational day 106 still had profiles indicative of higher stress and aggression, resulting in greater piglet mortality during the suckling period (Merlot et al., 2017, Anim Prod 57:1751-1758).

53.     Not only can floor space and group size affect the level of aggressive behavior and compromised welfare but so does sow social rank. Sow social rank is a major contributor to the level of aggressive behavior among group-housed sows.

54.     Aggressive behavior increases among sows housed in group pens at a floor space allowance of 2.3 m$^2$ (24.8 ft²) resulting in reduced reproductive performance compared to sows housed at less floor space (1.7 m$^2$ per sow (18.3 ft²); DeDecker et al. 2014, J Anim Sci 92:1666-1674). This effect was likely due to dietary treatment and pen design (DeDecker et al. 2014, J Anim Sci 92:1666-1674), further validating that affording more floor space to sows during gestation does not equate to better welfare.

**Proposition 12 Sow Mixing Requirement is Detrimental to Sow Welfare**

55.     Science does not support moving sows immediately into group pens post-breeding (Koketsu and Iida, 2017, Mol Reprod Dev, 84:979-986).

56.     Appropriate housing for sows in early gestation is important for protecting embryos,

11

1    pregnancy confirmation, and individual feeding management.

2        57.    Early is defined as the period from insemination to the first pregnancy check, which

3    commonly occurs four weeks after breeding. Frequent pregnancy checks must be performed during

4    3 to 6 weeks post-breeding since 70% of rebreeds occur during this time (Iida and Koketsu, 2103,

5    Anim Reprod Sci 139:115-120).

6        58.    Mixing pigs is not recommended during days 21 through 30 after breeding to avoid

7    aggressive behavior, so individual stalls are used (Peltoniemi et al., 2016, Porcine Health

8    Management, 2:15-20). Not only is early gestation critical, but so is late-gestation, a time when

9    sufficient nutrients and energy are required to support rapidly growing fetuses.

10        59.    Most data implies that delaying until at least 35 days post-insemination results in

11    reduced aggression, injuries, and stress, implying that the challenges associated with aggression,

12    injuries, and stress at mixing are greater early after insemination than later (Stevens et al., 2015;

13    Appl Anim Behav Sci 165:40-46). Mixing sows at 35 days (36-42 days) post-insemination instead

14    of early (1 to 7 days) resulted in reduced aggression and cortisol and injuries (Stevens et al., 2015;

15    Appl Anim Behav Sci 165:40-46).

16        60.    Farrowing and conception rates were reduced in sows mixed early post-

17    insemination (within 1–14 days) compared to sows mixed late post-insemination (within 35–46

18    days) into large electronic-sow-feeder pens (Knox et al., 2014, J Anim Sci 92:1698-1707; Li &

19    Gonyou, 20013, Can J Anim Sci 93:445-452). Based on these contradictory findings, the current

20    consensus is to not mix sows before implantation, with the first 2–3 weeks post-insemination being

21    the most vulnerable to stress.

22        61.    Most research has been conducted between days 30-35 post-breeding.  One reason

23    is that sows tend to be more aggressive before implantation than after. For example, it has been

24    shown that sows fought for a longer period of time and caused more injuries when they were

25    grouped immediately after breeding than 5 weeks after breeding (Strawford et al., 2008; Can J

26    Anim Sci 88:559-567). Unfortunately, aggression during early pregnancy can result in the loss of

27    embryos (Spoolder et al., 2009, Lives. Sci. 2009; 125:1-14), partly due to the stress-induced

28    aggression affecting hormone secretions, resulting in pregnancy failure.

12

62.     Others have shown that sows grouped in a housing system that includes an open pen area and a stall had substantially higher lesion scores up to 6 weeks post-grouping and remained higher through gestational day 110 when compared to sows that were housed in two different individual stall housing systems (Salak-Johnson et al., 2015, J Anim Sci 93:5006-5017). Also, older sows had greater lesions in this housing system than younger sows, and younger sows had higher piglet mortality suggesting they may be more vulnerable in group-pens with this level of aggression.

63.     Other measures such as lameness and inflammation have also been shown to be compromised in group-housed sows when mixed before day 35. Groups of sows mixed at day 35 post-breeding had a lower percentage of lameness, inflammation, and vulva lesion scores than those mixed at 3- or 14-days post-breeding (Knox et al., 2014; J Anim Sci 92:1698-1707).

**Proposition 12 Increases Risk for Disease Among Sows**

64.     The most unknown and under-researched area is long-term effects on future progeny and disease transmission, and biosecurity incidence.

65.     One study reported that sows infected with PEDV during the first 30 days post-breeding had a reduced farrowing rate (78.5%) than those infected later than gestational day 31 (92.5%), and sows infected early were more likely to return to estrus (9.2%) or abort (3.4%) and farrow one less live piglet (Olanratmanee et al., 2010, Anim Reprod Sci 122:42-51).

66.     Very scarce evidence-based information is available on the relationship between group housing and disease transmission.

67.     However, it is well known that stressed animals are more susceptible to disease and have a higher incidence of shedding pathogens.

68.     In addition, sows in groups have more nose-to-nose, nose-to-genital, and body-to-body contact, as well as more oral contact with feces and urine.  These factors contribute to higher or faster transmission of pathogens among a herd.

69.     More contact with feces would result in a higher risk for infections with intestinal pathogens such as Brachyspira spp.,  Lawsonia intracellularis,  Salmonella and Ascaris suum.

70.     Because of the harms to sow welfare and danger to workers associated with group

13

confinement, the time-tested practice in the pork industry is to confine breeding sows in individual stalls.

71.     These findings and opinions are subject to revision should more materials, research or data become available.

72.     The statements made in this Declaration are true and accurate statements. The basis for the opinions offered here is my specialized education, training, knowledge and skill in the area of animal well-being and animal science. All of the opinions expressed here are opinions I hold to a reasonable degree of scientific certainty.

73.     I declare under penalty of perjury and pursuant to the laws of the state of California that the preceding is true and correct, and that this declaration was made on this 9th day of November 2021, at _____Stillwater_____, Oklahoma.


Dr. _____
Dr. Janeen Salak-Johnson

14
DECLARATION OF DR. JANEEN SALAK-JOHNSON

EXHIBIT A

**Abbreviated Vitae for Janeen L. Salak-Johnson, Ph.D.**

## Educational Background
Doctor of Philosophy, Animal Science, May 1994, Texas Tech University, Lubbock, Texas
Master of Science, Animal Science, May 1990, Texas Tech University, Lubbock, Texas
Bachelor of Science, Animal Science, Dec 1987, Texas Tech University, Lubbock, Texas

## Professional Experience
Temple Grandin Professorship in Animal Behavior & Well-being, January 2018-current, Oklahoma State University, Animal and Food Sciences, Stillwater, OK.
Associate Professor of Stress Physiology and Well-being, August 2007-December 2017, University of Illinois, Animal Sciences, Urbana, IL.
Assistant Professor of Stress Physiology and Well-being, October 1999-2007, University of Illinois, Animal Sciences, Urbana, IL (*2 Roll-backs due to childbirth*).
Postdoctoral-Fellow, 1998-1999, University of Minnesota, Preventive Medicine & Sciences, Minneapolis, MN
NIH Postdoctoral Training Fellowship in Psychoneuroimmunology, 1994-1997, University of Minnesota, St. Paul, Minnesota.

## Other Professional Employment
| | |
|---|---|
| 2016–2017 | Triumph & Hanor Food Companies, Kansas City, MO |
| 2014–2016 | Consultant, Seaboard Foods, Guymon, OK |
| 2014–2018 | Member, Scientific Advisory for Swine Care and Handling, Elanco, Indianapolis, IN |
| 2013–2015 | Member, Animal Well-being Advisory Board FarmCheck, Tysons Foods, Iowa Falls, SD |
| 2012–2014 | Consultant, Christensen Farms, Sleepy Eye, MN |
| 2012–current | Member, 3rd party Expert, Animal Care and Well-being Advisory Board, Iowa Select, Iowa Falls, IA |
| 2011–2015 | Consultant and Animal Care & Well-being Advisory Board, Murphy-Brown LLC, Warsaw, NC |
| 2011–current | Member, Animal Agricultural Alliance OIE Scientific Animal Welfare Advisory Board, Washington, DC |
| 2007–current | Member, Scientific Advisory Board for Farm Animal Care, Training, Auditing, FACTA, Frost, PLLC, Little Rock, AK |

## Professional Activities and Services [shortened to most relevant]
AAALAC International Board of Director
ASAS representative to AAALAC International Board of Trustees
Selected to serve on Center for Food Integrity (CFI) Expert Animal Care Review Panel
Expert member Agricultural Alliance OIE Advisory Team Member on Animal Care (Welfare) for Poultry, Beef, and Swine
Member of W2173: Impacts of Stress Factors on Performance, health, and Well-being of Farm Animals
American Society for Animal Science, National Animal Behavior and Well-being Committee, Chair
Appointed Member to serve on Humane Livestock Transportation Standards Council, American Humane Certified,
Appointed Member of Scientific Advisory Committee for Farm Animal Care, Training, and Auditing (FACTA)
Appointed as Subcommittee Member of Sow Longevity Task Force for National Pork Board Animal Science and Working Groups Committee
Appointed as Sow Lifetime Productivity Research Consortium for National Pork Board Animal Science Committee
Selected Expert Member of Tyson Animal Well-being Advisory Panel—Farm Check
Selected Expert Member of Iowa Select Animal Welfare Advisory Committee
Journal of Animal Sciences, Editorial Board and Associate Editor

## Publications (since 2005)
Lopez, M; Pacheco, E; **Salak-Johnson, JL**. 2021. Dietary fiber source and length of feeding partitions differentially affected behavior, immune status, and productivity of group-housed dry sows. *Agriculture*, 11(1) 34-48.
Granger, KL; **Salak-Johnson, JL**. 2021. A pilot study on the effects of gestating sow nutrition and environment on piglet immune responsiveness to weaning stress. *Veterinary Science* (invited);
Lents, CA; Supakorn, C; DeDecker, AE; Phillips CE; Boyd, RD; Vallet, JL; Rohrer, GA; Foxcroft, GR; Knox, RV;  Flowers, B; Trottier, NL; **Salak-Johnson, JL;** Bartol, FF; Stalder, KJ. 2020. Dietary standardized ileal digestible lysine to energy ratios for managing growth and prepubertal development in replacement gilts. *Appl. Anim. Sci.* 36:701-714.

DeDecker AE, and **JL Salak-Johnson**, 2020. Effect of social rank on well-being and space utilization of dry sows kept in a free access stall-pen housing environment. Open J Anim Sci 10(2): 287-300.

Pacheco E, SL Rodriguez-Zas, and **JL Salak-Johnson**. 2020. Social status differentially impacts the well-being of gestating sows housed in pens with short or long feeding stalls and fed dietary fiber. Animals: (invited; revision submitted)

Tucker C, AR Green-Miller, RS Gates, S Myint, and **JL Salak-Johnson**. 2018. Behavioral responses of laying hens to atmospheric ammonia in an environmental chamber. Am. Society Agric. Biol. Engineers: 1-8. doi: 10.13031/iles.18-106

**Salak-Johnson JL**, and SR Webb. 2018. Pig social status and chronic cold or crowd stressors differentially impacted immune response. Open J Anim Sci 8:280-93. doi: 10.4236/ojas.2018.83021

**Salak-Johnson JL** and SR Webb. 2018. Short- and long-term effects of weaning age on pig innate immune status. Open J Anim Sci 8:137-50. doi: 10.4236/ojas.2018.82010

DeDecker A, M Mandru, and **JL Salak-Johnson**. 2018.  Housing pregnant sows in turnaround stalls during gestation impact behavior, immune, and well-being. Am J Anim Vet Sci. 13(4):123-129.

Ritter MJ, AK Johnson, ME Benjamin, SN Carr, M Ellis, L Faucitano, T Grandin, **JL Salak-Johnson,** et al. 2017. Review: Effects of Ractopamine Hydrochloride (Paylean) on welfare indicators for market weight pigs. Transl Anim Sci 1:533-58. doi: 10.2527/tas2017.0060

**Salak-Johnson JL**, and JP Shott. 2017. "Social status impacts macrophage function of pigs." J Dairy Vet Sci 2:555590. doi: 10.19080/ JDVS.2017.02.555590

**Salak-Johnson, JL**. 2017. "Social status and housing factors affect reproductive performance of pregnant sows in groups." Mol Reprod Dev, 84:905-913. doi.org/10.1002/mrd.22846

Lopez M, and **JL Salak-Johnson**. 2016. "A review: Aggression concerns with group-housed sow well-being. J Dairy Vet Anim Res 4:122-26.

Pacheco E and **JL Salak-Johnson**. 2016. "Social status affects welfare metrics of group-housed sows. Open access: J Vet Res Anim Husb 1:103-110.

Cockrum RR, SE Speidel, **JL Salak-Johnson**, CC Chase, PK Peel, et al. 2016. "Genetic parameters estimated at receiving for circulating cortisol, immunoglobulin G, Interleukin 8, and incidence of bovine respiratory disease in feedlot beef steers". J Anim Sci 94:2770-8. doi: 10.2527/jas.2015-0222.

**Salak-Johnson JL**, AE DeDecker, HA Levitin, and BM McGarry. 2015. "Wider stall space affects behavior, lesion scores, and productivity of gestating sows." J Anim Sci 93:5006-17. doi: 10.2527/jas.2015-9017.

Zverina LR, J Kane, TD Crenshaw, and **JL Salak-Johnson**. 2015. "A pilot study: behavior and productivity of gestating sows in a width-adjustable stall." Austin J Vet Sci & Anim Husb 2:1012-16.

DeDecker A E, AR Hanson, PM Walker, and **JL Salak-Johnson**. 2014. "Space allowance and high fiber diet impact performance and behavior of group-kept gestating sows." J Anim Sci 92:1666-74. doi: 10.2527/jas.2013-6776.

Knox R, **J Salak-Johnson**, M Hopgood, L Greiner, and J Connor. 2014. "Effect of day of mixing gestating sows on measures of reproductive performance and animal welfare." J Anim Sci 92:1698-707. doi: 10.2527/jas.2013-6432.

Canaday DC, **JL Salak-Johnson**, AM Visconti, X Wang, K Bhalerao, and RV Knox. 2013. "Effect of variability in lighting and temperature environments for mature gilts housed in gestation crates on measures of reproduction and animal well-being." J Anim Sci 91:1225-36. doi: 10.2527/jas.2012-5733.

Graugnard D., M Bionaz, E Trevisi, KM Moyes, **JL Salak-Johnson**, et al.  2012. "Blood immunometabolic indices and polymorphonuclear neutrophil function in peripartum dairy cows are altered by level of dietary energy prepartum." J Dairy Sci 95:1749-58. doi: 10.3168/jds.2011-4579.

**Salak-Johnson JL**, AE DeDecker, MJ Horsman, and SL Rodriguez-Zas. 2012. "Space allowance for gestating sows in pens: behavior and immunity." J Anim Sci 90:3232-42. doi: 10.2527/jas.2011-4531.

**Salak-Johnson JL**. 2010. Adaptation and Stress: Neuroendocrine, Physiological, and Behavioral Responses. Encyclopedia of Animal Science, 2nd Edition (invited).

Ritter MJ, M Ellis, SE Curtis, NL Berry, L Anil*, E Berg, M Benjamin, D Butler, C Dewey, B Driessen, P DuBois, JD Hill, JN Marchant-Forde, P Matzat, J McGlone, P Mormede, T Moyer, K Pfalzgraf, **J Salak-Johnson**, et al. 2009. Transport losses in market weight pigs: I. A Review of definitions, incidence, and economic impact. Professional Anim Scientist 25:404-414. *Alphabetical order from this point forward.

Moyes KM, JK Drackley, **JL Salak-Johnson**, DE Morin, JC Hope, and JJ Loor. 2009. "Dietary-induced negative energy balance has minimal effects on innate immunity during a Streptococcus uberis mastitis challenge in dairy cows during mid-lactation." J Dairy Sci 92:4301-16. doi: 10.3168/jds.2009-2170.

Sutherland MA, K Erlandson, JF Connor, **JL Salak-Johnson**, PD Matzat, JF Smith, and JJ McGlone. 2008. "Health of non-ambulatory, non-injured pigs at processing." Livest Sci 116:237-45. doi: 10.1016/j.livsci.2007.10.009

Niekamp SR, MA Sutherland, GE Dahl, and **JL Salak-Johnson**. 2007. "Immune responses of piglets to weaning stress: impacts of photoperiod." J Anim Sci 85:93-100. doi: 10.2527/jas.2006-153.

**Salak-Johnson JL** and JJ McGlone. 2007. "Making sense of apparently conflicting data: stress and immunity in swine and cattle." J Anim Sci 85(13 Suppl): E81-8. doi: 10.2527/jas.2006-538.

**Salak-Johnson JL**, SR Niekamp, SL Rodriguez-Zas, M Ellis, and SE Curtis. 2007. "Space allowance for dry, pregnant sows in pens: body condition, skin lesions, and performance." J Anim Sci 85:1758-69. doi: 10.2527/jas.2006-510.

Sutherland MA, SR Niekamp, RW Johnson, WG Van Alstine, and **JL Salak-Johnson**. 2007. "Heat and social rank impact behavior and physiology of PRRS-virus-infected pigs." Physiol Behav 90:73-81. doi: 10.1016/j.physbeh.2006.08.029.

Niekamp SR, MA Sutherland, GE Dahl, and **JL Salak-Johnson**. 2007. "Photoperiod influences the immune status of multiparous pregnant sows and their piglets." J Anim Sci 84:2072-82. doi: 10.2527/jas.2005-597.

Sutherland MA, SR Niekamp, SL Rodriguez-Zas, and **JL Salak-Johnson**. 2006. "Impacts of chronic stress and social status on various physiological and performance measures in pigs of different breeds." J Anim Sci 84:588-96.

Sutherland MA, SL Rodriguez-Zas, M Ellis, and **JL Salak-Johnson**. 2005. "Breed and age affect baseline immune traits, cortisol, and performance in growing pigs." J Anim Sci 83:2087-95.


**Invited Lectures and Invited Conference Presentations (>100 presentations, most relevant past 10 years)**

*Defending Animal Agriculture: A Consumer's View*. SCFB Livestock Industry Forum, March 2010

*Guide for the Care and Use of Agricultural Animals in Agricultural and Teaching: Swine Chapter*. BIO Livestock Biotech Summit, Sioux Falls, SD, September 2010

*Sow Housing and Environmental Considerations*. Sow Lifetime Productivity Task Force Conference sponsored by National Pork Board Animal Science Group. Des Moines, IA, December 2011

*Need for Improvement but Welfare-friendly*. Illinois Farm Families—Field Moms Conference, Illinois Farm Bureau, Dekalb, IL, March 2012

*Space Needs for Group-Housed Sows*. Gestation Sow Housing Webinar Federation of Animal Science Societies (FASS) and American Veterinary Medical Association (AVMA), May 2012

*Change Must be Based on Animal Well-being*. Annual Joint Stakeholders Conference with American Meat Institute, National Pork Producers Council and National Pork Board, Chicago, IL, June 2012

*Alternative Housing Systems: Pros and Cons*. National Pork Producer Council and Retailers Conference, Chicago, IL, July 2012

*Animal Care:  Seeing the Forest and the Trees Using Sow Housing*. Illinois Farm Bureau Executive Board of Directors Annual Meeting, Bloomington, IL, August 2012

*Sow Housing—What Should I do for my sows?* 22nd Annual Swine Health and Production Conference, Macomb, IL, August 2012

*A Scientific Perspective of Sow Housing Issue: Future and Options*. Emerging Leaders Pork Conference, 21st Century Strategic Forum, Chicago, IL, August 2102

*Sound-Science and Animal Well-being Should Drive Decisions*. Animal Care-Demonstrating Doing What's Right—Expert Panel, Packer Processor Industry Council, Sacramento, CA, September 2012

*Science of Animal Wellbeing Must be at the Forefront.*  **Featured Speaker:** Expert Animal Behavior & Welfare Panel, Pork Action Group Conference, Marco Island, FL, November 2012

*What science says about sow housing and well-being.* **Featured Speaker:** The State Ag and Rural Leaders 12th Annual Legislative Ag Chairs Summit, Vancouver, British Columbia, June 2013

*Understanding Pig Well-being is Complex, but Improving Well-being Requires an Integrated Approach.* **Keynote Speaker**: Manitoba Pork Council: Annual General Meeting, Winnipeg, Manitoba, Canada, April 2014

*Academic Perspective: Animal Well-being and Science should be at the forefront of animal welfare issues*. International Food and Agribusiness Management Association, Fair Oaks, IN, April 2014

*A scientific perspective of sow housing and well-being*. NCSL Legislative Summit: Agriculture Task Force, Minneapolis, MN, August 2014

*Scientific review of Indoor Gestation Housing Options.* Scientific Meeting for Swine Care Handbook Revision, National Pork Board, Chicago, IL, March 2015

*Science of Housing in Terms of Animal Well-being and Welfare Trade-offs*. CFI North American Conference on Animal Agriculture. Invited presentation & Panel participant. Chicago, IL, May 2016

*Animal Stress and Well-being: Applications and Impacts*. ARS-MARC Research Seminar Series, Clay Center, NE, May 2017

*Using the Science of Animal Well-being to Establish Policy vs. Consumer Perception*. **Invited Speaker**, ARPAS symposium at National Animal Sciences Meeting, Baltimore, MD, July 2017

*Swine Welfare and Behavior: Science drives change*. **Invited Speaker**, Animal Welfare Symposium: Advancing Animal Welfare Together, Dallas, TX, September 2017

*Effects of Group-housed Sows Nutrition, Environment, and Social Rank on Piglet Immune Responsiveness to Weaning.*
**Featured speaker**, International Conference on Immunology and Immunotechnology, Barcelona, Spain, November 2017
*The science of animal well-being should be at the forefront of cattle welfare issues*. OSU/OVMA Summer Seminar. Center for Veterinary Health Sciences, Oklahoma State Veterinary School, Stillwater, OK, June 2018 *Update on Swine and Cattle Welfare Issues*. Advancing Animal Welfare Consortium, August 2018
*Scientific Research in Animal Well-being Essential to Advancing and Reacting to Industry and Consumer Needs*. Sustainable Agriculture Summit Meeting in Advancing Animal Welfare Breakout Session. Denver, CO, November 2018, **Invited Speaker**
*Communicating with Science to Counteract the Emotional Message.*  Session: Interacting with Animal Rights Groups; Illinois Livestock Preparedness Symposium, Illinois State University, Normal, IL, February 2019, **Invited Speaker**
*Animal Well-being and Health: Science in the Real World*" Current Issues and Advances in Food Animal Wellbeing Forum: 8th Annual Welfare Symposium, University of Arkansas, Russellville, AR, March 2019, **Invited Speaker**

## Applied Perspective

*Effects of Alternative Housing Systems on Sow well-being*. Illinois Pork Expo, Peoria, IL,   February 2010.
*Challenges in Animal Agriculture*, ACES Council Expert Forum, Urbana, IL April 2010.
*Distance Learning: The Challenges of Teaching Online Courses with other Universities*. University of Illinois, Brown Bag Series, Urbana, IL, March 2011.
*Contemporary Issues in Animal Well-being*. Smithfield Foods Production and Research Conference, Guymon, OK, June 2011.
*Animal Rights and Welfare: Are you informed*? Illinois Farm Bureau Commodities Conference, Bloomington, IL, July 2011.
*Managing Photoperiod in the Environment of Pigs*. Swine Webinar Series, University of Illinois Extension, September 2011.
*Ethics of Animal Care. Panel on Ethics of Animal Research vs. Ethics of Care*. National Center for Professional and Research Ethics, University of Illinois, Urbana, IL October 2012.
*Current Animal Care and Well-being Issues: Using Science of Sow Housing*. Illinois Agricultural Legislative Roundtable, Bloomington, IL January 2013.
*In Defense of Pork Producers: Seeing the Forest and Tress by Doing the Right Thing*. **Keynote Speaker:** Wisconsin Pork Producers Expo, Wisconsin Dells, WI January 2013.
*Update: Sow Housing is a Continuum of Welfare-Related Issues*. Full Board Annual Meeting of Illinois Pork Producers, Peoria, IL February 2013.
*Sow Housing is a continuum of welfare-related issues, but choices should be made based on animal care and well-being*. Illinois Farm Bureau EU Animal Care Study tour briefing, April 2013.
*Animal Welfare Issues on the Farm, Center for one health Illinois*: Of Pugs, Pigs and Pandas: Animal Welfare at home, farm lab, and zoo, College of Veterinary Medicine, Urbana, IL May 2013.
*Animal Care and Animal Welfare Obligations for Farm Animals*. Animal Care Panel for Farm-in-the-Zoo, Lincoln Park Zoo, Chicago, IL May 2013.
*Animal Welfare Issues on the Farm*. Center for one health Illinois: Of Pugs, Pigs and Pandas: Animal Welfare at home, farm lab, and zoo, Brookfield Zoo, Chicago, IL May 2013.
*Improving Animal Well-being for Swine*. Dekalb Feeds Summer Seminar, Utica, IL June 2013.
*Sow housing is a continuum of welfare-related issues: science must drive choice*. Stakeholders Tyson Foods Annual Meeting, Sioux, SD January 2014.
*Science behind animal welfare practices.* Costco National Headquarters Meeting, Seattle, WA, February 2014
*What does science say about housing of gestating sows?* SeaBoard Foods, Research and Production Meeting, Guymon, OK, March 2014
*Review of Research on Sow Housing: More dynamic space improves well-being*. SeaBoard Foods Annual Research Meeting, Kansas City, KS June 2014
*Sow Housing: Scientific Research Update on Stalls vs. Pens in Terms of Well-being*. Annual Scientific Conference Hanor/Triumph, Kansas City, MO, March 2016
*Improving Pig Well-being Using Science*, Oklahoma Pork Congress, Norman, OK,  June 2018.
*Animal Health and Well-being: Where do we go from here?* OSU Beef Industry Conference. Stillwater, OK, October 2018
*Animal Care and Well-being: Essential to Beef Industry*. Oklahoma Beef Board, Oklahoma City, OK, December 2018
*Cattle Welfare Top Priority for the Future:* Session: Cattlemen's Educational Series Session 3. 67th Oklahoma Cattlemen's Association, Norman, OK, July 2019
*Human-animal Relationships ONF of the Keys to Achieving High Welfare*. AWCAA National Meeting and Cattle Show. Shawnee, OK, September 2019
*Animal Welfare Must be At the Forefront*. Oklahoma State University Vet. Med. Fall Conference, Stillwater, OK, November 2019
*Animal Activism and Beef Producers*, Early Spring Roundup Program, OSU Extension, Ardmore, OK, January 2020

*The Ag Guide serves as a primary standard for animal scientists and AAALAC accreditation of Ag Research Programs.*
Contemporary and Emerging Issues:Public Policy, National ASAS Meetings, July, 2020

# California General Election

<div style="border:1px solid black">

**EXHIBIT B**

</div>

## Tuesday November 6, 2018

**Polls Are Open From 7:00 a.m. to 8:00 p.m. on Election Day!**

★ ★ ★ ★ ★ **OFFICIAL VOTER INFORMATION GUIDE** ★ ★ ★ ★ ★



**Certificate of Correctness**

I, Alex Padilla, Secretary of State of the State of California, do hereby certify that the measures included herein will be submitted to the electors of the State of California at the General Election to be held throughout the State on November 6, 2018, and that this guide has been correctly prepared in accordance with the law. Witness my hand and the Great Seal of the State in Sacramento, California, this 13th day of August, 2018.



**Alex Padilla, Secretary of State**

Case 3:21-cv-03018-CJW-MAR   Document 36-4   Filed 07/20/21   Page 1 of 11
3:21-cv-03018-CJW-MAR - Iowa Pork Producer Association et al v. Bonta et al
EXHIBIT 4

# TABLE OF CONTENTS

**QUICK-REFERENCE GUIDE** ................................................................................ **5**

## PROPOSITIONS

**1** Authorizes Bonds to Fund Specified Housing Assistance Programs. Legislative Statute. ..............................**12**

**2** Authorizes Bonds to Fund Existing Housing Program for Individuals with Mental Illness. Legislative Statute. ......**18**

**3** Authorizes Bonds to Fund Projects for Water Supply and Quality, Watershed, Fish, Wildlife, Water Conveyance, and Groundwater Sustainability and Storage. Initiative Statute. ..................................**22**

**4** Authorizes Bonds Funding Construction at Hospitals Providing Children's Health Care. Initiative Statute. .........**28**

**5** Changes Requirements for Certain Property Owners to Transfer Their Property Tax Base to Replacement Property. Initiative Constitutional Amendment and Statute. ................................................................**34**

**6** Eliminates Certain Road Repair and Transportation Funding. Requires Certain Fuel Taxes and Vehicle Fees Be Approved by the Electorate. Initiative Constitutional Amendment. ....................................................**40**

**7** Conforms California Daylight Saving Time to Federal Law. Allows Legislature to Change Daylight Saving Time Period. Legislative Statute. ..................................................................................................**44**

**8** Regulates Amounts Outpatient Kidney Dialysis Clinics Charge for Dialysis Treatment. Initiative Statute. ..........**48**

**9** On July 18, 2018, Proposition 9 was removed from the ballot by order of the California Supreme Court. .........**56**

**10** Expands Local Governments' Authority to Enact Rent Control on Residential Property. Initiative Statute. .........**58**

**11** Requires Private-Sector Emergency Ambulance Employees to Remain On-Call During Work Breaks. Eliminates Certain Employer Liability. Initiative Statute. .....................................................................**62**

**12** Establishes New Standards for Confinement of Specified Farm Animals; Bans Sale of Noncomplying Products. Initiative Statute. ...................................................................................................**68**

**OVERVIEW OF STATE BOND DEBT** ...................................................................... **72**

**CANDIDATE STATEMENTS** ................................................................................ **75**

**JUSTICES OF THE SUPREME COURT** .................................................................... **89**

## VOTER INFORMATION

Voter Bill of Rights............................................. 2
Letter from the Secretary of State........................ 4
Check Your Voter Status Online........................... 11
Election Day Information.................................... 11
Top Contributors to Statewide Candidates and Ballot Measures............................................. 11
Information About Candidate Statements............. 74
Elections in California...................................... 90
County Elections Offices.................................... 91

Voter Registration............................................. 92
Conditional Voter Registration............................ 92
Voter Registration Privacy Information.................. 92
Voter's Choice Act............................................ 93
Important Notice About the Text of Proposed Laws................................................ 94
Assistance for Voters with Disabilities.................. 94
State Election Results Website............................ 94
Dates to Remember.......................................... 95

## Visit the Secretary of State's Website to:

- Research campaign contributions and lobbying activity
  *cal-access.sos.ca.gov* OR *powersearch.sos.ca.gov*

- View this voter guide in other languages
  *www.voterguide.sos.ca.gov*

- Check your registration status and registration information *VoterStatus.sos.ca.gov*

- Find your polling place or a vote center on Election Day
  *www.sos.ca.gov/elections/polling-place* OR
  *VoterStatus.sos.ca.gov*

- Get vote-by-mail ballot information
  *www.sos.ca.gov/elections/voter-registration/vote-mail/*

- Read helpful information for first-time voters
  *www.sos.ca.gov/elections/voting-california*

Case 3:21-cv-03018-CJW-MAR   Document 36-4   Filed 07/20/21   Page 2 of 11   **3**
3:21-cv-03018-CJW-MAR - Iowa Pork Producer Association et al v. Bonta et al
EXHIBIT 4



# Secretary of State

Dear Fellow Californians,

There is no greater right than the right to vote. America's democracy thrives when every eligible voter participates. Through voting, you can select your local, state and national leaders and ensure that your voice is heard. The General Election is Tuesday, November 6. The election is fast approaching. I encourage you to participate in your most fundamental right as a citizen of the United States of America.

All of the information is presented here as a reference for you. This Voter Guide can help you make informed decisions. It includes impartial analysis, arguments in favor and against numerous ballot measures, declarations of the candidates, the Voter Bill of Rights and other important information. This guide is also available online on the California Secretary of State website: *www.VoterGuide.sos.ca.gov*.

You can check your voter registration status anytime by visiting *VoterStatus.sos.ca.gov*. You can download our VOTE CALIFORNIA app on your smartphone or tablet and access critical election information and lookup your nearest polling location. And, you can visit *PowerSearch.sos.ca.gov* if you would like to learn more about who is financing each of the candidates or propositions on the ballot.

If you have any questions about how to vote, or how to register to vote, you can contact the office of the Secretary of State by calling toll free 1-800-345-VOTE (8683). To obtain the contact information of your local county elections officials, visit the Secretary of State website at: *www.sos.ca.gov/county-elections-offices*.

Thank you for your commitment to the future of both our state and nation. The General Election is Tuesday, November 6. Your vote is important. Your vote is your voice. Be heard. VOTE!

# QUICK-REFERENCE GUIDE

---

**PROP 11**  REQUIRES PRIVATE-SECTOR EMERGENCY AMBULANCE EMPLOYEES TO REMAIN ON-CALL DURING WORK BREAKS. ELIMINATES CERTAIN EMPLOYER LIABILITY. INITIATIVE STATUTE.

**PROP 12**  ESTABLISHES NEW STANDARDS FOR CONFINEMENT OF SPECIFIED FARM ANIMALS; BANS SALE OF NONCOMPLYING PRODUCTS. INITIATIVE STATUTE.

---

## SUMMARY  *Put on the Ballot by Petition Signatures*

Law entitling hourly employees to breaks without being on-call would not apply to private-sector ambulance employees. Fiscal Impact: Likely fiscal benefit to local governments (in the form of lower costs and higher revenues), potentially in the tens of millions of dollars each year.

## SUMMARY  *Put on the Ballot by Petition Signatures*

Establishes minimum requirements for confining certain farm animals. Prohibits sales of meat and egg products from animals confined in noncomplying manner. Fiscal Impact: Potential decrease in state income tax revenues from farm businesses, likely not more than several million dollars annually. State costs up to $10 million annually to enforce the measure.

## WHAT YOUR VOTE MEANS

**YES** A YES vote on this measure means: Private ambulance companies could continue their current practice of having emergency medical technicians (EMTs) and paramedics stay on-duty during their meal and rest breaks in order to respond to 911 calls. Private ambulance companies would attempt to reschedule meal and rest breaks that are interrupted by a 911 call.

**NO** A NO vote on this measure means: Private ambulance companies would be subject to labor laws for this industry. Based on a recent court decision, these laws likely would require ambulance companies to provide EMTs and paramedics with off-duty meal and rest breaks that cannot be interrupted by a 911 call.

## WHAT YOUR VOTE MEANS

**YES** A YES vote on this measure means: There would be new minimum requirements on farmers to provide more space for egg-laying hens, breeding pigs, and calves raised for veal. California businesses would be banned from selling eggs or uncooked pork or veal that came from animals housed in ways that did not meet these requirements.

**NO** A NO vote on this measure means: Current minimum space requirements for confining egg-laying hens, pregnant pigs, and calves raised for veal would continue to apply. Current ban on businesses in California selling eggs not meeting these space requirements for hens would remain in effect.

## ARGUMENTS

**PRO** California faces disasters too often. Prop. 11 ensures EMTs and paramedics are paid to be reachable during breaks to save lives, gives them better disaster training that meets FEMA standards and mandatory mental health coverage. In an emergency, seconds are the difference between life and death. YES on 11! It's commonsense.

**CON** No argument against Proposition 11 was submitted.

## ARGUMENTS

**PRO** Confining a baby veal calf, mother pig, or egg-laying hen inside a tiny cage is cruel. Products from these suffering animals threaten food safety. YES on Prop. 12 endorsers: Nearly 500 California veterinarians, ASPCA, Humane Society of the United States, California family farmers and animal shelters, Center for Food Safety.

**CON** This outrageous sell-out to the egg industry betrays animals and voters. Californians already voted to ban cages by 2015. This cruel measure legalizes cages until at least 2022! And hens get just ONE SQUARE FOOT of space. Vote *NO* on farm animal cruelty by voting *NO* on Proposition 12. www.StopTheRottenEggInitiative.org

## FOR ADDITIONAL INFORMATION

**FOR**
Californians for Emergency Preparedness and Safety
2350 Kerner Boulevard, Suite 250
San Rafael, CA 94901
(916) 836-4301
info@YESon11.org
www.YESon11.org

**AGAINST**
No contact information was provided.

## FOR ADDITIONAL INFORMATION

**FOR**
Crystal Moreland
Prevent Cruelty California Coalition
119 North Fairfax Ave. #613
Los Angeles, CA 90036
(323) 937-0600
info@preventcrueltyca.com
preventcrueltyca.com

**AGAINST**
Bradley Miller
Californians Against Cruelty, Cages, and Fraud
P.O. Box 3577
San Rafael, CA 94912
(855) NO CAGES (662-2437)
INFO@NoOnProposition12.org
www.NoOnProposition12.org

---

Case 3:21-cv-03018-CJW-MAR   Document 36-4   Filed 07/20/21   Page 4 of 11
3:21-cv-03018-CJW-MAR - Iowa Pork Producer Association et al v. Bonta et al
EXHIBIT 4

PROPOSITION

# 12

## ESTABLISHES NEW STANDARDS FOR CONFINEMENT OF SPECIFIED FARM ANIMALS; BANS SALE OF NONCOMPLYING PRODUCTS. INITIATIVE STATUTE.

**OFFICIAL TITLE AND SUMMARY**

PREPARED BY THE ATTORNEY GENERAL

### The text of this measure can be found on the Secretary of State's website at *http://voterguide.sos.ca.gov.*

- Establishes new minimum space requirements for confining veal calves, breeding pigs, and egg-laying hens.
- Requires egg-laying hens be raised in cage-free environment after December 31, 2021.
- Prohibits certain commercial sales of specified meat and egg products derived from animals confined in noncomplying manner.
- Defines sales violations as unfair competition.
- Creates good faith defense for sellers relying upon written certification by suppliers that meat and egg products comply with new confinement standards.

- Requires State of California to issue implementing regulations.

## SUMMARY OF LEGISLATIVE ANALYST'S ESTIMATE OF NET STATE AND LOCAL GOVERNMENT FISCAL IMPACT:

- Potential decrease in state income tax revenues from farm businesses, likely not more than several million dollars annually.
- State costs up to $10 million annually to enforce the measure.

**ANALYSIS BY THE LEGISLATIVE ANALYST**

# BACKGROUND

***Agriculture Is a Major Industry in California.*** California farms produce more food—such as fruit, vegetables, nuts, meat, and eggs—than in any other state. Californians also buy food produced in other states, including most of the eggs and pork they eat. The California Department of Food and Agriculture (CDFA) is responsible for promoting California agriculture and overseeing animal health and food safety.

***State Law Bans Cruelty to Animals.*** For over a century, the state has had laws banning the mistreatment of animals, including farm animals. For example, anyone who keeps an animal in an enclosed area is required to provide it with an exercise area and give it access to shelter, food, and water. Depending on the specific violation of these requirements, a person could be found guilty of a misdemeanor or felony, either of which is punishable by a fine, imprisonment, or both.

***Farm Animal Practices Are Changing.*** There has been growing public interest in the treatment of farm animals. In particular, concerns have been expressed about keeping farm animals in cages and crates. Partly in response to these concerns, various animal farming associations have developed guidelines and best practices to improve the care and handling of farm animals. Also in response to these concerns, many major grocery stores, restaurants, and other companies have announced that they are moving towards requiring that their food suppliers give farm animals more space to move around (for example, by only purchasing eggs from farmers who use "cage-free" housing for hens).

***Proposition 2 (2008) Created Standards for Housing Certain Farm Animals.*** Proposition 2 generally prohibits California farmers from housing pregnant pigs, calves raised for veal, and egg-laying hens in cages or crates that do not allow them to turn around freely, lie down, stand up, and fully extend their limbs. Under Proposition 2, anyone who violates this law is guilty of a misdemeanor.

***State Law Banned the Sale of Eggs That Do Not Meet Housing Standards.*** A state law passed after Proposition 2 made it illegal for businesses in California to sell eggs that they knew came from hens housed in ways that do not meet Proposition 2's standards for egg-laying hens. This law applies to eggs from California or other states. Any person who violates this law is guilty of a misdemeanor. (The law does not cover *liquid* eggs, which are egg yolks and whites that have been removed from their shells and processed for sale.)

# PROPOSAL

***Creates New Standards for Housing Certain Farm Animals.*** This measure (Proposition 12) creates new minimum requirements on farmers to provide more space for egg-laying hens, breeding pigs, and calves raised for veal. These requirements, which apply to farm animals raised in California, would be phased in over the next several years. Figure 1 shows the specific requirements for each animal, when they would be phased in, and how they compare to current law.

Case 3:21-cv-03018-CJW-MAR   Document 36-4   Filed 07/20/21   Page 5 of 11
3:21-cv-03018-CJW-MAR - Iowa Pork Producer Association et al v. Bonta et al
EXHIBIT 4

ESTABLISHES NEW STANDARDS FOR CONFINEMENT
OF SPECIFIED FARM ANIMALS; BANS SALE OF
NONCOMPLYING PRODUCTS. INITIATIVE STATUTE.

PROPOSITION
**12**

---

**ANALYSIS BY THE LEGISLATIVE ANALYST**                                    CONTINUED

**Figure 1**

### Minimum Space Requirements Under Current Law and Proposition 12

*Square Footage Per Animal*

| Farm Animal | Current Law[a] | Proposition 12[a] | |
| --- | --- | --- | --- |
| | | Starting in 2020 | Starting in 2022 |
| Egg-laying hen | Must be able to turn around freely, lie down, stand up, and fully extend their limbs.[b] | 1 square foot of floor space | Cage-free housing[c] |
| Breeding pig | | — | 24 square feet of floor space |
| Calf raised for veal | | 43 square feet of floor space | Unchanged (43 square feet) |

[a] Current law and Proposition 12 both include some exceptions to minimum space requirements.

[b] State regulations generally require 0.8 square feet of floor space per egg-laying hen. There are no similar regulations for breeding pigs or calves raised for veal.

[c] Cage-free includes indoor housing systems that provide 1 to 1.5 square feet of floor space per hen and allow hens to move around inside a building.

**Bans the Sale of Products That Do Not Meet New Housing Standards.** The measure also makes it illegal for businesses in California to knowingly sell eggs (including liquid eggs) or uncooked pork or veal that came from animals housed in ways that do not meet the measure's requirements. This sales ban applies to products from animals raised in California or out-of-state. The sales ban generally does not apply to foods that have eggs, pork, or veal as an ingredient or topping (such as cookie dough and pizza). Violation of the housing requirements or sales ban would be a misdemeanor, and a violation of the sales ban could also be subject to a fine in civil court. This measure also requires CDFA and the California Department of Public Health to write regulations to implement its requirements.

# FISCAL EFFECTS

**Consumer Prices Likely to Increase.** This measure would likely result in an increase in prices for eggs, pork, and veal for two reasons. First, this measure would result in many farmers having to remodel or build new housing for animals—such as by installing cage-free housing for hens. In some cases, this housing also could be more expensive to run on an ongoing basis. Much of these increased costs are likely to be passed through to consumers who purchase the products.

Second, it could take several years for enough farmers in California and other states to change their housing systems to meet the measure's requirements. If in the future farmers cannot produce enough eggs, pork, and veal to meet the demand in California, these shortfalls would lead to an increase in prices until farmers can meet demand.

As discussed above, many companies have announced that they are moving towards requiring that their food suppliers give farm animals more space to move around (such as by buying only cage-free eggs). To the extent this happens, some of the price increases described above would have occurred anyway in future years.

***Small Reduction in State Government Revenues.*** Because this measure would increase costs for some California farmers who produce eggs, pork, and veal, some of them could choose to stop or reduce their production. To the extent this happens, there could be less state income tax revenues from these farm businesses in the future. The reduction statewide likely would not be more than several million dollars each year.

***State Oversight Costs.*** CDFA would have increased workload to enforce this measure. For example, the department would have to check that farmers in California and other states that sell to California use animal housing that meets the measure's requirements. CDFA would also make sure that products sold in California comply with the measure's requirements. The **cost of this additional workload could be up to $10 million annually.**

Visit *http://www.sos.ca.gov/campaign-lobbying/cal-access-resources/measure-contributions/2018-ballot-measure-contribution-totals/* for a list of committees primarily formed to support or oppose this measure. Visit *http://www.fppc. ca.gov/transparency/top-contributors/nov-18-gen.html* to access the committee's top 10 contributors.

If you desire a copy of the full text of the state measure, please call the Secretary of State at (800) 345-VOTE (8683) or you can email *vigfeedback@sos.ca.gov* and a copy will be mailed at no cost to you.

3:21-cv-03018-CJW-MAR - Iowa Pork Producer Association et al v. Bonta et al
EXHIBIT 4

## ★ ARGUMENT IN FAVOR OF PROPOSITION 12 ★

YES ON PROP. 12—STOP ANIMAL CRUELTY

The *Humane Society of the United States, ASPCA,* and nearly *500 California veterinarians* endorse Prop. 12.

Voting YES prevents baby veal calves, mother pigs, and egg-laying hens from being crammed inside tiny cages for their entire lives. It will eliminate inhumane and unsafe products from these abused animals from the California marketplace. Voting YES reduces the risk of people being sickened by food poisoning and factory farm pollution, and helps family farmers.

VOTE YES ON PROP. 12 TO:

PREVENT CRUELTY TO ANIMALS. It's cruel to confine a baby calf in a tiny cage. Taken away from his mother shortly after birth, he's confined in that abusive way until he's sent to slaughter—at just four months old.

A mother pig shouldn't be locked in a tiny, metal cage where she can barely move. She's trapped, forced to live in this small amount of space for *nearly four years*.

It's wrong to cram a hen tightly in an overcrowded, wire cage for her entire life. She's forced to eat, sleep, defecate, and lay eggs in the same small space every single day.

PROTECT OUR FAMILIES FROM FOOD POISONING AND FACTORY FARM POLLUTION. In the past decade, there have been recalls of nearly a billion eggs from caged chickens because they carried deadly *Salmonella*. Scientific studies repeatedly find that packing animals in tiny, filthy cages increases the risk of food poisoning. Even *Poultry World*, a leading egg industry publication admitted, *"Salmonella thrives in caged housing."*

That's why the *Center for Food Safety* and *National Consumers League* both endorse YES on Prop. 12.

*The American Public Health Association* called for a moratorium on new animal confinement operations because they pollute the air and ground water, and diminish the quality of life for nearby homeowners.

HELP FAMILY FARMERS AND GROW THE CALIFORNIA ECONOMY. Mega-factory farms that cage animals cut corners and drive family farmers out of business. By voting YES on Prop. 12 we can create sensible standards that keep family farmers in business—and allow them to grow. Since cage-free farms employ more workers, this measure would create *more jobs* for hardworking farming families.

That's why *California family farmers* and the *United Farm Workers* endorse Prop. 12.

A COMMON-SENSE REFORM

- Prop. 12 strengthens a decade-old animal cruelty law and provides ample phase-in time for producers to shift to cage-free practices.
- Over 200 major food companies like *Walmart, McDonald's, Taco Bell, Burger King, Safeway,* and *Dollar Tree* have committed to using cage-free products.
- A dozen states have passed laws addressing the cruel caging of farm animals.
- The YES vote is endorsed by *Catholic, Presbyterian, Episcopal, Methodist, Jewish, Evangelical,* and *Unitarian* faith leaders, and *local animal shelters across California*.

We wouldn't force our dog or cat to live in a filthy, tiny cage for her whole life; we shouldn't allow any animal to endure such suffering either. All animals, including farm animals, deserve protection from cruelty and abuse.

*www.YesOn12CA.com*

**CRYSTAL MORELAND,** California State Director
The Humane Society of the United States

**DR. JAMES REYNOLDS, DVM, MPVM, DACAW,** Professor of Large Animal Medicine and Welfare
Western University College of Veterinary Medicine

**ANDREW DECORIOLIS,** Director of Strategic Programs and Engagement
Farm Forward

## ★ REBUTTAL TO ARGUMENT IN FAVOR OF PROPOSITION 12 ★

*Proposition 12 is a cruel betrayal of animals and voters.*

The argument for Proposition 12 consists entirely of platitudes, and it avoids any mention of United Egg Producers, the *acceptance* of CAGES through at least *2022*, allowing just *ONE SQUARE FOOT* of space per hen, or any other specifics about what the initiative actually *does*.

In other words, the scandal-ridden Humane Society of the United States is back to its old tricks.

The same group that said California hens would be cage free by *2015*, that Michael Vick would be a "good pet owner," that embraces SeaWorld, and lost millions of dollars in a Racketeer Influenced and Corrupt Organizations Act lawsuit, is back.

HSUS is *again* promising to ban egg-industry cages—even though it famously spent the last decade claiming that it *already did!*

Meanwhile, they're attacking whistleblowers.

*"We know when a charity fails the most basic obligations of trust. Instead of attacking women who've suffered abuse, HSUS should change its own culture."*—National Organization of Women

When women mobilized against the toxic culture at HSUS, it stemmed from multiple allegations of sexual harassment and misconduct against Proposition 12's chief architect, now former CEO, Wayne Pacelle. HSUS's first response was to question the *women's* integrity.

That tactic is now being used against conscientious animal advocates opposed to Proposition 12.

The inescapable reality is this: If not for HSUS's negligence, California hens would be cage-free *at this very moment*. Let's not fall for the same trick—twice.

*www.StopTheRottenEggInitiative.org*

**MARK EMERSON,** Advisory Board Member
Californians Against Cruelty, Cages, and Fraud

**ERIC MILLS,** Coordinator
Action for Animals

**PETER T. BROWN,** Advisory Board Member
Friends of Animals

ESTABLISHES NEW STANDARDS FOR CONFINEMENT
OF SPECIFIED FARM ANIMALS; BANS SALE OF
NONCOMPLYING PRODUCTS. INITIATIVE STATUTE.

**PROPOSITION**

# 12

## ★ ARGUMENT AGAINST PROPOSITION 12 ★

*Vote NO: Prevent Cruelty, Cages, and Fraud.*

The DC-based Humane Society of the United States (HSUS) is once again buying its way onto California's ballot, deceiving voters, flip-flopping on the issue of cages, and perpetuating the suffering of *millions* of egg-laying hens.

Falsely promoted as a "cage-free" measure, Proposition 12, in fact, explicitly *legalizes* the continued use of egg-factory cages for years to come.

Proposition 12 is the result of a public relations alliance between HSUS and the egg industry's national trade association, United Egg Producers.

At taxpayer expense, they are misusing California's initiative process in order to replace our current hen-housing law with the guidelines of United Egg Producers.

*Proposition 12 legalizes the cruel cages Californians overwhelmingly voted to prohibit ten years ago.*

California's current law (Prop. 2) states that egg-laying hens be given enough room to:

*". . . fully spread both wings without touching the side of an enclosure or other egg-laying hens."*

Proposition 12 would *repeal* that voter-enacted law in order to allow egg factories to provide each hen with just *ONE SQUARE FOOT* of cage or floor space.

*Proposition 12 is a cruel betrayal of farm animals and of California voters.*

Due to the negligent drafting of 2008's Prop. 2, millions of egg-laying hens *still* suffer in egg-factory cages throughout California.

Nevertheless, the egg-buying public has been told repeatedly that Prop. 2 successfully "banned" those cages. For an entire decade that has been HSUS's most cherished promotional claim.

Now, without so much as a passing mention that *California was supposed to be cage free by 2015*—proponents are back with yet another set of false promises.

Only this time they say Californians will have to wait for the year *2022!* And even that date is tentative. Proposition 12 was expressly written to allow the Legislature to make changes at any time *without* the consent of voters.

*Proposition 12 does nothing to help pigs or calves.*

For misdirection, the very same people who botched Prop. 2, and who promised that California would be "cage-free" by 2015, are now claiming that Proposition 12 will regulate the practices of *out-of-state* pork and veal producers. No one should fall for that ploy.

Even in the unlikely event that Proposition 12's constitutionally flawed provisions survive the inevitable years of legal challenges (the defense of which comes at *taxpayer* expense), Congress is already advancing legislation to render all such interstate regulations null and void.

And while claiming to regulate *other* states, Proposition 12 *allows* the cruel confinement of dairy calves right here in California!

Proposition 12 is a reckless exploitation of California's initiative process which not only harms farm animals, but it also puts in grave danger a wide array of existing consumer, animal, and environmental protection laws.

This rotten egg initiative should be decisively rejected.

Find out why People for the Ethical Treatment of Animals; Friends of Animals; the Humane Farming Association; Californians Against Cruelty, Cages, and Fraud; and many others all OPPOSE Proposition 12.

Please visit: *www.NoOnProposition12.org*

**BRADLEY MILLER,** President
Humane Farming Association (HFA)

**PETER T. BROWN,** Advisory Board Member
Friends of Animals (FoA)

**LOWELL FINLEY,** Treasurer
Californians Against Cruelty, Cages, and Fraud

## ★ REBUTTAL TO ARGUMENT AGAINST PROPOSITION 12 ★

YES on Prop. 12 stops the cruel and inhumane treatment of farm animals. That's why the most trusted voices on animal cruelty, sustainable farming, and food safety endorse YES on Prop. 12: nearly 500 California veterinarians, California family farmers, California animal shelters, ASPCA, Humane Society of the United States, Center for Food Safety, United Farm Workers, and National Consumers League.

The fringe group opposing Prop. 12—the so-called "Humane Farming Association"—has a history of joining polluting factory farms in opposing animal cruelty laws and has been supported by animal fighters, with one underground publication boasting that HFA's attack on animal protection charities "helps the cockfighters!"

The facts: A decade ago, Californians overwhelmingly passed a law giving farm animals more space. It led many egg and pork producers to phase-out cages, and McDonald's, Safeway, Burger King, and hundreds of other companies to start switching to cage-free products.

But some factory farms—including those opposing Prop. 12—have found ways around the law and still confine animals in cages. *That's exactly why Prop. 12 is needed.*

Prop. 12 *strengthens* cruelty laws by providing improved protections, including better living conditions, minimum space requirements, and cage-free housing, with a phase-in timetable that safeguards family farmers.

As the ballot language clearly shows, Prop. 12 prevents the extreme confinement of egg-laying hens, *and* veal calves, and pigs. *These animals deserve protection from abuse.*

YES for humane treatment of farm animals. YES for food safety. YES for family farmers. YES for mercy and common sense.

*www.YesOn12CA.com*

**DR. BARBARA HODGES, DVM, MBA,** Veterinary Adviser
Humane Society Veterinary Medical Association

**JEFF PETERSON,** General Manager
Central Valley Eggs

**BROOKE HAGGERTY,** Executive Director
Animal Protection and Rescue League

Case 3:21-cv-03018-CJW-MAR - Iowa Pork Producer Association et al v. Bonta et al
3:21-cv-03018-CJW-MAR
EXHIBIT 4



**The text of proposed laws is *not* printed in this guide.**

**However, the text is now available online at *http://voterguide.sos.ca.gov*.**

**If you would like a printed copy of the text:**

 **Email the Secretary of State at *vigfeedback@sos.ca.gov***

 **Contact the Secretary of State's toll-free voter hotline at (800) 345-VOTE (8683).**

# Assistance for Voters with Disabilities

## Check your county Voter Information Guide

Your county Voter Information Guide will:



- Describe how persons with disabilities can vote privately and independently
- Display a wheelchair symbol if your polling place is accessible to voters with disabilities

## Audio and large print Voter Information Guides

These guides are available at no cost in English, Chinese, Hindi, Japanese, Khmer, Korean, Spanish, Tagalog, Thai, and Vietnamese. To order:

 Call the Secretary of State's toll-free voter hotline at (800) 345-VOTE (8683)

 Download an audio MP3 version at *http://voterguide.sos.ca.gov/en/audio*

 Visit *http://voterguide.sos.ca.gov*

# State Election Results Website

Want to see the November 6, 2018, General Election results after the polls close at 8:00 p.m.? Visit the California Secretary of State's Election Results website at ***https://vote.sos.ca.gov/***.

The Election Results website is updated every five minutes on Election Night as counties report results to the Secretary of State. County elections officials send semi-official election results to the Secretary of State's website after the polls close at 8:00 p.m. and continue to send updates at least every two hours until all Election Day ballots are counted.

Beginning on November 8 through December 6, 2018, the Election Results website will update every day by 5:00 p.m. as counties count the remaining ballots.

The official results of the election will be posted by December 14, 2018, at *www.sos.ca.gov/elections/*

3:21-cv-03018-CJW-MAR - Iowa Pork Producer Association et al v. Bonta et al
EXHIBIT 4

# DATES TO REMEMBER!





## REMEMBER TO VOTE!

Polls are open from 7:00 a.m. to 8:00 p.m. on Election Day!

### OCTOBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   | 1 | 2 | 3 | 4 | 5 | 6 |
| 7 | (8) | 9 | 10 | 11 | 12 | 13 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 |
| 21 | (22) | 23 | 24 | 25 | 26 | 27 |
| 28 | 29 | (30) | 31 |   |   |   |

**October 8, 2018**
First day to vote-by-mail.

**October 22, 2018**
Last day to register to vote. You can "Conditionally" register and vote at your county elections office after the 15-day voter registration deadline.

**October 30, 2018**
Last day that county elections officials will accept any voter's application for a vote-by-mail ballot.

### NOVEMBER

| S | M | T | W | T | F | S |
|---|---|---|---|---|---|---|
|   |   |   |   | 1 | 2 | 3 |
| 4 | 5 | (6) | 7 | 8 | 9 | 10 |
| 11 | 12 | 13 | 14 | 15 | 16 | 17 |
| 18 | 19 | 20 | 21 | 22 | 23 | 24 |
| 25 | 26 | 27 | 28 | 29 | 30 |   |

**November 6, 2018**
**Election Day!**

3:21-cv-03018-CJW-MAR - Iowa Pork Producer Association et al v. Bonta et al
EXHIBIT 4

**California Secretary of State**
**Elections Division**
1500 11th Street
Sacramento, CA 95814

NONPROFIT
U.S. POSTAGE
PAID
CALIFORNIA
SECRETARY
OF STATE



OFFICIAL
ELECTION MAIL
*Authorized by the U.S. Postal Service*
®



CALIFORNIA

# GENERAL ELECTION

Check your voter registration status online at *voterstatus.sos.ca.gov*

**OFFICIAL VOTER INFORMATION GUIDE**

**Tuesday, November 6, 2018**
Remember to Vote!
Polls are open from 7:00 a.m. to 8:00 p.m.

**October 8**
First day to vote-by-mail.

★

**October 22***
Last day to register to vote.

**October 30**
Last day that county elections officials will
accept any voter's application for a vote-by-mail ballot.

**For additional copies of the Voter Information Guide
in any of the following languages, please call:**

**English:** (800) 345-VOTE (8683)
**TTY/TDD:** (800) 833-8683
**Español/Spanish:** (800) 232-VOTA (8682)
中文**/Chinese:** (800) 339-2857
हिन्दी**/Hindi:** (888) 345-2692
日本語**/Japanese:** (800) 339-2865
ខ្មែរ**/Khmer:** (888) 345-4917
한국어**/Korean:** (866) 575-1558
**Tagalog:** (800) 339-2957
ภาษาไทย**/Thai:** (855) 345-3933
Việt ngữ**/Vietnamese:** (800) 339-8163



**Text *Vote* to GOVOTE (468683)** to find the location of your polling place.

* You can still "conditionally" register and vote at your county elections office after the 15-day voter registration deadline.

In an effort to reduce election costs, the State Legislature has authorized the State and
counties to mail only one guide to each voting household. You may obtain additional copies
by contacting your county elections official or by calling (800) 345-VOTE.

OSP 18 145802  

Case 3:21-cv-03018-CJW-MAR   Document 36-4   Filed 07/20/21   Page 11 of 11
3:21-cv-03018-CJW-MAR - Iowa Pork Producer Association et al v. Bonta et al
EXHIBIT 4

# EXHIBIT F

1  TRENTON H. NORRIS (SBN 164781)
   PEG CAREW TOLEDO (SBN 181227)
2  WILLIS M. WAGNER (SBN 310900)
   Arnold & Porter Kaye Scholer LLP
3  Three Embarcadero Center, 10th Floor
   San Francisco, California 94111
4  Telephone: +1 415.471.3100
   Facsimile: +1 415.471.3400
5  E-mail: Trent.Norris@arnoldporter.com
           Peg.Toledo@arnoldporter.com
6          Will.Wagner@arnoldporter.com

7  ELDON MCAFEE (*pro hac vice pending*)        MARNIE A. JENSEN (*pro hac vice pending*)
   JULIE VYSKOCIL(*pro hac vice pending*)       RYANN A. GLENN (*pro hac vice pending*)
8  BRICK GENTRY, P.C.                           Husch Blackwell LLP
   6701 Westown Parkway, Suite 100              13330 California Street, Suite 200
9  West Des Moines, Iowa 50266                  Omaha, Nebraska 68154
   Telephone: 515.271.5916                      Telephone: 402.964.5000
10 Facsimile: 515.274.1488                      Facsimile: 402.964.5050
   E-mail: eldon.mcafee@brickgentrylaw.com      E-mail: marnie.jensen@huschblackwell.com
11         julie.vyskocil@brickgentrylaw.com            ryann.glenn@huschblackwell.com

12
   Attorneys for Plaintiff
13 IOWA PORK PRODUCERS ASSOCIATION

14            **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                       **COUNTY OF FRESNO**

16
   IOWA PORK PRODUCERS                 Case No. 21CECG03339
17 ASSOCIATION,
                                       **DECLARATION OF DR. GLYNN T.**
18         Plaintiff,                  **TONSOR, Ph.D., IN SUPPORT OF**
                                       **PLAINTIFF'S MOTION FOR**
19                                     **PRELIMINARY INJUNCTION AND**
                                       **REQUEST FOR EXPEDITED RELIEF AND**
20         v.                          **HEARING**

21
   ROB BONTA, in his official capacity as
22 Attorney General of California, KAREN
   ROSS, in her official capacity as Secretary   **DATE:   May 18, 2022**
23 of the California Department of Food and       **TIME:   3:30 p.m.**
   Agriculture, and TOMAS ARAGON, in his         **DEPT.:  502**
24 official capacity as Director of the           **JUDGE:  Rosemary T. McGuire**
   California Department of Public Health,
25                                                Complaint Filed:  November 9, 2021
           Defendants.
26

27

28

E-FILED
11/12/2021 11:49 PM
Superior Court of California
County of Fresno
By: Louana Peterson, Deputy

DECLARATION OF DR. GLYNN T. TONSOR, PH.D.

I, Dr. Glynn T. Tonsor, hereby state and declare as follows:

1.     I am over the age of majority and am competent to make this Declaration.  I have personal knowledge of the facts set forth in this Declaration.  If called as a witness, I could and would competently testify to the same.

2.     I am a Professor in the Department of Agricultural Economics at Kansas State University. I received a Ph.D. in Agricultural Economics from Kansas State University in 2006 and have been a faculty member at both Michigan State University and Kansas State University.  A true and correct copy of my curriculum vitae and brief biography are further described in the attached Exhibit "A" to this Declaration.[1]

3.     This Declaration is submitted in support of Plaintiffs' Motion for Preliminary Injunction.  The statements made in this Declaration are true and accurate statements. The basis for the opinions offered here is my specialized education, training, knowledge and skill in the area of agriculture economics. All of the opinions expressed here are opinions I hold to a reasonable degree of scientific certainty.

**Proposition 12 Sow Housing Regulations Create a Direct Effect Between California Pork Pricing and Pork Pricing Throughout the Remainder of the United States**

4.     Regionally separated U.S. hog and pork markets are directly linked.  When something changes in one regional market, there are clear and economically significant implications not just in that market but also in other markets throughout the country.  In lay terms, this connection reflects both supply and demand considerations that effectively connect prices of hogs and pork products across markets.

5.     To provide evidence supporting this statement of regional markets being connected first consider the prevalent topic of current pork prices.  Narrowly, there is elevated societal interest in meat prices as U.S. consumers are already, before implementation of Proposition 12 in California, paying more for pork.[2] What is most relevant here is documenting regional patterns in bacon prices. Exhibit 1 presents monthly retail bacon prices (sliced, $/lb, not seasonally adjusted)

---

[1] https://www.agmanager.info/contributors/tonsor
[2] https://www.cnn.com/2021/09/29/economy/bacon-prices-skyrocketing-pork/index.html

2

DECLARATION OF DR. GLYNN T. TONSOR, PH.D.

as reported since 1980 by the Bureau of Labor Statistics (BLS) for four different regions.[3]

## Exhibit 1. Historical Retail Bacon Prices, by U.S. Region



6.      A simple visual assessment reveals bacon prices in these four separate regional markets follow very similar patterns.  Note California represents the largest and most economically significant state within the Western region.  Further, note over the January 1980 - July 2021 period the Northeast, Midwest, and South region's bacon prices have <u>very</u> strong correlation with the West region (+95.5%, +95.7%, and +94.8%, respectively).  This simple yet powerful example using publicly available bacon prices documents the inherent connection of regional markets across the country.[4]

7.      Contemporary observations from supply chain discussions are also relevant here to drive home jargon-free lessons.  Note society-wide interest currently in the ability of ports in California to effectively load and unload goods from ships underlying trade between the U.S. and multiple Asian countries.[5]  This societal interest reflects the fact that what occurs in the ports of Los Angeles, Long Beach, etc. have direct and economically significant impacts throughout our

---

[3] These four regions reflect U.S. Census allocations: Northeast (CT, ME, MA, NH, RI, VT, NJ, NY, PA), South (DE, DC, FL, GA, MD, NC, SC, VA, WV, AL, KY, MS, TN, AR, LA, OK, TX), Midwest (IL, IN, MI, OH, WI, IA, KS, MN, MO, NE, ND, SD), and West (CA, AZ, CO, ID, MT, NV, NM, UT, WY, AK, HI, OR, WA).

[4] It is my opinion similar connections hold in other pork categories beyond bacon; however, the ability to document this is limited by available region-specific historical price data.

[5] https://www.cnn.com/2021/10/25/business/supply-chain-ports-inflation/index.html

DECLARATION OF DR. GLYNN T. TONSOR, PH.D.

1    country as these ports represent substantial and critical components of supply chains for many

2    industries.  Similarly, anything that impacts a key component of the U.S. hog and pork industry's

3    supply chain impacts markets throughout the country.  In this application, impacts stem nationally

4    from California's Proposition 12 on hog production in Iowa as the country's largest pork producing

5    state.  *Stated bluntly – it is my opinion that elevated production costs in Iowa stemming from*

6    *Proposition 12 confinement restrictions will have impact throughout the country's hog and pork*

7    *markets, not just in California and Iowa.*

8          8.      Further, it also is instructive to consider available peer-review literature.  First,

9    consider the work of Franken, Parcell, and Tonsor (2011)[6].  In an examination of regionally

10    separated hog (barrow and gilt) markets, hog markets are integrated.  That is, there is clear statistical

11    evidence that regional hog markets are inherently connected with price movement in one market

12    being directly related to price movement in other markets.  This finding is not surprising given the

13    above noted supply and demand connections prevalent in many U.S. industries, including the U.S.

14    hog industry.  In fact, these inherent connections apply in many other industries, including the U.S.

15    egg industry where the literature also offers lessons from past regulatory changes occurring in one

16    region.  Specifically, there are several studies that have examined the impact of California

17    restricting egg production methods through Proposition 2 implementation and enforcement.  Across

18    the available literature, ex post assessments quantify significant economic damage to California

19    consumers.  What is perhaps most germane here is sophisticated economic research methods that

20    directly leverage relationships between multiple regional markets.[7] Specifically, the prevalent use

21    of "difference-in-difference" modeling is based upon the dominant professional view that

22    commodity markets in regionally distinct markets are connected as researchers leverage differences

23    in relative market relationships before and after an event to identify economic impacts of an event

24    (such as California's restriction on egg production methods in the case of Mullally and Lusk, 2017).

25          9.      *As a summary point, it is my opinion based upon my education, experience and*

26    *research, that production restrictions involving the California pork market have clear, direct*

27

28

---

[6] https://www.cambridge.org/core/journals/journal-of-agricultural-and-applied-economics/article/abs/impact-of-mandatory-price-reporting-on-hog-market-integration/E15342512AFFBA856463CDAB3D79B1D0

[7] https://onlinelibrary.wiley.com/doi/full/10.1093/ajae.aax049

1    *economic implications for both producers and consumers in other U.S. markets outside of*
2    *California.*

3           10.    The remainder of this Declaration contains two separate analyses on economic
4    impacts following the possible implementation of Proposition 12 in California. Each of these
5    analyses build upon the Standardized Regulatory Impact Assessment of Proposed Regulations to
6    Implement Proposition 12 (SRIA hereafter) document submitted on July 2, 2020 to the California
7    Department of Food and Agriculture.[8]  The first assessment is of cost impacts faced by Iowa pork
8    producers.  The second assessment is of consumer impacts.

9           ***Cost Impacts on Iowa Producers***

10          11.    Based upon my experience, education and training, implementation of Proposition
11   12 would result in higher costs of production in the U.S. pork industry as a whole nationwide.  The
12   SRIA (2020) includes estimates on annual production cost impacts for farrowing operations who
13   convert production systems.[9] Attached hereto and incorporated by reference herein is a true and
14   correct copy of the SRIA (2020) as Exhibit "B" to this Declaration. One-time conversion costs
15   including added facility and employee training costs are estimated and, in my opinion, conservative
16   based upon July 2020 cost inputs that have increased by virtue of inflation and supply shortages.
17   Further, variable cost impacts from higher feed, labor, and other input costs are conservatively
18   estimated within the SRIA.  As reported within the SRIA (2020), producers who face increased
19   breeding sow mortality and reduced breeding efficiency will inevitably also face rising costs.  When
20   components of capital costs of production, increase in feed cost and increase of other costs such as
21   labor and health care are taken together, the SRIA (2020) reported estimated costs would increase
22   by 15% (with a range of 12-18% noted) for farrowing operations who convert production systems.
23   Ultimately increases in total costs of 4% for capital costs (stated as a 20% increase in facility costs),
24   6% for feed costs, and 5% for other costs (labor, sow health, etc.).  Combined the SRIA (2020)
25   estimates costs would increase by 15% (with a range of 12-18% noted) for farrowing operations

26   ─────────────────────
[8]
27   https://dof.ca.gov/Forecasting/Economics/Major_Regulations/Major_Regulations_Table/documents/CDFA_Propositi
on_12_SRIA.pdf
[9] The SRIA (2020) document notes (see page 13) it is focused on economic impacts inside of California and does not
28   estimate impacts outside of California.

DECLARATION OF DR. GLYNN T. TONSOR, PH.D.

who convert production systems.

12.     It should be clarified, largely due to the SRIA (2020) being focused on impacts within California, that these cost estimates correspond with a shift from about 20 square feet of floor space to the 24 square feet included in Proposition 12.  This is important as it is generally believed most operations outside of California would currently have about 14-16 square feet of floor space – hence the move to 24 square feet represents a more substantial adjustment. (Declaration of Dr. Janeen Salak-Johnson, ¶ 19). The SRIA (2020) document arrives at a 4% increase in total costs from capital cost increases involved with operations moving from 20 to 24 square feet of floor space.

13.     Here for Iowa we presume capital costs increase not by 20% as in the SRIA (2020) case for California, but by 50% reflecting the shift from 16 to 24 square feet.  This results in a 10% total cost increase from facility expense increases.  Conservatively presuming changes in feed costs, labor costs, herd health, and other expenses besides capital costs are similar to California, it is reasonable in my opinion to conclude that costs would increase by 21% for farrowing operations in Iowa who convert production systems.

14.     To avoid this increased cost, many producers may opt to construct entirely new facilities in order to maintain their existing herd size. While this simply may not be an option for producers who do not have the capital or the land to construct a new farrowing facility, the cost of manufacturing a farrowing confinement operation is significant. In general, farrowing units tend to be the most expensive confinement space within a sow production facility. This cost can increase substantially depending on the configuration needed and if an on-site gilt development unit (GDU) is included, for example. The extra square footage required by Proposition 12 within a gestation barn (16 to 24 square feet) will require at least 50% more space. These issues, coupled with construction costs currently estimated at 20% higher in 2021 than in 2020 for confinement operations due to the increase in materials, will make construction of new infrastructure unfeasible for many Iowa producers.

15.     Estimated Livestock Returns published monthly by Iowa State University indicate the total costs of farrow-to-wean operation in Iowa averaged $33.59 per weaned pig in 2020.[10] Combined with the Iowa increased percentage of costs per weaned pig, these two estimates indicate the costs of producing weaned pigs in Iowa that would be compliant with Proposition 12 would increase by at least $7.05/weaned pig.  Some economic trends for weaned pig operations in Iowa for 2016-2020 are shown in Figure 1. The Iowa State University estimates indicate farrow-to-wean operations in Iowa averaged a loss of $2.50 per weaned pig in 2020.  Given profitability varies over time for a multitude of reasons, it is further worth noting over the 2016-2020 period costs averaged $33.13/weaned pig and profit averaged $5.39/weaned pig.

**Figure 1. Historical Weaned Pig Total Costs and Profit (Loss), Jan. 2016 – Dec. 2020.**



---

[10] http://www2.econ.iastate.edu/estimated-returns/

7

DECLARATION OF DR. GLYNN T. TONSOR, PH.D.

16.     A take-home point here is the $7.05/weaned pig cost increase from Proposition 12 represents a very substantial economic impact relative to typical profitability margins for weaned pig producers. In short, Proposition 12 will shred any chance at profitability that an Iowa producer has based upon the average profitability margins. A reasonable conclusion is that many Iowa producers will choose to exit the market all together due to a lack of profit or potential losses faced year over year.

17.     To gain insights on aggregate economic impacts, note USDA estimates there were 940,000 breeding hogs (sows and gilts) in Iowa as of March 1, 2021.[11] A productivity analysis commissioned by the National Pork Board estimates for 2017-2019, 26.61 pigs were weaned per breeding female per year.[12] Combined these two estimates indicate a total annual production of 25 million weaned pigs in Iowa.

18.     Considering a per/pig cost increase of $7.05 and the aggregate number of weaned pigs being 25 million results in an annual aggregate cost impact of $176.46 million.  This estimate reflects the annual aggregate costs to weaned-pig selling operations if all weaned-pig producing operations in Iowa made adjustments to become compliant with Proposition 12 in California.

19.     Operations who produce weaned-pigs typically sell them to other operations who proceed to feed them and later sell at heavier weights as market hogs.  To gather impacts on this wean-to-finish segment of the industry we again can use Estimated Livestock Returns published monthly by Iowa State University.  These estimates indicate the total costs of wean-to-finish operations in Iowa averaged $137.21 per market hog in 2020 with 24% of these costs being from the purchase of weaned pigs.  This Iowa State University series also indicates the average market hog was sold in 2020 at a loss of $13.12/head.  This provides important context on the significant impact of Proposition 12 on wean-to-finish operators – purchase of more expensive weaned pigs, produced at an elevated cost of $7.05/pig per above, expands costs for the wean-to-finish sector which operated at an estimated loss in 2020.

20.     It is further important to appreciate these cost estimates build from a July 2, 2020

---

[11] https://downloads.usda.library.cornell.edu/usda-esmis/files/rj430453j/7p88db205/mw22w1890/hgpg0321.pdf
[12] https://library.pork.org/media/?mediaId=4D0CDE8D-9898-44F4-A2FB321F87DE331D

DECLARATION OF DR. GLYNN T. TONSOR, PH.D.

dated report that leveraged industry surveys and interviews completed before then.  Given the unprecedented price increase in lumber, steel, and many other commodity prices since this report was composed, the costs of adjusting physical infrastructure have increased significantly.[13],[14]  Meanwhile, feed grain prices have also increase substantially and hence those ongoing variable cost impacts have also increased.[15]  The take-home point is the cost impacts presented here for weaned-pig producing operations in Iowa who make adjustments to become compliant with Proposition 12 in California are conservative.

21.     Moreover, the above estimates reflect average cost impacts if all weaned-pig producing operations in Iowa made adjustments to become compliant with Proposition 12 in California.  The diversity across weaned-pig operations in terms of operation size, building age, etc. would correspond with varied cost impacts from calls to adjust in response to Proposition 12 in California.  On balance, we would expect smaller operations, who operate with fewer cost efficiencies than larger operations, to face higher adjustment costs and be more likely to exit the industry accordingly.[16]

22.     Finally, it is important to note the above assessment builds from the SRIA (2020) report reviewing California impact only and this analysis is specific only to weaned-pig and market hog producers in Iowa.  There are multiple other segments of the hog industry (e.g. genetic seedstock operators) that would also be adversely impacted as well as several other affiliated industries (e.g. crop producers, farm input and machinery companies, etc.).

23.     Overall, the cost to Iowa pork producers to comply with Proposition 12 will be substantial. California has not taken into consideration the current common industry practice of utilizing gestation stalls averaging 16 square feet per breeding sow. Further, it has not considered the fact the majority of these operations utilizing gestation stalls house the sows in this manner the vast majority of time throughout the gestation cycle. The transition to group housing of 24 square

---

[13] https://www.cnbc.com/2021/04/30/soaring-lumber-prices-add-36000-to-the-cost-of-a-new-home.html
[14] https://tradingeconomics.com/commodity/steel
[15] https://www.macrotrends.net/2532/corn-prices-historical-chart-data
[16] A related overview of the U.S. hog industry and its evolution over time is provided by the United States Department of Agriculture: https://downloads.usda.library.cornell.edu/usda-esmis/files/rr171x21v/cz30pw658/js956j577/hogview-10-29-2015.pdf

DECLARATION OF DR. GLYNN T. TONSOR, PH.D.

1  feet per breeding sow from the current practice is economically cost prohibitive due to the

2  conversion capital costs, feed costs, labor costs and reduction in herd size that is natural either

3  through increased mortality or voluntary culling to keep existing infrastructure. Accordingly, I have

4  concluded that an already slim profitability margin will be non-existent if Proposition 12 is

5  implemented and forced upon out-of-state producers.

6       *Impacts on Consumers*

7       24.    In my opinion, the implementation and enforcement of Proposition 12 would result

8  in higher pork prices for consumers and less pork being available for purchase.  The SRIA (2020)

9  estimates covered whole pork retail prices would increase in California by 7.4% in 2022 and 7.5%

10  in 2023 as a direct result of Proposition 12 mandates and specifically considering only the lower-

11  cost regulations proposed by the CDFA in its Proposed Regulations published on May 28, 2021.[17]

12  The SRIA (2020) also estimates 57.6% of total retail pork is whole pork covered by Proposition 12

13  with other pork meat (the remaining 42.4%) not being covered.  Combined this results in an

14  aggregated retail pork price increase estimate of 4.26% in 2022 and 4.32% in 2023, or an average

15  impact of 4.29%.

16       25.    Additional insight into the magnitude and distribution of impacts on consumers can

17  be ascertained from the work of Tonsor and Lusk (2021).[18] This study used data from 2016-2020

18  on 51 different U.S. markets to quantify how sensitive consumer pork purchases are to changes in

19  retail pork prices.  The study estimates the median own-price elasticity for pork is -1.315 across the

20  51 examined markets.   All four of the examined California markets (Los Angeles -1.823,

21  Sacramento -1.621, San Diego -1.593, and San Francisco/Oakland -1.549) are more price elastic

22  than the median market.   Based upon this study, I have concluded that pork consumption in

23  California will change more in response to retail price changes than most markets outside of

24  California. As the SRIA reported, Proposition 12 will result in a significant amount of pork not

25  being consumed in California.

26       26.    The work of Tonsor and Lusk (2021) can further be used to estimate how consumers

27  ───────────────
[17] See tables A4.7 and A4.8 of the SRIA(2020) report.
[18] https://www.agmanager.info/livestock-meat/meat-demand/meat-demand-research-studies/consumer-sensitivity-
28  pork-prices-comparison

10

DECLARATION OF DR. GLYNN T. TONSOR, PH.D.

in the 51 examined markets will be impacted by higher retail pork prices as Proposition 12 adjustment costs are incurred.  The study estimates how much consumer surplus (economic well-being of consumers) declines following a 1% increase in retail pork prices.  That information can be coupled with the estimate from SRIA (2020) that retail pork prices would increase by 4.29%. This leads to table 1 shown below, presenting estimated declines in consumer surplus in 51 different U.S. retail markets that follow from higher retail pork prices incurred as a result of Proposition 12 in California and the U.S. industry making corresponding adjustments to be compliant.

27.    Table 1 indicates annual consumer loss of over $34 million would occur across the four evaluated California retail pork markets following higher pork prices from Proposition 12 being implemented. The combined impact on consumers outside of California, who had no direct vote on Proposition 12 in California, is larger. Table 1 shows annual consumer losses would exceed $303 million in the 47 examined U.S. markets outside of California following higher pork prices from Proposition 12 being implemented.[19] Accordingly, it is my opinion that Proposition 12 will create a nationwide rippling effect of economic consumer losses and, as represented in the first analyses, a nationwide increase of pork production costs.

**Table 1. Change in Annual Consumer Surplus from 4.29% Retail Price Increase ($1,000 dollars)**

| Market | Pork | Market | Pork |
|---|---|---|---|
| Albany, NY | -$2,356.23 | New England | -$6,162.05 |
| Atlanta, GA | -$8,908.58 | New Orleans, LA/Mobile, AL | -$6,895.75 |
| Baltimore, MD/Washington D.C. | -$13,025.60 | New York, NY | -$21,735.30 |
| Birmingham/Montgomery, AL | -$8,413.47 | Orlando, FL | -$7,590.64 |
| Boise, ID | -$952.42 | Peoria/Springfield, IL | -$4,055.97 |
| Boston, MA | -$6,846.48 | Philadelphia, PA | -$10,788.21 |
| Buffalo/Rochester, NY | -$4,412.63 | Phoenix/Tucson, AZ | -$8,818.06 |
| Charlotte, NC | -$5,918.31 | Pittsburgh, PA | -$4,171.18 |
| Chicago, IL | -$13,221.60 | Portland, OR | -$4,822.30 |
| Cincinnati/Dayton, OH | -$5,983.55 | Providence, RI | -$1,358.21 |
| Columbus, OH | -$3,641.08 | Raleigh/Greensboro, NC | -$7,347.25 |

---

[19] Additional consumer losses would occur in other markets as about one-third of the total U.S. population resides outside of the 51 evaluated markets in this report.  Moreover, these impacts are simply for retail markets and do not incorporate food service market impacts.

DECLARATION OF DR. GLYNN T. TONSOR, PH.D.

| | | | |
|---|---|---|---|
| Dallas/Ft. Worth, TX | -$12,638.07 | Richmond/Norfolk, VA | -$6,396.33 |
| Denver, CO | -$8,600.89 | Roanoke, VA | -$5,010.68 |
| Detroit, MI | -$7,664.44 | *Sacramento, CA* | -$4,094.09 |
| Grand Rapids, MI | -$3,376.04 | *San Diego, CA* | -$3,984.95 |
| Harrisburg/Scranton, PA | -$7,152.02 | *San Francisco/Oakland, CA* | -$7,249.92 |
| Hartford, CT/Springfield, MA | -$5,413.11 | Seattle/Tacoma, WA | -$5,519.22 |
| Houston, TX | -$9,780.60 | South Carolina | -$12,776.82 |
| Indianapolis, IN | -$4,624.35 | Spokane, WA | -$1,029.50 |
| Jacksonville, FL | -$4,022.57 | St. Louis, MO | -$5,671.08 |
| Knoxville, TN | -$2,391.60 | Syracuse, NY | -$2,367.89 |
| Las Vegas, NV | -$3,357.60 | Tampa/St. Petersburg, FL | -$8,482.53 |
| *Los Angeles, CA* | -$19,273.50 | Toledo, OH | -$3,511.95 |
| Louisville, KY | -$2,589.63 | West Texas/New Mexico | -$8,752.45 |
| Miami/Ft. Lauderdale, FL | -$9,136.71 | Wichita, KS | -$1,721.36 |
| Nashville, TN | -$3,949.83 | | |
| *California, 4- Market Total* | -$34,602.46 | | |
| Non-California, 47 Market Total | -$303,362.14 | | |

Note: California markets evaluated are denoted in italics.

28.     The above assessment of consumer impacts presumes no major availability shocks reflecting a situation where the U.S. hog industry can and does immediately adjust production and confinement operations.  That is, the above assessment reflects more of a longer-run situation where production costs increase and are passed on through the supply chain – yet this importantly fails to consider more immediate and stark economic impacts.  For instance, RaboResearch (2021) suggests the U.S. pork market will be split early in 2022 if Proposition 12 goes into effect with less than 4% of U.S. sow housing capacity currently able to meet Proposition 12.[20]  In this split market situation, California residents would face a significant shortfall of pork while other U.S. residents would initially see an increase in pork available.

29.     To approximate the situation that may occur in early 2022 if Proposition 12 is implemented, presume currently California represents 15% of the national retail pork market and that 4% of U.S. production can comply with Proposition 12 (and by extension presume all product from this 4% of production becomes destined for California).  This suggests California residents may initially see a 73.33% reduction in pork available for purchase (move from 15% to 4% of

[20] https://research.rabobank.com/far/en/sectors/animal-protein/us-pork-supply-chain-locked-in-limbo-as-producers-await-legal-ruling.html

12

domestic pork consumption) while non-California residents would initially have 12.94% more pork available (non-CA markets would comprise 96% rather than 85% of domestic consumption).

30.     Using flexibility estimates obtained from elasticities previously reported, I have quantified how prices may initially increase in different consumer markets given these changes in the volume of pork available.   Table 2 indicates the significant reduction of 73.33% in pork available to California residents would correspond with an estimated 40-47% increase in retail pork prices faced by California consumers.   Conversely, Table 3 indicates how much retail pork prices would initially decrease in U.S. markets outside of California given a 12.94% increase in pork available.   Table 3 reveals on average pork prices in non-California markets may decrease by 10.60% with impacts ranging widely from a decrease of 4.53% in St. Louis, MO to a decrease of 24.35% in Boston, MA.

31.     Any decrease in pork prices will admittedly be felt throughout the entire supply chain down the line to the producer who is already facing significant profitability margin threats caused by Proposition 12. Accordingly, an annual shortage in 2022 of pork to California consumers could reasonably cause a cascading effect onto producers who are faced with substantial cost impacts to not only convert to group housing but also maintain that production practice year over year.

**Table 2. Initial Change in Prices following Reduction in Pork Available in California**

| Market | Pork |
|---|---|
| Los Angeles, CA | 40.24% |
| Sacramento, CA | 45.24% |
| San Diego, CA | 46.04% |
| San Francisco/Oakland, CA | 47.34% |

**Table 3. Initial Change in Prices following Increase in Pork Available outside of California**

| Market | Pork | Market | Pork |
|---|---|---|---|
| Albany, NY | -13.59% | New Orleans, LA/Mobile, AL | -6.83% |
| Atlanta, GA | -7.92% | New York, NY | -10.43% |
| Baltimore, MD/Washington D.C. | -14.47% | Orlando, FL | -6.73% |

13

| | | | |
|---|---|---|---|
| Birmingham/Montgomery, AL | -8.96% | Peoria/Springfield, IL | -20.14% |
| Boise, ID | -10.85% | Philadelphia, PA | -9.84% |
| Boston, MA | -24.35% | Phoenix/Tucson, AZ | -8.45% |
| Buffalo/Rochester, NY | -14.22% | Pittsburgh, PA | -5.14% |
| Charlotte, NC | -7.50% | Portland, OR | -6.89% |
| Chicago, IL | -5.19% | Providence, RI | -18.32% |
| Cincinnati/Dayton, OH | -12.04% | Raleigh/Greensboro, NC | -10.02% |
| Columbus, OH | -6.39% | Richmond/Norfolk, VA | -9.34% |
| Dallas/Ft. Worth, TX | -10.50% | Roanoke, VA | -11.33% |
| Denver, CO | -9.64% | Seattle/Tacoma, WA | -11.23% |
| Detroit, MI | -9.19% | South Carolina | -7.74% |
| Grand Rapids, MI | -14.40% | Spokane, WA | -10.36% |
| Harrisburg/Scranton, PA | -10.51% | St. Louis, MO | -4.53% |
| Hartford, CT/Springfield, MA | -10.48% | Syracuse, NY | -14.61% |
| Houston, TX | -9.71% | Tampa/St. Petersburg, FL | -6.67% |
| Indianapolis, IN | -10.16% | Toledo, OH | -8.58% |
| Jacksonville, FL | -6.93% | West Texas/New Mexico | -10.20% |
| Knoxville, TN | -10.21% | Wichita, KS | -12.09% |
| Las Vegas, NV | -6.94% | | |
| Louisville, KY | -10.32% | | |
| Miami/Ft. Lauderdale, FL | -7.87% | | |
| Nashville, TN | -16.74% | | |
| New England | -19.72% | | |

32.     These findings and opinions are subject to revision should more materials, research or data become available.

33.     Attached as Exhibit "C" to this Declaration are full citations to the materials referenced in this Declaration.

34.     I declare under penalty of perjury and pursuant to the laws of the state of California that the preceding is true and correct, and that this declaration was made on this 9th day of November 2021, at St. George, Kansas.

_____

Dr. Glynn T. Tonsor, Ph.D.

14

# GLYNN T. TONSOR
(as of December 21, 2020)

## CONTACT INFORMATION:

| | | |
|---|---|---|
| 331-A Waters Hall | Telephone: | (785) – 532 - 1518 |
| Kansas State University | Fax: | (785) - 532 - 6925 |
| Manhattan, KS 66506 | Email: | gtonsor@ksu.edu |

## EDUCATION

| | | |
|---|---|---|
| Kansas State University | Manhattan, KS | |
| *Ph.D. – Agricultural Economics* | G.P.A.: 3.9/4.0 | May 2006 |
| | | |
| Missouri State University | Springfield, MO | |
| *B.S. Agriculture Business–Finance* | G.P.A.: 3.8/4.0 | Dec. 2001 |

## EMPLOYMENT

| | |
|---|---|
| March 2010 to present | Kansas State University |
| *Full Professor* (July 2016 - present) | Dept. of Agricultural Economics |
| *Associate Professor* (July 2012 - June 2016) | |
| *Assistant Professor* (March 2010 - June 2012) | |
| | |
| May 2006 to March 2010 | Michigan State University |
| *Assistant Professor* | Dept. of Ag., Food, & Resource Economics |
| | |
| June 2002 to May 2006 | Kansas State University |
| *USDA National Needs Graduate Fellow* | Dept. of Agricultural Economics |

## PEER-REVIEWED JOURNAL ARTICLES – PUBLISHED/ACCEPTED (97)

1. Lusk, J.L. and **G.T. Tonsor**. "Supply and Demand Indices and their Welfare Implications." *Q Open.* Forthcoming.

2. Mitchell, J.L., **G.T. Tonsor**, and L.L. Schulz. "The Market for Traceability with Applications to U.S. Feeder Cattle." *European Review of Agricultural Economics.* Forthcoming. (LINK)

3. McKendree, M.G.S., **G.T. Tonsor**, and L.L. Schulz. "Management of Multiple Sources of Risk in Livestock Production." *Journal of Agricultural and Applied Economics.* Forthcoming.

4. Lusk, J.L., **G.T. Tonsor**, and L.L. Schulz. "Beef and Pork Marketing Margins and Price Spreads during COVID-19." *Applied Economic Perspectives and Policy*. Forthcoming. (LINK)

5. **Tonsor, G.T.** and L.L. Schulz. (2020). "Will an Incentive-Compatible Indemnity Policy Please Stand Up? Livestock Producer Willingness to Self-Protect." *Transboundary and Emerging Diseases.* 67:2713-2730. (LINK)

6. Coffey, B., A. Barkley, **G.T. Tonsor**, and J. Tack. (2020). "How do Students Allocate their Time? An Application of Prospect Theory to Trade-Offs between Time Spent to Improve GPA and Time Spent on Other Activities." *Applied Economics Teaching Resources.* 2:1-14. (LINK)

7. Britton, L.L. and **G.T. Tonsor**. (2020). "U.S. Consumers' Attitudes Toward RNA Interference Technology in the Beef Sector." *Journal of Agriculture and Food Research.* Forthcoming. (LINK)

8. McKendree, M.G.S., **G.T. Tonsor**, T.C. Schroeder, and N.P. Hendricks. (2020). "Impacts of Retail and Export Beef Demand on United States Cattle Producers." *American Journal of Agricultural Economics.* 102:866-883. (LINK)

9. Moon, D. and **G.T. Tonsor**. (2020). "How do *E.coli* Recalls Impact Cattle and Beef Prices?" *Journal of Agricultural and Resource Economics.* 45:92-106. (LINK)

10. Shang, X. and **G.T. Tonsor**. (2019). "Sanitary and Phytosanitary Regulations and International Red Meat Trade." *British Food Journal.* 121:2309-2321. (LINK)

11. **Tonsor. G.T.** and C.A. Wolf. (2019; senior authorship shared). "US Farm Animal Welfare: An Economic Perspective." *Animals.* 9:1-6. (LINK)

12. Pudenz, C.C., L.L. Schulz, and **G.T. Tonsor**. (2019). "Adoption of Secure Pork Supply Plan Biosecurity by U.S. Swine Producers." *Frontiers in Veterinary Science.* 6:1-14. (LINK)

13. Appuhamilage, B.P.M. and **G.T. Tonsor**. (2019). "E.coli Recalls and Meat Demand: An Updated Assessment." *Journal of Agribusiness.* 37:35-52. (LINK)

14. Britton, L. and **G.T. Tonsor**. (2019). "Consumers' Willingness to Pay for Beef Products Derived from RNA Interference Technology." *Food Quality and Preference.* 75:187-197. (LINK)

15. Paul, A.S., J.L. Lusk, F.B. Norwood, and **G.T. Tonsor**. (2019). "An Experiment on the Vote-Buy Gap with Application to Cage-Free Eggs." *Journal of Behavioral and Experimental Economics.* 79:102-109. (LINK)

16. Bekkerman, A., G.W. Brester, and **G.T. Tonsor**. (2019). "An Alternative Approach to Measure Demand Changes in Meat Markets." *International Food and Agribusiness Management Review.* 22:397-412. (LINK)

17. Taylor, M.R. and **G.T. Tonsor**. (2019). "Impact of Extension Education on 2014 Farm Bill Enrollment Decisions for Kansas Producers." *Journal of Agricultural and Resource Economics.* 44:213-225. ([LINK](#))

18. Coffey, B.K., D.L. Pendell, and **G.T. Tonsor**. (2019). "Contemporaneous and Lagged Causal Relationships among Negotiated Live Cattle Cash Markets." *Journal of Agricultural and Applied Economics.* 51:182-198. ([LINK](#))

19. Schroeder, T.C., **G.T. Tonsor**, and B.K. Coffey. (2019). "Commodity Futures with Thinly Traded Cash Markets: The Case of Live Cattle." *Journal of Commodity Markets*. 15:1-15. ([LINK](#))

20. Norwood, B., **G.T. Tonsor**, J. Lusk. (2019). "I Will Give You My Vote but not My Money: Preferences for Public versus Private Action in Addressing Social Issues." *Applied Economic Perspectives & Policy*. 41:96-132. ([LINK](#))

21. Conley, K., J.L. Lusk, J.L. Parcell, and **G.T. Tonsor**. (2019). "Consulting Activities of Agricultural Economists and Response to University Policies." *Applied Economic Perspectives & Policy*. 41:650-667. ([LINK](#))

22. Thompson, J.M., **G.T. Tonsor**, D.L. Pendell, and W. Preston. (2018). "United States Feedlot Operator Willingness to Pay for Disposal Capacity to Address Foreign Animal Disease Risk." *Transboundary and Emerging Diseases*. 65:1951-1958. ([LINK](#))

23. **Tonsor, G.T**. (2018). "Producer Decision Making under Uncertainty: Role of Past Experiences and Question Framing." *American Journal of Agricultural Economics*.100:1120-1135. ([LINK](#))

24. Lusk, J.L., **G.T. Tonsor**, T.C. Schroder, D. Hayes. (2018). "Effect of Government Quality Grade Labels on Consumer Demand for Pork Chops in the Short and Long Run." *Food Policy*. 77:91-102. ([LINK](#))

25. McKendree, M.G.S., **G.T. Tonsor**, C. Wolf. (2018). "Animal Welfare Perceptions of the U.S. Public and Cow-Calf Producers." *Journal of Agricultural and Applied Economics*. 50:544-578. ([LINK](#)).

26. **Tonsor, G.T.** (2018). "Public Animal Welfare Discussions in the United States: Perspectives from a Missouri Farm Boy Turned Economist." *Animal Frontiers*. 8(1):4-7. ([LINK](#)).

27. Coffey, B.K., **G.T. Tonsor**, and T.C. Schroeder. (2018). "Impacts of Market Changes and Price Momentum on Hedging Live Cattle." *Journal of Agricultural and Resource Economics*. 43:18-33. ([LINK](#)).

28. Wu, Q., L.L. Schulz, and **G.T. Tonsor**. (2018). "Using Expert Knowledge to Understand Adoption of Biosecurity Measures for Mitigating Tier 1 Disease Risks in the U.S. Livestock Industry." *Journal of Agricultural Sciences*. 10:12-26. ([LINK](#)).

29. Taylor, M.R., **G.T. Tonsor**, N.D. Paulson, B. Ellison, J. Coppess, and G.D. Schnitkey. (2017). "Is it Good to Have Options? The 2014 Farm Bill Program Decisions." *Applied Economic Perspectives and Policy.* 39:533-546. ([LINK](LINK)).

30. Ellison, B., N.D. Paulson, M.R. Taylor, **G.T. Tonsor**, J. Coppess, and G.D. Schnitkey. (2017). "Evaluation of Educational Offerings Associated with the 2014 Farm Bill." *Applied Economic Perspectives and Policy.* 39: 547-558. ([LINK](LINK)).

31. Wolf, C.A. and **G.T. Tonsor**. (2017). "U.S. Dairy Cow Welfare Demand and Supply." *Journal of Agricultural and Resource Economics.* 42:164-179. ([LINK](LINK)).

32. Wu, Q., L.L. Schulz, **G.T. Tonsor**, and J.M. Smith. (2017). "Expert Views on Effectiveness, Feasibility, and Implementation of Biosecurity Measures for Mitigating Tier 1 Disease Risks in the U.S. Swine, Beef Cattle, and Dairy Industries." *Journal of Veterinary Science & Technology*. 8:435. ([LINK](LINK)).

33. Shang, X. and **G.T. Tonsor**. (2017). "Food Safety Recall Effects across Meat Products and Regions." *Food Policy*. 69:145-153. ([LINK](LINK)).

34. **Tonsor, G.T**. and E. Mollohan. (2017). "Price Relationships between Calves and Yearlings: An Updated Structural Change Assessment." *Journal of Applied Farm Economics*. Vol. 1: Issue 1, Article 3. ([LINK](LINK)).

35. Lister, G., **G.T. Tonsor**, M. Brix, T.C. Schroeder, and C. Yang. (2017). "Food Values Applied to Livestock Products." *Journal of Food Products Marketing*. 23:326-341. ([LINK](LINK))

36. Schroeder, T.C., **G.T. Tonsor**, and J.L. Parcell. (2016). "Mandated and Voluntary Food Labeling." *Journal of Agribusiness*. 34:83-97.

37. Parcell, J.L., **G.T. Tonsor**, and J.V. Franken. (2016). "Few Journal Article Organizational Characteristics Affect Article Citation Rate: A Look at Agricultural Economics Articles Using Regression Analysis." *Journal of Agricultural Science*. 8:73-82. ([LINK](LINK)).

38. Sackett, H., R. Shupp, and **G.T. Tonsor**. (2016). "Differentiating "Sustainable" from "Organic" and "Local" Food Choices: Does Information about Certification Criteria Help Consumers?" *International Journal of Food and Agricultural Economics*. 4:17-31. ([LINK](LINK))

39. Wolf, C.A., **G.T. Tonsor**, M.G.S. McKendree, D.U. Thomson, and J.C. Swanson. (2016). "Public and Farmer Perceptions of Dairy Cattle Welfare in the United States." *Journal of Dairy Science*. 99:5892-5903. ([LINK](LINK))

40. Ortez, M.A. and **G.T. Tonsor** (2016). "Structural Change and Forecasting of Agricultural Commodity Realized Volatilities" *International Journal of Business and Applied Social Science*. 2:1-18. ([LINK](LINK))

41. Lusk, J.L. and **G.T. Tonsor**. (2016). "How Meat Demand Elasticities Vary with Price, Income, and Product Category." *Applied Economic Perspectives & Policy*. 38: 673-711. (LINK)

42. Schulz, L. and **G.T. Tonsor**. (2015). "Assessment of the Economic Impacts of Porcine Epidemic Diarrhea Virus in the United States." *Journal of Animal Science*. 93: 5111-8. (LINK)

43. **G.T. Tonsor** and L. Schulz. (2015). "Economic Considerations Related to U.S. Beef Herd Expansion." *Journal of Animal Science*. 93:4227-4234. (LINK)

44. **Tonsor, G.T.** and T.C. Schroeder. (2015). "Market Impacts of E. Coli Vaccination in U.S. Feedlot Cattle." *Agricultural and Food Economics*. 3:7. (LINK)

45. Schulz, L. and **G.T. Tonsor**. (2015). "The U.S. Gestation Stall Debate." *Choices*. 30:1-7. (LINK)

46. Dentoni, D., **Tonsor, G.T.**, Calantone, R. and Peterson, H.C. (2014). "Consumers' Perceptions of Stakeholder Credibility: Who Has It and Who Perceives It?" *Journal of Chain and Network Science.* 14:3-20. (LINK)

47. **Tonsor, G.T.**, T.C. Schroeder, J. Mintert. (2014). "Using Expert Knowledge to Guide Commodity Promotion and Research Program Investments." *Journal of Agribusiness*. 31:19-32.

48. Taylor, M., **G.T. Tonsor**, and K. Dhuyvetter. (2014). "Structural Changes in Forward Contract Risk Premiums for Kansas Wheat." *Journal of Agricultural and Resource Economics*. 39:217-229. (LINK)

49. Pruitt, J.R. **G.T. Tonsor,** and K. Brooks. (2014). "End User Preferences for USDA Market Information." *Food Policy*. 47:24-33. (LINK)

50. Dentoni, D., **G.T. Tonsor**, R. Calantone, and C. Peterson. (2014). "Disentangling Direct and Indirect Effects of Credence Labels." *British Food Journal*. 116:931-951. (LINK)

51. Lusk, J.L., T.C. Schroeder, and **G.T. Tonsor**. (2014). "Distinguishing Beliefs from Preferences in Food Choice." *European Review of Agricultural Economics*. 41:627-655. (LINK).*Outstanding Journal Article, 2014.*

52. Klain, T.J., J.L. Lusk, **G.T. Tonsor,** and T.C. Schroeder. (2014). "Valuing Information: The Case of Country of Origin Labeling." *Agricultural Economics*. 45:635-648. (LINK).

53. Dentoni, D., **Tonsor, G**.T., Calantone, R. and Peterson, H.C. (2013). "Brand Competition with Geographical Indications: Which Information Does Lead to Brand Differentiation?" *New Medit*. 12:14-27. (LINK)

54. Pendell, D.L., **G.T. Tonsor,** K.C. Dhuyvetter, G.W. Brester, and T.C. Schroeder. (2013). "Evolving U.S. Beef Export Market Access Requirements for Age and Source Verification." *Food Policy*. 43:332-340. ([LINK](LINK)).

55. Taylor, M. and **G.T. Tonsor**. (2013). "Revealed Demand for Country of Origin Labeling of Meat in the United States." *Journal of Agricultural and Resource Economics*. 38:235-247. ([LINK](LINK)).

56. Herrington, M. and **G.T. Tonsor**. (2013). "Econometric Estimations of Performance Improvements in Kansas Feedlot Cattle." *Professional Animal Scientist*. 29:435-442. ([LINK](LINK)).

57. Wolf, C.A. and **G.T. Tonsor**. (2013). "Dairy Farmer Preferences for US Dairy Policy." *Journal of Agricultural and Resource Economics*. 38:220-234. ([LINK](LINK)).

58. **Tonsor, G.T.,** T.C. Schroeder, and J.L. Lusk. (2013). "Consumer Indifference to Alternative Meat Origin Labels." *Journal of Agricultural Economics.* 64:676-692. ([LINK](LINK)).

59. Sackett, H., R. Shupp, and **G.T. Tonsor**. (2013). "Consumer Perceptions of Sustainable Farming Practices: A Best-Worst Scenario." *Agricultural and Resource Economics Review.* 42:275-290. ([LINK](LINK)).

60. Olynk, N.J., C.A. Wolf, and **G.T. Tonsor**. (2012). "Producer Technology Option Value: The Case of rbST in Michigan." *Agricultural Economics*. 43:1-9. ([LINK](LINK)).

61. Pozo, V., **G.T. Tonsor,** and T.C. Schroeder. (2012). "How Choice Experiment Design Affects Estimated Valuation of Use of Gestation Crates." *Journal of Agricultural Economics.*63:639-655. ([LINK](LINK))

62. Schumacher, T., T.C. Schroeder, and **G.T. Tonsor**. (2012). "Value of Calf Preconditioning Health Programs. *Journal of Agricultural and Applied Economics*. 44:191-202. ([LINK](LINK))

63. Schroeder, T.C. and **G.T. Tonsor**. (2012). "International Cattle ID and Traceability: Competitive Implications for the US." *Food Policy*. 31:31-40. ([LINK](LINK))

64. **Tonsor, G.T.** and C.A. Wolf. (2012). "Effect of Video Information on Consumers: Case of Milk Production Attributes." *American Journal of Agricultural Economics*. 94:503-508. ([LINK](LINK))

65. Lewis, K.E. and **G.T. Tonsor**. (2011). "The Impact of Ethanol Production on Spatial Grain Market Relationships." *International Food and Agribusiness Management Review*. 14:201-214. ([LINK](LINK))

66. Wolf, C., **G.T. Tonsor**, and N. J. Olynk. (2011). "Understanding US Consumer Demand for Milk Production Attributes." *Journal of Agricultural and Resource Economics*. 36:326-342. ([LINK](LINK))

67. Schroeder, T.C. and **G.T. Tonsor**. (2011). "Economic Impacts of Zilmax Adoption in Cattle Feeding." *Journal of Agricultural and Resource Economics*. 36:521-535. ([LINK](#))

68. **Tonsor, G.T.** and R. Shupp. (2011). "Cheap Talk Scripts: Effectiveness in Online Choice Experiments and Private Good, Niche Market Assessments." *American Journal of Agricultural Economics*. 93:1015-1031. ([LINK](#))

69. **Tonsor, G.T.** (2011). "Consumer Inferences of Food Safety and Quality." *European Review of Agricultural Economics*. 38:213-235. ([LINK](#))

70. **Tonsor, G.T.** and C.A. Wolf. (2011). "On Mandatory Labeling of Animal Welfare Attributes." *Food Policy*. 36:430-437. ([LINK](#))

71. Franken, J.R., J.L. Parcell, and **G.T. Tonsor**. (2011). "Impact of Mandatory Price Reporting on Hog Market Integration." *Journal of Agricultural and Applied Economics*. 43:229-241. ([LINK](#))

72. Chaudhuri, M., **G.T. Tonsor**, and H.C. Peterson. (2011). "Factor Demand Analysis for Ethanol in the U.S. Refinery Industry."*The B.E. Journal of Economic Analysis & Policy*. Vol. 11: Iss. 1(Topics): Article 21. ([LINK](#))

73. Dentoni, D., **G. T. Tonsor**, R. Calantone, and C. Peterson. (2011). "Animal Welfare Practices along the Food Chain: How Does Negative and Positive Information Affect Consumers?" *Journal of Food Products Marketing*. 17:279-302. ([LINK](#))

74. **Tonsor, G.T**. and N. Olynk. (2011). "Impacts of Animal Well-Being and Welfare Media on Meat Demand." *Journal of Agricultural Economics*. 62:59-72. ([LINK](#))

75. **Tonsor, G.T.** and T.C. Schroeder. (2011). "Multivariate Forecasting of a Commodity Portfolio:  Application to Cattle Feeding Margins and Risk." *Applied Economics*. 43:1329-1339. ([LINK](#)).

76. Dentoni, D., **G.T. Tonsor**, R. Calantone, and C. Peterson. (2010). "Brand Information Mitigating Negative Shocks on Animal Welfare." *International Food and Agribusiness Management Review*. 13:17-56. ([LINK](#)) *Innovation Award*, 2010.

77. Schulz, L. and **G.T. Tonsor**. (2010). "Cow-Calf Producer Perceptions Regarding Individual Animal Traceability." *Journal of Agricultural and Applied Economics*. 42:659-677. ([LINK](#))

78. Olynk, N.J., **G.T. Tonsor,** and C.A. Wolf. (2010). "Consumer Willingness to Pay for Livestock Credence Attribute Claim Verification. *Journal of Agricultural and Resource Economics*. 35:261-280. ([LINK](#)).

79. Pendell, D., G. Brester, T. Schroeder, K. Dhuyvetter, and **G.T. Tonsor**. (2010). "Animal Identification and Tracing in the United States." *American Journal of Agricultural Economics*. 92:927-940. ([LINK](#)).

80. Olynk, N.J., **G.T. Tonsor,** and C.A. Wolf. (2010). "Verifying Credence Attributes in Livestock Production." *Journal of Agricultural and Applied Economics.* 42:439-452 ([LINK](#)).

81. **Tonsor, G.T.** and C.A. Wolf. (2010). "Drivers of Resident Support for Animal Care Oriented Ballot Initiatives." *Journal of Agricultural and Applied Economics.* 42:419-428. ([LINK](#)).

82. **Tonsor, G.T.**, J. Mintert, and T.C. Schroeder. (2010). "U.S. Meat Demand: Household Dynamics and Media Information Impacts." *Journal of Agricultural and Resource Economics*. 35:1-17. ([LINK](#)).

83. Schulz, L. and **G.T. Tonsor.** (2010). "Cow-Calf Producer Preferences for Voluntary Traceability Systems." *Journal of Agricultural Economics*. 61:138-162. ([LINK](#))

84. Olynk, N.J., C.A.Wolf, and **G.T. Tonsor**. (2009). "Labeling of Credence Attributes in Livestock Production: Verifying Attributes which are More than "Meet the Eye." *Journal of Food Law & Policy*. 5:181-200. ([LINK](#))

85. **Tonsor, G.T.** and R. Shupp. (2009). "Valuations of 'Sustainably Produced' Labels on Beef, Tomato, and Apple Products." *Agricultural and Resource Economics Review*. 38:371-383. ([LINK](#))

86. Dentoni, D., **G.T. Tonsor**, R. Calantone, and C. Peterson. (2009). "The Direct and Indirect Effect of Credence Attributes on Consumers' Attitudes towards Agri-Food Products." *Agricultural and Resource Economics Review*. 38:384-396. ([LINK](#))

87. **Tonsor, G.T.**, N. Olynk, and C. Wolf. (2009). "Consumer Preferences for Animal Welfare Attributes: The Case of Gestation Crates." *Journal of Agricultural and Applied Economics*. 41:713-730. ([LINK](#))

88. **Tonsor, G.T.**, C. Wolf, and N. Olynk. (2009). "Consumer Voting and Demand Behavior Regarding Swine Gestation Crates." *Food Policy*. 34:492-498. ([LINK](#))

89. **Tonsor, G.T.** and A.M. Featherstone. (2009). "Production Efficiency of Specialized Swine Producers." *Review of Agricultural Economics*.  31:493-510. ([LINK](#))

90. **Tonsor, G.T**., T.C. Schroeder, and J.M.E. Pennings. (2009). "Factors Impacting Food Safety Risk Perceptions." *Journal of Agricultural Economics*. 60:625-644. ([LINK](#))

91. **Tonsor, G.T**., T.C. Schroeder, J.M.E. Pennings, and J. Mintert. (2009). "Consumer Valuations of Beef Steak Food Safety Enhancements in Canada, Japan, Mexico, and the United States." *Canadian Journal of Agricultural Economics*. 57:395-416. ([LINK](#))

8

92. **Tonsor, G.T.** and T. Kastens. (2009). "Do Starting Values Really Matter? Development of a Genetic Algorithm Approach." *Applied Economics Letters*. 16:781-784. (LINK)

93. Schroeder, T.C., **G.T. Tonsor,** J.M.E. Pennings, and J. Mintert (2007). "Consumer Food Safety Risk Perceptions and Attitudes: Impacts on Beef Consumption across Countries." *The B.E. Journal of Economic Analysis & Policy*. Vol. 7: Iss. 1(Contributions): Article 65. (LINK)

94. **Tonsor, G.T.** and T.L. Marsh. (2007). "Comparing Heterogeneous Consumption in US and Japanese Meat and Fish Demand." *Agricultural Economics*. 37:81-91. (LINK)

95. **Tonsor, G.T.** and T.C. Schroeder. (2006). "Livestock Identification: Lessons for the U.S. Beef Industry from the Australian System." *Journal of International Food and Agribusiness Marketing*. 18:103-118. (LINK)

96. **Tonsor, G.T.,** T.C. Schroeder, J.A. Fox, and A. Biere. (2005). "European Preferences for Beef Steak Attributes." *Journal of Agricultural and Resource Economics*. 30:367-380. (LINK)

97. **Tonsor, G.T**., K.C. Dhuyvetter, and J. Mintert. (2004). "Improving Cattle Basis Forecasting." *Journal of Agricultural and Resource Economics*. 29:228-241. (LINK)

## BOOK/REPORT CHAPTERS

**Tonsor, G.T.** and L. Schulz. "COVID-19 Impacts on the Meat Processing Sector." In *Economic Impacts of COVID-19 on Food and Agricultural Markets*. CAST Commentary. 2020. (LINK).

J.L. Parcell, **G.T. Tonsor**, and T.C. Schroeder. "Changing Structure in the U.S. Hog Supply Chain: Implications for Market Price Discovery." In Elzbieta Jadwiga Szymanska, ed. *Changes in the Live Pig Market in Different Countries*. WULS Press Warsaw, 2017. (LINK).

**Tonsor, G.T.** "Meat Pricing Systems." *The Encyclopedia of Meat Sciences, Second Edition*. Published by Elsevier. 2014. (LINK).

J.L. Parcell and **G.T. Tonsor**. "Information and Market Institutions." In W.J Armbruster and R.D. Knutson, eds. *US Programs Affecting Food and Agricultural Marketing*. New York: Springer Science + Business Media, 2013. (LINK).

T.C. Schroeder and **G.T. Tonsor** "Demand for Meat Quality Attributes." Chapter in Oxford Handbook on the Economics of Food Consumption and Policy, Jayson Lusk, Jutta Roosen, Jason Shogren (editors), Published by Elsevier, 2011. (LINK).

## REGULARLY SCHEDULED OUTREACH OUTPUTS

K-State Radio Network, Livestock Market Outlook Interviews (LINK)

- 2010 (Apr. 12; May 10; June 7; July 9; Aug. 6, 27; Oct. 1, 8, 29; Nov. 24)
- 2011 (Jan. 7; Feb. 4; Mar. 4; Apr. 1, 29; May 27; June 23; July 22; Aug. 15; Sept. 6, 23; Oct. 14; Nov. 11, 23; Dec.19)
- 2012 (Jan. 20; Feb. 3, 27; Mar. 12; Apr. 9, 30; May7, 21; June 18; July 7, 30; Aug. 24; Sept. 14; Oct. 8, 26; Nov. 9; Dec. 7)
- 2013 (Jan. 14; Feb. 4, 18; Mar. 15; Apr. 8; May 13; June 28; July 26; Aug. 30; Oct. 4; Nov. 4; December 16)
- 2014 (Jan. 24; Mar 3; Apr 4; Aug 4, 25; Sept. 29; Oct. 31, Dec. 8)
- 2015 (Jan. 9, Feb. 9, 23; Apr 13; May 3; June 12, 19; July 20; Aug. 24; Sept. 21; Nov. 2, 23)
- 2016 (Jan. 25; Feb. 15, 29; Apr. 4; May 6; June 13; July 1; Aug. 8; Sept. 6, 30; Oct. 31; Nov. 28)
- 2017 (Jan. 3, 30; Feb. 6, 27; Mar. 27; Apr. 24; May 18; June 19; July 7; Aug. 14; Sept. 8; Oct. 2, 30; Dec. 4)
- 2018 (Jan. 2, 29; Feb. 26; Mar. 26; Apr. 23; May 21, 29; June 11; July 9; Aug. 6; Sept. 4; Oct. 1, 29; Nov. 26)
- 2019 (Jan. 7, Feb. 4; Mar. 4, 29; April 15; May 28; June 24; July 22; Aug. 19; Sept. 16; Oct. 14; Nov. 11; Dec. 9)
- 2020 (Jan. 27; Feb. 24; Mar. 23; Apr. 20; May 18; June 15; July 13; Aug. 10; Sept. 8, 28; Nov. 9; Dec. 14)

*Meat Demand Monitor* – monthly (LINK)
- Special Reports: March 26, 2020; May 12, 2020; November 16, 2020
- Multi-Month Summary Reports: July 27, 2020

*In The Cattle Markets* (LINK)
- 2011 (Sept. 26; Nov. 7; Dec. 5)
- 2012 (Jan. 9; Feb. 13; Apr. 9; July 2; Aug. 6; Sept. 11, Oct. 15; Nov. 19)
- 2013 (Jan. 7; Feb. 4; Mar. 27; May 13; June 24; July 31; Sept. 9; Oct. 15; Nov. 4, Dec. 30)
- 2014 (Feb. 10, Mar. 17, April 28; Aug. 11; Sept. 22; Nov. 3, Dec. 1)
- 2015 (Jan. 13, Feb. 16, April 27; June 1; July 7; Aug. 10; Sept. 8; Oct. 19; Nov. 30)
- 2016 (Jan. 11; Apr. 4; May 16; June 20; Aug. 8; Sep. 12; Oct. 10)

*Fed Cattle Finishing Historical and Projected Returns* – monthly (LINK)

*Domestic Beef, Pork, and Chicken Demand Indices* – monthly (LINK)

*Export Beef, Pork, and Broiler Demand Indices* – monthly (LINK)

*Connecting Livestock Producers with Recent Economic Research* (CLPER) - Feedstuffs partner
- Quarterly series (2010-2017) posted by AgManager (LINK) and Feedstuffs (LINK)

*Beef-Cattle Economics Webinar* –quarterly in partnership with BEEF, Drovers, and Meatingplace

- 2012 (Feb. 7; May 1; Aug. 7; Nov. 8)
- 2013 (Feb. 14; May 14; Aug. 13; Nov. 5)
- 2014 (Feb. 11; May 6; Aug. 5; Nov. 11)

*The Tonsor Beef Report* – webinar in partnership with Meatingplace
- 2015 (Aug. 11)

*Kansas State Livestock Farm Management Guides* (LINK)
- Beef: Cow-Calf, Background, Stocker, and Finishing
  - with Robin Reid and K-State Beef Team
- Swine: Farrow-Finish, Farrow-Wean, Wean-Finish, Nursery, and Finishing
  - With Robin Reid and K-State Swine Team
- Dairy:
  - With Robin Reid


**POPULAR PRESS ARTICLES AND INTERVIEWS (Authored by others)**

*ABC News, Ag Journal, Ag Network, Agecnce France Presse, AgriMarketing, Agri-Pulse, AgriTalk, AgWeb, AgWeek, Arcamax, Associated Press, Barrons, BBC News, BEEF Magazine, Bloomberg, Brinkwire, Brownfield, Capital Press, Chicago Tribune, CNN Money, Dow Jones, Drovers, Economist, Farm Journal, Federal News Network, Feedstuffs, Food and Farm Radio, Fortune, Hays Post, High Plains/Midwest Ag Journal, HPPR, International Business Times, Kansas City Star, Los Angeles Times, Meatingplace, Miami Herald, Michigan Farm News, NBC News, National Hog Farmer, New York Times, National Public Radio, Omaha World-Herald, Pork, Progressive Farmer, QSR, Reuters, Successful Farming, Supermarket News, The Counter, The Fence, The Herald, The Hutchinson News, Time Magazine, UPI, USA Today, U.S. Farm Report, U.S. News & World Report, Wall Street Journal, Western Producer, Washington Post, Yahoo Finance*

**TELEVISION VIDEOS AND INTERVIEWS (Authored by others)**

*Government Shutdown Impacts – October 2013 Videos* (LINK)
*Mandatory Country of Origin Labeling – November 2013 Videos* (LINK)
*Record Beef Price Explanation – January 2014 Videos* (LINK)
*Food Price Increase Explanation – March 2014 Videos* (LINK)
*Meat Prices and Holiday Grilling Explanation – May 2014 Videos* (LINK)
*Agricultural Exports and Trade Benefits Explanation – June 2014 Videos* (LINK)
*Processing Plant Closures Explanation – August 2014 Videos* (LINK)
*Pubic-Producer Views on Animal Welfare – September 2014 Videos* (LINK)
*Pork Price and Demand Explanation – October 2014 Videos* (LINK)
*Mandatory Country of Origin Labeling – October 2014 Videos* (LINK)
*Mandatory Country of Origin Labeling – January 2015 Videos* (LINK)
*Meat Production and Prices – February 2015 Videos* (LINK)
*Meat Prices – February 2015 Videos* (LINK)
*Avian Influenza and Meat Exports – March 2015 Videos* (LINK)

*Mandatory Country of Origin Labeling – May 2015 Videos* (LINK)
*Mandatory Country of Origin Labeling – June 2015 Videos* (LINK)
*U.S. Farm Report Push 4 Protein –May 25, 2019 Video* (LINK)
*KMBZ News – COVID19 (May 5, 2020) Live Radio* (LINK)
*CBS National Evening News – COVID19 (May 4, 2020) Video* (LINK)
*KMBC ABS Evening News – COVID19 (April 16, 2020) Video* (LINK)
*KSNT NBC Evening News – COVID19 (April 14, 2020) Video* (LINK)
*U.S. Farm Report – COVID19 (April 11, 2020) Video* (LINK)
*TIME Magazine – COVID19 Meat Shortages (April 30, 2020) Video* (LINK)
*U.S. Farm Report – COVID19 (May 16, 2020) Video* (LINK)
*Loos Tales Podcast – COVID19 (April 21, 2020) Video* (LINK)
*U.S. Farm Report – College Roadshow (November 9, 2020) Videos* (LINK)
*AgWeb – COVID19 Vaccine & Meat Demand (November 9, 2020) Video* (LINK)


**AUDIO/VISUAL OUTPUTS (Posted to AgManager.Info & YouTube.com)**

1.  "Cow-Calf Producer Preferences for Animal Identification and Traceability." Posted on July 9, 2010. (LINK)

2.  "Impacts of Animal Welfare Media Attention on Meat Demand." Posted on June 22, 2010. ( LINK)

3.  "Consumer Preferences for Animal Welfare Attributes: The Case of Gestation Crates." Posted on June 22, 2010. (LINK)

4.  "Consumer Voting Behavior Regarding Swine Gestation Crates." Posted on June 22, 2010. (LINK)

5.  "Mandatory Labeling of Animal Welfare Attributes: Public Support and Considerations for Policymakers." Posted on July 14, 2011. (LINK)

6.  "Historical and Projected Cattle Finishing Returns." Posted on September 4, 2012. (LINK)

7.  "Cash Price Forecasting: Cattle Application." Posted on September 13, 2012. (LINK)

8.  "Cash Price Forecasting: Crops Application." Posted on September 13, 2012. (LINK)

9.  "Highlighting Decision Tools on AgManager.info." Posted on October 25, 2012. (LINK)

10. "Highlighting Regularly Updated Cattle Marketing Information AgManager.info." Posted on October 25, 2012. (LINK)

11. "Introduction to Farm Management Guides – Cow-Calf Enterprise Example." Posted on October 25, 2012. (LINK)

12. "Impact of Mandatory Country of Origin Labeling (MCOOL) on Meat Demand." Posted on November 14, 2012. (LINK)

13. "Beef Demand Concepts – Video #1." Posted on December 18, 2012. (LINK)

14. "Beef Demand Concepts – Video #2." Posted on December 18, 2012. (LINK)

15. 6 Beef Demand Videos. Posted on August 19, 2013. (LINK)

16. "KSU-Beef Replacement – Video Tutorial." Posted on November 6, 2013. (LINK)

17. "Big Picture Look: Coronavirus Impact on Pork-Swine Industry." Posted on March 17, 2020. (LINK)

18. "Big Picture Look: Coronavirus Impact on Beef-Cattle Industry." Posted on March 17, 2020. (LINK)

## PROFESSIONAL PRESENTATIONS AND PUBLICATIONS

Oerly, A., **G.T. Tonsor**, and J. Mitchell. "Biosecurity and Health Management by U.S. Cattle Producers: 2018 Survey Summary." October 16, 2020. (LINK)

Oerly, A., **G.T. Tonsor**, and J. Mitchell. "Traceability, Biosecurity and Health Management by U.S. Feedlot Operations: 2018 Survey Summary." October 16, 2020. (LINK)

Oerly, A., **G.T. Tonsor**, and J. Mitchell. "Traceability, Biosecurity and Health Management by U.S. Cow-Calf Operations: 2018 Survey Summary." October 16, 2020. (LINK)

Hissong, C., **G.T. Tonsor**, and D. Blasi. "Limit Fed or Ad Libitum Feeding at the Stocker Phase." September 16, 2020. (LINK)

Hissong, C., **G.T. Tonsor**, and D. Blasi. "Finishing Cattle that Have Been Limit Fed or Ad Libitum Feeding at the Stocker Phase – Marketing Live Fed Cattle." September 16, 2020. (LINK)

Hissong, C., **G.T. Tonsor**, and D. Blasi. "Finishing Cattle that Have Been Limit Fed or Ad Libitum Feeding at the Stocker Phase – Marketing Fed Cattle on the Grid." September 16, 2020. (LINK)

**Tonsor, G.T.** and M. Tokach. "KSU – Hog Contract Evaluation Tool: Overview of Decision-Aide." June 17, 2020. (LINK)

**Tonsor, G.T.** "Overview of US Beef Production, Export, Import, and Domestic Consumption Trends: 2003-2019." May 21, 2020. (LINK)

13

**Tonsor, G.T.** "Kansas Livestock Industry's COVID19 Economic Damage Assessment."  May 12, 2020. (LINK)

**Tonsor, G.T.** and J.L. Lusk. "Meat Demand Monitor – Coronavirus (COVID19) Impact on U.S. Meat Demand: An Update."  May 12, 2020. (LINK)

**Tonsor, G.T.**, LL. Schulz, and J.L Lusk. "Meat Availability and Shortages Overview." April 28, 2020. (LINK)

**Tonsor, G.T.** and Lee Schulz. "Fed Cattle Flows: Demonstrative Scenario Examples." April 28, 2020. (LINK)

Peel, D.S., R. Blach, D. Close, J. Maples, **G.T. Tonsor**, D. Aherin, K. Burdine, A. Hagerman, and J. Robb. "Economic Damages to the U.S. Beef Cattle Industry Due to COVID-19." April 2020. (LINK)

**Tonsor, G.T.** and Lee Schulz. "Assessing Impact of Packing Plant Utilization on Livestock Prices." April 4, 2020. (LINK)

**Tonsor, G.T.** "Meat Demand Monitor - COVID19 Impact Special Report."  March 26, 2020. (LINK)

**Tonsor, G.T.** "Cattle Industry's COVID19 Economic Damage Assessment." KSU-AgEcon-GTT-2020.1. March 2020. (LINK)

Schroeder, T.C., L.L. Schulz, and **G.T. Tonsor**. "Feasibility Assessment of Reporting Negotiated Slaughter Cattle Purchases in Separate Delivery Window Categories." Report Submitted to the USDA Agricultural Marketing Service. November 2019. (LINK)

**Tonsor, G.T.** "Overview of MCOOL Impact on KSU Domestic Beef and Pork Demand Indices." KSU-AgEcon-GT-2019.3. September 2019. (LINK)

**Tonsor, G.T.** "Overview of KSU Export Meat Demand Indices." KSU-AgEcon-GT-2019.2. May 2019. (LINK)

**Tonsor, G.T.** "Updated Overview of KSU Domestic Meat Demand Indices." KSU-AgEcon-GT-2019.1. May 2019. (LINK)

**Tonsor, G.T.** "Will an Incentive-Compatible Indemnity Policy Please Stand Up? & Broader Thoughts." *Invited seminar presentation – Michigan State University*. March 21, 2019. (LINK)

Gatson Smart, C. and **G.T. Tonsor**. "Animal Health Conversations and Social Media." KSU-AgEcon-GT-2018.2. September 2018. (LINK)

**Tonsor, G.T.** "Concentration of U.S. Beef and Pork Exports." Kansas State University, KSU-AgEcon-GT-2018.1. March 2018. (LINK)

**Tonsor, G.T**., J.L. Lusk, T.C. Schroeder. "Assessing Beef Demand Determinants." Report Submitted to the Cattlemen's Beef Board. January 2018. (LINK).

Pudenz, C., L. Schulz, and **G.T. Tonsor**. "Biosecurity and Health Management by U.S. Pork Producers – 2017 Survey Summary." December 2017. (LINK)

Mitchell, J.L. and **G.T. Tonsor.** "Feeder Cattle Price Spreads." Kansas State University, KSU-AgEcon-JMGT-2017.1 November 2017. (LINK)

Schroeder, T.C. and **G.T. Tonsor**. "Developing and Assessing a New Composite Fed Cattle Value Report.  Report Submitted to the USDA Agricultural Marketing Service. November 2017. (LINK)

McKendree, M., **G.T. Tonsor**, L.L. Schulz. "Feedlot Risk Management and Benchmarking Survey Summary." Michigan State University, Staff Paper 2017-07. October 2017. (LINK)

**Tonsor, G.T**. "Updated Retail Beef Demand Indices." Report Submitted to the Cattlemen's Beef Board. September 2017. (LINK)

J. Parcell and **G.T. Tonsor**. "Live Lamb and Lamb Products Confidentiality Study." Report Submitted to the USDA Agricultural Marketing Service. August 2017. (LINK) Included in Report to Congress:
    https://www.ams.usda.gov/sites/default/files/media/LMR2018ReporttoCongress.pdf

National Academies of Sciences, Engineering, and Medicine. 2017. *Revisiting Brucellosis in the Greater Yellowstone Area*. Washington, DC: The National Academies Press. https://doi.org/10.17226/24750. (LINK)

Wilson, C., M. Taylor, and **G.T. Tonsor**. "Farm Bill Program Enrollment Decisions by Kansas Farmers." Kansas State University, June 2017. (LINK)

Lusk, J., **G.T. Tonsor**, T.C. Schroeder, and D. Hayes. **"**Consumer Valuation of Pork Chop Quality and Quality Information. Report Submitted to the National Pork Board. February 2017. (LINK)

Coffey, B.K., **G.T. Tonsor,** and T.C. Schroeder. "What Influences Ability to Hedge Live Cattle?" Kansas State University, AM-BKC-2017.1 February 2017. (LINK)

**Tonsor, G.T.** and T.C. Schroeder. "Creating and Assessing Candidate Food Service and Retail Beef Demand Indices." Report Submitted to the Cattlemen's Beef Board. January 2017. (LINK)

**Tonsor, G.T.** and J.L. Mitchell. "Evaluating Cattle Cycles: Changes over Time and Implications." Kansas State University, AM-GTT-2017.1 February 2017. (LINK)

J. Parcell, **G.T. Tonsor** and T.C. Schroeder. "Baseline Study of Livestock and Meat Marketing

Trends and Implications for Livestock Mandatory Reporting." Report Submitted to the USDA Agricultural Marketing Service. August 2016. (LINK)

**Tonsor, G.T.**, S. Hill, and D. Blasi. "Benchmarking Situation and Practices of U.S. Stocker Operations." Kansas State University, KSU-AgEcon-GTT-2015.6. December 2015. (LINK)

**Tonsor, G.T.** "It's all Relative – Reference Points in Choice Experiments." *Invited seminar presentation – University of Missouri-Columbia*. October 30, 2015. (LINK)

**Tonsor, G.T.** and T.C. Schroeder. "Beef Demand Prioritization." Kansas State University, KSU-AgEcon-GTT-2015.5. August 2015. (LINK)

Wolf, C.A., **G.T. Tonsor**, M. McKendree, D.U. Thomson, and J.C. Swanson. "U.S. Dairy Farmer Welfare Perceptions and Attitudes: Survey Summary." Michigan State University, Staff Paper 2015-04. July 2015. (LINK)

Wolf, C.A., **G.T. Tonsor**, M. McKendree, L. Polzin, D.U. Thomson, and J.C. Swanson. "U.S. Public Dairy Cattle Welfare Perceptions and Attitudes: Survey Summary."
Michigan State University, Staff Paper 2015-03. June 2015. (LINK)

McKendree, M., **G.T. Tonsor**, C.A. Wolf, D.U. Thomson, and J.C. Swanson. "U.S. Cow-Calf Producer Viewpoints of Animal Welfare in the Beef Industry: Survey Summary." Kansas State University, AM-GTT-2015.4. July 2015. (LINK)

McKendree, M., **G.T. Tonsor**, C.A. Wolf, D.U. Thomson, and J.C. Swanson. "Viewpoints of the U.S. Public on Animal Welfare in the Beef Industry: Survey Summary." Kansas State University, AM-GTT-2015.3. July 2015. (LINK)

McKendree, M., **G.T. Tonsor**, C.A. Wolf, D.U. Thomson, and J.C. Swanson. "Executive Summary: Viewpoints of the U.S. Public and Cow-Calf Producers on Animal Welfare in the Beef Industry." Kansas State University, AM-GTT-2015.2. July 2015. (LINK)

**Tonsor, G.T.,** T.C. Schroeder, and J. Parcell. 2015. Economic Impacts of 2009 and 2013 U.S. Country-of-Origin Labeling on U.S. Beef and Pork Markets. Project No. AG-3142-P-14-0054 R0. Final Report submitted to the Office of the Chief Economist, U.S. Department of Agriculture, January 26, 2015. (LINK; See Appendix A)

**Tonsor, G.T.** and T.C. Schroeder. "E.Coli Vaccination in U.S. Feedlot Cattle: Market Impacts." Kansas State University, AM-GTT-2015.1. February 2015. (LINK)

E. Mollohan and **Tonsor, G.T.** "Premiums and Discounts on Calves and Yearlings." Kansas State University, AM-GTT-2014.1. December 2014. (LINK)

J. Farney, C. Reinhardt, **G.T. Tonsor,** J. Petersilie, and S. Johnson. "Beef Cow-Calf Management Options When Pasture is Limited." Kansas State University, MF-3114, August 2014. (LINK)

**Tonsor, G.T.** "Economics of Technology Acceptance and Agricultural Producer Self-Regulation Assessment." *Invited seminar presentation – Ohio State University*. April 8, 2014. (LINK)

M.R. Taylor, K.C. Dhuyvetter, and **Tonsor, G.T.** "Cost of Forward Contracting Wheat in Kansas." Kansas State University, AM-MRT-2013.2. November 2013. (LINK)

**Tonsor, G.T.** and K.C. Dhuyvetter. "Net Present Value of Beef Replacements: Regional Analysis Summary." Kansas State University, AM-GTT-KCD-2013.2. November 2013. (LINK)

**Tonsor, G.T.** and K.C. Dhuyvetter. "Net Present Value of Beef Replacements: Sensitivity Analysis Summary." Kansas State University, AM-GTT-KCD-2013.1. November 2013. (LINK)

**G.T. Tonsor** and T.C. Schroeder. "Economic Needs Assessment: Pork Quality Grading System."
2013 Report Submitted to the National Pork Board. (LINK)

Schroeder, T., **G.T. Tonsor**, and J. Mintert. "Beef Demand: Recent Determinants and Future Drivers." 2013 Report Submitted to the Cattlemen's Beef Board. (LINK)

J. R. Pruitt, **G.T. Tonsor**, K.R. Brooks, and R.J. Johnson. "Agribusiness and Market Analyst Preferences for USDA Market Information." LSU AgCenter Research & Extension. Pub. 3230. February 2013.

**Tonsor, G.T.**, J.L. Lusk, T.C. Schroeder, and M.R. Taylor. "Mandatory Country of Origin Labeling: Consumer Demand Impact." Kansas State University, AM-GTT-2012.6. November. (LINK)

**Tonsor, G.T.** and K.C. Dhuyvetter. "Value of Gain Projections: Overview of Forecasts Accuracy." Kansas State University, AM-GT-2012.5. September 2012. (LINK)

Dhuyvetter, K.C. and **G.T. Tonsor.** "Detail of Procedures for Estimating Historic and Projecting Future Fed Cattle Finishing Returns." Kansas State University, AM-GTT-KCD-KFR-7.2012. July 2012. (LINK)

**Tonsor, G.T.** "USDA Certification of Beef Tenderness: An Overview of Economic Considerations." Kansas State University, AM-GT-2012.4. August 2012. (LINK)

**G.T. Tonsor**. "How to Get More from Demand Models using Simulations in Matlab." Organized Symposium presentation 2012 Western Agricultural Economics Association Annual Meeting, Park City, Utah.

J. R. Pruitt, **G.T. Tonsor**, K.R. Brooks, and R.J. Johnson. "County Extension Agent Preferences for USDA Market Information." LSU AgCenter Research & Extension. Pub. 3237. June 2012. (LINK)

**Tonsor, G.T.** "Life as a Land-Grant Economist in a Changing World." *Invited seminar presentation – Oklahoma State University*. April 27, 2012.

McElligott, J. and **G.T. Tonsor**. "Fed Cattle Basis: An Updated Overview of Concepts and Applications." Kansas State University, AM-GT-2012.3. March 2012. ([LINK](LINK))

Herrington, M.A. and **G.T. Tonsor**. "Grid and Formula Pricing in the Beef Industry." Kansas State University, AM-GT-2012.2. March 2012. ([LINK](LINK))

Herrington, M.A. and **G.T. Tonsor**. "Beef Premiums and Discounts: An Update of 5-Area Cattle and Beef Quality Premiums and Discounts." Kansas State University, AM-GT-2012.1. March 2012. ([LINK](LINK))

**Tonsor, G.T.** and K.C. Dhuyvetter. "Value of Gain: Current Situation and Overview of Available Decision Tools." Kansas State University, AM-GT-2011.5. September 2011. ([LINK](LINK))

Pendell, D.L., **G.T. Tonsor,** G.W. Brester, K.C. Dhuyvetter, and T.C. Schroeder. "Economic Impacts of Evolving Red Meat Export Market Access Requirements for Traceability of Livestock and Meat." Kansas State University, AM-GT-2011.2. September 2011. ([LINK](LINK))

Schroeder**,** T.C. and **G.T. Tonsor.** "Cattle Identification and Traceability: Implications for United States Beef Exports." Kansas State University, AM-GT-2011.3. September 2011. ([LINK](LINK))

**Tonsor, G.T.** "Evaluating Cattle Cycles: Changes Over Time and Implications." Kansas State University, AM-GT-2011.4. August 2011. ([LINK](LINK))

**Tonsor, G.T.**, J.R.V. Franken, and J.L. Parcell. "Impact of Mandatory Price Reporting on Hog Market Integration." Kansas State University, MF-3019. 2011. ([LINK](LINK))

Schumacher, T., T.C. Schroeder, and **G. T. Tonsor**. "Value of Preconditioned Certified Health Programs to Feedlots." Kansas State University, MF-3017. 2011. ([LINK](LINK))

**Tonsor, G.T.** and C.A. Wolf. "Effect of Video Information on Consumers: Case of Milk Production Attributes." Invited paper presented at 2011 Agricultural & Applied Economics Association Annual Meeting, Pittsburgh, PA.

**Tonsor, G.T.** and J. McElligott. "Fed Cattle Basis Forecasting: Assessing Alternative Methods." Selected paper presented at 2011 Agricultural & Applied Economics Association Annual Meeting, Pittsburgh, PA.

**Tonsor, G.T.** and C.A. Wolf. "Mandatory Labeling of Animal Welfare Attributes: Public Support and Considerations for Policymakers." Kansas State University, AM-GT-2011.1. July 2011. ([LINK](LINK))

**G.T. Tonsor** and C. Wolf. "Consumer Perceptions of Effectiveness in Improving Animal Well-Being." Selected paper presented at 2011 Western Agricultural Economics Association-Canadian Agricultural Economics Society Joint Annual Meeting, Banff, Alberta.

**G.T. Tonsor**, G. Brester, K. Dhuyvetter, D. Pendell, and T. Schroeder. "Economics of Evolving Red Meat Export Market Access Requirements for Traceability of Livestock and Meat." Organized symposium presentation at 2011 Western Agricultural Economics Association-Canadian Agricultural Economics Society Joint Annual Meeting, Banff, Alberta.

**Tonsor, G.T.** "Consumer Inferences of Food Safety and Quality: Implications for Researchers, Marketers, and Policy Makers." *Invited seminar presentation –University of Nebraska-Lincoln*. January 28, 2011.

Dhuyvetter, K.C. and **G. T. Tonsor**. "Determining Pasture Rents in the Flint Hills of Kansas." Kansas State University. November 2010. ([LINK](LINK))

**Tonsor, G.T.** and N.J. Olynk. "U.S. Meat Demand: The Influence of Animal Welfare Media Coverage." Kansas State University, MF-2951. 2010. ([LINK](LINK))

Buskirk, D., **Tonsor, G**., and D. Grooms. "Trust, but Verify: Source and Age Demonstration Project." *Michigan State University Cattle Call*. 15:3(2010):1-3. ([LINK](LINK))

**Tonsor, G.T.**. "Consumer Food Safety Perceptions: Do they Differ across Products, Species, and Specific Risks?" Paper presented at 2010 Agricultural & Applied Economics Association Annual Meeting, Denver, CO. ([LINK](LINK))

**Tonsor, G.T.** and L.L. Schulz. "National Survey of Cow-Calf Producers' Beliefs about Traceability." Kansas State University, MF-2944. 2010. ([LINK](LINK))

**Tonsor, G.T.** and L.L. Schulz. "Cow-Calf Producer Preferences for Voluntary Animal Identification and Traceability Systems." Kansas State University, MF-2943. 2010. ([LINK](LINK))

**Tonsor, G.T.,** T.C. Schroeder, and J. Parcell. "Wholesale Pork Price Reporting Analysis: A Study Summary." Kansas State University, MF-2931. 2010. ([LINK](LINK))

Parcell, J., T. Schroeder, and G.T. Tonsor. "Wholesale Pork Price Reporting Analysis." 2009 Report to the United States Department of Agriculture, Agricultural Marketing Service. ([LINK](LINK))

**Tonsor, G.T.** "Impacts of Animal Handling and Welfare Media on Meat Demand." *Invited seminar presentation – North Dakota State University*. November 20, 2009.

**Tonsor, G.T.** "Production Efficiency of Specialized Swine Producers." *Michigan State University Pork Quarterly*. 14:3(2009):4-5.

Pofhal, G.M., T.J. Richards, and **G.T. Tonsor**. "Valuation of New Products in the Face of Consumer Income Disparity." Selected paper at 2009 American Agricultural Economics Association Annual Meeting, Milwaukee, WI.

**G.T. Tonsor**, N. Olynk, and C. Wolf. "Media Coverage of Animal Handling and Welfare: Influence on Meat Demand." Selected paper at 2009 American Agricultural Economics Association Annual Meeting, Milwaukee, WI.

**Tonsor, G.T.** and C. Wolf. "Consumer Use, Perceptions, and Demand Impacts of Alternative Animal Welfare Information Sources." Paper presented at 2009 American Agricultural Economics Association Annual Meeting, Milwaukee, WI; Organized Symposium Session.

**Tonsor, G.T.** "Pork Demand Determinants." *Michigan State University Pork Quarterly*. 14:2(2009):4.

NAIS Benefit-Cost Research Team. *Benefit-Cost Analysis of the National Animal Identification System.* Final Research Report Submitted to U.S. Department of Agriculture, Animal and Plant Health Inspection Service. January 2009. Available at: http://www.agmanager.info/livestock/marketing/NAIS/BC_Analysis_NAIS.pdf

**Tonsor, G.T.** "USDA Surveillance of Animal Handling at Auction and Processing Facilities." *Michigan State University Pork Quarterly*. 14:1(2009):1-2.

**G. T. Tonsor,** J. Mintert, and T. Schroeder. "U.S. Beef Demand Drivers and Enhancement Opportunities." Kansas State University, MF-2893. 2009. Available at: http://www.agmanager.info/livestock/marketing/bulletins_2/industry/demand/Beef_Demand_Drivers_June_2009.pdf

Mintert, J., **G. Tonsor,** and T. Schroeder. "U.S. Beef Demand Drivers and Enhancement Opportunities: A Research Summary." Kansas State University, MF-2876. 2009. Available at: http://www.agmanager.info/livestock/marketing/bulletins_2/industry/demand/Beef_Demand_Drivers_January_2009.pdf.

**Tonsor, G.T.** and R. Shupp. "Valuations of 'Sustainably Produced' Labels on Beef, Tomato, and Apple Products." Paper presented at 2009 FAMPS Meeting, San Diego, CA.

**Tonsor, G.T**. and C. Wolf. "USDA Surveillance of Animal Handling at Auction and Processing Facilities." Paper presented at 2009 FAMPS Meeting, San Diego, CA.

**Tonsor, G.T.** "U.S. Resident Support for Gestation Crate Bans." *Michigan State University Pork Quarterly*. 13:4(2008):3-4.

**Tonsor, G.T.,** N. Olynk, and C. Wolf. "Consumer Preferences for Animal Welfare Attributes: The Case of Gestation Crates." Paper presented at 2008 American Agricultural Economics Association Annual Meeting, Orlando, FL.

**Tonsor, G.T.**, T. Schroeder, and J. Pennings. "Factors Impacting Food Safety Risk Attitudes and Perceptions." Paper presented at 2008 American Agricultural Economics Association Annual Meeting, Orlando, FL; FAMPS Session.

**Tonsor, G.T.** "Government Benefits & Costs of NAIS." Paper presented at 2008 Western Agricultural Economics Association Annual Meeting, Big Sky, MT.

Chaudhuri, M. and **G.T. Tonsor**. "Structural Change in the Energy Sector: The Demand for Ethanol." Paper presented at 2008 Western Agricultural Economics Association Annual Meeting, Big Sky, MT.  Abstract published: *Journal of Agricultural and Resource Economics*. 33:3(December 2008):501.

Schulz, L. and **G.T. Tonsor**. "Cow-Calf Producer Valuations of Traceability System Attributes." Paper presented at 2008 Western Agricultural Economics Association Annual Meeting, Big Sky, MT.  Abstract published: *Journal of Agricultural and Resource Economics*. 33:3(December 2008):502.

Schroeder, T.C., K.C. Dhuyvetter, C. Crosby, **G.T. Tonsor**, D.L. Pendell, G.W. Brester, and J. Wiemers. "Benefits and Costs of the National Animal Identification System."  Paper presented at 2008 Western Agricultural Economics Association Annual Meeting, Big Sky, MT.  Abstract published: *Journal of Agricultural and Resource Economics*. 33:3(December 2008):506-7.

Schulz, L. and **G.T. Tonsor** "ID Feedback." *BEEF Magazine*. August 1, 2008.  Available at: http://beefmagazine.com/sectors/cow-calf/0801-survey-id-feedback/.

**Tonsor, G.T.** "Michigan Producer Perceptions of Gestation Stall Pressures." *Michigan State University Pork Quarterly*. 13:2(2008):1-3.

**Tonsor, G.T.** "Michigan Consumer Gestation Stall Perceptions and Preferences." *Michigan State University Pork Quarterly*. 13:2(2008):4-5.

**Tonsor, G.T.** "Hog Enterprise Price Analysis Excel Tool." *Michigan State University Pork Quarterly*. 13:2(2008):12.  Excel spreadsheet and instructions available at: https://www.msu.edu/user/gtonsor/DecisionTools.html

**Tonsor, G.** "Age and Source Verification." *Michigan State University Cattle Call*. 13:3(2008):4-5.

**Tonsor, G.T.** and K.C. Dhuyvetter. "Sow Management: How Many Litters/Sows Should I be Targeting." *Michigan State University Pork Quarterly*. 13:1(2008):1-3.

**Tonsor, G.T.**. "Hedging in Presence of Market Access Risk."  Paper presented at 2008 NCCC-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management. St. Louis, MO.

**Tonsor, G**., S. Rust., and R. Black. "Optimal Use of Distiller's Grains in Feedlot Rations: An Economic Perspective." *Michigan State University Cattle Call*. 13:2(2008):1-2.

Schroeder, T.C., **G.T. Tonsor**, J. Pennings, and J. Mintert. "The Role of Consumer Risk Perceptions and Attitudes in Cross-Cultural Beef Consumption Changes."  Paper presented at 2007 Western Agricultural Economics Association Annual Meeting, Honolulu, Hawaii.  Abstract published: *Journal of Agricultural and Resource Economics*. 32:3(December 2008):566.

**Tonsor, G.T.** and S. Rust.  "How Many Producers are Feeding Ethanol Co-Products? Can I Guarantee Supply?" *Michigan State University Cattle Call*. 12:2(2007):6-7.

Jones, C. and **G.T. Tonsor.** "Economically Optimal Distiller's Grains Use in Feedlots Rations: Recognition of Omitted Factors." Paper presented at 2007 American Agricultural Economics Association Annual Meeting, Portland, OR.

**Tonsor, G.T.,** Schroeder, T.C., J.M.E., and J. Mintert. "Consumer Valuations and Choice Processes of Food Safety Enhancement Attributes: An International Study of Beef Consumers." Paper presented at 2007 American Agricultural Economics Association Annual Meeting, Portland, OR.

Schroeder, T.C., **G.T. Tonso**r, J.M.E., and J. Mintert. "The Role of Consumer Risk Perceptions and Attitudes in Cross Cultural Beef Consumption Changes." Paper presented at 2007 Western Agricultural Economics Association Annual Meeting, Portland, OR.  Abstract published: *Journal of Agricultural and Resource Economics*. 32:3(December 2007):566.

**Tonsor, G.T**. "Economic Impacts of Hog Operations." *Michigan State University Pork Quarterly*. 12:2(2007):1-4.

**Tonsor, G.T.** "Economic Impacts of Hog Operations." 2007 Michigan State University Extension Technical Bulletin prepared for Gratiot County Forum on Emerging Issues in Dairy and Livestock Production.  Available at: http://www.msue.msu.edu/objects/content_revision/download.cfm/revision_id.376519/workspace_id.27335/Tech%20Bulletin%20Economic%20Impacts.pdf/

Schroeder, T.C., **G.T. Tonsor**, J. Mintert, and J.M.E. Pennings, "Consumer Risk Perceptions and Attitudes about Beef Food Safety: Implications for Improving Supply Chain Management." Kansas State University Agricultural Experiment Station Report, November 2006.  Available at: http://www.naiber.org/Publications/NAIBER/Consumer%20Perceptions%20Final.pdf.

**Tonsor, G.T**. and T.C. Schroeder. "Cattle Feeding Net Revenue Variability: Forecasting and Window Contract Value."  Paper presented at 2006 Western Agricultural Economics Association Annual Meeting, Anchorage, AK.  Abstract published: *Journal of Agricultural and Resource Economics*. 31:3(December 2006):691.

**Tonsor, G.T.** and T. Kastens. "How Much Do Starting Values Really Matter? An Empirical Comparison of Genetic Algorithm and Traditional Approaches." Paper presented at 2006 American Agricultural Economics Association Annual Meeting, Long Beach, CA.

**Tonsor, G.T.** and D.L. Pendell. "How to Get a Job: The Determinants of Academic Employment in Agricultural Economics." Paper presented at 2006 American Agricultural Economics Association Annual Meeting, Long Beach, CA.

**Tonsor, G.T.** and A.M. Featherstone. "Non-Parametric Efficiency Measures for Swine Enterprises Differing by Production Organization." Paper presented at 2006 Southern Agricultural Economics Association Annual Meeting, Orlando, FL.  Abstract published: *Journal of Agricultural and Applied Economics*. 38:3(December 2006):660.

**Tonsor, G.T.** and T.C. Schroeder. "Lessons for the U.S. Beef Industry Learned from the Australian National Livestock Identification System." Livestock Marketing Information Center fact sheet WEMC FS#13-2006. Fact sheet and PowerPoint presentation available at: http://www.lmic.info/memberspublic/pubframes.html.

**Tonsor, G.T.** and T.L. Marsh. "Explaining Heterogeneous Responses by American and Japanese Consumers to Non-Price Effects in Meat Demand." Paper presented at 2005 American Agricultural Economics Association Annual Meeting, Providence, RI.

Schroeder, T.C. and **G.T. Tonsor**. "The Tortoise and the Hare: Which One Will the U.S. be in the ID System Race?" *Strategic Agribusiness Review*. Issue 13, October 2004. Available at: http://www.strategicagreview.com/e_article000299776.cfm?x=b11,b2q0cKf2.

**Tonsor, G. T**. and T.C. Schroeder. "Australia's Livestock Identification Systems: Implications for United States Programs." Paper presented at 2004 Risk and Profit Conference, Manhattan, KS.

Brant, M., D. Pendell, and **G.T. Tonsor**. "What Do You Think? Participant Survey Results: 2004 Kansas State Risk and Profit Conference."  Paper presented at 2004 Risk and Profit Conference, Manhattan, KS.  Kansas State University, Department of Agricultural Economics Staff Paper #05-02.

**Tonsor, G.T**., J. Mintert, and K.C. Dhuyvetter. "Calendar vs. Weeks to Expiration Livestock Basis Forecasts: Which Is Better?"  Paper presented at 2003 NCR-134 Conference on Applied Commodity Price Analysis, Forecasting, and Market Risk Management. St. Louis, MO.

**Tonsor, G.T.,** K.C. Dhuyvetter, and J. Mintert. "Livestock Basis Forecasts: How Beneficial Is the Inclusion of Current Information."  Paper presented at 2003 Western Agricultural Economics Association Annual Meeting, Denver, CO.  Abstract published: *Journal of Agricultural and Resource Economics*. 28:3(December 2003):660.

**Tonsor, G.T.** and T.C. Schroeder. "European Consumer Preferences for U.S. and Domestic Beef: Willingness to Pay for Source Verification, Hormone-Free, and Genetically Modified

Organism-Free Beef." Paper presented at 2003 American Agricultural Economics Association Annual Meeting, Montreal, CA.

**Tonsor, G.T.** and T.C. Schroeder. "European Consumer Preferences for U.S. and Domestic Beef: Value of Source Verification and Beef Produced Without Use of Synthetic Hormones or GMO Feed Grains." Paper prepared for the National Cattleman's Beef Association, May 2003.

### SIGNFICANT INVITED EXTENSION PRESENTATIONS & PANELS (archive LINK)

"Beef-Cattle Outlook & Feeder Cattle Price Risk Management." Webinar. December 15, 2020. (+/- 35 in "live" attendance).

"What's Up in Meat." Virtual Fall 2020 Retail Advisory Committee Meeting. October 6, 2020. (+/- 115 in "live" attendance).

"Economics Aspects – Limit Feeding." Virtual Beef Stocker Field Day, Manhattan, KS. September 20, 2018. (+/- 175 in "live" attendance).

"Beef Cattle Market Outlook." Virtual Beef Stocker Field Day, Manhattan, KS. September 20, 2018. (+/- 230 in "live" attendance).

"Beef Labeling." *Pasture to Plate Program*. South Dakota Farm Bureau Series. September 24, 2020 Webinar. (+/- 18 in "live" attendance).

"Imagining the Post-COVID U.S. Livestock Industry." *Virtual KARL Café*. September 1, 2020 Webinar. (+/- 25 in "live" attendance).

"Impact of COVID-19 on the Food Supply Chain." *The Agricultural Business Council of Kansas City*. July Webinar. (+/- 85 in "live" attendance). (LINK)

"Beef Demand Considerations: In-Depth Perspective of Domestic and International Demand." June 10, 2020 Webinar with Ted Schroeder. (+/- 70 in "live" attendance). (LINK)

"How Resilient is the US Meat Supply Chain?" June 5, 2020 C-FARE Webinar with Josh Maples and Kenny Burdine. (+/- 250 registered) (LINK)

"Managerial Tools and Tips in an Uncertain Climate and Market." June 4, 2020 Webinar with KSU Beef Team. (? Registered). (LINK)

"COVID19's Impact on the Pork Industry." Brownfield Ag News – Part 2, May 27, 2020 Webinar. (1,666 attendance reach). (LINK)

"Troubleshooting Uncertain Times in the Beef Industry." May 14, 2020 Webinar with KSU Beef Team. (? Registered). (LINK)

"Economics of Agriculture During the COVID-19 Pandemic: A Series of Online Gatherings *More on Livestock Markets*." May 7, 2020 Webinar. (138 in "live" attendance). ([LINK](LINK))

"COVID19's Impact on the Pork Industry." Brownfield Ag News, April 29, 2020 Webinar. (3,115 attendance reach). ([LINK](LINK))

"Beef-Cattle Sector Thoughts." Post-webinar update. April 16, 2020. ([LINK](LINK))

"Economics of Agriculture During the COVID-19 Pandemic: A Series of Online Gatherings *Livestock Markets*." April 9, 2020 Webinar. (111 in "live" attendance). ([LINK](LINK))

"Big Picture Look: Coronavirus Impact on Pork-Swine Industry." March 17, 2020. ([LINK](LINK))

"Big Picture Look: Coronavirus Impact on Beef-Cattle Industry." March 17, 2020. ([LINK](LINK))

"Beef Cattle Market Outlook." American Society of Farm Managers & Rural Appraisers – KS Chapter Annual Meeting. Manhattan, KS. February 21, 2020. (+/- 75 in attendance).

"Beef Cattle Market Outlook." Women in Agriculture – Educational Series. Clay Center, KS. February 20, 2020. (+/- 35 in attendance).

"Alternative Proteins Situation: Broad Overview & Framing for Economic Discussion." International Meat Secretariat 7th Economic Workshop.  Buenos Aires, Argentina. November 19, 2019 (+/- 65 in attendance).

"Alternative Proteins Situation: Broad Overview & Framing for Economic Discussion." USMEF Strategic Planning Conference. Tucson, AZ. November 7, 2019 (+/- 200 in attendance).

"Beef and Cattle Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. October 8-9, 2019. (162 in attendance over two locations).

"LMR & Holcomb Fire Update." Hill Briefing – U.S. House of Representatives Staff. Washington DC. October 7, 2019. (+/- 30 in attendance).

 "Beef Cattle Market Outlook." Stockmanship-Stewardship, 2019 Regional Tour. Manhattan, KS. September 21, 2019. (+/- 100 in attendance).

"Beef Cattle Market Outlook." Beef Stocker Field Day, Manhattan, KS. September 19, 2019. (+/- 200 in attendance).

 "Beef Industry Outlook." Risk and Profit Conference. Manhattan, KS. August 23, 2019. (+/- 100 in attendance).

"Consumer Beef Demand Determinants & Nutrient Content's Role." ASAS Annual Meeting. Austin, TX. July 9, 2019. (+/- 35 in attendance).

"Role of Packers & Processors in Livestock Biosecurity Effort." WAEA Organized Symposium: Multisectoral Livestock Biosecurity & Surveillance. Coeur d'Alene, ID; July 1, 2019. (+/- 30 in attendance).

"Beef Demand Determinants: Research Summary & Implications" Reciprocal Meat Conference. Ft. Collins, CO; June 25, 2019. (+/- 30 in attendance).

"Economist Perspective on *So What*?" ADBCAP Symposium: Innovation and Collaboration for Agricultural Biosecurity. College Park, MD; May 16, 2019. (+/- 30 in attendance).

"Agricultural Research Congressional Exhibition & Reception." Rayburn House Office Cafeteria. Washington DC; May 15, 2019. (+/- 125 in attendance).

"The Role of Research and Extension in Creating Healthier Individuals, More Resilient Communities, and Safer Agriculture." Senate Ag Staff Briefing, SR-328. Washington DC; May 15, 2019. (+/- 35 in attendance).

"Information Sharing in the Beef-Cattle Industry – Tactical Plan: Where's the Beef?" ADBCAP Symposium: Innovation and Collaboration for Agricultural Biosecurity. College Park, MD; May 15, 2019. (+/- 45 in attendance).

"U.S. Swine Survey Insights – Tactical Plan: Gaining Empirical Insights on Producer Decision-Making." ADBCAP Symposium: Innovation and Collaboration for Agricultural Biosecurity. College Park, MD; May 15, 2019. (+/- 45 in attendance).

"Beef and Cattle Market Outlook Synthesis." Beef Cattle and Forage Field Day. Parsons, KS; May 2, 2019. (+/-100 in attendance).

"U.S. Hog and Pork Pricing Situation." Annual General Meeting, Ontario Pork Producers. Guelph, Ontario. March 19, 2019. (+/- 200 in attendance).

"Beef Cattle Market Outlook & Economic Issues Surrounding Alternative Proteins." KSU Cattlemen's Day. Manhattan, KS. March 1, 2019. (+/- 150 in attendance; +/- 500 via on-site streaming video).

"Beef and Cattle Market Outlook." 2019 KOMA Beef Cattle Conference. Greenbush, KS; January 24, 2019. (+/-110 in attendance).

"Beef Demand Overview." Committee Leadership Summit. Aurora, CO. December 11, 2018. (+/- 30 in attendance).

"Beef Demand Insight." Hawaii Cattlemen's Council Convention. Waikola Beach, Hawaii. November 16, 2018. (+/- 150 in attendance).

"U.S. Hog and Pork Pricing Situation." Quebec Hog Breeders Annual Assembly.  Quebec City, Quebec. November 8, 2018. (+/- 260 in attendance).

"Beef Demand Insight: Concepts Update, Sustainability Related Issues, & Alt-Meat Discussion." NCBA Hosted *Producer Communications-Sustainability Research* meeting.  October 22, 2018. Centennial, CO. (+/- 20 invited media leaders in attendance by webinar).

"Beef and Cattle Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. October 9-10, 2018. (162 in attendance over two locations).

"Beef Cattle Outlook & Role of Producer Expectations in Buying Decisions." Beef Stocker Field Day, Manhattan, KS. September 20, 2018. (+/- 200 in attendance).

 "Beef Industry Outlook & Trade Insights." Risk and Profit Conference. Manhattan, KS. August 17, 2018. (+/- 125 in attendance).

"Beef Industry Outlook & Trade Insights." Flint Hills Beef Fest. Emporia, KS. August 17, 2018. (+/- 150 in attendance).

"Beef-Cattle Industry Outlook." Industry Outlook Conference. Kansas City, MO. August 13, 2018. (+/- 50 in attendance).

"Challenges in Agriculture's Producer-Public Interface: Perspectives of an Economist." 12th World Conference on Animal Production (WCAP). Vancouver, Canada July 8, 2018. (+/- 35 in attendance).

"Impact of Indemnity Expectations on Producer Biosecurity Effort." International Society for Economics and Social Sciences of Animal Health (ISESSAH) 2018 Conference. Montpellier, France May 15, 2018. (+/- 100 in attendance).

"Beef Industry Outlook & Beef Demand Insights." Niman Ranch Beef Education Summit. Manhattan, KS. May 2, 2018. (+/- 60 in attendance).

"Beef-Cattle Outlook." Spring 2018 Industry Outlook Conference. Chicago, IL. April 25, 2018. (+/- 90 in attendance).

"A Different Animal: Futures Contract Design, Hedging Effectiveness, and Transparency in Thinly Traded Cash Markets for Cattle and Hogs." 2018 Agricultural Commodity Futures Conference. Overland Park, KS.  April 6, 2018. (+/- 295 in attendance; joint with Ted Schroeder).

"Beef Industry Outlook & International Trade's Role." KSU Cattlemen's Day. Manhattan, KS. March 2, 2018. (+/- 150 in attendance; +/- 500 via on-site streaming video).

"Beef-Cattle Outlook and Deeper Look at Data Quality." Kansas Society of Farm Managers and Rural Appraisers Winter Meeting. Salina, KS. February 23, 2018 (+/- 80 in attendance).

"Beef-Cattle Outlook & Further Examination of Feedlot Management Info.." 2018 Performance Beef Winter Conference. Sioux Falls, SD. February 22, 2018. (+/- 110 in attendance).

"Assessing Beef Demand Determinants." Checkoff Update Session. 2018 Cattle Industry Convention. Phoenix, AZ. February 1, 2018. (+/- 225 in attendance).

"Assessing Beef Demand Determinants." Joint Evaluation Advisory Committee Meeting. 2018 Cattle Industry Convention. Phoenix, AZ. January 31, 2018. (+/- 65 in attendance).

"Cattle and Beef Outlook." Farming for the Future. Emporia, KS. January 22, 2018. (+/- 20 in attendance).

"Cattle and Beef Outlook."2018 KOMA Beef Cattle Conference & Trade Show. Dewey, OK. January 17, 2018. (+/- 50 in attendance).

"Cattle and Beef Outlook." Farming for the Future. Scott City, KS. January 10, 2018. (+/- 60 in attendance).

"Cattle and Beef Outlook." Farming for the Future. Salina, KS. December 19, 2017. (+/- 60 in attendance).

"Cattle and Beef Outlook." Farming for the Future. Pratt, KS. December 14, 2017. (+/- 75 in attendance).

"Livestock Risk Management Considerations." 2017 Agricultural Economics Agent Update. Emporia, KS. November 8, 2017. (+/- 25 in attendance).

"Beef and Cattle Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. October 10-11, 2017. (+/- 175 in attendance over two locations).

"Livestock Risk Management Considerations." 2017 Agricultural Economics Agent Update. Dodge City, KS. October 10, 2017. (+/- 20 in attendance).

"Cattle & Beef Outlook & Industry Overview." Cochran Fellowship Program – Visitors from Turkey. Manhattan, KS. October 6, 2017. (6 in attendance).

"Beef-Cattle Industry Outlook." Flint Hills Beef Fest. Emporia, KS. August 18, 2017. (+/- 170 in attendance).

"Livestock Industry Outlook Overview." Risk and Profit Conference. Manhattan, KS. August 17, 2017. (+/- 140 in attendance).

"Beef-Cattle Industry Outlook." KSU Southeast Agricultural Research Center *Beef Cattle and Forage Crops Field Day*. Mound Valley, KS. May 4, 2017. (+/- 125 in attendance).

*"Consumer Perceptions of Animal Health."* *University of Missouri-Columbia Guest Lecture-Webinar.* April 24, 2017. (+/- 25 in attendance via webinar).

"Beef-Cattle Industry Outlook." K-State Agricultural Research Center Roundup. Hays, KS. April 20, 2017. (+/- 20 in attendance).

"Beef Cattle Economics Trilogy: Beef Industry Outlook, Drivers of Profitability, and Better Use of Farm Management Budgets." KSU Cattlemen's Day. Manhattan, KS. March 3, 2017. (+/- 150 in attendance; +/- 500 via on-site streaming video; joint with Dustin Pendell).

"2017 Beef-Cattle Market Outlook." Lawrence, KS February 21, 2017. (+/- 45 in attendance).

"Creating and Assessing Candidate Food Service and Retail Beef Demand Indices." FY17 Checkoff Update Session. 2017 National Cattlemen's Beef Association Annual Meeting. Nashville, TN. February 2, 2017. (+/- 225 in attendance).

"Creating and Assessing Candidate Food Service and Retail Beef Demand Indices." Joint Evaluation Advisory Committee Meeting. 2017 National Cattlemen's Beef Association Annual Meeting. Nashville, TN. February 1, 2017. (+/- 70 in attendance).

"Beef-Cattle Market Outlook & Cow-Calf Decision-Making Overview." Ord, NE January 24, 2017. (+/- 90 in attendance).

"Cattle Market Outlook & Role of Consumer in U.S. Livestock Industry." Mississippi Farm Bureau Federation Winter Commodity Conference. Jackson, MS January 23, 2017. (+/- 80 in attendance).

"Beef and Cattle Market Outlook." New York Beef Producers' Association Annual Meeting. Syracuse, NY. January 20, 2017. (+/- 75 in attendance via webinar).

"U.S. Beef Industry in 20 Years." 2017 Cow-Calf Conference. Manhattan, KS. January 13, 2017. (+/- 60 in attendance).

"Role of Consumer Perceptions of Animal Health." Feedlot Receiving Calf Health & Well-Being Conference. Stillwater, OK. January 9, 2017. (+/- 250 in attendance).

"Beef and Cattle Market Outlook." Abilene, KS. December 5, 2016. (+/- 30 in attendance).

"U.S. Beef Industry in 20 Years." Academy of Veterinary Consultants. Denver, CO. December 2, 2016. (+/- 300 in attendance).

"Beef and Cattle Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. October 4-5, 2016. (+/- 160 in attendance over two locations).

"Beef Cattle Outlook." Beef Stocker Field Day, Manhattan, KS. September 22, 2016. (+/- 250 in attendance).

"Livestock Industry Outlook Overview." Risk and Profit Conference. Manhattan, KS. August 19, 2016. (+/- 170 in attendance).

"The U.S. Beef Industry in 20 Years." Risk and Profit Conference. Manhattan, KS. August 18, 2016. (+/- 65 in attendance).

"Beef-Cattle Industry Outlook Overview." 2016 Midwest, Great Plains, and Western Outlook Conference. Des Moines, IA August 15, 2016. (+/- 35 in attendance).

"Why Do Producers Partially Implement Biosecurity Recommendations of Experts?" *Economics of Animal Health Session*. Agribusiness Economics and Management Session, Agricultural and Applied Economics Association Annual Meeting.  Boston, MA. August 2, 2016.  (+/- 55 in attendance).

"What's the North American Beef Market Look Like 20 Years from Now?" 2016 Beef Improvement Federation Annual Meeting & Symposium. Manhattan, KS.  June 15, 2016. (+/- 500 in attendance; joint with Ted Schroeder).

"*Animal Welfare Perceptions of U.S. Cow-Calf Producers and Consumers: Economic and Educational Implications*." Extension Risk Management Education National Conference. Ft. Worth, TX. April 28, 2016.  (+/- 200 in attendance).

"Beef-Cattle Industry Outlook." K-State Agricultural Research Center Roundup. Hays, KS. April 21, 2016. (+/- 45 in attendance).

"Beef-Cattle Industry Outlook." Industry Outlook Conference. West Des Moines, IA. April 14, 2016. (+/- 80 in attendance).

"Understanding Incentives for Livestock Biosecurity Investments & Efforts." National Institute for Animal Agriculture, 2016 Annual Meeting – Closing General Session. Kansas City, MO. April 6, 2016. (+/- 120 in attendance).

"Economics of Biosecurity." National Institute for Animal Agriculture, 2016 Annual Meeting - Small Ruminant Committee Meeting. Kansas City, MO. April 5, 2016. (+/- 20 in attendance).

"Assessment of the Economic Impacts of PEDv." National Institute for Animal Agriculture, 2016 Annual Meeting – Swine Committee Meeting. Kansas City, MO. April 5, 2016. (+/- 30 in attendance).

"Cattle Industry Outlook." KSU Cattlemen's Day. Manhattan, KS. March 4, 2016. (+/- 150 in attendance; +/- 500 via on-site streaming video; joint with Ted Schroeder).

"An Appreciative Look Back & Glimpse Forward from a Broken Crystal Ball." AgriLeader and FFA Alumni Banquet.  Monroe City, MO. February 8, 2016. (+/- 60 in attendance).

"What We've Learned During the Past Two Years about the Pork Sector." Kansas State University, 2016 Swine Profitability Conference. Manhattan, KS. February 2, 2016. (+/- 120 in attendance).

"Feeder Cattle Price Risk Management." RAM Workshop. Wamego, KS. January 25, 2016. (7 in attendance).

"Beef Cattle Market Outlook & Cow-Calf Decision-Making Overview." St. John, KS. January 21, 2016. (+/- 20 in attendance).

"Beef Cattle Market Outlook & Cow-Calf Decision-Making Overview." Arnold, NE & Geneva, NE. January 19-20, 2016. (+/- 145 in attendance over two locations).

"Beef and Cattle Market Outlook." Wilson, KS. January 14, 2016. (+/- 30 in attendance).

"Beef and Cattle Market Outlook." 2015 K-State Cattle Feeders Roundtable. Garden City, KS. December 9, 2015. (+/- 20 in attendance).

"Beef and Cattle Market Outlook." 2015 Crop Insurance Workshop. Salina, KS. November 12, 2015. (+/- 130 in attendance).

"Beef and Cattle Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. September 29-30, 2015. (+/- 100 in attendance over two locations).

"Charting the Course in Choppy Waters." Beef Stocker Field Day, Manhattan, KS. September 24, 2015. (+/- 250 in attendance).

 "Update on the State of Beef Industry Economics." New Generation Supplements, 2015 National Sales Meeting. Manhattan, KS. August 25, 2015. (+/- 30 in attendance).

"Livestock Industry Outlook Overview." Risk and Profit Conference. Manhattan, KS. August 20, 2015. (+/- 140 in attendance).

"Beef-Cattle Market Outlook." Lincoln County Cattlemen's Association Annual Banquet. Lincoln, KS. April 14, 2015. (+/- 35 in attendance).

"Animal Welfare: What do Ranchers Think? What do Consumers Think?" Cattle Raisers Convention and Expo. Ft. Worth, TX. March 28, 2015. (+/- 50 in attendance).

"Risk Management: Considerations for Cow-Calf Producers." Paola, KS. March 24, 2015. (9 in attendance via webinar).

"A Challenge for Tomorrow." Seminar at ADSA-ASAS Midwest Meeting. Des Moines, IA. March 18, 2015. (+/- 110 in attendance).

"Risk Management." MKC Emerging Producer Program. Manhattan, KS. March 14, 2015. (+/- 75 in attendance).

"Cattle Industry Outlook." KSU Cattlemen's Day. Manhattan, KS. March 6, 2015. (+/- 150 in attendance; +/- 400 via on-site streaming video; joint with Ted Schroeder).

"Beef-Cattle Market Outlook." Kansas Society of Farm Managers and Rural Appraisers Annual Winter Meeting. Salina, KS. February 26, 2015. (+/- 80 in attendance).

"2015 Outlook & Adding Value to Your Calf Crop." Russell, KS. February 17, 2015. (+/- 45 in attendance).

"Economic Considerations for Growing the U.S. Swine Industry." Kansas State University, 2015 Swine Profitability Conference. Manhattan, KS. February 3, 2015. (+/- 125 in attendance).

"Will Consumers Really Pay for Happier Pigs?" Banff Pork Seminar. Banff, Alberta. January 21, 2015. (+/- 600 in attendance).

"Livestock/Poultry Outlook." American Farm Bureau Federation, Annual Convention.  San Diego, CA. January 11, 2015. (+/- 350 in attendance).

"30,000' Level Summary of Beef-Cattle Market Outlook and Herd Expansion." K-State Winter Ranch Management Seminar Series. January 205: LaCrosse, KS (+/- 35 in attendance); Hill City, KS (+/- 20 in attendance); Beloit, KS (+/- 20 in attendance); Herington, KS (+/- 25 in attendance); Wamego, KS (+/- 25 in attendance).

"Risk Management: Considerations from an Economist's Perspective." Florida Cattle Feeding School. Gainesville, FL. December 4, 2014. (+/- 20 in attendance).

"Beef-Cattle Market Outlook Update." 2014 Wheat Pasture and Stocker Cattle Management Seminar. Greensburg, KS. November 4, 2014. (+/- 35 in attendance via webinar).

 "Beef and Cattle Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. October 7-8, 2014. (+/- 91 in attendance over two locations).

"Forward Planning Implications for Herd Rebuilding Phase: Where Does the Stocker Segment Fit?" Beef Stocker Field Day, Manhattan, KS. September 25, 2014. (+/- 290 in attendance).

"Beef-Cattle Industry Outlook." USDA-GIPSA Packers and Stockyards Program, Midwestern Regional Office Meeting. Kansas City, MO. September 11, 2014. (+/- 40 in attendance).

"Economics of Food Trends & Implications for Cooperatives." K-State Symposium on Cooperative Issues. Manhattan, KS. August 27, 2014. (+/- 80 in attendance).

"Beef-Cattle Industry Outlook." Flint Hills Beef Fest. Emporia, KS. August 22, 2014. (+/- 150 in attendance).

"Economics of Beef-Cow Herd Expansion." Risk and Profit Conference. Manhattan, KS. August 21, 2014. (+/- 40 in attendance).

"Livestock Industry Outlook Overview." Risk and Profit Conference. Manhattan, KS. August 21, 2014. (+/- 140 in attendance).

"Economic Considerations Related to Rebuilding the U.S. Cowherd." Beef Species Symposium: Joint Annual Meeting – American Dairy Science Association (ADSA), American Society of Animal Science (ASAS), and Canadian Society of Animal Science (CSAS). Kansas City, MO. July 21, 2014. (+/- 150 in attendance; joint with Lee Schulz).

"Economics of Farm Animal Welfare." 2014 International Symposium on Beef Cattle Welfare, Ames, IA. July 17, 2014. (+/- 130 in-person attendance).

"Beef-Cattle Industry Issues: Market Outlook, Decision Tools, and Economic Trends." *2014 South Dakota Beef Producer Meetings* – Boehringer Ingelheim. Kadoka, SD (April 29, 2014), Chamberlain, SD (April 30, 2014), and Aberdeen, SD (May 1, 2014).  (+/- 140 in attendance across three locations).

"Beef-Cattle Industry Outlook Situation: Herd Expansion, Domestic Demand, and Export Update." *K-State Agricultural Research Center in Hays – Round-Up*. Hays, KS. April 17, 2014. (+/- 90 in attendance).

"Relating Economics to Animal Welfare." ADSA-ASAS Midwest Meeting – Animal Behavior, Housing, & Well-Being Symposium. Des Moines, IA. March 18, 2014. (+/- 110 in attendance).

"Beef-Cattle Industry Outlook & Economics of Evolving Technology and Regulations." *KSU Cattlemen's Day*. Manhattan, KS. March 7, 2014. (+/- 140 in attendance; +/- 400 via on-site streaming video; joint with Ted Schroeder).

"Economic Considerations of Expanding the Beef Herd: Buying vs. Raising Replacements." Dodge City, KS (2 in attendance) and Protection, KS (10 in attendance). February 24, 2014.

"Beef-Cattle Economic Outlook Update & Engaging Exchange." 2014 Western Farm Show. Kansas City, MO. February 21, 2014. (+/- 50 in attendance).

"Economic Outlook Update, A Deeper Look at Beef Demand, & Engaging Exchange." Kansas Beef Council – Executive Committee Meeting. Topeka, KS. February 18, 2014. (+/- 25 in attendance).

"Expanding the Cowherd: Economic Considerations." 2013 KLA Convention, Beef Industry University. Wichita, KS. December 5, 2013. (+/- 200 in attendance).

"Economic State of the Cattle Industry." 2013 KLA Young Stockmen's Academy Alumni Event. Manhattan, KS. November 14, 2013. (+/- 25 in attendance).

"Beef-Cattle Market Outlook." 2013 Lyons State Bank Ag Seminar. Lyons, KS. November 6, 2013. (+/- 75 in attendance).

"Beef and Cattle Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. October 8-9, 2013. (+/- 123 in attendance over two locations).

 "30,000-Ft. View: What's in Store for the Stocker Segment?" Beef Stocker Field Day, Manhattan, KS. September 26, 2013. (+/- 306 in attendance live with +/- 200 more viewing off-site).

"Economic Needs Assessment: Pork Quality Grading System." Retail Advisory Committee RAC)/ Packer Processor Industry Council (PPIC) 2013 Fall Meeting. Naples, FL. September 25, 2013. (+/- 75 in attendance across two presentations).

"Beef-Cattle Industry Outlook." *Adding Value to Your Crop Producer Meeting.* Overbrook, KS. September 11, 2013. (+/- 35 in attendance).

"Producers, Animals, & Consumers: Animal Welfare in U.S. Food Animal Production." Ohio Livestock Coalition – Annual Meeting and Industry Symposium.  Lewis Center, OH. September 6, 2013. (+/- 95 in attendance).

"Beef-Cattle Industry Outlook: Highlighted Trends and Changes." 5-State Beef Conference. Boise City, OK. August 28, 2013. (+/- 40 in attendance).

"Beef and Cattle Market Outlook." Flint Hills Beef Fest. Emporia, KS. August 23, 2013. (+/- 150 in attendance).

"Tackling Big Issues in the U.S. Beef-Cattle Industry: An Interactive 'Clicker' Session." Risk and Profit Conference. Manhattan, KS. August 22, 2013. (+/- 30 in attendance).

"Beef Demand: Recent Determinants and Future Drivers." Risk and Profit Conference. Manhattan, KS. August 22, 2013. (+/- 45 in attendance; joint with Ted Schroeder).

"Beef and Cattle Market Outlook." Risk and Profit Conference. Manhattan, KS. August 22, 2013. (+/- 100 in attendance).

"Beef Demand: Recent Determinants and Future Drivers." Presentation to Cattle Industry Summer Conference General Session. Denver, CO. August 9, 2013. (+/- 400 in attendance; joint with Jim Mintert).

"Beef Demand: Recent Determinants and Future Drivers." Presentation to Cattlemen's Beef Board Joint Evaluation Advisory Committee. Cattle Industry Summer Conference. Denver, CO. August 8, 2013. (+/- 50 in attendance; joint with Ted Schroeder).

"Economic Needs Assessment: Pork Quality Grading System." Pork Safety, Quality, and Human Nutrition Summer Meeting. National Pork Board Office. Des Moines, IA. July 18, 2013. (+/- 30 in attendance).

"Beef Demand: Clarifying Concepts, Summarizing Status, and Discussing Future Opportunities." *The Future of the Missouri Cattle Industry* – 2013 Breimyer Seminar. Columbia, MO. July 17, 2013. (+/- 190 in attendance).

"Results from Extension agent and Agribusiness surveys, ongoing work, and thoughts for consideration..." *Seminar on Value of USDA Data Products*, Organized by C-FARE. Washington, DC. May 6, 2013. (+/- 40 in attendance). (LINK TO FINAL REPORT).

"Feeder Cattle Situation: Indicators & Implications for Feedlot Operations." K-State Cattle Feeders College. Scott City, KS. May 9, 2013. (+/- 80 in attendance).

"Beef and Cattle Market Outlook." University Bank Annual Agriculture Dinner. Pittsburg, KS. March 26, 2013. (+/- 45 in attendance).

"Sow Housing from the Perspective of the Consumer." ADSA-ASAS Midwest Meeting – Bill Day Symposium. Des Moines, IA. March 12, 2013. (+/- 130 in attendance).

"Cattle Market Short Run Outlook and Long Term Prospective." *KSU Cattlemen's Day*. Manhattan, KS. March 1, 2013. (+/- 150 in attendance; +/- 500 via on-site streaming video; joint with Ted Schroeder).

"Economics of Animal Welfare: Summary of Literature/Evidence and Current Situation from and Economist's Perspective." National Pork Board, Literature Review Workshop Panel. Des Moines, IA. February 13, 2013. (+/- 20 in attendance via webinar).

"Profitability Drivers and Global Position Impacts on the U.S. Beef Industry's Future." Ag Profitability Conference. Salina, KS. February 12, 2013. (+/- 50 in attendance; additional +/- 30 offsite in Iola and El Dorado via webinar).

"Beef and Cattle Market Outlook." Ag Profitability Conference. Pratt, KS. February 7, 2013. (+/- 35 in attendance via webinar).

"Beef and Cattle Market Outlook." Ag Profitability Conference. McPherson, KS. February 5, 2013. (+/- 35 in attendance via webinar).

"Beef and Cattle Market Outlook." Ag Profitability Conference. Home City, KS. January 31, 2013. (+/- 15 in attendance).

"A Look into the Future of the Cattle Industry." Cornbelt Cow-Calf Conference. Ottumwa, IA. January 19, 2013. (+/- 225 in attendance; joint with Lee Schulz).

"Beef and Cattle Market Outlook, Drought Implications, and Risk Management Overview." Cattle Feeding and Marketing Workshop. Auburn, KS. January 15, 2013. (+/- 70 in attendance).

"Beef and Cattle Market Outlook." Ag Profitability Conference. Wichita, KS. December 11, 2012. (+/- 85 in attendance via webinar).

"30,000 Foot Look at U.S. Cattle Industry: State and Possible Future." St. Francis, KS. November 13, 2012. (+/- 60 in attendance via webinar).

"Animal Welfare Oriented Expectations of the U.S. Public: Situation and Implications." *New Mexico State University Collegiate Cattlemen's Association Webconference.* October 29, 2012. (+/- 40 in attendance via webinar).

"Animal Welfare Oriented Expectations of the U.S. Public: Situation and Implications." *K-State Olathe Seminar: Producers, Animals, and Consumers: Animal Welfare in U.S. Food Animal Production.* October 22, 2012. (+/- 45 in attendance).

"Beef and Cattle Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. October 9-10, 2012. (+/- 105 in attendance over two locations).

"Beef and Cattle Market Outlook: Implications for Stockers." Beef Stocker Field Day, Manhattan, KS. September 27, 2012. (+/- 250 in attendance).

"U.S. Beef Cattle Industry Outlook & Global Perspectives." Kazakhstan Livestock Group – Sponsored by USAID/CNFA/Kansas Dept. of Ag.. Manhattan, KS. Sept. 20, 2012 (+/- 15 in attendance).

"Beef-Cattle Industry Outlook." Extension Midwest Outlook Conference. Kansas City, MO. August 20, 2012. (+/-45 in attendance).

"Beef-Cattle Industry Outlook Overview, Drought Impacts, and Structural Changes, OH MY..." Risk & Profit Conference. Manhattan, KS. August 17, 2012. (+/-125 in attendance).

"Benchmarking Industry Self-Perceptions Regarding Animal Welfare." Risk & Profit Conference. Manhattan, KS. August 17, 2012. (17 in attendance across two session).

"Ten Thousand Labels: Credence Attributes, Product Differentiation, and Information Flows in the Food Systems: Animal Welfare." Organized Symposium Presentation. Agricultural & Applied Economics Association Annual Meeting, Seattle, WA. August 14, 2012. (+/- 40 in attendance).

"Cow-Calf Business: Outlook Overview, Drought Impacts, Structural Changes, and Implications." *2012 K-State Beef Conference*. Manhattan, KS. August 9, 2012. (+/- 95 in attendance; additional +/- 40 offsite).

"The Future of the U.S. Industry: An Overview of Herd Size, Farm-Level Profitability Drivers, and Global Position." *14th Annual Field Day at the Termuende Research Ranch - Western Beef Development Centre*. Lanigan, SK. June 26, 2012. (+/- 175 in attendance).

"Drivers and Implications of Cow-Calf Profitability Differences Across Operations." *2012 Alabama Cow-Calf Conference*. Auburn, AL. June 15, 2012. (154 in attendance).

"There is Excitement and Opportunity for Top Managers in the Cattle Industry." *2012 Alabama Cow-Calf Conference*. Auburn, AL. June 15, 2012. (154 in attendance).

"Beef and Cattle Market Outlook." *New Generation Feeds Leadership Meeting*. Manhattan, KS. June 12, 2012. (+/- 15 in attendance).

"Beef and Cattle Market Outlook." *Beef Cattle Research Roundup, KSU Agricultural Research Center, Hays*. Hays, KS. April 19, 2012. (+/- 65 in attendance).

"Meat Industry Macroeconomics." *35th Midwest Process/Cured Meat Workshop*. Manhattan, KS. March 30, 2012. (+/- 40 in attendance).

"Economic Considerations in Beef Production." *Western Edge Veterinary Center - Spring Producer Meeting*. Ness City, KS. March 28, 2012. (+/- 50 in attendance; joint with Kevin Dhuyvetter).

"Benchmarking Industry Self-Perceptions Regarding Animal Welfare." *2012 National Institute for Animal Agriculture Annual Conference*. Denver, CO. March 28, 2012. (+/- 45 in attendance).

"Consumer Expectation and their Economics Impact." *2012 Livestock Care Conference - Alberta Farm Animal Care*. Red Deer, Alberta. March 22, 2012. (+/- 180 in attendance).

"Economic Considerations in Beef Production." *Boehringer Ingelheim Vetmedica, Inc., 2012 Beef Summit*. Springfield, MO. March 13, 2012. (+/- 15 in attendance; joint with Kevin Dhuyvetter).

"Decision Tools to Make Management and Marketing Decisions." *Boehringer Ingelheim Vetmedica, Inc., 2012 Beef Summit*. Springfield, MO. March 13, 2012. (+/- 15 in attendance; joint with Kevin Dhuyvetter).

"Beef and Cattle Market Outlook." *KSU Cattlemen's Day*. Manhattan, KS. March 2, 2012. (+/- 150 in attendance; +/- 500 via on-site streaming video).

"Cow-Calf Producer Risk Management." *KSU Cattlemen's Day*. Manhattan, KS. March 2, 2012. (+/- 90 in attendance; joint with Ted Schroeder).

"Short and Long-Term Price Outlook: How Will Consumer Preferences on the Welfare Front Impact Your Operation?" 2012 Swine Profitability Conference. Manhattan, KS. February 28, 2012. (+/- 160 in attendance).

"Overview of Beef-Cattle Industry Changes and Economic Implications." Kansas Society of Farm Managers and Rural Appraisers 49th Annual Winter Meeting. Salina, KS. February 23, 2012. (+/- 70 in attendance).

"Glynn and Mykel Tackle the Big Issues (*with your* help)." MAST On-Campus Session. Manhattan, KS. February 21, 2012. (16 in attendance).

"Beef and Cattle Market Outlook." Ag Profitability Conference. Ulysses, KS. February 21, 2012. (+/- 17 in attendance; delivered via webinar).

"Beef and Cattle Market Outlook." Pawnee County Crops & Livestock Supper. Larned, KS. February 20, 2012. (+/- 55 in attendance; delivered via phone).

"Beef and Cattle Market Outlook." Ag Profitability Conference. Scott City, KS. February 14, 2012. (+/- 35 in attendance).

"Formulating Price Forecasts Using Readily Available Information." Ag Profitability Conference (joint with Kevin Dhuyvetter). Scott City, KS. February 14, 2012. (+/- 35 in attendance).

"Formulating Price Forecasts Using Readily Available Information." Women Managing the Farm Conference (joint with Kevin Dhuyvetter). Wichita, KS. February 11, 2012. (+/- 60 in attendance).

"Economics of Animal Welfare Concerns." Animal Welfare and Current Industry Issues for Livestock Producers. West Point, NE; Lincoln, NE; Kearney, NE; Gering, NE. February 6-9, 2012. (+/- 100 in attendance over four locations; delivered via webinar).

"Beef and Cattle Market Outlook." Ag Profitability Conference. Beloit, KS. February 2, 2012. (+/- 65 attendance).

"Beef and Cattle Market Outlook." Ag Profitability Conference. Hutchinson, KS. January 12, 2012. (+/- 25 in attendance).

"Formulating Price Forecasts Using Readily Available Information." Ag Profitability Conference (joint with Kevin Dhuyvetter). Hutchinson, KS. January 12, 2012. (+/- 25 in attendance).

"Beef and Cattle Market Outlook." Ag Profitability Conference. Girard, KS. January 11, 2012. (+/- 20 in attendance).

"Formulating Price Forecasts Using Readily Available Information." Ag Profitability Conference (joint with Kevin Dhuyvetter). Girard, KS. January 11, 2012. (+/- 20 in attendance).

"Beef and Cattle Market Outlook." K-State Winter Ranch Management Seminar. Manhattan, KS. January 10, 2012. (+/- 25 in attendance; additional +/- 75 offsite).

"Beef and Cattle Market Outlook." Ag Profitability Conference. Wichita, KS. December 6, 2011. (+/- 50 in attendance).

"Impacts of Animal Well-Being & Welfare Media Coverage on Meat Demand." American Meat Institute, Animal Care and Handling Conference for the Food Industry - 2011. Kansas City, MO. October 19, 2011. (+/-100 in attendance).

"Livestock and Meat Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. October 12-13, 2011. (+/- 86 in attendance over two locations).

"Economic Considerations in Beef Production." Novartis Veterinary Meeting (joint with Kevin Dhuyvetter). Manhattan, KS. October 7, 2011. (+/- 35 in attendance).

"Beef & Cattle Market Outlook." K-State Fall 2011 Calf Conference. Oakley, KS. September 28, 2011. (+/- 25 in attendance).

"Beef and Cattle Market Outlook." Beef Stocker Field Day, Manhattan, KS. September 22, 2011. (+/- 200 in attendance).

"Situation Overview and Outlook for U.S. Agriculture." Central National Bank Meeting (joint with Brian Briggeman). Lawrence, KS. September 15, 2011. (+/- 40 in attendance).

"Economic Considerations in Beef Production." Boehringer-Ingelheim Territory Manager Beef Training (joint with Kevin Dhuyvetter). Manhattan, KS. August 30, 2011. (+/- 65 in attendance).

"Beef & Cattle Market Outlook." Flint Hills Beef Fest. Emporia, KS. August 19, 2011. (+/- 240 in attendance).

"Beef & Cattle Market Outlook." Risk & Profit Conference. Manhattan, KS. August 18, 2011. (+/-140 in attendance).

"The New Reality: Volatility, 'State of the Industry,' and Where Things May be Going." K-State Beef Conference. Manhattan, KS. August 16, 2011. (+/- 60 in attendance; additional +/- 60 offsite).

"Economic Aspects of Animal Welfare Changes and Issues." Merck Animal Health Beef College. Lincoln, NE. August 10, 2011. (+/- 55 in attendance).

"Assessing Domestic and Export Beef Demand Drivers, Trends, and Issues." 2011 Reciprocal Meat Conference -American Meat Science Association.  (joint with Ted Schroeder). Manhattan, KS. June 20, 2011  (+/- 125 in attendance over two sessions).

"The Impact of Welfare Media Coverage on Meat Demand." National Institute for Animal Agriculture Conference. San Antonio, TX. April 12, 2011 (+/-50 in attendance).

"Livestock and Meat Market Outlook." Pfizer Animal Health Producer Meeting. Wichita, KS. March 15, 2011. (+/- 35 in attendance).

"Livestock and Meat Market Outlook." KSU Cattlemen's Day. Manhattan, KS. March 4, 2011. (+/- 125 in attendance; additional +/- 500 via on-site streaming video).

"Livestock and Meat Market Outlook." 2011 KOMA Beef Cattle Conference. Oswego, KS. March 2, 2011. (20 in attendance).

"Livestock and Meat Market Outlook." Cherokee County Meeting. Columbus, KS. March 1, 2011. (13 in attendance).

"Livestock & Meat Market Outlook: Current & Long-Run Perspectives." MAST On-Campus Session. Manhattan, KS. February 22-23, 2011. (23 in attendance).

"Livestock and Meat Market Outlook." Ag Profitability Conference. Hoisington, KS; Washington, KS. February 16-17, 2011. (+/- 50 in attendance over two locations).

"Economics of Animal Welfare Concerns." Ag Profitability Conference. Salina, KS; Washington, KS. February 15 & 17, 2011. (+/- 70 in attendance over two locations).

"Livestock and Meat Market Outlook." 'Marketing in Uncertain Times' Conference. Colby, KS. February 10, 2011. (+/- 32 in attendance).

"Livestock and Meat Market Outlook." Ag Profitability Conference. Pratt, KS; Jewell, KS. February, 2011. (+/- 90 in attendance over two locations).

"Impact of GIPSA's Proposed Rules (Release No. 0326.10) on Cattle Producers." East Lansing, MI; Wyoming, Ontario. February 1 & 3, 2011. (+/ 50 in attendance over two locations).  Video conference presentation.

"Livestock and Meat Market Outlook." Agricultural Lenders Conference. Garden City, KS; Manhattan, KS. October 12-13, 2010. (+/- 75 in attendance over two locations).

"Age and Source Verification" Wabaunsee County Ranch and Range Tour. Maple Hill, KS. October 2, 2010. (+/- 120 in attendance for panel based discussion).

"Livestock and Meat Market Outlook." Beef Stocker Field Day, Manhattan, KS. September 30, 2010. (+/- 175 in attendance).

"Beef and Cattle Market Outlook." 5 State Beef Conference. Coldwater, KS; Goodwell, OK; and Clayton, NM. August 31 - September 2, 2010. (+/- 160 in attendance over three locations).

"Livestock and Meat Market Outlook." Risk & Profit Conference, Manhattan, KS. August 20, 2010. (+/- 120 in attendance).

"What we Do and Don't Know: Economic Impacts of U.S. Animal Welfare Oriented Changes." Risk & Profit Conference, Manhattan, KS. August 19, 2010. (+/- 45 in attendance over 2 sessions).

"Pork and Swine Market Outlook." Agricultural & Applied Economics Association Annual Meeting, Denver, CO. July 27, 2010. (+/- 45 in attendance).

"Beef and Cattle Market Outlook." New Generation Feeds On-Campus Meeting, Manhattan, KS. June 15, 2010. (+/- 20 in attendance).

"What we Do and Don't Know: Economic Impacts of U.S. Animal Welfare Oriented Changes." 2010 International Symposium on Beef Cattle Welfare, Manhattan, KS. May 21, 2010. (+/- 150 in-person attendance; +/- 1,500 {in 6 countries} web cast participants).

"Beef and Cattle Market Outlook." Cattlemen's Day, Manhattan, KS. March 5, 2010. (+/- 60 in attendance).

"Consumer and Resident Drivers of Change, Economic Implications, and Unanswered Important Questions." Michigan State University Extension In-Service, East Lansing, MI. Dec. 15, 2009. (+/- 40 in attendance).

"Livestock Agriculture and Michigan's Economy." Michigan State University Extension In-Service, East Lansing, MI. Dec. 16, 2009. (+/- 40 in attendance).

"Financial and Production Implications of Animal Welfare Legislation." Michigan Agricultural Lenders Conference, East Lansing, MI. Nov. 2009. (130 in attendance)

"How the Public Thinks and Responds – Food Animal Well-Being." Invited Participant and Presenter in Food Animal Well-Being Breakout Session.  Food System Summit, Kansas City, MO.  October 6, 2009 (+/- 60 in attendance).

"Beef Industry Risk Management: Alternatives and Resources for Producers" Michigan Cattlemen's Association Summer Roundup. June 19, 2009. (+/- 75 in attendance).

"Alternative Animal Welfare Responses: Options and Implications for Producers and Industry at Large." Presented 4 times in the 2009 State-Wide Pork Industry Information Meetings.  (+/- 150 in attendance). March 23 – March 26, 2009.

"Summary of Current Livestock Industry Issues: Animal Welfare, Traceability, Food Safety, & Consumer Demand." Thumb Cattlemen's Meeting. Bad Axe, MI. Mar. 2009. (20 in attendance)

"MCOOL: History, Status, and Next Steps." Presented 3 times in Great Lakes Professional Cattle Feeding and Marketing Shortcourse series.  February 10-12, 2009. (20-25 in attendance at each session, total estimated audience of 60)

"Consumer & Resident Perceptions and Demand for Animal Welfare & Handling." Michigan Farm Bureau – 'Defending Michigan Agriculture,' Lansing, MI. Jan. 2009. (+/- 160 in attendance)

"Consumer Demand for Animal Welfare Practices: Gestation Crate/Stall Use." Michigan Pork Producers – Animal Welfare Discussion, Lansing, MI. Dec. 2008. (+/- 20 in attendance)

"Consumer Demand for Animal Welfare Practices." Michigan Farm Bureau –Animal Welfare Roundtable Meeting, Lansing, MI. Two presentations in Nov. 2008. (20-25 each in attendance)

"Consumer Demand for Animal Welfare Practices." Michigan Agricultural Lenders Conference, East Lansing, MI. Nov. 2008. (143 in attendance)

"Age & Source Verification for Michigan's Cow-Calf Producers." Presented to the North Country Beef Group (15 in attendance).  May 29, 2008.

"Gestation Stalls: Michigan Producers Views and Perceptions." Presented 4 times in the 2008 State-Wide Pork Industry Information Meetings.  (+/- 75 in attendance). March 31 – April 3, 2008.

"Comparative Effects of Animal Agriculture on Real Estate Values." Presented at the Balancing Animal Agriculture and Communities Conference (+/- 140 in attendance). February 29, 2008

"The Economics of Effective Gilt Management Programs." Presented at the 2008 Professional Pork Producers Symposium "Gilts to Sows 101" (+/- 75 in attendance).  February 21, 2008

Interviewed on Michigan Farm and Garden.  Discussed importance of animal agriculture to Michigan and the upcoming Balancing Animal Agriculture and Communities Conference being held on February 29th.  February 11, 2008

"Age and Source Verification Programs in the Region." Presented 4 times in Great Lakes Professional Cattle Feeding and Marketing Shortcourse series.  February 4-7 2008. (15-40 in attendance at each session, total estimated audience of 120)

"Livestock and Dairy Production Outlook for Michigan." Presented at the 2008 Michigan Agribusiness Association Winter Conference (+/- 20 in attendance).  January 14, 2008

"Michigan Planting Projections for 2008." Presented at the 2008 Michigan Agribusiness Association Winter Conference (+/- 75 in attendance).  January 14, 2008

"Cattle Market Outlook and Economics of Cow-Calf Traceability." Presented in Lansing (82 in attendance), Escanaba (20 in attendance), and Gaylord (30 in attendance).  2007 Winter Cow-Calf Meetings.  December 10-12, 2007.

"The Economic Impact of Biofuel Production on Pork Production." Presented in Dowagiac (13 in attendance) and Bridgeport (11 in attendance).  2007 State-Wide Pork Industry Information Meetings.  March 26 and 29, 2007.

"Economic Impacts of Hog Operations." Presenting economics expert at Gratiot County, MI Forum on Emerging Issues in Dairy and Livestock Production.  March 20, 2007 (210 in attendance).

"Addressing Issues Related to Co-Products of Biofuels."  MI Agri-Energy Conference.  Lansing, MI.  March 13, 2007 (120 in attendance). Presentation published in 2007 Agri-Energy Conference Proceedings: http://www.michigan.gov/deq/0,1607,7-135-3585_4129_4183-166042--,00.html.

"Cattle and Feed Prices Outlook."  MI Winter Beef Meetings.  Presented a total of 11 times in Mt. Pleasant, Clarksville, Cadillac, West Branch, Lawrence, and Jackson Michigan.  February 26 – March 12, 2007 (attendance ranged from 5 to 22, totaled 155, averaged 14).

"Expanding Ethanol Industry and Outlook."  GreenStone Information Meeting, Ovid, MI.  February 27, 2007 (75 in attendance)

"Expanding Ethanol Industry: Implications for MI Livestock."  Michigan Winter Poultry Seminar.  Zeeland, MI.  February 15, 2007 (121 in attendance).

"Marketing and Production Strategies: Response to Increased Ethanol Production." Presented 4 times in Great Lakes Professional Cattle Feeding and Marketing Shortcourse series.  February 5-8, 2007. (35-70 in attendance at each session, total estimated audience of 200)

"Current and Projected Impacts of Ethanol on Livestock Production in the U.S. and Michigan."  MSU Extension Meeting, Kalamazoo, MI. January 31, 2007 (25 in attendance)

"Implications of Ethanol Expansion for Michigan Agriculture." GreenStone Information Meeting, Wyman, MI. December 13, 2006 (73 in attendance)

"Impacts of Ethanol Production Growth on Decisions Michigan Farmers Face." Michigan State University Extension In-Service Conference, East Lansing, MI. December 4, 2006 (51 extension agents in attendance)

"Michigan Implications of Ethanol Production." Agricultural Lenders Conference, East Lansing, MI. Nov. 2006. (+/- 125 in attendance)

"Feeding DGS." Thumb Cattlemen's Meeting. September 13, 2006. (+/- 20 in attendance)

"Do We *Really* Understand Beef Consumers?" Michigan Cattlemen's Association Summer Roundup. June 23, 2006. (+/- 100 in attendance)

"Livestock Identification Systems: Where are we? Can (will) we Learn from Australia?" Presented 3 times in Great Lakes Professional Cattle Feeding and Marketing Shortcourse series. Feb. 2006. (20-40 in attendance at each session)

"Improving Feedlot Profitability Forecasting." Presented 3 times in Great Lakes Professional Cattle Feeding and Marketing Shortcourse series.  Feb. 2006. (20-40 in attendance at each session)

"Australian Livestock Identification Systems, What Can We Lean?" Agricultural Lenders Conferences, East Lansing, MI. Nov. 2005. (+/- 125 in attendance)

## GRANT ACTITIVY

*Title:* "Assessing Packing Plant and Wholesale Beef COVID-19 Impacts in the Beef-Cattle Industry."
*Status/Amount:*  Successfully funded; $50,000
*Source:* USDA-ERS
*Date:* October 1, 2020 – September 30, 2022
*Objective*: To assess the experience beef-cattle packing plants had during COVID-19 and to assess wholesale beef demand to improve understanding of industry impacts from COVID-19.
*Investigators:* **G.T. Tonsor** (PI).

*Title:* "Effective and Efficient Cattle and Beef Market Alignment: Price and Value Discovery, Divergent Incentives, Risk Management, and Future Prospects."
*Status/Amount:*  Successfully funded; $120,000
*Source:* USDA-OCE
*Date:* July 1, 2020 – August 30, 2021
*Objective*: Complete a study to increase our understanding of why price and value discovery in fed cattle markets have changed and provide a vision of where they are headed.
*Investigators:* Ted Schroeder (PI), **G.T. Tonsor** (co-PI), and B. Coffey (co-PI).

*Title:* "U.S. Meat Export Sentiment Index: Development, Initiation, And Proof of Concept For Food Industries."
*Status/Amount:*  Successfully funded; $299,565
*Source:* USDA-NIFA
*Date:* July 1, 2019 – June 30, 2022
*Objective*: To design and successfully implement the first-ever U.S. meat export sentiment index.
*Investigators:* **G.T. Tonsor** (PI).

*Title:* "Consumer and Societal Economic Impacts of Technological Advances in Animal Protein Production."
*Status/Amount:*  Successfully funded; $500,000 (KSU budget: $93,033)
*Source:* USDA-NIFA

*Date:* April 15, 2019 – April 14, 2022

*Objective:* To elicit consumer preferences for a basket of protein choices, to examine cross-species and within-carcass effects of increased animal productivity, and to estimate societal impact of increase animal productivity.

*Investigators:* Josh Maples (PI), Jayson Lusk (Co-PI), Derrell Peel (Co-PI), and **G.T. Tonsor** (Co-PI).

*Title:* "Development of a Production and Economic Framework that will Measure and Quantify the Sustainable Attributes of Limit Feeding during the Backgrounding Phase and on Subsequent Feedlot Cattle Performance, Health, and Carcass Merit."

*Status/Amount:*  Successfully funded; $75,500

*Source:* National Cattlemen's Beef Association

*Date:* June 1, 2019 – May 31, 2021

*Objective:* To create an economic framework that will quantify the sustainable attributes and market sensitivity conditions of the limit feeding practice during the receiving and backgrounding phases and its subsequent impact(s) on feedlot cattle performance, health and carcass merit.

*Investigators:* Dale Blasi (PI), **G.T. Tonsor** (Co-PI), A.J. Tarpoff (Co-PI), Dan Thomson (Co-PI), Joel DeRouchey (Co-PI), and Travis O'Quinn (Co-PI)

*Title:* "Evaluation of Biosecurity Incentives: Assessing Feedlot, Dairy, Broiler, Egg Layer, and Turkey Producers."

*Status/Amount:*  Successfully funded; $102,903

*Source:* USDA-OCE

*Date:* October 1, 2016 – September 30, 2017

*Objective:* To increase our understanding of how to best incentivize livestock producers to adopt biosecurity practices.

*Investigators:* Dustin Pendell (PI), **G.T. Tonsor** (Co-PI), Jada Thompson (Co-PI)

*Title:* "Meeting the Need for M.S. and Ph.D's trained in Agricultural Management and Economics."

*Status/Amount:*  Successfully funded; $241,000

*Source:* USDA-NIFA, National Needs Fellowships

*Date:* June 15, 2016 – June 14, 2021

*Investigators:* Mykel Taylor (PI) and **G.T. Tonsor** (Co-PI)

*Title:* "Addressing National Needs in the Economics of Food Security Through Animal Health and Biosecurity."

*Status/Amount:*  Successfully funded; $79,500

*Source:* USDA-NIFA, National Needs Fellowships

*Date:* June 15, 2016 – June 14, 2021

*Investigators:* Dustin Pendell (PI), **G.T. Tonsor** (Co-PI), and T.C. Schroder (Co-PI)

*Title:* "Tapping the Potential for RNA Interference for Agriculture."

*Status/Amount:*  Successfully funded; $59,000

*Source:* Kansas State University Global Food Systems Innovation Program

*Date:* May 1, 2015 – April 30, 2016
*Objective:* The overall purpose of this project is to address the two key hurdles facing essentially all agricultural applications of RNA interference (RNAi): delivery of intact double stranded RNA molecules to target cells and evaluating the potential for consumer acceptance of this technology.
*Investigators:* Barry Bradford (PI), **G.T. Tonsor** (Co-PI), and Jeff Comer (Co-PI)

*Title:* "A human behavioral approach to reducing the impact of livestock pest or disease incursions of socio-economic importance."
*Status/Amount:*  Successfully funded; $7.5 million (KSU budget: $639,246)
*Source:* USDA – AFRI Coordinated Agricultural Project (CAP)
*Date:* April 2015 – March 2020
*Objective:* Reduce the impact of new, emerging and foreign pests and diseases to domestic production of cattle, swine and small ruminant foods and byproducts.
*Investigators:* Smith, Julia (PI), Thomas Bass (Co-PI), Susan Kerr (Co-PI), Jason Parker (Co-PI), Lee Schulz (Co-PI), Timothy Sellnow (Co-PI), and **G.T. Tonsor** (Co-PI).

*Title:* "Using Consumer Tracking Survey to Understand and Forecast Changes in Consumer Demand for Disaggregated Meat Products."
*Status/Amount:*  Successfully funded; $485,414 (KSU budget: $56,322)
*Source:* USDA- AFRI
*Date:* January 2015 – December 2017
*Objective:* The overall purpose of this project is to better understand changes in consumer preferences and provide insights to improve the competitiveness of the industry and the effects of public policies.
*Investigators:* Jayson Lusk (PI), **G.T. Tonsor** (Co-PI), and Susan Murray (Co-PI)

*Title:* "Causes and Consequences of the Unfounded Mandate Following Differences in Voting and Buying Behavior."
*Status/Amount:*  Successfully funded; $500,000 (KSU budget: $261,885)
*Source:* USDA- AFRI
*Date:* January 2015 – January 2018
*Objective:* To substantially increase understanding of the existence, drivers, and implications of differences in voting behavior and consumer food buying behavior.
*Investigators:* **G.T. Tonsor** (PI), Jayson Lusk (Co-PI), Kathleen Brooks (Co-PI), Bailey Norwood (Co-PI), and Melissa McKendree (Co-PI)

*Title:* "Shiga-toxigenic Escherichia coli (STEC) in the Beef
Chain: Assessing and Mitigating the Risk by Translational Science, Education and Outreach."
*Status/Amount:*  Successfully funded; $25 million (KSU AGEC budget: $499,944)
*Source:* USDA – AFRI Coordinated Agricultural Project (CAP)
*Date:* 2012-2016
*Investigators:* A large multi-university and multi-disciplinary team of 50 co-PIs

*Title:* "Beef and Dairy Cattle Animal Welfare: Market Opportunities and Threats."
*Status/Amount:*  Successfully funded; $498,261

46

*Source:* USDA- AFRI
*Date:* January 2012 – December 2015
*Objective:* To identify and document perceptions of animal welfare issues from both consumer and producer perspectives, and to disseminate generated knowledge widely and effectively through novel and practical outreach efforts.
*Investigators:* **G.T. Tonsor** (PI), Janice Swanson (Co-PI), Daniel Thomson (Co-PI), and Christopher Wolf (Co-PI)

*Title:* "Crop Price Forecasts: Increasing Awareness of Freely Available and Valuable Resources for Rick Management Decisions by Crop and Livestock Producers in the Topeka, Kansas RMA Region."
*Status/Amount:*  Successfully funded; $64,067 ($78,839 requested)
*Source:* USDA Risk Management Agency - Risk Management Education
*Date:* October 2011 – September 2012
*Objective:* To develop information and teach substantial numbers of Kansas and regional producers about how to formulate price expectations in the current volatile commodity markets, particularly using basis-adjusted futures market information, which is freely available.
*Investigators:* Kevin C. Dhuyvetter (PI), **G.T. Tonsor** (Co-PI), and Rich Llewelyn (Co-PI).

*Title:* "Value of Pre-Harvest Food Safety and Animal Welfare Certification for Cattle Producers."
*Status/Amount:*  Successfully funded; $113,700
*Source:* USDA-Federal State Marketing Improvement Program
*Date:* September 2011 – August 2013
*Objective:* To generate and disseminate essential information producers can use to increase profitability by certifying production protocols providing safer beef produced with animal welfare assurances to consumers.
*Investigators:* Ted C. Schroeder (PI), C. Reinhardt (Co-PI), L. Schulz (Co-PI), D. Thomson (Co-PI), and **G.T. Tonsor** (Co-PI).

*Title:* "Economics of PRRS (Porcine Reproductive and Respiratory Syndrome) Eradication for Pork Producers."
*Status/Amount:*  Successfully funded as a subcontract; $20,000
*Source:* USDA-AFRI CAP - Subcontract with Kansas State University
*Date:* January 2011 – December 2011
*Objective:* To conduct an economic assessment of PRRS eradication efforts, with particular focus on regional eradication projects.
*Investigators:* **G.T. Tonsor** and Ted C. Schroeder (Co-PI) - Raymond Rowland (CAP PI)

*Title:* "Greenhouse Gas Emissions And Nitrogen Cycling From Beef Production Systems: Effect Of Climate, Season, Production System, Diet, And Management."
*Status/Amount:*  Successfully funded; $49,960
*Source:* USDA- NIFA Planning Grant
*Date:* August 2010 – July 2011

*Objective:* To develop an integrated USDA CAP proposal for FY 2011 in the climate change area focused on mitigation and education in the area of ruminant production systems, with emphasis on different beef production systems/regions.
*Investigators:* Galen Erickson (PI), Brent Auvermann (PI), Rick Stowell (PI), **G.T. Tonsor** and 21 other Co-PIs

*Title:* "Ex-post Impact of MCOOL: Extensive Assessment Comparing Novel Demand Estimation Techniques."
*Status/Amount:*  Successfully funded; $376,342
*Source:* USDA- AFRI
*Date:* June 2010 – June 2012
*Objective:* To thoroughly evaluate the economic impacts of mandatory country of origin labeling and determine sensitivity of our findings to a range of alternative methodological approaches.
*Investigators:* **G.T. Tonsor** (PI), Jayson Lusk (Co-PI), Mykel Taylor (Co-PI), Ted Schroeder (Co-PI)

*Title:* "Consumer Perceptions of and Willingness-to-Pay for "Sustainably Produced" Michigan Apples and Beef."
*Status/Amount:*  Successfully funded; $59,782
*Source:* MSU –USDA
*Date:* April 2009 – April 2011
*Objective:* Identify perceptions and valuations of Michigan apples and beef products carrying 'sustainably produced' labels.
*Investigators:* Rob Shupp (PI), **Glynn Tonsor** (Co-PI), and Phil Howard (Co-PI)

*Title:* "State of the State Survey: Weighing Michigan Public Opinion about Agriculture: Animal Welfare Issues"
*Status/Amount:*  Successfully funded; $8,400
*Source: Michigan Animal Initiative Industry Coalition Competitive Grants*
*Date:* July 2009 – June 2010
*Objective:* Increase awareness about Michigan citizen concerns by identifying public perceptions, knowledge, and attitudes about animal welfare.
*Investigators*: J. Swanson (PI), **G.T. Tonsor** (Co-PI), M. Orth (Co-PI), S. Miller (Co-PI), S. Long (Co-PI), and R. Borger (Co-PI).

*Title:* "Spatially Varied Impacts of Ethanol on Feed Prices, Levels, and Livestock Production"
*Status/Amount:*  Successfully funded; $37,000
*Source: Michigan Animal Initiative Industry Coalition Competitive Grants*
*Date:* July 2009 – June 2010
*Objective:* Estimate the impact of spatially dispersed ethanol plants on livestock feed costs and variability.
*Investigators*: **G.T. Tonsor** (PI)

Title: "Valuation of New Products in the Face of Consumer Income Disparity."
*Status/Amount:* Successfully funded as cooperative agreement; $102,357 ($225,516 requested)
*Source:* USDA – ERS FANRP

*Date:* January 2009 – December 2009
*Objective:* To estimate consumer and producer welfare effects of new food product introductions and to determine whether such effects vary depending on the income classification of the customer base to which the product is introduced.
*Investigators:* Geoffrey M. Pofahl (PI), **G.T. Tonsor** (co-PI), and Timothy J. Richards

*Title:* "Establishing an USDA Process Verified Program: Capitalizing on Michigan's Leadership in Individual Animal Identification."
*Status/Amount:*  Successfully funded; $25,000 ($35,000 requested)
*Source: Michigan Animal Initiative Industry Coalition Competitive Grants*
*Date:* July 2008 – Dec. 2008
*Objective:* Develop the processes and documentation necessary for an USDA PVP for the state of Michigan.
*Investigators:* D. Buskirk (PI) and **G.T. Tonsor** (Co-PI)

*Title:* "Benefit Cost Analysis of the National Animal Identification System"
*Status/Amount:*  Successfully funded; $499,462
*Source: USDA – APHIS: Cooperative Agreement for a Benefit Cost Analysis of the National Animal Identification System (NAIS)*
*Date:* July 2007 – June 2008 (no cost-extension to December 2008)
*Objective:* Conduct a comprehensive assessment of the economic benefits and costs of a National Animal Identification System in the U.S.
*Investigators:* T.C. Schroeder (PI), D.A. Blasi (Co-I), G.W. Brester (Co-I), K.C. Dhuyvetter (Co-I), D.L. Pendell (Co-I), G.C. Smith (Co-I), J. Stroade (Co-I), and **G.T. Tonsor** (Co-I)

*Title:* "Understanding Michigan Consumer Preferences for Livestock Products"
*Status/Amount:*  Successfully funded; $46,274
*Source: Michigan Animal Initiative Industry Coalition Competitive Grants*
*Date:* July 2007 – December 2008
*Objective:* Improve understanding of current consumer and livestock producer perceptions and beliefs on issues revolving bST and gestation crates use in dairy and swine agriculture.
*Investigators*: **G.T. Tonsor** (PI) and C. Wolf (Co-PI)

*Title:* "Determining Heterogeneous Consumer Risk Perceptions and Attitudes: Implications for Improving Supply Chain Management"
*Status/Amount:* Successfully funded; $191,150
*Source:* CanFax Research Services
*Date:* Apr. 2005 - May 2007
*Objective:* Investigate heterogeneous risk attitudes, perceptions, and knowledge among beef consumers in Canada, U.S., Japan, and Mexico.
*Investigators:* T.C. Schroeder (PI), **G.T. Tonsor**, J. Mintert, and J. Pennings

*Title:* "Comprehensive Analysis of Australian Meat Traceability Systems"
*Status/Amount:*  Successfully funded; $10,000
*Source: USDA – Special International Study or Dissertation Research Travel Grant*
*Date:* May 2004 - May 2006

*Objective:* Onsite examination of Australian animal traceability and identification systems.
*Investigators*: T.C. Schroeder (Co-PI), **G.T. Tonsor** (Co-PI)

## INTERNATIONAL TRAVEL EXPERIENCE

*Argentina* (2019), *Australia* (2004, 2005); *Brazil* (2006, 2016); *Canada:* Multiple trips associated with varied projects and presentations; *England* (2002); *France* (2002, 2018); *Germany* (2002)

## ON-CAMPUS INSTRUCTION

*Agricultural Economics 500, Production Economics*:              Kansas State University
Intermediate-level microeconomics course on producer and consumer theory (Spring 2005)

Guest Lectures at Michigan State University:
*Global Agrifood Markets ABM-FIM 427*                    *Dr. Tom Reardon*
"Meat Traceability in the International and Domestic Market." 2007 & 2008 (+/- 75 in course)
*Advanced Beef Cattle Feedlot Management ANS 422*          *Dr. Dan Buskirk*
"Marketing Feedlot Cattle: Basics and Contracting Decision Examples." 2008 & 2009 (+/- 25 in course)
*Issues in Animal Agriculture ANS 401*                    *Dr. Janice Swanson*
"U.S. Consumer & Resident Perceptions and Demand for Animal Welfare & Handling." 2009 (+/- 50 in course)

Guest Lectures at Kansas State University:
*ASI 650*                                        *Dr. Dale Blasi*
"Benefits of National Identification Systems." 2010-15 (+/- 25 in course)
*ASI 515*                              *Drs. Larry Hollis & Chris Reinhardt*
"Feedlot Risk Management." 2012, 2014 (+/- 80 in course)

*AGEC 650*                                      *Dr. Rich Llewelyn*
"Meat Demand & Data Quality." 2018, 2020 (40-50 in course)
*AGEC 420*                                *Drs Sean Fox/Beth Yeager*
"Livestock & Meat Markets Situation." 2010-2015, 2017 (50-75 in course)
*AGEC 500*                                      *Dr. Brian Coffey*
"Clarifying Demand Concepts." 2015 (>75 in course)
*AGEC 315*                                    *Dr. Nathan Hendricks*
"Societal Interest in Food Production: Meat Industry Examples." 2012 (+/- 45 in course)
*AGEC 598*                                        *Levi Russell*
"Farm Management Strategy." 2012 (+/- 20 in course)
*MAB Program – Animal Health Cohort*                *Dr. Allen Featherstone*
"Animal Welfare in U.S. Food Animal Production: Economist Perspectives." 2013 (12 in course)

## CONTRACTUAL WORK

Reviewed the "Fed Cattle and Beef Industries" portion of the "Grain Inspection, Packers and Stockyard Administration (GIPSA) Livestock and Meat Marketing Study," a confidential report. December 2006.

Served on the U.S. Government Accountability Office's (GAO) expert panel regarding the National Animal Identification System (NAIS). December 2006.

U.S. Beef Demand Assessment (Cattlemen's Beef Board). April 2009.

Wholesale Pork Price Reporting Analysis (USDA-AMS). November 2009.

Economic Impacts of Zilmax Adoption in the U.S. Beef Industry (Intervet Schering Plough Animal Health) August 2010.

Economic Assessment of Evolving Red Meat Export Market Access Requirements for Traceability of Livestock and Meat (USMEF) March 2011.

Swine Feed Mill Feasibility Study (Holden Farms) July 2011.

Economic Impacts of Improvest Adoption in the U.S. Pork Industry (Pfizer Animal Health) January 2012.

Assessing Supply and Demand of non-GMO Feedstuffs (Keystone Foods, LLC) April 2012.

Market Assessment (CAFO's BEST) September 2012.

U.S. Beef Demand Assessment (Cattlemen's Beef Board). December 2012.

Pork Quality Grading System Needs Assessment (National Pork Board). April 2013.

Economic Impacts of 2009 and 2013 US Country-of-Origin Labeling Rules on US Beef and Pork Markets (USDA-OCE). February 2015.

Baseline Study of Livestock and Meat Marketing Trends and Livestock Mandatory Reporting (USDA-AMS). August 2016.

Consumer Valuation of Pork Chop Quality and Quality Information (National Pork Board). December 2016.

Creating and Assessing Candidate Food Service and Retail Beef Demand Indices. (Cattlemen's Beef Board). February 2017.

Live Lamb and Lamb Products Confidentiality Study (USDA-AMS). August 2017.

Developing and Assessing a New Fed Cattle Value Report (USDA-AMS). November 2017.

Assessing Beef Demand Determinants (Cattlemen's Beef Board). February 2018.

North American Meat-Livestock Model (USDA-OCE). October 2019.

Assessing Fed Cattle Price Reporting (USDA-AMS). December 2019.

Superior Livestock Auction Sales – Price Analysis: 2019 (Merck Animal Health). February 2020.

## PROFESSIONAL SERVICE

KSU (Agricultural Economics Department unless noted) Committees:
*Agricultural Economics Preliminary Examination Committee, 2010, 2015-*
*Dean of Agriculture and Director of K-State Research and Extension - Search Committee, 2011-12*
*Farm Management Position - Search Committee Chair, 2012*
*Animal Science & Industry's Animal Behavior Position - Search Committee, 2012*
*KSRE Program Prioritization Taskforce, 2012-2013*
*COA 2025 Strategic Plan – Extension Sub-Committee, 2012-2013*
*Department Head Position - Search Committee, 2014*
*2 Assistant Professor Positions - Search Committee Chair, 2014*
*Assistant Professor Position - Search Committee Chair, 2014*

MSU Agricultural Economics Departmental Committees:
*Departmental Advisory Committee 2009-2010*
*Seminar Committee, 2008-2009*
*Graduate Policy Committee*, 2006-2008
*Ph.D. Thesis Selection Committee (Chair)*, 2006-2007
*Search Committee: Agricultural Economist/Marketing Position* 2007-2008

KSU Graduate Student Advisory Committees:
*Ph.D. Agricultural Economics:*
Kayode Ajewole – Grad: Spring 2019
Buddhika Mallika Appuhamilage (Major Advisor) – Grad: Summer 2020
Chelsea Arnold – Exp. Grad: TBD
Hunter Biram – Exp. Grad: TBD
Elliott Dennis – Grad: Spring 2019
Kaitlyn Dinges – Exp. Grad: TBD
Yan Heng – Grad: Spring 2015
Youngjune Kim – Grad: Fall 2019
Ji Yong Lee – Grad: Summer 2016
Melissa McKendree (Major Advisor) – Grad: Summer 2017
James Mitchell (Major Advisor) – Grad: Summer 2020
Donghyun Moon (Major Advisor) – Grad: Spring 2020
Tebila Nakelse – Grad: Spring 2019
Veronica Pozo – Grad: Summer 2014

Lee Schulz                                                  – Grad: Spring 2012
Xia Shang (Major Advisor)                                  – Grad: Summer 2016

*M.S. Agricultural Economics:*
Walter Acpangan                                            – Exp. Grad: TBD
Tanner Aherin                                              – Grad: Summer 2018
Kayode Ajewole                                             – Grad: Fall 2013
Meghan Brence (Major Advisor)                              – Grad: Spring 2021
Sam Baseley (Co-Major Advisor)                             – Exp. Grad: TBD
Whitney Bowman                                             – Grad: Fall 2019
Logan Britton (Major Advisor)                              – Grad: Summer 2016
Will Callis                                                – Grad: Fall 2013
Michaela Eden (Major Advisor)                              – Exp. Grad: TBD
Candace Gatson (Major Advisor)                             – Grad: Summer 2018
Matthew Herrington (Co-Major Advisor)                      – Grad: Summer 2013
Emilie Herbst                                              – Grad: Spring 2018
Brian Highfill (Major Advisor)                             – Grad: Fall 2016
Shelby Hill (Major Advisor)                                – Grad: Summer 2015
Claudia Hissong (Major Advisor)                            – Grad: Spring 2021
Mary Kurzweil                                              – Exp. Grad: TBD
Garrett Lister                                             – Grad: May 2014
Jeremiah McElligott (Major Advisor)                        – Grad: Spring 2012
Emily Mollohan (Major Advisor)                             – Grad: Fall 2014
Matt Myers                                                 – Grad: Spring 2019
Mario Ortez (Major Advisor)                                – Grad: Spring 2015
Henry Ott (Major Advisor)                                  – Grad: Summer 2016
Alex Strevell                                              – Grad: Summer 2014
Hannah Taylor (Major Advisor)                              – Exp. Grad: TBD
Laura Teague                                               – Grad: Summer 2013
Christian Torrez (Major Advisor)                           – Exp. Grad: TBD
Grace Tucker (Major Advisor)                               – Grad: Summer 2012
Kyle Waldie                                                – Grad: Spring 2014
Candace Wilson                                             – Grad: Summer 2017

*Master of Agribusiness - Distance Program:*
Cortney Bally (Major Advisor)                              – Grad: Spring 2011
Virginia Guardia                                           – Grad: Spring 2011
Logan Hoffman                                              – Grad: Spring 2019
Juan Orozco (Major Advisor)                                – Exp. Grad: TBD
Jason Pratt (Major Advisor)                                – Exp. Grad: TBD
Tucker Schumacher                                          – Grad: Summer 2011
Jordan Shifflett                                           – Grad: Fall 2014
Daren Stephens                                             – Grad: Fall 2015

*Other KSU Departments:*
Edward Horwitz (Ph.D., Inst. of Personal Fin. Planning)    – Grad: Spring 2015

Shane Terrell (PhD., College of Veterinary Medicine)    – Grad: Fall 2016
Tim Todd (Ph.D., Inst. of Personal Fin. Planning)    – Grad: Fall 2019

MSU Graduate Student Advisory Committees:
> *Ph.D. Agricultural Economics:*
> Malika Chaudhuri (Research Supervisor)    – Grad: Summer 2009
> Domenico Dentoni (MSU Best Dissertation Award)    – Grad: Winter 2009
> Nicole Olynk    – Grad: Winter 2009
> Hillary Sacket    – Grad: Summer 2013
>
> *M.S. Agricultural Economics:*
> Ross Bowmar    – Grad: Fall 2009
> Crystal Jones (Major Advisor)    – Grad: Summer 2007
> Karen Lewis (Major Advisor)    – Grad: Spring 2010
> Lee Schulz (Major Advisor)    – Grad: Summer 2008
>
> *Other MSU Departments:*
> Barbara Casey (M.S., Animal Science)    – Grad: Spring 2010

Article Reviews:
*African Journal of Agricultural Research, Agribusiness: An International Journal, Agricultural and Human Values, Agricultural and Resource Economics Review, Agricultural Economics, American Journal of Agricultural Economics, Animals, Animal Welfare, Applied Economic Perspectives and Policy, Australian Agricultural and Resource Economics Society, Choices, Canadian Journal of Agricultural Economics, Contemporary Economic Policy, Ecological Economics, European Review of Agricultural Economics, Food Policy, International Food and Agribusiness Management Review, Journal of Animal Science, Journal of Agricultural Economics, Journal of Agricultural and Applied Economics, Journal of Agricultural and Resource Economics, Journal of Applied Aquaculture, Journal of Consumer Affairs, Journal of Economic Studies, Journal of Food Distribution Research, Livestock Science, PrioNet Canada, The Professional Animal Scientist, USDA ERS*

NCCC-134 Executive Committee (2009-2016) and Paper Reviewer (2009-2012)

Western Association of Agricultural Experiment Station Directors project: "Enhancing the Competitiveness and Value of U.S. Beef." (W-2177, W-3177, W-4177)
> 2010-2012 Chairperson; 2009-2010 Secretary

Livestock Marketing Information Center (LMIC)
> 2010-present Technical Advisory Committee (TAC)
> 2013-2014 Chair-Elect; 2015-2016 Chair; 2017-2018 Past-Chair

## PROFESSIONAL SOCIETY MEMBERSHIPS, SERVICE, AND AWARDS

Agricultural & Applied Economics Association, 2002 to present
> Food and Agricultural Marketing Policy Section (FAMPS), 2011-2013 Chair-Elect/Chair

Choices Editorial Council, 2015-2017
Communications/Publications Committee, 2014-2022 Member/Chair

Australian Agricultural Resource Economics Society (AARES)
President (North American Branch, 2008-10)
Secretary/Treasurer (North American Branch, 2006-08)

Southern Agricultural Economics Association, 2005 to present
JAAE Editorial Board, 2015-2017
Outstanding Extension Program Awards Committee, 2014-2016

Western Agricultural Economics Association, 2002 to present
Director, 2015-2018
President-Elect, 2020-2021

One of thirteen contributors who received the 2007 AAEA Distinguished Extension/Outreach
Program Group Award for a paper/presentation in the LMIC based project series titled "U.S.
CATTLE IDENTIFICATION SYSTEMS: Risk Management and Market Opportunities."
View project at: http://www.lmic.info/memberspublic/animalID/AnimalID.htm

USMEF Eric Choon Memorial Research Award for 2009: Schroeder et al. (2007) article in *The B.E. Journal of Economic Analysis & Policy*.

International Food and Agribusiness Management Association *Innovation Award* (Dentoni et al., 2010).

Southern Agricultural Economics Association (SAEA) *Outstanding Extension Program Award Individual*, 2014

Outstanding Journal Article, *European Review of Agricultural Economics*, 2014

Agricultural & Applied Economics Association's (AAEA) Distinguished Extension Program
Individual: More than 10 Years' Experience Award, 2019

Livestock Marketing Information Center (LMIC) – Superior Service award, 2019

Communicator of the Year Award, K-State Research and Extension, 2020

# Glynn T. Tonsor

Professor, Dept. of Agricultural Economics, Kansas State University



Glynn Tonsor is a Professor in the Department of Agricultural Economics at Kansas State University (KSU). Glynn grew up on a farrow-to-finish swine farm in Monroe City, Missouri. Tonsor obtained a B.S. from Missouri State University and Ph.D. from KSU. He was a faculty member at Michigan State University from May 2006 to March 2010 when he joined the KSU faculty.

Tonsor has broad interests and experiences which span many issues throughout the meat supply chain. Through active research, engaged outreach with industry, and first-hand knowledge with livestock production, Glynn has economic expertise in an array of topics of economic importance to Kansas, U.S. and global stakeholders.  These meat-livestock industry topics include animal health, identification, traceability, and welfare; commodity market analysis and risk management; consumer meat demand; and producer perceptions and preferences.

Since 2010, Tonsor has over 78 peer-reviewed publications, provided over 225 presentations to an in-persons audience exceeding 27,000 attendees, conducted numerous educational webinars, and written a multitude of non-technical publications.  He has been interviewed or been cited by high-impact outlets including the CBS Evening News, BBC News, Economist magazine, Time magazine, Wall Street Journal, and the U.S. Farm Report.

Glynn and his wife, Shauna, live in Saint George, Kansas with their children Ethan, Levi, and Aubree.

**<u>Contact Information</u>**:
Mailing Address:       331-A Waters Hall
                                   Dept. of Agricultural Economics, Kansas State University
                                   Manhattan, KS 66506

Email: gtonsor@ksu.edu
Twitter: @TonsorGlynn
Phone: (785) 532-1518
Webpage: http://www.agmanager.info/about/contributors/individual/tonsor.asp

# Standardized Regulatory Impact Assessment of Proposed Regulations to Implement Proposition 12

**Prepared for the California Department of Food and Agriculture**

Daniel A. Sumner, Robin Goldstein, Jarrett D. Hart, Hanbin Lee, William A. Matthews, and Josue Medellin-Asuara

University of California, Davis and the UC Agricultural Issues Center

July 2, 2020

**Table of contents**

1. Introduction and Summary .................................................................................4
    1.1. Purpose of a SRIA
    1.2. Scope of this SRIA: The impact of Prop 12 regulations
    1.3. How we calculate economic impacts
    1.4. Overview of main economic impact results
    1.5. Overview of SRIA contents

2. Background ....................................................................................................17
    2.1. Proposition 12 mandates
    2.2. Determination of need for a SRIA
    2.3. Methods of analysis

3. Estimated Baselines in Impacted Markets Before Proposed Regulations ................................20
    3.1. Market characteristics for eggs
    3.2. Market characteristics for whole veal meat
    3.3. Market characteristics for whole pork meat

4. Estimated Impacts of Proposed Regulations and Alternatives ...................................23
    4.1. Proposed regulations
    4.2. Selection of two alternative packages of regulations
    4.3. Simulation results for lower-cost, proposed, and higher-cost regulations

5. Estimated Economy-Wide Impacts of Proposed Regulations ...................................46
    5.1. IMPLAN approach to calculating economy-wide impacts
    5.2. Direct, indirect, and induced impacts calculated using IMPLAN

6. Determination of the impact of the regulatory proposal on the state economy, businesses, and the public welfare (Government Code § 11346.3(c)) ...........................................54
    6.1. Assessment 1. The creation or elimination of jobs in the state
    6.2. Assessment 2. The creation of new businesses or the elimination of existing businesses in the state
    6.3. Assessment 3. The competitive advantages or disadvantages for businesses currently doing business in the state
    6.4. Assessment 4. The increase or decrease of investment in the state
    6.5. Assessment 5. The incentives for innovation in products, materials, or processes
    6.6. Assessment 6. The benefits of the proposed regulations, including, but not limited to, benefits to the health, safety, and welfare of California residents, worker safety, environment and quality of life, and any other benefits identified by the agency

6.7. Types of costs considered for implementation of the proposed regulations

6.8. Effects on the General Fund, special state funds, and affected local government agencies attributable to the proposed regulations

Appendix 1. Data and Economic Modelling on the Proposition 12 Mandate of New Hen Housing Requirements for Liquid Eggs Supplying the California Market ...................................59

Appendix 2. Data and Economic Modelling on the Proposition 12 Mandate for an Increase to 43 Square Feet of Confinement Space for Veal Calves Supplying the California Market .......79

Appendix 3. Data and Economic Modelling on the Proposition 12 Mandate of New Hen Housing Requirements for Shell Eggs Supplying the California Market....................................100

Appendix 4. Data and Economic Modelling on the Proposition 12 Mandate for an Increase to 24 Square Feet of Confinement Space for Breeding Sows Supplying the California Market.....138

Appendix 5. Methods for Measuring the Economic Contributions of Proposed Regulations Using IMPLAN....................................................................................................................183

Appendix 6. Text of Proposition 12........................................................................................190

References................................................................................................................................197

# 1. Introduction and Summary

## 1.1. Purpose of a SRIA

SRIA stands for Standardized Regulatory Impact Assessment (or Analysis). SRIAs are specific to California. When a California state agency proposes new regulations whose aggregate economic impacts are expected to exceed $50 million in the 12-month period after the regulations are fully implemented (the "Implementation Period"), then under state law, the agency must prepare a SRIA. The purpose of the SRIA is to estimate and explain the economic impacts of proposed state regulations and of reasonable alternative regulations that would fulfill the same statutory requirements. When the SRIA is completed, it is submitted by the state agency to the California Department of Finance, published into the public record, and consulted by various state officials as the rulemaking process goes forward. It is common for the SRIA to be revised, or new editions of the SRIA drafted, as revised drafts of regulations are released.

## 1.2. Scope of this SRIA: The impact of Prop 12 regulations

The background for this SRIA is Proposition 12 (the Farm Animal Confinement Initiative, hereafter "Prop 12"), a ballot question passed by California voters on November 6, 2018. Prop 12 imposed several new conditions on some veal, pork, and egg products that must be met in order for the products to be legally sold in California.

Prop 12, in its statutory text, mandates requirements that take effect in two phases. The first set of Prop 12's basic requirements, whose enforcement Prop 12 mandates beginning on January 1, 2020, introduces the following mandatory requirements:

- "Shell" and "liquid" eggs sold in California cannot come from hens confined in cages with less than 144 square inches of usable floor space per hen.

- Uncooked "whole veal" sold in California cannot come from calves confined in less than 43 square feet of usable floor space per calf.

- Eggs, pork, and veal sold in California cannot come from covered animals confined "in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely." A covered animal is a calf raised for veal, breeding pig, or egg-laying hen kept on a farm.

The second phase of Prop 12 implementation, which is mandated under Prop 12 to begin on January 1, 2022, introduces the following additional requirements:

- "Shell" and "liquid" eggs can only come from hens kept in "cage-free" compliant spaces.

- Uncooked "whole pork" cannot come from breeding sows or the immediate offspring of breeding sows confined in less than 24 square feet of floor space per sow.

The California Department of Food and Agriculture (CDFA) and the California Department of Public Health (CDPH) were assigned the task of promulgating Prop 12 regulations. This means that CDFA and CDPH are responsible for turning Prop 12 requirements into a set of specific, enforceable rules in the state, including protocols for verification and enforcement of the animal housing standards described in the statutes of Prop 12. (These include, for example the 144 sq.in. minimum cage size for egg-laying hens starting in 2020, and mandatory cage-free housing for egg-laying hens starting in 2022, among other specifics for other species.)

One of the purposes of the SRIA is to compare proposed regulations with legally viable alternative regulatory implementations of the same statutes. CDFA has some discretionary choices to make in developing its regulations to implement Prop 12, but CDFA's choices are limited and deal with definitional issues and procedures. For example, CDFA must define terms, such as "liquid eggs" or "pork cuts" and implement processes for verification and enforcement of the new standards. However, CDFA is not choosing whether or not eggs must be cage-free, or by when: the voters made those choices. CDFA is deciding how to turn Prop 12 into a set of practical rules that can be followed and enforced. This means that the *discretionary regulatory choices* made by CDFA are narrower than the scope of Prop 12 itself.

Therefore, the "regulatory alternatives" we consider in this SRIA, which are explained below, do not vary the basic requirements of Prop 12 itself. Rather, the purpose of the alternatives is to evaluate the differences between economic impacts of CDFA's discretionary choices in how to implement Prop 12 regulations versus lower-cost and higher-cost alternative possible implementations of Prop 12. For instance, Prop 12 requires that starting in 2022, certain types of uncooked pork cannot be sold in California if the breeding sows have been kept in spaces with less than 24 square feet of usable floor space per pig. This 24-square-foot restriction is not the result of a discretionary choice by CDFA: CDFA is required by law to implement and enforce this 24-square-foot restriction. Thus, the 24-square-foot restriction is not varied in the regulatory alternatives we consider; it is applied in all alternatives. All regulatory alternatives must include the imposition of this standard as required by Prop 12.

### 1.3. How we calculate economic impacts of proposed regulations and alternatives

The basic approach to the SRIA is as follows. First, we use the market in a recent situation, before any new rules take effect or affect the market economic outcomes. These data from before the imposition of the regulations are useful in establishing a without-regulations **"Baseline"** to which the impacts of the regulations are compared. The "Baseline" for each year to be considered for regulatory impact, 2020 through 2023, is constructed using the regulatory and market situation before January 1, 2020, adjusted for actual and anticipated changes that are *not* a consequence of the proposed (or alternative) regulations under consideration. For example, the Department of Finance projections of per capita income in California help establish Baseline consumption of the products affected by these regulations. The regulations cause impacts relative to the Baseline, which has already incorporated other anticipated economic factors.

The most recent 12-month California market data available (for calendar year 2019) allows calculation of prices and quantities for the egg, pork, and veal markets (or to be more precise, subsets of each of these markets as defined by the statute, e.g. uncooked "whole veal," "whole pork," etc.). Note that none of the Prop 12 rules had been implemented in 2019. Model parameters, such as income elasticities, and Department of Finance forecasts generate Baseline prices and quantities for each market. These Baseline projections, for the years 2020, 2021, 2022 and 2023 do not include any impact of the proposed regulations.

Next, the models developed simulate and estimate the economic impacts of three regulatory scenarios year-by-year assuming that certain of the Prop 12 regulations have been implemented and markets have adjusted (in part or fully) to the new regulations. The impacts are calculated for the proposed regulations and two alternative regulatory packages, each of which implements the basic requirements outlined above and required by the text of Prop 12 statutes.

The first package of regulations we consider is CDFA's current package of "proposed regulations" (Animal Confinement Articles 1–5) to implement Prop 12. The other two packages of regulations are what we call "alternative packages" of regulations. In the two alternative packages we consider, we vary some of CDFA's discretionary choices of how to implement Prop 12 (i.e. on issues where Prop 12 is vague as written, e.g. whether or not "liquid eggs" include cooked egg patties or "pucks"). However, the two alternative packages of regulations do *not* vary the basic cage-size or other mandatory requirements of Prop 12. One alternative package is what we call a "lower-cost alternative," which imposes requirements on fewer businesses and fewer products than the proposed regulations do. The other alternative package is what we call a "higher-cost alternative," which imposes requirements on more businesses and more products than the proposed regulations do.

For each of the three regulatory packages (proposed regulations, lower-cost alternative, higher-cost alternative), we simulate the market and assess the economic impacts. The impacts to be considered are those that are imposed on the California economy and include consumer and producer responses. Impacts include industry output, employment, investment and consumer expenditures. We consider the impacts of the proposed regulations and we compare them with the impacts of the lower-cost alternative and the higher-cost alternative. Using economic simulations, we start with and calculate the expected economic outcomes under the three different possible packages of regulations.

Finally, we analyze "multiplier effects" using IMPLAN. These results take the industry and product specific implications and consider how these industry specific effects on job or value-added ripple through the economy first as "indirect impacts" on input supplying industries.

7

Indirect impacts could include, for example, the indirect economic impacts of regulations on purchases of livestock feed by egg farms or electricity purchased by grocery stores in marketing of the food products affected. The second category of multiplier effects are "induced impacts," which include how the changes in employment and proprietor income affect consumer purchases and thus affect economic sectors, including government, that supply these goods and services.

## 1.4. Overview of main economic impact results

We consider implementation in two parts. Based on available data, detailed research, and economic simulations, we estimate that relatively small economic impacts will come from the first part of Prop 12 implementation on January 1, 2020, when 144-square-inch egg standards and veal standards take effect. Much more substantial impacts will come from the second part of Prop 12 implementation on January 1, 2022, when cage-free egg standards and breeding sow standards take effect.

As required by California law, this SRIA evaluates the economic impacts of full implementation in the 12-month period after "Full Implementation" of all the above sets of regulations. The 12-month period we consider is thus January 1 to December 31, 2022.

First, we note that Title 3, Section 1350 of the California Code of Regulations (CCR) is being revised under separate rulemaking (effective July 1, 2020) to change the minimum required cage size from 116 to 144 square inches per hen to be consistent with Prop 12.  Effective January 1, 2022, the Prop 12 statutes will require egg-laying hens to be housed in cage-free enclosures, thereby superseding the 144-square-inch requirement specified under Section 1350 and enforced by CDFA's Shell Egg Food Safety Program.  However, no fiscal savings is anticipated. The current statutes authorizing the Shell Egg Food Safety program, and the regulations under Section 1350, only include shell eggs and do not include pasteurized in-shell eggs, liquid eggs, frozen eggs or other egg products such as pucks and patties. Additionally, if industry utilizes CDFA personnel in the Shell Egg Food Safety program to confirm and certify Prop 12 compliance for shell eggs, either 144 or cage-free, such work would replace or reduce private

third-party certifier activity, not CDFA Animal Care Program work.  Thus, the current 1350 regulation and associated revisions, are projected to have a neutral effect on CDFA field resources.

California consumers will be affected by higher prices and respond with lower quantity consumed. In the 2022 calendar year, proposed regulations will increase consumer expenditures in California of $1,195 million. The largest impacts are on consumers of shell egg and pork products. Many of the shell egg farm business enterprises impacted produce shell eggs in California. Egg producers in California face higher costs by $72 million, and egg output will decline by 51 million dozen relative to the baseline in 2022. Shell egg farm revenue rises by $7 million.

Table 1.4.1 shows a summary of our estimates of economic impacts on each covered segment for four years: 2020, 2021, 2022, and 2023.

**Table 1.4.1. Overview of baseline and economic impacts under Proposed Regulations**

| 1.4.1a. Liquid eggs | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Baseline Without Regulations** | | | | |
| Quantity consumed in CA (mil dozen equivalent) | 288.2 | 281.9 | 284.5 | 289.3 |
| Avg retail price ($ per dozen equivalent) | 0.95 | 0.95 | 0.95 | 0.95 |
| Consumer expenditure ($ millions) | 273.8 | 267.8 | 270.3 | 274.8 |
| **With Proposed Regulations** | | | | |
| Quantity consumed in CA (mil dozen equivalent) | 283.6 | 275.1 | 270.8 | 270.7 |
| *Change vs. Baseline* | -4.7 | -6.9 | -13.7 | -18.6 |
| Avg retail price ($ per dozen equivalent) | 1.10 | 1.10 | 1.26 | 1.26 |
| *Change vs. Baseline* | +0.15 | +0.15 | +0.31 | +0.31 |
| Consumer expenditure ($ millions) | 313.2 | 303.8 | 340.1 | 340.0 |
| *Change vs. Baseline* | +39.4 | +36.0 | +69.8 | +65.1 |

| 1.4.1b. Veal meat | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Baseline Without Regulations** | | | | |
| Qty consumed in CA (mil lbs) | 6.9 | 6.7 | 6.8 | 6.9 |
| Avg retail price ($ per lb)[1] | 15.91 | 16.97 | 17.10 | 17.53 |
| Consumer expenditure ($ mil) | 109.5 | 112.3 | 116.4 | 121.5 |
| **With Proposed Regulations** | | | | |
| Qty consumed in CA (mil lbs) | 4.7 | 4.8 | 4.9 | 5.2 |
| *Change vs. Baseline* | -2.2 | -1.9 | -1.9 | -1.7 |
| Avg retail price ($ per lb)[1] | 19.89 | 21.36 | 21.85 | 22.23 |
| *Change vs. Baseline* | +3.97 | +4.39 | +4.75 | +4.70 |
| Consumer expenditure ($ mil) | 94.4 | 101.6 | 107.5 | 114.7 |
| *Change vs. Baseline* | -15.1 | -10.7 | -8.9 | -6.8 |

[1] Average retail price for veal meat represents a weighted average of veal meat sold at restaurants and veal meat sold at grocery stores.

10

| 1.4.1c. Shell eggs | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Baseline Without Regulations** | | | | |
| Qty produced in CA (mil dozen) | 378 | 387 | 397 | 407 |
| Farm output value in CA (mil $) | 504 | 517 | 530 | 543 |
| Qty consumed in CA (mil dozen) | 686 | 704 | 721 | 739 |
| Avg retail price ($ per dozen)[2] | 2.81 | 2.81 | 2.81 | 2.81 |
| Consumer expenditure ($ mil) | 1,929 | 1,977 | 2,026 | 2,077 |
| **With Proposed Regulations** | | | | |
| Qty produced in CA (mil dozen) | N/A[3] | N/A[3] | 346 | 321 |
| *Change vs. Baseline* | | | -51 | -86 |
| Farm output value in CA (mil $) | N/A | N/A | 537 | 497 |
| *Change vs. Baseline* | | | +7 | -46 |
| Qty consumed in CA (mil dozen) | N/A | N/A | 629 | 583 |
| *Change vs. Baseline* | | | -92 | -157 |
| Avg retail price ($ per dozen)[2] | N/A | N/A | 4.75 | 4.75 |
| *Change vs. Baseline* | | | +1.94 | +1.94 |
| Consumer expenditure ($ mil) | N/A | N/A | 2,986 | 2,768 |
| *Change vs. Baseline* | | | +960 | +691 |

[2] Average retail price for shell eggs represents a weighted average of cage-free eggs and conventional eggs. For example, in 2020, we estimate conventional eggs to be about 80% of the total shell eggs consumed in California, at an average price of $2.32 per dozen; and we estimate cage-free eggs to be about 20% of the total shell eggs consumed in California, at an average price of $4.75 per dozen; thus the weighted average retail price for 2020 is $2.81. In 2022 and 2023, as required by Prop 12, conventional eggs will no longer be available and all shell eggs are cage-free, so with regulations, the weighted average is equal to the cage-free price (which we estimate will remain at $4.75 per dozen.

[3] Not applicable because proposed regulations do not go into effect until 2022.

| **1.4.1d. Pork meat** | **2020** | **2021** | **2022** | **2023** |
|---|---|---|---|---|
| **Baseline Without Regulations** | | | | |
| Quantity consumed in CA (mil lbs) | 1,996 | 1,975 | 1,989 | 2,013 |
| Avg retail price ($ per lb)[4] | 3.50 | 3.50 | 3.50 | 3.50 |
| Consumer expenditure ($ mil) | 6,989 | 6,912 | 6,964 | 7,048 |
| **With Proposed Regulations** | | | | |
| Quantity consumed in CA (mil lbs) | N/A[5] | N/A[5] | 1,959 | 1,955 |
| *Change vs. Baseline* | | | -30 | -58 |
| Avg retail price ($ per lb)[4] | N/A | N/A | 3.64 | 3.65 |
| *Change vs. Baseline* | | | +0.14 | +0.15 |
| Consumer expenditure ($ mil) | N/A | N/A | 7,138 | 7,131 |
| *Change vs. Baseline* | | | +174 | +83 |

[4] Average retail price for pork meat represents a weighted average of whole pork meat, as defined under the proposed regulations; and other pork meat whose consumption is impacted by the proposed regulations due to substitution effects. Here, other pork meat is defined as pork meat that does not satisfy the definition of whole pork meat under Prop 12 statute. For example, other pork meat includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than pork meat. We estimate that whole pork meat makes up about 58% of all pork meat consumed in California, at an average price of $3.30 per pound in 2020; and that other pork meat makes up about 42% of all pork meat consumed in California, at an average price of $3.78 per pound in 2020; thus the weighted average retail price for 2020 is $3.50.

[5] Not applicable because regulations governing pork meat do not go into effect until 2022.

In SRIA Section 4, we define the impacted food categories ("liquid eggs," "whole veal meat," "shell eggs," and "whole pork meat") and report the main results that are summarized above. In Appendices 1–4, we provide additional detail on these results.

We also consider broad economic "ripple effects" of the proposed regulations in the SRIA. Higher farm costs for production of covered products is the foundation for other economic impacts. These higher farm costs apply to production in California for a significant share of shell eggs and outside California for the other share of shell eggs and for veal, liquid eggs and pork. The higher farm costs for shell eggs generate further downstream economic impacts in

California. Our analysis does not develop estimates of economic impacts of Proposition 12 regulations outside of California.

These higher farm costs lead to higher prices received by farmers and higher prices paid for the covered products by wholesalers, retailers and consumers. Since much of the farm production and initial costs are incurred outside of California, much of the impact within California derives from effects on livestock product marketers and consumers. These impacts are shown in the product-specific results summarized in this Section 1.4 and below in Section 4, and provided in detail in the appendix.

As costs and prices rise, the quantities of the covered products are projected to be lower than they would have been but for the regulations. For these products, consumers buy less when faced with higher prices. Consumer expenditures may rise because the percentage increase in price is often larger than the percentage decline in quantity for these products. The impact on overall food sales at wholesale and retail is projected to be very small. Therefore, we expect that economy-wide impacts such as on employment, number of firms and investment in overall food marketing and retailing are likely to be too small to be measurable in the large scope of the California economy. With very small direct effects on employment and value added in food marketing and retailing, there are also negligible multiplier impacts from food marketing to the rest of the economy.

Proposition 12 mandates cage-free housing, which raises costs of production per dozen eggs. Reduced quantity demanded reduces the overall number of hens. Therefore, feed use and most other inputs such as labor decline roughly in proportion with number of eggs. For example, under the proposed regulations, for 2022, the quantity of shell eggs produced in California is lower than it would have been by about 15 percent, and in 2023 shell egg production is lower by about 27 percent (Table 1.4.1c). Table 1.4.2 shows how reducing California egg production reduces direct and total jobs associated with egg production.

**Table 1.4.2. Impacts On Jobs Related to Egg Production in California**

|  | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Baseline Without Regulations** | | | | |
| Direct Jobs | 471 | 482 | 495 | 507 |
| Total Jobs | 2,957 | 3,028 | 3,106 | 3,184 |
| **Change With Proposed Regulations** | | | | |
| Job Impact Direct | N/A[1] | N/A[1] | -64 | -107 |
| Job Impact Total | N/A | N/A | -31 | -332 |

[1] Not applicable because regulations governing shell eggs do not go into effect until 2022.

The impacts of the Proposition 12 regulations on shell egg farm production ripple economy-wide in California as shown above for jobs. In addition to the jobs impact, we project that the proposed regulations for eggs would add about $16 million to total statewide value of output in 2022, but decrease statewide value of output by about $114 million in 2023. We project that the proposed regulations for eggs would increase statewide value added by $5 million in 2022, but decrease statewide value added by $33 million in 2023.

The other California economy-wide impact is associated only with the higher-cost regulation package. In particular, the provision that would require that pork exported from California ports meet the California standards would stimulate pork exports to use other West Coast ports outside of California. Compared to the no-regulations baseline, we project 79 fewer direct jobs and 431 fewer total jobs in both 2022 and 2023. The total value of output statewide from the port impacts is lower by $135 million and statewide value added is lower by $60 million in both 2022 and 2023.

The full economy-wide economic impacts are shown in Section 5, with methods described in Appendix 5.

**1.5. Overview of SRIA contents**

The SRIA includes six sections, including this introduction. Sections 2 to 6 contain the main SRIA. Following this are six appendices providing more detail. To summarize the content:

- **Main SRIA.** The main SRIA, after this introduction (Section 1), includes the following material, which is supplemented by tables. Sections 2 through 6 describe the main results on the economic impacts of the proposed regulatory package and selected alternatives.

  o Section 2 includes important background information and a summary of our data and methods. We describe the effects of the statute, the proposed regulations, the approach of the SRIA, our data, and how the analyses are conducted.

  o Section 3 assesses situation of the three relevant markets (eggs, pork, and veal), without effects of the regulations.

  o Section 4 assesses the economic impacts of the proposed regulations and compares them with the impacts of two alternative packages of regulations: the lower-cost alternative and the higher-cost alternative. In Section 4.3 we report the central results of the SRIA: the outcomes of our economic simulations.

  o Section 5 reports our calculations of economy-wide "multiplier" impacts of the proposed regulations using the IMPLAN method, which include assessments on number of jobs and value added.

  o Section 6 makes additional economic determinations as required by state SRIA law.

- **Appendices.** There are six appendices:

  o Appendices 1 through 4 (Appendix 1 for liquid eggs, Appendix 2 for veal, Appendix 3 for shell eggs, and Appendix 4 for pork) describe the data going into

our analyses, state our economic models in mathematical form, describe the econometric basis for our simulation parameters, and show detailed tables and economic calculations we made to arrive at each of our simulation results, market estimates, and other findings.

o  Appendix 5 explains the methodology behind our assessments of the economy-wide impacts of the regulations and alternatives.

o  Appendix 6, for convenience, includes the full statutory text of Proposition 12, which is cited and discussed at length throughout this SRIA.

o  We do not attach the full text of the proposed regulations, which can be downloaded in their most recent current form from the CDFA website.

## 2. Background

### 2.1. Proposition 12 mandates

In 2018, the passage of California Proposition 12 created new minimum housing space requirements for selected farm animals. Proposition 12, the *Prevention of Cruelty to Farm Animals Act*, prohibits a business owner or operator from engaging in the sale within the state of whole veal meat, whole pork meat, shell eggs and liquid eggs from "animals confined in a cruel manner".  The requirements would be phased in in two steps with full implementation of the law starting January 1, 2022.

Proposition 12 specifically states the following confinement space requirements for effected farm animals be implemented.

1) The confinement of a calf raised for veal shall provide no less than 43 square feet of usable floor space per calf effective January 1, 2020.

2) The confinement of a female breeding pig shall provide no less than 24 square feet of usable floor space per pig effective January 1, 2022.

3) The confinement of egg-laying hens shall provide no less than 144 square inches per hen effective January 1, 2020, and shall be confined effective January 1, 2022 in a cage-free housing system that follows the requirements laid out by the 2017 United Egg Producers' Animal Husbandry Guidelines for U.S. Egg-Laying Flocks: Guidelines for Cage-Free Housing.

The full text of Proposition 12 is included as Appendix 6 of this SRIA.

### 2.2. Determination of need for a SRIA

Government Code section 11346.3 specifies that a California state agency proposing a "major regulation," which Government Code section 11342.548 defines as "any proposed adoption, amendment, or repeal of a regulation subject to review by the Office of Administrative Law . . .

17

that will have an economic impact on California business enterprises and individuals in an amount exceeding fifty million dollars ($50,000,000), as estimated by the agency," is required to prepare a Standardized Regulatory Impact Analysis (SRIA) to be submitted to the state Department of Finance for review and comment before the regulations are noticed to the public.

The first requirement of a SRIA is that it must verify that the regulation under review meets the definition of "major regulation" under Government Code § 11342.548. The regulations adopted by the Department of Finance further define the threshold as $50 million in either costs or benefits occurring within one year of full implementation of the proposed regulations (which, as above, we call the "Implementation Period").

We have determined, based on the analysis summarized in Sections 3 to 5 and shown in greater detail in the Appendix, that these proposed regulations met the definition of "major regulation" because as is shown in Sections 4 and 5, the expected economic impacts of the full package of proposed regulations in California exceed $50 million during the Implementation Period. We have made the determination of the need for a SRIA based on the text of California SB 617 and its subsequent interpretations by the state government. In particular, we rely on guidance from the 2015 joint report by the Directors of the Office of Administrative Law and Department of Finance to the Chair of the Senate Committee on Governmental Organization and the Chair of the Assembly Committee on Government, which clarifies the interpretation of Government Code section 11346.3 with respect to SRIA content, purpose, and the "major regulation" determination.

### 2.3. Methods of analysis

This SRIA provides the detailed economic analysis required to understand the economic impacts on egg, pork and veal suppliers and buyers in California of change in law and regulations related to California's implementation of Proposition 12. The SRIA was prepared by a team at University of California, Davis and the University of California Agricultural Issues Center (AIC), including professors, project scientists, senior analysts, post-doctoral fellows, other Ph.D. researchers, and graduate student researchers.

We establish effects on costs of commercial farms in meeting regulations in the production of eggs, pork, and veal as rules change from current California regulatory standards or marketing meat and egg products in California. These estimates of farm costs draw on interviews with producers and prior academic research and publications of members of the AIC team and others.

We also develop estimates of the cost of segregation of eggs, livestock, and meat so that products destined for California can be appropriately traced to farm sources, assurances and certifications can appropriately accompany the products and labels attached for retail marketing. The costs of this traceability and product segregation are complicated at some stages of livestock product processing and marketing in the modern supply chain. Our estimates draw on academic research and publications of the AIC team and others.

Other drivers of the economic impacts include supply and demand function parameters and estimates of function relating to the marketing margins or mark-ups as products move through the supply chain from farm to retail. We draw on the published literature in agricultural economics, including our own studies. We use interviews with industry experts. Where no reliable evidence was available for crucial parameters, we have developed new econometric estimates using detailed cross section and time series data.

We utilized the results from each of the evidence gathering efforts to parameterize and calibrate the economic simulation models that we used to assess direct impacts of Proposition 12 regulations on livestock product prices and quantities. This allowed us to estimate on direct economic impacts on expenditures of consumers, and measures of consumer gains and losses. We also used these estimates to calculate the direct impacts on farm producers and other suppliers along the marketing chain on to retail firms in California.

We then assessed the indirect and induced impacts on the broader California economy as a whole in the well-known and often-applied IMPLAN model, adjusted for the specific circumstances of this application.

19

### 3. Baselines in Impacted Markets Before Proposed Regulations

The tables below show our estimates of basic market characteristics for the liquid egg, veal, shell egg, and pork markets in California. These estimates are based on the best available data and supplemented by industry interviews and other research. We use these estimates in order to construct parameters for our simulations. Our estimates account for the effects of COVID-19 based on California Department of Finance economic projections (see Section 4 below).

### 3.1. Market characteristics for eggs

Tables 3.1a and 3.1b show our estimates of market characteristics for the relevant liquid and shell egg markets in California if there were no Proposition 12 regulations.

**Table 3.1a. Quantities and Average Retail Prices of Liquid Eggs in California, 2019 – 2023**

| | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Quantity of liquid eggs consumed in California, dozen equivalents | | | | | | |
| Quantity | Mil. dozen | 314 | 288 | 282 | 285 | 289 |
| Retail/Restaurant price of liquid egg component of finished product, $ per dozen equivalents | | | | | | |
| Price | $/dozen | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 |

**Table 3.1b. Quantities and Average Retail Prices of Shell Eggs in California, 2019 – 2023**

| | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Quantity of shell eggs consumed in California | | | | | | |
| Conventional | Mil. dozen | 525 | 548 | 562 | 576 | 590 |
| Cage-free | Mil. dozen | 131 | 138 | 142 | 145 | 149 |
| Total | Mil. dozen | 656 | 686 | 704 | 721 | 739 |
| Retail prices in California | | | | | | |
| Conventional | $/dozen | 2.20 | 2.32 | 2.32 | 2.32 | 2.32 |
| Cage-free | $/dozen | 4.75 | 4.75 | 4.75 | 4.75 | 4.75 |

### 3.2. Market characteristics for whole veal meat

Table 3.2 shows our estimates of market characteristics for the relevant veal market in California if there were no Proposition 12 regulations.

20

**Table 3.2. Quantities and Average Retail Prices of Whole Veal Meat in California, 2019 – 2023**

|  | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Quantity of whole veal meat consumed in California, millions of pounds | | | | | | |
| Quantity | Mil. lbs. | 7.6 | 6.9 | 6.7 | 6.8 | 6.9 |
| Average retail price (retail and food service prices) of whole veal meat, $ per pound | | | | | | |
| Price | $/lb. | 17.78 | 15.91 | 16.97 | 17.10 | 17.53 |

### 3.3. Market characteristics for whole pork meat

Table 3.3 shows our estimates of market characteristics for the relevant pork market in California if there were no Proposition 12 regulations. We present two tables, depending on the definition of whole pork meat. In addition to the proposed regulations, we consider two alternative packages of regulations (lower-cost regulations and higher-cost regulations) for comparison. Under the proposed regulations and lower-cost regulations, whole pork meat does not include ground pork (including sausage). However, under the higher-cost regulations, whole pork meat includes ground pork.

**Table 3.3. Quantities and Average Retail Prices of Pork in California When Whole Pork Meat Does Not Include Ground Pork, 2019–2023**

|  | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Quantity of pork consumed in California | | | | | | |
| Whole pork meat | Mil. lbs. | 1,205 | 1,149 | 1,137 | 1,145 | 1,159 |
| Other pork meat[1] | Mil. lbs. | 889 | 847 | 838 | 844 | 854 |
| Total | Mil. lbs. | 2,094 | 1,996 | 1,975 | 1,989 | 2,013 |
| Retail prices in California | | | | | | |
| Whole pork meat | $/lb. | 3.30 | 3.30 | 3.30 | 3.30 | 3.30 |
| Other pork meat | $/lb. | 3.78 | 3.78 | 3.78 | 3.78 | 3.78 |

[1] Here other pork meat is defined as pork meat that does not satisfy the definition of whole pork meat under Prop 12 statute. For example, other pork meat includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products) that are comprised of more than pork meat.

21

**Table 3.4. Quantities and Average Retail Prices of Pork in California When Whole Pork Meat Includes Ground Pork, 2019 – 2023**

| | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| **Quantity of pork consumed in California** | | | | | | |
| Whole pork meat | Mil. lbs. | 1,618 | 1,543 | 1,526 | 1,537 | 1,556 |
| Other pork meat[1] | Mil. lbs. | 476 | 454 | 449 | 452 | 457 |
| Total | Mil. lbs. | 2,094 | 1,996 | 1,975 | 1,989 | 2,013 |
| **Retail prices in California** | | | | | | |
| Whole pork meat | $/lb. | 3.35 | 3.35 | 3.35 | 3.35 | 3.35 |
| Other pork meat | $/lb. | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |

[1] Here other pork meat is defined as pork meat that does not satisfy the definition of whole pork meat under Prop 12 statute. For example, other pork meat includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products) that are comprised of more than pork meat.

**4. Estimated Impacts of Proposed Regulations and Alternatives**

For the analysis in this SRIA, we look at the impacts of the proposed regulations for four specific 12-month periods. These are the January to December calendar years 2020, 2021, 2022, and 2023. The analyses and projections of impacts related to calendar years 2020 and 2021 apply only to veal and liquid egg impacts that began with implantation of Proposition 12 on January 1, 2020. For the year 2022 and 2023, the analyses and projects apply to those plus the impacts for Proposition 12 and regulations that take effect on January 1, 2022. Our analysis of the one-year period in fulfillment of the basic SRIA requirements is of the calendar year 2022, the first 12 months after "Full Implementation" of the full package of proposed regulations. We also include the years 2020, 2021, and 2023 for completeness.

Some of the analyses and projections specified below depend on the size of the California population and the state of the economy in California in the years considered. The SRIA uses the most recent information from the California Department of Finance for the data and projections of economic aggregates. Table 4.0 lists key data on California nominal and real personal income, labor force, employment, unemployment rate, population, per capita income, and the inflation rates in 2018 through 2023. Table 4.0 also shows year-to-year percentage changes. The historical data from 2018 and 2019 provide useful context. The economic analyses of impacts of the Proposition 12 regulations use the projection data for 2020 and forward. Of course, economic projections for future time period are always uncertain. The usual uncertainty about the future has been amplified by the COVID-19 pandemic which has affected all aspects of the economy.

The economic projections affect the magnitudes of the impacts of proposed regulations in complex ways, including through per capita consumption rates and income impacts. The California population and per capita income affect consumption of food items such as veal, liquid eggs, shell eggs and pork. In addition, for 2020, rules related to COVID-19 restricting business operation and employment affect consumption of veal and liquid-egg use. The analyses and projections of impacts of Proposition 12 regulations incorporate assessments of these effects. Although there were significant short-term COVID-19-related impacts on pork, as some plants in

the Midwest were shut down due to workers' illnesses, these effects have been transient and there have been no lasting significant direct disruptions on the supply side for pork. Our analysis for 2021 anticipates gradual shifts back to normal per-capita veal and liquid egg demand, given the per-capita income losses.

For 2022 and 2023, the impact analyses for all four product categories incorporate the California income, employment, and population projections in Table 4.0. The analyses do not include remaining supply chain disruptions for those years. Because of the uncertainly surrounding COVID-19, and the policy and economic responses, this SRIA includes several additional projections to represent sensitivity of results to alternative scenarios.

**Table 4.0. California Data and Forecasts for Income, Employment and Population**

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Total Personal Income, Nominal ($ Millions) | 2,514.1 | 2,633.9 | 2,400.1 | 2,401.7 | 2,509.7 | 2,646.9 |
| % change from previous year |  | 4.76% | -8.88% | 0.06% | 4.50% | 5.47% |
| Real Personal Income, 2018 base ($ Millions) | 2,514.1 | 2,557.9 | 2,308.1 | 2,245.3 | 2,266.8 | 2,311.4 |
| % change from previous year |  | 1.74% | -9.77% | -2.72% | 0.96% | 1.97% |
| Civilian Labor Force (millions) | 19.3 | 19.4 | 19.5 | 19.5 | 19.5 | 19.6 |
| Pct change from previous year |  | 0.67% | 0.21% | 0.10% | 0.21% | 0.31% |
| Civilian Employment (millions) | 18.5 | 18.6 | 16.0 | 16.0 | 16.5 | 17.2 |
| Pct change from previous year |  | 0.87% | -14.34% | 0.56% | 2.68% | 4.49% |
| Unemployment Rate (%) | 4.3 | 4.1 | 18.0 | 17.6 | 15.6 | 12.1 |
| Population (millions) | 39.8 | 40 | 40.1 | 40.3 | 40.5 | 40.7 |
| Per Capita Income, Nominal, $ Thousands | 63.141 | 65.916 | 59.809 | 59.578 | 61.956 | 65.008 |
| Pct change from previous year |  | 4.39% | -9.26% | -0.39% | 3.99% | 4.93% |
| Per Capita Income, Real, $ Thousands | 63.141 | 64.013 | 57.517 | 55.698 | 55.962 | 56.769 |
| Pct change from previous year |  | 1.38% | -10.15% | -3.16% | 0.47% | 1.44% |
| Consumer Price Index (1982-84=100) Pct change from previous year |  | 3.0% | 1.0% | 2.9% | 3.5% | 3.4% |

Note: Per capita income is nominal. Data on income and employment starting in 2020 are forecasts prepared in April 2020. Sources: http://www.dof.ca.gov/Forecasting/Economics/Eco_Forecasts_Us_Ca/index.html http://www.dof.ca.gov/Forecasting/Demographics/

## 4.1. Proposed Regulations

The proposed regulations, enforce the standards set out in the statute (Prop 12), as required by law and summarized in Sections 1.2 and 2.1 of the SRIA.

Prop 12 statutes are not specific about most aspects of enforcement, and instead leave many choices (e.g. registration and enforcement) to the discretion of CDFA. One role of the SRIA is to identify and evaluate the discretionary regulatory choices that we expect to be associated with nontrivial costs of compliance (and therefore some economic impacts). We find that the biggest discretionary impacts come from regulatory choices related to the breadth or narrowness of which products are included, and which businesses are subject to certification requirements.

The proposed regulations include the following discretionary regulatory choices, some of which are varied in the two alternative packages of regulations we consider (see Section 4.2).

- o **Inclusion of frozen, dried, and cooked eggs in the definition of "liquid eggs."** In the proposed regulations, Division 2, Title 3, California Code of Regulations, Chapter 10, Article 1, Section 1320(q), "liquid eggs" can be "raw or pasteurized, co-packaged with other foods, or sold frozen, dried, or as a cooked patty, puck or other cooked form"). "Liquid eggs" are not specifically defined in the text of Prop 12 to include these product categories.

- o **Inclusion of hard-boiled, peeled, sliced, chopped, and cut eggs in the definition of "shell eggs."** Article 1, Section 1320(q), says: "In its shell form" for purposes of section 25991(p) of the Health and Safety Code and this Article means an egg as developed, proportioned and shaped in the shell by an egg-laying hen, whether it is in the shell, raw, pasteurized in the shell, treated in the shell, hardboiled or otherwise cooked in whole form, peeled, co-packaged with other foods, or subsequently sold sliced, chopped or otherwise cut." "Shell eggs" are not specifically defined in the text of Prop 12 to include these product categories.

25

- o **Exclusion of ground pork and ground veal from the definition of "whole meat."** Prop 12 is vague as to whether raw ground pork or veal meat is considered to be a "cut" of whole pork meat or whole veal meat. The proposed regulations exclude raw ground pork and raw ground veal and their products from Prop 12 requirements.

- o **Registration requirements.** The proposed regulations (for eggs, Article 1, Section 1320.2; for veal, Article 2, Section 1321.2; for pork, Article 3, Section 1322.2; and for all, Article 5) require certain businesses, defined as "handlers" who sell or distribute Prop 12-covered shell eggs, liquid eggs, whole veal, or whole pork meat to an end-user in California to register annually with CDFA and show documentation of third-party certification and inspection by a CDFA-accredited third-party certifier for compliance with Prop 12 standards. Examples of an end-user as defined by the regulations are a consumer, retailer, restaurant or food manufacturing company. Below we refer to these registration, on-site inspection, and certification requirements, collectively, as "certification." The discretionary certification requirements in the proposed regulations, and associated costs, are applied to some categories of businesses and products and not others. Registration with CDFA requires an application form, proof of certification, and annual renewal process. Relevant businesses with multiple facilities are required to apply for registration separately for each compliant facility distributing or selling covered products to an end-user. Registration must be renewed every 12 months.

- o **Which businesses must be certified.** 1) Under the proposed regulations (for eggs, Article 1, Section 1320(h); for veal, Article 2, Section 1321(w); for pork, Article 3, Section 1322(r) and Article 5), the initial CDFA certification requirements (including registration with CDFA and documentation of a third-party certification) and annual renewal requirements are imposed on a category of business called "handlers": "egg handlers," "veal handlers," and "pork handlers."

  - ▪ The "handler," in each case, means a person engaged in the business of commercial sales of shell eggs, liquid eggs, whole veal meat or whole pork

26

meat (as a pork producer or otherwise) to an end-user in California. This definition shall not apply to a person or facility that only receives whole pork meat as an end-user. Handlers include, but are not limited to, farms, distributors, warehouses, and co-packers selling, distributing, and moving the product in question to an end-user in California. Prop 12 statute does not impose any specific registration or inspection requirements on businesses, and Prop 12 statutes are vague as to which categories of businesses, if any, should submit to mandatory inspection, certification, or other enforcement measures.

o   Under the proposed regulations (for eggs, Article 1, Section 1320(j); for veal, Article 2, Section 1321(x); for pork, Article 3, Section 1322(s) and Article 5), producers of covered shell eggs, liquid eggs, veal meat and pork meat must be third-party certified by a CDFA accredited third-party certification agency.

o   **Certification exemptions.** The proposed regulations do not require CDFA certification or registration for end-users such as restaurants, retailers, or prepared food vendors who cook or prepare Prop 12-covered food products (liquid or shell eggs, raw pork, or raw veal), or who use covered food products as ingredients in other combination food products or prepared foods This exemption is only from the registration process with CDFA and does not exclude the covered products used by these end-users from being Prop 12-compliant.

o   **Labeling requirements.** The proposed regulations (for eggs, Article 1, Section 1320.4; for veal, Article 2, Section 1321.4; and for pork, Article 3, Section 1322.4) require that compliant covered shell egg consumer-facing cartons and shipping manifests be labeled with the words "CA 144", "CA SEFS Compliant" or "CA Cage Free" (in 2022). In addition, all other covered shell egg, liquid egg, veal and pork shipping manifests are to be labeled with "CA 144" or "CA Cage Free" (for egg products), "CA 43+ Compliant" (for veal), or "CA 24+ Compliant" (for pork). We expect this requirement to impose some costs, but given existing labeling requirements, we expect these costs to be smaller than the margins of error in our

estimates, so we do not include labeling costs explicitly as a separate item in our simulations or economic impact calculations.

- o **Recordkeeping requirements.** The proposed regulations (for eggs, Article 1, Sections 1320.5 and 1320.8; for veal, Article 2, Sections 1321.5 and 1321.8; and for pork, Article 3, Sections 1322.5 and 1322.8) require that records must be sufficient for an audit trail and documented in a traceable manner that covered product originated from Prop 12 compliant operations; and that certified producers and certified handlers must keep the records on-site or available electronically for two years. We expect the recordkeeping requirements in the proposed regulations to impose some costs (including not only costs for egg, pork, or veal handlers but also costs for producers). However, we expect these costs to be smaller than the margins of error in our estimates, so we do not include recordkeeping costs in our simulations or economic impact calculations.

- o **Enforcement requirements.** The proposed regulations establish an enforcement system administered by CDFA, including a wide variety of administrative and enforcement rules. A variety of provisions in Articles 1 to 5 establish rules for administering the program, and ensuring compliance with Prop 12 standards for eggs, pork, and veal. For instance, Article 1, Section 1320.6 (Inspection of Conveyances) establishes that enforcement officers can stop and inspect vehicles transporting eggs, or vehicles can be inspected at a California inspection station, and that violating containers can be seized by enforcement officers. We have been provided with estimates of CDFA's administrative costs stemming from the proposed regulations, which we include the costs of enforcement as set out in the proposed regulations. We understand that the enforcement system in the proposed regulations is necessary for CDFA to carry out its legally mandated duties, so we do not vary the discretionary choices of enforcement system in the proposed regulations versus the lower-cost and higher-cost alternatives.

## 4.2. Selection of two alternative packages of regulations

Our "lower-cost" and "higher-cost" packages of regulations were constrained by our analysis of the statutory language of Prop 12. We do not consider regulatory alternatives that would conflict with the mandatory requirements of Prop 12. Below we summarize the key variations we have chosen in the lower-cost and higher-cost alternatives.

**4.2.1. Alternative Regulatory Package 1:** "**Lower-Cost Regulations**."

The lower-cost regulations apply a narrower interpretation of which food products are covered and which businesses are subject to annual registration and certification requirements. Key variations in the lower-cost regulations, versus the proposed regulations, are as follows:

- o "Shell eggs" include only raw or pasteurized eggs in the shell.

- o "Shell eggs" therefore exclude peeled, sliced, chopped, and cut hard-boiled eggs.

- o "Liquid eggs" include only eggs broken from the shell with the yolks and whites in their natural proportions, or with the yolks and whites separated, mixed or mixed and strained as defined by the following Code of Federal Regulations:
    - ▪ Liquid eggs as described by Section 160.115 of Title 21 of the Code of Federal Regulations.
    - ▪ Egg whites as described by Section 160.140 of Title 21 of the Code of Federal Regulations.
    - ▪ Egg yolks as described by Section 160.180 of Title 21 of the Code of Federal Regulations.

- o "Liquid eggs" therefore exclude frozen, dried, cooked, and prepared egg products (e.g. egg patties or egg "pucks" consisting of mostly eggs except for added seasoning and flavoring).

- o   Prop 12 requirements are limited to shell eggs, liquid eggs, veal or pork meat sold at the retail level to an end consumer.  Under the lower-cost regulations, restaurants, prepared food vendors, and food manufacturing are not required to source Prop 12 compliant shell eggs, liquid eggs, veal or pork for their business of further processing those ingredients.

## 4.2.2. Alternative Regulatory Package 2: "Higher-Cost Regulations."

This package includes all the requirements of the proposed regulations are imposed, plus the following additional requirements:

- o   Raw ground veal, raw ground pork, and their products (meaning foods composed of raw ground veal or pork plus seasonings, coloring, curing agents, etc.) are considered cuts of "whole veal meat" and cuts of "whole pork meat," and thus subject to Prop 12 requirements.

- o   Prop 12 requirements apply to covered food products moving through California for sale and end-use in another state or country.

- o   Consumer-facing labeling is required for all covered products or prepared foods containing a covered product. Labels would allow the buyer to scan a QR code at retail or when consuming a prepared food made with covered product and see record of Prop 12 animal confinement certification and traceability of product back to farm of origin.

Our estimates of impacts of the lower-cost and higher-cost regulations are shown below in section 4.3.

### 4.2.3. Costs of implementation, enforcement, and administration

Most of the impacts of the proposed regulations, and of the two alternative packages of regulations, are generated by the costs of complying with the new Prop 12-related animal-confinement standards. However, the proposed regulations and alternatives, like most new sets of regulations, also generate some administrative costs to the state. These include the costs of initial implementation, salaries and benefits for administrative and field officers, travel, enforcement and auditing activities, IT and data, administration, recordkeeping, and facilities operations. The administrative costs of implementing the proposed regulations and alternatives are as follows, based on fiscal projections.

The proposed regulations specify that certification and inspection for compliance with Prop 12 standards are conducted by third-party certification businesses. Those and other costs of certification are incorporated into the market simulation results that are reported in section 4.3 and detailed in Appendices 1 through 4. The administrative costs shown below, in Tables 4.2a and 4.2b, represent only the direct administrative costs to the state, which include the costs of auditing third-party certification businesses.

The fiscal cost to implement the smaller-scope regulatory alternative would be the same as the fiscal cost to implement the proposed regulations, because the resources needed for the regulatory framework (registration, accreditation and audits of third-party certifiers, verification and compliance activities, investigations, etc.) would not differ between the two alternatives.

In the higher-cost regulations, the increased workload at the food service sector for both inspection and investigative activity would be significant, given approximately 90,000 restaurants statewide (pre-COVID-19). Compliance and enforcement activity for the higher-cost regulations is estimated to require more than three times the number of field staff and increased supervisory personnel which implies an additional $5.8 million per year of overall fiscal cost compared to the proposed and lower-cost regulations.

31

**Table 4.2a. Estimated Administrative Costs for Proposed and Lower-Cost Regulations**

|  | 2019-20 | 2020-21 | 2021-22 | Ongoing |
|---|---|---|---|---|
| Full-time employees | 11.0 | 17.0 | 26.0 | 26.0 |
| Initial IT implementation | $ 2,537,000 |  |  |  |
| Salaries | $    901,092 | $ 1,317,588 | $ 1,971,684 | $ 1,971,684 |
| Benefits | $    514,341 | $    882,148 | $ 1,150,760 | $ 1,150,760 |
| IT and data | $    422,000 | $    485,800 | $    566,800 | $    566,800 |
| General administrative | $    134,700 | $ 1,035,600 | $ 1,217,600 | $ 1,217,600 |
| Facilities operations | $     74,000 | $    137,280 | $    137,280 | $    137,280 |
| **Total** | **$ 4,583,133** | **$ 3,858,416** | **$ 5,044,124** | **$ 5,044,124** |

**Table 4.2b. Estimated Administrative Costs for Higher-Cost Regulations**

|  | 2019-20 | 2020-21 | 2021-22 | Ongoing |
|---|---|---|---|---|
| Full-time employees | 11.0 | 17.0 | 65.0 | 65.0 |
| Initial IT implementation | $ 2,537,000 |  |  |  |
| Salaries | $    901,092 | $ 1,317,588 | $ 4,709,238 | $ 4,709,238 |
| Benefits | $    514,341 | $ 1,393,750 | $ 2,786,566 | $ 2,786,566 |
| IT and data | $    422,000 | $    517,000 | $    949,000 | $    949,000 |
| General administrative | $    134,700 | $ 1,644,000 | $ 2,099,000 | $ 2,099,000 |
| Facilities operations | $     74,000 | $    343,200 | $    343,200 | $    343,200 |
| **Total** | **$ 4,583,133** | **$ 5,215,538** | **$ 10,887,004** | **$ 10,887,004** |

The administrative costs shown in Tables 4.2a and 4.2b are incorporated into our analyses of total economic impact to the state under the proposed regulations and alternatives in Section and 6. The funds used for the government activity are collected from taxed entities in the economy of California and/or user fees charged directly to Prop 12-regulated industries. These transfers do not change the overall economic activity in the state.

32

**4.3. Estimated impacts of Lower-Cost, Proposed, and Higher-Cost Regulations**

Basic simulation results of the impacts of the proposed regulations, higher-cost regulations, and lower-cost regulations for each of the relevant Prop 12-impacted markets are shown in the tables below, beginning with Table 4.3a. The initial characteristics of each of these markets (which are used as inputs going into our simulations) are summarized in Section 3. Appendices 1–4 provide details on our data sources and analysis, mathematical models, and calculations. The tables below are also reproduced in expanded form in Appendices 1–4, where they are shown together with sensitivity analyses that vary certain starting assumptions.

**Table 4.3a. Liquid eggs: Summary of estimated impacts of Proposed Regulations**

|  | **2020** | **2021** | **2022** | **2023** |
|---|---|---|---|---|
| **Quantity of covered liquid eggs consumed, millions of dozens equivalent** | | | | |
| With regulations | 283.6 | 275.1 | 270.8 | 270.7 |
| Without regulations | 288.2 | 281.9 | 284.5 | 289.3 |
| Change | -4.7 | -6.9 | -13.7 | -18.6 |
| **Average wholesale price, $ per dozen equivalent** | | | | |
| With regulations | 0.63 | 0.63 | 0.74 | 0.74 |
| Without regulations | 0.52 | 0.52 | 0.52 | 0.52 |
| Change | 0.11 | 0.11 | 0.22 | 0.22 |
| **Average retail price, $ per dozen equivalent** | | | | |
| With regulations | 1.10 | 1.10 | 1.26 | 1.26 |
| Without regulations | 0.95 | 0.95 | 0.95 | 0.95 |
| Change | 0.15 | 0.15 | 0.31 | 0.31 |
| **Consumer expenditure, millions of $** | | | | |
| With regulations | 313.2 | 303.8 | 340.1 | 340.0 |
| Without regulations | 273.8 | 267.8 | 270.3 | 274.8 |
| Change | 39.4 | 36.0 | 69.8 | 65.1 |

**Table 4.3b. Liquid Eggs: Summary of estimated impacts of Lower-Cost Regulations**

|  | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity of covered liquid eggs consumed, millions of dozens equivalent** | | | | |
| With regulations | 12.2 | 11.9 | 11.7 | 11.7 |
| Without regulations | 12.4 | 12.2 | 12.3 | 12.5 |
| Change | -0.2 | -0.3 | -0.6 | -0.8 |
| **Average wholesale price, $ per dozen equivalent** | | | | |
| With regulations | 0.63 | 0.63 | 0.74 | 0.74 |
| Without regulations | 0.52 | 0.52 | 0.52 | 0.52 |
| Change | 0.11 | 0.11 | 0.22 | 0.22 |
| **Average retail price, $ per dozen equivalent** | | | | |
| With regulations | 1.11 | 1.11 | 1.26 | 1.26 |
| Without regulations | 0.95 | 0.95 | 0.95 | 0.95 |
| Change | 0.15 | 0.15 | 0.31 | 0.31 |
| **Consumer expenditure, millions of $** | | | | |
| With regulations | 17.1 | 16.6 | 18.6 | 18.6 |
| Without regulations | 15.0 | 14.7 | 14.8 | 15.0 |
| Change | 2.1 | 2.0 | 3.8 | 3.6 |

**Table 4.3c. Liquid eggs: Summary of estimated impacts of Higher-Cost Regulations**

|  | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity of covered liquid eggs consumed, millions of dozens equivalent** | | | | |
| With regulations | 283.3 | 274.6 | 270.4 | 270.1 |
| Without regulations | 288.2 | 281.9 | 284.5 | 289.3 |
| Change (%) | -5.0 | -7.3 | -14.2 | -19.2 |
| **Average wholesale price, $ per dozen equivalent** | | | | |
| With regulations | 0.63 | 0.63 | 0.74 | 0.74 |
| Without regulations | 0.52 | 0.52 | 0.52 | 0.52 |
| Change ($) | 0.11 | 0.11 | 0.22 | 0.22 |
| **Average retail price, $ per dozen equivalent** | | | | |
| With regulations | 1.11 | 1.11 | 1.27 | 1.27 |
| Without regulations | 0.95 | 0.95 | 0.95 | 0.95 |
| Change ($) | 0.16 | 0.16 | 0.32 | 0.32 |
| **Average consumer expenditure, millions of $** | | | | |
| With regulations | 315.6 | 306.0 | 342.1 | 341.8 |
| Without regulations | 273.8 | 267.8 | 270.3 | 274.8 |
| Change ($) | 41.8 | 38.1 | 71.8 | 67.0 |

### 4.3.2 Simulation results for veal

**Table 4.3d. Veal: Summary of estimated impacts of Proposed Regulations**

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity of covered whole veal meat consumed, millions of pounds** | | | | |
| With regulations | 4.7 | 4.8 | 4.9 | 5.2 |
| Without regulations | 6.9 | 6.7 | 6.8 | 6.9 |
| Change | -2.2 | -1.9 | -1.9 | -1.7 |
| **Average producer price, $ per pound** | | | | |
| With regulations | 8.87 | 8.90 | 8.91 | 8.92 |
| Without regulations | 7.00 | 7.00 | 7.00 | 7.00 |
| Change | 1.87 | 1.90 | 1.91 | 1.92 |
| **Weighted average retail price (including restaurant and grocery), $ per pound** | | | | |
| With regulations | 19.89 | 21.36 | 21.85 | 22.23 |
| Without regulations | 15.91 | 16.97 | 17.10 | 17.53 |
| Change | 3.97 | 4.39 | 4.75 | 4.70 |
| **Consumer expenditure, millions of $** | | | | |
| With regulations | 94.4 | 101.6 | 107.5 | 114.7 |
| Without regulations | 109.5 | 112.3 | 116.4 | 121.5 |
| Change | -15.1 | -10.7 | -8.9 | -6.8 |

**Table 4.3e. Veal: Summary of estimated impacts of Lower-Cost Regulations**

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity of covered whole veal meat consumed, millions of pounds** | | | | |
| With regulations | 2.2 | 1.8 | 1.6 | 1.5 |
| Without regulations | 4.1 | 3.4 | 3.1 | 2.8 |
| Change (%) | -1.9 | -1.6 | -1.5 | -1.3 |
| **Average producer price, $ per pound** | | | | |
| With regulations | 8.78 | 8.78 | 8.78 | 8.78 |
| Without regulations | 7.00 | 7.00 | 7.00 | 7.00 |
| Change ($) | 1.78 | 1.78 | 1.78 | 1.78 |
| **Average retail price, $ per pound** | | | | |
| With regulations | 14.93 | 14.93 | 14.93 | 14.93 |
| Without regulations | 12.44 | 12.44 | 12.44 | 12.44 |
| Change ($) | 2.49 | 2.49 | 2.49 | 2.49 |
| **Consumer expenditure, millions of $** | | | | |
| With regulations | 33.4 | 15.9 | 24.6 | 22.3 |
| Without regulations | 51.5 | 23.5 | 38.0 | 34.4 |
| Change ($) | -18.1 | -7.6 | -13.4 | -12.1 |

**Table 4.3f. Veal: Summary of estimated impacts of Higher-Cost Regulations**

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity of covered whole veal meat consumed, millions of pounds** | | | | |
| With regulations | 4.6 | 4.7 | 4.9 | 5.1 |
| Without regulations | 6.9 | 6.7 | 6.8 | 6.9 |
| Change (%) | -2.3 | -2.0 | -1.9 | -1.8 |
| **Average producer price, $ per pound** | | | | |
| With regulations | 8.86 | 8.89 | 8.90 | 8.91 |
| Without regulations | 7.00 | 7.00 | 7.00 | 7.00 |
| Change ($) | 1.86 | 1.89 | 1.90 | 1.91 |
| **Weighted average retail price (including restaurant and grocery), $ per pound** | | | | |
| With regulations | 20.47 | 21.13 | 22.02 | 22.05 |
| Without regulations | 15.91 | 16.97 | 17.10 | 17.53 |
| Change ($) | 4.56 | 4.16 | 4.92 | 4.52 |
| **Consumer expenditure, millions of $** | | | | |
| With regulations | 93.5 | 100.9 | 107.0 | 114.2 |
| Without regulations | 109.5 | 112.3 | 116.4 | 121.5 |
| Change ($) | -16.00 | -11.40 | -9.40 | -7.30 |

### 4.3.3 Simulation results for shell eggs

**Table 4.3g. Shell eggs: Summary of estimated impacts of Proposed Regulations**

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity of shell eggs produced in California, millions of dozens equivalent** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | 0 | 0 |
| Without regulations | 302 | 309 | 317 | 325 |
| Change | N/A | N/A | -317 | -325 |
| Cage-free | | | | |
| With regulations | N/A | N/A | 346 | 321 |
| Without regulations | 76 | 78 | 80 | 82 |
| Change | N/A | N/A | 266 | 239 |
| Total | | | | |
| With regulations | N/A | N/A | 346 | 321 |
| Without regulations | 378 | 387 | 397 | 407 |
| Change | N/A | N/A | -51 | -86 |
| **Quantity consumed in California, millions of dozens equivalent** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | 0 | 0 |
| Without regulations | 548 | 562 | 576 | 590 |
| Change | N/A | N/A | -576 | -590 |
| Cage-free | | | | |
| With regulations | N/A | N/A | 629 | 583 |
| Without regulations | 138 | 142 | 145 | 149 |
| Change | N/A | N/A | 483 | 434 |
| Total | | | | |
| With regulations | N/A | N/A | 629 | 583 |
| Without regulations | 686 | 704 | 721 | 739 |
| Change | N/A | N/A | -92 | -157 |
| **Average farm price in California, $ per dozen** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | N/A | N/A |
| Without regulations | 1.28 | 1.28 | 1.28 | 1.28 |
| Change | N/A | N/A | N/A | N/A |
| Cage-free | | | | |
| With regulations | N/A | N/A | 1.55 | 1.55 |
| Without regulations | 1.55 | 1.55 | 1.55 | 1.55 |
| Change | N/A | N/A | 0 | 0 |
| **Average retail price in California, $ per dozen** | | | | |

| | **2020** | **2021** | **2022** | **2023** |
|---|---|---|---|---|
| Conventional | | | | |
|   With regulations | N/A | N/A | Prohibited | Prohibited |
|   Without regulations | 2.32 | 2.32 | 2.32 | 2.32 |
|   Change | N/A | N/A | N/A | N/A |
| Cage-free | | | | |
|   With regulations | N/A | N/A | 4.75 | 4.75 |
|   Without regulations | 4.75 | 4.75 | 4.75 | 4.75 |
|   Change | N/A | N/A | 0 | 0 |
| **Farm revenue, retailer expenditure and consumer expenditure on shell eggs in California, millions of $** | | | | |
| Farm revenue | | | | |
|   With regulations | N/A | N/A | 537 | 497 |
|   Without regulations | 504 | 517 | 530 | 543 |
|   Change | N/A | N/A | 7 | -46 |
| Retailer expenditure | | | | |
|   With regulations | N/A | N/A | 975 | 903 |
|   Without regulations | 916 | 939 | 962 | 986 |
|   Change | N/A | N/A | 12 | -83 |
| Consumer expenditure | | | | |
|   With regulations | N/A | N/A | 2,986 | 2,768 |
|   Without regulations | 1,929 | 1,977 | 2,026 | 2,077 |
|   Change | N/A | N/A | 960 | 691 |

**Table 4.3h. Shell eggs: Summary of estimated impacts of Lower-Cost Regulations**

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity of shell eggs produced in California, millions of dozens equivalent** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | 33 | 34 |
| Without regulations | 302 | 309 | 317 | 325 |
| Change | N/A | N/A | -284 | -291 |
| Cage-free | | | | |
| With regulations | N/A | N/A | 318 | 296 |
| Without regulations | 76 | 78 | 80 | 82 |
| Change | N/A | N/A | 238 | 214 |
| Total | | | | |
| With regulations | N/A | N/A | 351 | 330 |
| Without regulations | 378 | 387 | 397 | 407 |
| Change | N/A | N/A | -46 | -77 |
| **Quantity consumed in California, millions of dozens equivalent** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | 60 | 62 |
| Without regulations | 548 | 562 | 576 | 590 |
| Change | N/A | N/A | -515 | -528 |
| Cage-free | | | | |
| With regulations | N/A | N/A | 578 | 537 |
| Without regulations | 138 | 142 | 145 | 149 |
| Change | N/A | N/A | 433 | 388 |
| Total | | | | |
| With regulations | N/A | N/A | 638 | 599 |
| Without regulations | 686 | 704 | 721 | 739 |
| Change | N/A | N/A | -83 | -140 |
| **Average farm price in California, $ per dozen** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | 1.28 | 1.28 |
| Without regulations | 1.28 | 1.28 | 1.28 | 1.28 |
| Change | N/A | N/A | 0 | 0 |
| Cage-free | | | | |
| With regulations | N/A | N/A | 1.55 | 1.55 |
| Without regulations | 1.55 | 1.55 | 1.55 | 1.55 |
| Change | N/A | N/A | 0 | 0 |
| **Average retail price in California, $ per dozen** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | 2.32 | 2.32 |

|  | **2020** | **2021** | **2022** | **2023** |
|---|---|---|---|---|
| Without regulations | 2.32 | 2.32 | 2.32 | 2.32 |
| Change | N/A | N/A | 0 | 0 |
| Cage-free |  |  |  |  |
| With regulations | N/A | N/A | 4.75 | 4.75 |
| Without regulations | 4.75 | 4.75 | 4.75 | 4.75 |
| Change | N/A | N/A | 0 | 0 |
| **Farm revenue, retailer expenditure and consumer expenditure on shell eggs in California, millions of $** | | | | |
| Farm revenue |  |  |  |  |
| With regulations | N/A | N/A | 536 | 502 |
| Without regulations | 504 | 517 | 530 | 543 |
| Change | N/A | N/A | 6 | -41 |
| Retailer expenditure |  |  |  |  |
| With regulations | N/A | N/A | 973 | 912 |
| Without regulations | 916 | 939 | 962 | 986 |
| Change | N/A | N/A | 11 | -75 |
| Consumer expenditure |  |  |  |  |
| With regulations | N/A | N/A | 2,886 | 2,695 |
| Without regulations | 1,929 | 1,977 | 2,026 | 2,077 |
| Change | N/A | N/A | 859 | 618 |

**Table 4.3i. Shell eggs: Summary of estimated impacts of Higher-Cost Regulations**

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity of shell eggs produced in California, millions of dozens equivalent** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | 0 | 0 |
| Without regulations | 302 | 309 | 317 | 325 |
| Change | N/A | N/A | -317 | -325 |
| Cage-free | | | | |
| With regulations | N/A | N/A | 346 | 320 |
| Without regulations | 76 | 78 | 80 | 82 |
| Change | N/A | N/A | 266 | 238 |
| Total | | | | |
| With regulations | N/A | N/A | 346 | 320 |
| Without regulations | 378 | 387 | 397 | 407 |
| Change | N/A | N/A | -51 | -87 |
| **Quantity consumed in California, millions of dozens equivalent** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | 0 | 0 |
| Without regulations | 548 | 562 | 576 | 590 |
| Change | N/A | N/A | -576 | -590 |
| Cage-free | | | | |
| With regulations | N/A | N/A | 628 | 581 |
| Without regulations | 138 | 142 | 145 | 149 |
| Change | N/A | N/A | 482 | 432 |
| Total | | | | |
| With regulations | N/A | N/A | 628 | 581 |
| Without regulations | 686 | 704 | 721 | 739 |
| Change | N/A | N/A | -93 | -158 |
| **Average farm price in California, $ per dozen** | | | | |
| Conventional | | | | |
| With regulations | N/A | N/A | Prohibited | Prohibited |
| Without regulations | 1.28 | 1.28 | 1.28 | 1.28 |
| Change | N/A | N/A | N/A | N/A |
| Cage-free | | | | |
| With regulations | N/A | N/A | 1.55 | 1.55 |
| Without regulations | 1.55 | 1.55 | 1.55 | 1.55 |
| Change | N/A | N/A | 0 | 0 |

| Table 4.3i cont'd. | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Average retail price in California, $/dozen** | | | | |
| Conventional | | | | |
|   With regulations | N/A | N/A | Prohibited | Prohibited |
|   Without regulations | 2.32 | 2.32 | 2.32 | 2.32 |
|   Change | N/A | N/A | N/A | N/A |
| Cage-free | | | | |
|   With regulations | N/A | N/A | 4.78 | 4.78 |
|   Without regulations | 4.75 | 4.75 | 4.75 | 4.75 |
|   Change | N/A | N/A | 0.03 | 0.03 |
| **Farm revenue, retailer expenditure and consumer expenditure on shell eggs in California, millions of $** | | | | |
| Farm revenue | | | | |
|   With regulations | N/A | N/A | 536 | 496 |
|   Without regulations | 504 | 517 | 530 | 543 |
|   Change | N/A | N/A | 6 | -47 |
| Retailer expenditure | | | | |
|   With regulations | N/A | N/A | 973 | 901 |
|   Without regulations | 916 | 939 | 962 | 986 |
|   Change | N/A | N/A | 11 | -85 |
| Consumer expenditure | | | | |
|   With regulations | N/A | N/A | 3,003 | 2,781 |
|   Without regulations | 1,929 | 1,977 | 2,026 | 2,077 |
|   Change | N/A | N/A | 976 | 704 |

### 4.3.4 Simulation results for pork

**Table 4.3j. Pork: Summary of estimated impacts of Proposed Regulations**

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity of whole pork meat consumed in California, millions of pounds** | | | | |
| Whole pork meat | | | | |
| With regulations | N/A | N/A | 1,107 | 1,081 |
| Without regulations | 1,149 | 1,137 | 1,145 | 1,159 |
| Change | N/A | N/A | -38 | -78 |
| Other pork meat | | | | |
| With regulations | N/A | N/A | 852 | 874 |
| Without regulations | 847 | 838 | 844 | 854 |
| Change | N/A | N/A | 8 | 20 |
| Total | | | | |
| With regulations | N/A | N/A | 1,959 | 1,955 |
| Without regulations | 1,996 | 1,975 | 1,989 | 2,013 |
| Change | N/A | N/A | -30 | -58 |
| **Wholesale price in California, $ per pound** | | | | |
| Whole pork meat | | | | |
| With regulations | N/A | N/A | 1.44 | 1.45 |
| Without regulations | 1.20 | 1.20 | 1.20 | 1.20 |
| Change | N/A | N/A | 0.24 | 0.25 |
| Other pork meat | | | | |
| With regulations | N/A | N/A | 1.68 | 1.68 |
| Without regulations | 1.68 | 1.68 | 1.68 | 1.68 |
| Change | N/A | N/A | 0.00 | 0.00 |
| **Retail price in California, $ per pound** | | | | |
| Whole pork meat | | | | |
| With regulations | N/A | N/A | 3.54 | 3.54 |
| Without regulations | 3.30 | 3.30 | 3.30 | 3.30 |
| Change | N/A | N/A | 0.24 | 0.25 |
| Other pork meat | | | | |
| With regulations | N/A | N/A | 3.78 | 3.78 |
| Without regulations | 3.78 | 3.78 | 3.78 | 3.78 |
| Change | N/A | N/A | 0.00 | 0.00 |
| **Retailer expenditure and consumer expenditure in California, millions of $** | | | | |
| Retailer expenditure | | | | |
| With regulations | N/A | N/A | 3,030 | 3,032 |
| Without regulations | 2,803 | 2,772 | 2,793 | 2,827 |
| Change | N/A | N/A | 237 | 206 |
| Consumer expenditure | | | | |
| With regulations | N/A | N/A | 7,138 | 7,131 |
| Without regulations | 6,989 | 6,912 | 6,964 | 7,048 |
| Change | N/A | N/A | 174 | 83 |

**Table 4.3k. Pork: Summary of estimated impacts of Lower-Cost Regulations**

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity consumed in California, millions of pounds** | | | | |
| Whole pork meat | | | | |
|   With regulations | N/A | N/A | 1,116 | 1,100 |
|   Without regulations | 1,149 | 1,137 | 1,145 | 1,159 |
|   Change | N/A | N/A | -29 | -59 |
| Other pork meat | | | | |
|   With regulations | N/A | N/A | 850 | 867 |
|   Without regulations | 847 | 838 | 844 | 854 |
|   Change | N/A | N/A | 6 | 13 |
| Total | | | | |
|   With regulations | N/A | N/A | 1,967 | 1,966 |
|   Without regulations | 1,996 | 1,975 | 1,989 | 2,013 |
|   Change | N/A | N/A | -23 | -47 |
| **Wholesale price in California, $ per pound** | | | | |
| Whole pork meat | | | | |
|   With regulations | N/A | N/A | 1.38 | 1.38 |
|   Without regulations | 1.20 | 1.20 | 1.20 | 1.20 |
|   Change | N/A | N/A | 0.18 | 0.18 |
| Other pork meat | | | | |
|   With regulations | N/A | N/A | 1.68 | 1.68 |
|   Without regulations | 1.68 | 1.68 | 1.68 | 1.68 |
|   Change | N/A | N/A | 0.00 | 0.00 |
| **Retail price in California, $ per pound** | | | | |
| Whole pork meat | | | | |
|   With regulations | N/A | N/A | 3.48 | 3.48 |
|   Without regulations | 3.30 | 3.30 | 3.30 | 3.30 |
|   Change | N/A | N/A | 0.18 | 0.18 |
| Other pork meat | | | | |
|   With regulations | N/A | N/A | 3.78 | 3.78 |
|   Without regulations | 3.78 | 3.78 | 3.78 | 3.78 |
|   Change | N/A | N/A | 0.00 | 0.00 |
| **Retailer expenditure and consumer expenditure in California, millions of $** | | | | |
| Retailer expenditure | | | | |
|   With regulations | N/A | N/A | 2,974 | 2,979 |
|   Without regulations | 2,803 | 2,772 | 2,793 | 2,827 |
|   Change | N/A | N/A | 181 | 153 |
| Consumer expenditure | | | | |
|   With regulations | N/A | N/A | 7,097 | 7,103 |
|   Without regulations | 6,989 | 6,912 | 6,964 | 7,048 |
|   Change | N/A | N/A | 133 | 55 |

**Table 4.3l. Pork: Summary of estimated impacts of Higher-Cost Regulations**

| | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|
| **Quantity consumed in California, millions of pounds** | | | | |
| Whole pork meat | | | | |
| With regulations | N/A | N/A | 1,495 | 1,469 |
| Without regulations | 1,543 | 1,526 | 1,537 | 1,556 |
| Change | N/A | N/A | -43 | -87 |
| Other pork meat | | | | |
| With regulations | N/A | N/A | 457 | 468 |
| Without regulations | 454 | 449 | 452 | 457 |
| Change | N/A | N/A | 5 | 11 |
| Total | | | | |
| With regulations | N/A | N/A | 1,952 | 1,938 |
| Without regulations | 1,996 | 1,975 | 1,989 | 2,013 |
| Change | N/A | N/A | -37 | -76 |
| **Wholesale price in California, $ per pound** | | | | |
| Whole pork meat | | | | |
| With regulations | N/A | N/A | 1.45 | 1.46 |
| Without regulations | 1.26 | 1.26 | 1.26 | 1.26 |
| Change | N/A | N/A | 0.20 | 0.20 |
| Other pork meat | | | | |
| With regulations | N/A | N/A | 1.91 | 1.91 |
| Without regulations | 1.91 | 1.91 | 1.91 | 1.91 |
| Change | N/A | N/A | 0.00 | 0.00 |
| **Retail price in California, $ per pound** | | | | |
| Whole pork meat | | | | |
| With regulations | N/A | N/A | 3.59 | 3.59 |
| Without regulations | 3.35 | 3.35 | 3.35 | 3.35 |
| Change | N/A | N/A | 0.23 | 0.23 |
| Other pork meat | | | | |
| With regulations | N/A | N/A | 4.00 | 4.00 |
| Without regulations | 4.00 | 4.00 | 4.00 | 4.00 |
| Change | N/A | N/A | 0.00 | 0.00 |
| **Retailer expenditure and consumer expenditure in California, millions of $** | | | | |
| Retailer expenditure | | | | |
| With regulations | N/A | N/A | 3,046 | 3,032 |
| Without regulations | 2,803 | 2,772 | 2,793 | 2,827 |
| Change | N/A | N/A | 253 | 205 |
| Consumer expenditure | | | | |
| With regulations | N/A | N/A | 7,189 | 7,144 |
| Without regulations | 6,989 | 6,912 | 6,964 | 7,048 |
| Change | N/A | N/A | 225 | 96 |

**5. Projected Economy-wide Impacts of the Proposed Regulations and Alternatives for Eggs and the Higher-Cost Regulations that Affect Pork Exports Through California Ports**

This chapter reports on the impacts of the proposed regulations on the broader economy outside of the directly regulated industries. The impact estimates build directly on the results presented in Section 4, and focus on how changes in costs and revenues for the targeted industries ripple back through the California economy. We use a modified version of the IMPLAN model and data set to develop the economy-wide impacts. For readers unfamiliar with this approach, a brief discussion of IMPLAN and similar models is provided as background in Appendix 5.

The first set of statewide impacts stemming from direct Proposition 12 regulations come from shifts in costs and revenues within the California egg industry (liquid eggs plus shell eggs). The California egg industry specializes in shell egg production which allows them to compete with producers outside of California, which have lower cost feed and other inputs, because of the cost of transport of shell eggs. Eggs processed for liquid eggs (breakers) do not have such large transport costs, so California production of liquid eggs in-state is very low (only 1.5% by volume). Our economy-wide impact estimates include shell eggs and liquid eggs.

California farms produce very little pork, and the pork that is produced in California is destined primarily for specialty markets and would be little affected by Proposition 12 regulations. There is no veal produced within California that is regulated by Proposition 12. Therefore, the economic impacts from shifts in farm cost and revenues to the pork and veal industries occur outside the state of California. For reasons discussed below, the retail market impacts of higher cost of veal and pork shipped into California affect California consumers, but there are unlikely to be significant measurable economy-wide impacts of those higher veal and pork costs on aggregates such as employment in California.

We do not include the impacts related to veal, eggs or pork shipped into California from other states. These products have additional Proposition 12-related production costs that occur outside of California. Consumers in California pay higher prices and buy smaller quantities of these

47

products because these products have higher costs and wholesale prices. These results are all explained and quantified in Section 4.

Retailers pay more for products and charge consumers higher prices to offset the higher costs. However, based on much empirical research, we determine that overall food demand or marketing in California is unlikely to be affected measurably by Prop 12 regulations. We project negligible economy-wide impacts on economic activity, jobs or indirect economic aggregates related to impacts on food marketing in California. For that reason, we to do not attempt to use the IMPLAN model to assess economy-wide impacts of more expensive egg, veal or pork on the broader California economy. The projections for the markets for the covered products are fully assessed and reported in section 4 and in Appendices 1 through 5.

## 5.1 Multipliers Used for Eggs

The IMPLAN model categorizes the California economy into 546 separate industry sectors. Each sector represents a category of similar economic activity. For our analysis of the California egg industry, we use IMPLAN Sector 13 (Poultry and Egg Production). Since there is no separate egg sector, and poultry meat differs from egg production on farms, we adjust the IMPLAN data to represent eggs alone.

Table 5.1 provides the detailed multipliers that we use for the California egg industry. These multipliers are used to calculate impacts from changes in the shell egg value of output. "Value added" includes (1) proprietor income, (2) hired employee wages and salaries, (3) business taxes and (4) other returns to the operation. "Value added" measures the contribution to gross state product of the sector (output minus the value of indirect inputs purchased from other sectors). For example, for an egg farm, these indirect input purchases include feed, electricity services, cleaning supplies, equipment and etc. Table 5.1 includes jobs per million dollars of output. However, for estimates of direct employment in the California egg industry, our projections use employees per quantity of eggs rather than value of egg production. Based on recent research there are no additional on-farm labor when eggs are more costly Matthews and Sumner, 2015).

48

**Table 5.1.** Impact Multipliers of California Egg Farms to the California Economy

| Multiplier | Impact Multipliers |
|---|---|
| **Value of Output** | *$ of output per $1.00 output* |
| Direct Effect | 1.00 |
| Indirect Effect | 1.22 |
| Induced Effect | 0.29 |
| Total Effect | 2.51 |
| **Value Added** | *GDP ($) per $1.00 of output* |
| Direct Effect | 0.10 |
| Indirect Effect | 0.44 |
| Induced Effect | 0.18 |
| Total Effect | 0.71 |
| **Employment** | *Jobs per $ million of output* |
| Direct Effect | 0.82 |
| Indirect Effect | 3.36 |
| Induced Effect | 1.57 |
| Total Effect | 5.75 |

Source: Multipliers were generated in IMPLAN.

For each economic measure, the multipliers are provided for indirect effects. These multipliers represent the "ripple effects" of purchases by the egg industry from other industries outside the egg industry segment. The induced effects are associated with purchases made by those that earn the value added of the industry. The total effect adds the direct effect to indirect and induced effects.

**5.2 Economy-wide Impacts of Propositions 12 Regulations of Shell Egg Production in California**

The top panel of Table 5.2 shows direct value of output, value added, and jobs within the California egg industry using the IMPLAN multipliers and estimates shown in Section 4 about shell egg production in California. The top panel also uses multipliers to estimate the total economy-wide value of output, value added, and jobs associated with the California shell egg industry. The total value of output in the baseline starts at $1.27 billion in 2020 and rises to $1.36 billion by 2023. Total jobs rise from 2,957 in 2020 to 3,184 by 2023.

The next three panels of Table 5.2 provide projections of the impacts of the proposed regulations and the two alternative sets of regulations on the economy-wide impacts of California shell egg production. The proposed regulations increase shell egg farm value of output and value added (because of the cost and price increases) in 2022; and decrease the value of output and value added by 2023, when the industry has fully adjusted to reduced quantities. In 2022, economy-wide value added is higher by $5 million, but jobs are lower by 31 jobs. For 2023, total value added falls by $34 million. Results under the higher- and lower-cost regulations are also shown in Table 5.2.

**Table 5.2 Changes to California Statewide Economy from Implementation of Proposition 12 Proposed Regulatory Packages on California Egg Farms**

|  |  | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| **Baseline** |  |  |  |  |  |
| Value of Output ($ mil) | Direct | 504 | 516 | 530 | 543 |
|  | Total | 1,266 | 1,296 | 1,329 | 1,363 |
| Value Added ($ mil) | Direct | 49 | 51 | 52 | 53 |
|  | Total | 360 | 369 | 378 | 388 |
| Employment (number of jobs) | Direct | 471 | 482 | 495 | 507 |
|  | Total | 2,957 | 3,028 | 3,106 | 3,184 |
| **Proposed Regulations Minus Baseline** |  |  |  |  |  |
| Value of Output ($ mil) | Direct Impacts | N/A[1] | N/A[1] | 7 | -46 |
|  | Total Impacts | N/A | N/A | 16 | -114 |
| Value Added ($ mil) | Direct Impacts | N/A | N/A | 1 | -4 |
|  | Total Impacts | N/A | N/A | 5 | -33 |
| Employment (number of jobs) | Direct Impacts | N/A | N/A | -64 | -107 |
|  | Total Impacts | N/A | N/A | -31 | -332 |
| **Lower-Cost Alternative Minus Baseline** |  |  |  |  |  |
| Value of Output ($ mil) | Direct Impacts | N/A | N/A | 5 | -41 |
|  | Total Impacts | N/A | N/A | 14 | -102 |
| Value Added ($ mil) | Direct Impacts | N/A | N/A | 1 | -4 |
|  | Total Impacts | N/A | N/A | 4 | -29 |
| Employment (number of jobs) | Direct Impacts | N/A | N/A | -57 | -96 |
|  | Total Impacts | N/A | N/A | -31 | -297 |
| **Higher-Cost Alternative Minus Baseline** |  |  |  |  |  |
| Value of Output ($ mil) | Direct Impacts | N/A | N/A | 7 | -47 |
|  | Total Impacts | N/A | N/A | 16 | -118 |
| Value Added ($ mil) | Direct Impacts | N/A | N/A | 1 | -5 |
|  | Total Impacts | N/A | N/A | 5 | -34 |
| Employment (number of jobs) | Direct Impacts | N/A | N/A | -64 | -108 |
|  | Total Impacts | N/A | N/A | -31 | -341 |

[1] Not applicable because Prop 12 regulations governing shell eggs do not go into effect until 2022.

51

**5.3 Economy-Wide Impacts of High-Cost Alternative Packages of Regulations on Pork Exports from California Ports**

We include analysis of economic impacts from loss of pork product exports from California ports under the high-cost alternative regulatory package. A large amount of pork that is produced in other states is exported through California ports, and the higher-cost alternative regulation package would affect those exports and have economic impacts on California ports.

California ports in Long Beach, Los Angeles and Oakland are major shipping exit points for U.S. agricultural products destined for Japan, Korea and many other Pacific Rim countries. U.S. pork competes in international markets for relatively homogeneous agricultural commodities mainly on the basis of price. The higher-cost regulations require that all Proposition 12 regulated products entering California destined for export through California ports must meet Proposition 12 standards. The United States exports very little value of egg products and no veal from California ports. Therefore, we evaluate quantitively impact on export of U.S. pork products through California ports.

We expect that rather than meeting California standards for pork products, which as shown in Section 4, raise cost of production substantially, exports will be diverted to other West Coast ports in California, or if that is too costly, will not be exported at all. The loss of economic activity at ports will cause impacts on the California economy.

Calculations in Table 5.3 use U.S. government trade data and data from the 2019 Port of Long Beach Economic Impact Study to estimate the magnitude of economic activity generated at California ports from the export of U.S. pork products. Approximately 822,000 metric tons of pork product pass through the ports of Long Beach, Los Angeles and Oakland annually. This activity generates approximately $61 million in added gross revenues for the state's ports. It is expected that enactment of the high-cost alternative package will eliminate the pork export revenues altogether as handlers and exporters will opt to ship their pork products from the ports in Seattle, Washington or Portland, Oregon, to avoid compliance costs. That means California ports lose $61 million in revenue.

**Table 5.3. Value of Output Generated for California Ports from Export of U.S. Pork Products**

| Parameter | Measurement |
|---|---|
| Quantity of Proposition 12-regulated pork products exported through California ports (in metric tons) | 821,881 |
| Volume of product per Twenty-Foot-Equivalent shipping Unit (TEU) | 21.6 |
| Quantity of pork exported for California ports in TEU's | 38,050 |
| Average revenue generated for California ports per TEU | $1,595 |
| Total value of California port output from export of U.S. pork products | $61 million |

*Source:* Quantity of pork exported through California ports comes from U.S. International Trade Commission online trade database. Volume of product per TEU and average revenue per TEU is estimated using data from the 2019 Port of Long Beach: Economic Impact Study (https://globalmaritimehub.com/wp-content/uploads/2019/09/POLB-Economic-Impact-Report_FINAL.pdf).

To analyze the statewide impacts, we modeled the loss in revenue for California ports using IMPLAN data for Sector 216 "Water Transport." Table 5.4 presents the impacts for value of output, value added and jobs. The elimination of $61 million in total direct output by California ports results in a decrease of $135 million in value of output statewide. Direct labor income loss at the ports equals $9 million and statewide labor income is reduced by $35 million. Value added to the California economy declines by $60 million. The number of jobs statewide supported by California port activity is reduced by 431.

**Table 5.4** Loss of Economy-wide Economic Activity from Elimination of U.S. Pork Exports from California Ports Under the High-Cost Alternative Regulations

| Multiplier | Economic Contributions |
|---|---|
| **Value of Output** | *$ million* |
| Direct Effect | -$61 |
| Indirect Effect | -$51 |
| Induced Effect | -$24 |
| Total Effect | -$135 |
| **Labor Income** | |
| Direct Effect | -$9 |
| Indirect Effect | -$18 |
| Induced Effect | -$8 |
| Total Effect | -$35 |
| **Value Added** | |
| Direct Effect | -$18 |
| Indirect Effect | -$27 |
| Induced Effect | -$15 |
| Total Effect | -$60 |
| **Employment** | *Jobs* |
| Direct Effect | -79 |
| Indirect Effect | -220 |
| Induced Effect | -132 |
| Total Effect | -431 |

Source: Economic contribution estimates come from IMPLAN modeling using revenue estimates generated in Table 5.3.

**6. Determination of the impact of the regulatory proposal on the state economy, businesses, and the public welfare (Government Code § 11346.3(c))**

In Government Code § 11346.3(c), the markers to be used in assessing the economic impact of the proposed regulations in a SRIA are the following:

(1)     The creation or elimination of jobs in the state;

(2)     The creation of new businesses or the elimination of existing businesses in the state;

(3)     The competitive advantages or disadvantages for businesses currently doing business in the state;

(4)     The increase or decrease of investment in the state;

(5)     The incentives for innovation in products, materials, or processes; and

(6)     The benefits of the proposed regulations, including, but not limited to, benefits to the health, safety, and welfare of California residents, worker safety, environment and quality of life, and any other benefits identified by the agency.

Our quantitative estimates are based where possible on the IMPLAN projections of economy-wide impacts shown in Section 5 above.

**6.1. Assessment 1. The creation or elimination of jobs in the state**

Impacts on jobs in California is minimal compared to the impact on consumer expenditures for the covered food items. Overall, we project a loss of 31 jobs statewide in the calendar year 2022, when the proposed regulations are fully implemented, and a loss of 332 jobs in 2023, after adjustments for the full reduction in egg production are fully incorporated. A large portion of the jobs effect from the proposed regulations are in the shell egg production industry and associated industries.

**6.2. Assessment 2. The creation of new businesses or the elimination of existing businesses in the state**

Creation and elimination of businesses is natural given any significant change to the business conditions. The regulations considered here will change the nature of veal, pork and eggs produced and marketed in California. The current businesses from farm through retail will be

55

affected. Some farms may choose to exit during implementation rather that make adjustments others may find the implementation of the regulations attractive for entry. We expect this flux to be small relative to the numbers already in the production, distribution and retailing businesses. Indirect impacts are also small for the same reason. We expect entries and exits in the range of less than 100 businesses roughly in balance.

## 6.3. Assessment 3. The competitive advantages or disadvantages for businesses currently doing business in the state

The cage-free mandate for hens and 24-square-foot mandate for breeding sows (the portion of the proposed regulations that is enforced starting on January 1, 2022) may cause some egg and pork producers to exit because they find it uneconomic to adapt their facilities to comply with the new mandates required by Prop 12. We expect that some pre-existing producers whose facilities already meet Prop 12 standards will enjoy some corresponding competitive advantages. Pre-existing cage-free egg producers, whose potential market grows when regulations take effect, will have an advantage over those who had not engaged in cage-free production in that they will not face costs of converting non-compliant facilities. Similar competitive farm issues apply to sow operations but there are very few such businesses in California.

## 6.4. Assessment 4. The increase or decrease of investment in the state

As discussed in Section 6.2 and 6.3, some new businesses and investment may enter the market as a result of the proposed regulations, the overall effect of the regulations (as summarized in Section 1.4, reported in Section 4, and detailed in Appendices 1–4) is to decrease the total amount of egg, pork, and veal consumed in California. Although some one-time investments in construction, machinery, and labor will be made by businesses as they adapt their facilities, in the long run we expect that the regulations will decrease average annual investment in the California egg, pork, and veal businesses, relative to the Baseline. Although investment in other businesses in California may correspondingly decrease as investors move resources elsewhere, we expect the net effect to be a modest decrease in overall investment in the state. Under the higher-cost regulations, we would expect slightly more of a decrease in overall investment in the state.

**6.5. Assessment 5. The incentives for innovation in products, materials, or processes**

Farms may have some incentives to innovate in their business processes as they adapt their facilities to be compliant with Prop 12 cage-size standards. However, businesses involved in the design and manufacturing of products and materials that would be employed in Prop 12 adaptation, such as animal cages, are not typically located in California.

**6.6. Assessment 6. The benefits of the proposed regulations, including, but not limited to, benefits to the health, safety, and welfare of California residents, worker safety, environment and quality of life, and any other benefits identified by the agency**

Economic studies have shown that some government regulations of meat and poultry production and processing increase consumer willingness to pay in food markets. About 20% of California's pre-Prop 12 egg consumption already met government-set cage-free eggs standards. Cage-free egg consumers were already willing to pay more than twice as much, on average, for cage-free eggs than for conventional California eggs. Some other consumers who are not willing to pay full cage-free prices may still be willing to pay some smaller amount more for cage-free eggs than for conventional eggs. Such consumers would therefore receive some corresponding benefits (even if they are hard-to-quantify benefits such as moral satisfaction, peace of mind, social approval, etc.) from the cage-free attribute. Under the higher-cost regulations, consumers may receive additional such benefits due to the stricter cage standards. In addition, non-consumers of the animal products covered by Prop-12 may benefit from assurance that products sold in California meet the specified housing standards even if they do not plan to consume the products covered. We note that a large majority of voters in 2018 approved on the changes stated in Prop 12. We have not attempted to measure quantitatively the benefits of the Prop 12 requirements on Californians.

The scientific literature is not yet conclusive on links between animal housing space allocation, such as cage size, and human food-borne illness, worker safety, environment, viruses and other transmittable diseases, or other human health, or safety (Sumner et al. 2011).  CDFA has no regulatory discretion over the Prop 12 cage-size mandates, so any such effects would stem not from the way regulations were written or enforced, but from the mandates directly imposed by Prop 12. It would be outside the scope of this SRIA to conduct a detailed food safety, worker

57

safety, or public health analysis of the Prop 12 cage-size changes themselves. We do not estimate that any of these worker or public health benefits would vary between the proposed regulations and alternative regulatory packages we consider in this SRIA.

**6.7. Types of costs considered for implementation of the Proposed Regulations**

The initial start-up costs of implementing the proposed regulations is estimated by CDFA at about $2.5 million (in IT implementation costs), and the costs of administering the program and its enforcement arm during the calendar year 2022 (the period of evaluation for the SRIA) at about $5 million per year under the proposed and lower-cost regulations, and about $11 million per year under the higher-cost regulations (see sections 6.8 and 4.3.2).

Other costs to the industry necessary to comply with regulations comprise the most immediate, first-order costs. These costs are provided in detail in Appendices 1 through 4. The cost to consumers of higher costs of meat and eggs are detailed above and in the Appendices.

**6.8. Effects on the General Fund, special state funds, and affected local government agencies attributable to the proposed regulations**

As shown in Section 1.4, Section 4, and Appendices 1–4, in the 2022 calendar year, we estimate that the proposed regulations will increase total consumer expenditure in California on liquid eggs by about $36 million, decrease total consumer expenditure on veal meat by $9 million, increase expenditure on shell eggs by $960 million, and increase expenditure on pork meat by $174 million. This would result in a net increase in consumer expenditure on liquid eggs, veal, shell eggs, and pork of $1.2 billion.

However, given that consumers have budget constraints, some (or perhaps even all) of these expenditures on food could be offset (or more than offset) by corresponding decreases in consumption of other items including non-food items liable to sales taxes. Thus, we expect a slight decrease in overall sales tax revenue. Other tax revenue impacts are small as a share of the give the small size of the impacts as a share of the economy.

Absent the establishment and use of fees charged to entities producing and/or selling Prop 12-covered products, the General Fund is also impacted by the administrative costs of implementing regulations, which are summarized in Section 4.3.2. Under the proposed regulations and the lower-cost regulations, we estimate CDFA's administrative costs at about $4.6 million in the 2019-20 fiscal year, $3.9 million in 2020-21, and $5.0 million in ongoing annual costs from 2021-22 onward. Under the higher-cost regulations, we estimate CDFA's administrative costs at about $4.6 million in 2019-20, $5.2 million in 2020-21, and $10.9 million in ongoing annual costs from 2021-22 onward. We estimate no impact on special funds and little impacts on local government of the proposed regulations.

## Appendix 1. Data and Economic Modelling on the Proposition 12 Regulation of New Hen Housing Requirements for Liquid Eggs Supplying the California Market

In this appendix, we analyze the likely economic effects on liquid egg consumption in California of the proposed regulations by CDFA for implementing Proposition 12. We develop a simulation model to predict these effects, calibrated for expected prices and consumption of liquid eggs when the proposed regulations are implemented. We also perform a sensitivity analysis for the simulations.

We conduct our simulations in two stages. First, we simulate the effects of switching from the national standard for hen space to 144 square inches on the California market for liquid eggs in 2020 and 2021. Second, we simulate the effects of switching from 144 square inches to cage-free on the California market for liquid eggs in 2022 and 2023.

For both sets of simulations, we incorporate current forecasts for the California population and income from the State of California Department of Finance to determine the quantity of liquid eggs consumed. See the introduction to Section 4 and Table 4.0 of the main SRIA for more details.

In addition to the proposed regulations, CDFA considers two alternative packages of regulations: higher-cost regulations and lower-cost regulations (for more information about regulations, see the following section). In this appendix, we discuss the simulation results for each package of regulations.

## Proposition 12 Liquid Egg Regulations

*Proposed Regulations*

Current draft regulations from the CDFA state that liquid eggs may be "raw or pasteurized, co-packaged with other foods, or sold frozen, dried or as a cooked patty, puck or other cooked form…" Liquid eggs used as an ingredient in food manufacturing and food service or liquid eggs going to retail must adhere to the new regulations.

*Higher-Cost Regulations*

The higher-cost regulations expand the definition of liquid eggs to encompass any liquid eggs imported, shipped into, or passing through California. The higher-cost regulations also allow end customers, at a grocery store or restaurant, to scan a QR code and see a record of Proposition 12 animal confinement certification and traceability of the product back to farm of origin.

*Lower-Cost Regulations*

The lower-cost regulations limit liquid eggs to exclude frozen, dried, and other solid forms of eggs shipped into California from being subject to Proposition 12 regulations. Under the lower-cost regulations, the regulations only affect liquid eggs produced in California and the sale of liquid eggs at retail, creating an exemption for liquid eggs intended for further processing, preparation, or manufacturing into a combination food product or prepared meal.

**Baseline: Quantities and Prices of Liquid Eggs if There Were No Proposed Regulations**

In this section, we provide quantity and price data of liquid eggs if there were no proposed regulations. Here "baseline" denotes those market outcomes without the proposed regulations. We use those baseline data to measure the likely effects of the proposed regulations of CDFA. Specifically, we measure the likely effects of the proposed regulations by differencing the market outcomes (including quantities and prices) with and without the proposed regulations.

In Table A1.1, we list the baseline retail prices and quantities of liquid eggs consumed in California for 2019 and projected through 2023 if there were no Proposition 12 regulations. Quantities are converted to dozen equivalents. To consider income and population changes in California, we incorporate current forecasts for the California population and income from the State of California Department of Finance. To convert income changes into the quantity changes, we use an income elasticity of 0.84 for liquid eggs, as estimated for food-away-from-home by Okrent and Alston (2011).

We expect that the annual average prices of liquid eggs at retail and food service (restaurants) will be stable from 2019 to 2023, based on reviewing related data and discussing with industry members. Note we refer to "finished product" prices as opposed to "retail" prices as liquid eggs

are primarily consumed at restaurants or in food products, and only a small fraction of those eggs are sold at retail as liquid eggs. Finished product prices reflect only the liquid egg component of the good, converted to dozen egg equivalents.

**Table A1.1. Liquid Eggs Quantities and Prices without Proposition 12 Regulations in California**

|  | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Quantity consumed of liquid eggs in California, dozen equivalents | | | | | | |
| Retail | Mil. dozen | 15 | 14 | 13 | 14 | 14 |
| Food Manufacturing | Mil. dozen | 151 | 139 | 136 | 137 | 139 |
| Food service | Mil. dozen | 148 | 136 | 133 | 134 | 136 |
| Total | Mil. dozen | 314 | 288 | 282 | 285 | 289 |
| Quantity produced of liquid eggs in California, dozen equivalents | | | | | | |
| Total | Mil. dozen | 4.6 | 4.3 | 4.2 | 4.3 | 4.3 |
| Retail/Restaurant price of liquid egg component of finished product, $ per dozen equivalents | | | | | | |
| Price | $/dozen | 0.95 | 0.95 | 0.95 | 0.95 | 0.95 |

**Data and Parameters**

In this section, we provide the values and definitions for all parameters used in the model (Table A1.2). Below we describe the parameters and their sources in more detail. All parameter values are calibrated based on our expectations of California liquid egg consumption after the implementation of Prop 12 regulations, incorporating CDFA income and population projections.

**Table A1.2. Model Parameters: Definitions, Value Specifications, and Descriptions**

| | Parameter definition | Value | Descriptions |
|---|---|---|---|
| $D$ | Total consumption of liquid eggs in California in 2019, millions of dozen equivalents | 314 | *See Consumption* |
| $P_f$ | Wholesale price of liquid eggs in 2019, dollars per dozen equivalents | 0.52 | See *Prices* |
| $P_r$ | Price of liquid egg component in finished product, dollars per dozen equivalent | 0.95 | See *Prices* |
| | Export price of liquid eggs, dollars per dozen | 2.33 | |
| $\omega$ | Farm-to-product markup (as a % of farm price) | 0.83 | See *Farm-to-Product Markup* |
| $\kappa$ | Percent change in farm price from policy change to 144 square inches | 0.21 | See *Farm Cost Increase* |
| | Percent change in farm price from policy change to cage-free | 0.17 | |
| $\gamma$ | Percent change in product price from segregation | 0.00 | See *Labelling Cost Increase* |
| | Percent change in product price from segregation costs under higher-cost regulations | 0.01 | |
| $\beta$ | Demand shift for liquid eggs from policy change | 0.00 | See *Demand Shift* |
| $\eta$ | Demand elasticity for liquid eggs, 2020 | -0.10 | See *Demand Elasticity* |
| | Demand elasticity for liquid eggs, 2021 | -0.15 | |
| | Demand elasticity for liquid eggs, 2022 | -0.15 | |
| | Demand elasticity for liquid eggs. 2023 | -0.20 | |
| | Demand elasticity of exported liquid eggs | $-20$ | |
| $\epsilon$ | Supply elasticity of liquid eggs | $\infty$ | See *Supply Elasticity* |

*Consumption (D)*

For simulations, we need the baseline quantity data of liquid eggs. To assess those quantity data, we begin with converting pounds of liquid eggs consumed in 2019 to dozens of liquid egg equivalents, and we estimate that there were 2.6 billion dozen liquid eggs consumed in 2019 in the United States. Given the 2019 data, we project the 2022 – 2023 data, considering income and

population projections. To estimate the 2019 quantity of liquid eggs, we use historical processed egg production data from the USDA (AMS 1). To project the 2022 – 2023 data, we also use CDFA projections for California's net income, and an income elasticity of 0.84. Okrent and Alston (2011) used the estimate of income elasticity for the demand for food consumed away from home.

Quantities of liquid whole, white, and yolk eggs and dried eggs are converted from pounds to dozens of egg equivalents for consistency. One pound of liquid eggs is approximately 9 liquid eggs; thus one pound of whole liquid eggs is equivalent to 9/12, or 0.75 dozen eggs (Rembrandt Foods). Egg whites account for 67% of liquid egg weight (AEB), and there are 14 egg whites per pound (Rembrandt Foods); therefore, one pound of liquid egg whites is equivalent to 0.78 dozen eggs (14*0.67/12). Egg yolks account for 33% of liquid egg weight (AEB), and there are 22 egg yolks per pound (Rembrandt Foods); therefore, one pound of liquid egg yolks is equivalent to 0.61 dozen eggs (22*0.33/12). One pound of dried eggs is equivalent to 3 dozen eggs (AEB). Total whole liquid egg equivalents are adjusted by the net liquid egg imports in California to determine the quantity affected by Proposition 12.

We use data from the National Health and Nutrition Examination Survey (USDA ARS) to adjust California per capita consumption relative to the rest of the United States; ultimately, we expect there to be offsetting demand effects from California's higher egg prices and larger proportion of ethnic groups that consume more eggs per capita. Therefore, we apply the national average egg consumption per capita to California, giving us 314 million dozen as our 2019 baseline for liquid egg consumption in California.

CDFA estimates based on internal data that 4.6 million dozen liquid egg equivalents were produced at California breaking plants in 2019. This is 1.5% of our total estimated quantity of liquid eggs consumed in California. We use this same 1.5% as the baseline for California production in other years. We estimate (as elsewhere) that approximately 80% of the liquid eggs produced in California are conventional, and the other 20% are cage-free. The 20% that are cage-free are not affected by Proposition 12 regulations.

California produces combination food products containing liquid eggs. Some of these products are consumed inside California, and others are consumed outside of California. People in California also consume combination food products containing liquid eggs. Some of these products are produced inside California and some of which are produced outside of California. For the purposes of our simulation, we assume that California produces combination food products containing liquid eggs in the same proportion that it consumes combination food products containing liquid eggs.

Using national egg usage data from a recent Urner Barry report (Urner Barry 2020), we estimate the quantity of egg use in California by sector (retail, food product manufacturing, and foodservice) and type (shell-eggs and liquid eggs). Specifically, among the total quantity consumed of liquid eggs (314 million dozen), our best estimates are 15 million dozen for the retail sector, 151 million dozen for the food product sector, and 148 million dozen for the food service sector.

*Prices* $(P_f, P_r)$

We use monthly United Egg Producers (UEP) certified wholesale prices for whole, white, and yolk liquid eggs and dried eggs for 2019 sourced from the USDA Egg Market News Reports (AMS 2). Months in which UEP certified prices are unavailable, non-certified prices are used instead. Certification adds no value to eggs—price differences for certified and non-certified eggs are based solely on availability.

If neither price is available for a given month, the price is estimated by multiplying the closest available monthly price by the percentage change in whole liquid eggs between the two months (prices for certified whole liquid eggs are available for all of 2019). Annual weighted average prices are then calculated for each liquid egg category, weighting by the monthly total production of the categories (AMS 2); prices are converted to dollars per dozen egg equivalents using the same conversion factors described in the *Consumption* sub-section. An overall annual weighted average price per dozen of liquid egg equivalents is calculated using the quantities of each category as weights.

Based on these data, we would expect the wholesale price for liquid eggs to be approximately $0.52 per dozen equivalents if there were no policy changes. We would expect the restaurant and bakery price for liquid eggs to be approximately $0.95, absent the policy change, assuming the same markup used for shell eggs (roughly 5/6 of the farm price). This price simply represents the egg portion of a product, e.g., baked goods, as liquid eggs are an ingredient and not a final product. Also note that this price is for conventional liquid eggs, not cage-free liquid eggs—we expect that few businesses at foodservice would use liquid eggs from cage-free eggs because of a substantially higher price of cage-free eggs relative to conventional eggs. To avoid uneeded complication we do not include cage-free liquid eggs in the formal model. Cage-free eggs have a farm-to-retail markup of approximately 200%. Owing to the nature of liquid egg use as an ingredient in the combination of food products or restaurant meals, we do not expect the markup to be similarly high.

*Farm Cost Increase (κ)*

Liquid eggs were not subject to the 116 sq. in. hen space requirement established in 2008 California Proposition 2. Liquid eggs must adhere to the increased space requirement of 144 sq. in. that began January 1, 2020. Liquid eggs must adhere to the cage-free housing requirement that will begin on January 1, 2022.

For 2020 and 2021, we assess a 21% increase in cost to go from national standard to 144 square inches. This estimate is based on Matthews and Sumner (2015), who estimate a 13% increase in cost to go from the national standard to 116 square inches, and our assessment of a 7% cost increase to go from 116 to 144 square inches. (1.13 x 1.07 = 1.21). For 2022 and 2023, we apply the additional cost increase from changing hen space from 144 square inches to cage-free, approximately 17%.

*Farm-to-Restaurant Markup (ω)*

Based on the farm and retail price data from the Egg Industry Center (Ibarburu 2019), we expect the farm-to-restaurant markup to be approximately $0.43 per dozen (or roughly 83% of the farm price) for liquid eggs with no cage-free requirements. There is debate as to whether the markup is additive or multiplicative. If it is additive, there would be no increase in the markup after

assessing the cost increase from switching to cage-free; that is, it stays at $0.43. If the markup is multiplicative, we assume that the farm-to-restaurant price ratio stays constant—that is, the markup increases by 0.83 of the farm price increase. We assume that the farm-to-restaurant markup increase is equal to the midpoint of these two extremes—that is, the markup increases by 0.41 of the farm price increase.

*Labelling Cost Increase (γ)*

Retailers, food product manufacturers, and restaurants selling liquid eggs or food products containing liquid eggs may incur additional segregation and labeling costs as a result of Proposition 12. However, this cost is likely close to zero. For our simulations, we assume there is no increase in such costs for retailers under the Baseline. We include the parameter in the model for adjustment under the higher-cost regulations, increasing costs by 1%.

*Demand Shift (β)*

We incorporate a demand shift parameter in our model, but we set the parameter to zero in our simulations. In general, we do not expect the demand for eggs to increase as a result of the policy change.

*Demand Elasticity (η)*

When we refer to the elasticity of demand, we are specifically referring the restaurant (as opposed to the farm) elasticity of demand. In general, we expect demand for eggs to change very little in response to price changes. That is, we assume that the elasticity of demand for eggs is inelastic. As consumers adjust to the new market for eggs, they will become slightly more elastic over time. We set the parameter to -0.10 in 2020, -0.15 in 2021 and 2022, and -0.20 in 2023. These values are consistent with previous studies (Sumner et al. 2011). The demand elasticity for exported liquid eggs is extremely elastic as they compete with the world market. For exported liquid eggs, we change the demand elasticity to −20.

Estimates for 2020 are the first year in which the 144 square inch regulation takes effect—here buyers and sellers are less elastic because they have less time to prepare for the adjustment. Estimates for 2021 are the second year in which the 144 square inch regulation is in effect—here

the elasticity parameters are slightly more elastic as buyers and sellers have more time to adjust to regulations. Estimates for 2020 are the first year in which the cage-free regulation is in effect—here the elasticity parameters are the same as those used in 2021.

*Supply Elasticity ($\epsilon$)*

As discussed previously, producers have had adequate time to adjust to proposed regulations; therefore, the elasticity is highly elastic, and we set it to infinity.

**Economic Model for Market Equilibrium Displacement**

The simulation model traces how the California market for liquid eggs adjusts to a new equilibrium following forthcoming hen housing restrictions. We characterize the market equilibrium using supply and demand equations of liquid eggs and market equilibrium conditions. We also characterize housing restrictions of Proposition 12 as an exogenous shock in the markets.

We consider a simple set of demand and supply equations in log-linear form for California standard eggs. Equation (A1.1) represents demand in California markets for California standard eggs,

$$(A1.1) \; dlnD = \eta dlnP_r + \beta,$$

where $D$ is the quantity demanded, $\eta$ is the price elasticity of demand, $P_r$ is the retail price, and $\beta$ is a parameter describing an exogenous shock in demand. Equation (A1.2) represents the supply of liquid eggs in California,

$$(A1.2) \; dlnS = \epsilon\big(dlnP_f - \kappa\big),$$

where $S$ is the quantity supplied, $\epsilon$ is the price elasticity of supply, $P_f$ is the price farms receive, and $\kappa$ is the change in cost from increasing switching to cage-free in terms of the percentage of the farm price. In addition to these supply and demand equations, equation (A1. 3) represents the relationship between farm prices and restaurant prices,

$$(A1.3) \; dlnP_r = \omega dlnP_f + \gamma,$$

68

where $\omega$ is the farm-to-restaurant multiplicative margin, and $\gamma$ is an additional segregation cost in terms of the percentage of the restaurant price.

The equilibrium solution to the model for the farm price of liquid eggs is solved using the market clearing condition:

$$(A1.4)\ dlnD = dlnS = dlnQ^*.$$

The term $Q^*$ is the equilibrium quantity. The corresponding solution for the farm price is:

$$(A1.5)\ dlnP_f = \frac{\eta\gamma + \epsilon\kappa + \beta}{\epsilon - \omega\eta}.$$

The other solutions can be directly derived using the solution for the farm price. For example, the percent change in quantity of liquid eggs becomes:

$$(A1.6)\ dlnQ^* = \eta\left(\omega\frac{\eta\gamma + \epsilon\kappa + \beta}{\epsilon - \omega\eta} + \gamma\right) + \beta.$$

**Simulation Results**

In this section, we conduct simulations by the three sets of regulations: proposed regulations, higher-cost regulations, and lower-cost regulations. When comparing the simulation results across different regulatory alternatives, we note two points. First, as we discussed in the previous section, the exemption policy differs across the proposed, higher-cost, and lower-cost regulations, so the number of liquid eggs affected or "covered" differs in those three sets of regulations. Thus, the total quantities provided in Table A1.1 are not necessary to equal the number of liquid eggs covered under each set of regulations.

In each of the regulation-specific subsections that follow, we provide a table of relevant baseline quantities affected by the proposed regulations and elasticity parameters used in the simulations.

*Proposed Regulations*

Based on the assumptions described in the previous sections, we first estimate the effects of Proposition 12 under CDFA's proposed regulations.

69

We report the estimated affected annual quantity of liquid eggs in dozen equivalents in Table A1.3. Baseline quantities for 2020 through 2023 are based on national standard liquid egg requirements. We note that California produces very few liquid eggs; therefore, there is a small effect on California farmers. The effects on consumers are more considerable as consumers are affected through price changes.

**Table A1.3. Baseline Quantities of Liquid Eggs Affected by Proposed Proposition 12 Regulations in California and Elasticities**

|  | Unit | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Quantity consumed affected, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.7 | 13.4 | 13.5 | 13.7 |
| Food Manufacturing | Mil. dozen | 138.7 | 135.7 | 136.9 | 139.2 |
| Foodservice | Mil. dozen | 135.8 | 132.9 | 134.1 | 136.3 |
| Total | Mil. dozen | 288.2 | 281.9 | 284.5 | 289.3 |
| Quantity produced in California affected, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.5 | 3.4 | 3.4 | 3.5 |
| Elasticities | | | | | |
| Elasticity of Supply | | $\infty$ | $\infty$ | $\infty$ | $\infty$ |
| Elasticity of Demand | | -0.1 | -0.15 | -0.15 | -0.20 |

Simulation results for 2020, the first year in which the 144 square inch regulation takes effect, are provided in Table A1.4; simulation results for 2021, the second year in which the 144 square inch regulation is in effect, are provided in Table A1.5; simulation results for 2022, the first year in which the cage-free regulation is in effect (and the main year whose economic impacts are required to be evaluated by this SRIA), are provided in Table A1.6; simulation results for 2023, the second year in which the cage-free regulation is in effect, are provided in Table A1.7.

The proposed regulations raise liquid egg prices (wholesale price and retail price) but reduce the quantity consumed of liquid eggs in California from 2020 to 2023, although the magnitudes of those changes differ across those years. Those changes in prices and quantities result in increases in consumer expenditure across those years.

**Table A1.4. Impacts of Proposed Proposition 12 Liquid Egg Regulations in 2020**

| | Unit | Without regulations (national standard) | With regulations (144 square inches) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.7 | 13.5 | -0.2 | -1.6% |
| Food Manufacturing | Mil. dozen | 138.7 | 136.5 | -2.3 | -1.6% |
| Foodservice | Mil. dozen | 135.8 | 133.6 | -2.2 | -1.6% |
| Total | Mil. dozen | 288.2 | 283.6 | -4.7 | -1.6% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.5 | 3.4 | -0.1 | -1.6% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.63 | 0.11 | 21.0% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.10 | 0.15 | 16.3% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 273.8 | 313.2 | 39.4 | 14.4% |

**Table A1.5. Impacts of Proposed Proposition 12 Liquid Egg Regulations in 2021**

| | Unit | Without regulations (national standard) | With regulations (144 square inches) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.4 | 13.1 | -0.3 | -2.4% |
| Food Manufacturing | Mil. dozen | 135.7 | 132.4 | -3.3 | -2.4% |
| Foodservice | Mil. dozen | 132.9 | 129.6 | -3.2 | -2.4% |
| Total | Mil. dozen | 281.9 | 275.1 | -6.9 | -2.4% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.4 | 3.3 | -0.1 | -2.4% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.63 | 0.11 | 21.0% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.10 | 0.15 | 16.3% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 267.8 | 303.8 | 36.0 | 13.4% |

**Table A1.6. Impacts of Proposed Proposition 12 Liquid Egg Regulations in 2022**

| | Unit | Without regulations (national standard) | With regulations (cage-free) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.5 | 12.9 | -0.7 | -4.8% |
| Food Manufacturing | Mil. dozen | 136.9 | 130.3 | -6.6 | -4.8% |
| Foodservice | Mil. dozen | 134.1 | 127.6 | -6.5 | -4.8% |
| Total | Mil. dozen | 284.5 | 270.8 | -13.7 | -4.8% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.4 | 3.2 | -0.2 | -4.8% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.74 | 0.22 | 41.6% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.26 | 0.31 | 32.2% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 270.3 | 340.1 | 69.8 | 25.8% |

**Table A1.7. Impacts of Proposed Proposition 12 Liquid Egg Regulations in 2023**

| | Unit | Without regulations (national standard) | With regulations (cage-free) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.7 | 12.8 | -0.9 | -6.4% |
| Food Manufacturing | Mil. dozen | 139.2 | 130.3 | -9.0 | -6.4% |
| Foodservice | Mil. dozen | 136.3 | 127.5 | -8.8 | -6.4% |
| Total | Mil. dozen | 289.3 | 270.7 | -18.6 | -6.4% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.5 | 3.2 | -0.2 | -6.4% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.74 | 0.22 | 41.6% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.26 | 0.31 | 32.2% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 274.8 | 340.0 | 65.1 | 23.7% |

*Higher-Cost Regulations*

We next estimate the effects of Proposition 12 under a set of higher-cost regulations. We report the estimated affected annual quantity of liquid eggs in dozen equivalents in Table A1.8. Baseline quantities for 2020 through 2023 are based on national standard liquid egg requirements.

**Table A1.8. Baseline Quantities of Liquid Eggs Affected by Higher-Cost Proposition 12 Regulations in California and Elasticities**

|  | Unit | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Quantity affected, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.7 | 13.4 | 13.5 | 13.7 |
| Food Manufacturing | Mil. dozen | 138.7 | 135.7 | 136.9 | 139.2 |
| Foodservice | Mil. dozen | 135.8 | 132.9 | 134.1 | 136.3 |
| Total | Mil. dozen | 288.2 | 281.9 | 284.5 | 289.3 |
| Quantity produced in California affected, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.5 | 3.4 | 3.4 | 3.5 |
| Elasticities | | | | | |
| Elasticity of Supply | | $\infty$ | $\infty$ | $\infty$ | $\infty$ |
| Elasticity of Demand | | -0.1 | -0.15 | -0.15 | -0.20 |

Simulation results for 2020, the first year in which the 144 square inch regulation takes effect, are provided in Table A1.9; simulation results for 2021, the second year in which the 144 square inch regulation is in effect, are provided in Table A1.10; simulation results for 2022, the first year in which the cage-free regulation is in effect, are provided in Table A1.11; simulation results for 2023, the second year in which the cage-free regulation is in effect, are provided in Table A1.12.

The higher-cost regulations raise liquid egg prices (wholesale price and retail price) but reduce the quantity consumed of liquid eggs in California from 2020 to 2023. However, the magnitudes of those changes differ across those years. Changes in prices and quantities result in increases in consumer expenditure across those years.

**Table A1.9. Impacts of Higher-Cost Proposition 12 Liquid Egg Regulations in 2020**

| | Unit | Without regulations (national standard) | With regulations (144 square inches) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.7 | 13.4 | -0.2 | -1.7% |
| Food Manufacturing | Mil. dozen | 138.7 | 136.3 | -2.4 | -1.7% |
| Foodservice | Mil. dozen | 135.8 | 133.5 | -2.3 | -1.7% |
| Total | Mil. dozen | 288.2 | 283.3 | -5.0 | -1.7% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.5 | 3.4 | -0.1 | -1.7% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.63 | 0.11 | 21.0% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.11 | 0.16 | 17.3% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 273.8 | 315.6 | 41.8 | 15.2% |

**Table A1.10. Impacts of Higher-Cost Proposition 12 Liquid Egg Regulations in 2021**

| | Unit | Without regulations (national standard) | With regulations (144 square inches) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.4 | 13.0 | -0.3 | -2.6% |
| Food Manufacturing | Mil. dozen | 135.7 | 132.2 | -3.5 | -2.6% |
| Foodservice | Mil. dozen | 132.9 | 129.4 | -3.4 | -2.6% |
| Total | Mil. dozen | 281.9 | 274.6 | -7.3 | -2.6% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.4 | 3.3 | -0.1 | -2.6% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.63 | 0.11 | 21.0% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.11 | 0.16 | 17.3% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 267.8 | 306.0 | 38.1 | 14.2% |

**Table A1.11. Impacts of Higher-Cost Proposition 12 Liquid Egg Regulations in 2022**

| | Unit | Without regulations (national standard) | With regulations (cage-free) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.5 | 12.8 | -0.7 | -5.0% |
| Food Manufacturing | Mil. dozen | 136.9 | 130.1 | -6.8 | -5.0% |
| Foodservice | Mil. dozen | 134.1 | 127.4 | -6.7 | -5.0% |
| Total | Mil. dozen | 284.5 | 270.4 | -14.2 | -5.0% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.4 | 3.2 | -0.2 | -5.0% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.74 | 0.22 | 41.6% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.27 | 0.32 | 33.2% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 270.3 | 342.1 | 71.8 | 26.6% |

**Table A1.12. Impacts of Higher-Cost Proposition 12 Liquid Egg Regulations in 2023**

| | Unit | Without regulations (national standard) | With regulations (cage-free) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 13.7 | 12.8 | -0.9 | -6.6% |
| Food Manufacturing | Mil. dozen | 139.2 | 130.0 | -9.3 | -6.6% |
| Foodservice | Mil. dozen | 136.3 | 127.3 | -9.1 | -6.6% |
| Total | Mil. dozen | 289.3 | 270.1 | -19.2 | -6.6% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.5 | 3.2 | -0.2 | -6.6% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.74 | 0.22 | 41.6% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.27 | 0.32 | 33.2% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 274.8 | 341.8 | 67.0 | 24.4% |

*Lower-Cost Regulations*

We next estimate the effects of Proposition 12 under a set of lower-cost regulations. We report the estimated affected annual quantity of liquid eggs in dozen equivalents in Table A1.13. Baseline quantities for 2020 through 2023 are based on the national standard liquid egg requirements.

**Table A1.13. Baseline Quantities of Liquid Eggs Affected by Proposed Proposition 12 Regulations in California and Elasticities**

|  | Unit | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Quantity affected, dozen equivalents | | | | | |
| Retail | Mil. dozen | 12.4 | 12.2 | 12.3 | 12.5 |
| Food Manufacturing | Mil. dozen | 1.7 | | | |
| Foodservice | Mil. dozen | 1.6 | | | |
| Total | Mil. dozen | 15.7 | | | |
| Quantity produced in California affected, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.5 | 3.4 | 3.4 | 3.5 |
| Elasticities | | | | | |
| Elasticity of Supply | | ∞ | ∞ | ∞ | ∞ |
| Elasticity of Demand | | -0.1 | -0.15 | -0.15 | -0.20 |

Simulation results for 2020, the first year in which the 144 square inch regulation takes effect, are provided in Table A1.14; simulation results for 2021, the second year in which the 144 square inch regulation is in effect, are provided in Table A1.15; simulation results for 2022, the first year in which the cage-free regulation is in effect, are provided in Table A1.16; simulation results for 2023, the second year in which the cage-free regulation is in effect, are provided in Table A1.17.

The lower-cost regulations raise liquid egg prices (wholesale price and retail price) but reduce the quantity consumed of liquid eggs in California from 2020 to 2023. However, the magnitudes of those changes differ across those years. Those changes in prices and quantities result in increases in consumer expenditure across those years.

76

**Table A1.14. Impacts of Lower-Cost Proposition 12 Liquid Egg Regulations in 2020**

| | Unit | Without regulations (national standard) | With regulations (144 square inches) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 12.4 | 12.2 | -0.2 | -1.6% |
| Food Manufacturing | Mil. dozen | 1.7 | 1.6 | 0.0 | -1.6% |
| Foodservice | Mil. dozen | 1.6 | 1.6 | 0.0 | -1.6% |
| Total | Mil. dozen | 15.7 | 15.5 | -0.3 | -1.6% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.5 | 3.4 | -0.1 | -1.6% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.63 | 0.11 | 21.0% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.11 | 0.16 | 16.2% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 15.0 | 17.1 | 2.1 | 14.3% |

**Table A1.15. Impacts of Lower-Cost Proposition 12 Liquid Egg Regulations in 2021**

| | Unit | Without regulations (national standard) | With regulations (144 square inches) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 12.2 | 11.9 | -0.3 | -2.4% |
| Food Manufacturing | Mil. dozen | 1.6 | 1.6 | 0.0 | -2.4% |
| Foodservice | Mil. dozen | 1.6 | 1.6 | 0.0 | -2.4% |
| Total | Mil. dozen | 15.4 | 15.0 | -0.4 | -2.4% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.4 | 3.3 | -0.1 | -2.4% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.63 | 0.11 | 21.0% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.11 | 0.15 | 16.2% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 14.7 | 16.6 | 2.0 | 13.4% |

**Table A1.16. Impacts of Lower-Cost Proposition 12 Liquid Egg Regulations in 2022**

| | Unit | Without regulations (national standard) | With regulations (cage-free) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 12.3 | 11.7 | -0.6 | -4.8% |
| Food Manufacturing | Mil. dozen | 1.6 | 1.6 | -0.1 | -4.8% |
| Foodservice | Mil. dozen | 1.6 | 1.5 | -0.1 | -4.8% |
| Total | Mil. dozen | 15.5 | 14.8 | -0.7 | -4.8% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.4 | 3.2 | 0.2 | -4.8% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.74 | 0.22 | 41.6% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.26 | 0.31 | 32.1% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 14.8 | 18.6 | 3.8 | 25.8% |

**Table A1.17. Impacts of Lower-Cost Proposition 12 Liquid Egg Regulations in 2023**

| | Unit | Without regulations (national standard) | With regulations (cage-free) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity of liquid eggs consumed, dozen equivalents | | | | | |
| Retail | Mil. dozen | 12.5 | 11.7 | -0.8 | -6.4% |
| Food Manufacturing | Mil. dozen | 1.7 | 1.6 | -0.1 | -6.4% |
| Foodservice | Mil. dozen | 1.6 | 1.5 | -0.1 | -6.4% |
| Total | Mil. dozen | 15.8 | 14.8 | -1.0 | -6.4% |
| Quantity of liquid eggs produced in California, dozen equivalents | | | | | |
| Total | Mil. dozen | 3.5 | 3.2 | -0.2 | -6.4% |
| Wholesale price of liquid eggs, $ per dozen equivalents | | | | | |
| Wholesale price | $/dozen | 0.52 | 0.74 | 0.22 | 41.6% |
| Price of liquid egg component of finished products, $ per dozen equivalents | | | | | |
| Retail price | $/dozen | 0.95 | 1.26 | 0.31 | 32.1% |
| Consumer expenditure on liquid egg components of finished products | | | | | |
| Expenditure | Million $ | 15.0 | 18.6 | 3.6 | 23.6% |

*Effect of Proposition 12 Regulations on Exports*

Some liquid eggs are exported through California ports. Liquid egg exports are exempt from Proposition 12 regulations in the proposed and lower-cost scenarios, but not in the higher-cost scenario. In 2019, approximately 11.3 million dozen egg equivalents of liquid eggs were exported through California, at an average value of $2.33 per dozen. We forecast baseline liquid egg exports through 2023 that would be affected by Proposition 12 regulations in the higher-cost scenario and report them in Table A1.18 along with relevant supply and demand elasticities. The demand elasticity for exported liquid eggs is extremely elastic as they compete with the world market. For exported liquid eggs, we change the demand elasticity to −20.

**Table A1.18. Baseline Quantities of Liquid Egg Exports Affected by Higher-Cost Proposition 12 Regulations in California and Elasticities**

|  | Unit | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|
| Quantity affected, dozen equivalents | | | | | |
| Exports | Mil. dozen | 10.4 | 10.2 | 10.3 | 10.4 |
| Export price per dozen liquid egg equivalents | | | | | |
| Price | $/dozen | 2.33 | 2.33 | 2.33 | 2.33 |
| Elasticities | | | | | |
| Elasticity of Supply | | 1.0 | 3.0 | ∞ | ∞ |
| Elasticity of Demand | | -20 | -20 | -20 | -20 |

Note that requiring egg exports that pass through California to adhere to the Proposition 12 regulations results in liquid egg prices being prohibitively expensive. That is, exports through California ports would become zero. Producers could easily change to ports in other states to export liquid eggs.  Therefore, the new value of exports through California ports for 2020–2023 would be $0.

**Appendix 2. Data and Economic Modelling on the Proposition 12 Regulations for an Increase to 43 Square Feet of Confinement Space for Veal Calves Supplying the California Market**

The market for veal in California has been distinct from the rest of the United States since 2008 when voters imposed new rules. Regulations established that calves raised for veal meat to be marketed in California must be confined in ways that allow the animals to lie down, stand up, fully extend their limbs, and turn around freely. Producers have complied with these standards by providing 16–20 square feet per calf, depending on the size of the calf.  In 2018, by passing Proposition 12, voters changed the rules to establish a new minimum of 43 square feet per calf raised for veal. Notice that these minimums apply to veal consumed in California, no matter where the calf is housed, including in Canada for a significant share of California consumption.

We examine the economic impact of the proposed regulations by CDFA for implementing Proposition 12. Specifically, we analyze the economic effects of the minimum requirement on the usable floor space per calf. We note explicitly that this discussion relates to the law and regulations that apply to whole veal meat and not to other regulations that are being developed to deal with other regulations in Proposition 12. This report does not attempt to isolate the economic impacts of regulation separately from the legal mandate of Proposition 12.

To provide data and context for the economic analysis, we review the required change in regulation and review briefly the market situation and outlook for the market for whole veal meat in California. We provide background information about the quantity demanded and production of whole veal meat. We explain data and parameters that are used for a simulation model. We explain the simulation model that we develop for analyzing the economic effects of the proposed regulations. Finally, we report and discuss the simulation results.

**Regulation and Industry Specifics**

As of January 1, 2020, any business engaging in the sale of whole veal meat in California has been subject to a change in the definition of "confined in a cruel manner." According to regulations in California Proposition 12, no whole veal meat may come from "covered" veal

80

calves confined to a space of less than 43 square feet per calf. Proposition 12 specifically states, "an enclosure shall provide a minimum of 43 square feet of usable floor space per calf," for any veal calf defined by the proposed regulations, "that is, or is intended to be, slaughtered at more than 21 days of age or more than 150 pounds in liveweight…"

Veal calves are typically marketed up to 6 months of age and weigh 500 to 700 pounds. We understand that little, if any, veal meat in California comes from calves slaughtered at more than 21 days of age or more than 150 pounds in liveweight. Therefore, the new regulation would not directly affect production in California. The impact is on whole veal meat shipped into California, mostly from New Jersey, Pennsylvania, and Quebec. The affected whole veal meat primarily consists of prime cuts such as loin chops ribs, of which approximately 60% is sold at restaurants and 40% at retail.

Producers of veal must separate calves raised for veal to be sold in California from other calves. Calves designated for California veal market will be raised in housing that meets the 43 square foot requirement, whereas calves destined for other markets will not have this requirement.

**Market for whole veal meat in California**

We first determine the approximate quantity of whole veal meat to which the proposed regulations would apply to ensure consistency with the law beginning January 1, 2020. This quantity is based on estimates and projections using publicly available data.

The U.S. produced 63.2 million pounds of whole veal meat in 2019, of which California consumed about 12% (7.7 million pounds). Veal consumption in the United States is historically low but has changed little in recent years.

There are no data to indicate that certain ethnicities or groups of people that have a larger or smaller share of the population in California are more or less consume more veal than others. We, therefore, use the per capita volume of consumption is the same in California as in the rest of the United States (roughly 0.2 pounds per year).

According to industry representatives, roughly 60% of whole veal meat is purchased at restaurants, whereas the rest is primarily purchased at retail. Estimating expenditure on whole veal meat at retail is straightforward but determining expenditure at restaurants requires additional considerations. Whole veal meat only represents a portion of a meal—restaurant prices include costs of other ingredients and factors not present in whole veal meat purchased at retail. Based on listed menu prices from restaurants across California, as well as other studies that examine restaurant markups, we have determined that a producer-to-restaurant price markup ratio of 3:1 is appropriate.

The average price paid to producers in 2019 for veal cuts most commonly sold in California (rib and loin chops) was $7.00 per pound, and the average price paid to retailers (restaurants) by consumers was $12.44 ($21) per pound. Based on these values, we estimate 2019 producer revenue from veal sales in California to be $53.4 million and retail (restaurant) revenue to be $38.0 ($96.3) million. Prices and quantities have been stable for the past several years, and we would expect that to remain true if not for Proposition 12 and COVID-19. A summary of California whole veal meat quantities and prices is provided in Table A2.1.

**Table A2.1. Value of California whole veal meat consumption, 2019**

| | |
|---|---|
| Total U.S. whole veal meat production (USDA NASS) | 63.2 million pounds |
| California whole veal meat consumption at retail (USDA NASS) | 3.1 million pounds |
| California whole veal meat consumption at restaurants (USDA NASS) | 4.6 million pounds |
| Total California whole veal meat consumption (USDA NASS) | 7.7 million pounds |
| Weighted average price of representative cuts (loins and rips) paid to producers (USDA AMS 1; PSU) | $7.00 per pound |
| Weighted average retail price of representative cuts (loins and rips) (USDA AMS 2; PSU) | $12.44 per pound |
| Average restaurant price of whole veal meat | $21 per pound |
| Total producer value of whole veal meat consumed in California | $53.5 million |
| Total expenditure on whole veal meat at retail in California | $38.0 million |
| Total expenditure on whole veal meat at restaurants in California | $96.3 million |

In Table A2.2, we list the baseline prices and quantities of whole veal meat consumed in California for 2019 and projected through 2023 if there were no Proposition 12 regulations.

**Table A2.2. Whole Veal Meat Quantities and Prices without Proposition 12 Regulations in California**

| | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Quantity consumed of whole veal meat in California, millions of pounds | | | | | | |
| Retail | Mil. lbs. | 3.1 | 4.1 | 3.4 | 3.1 | 2.8 |
| Restaurants | Mil. lbs. | 4.6 | 2.8 | 3.4 | 3.7 | 4.1 |
| Total | Mil. lbs. | 7.6 | 6.9 | 6.7 | 6.8 | 6.9 |
| Retail and Restaurant prices of whole veal meat, $ per pound | | | | | | |
| Retail Price | $/lb. | 12.44 | 12.44 | 12.44 | 12.44 | 12.44 |
| Restaurant Price | $/lb. | 21.00 | 21.00 | 21.00 | 21.00 | 21.00 |

**Data and Parameter Values**

We provide the values and definitions for all parameters and market data (prices and quantities) used in the model in Table A2.3. Below we describe the parameters, the market data, and their sources in more detail. All parameter values are calibrated based on our expectations of California veal consumption in 2020.

*Consumption (D)*

The USDA National Agricultural Statistics Service (NASS) provides monthly and annual data on national veal meat production. U.S. veal meat production has been fairly stable since 2016, ranging from 74.4 to 75.8 million pounds in terms of weight after slaughter, or dressing weight (USDA NASS, 2020). Absent of the implementation of Proposition 12, we would not expect the production of veal meat to change substantially in 2020. We assume production and consumption of veal meat in the U.S. are roughly equivalent, and therefore total veal meat production in 2020 is expected to be approximately 75 million pounds. For our analysis, we include only meat from animals over 21 days of age or more than 150 pounds to obtain relevant veal production because proposed regulations only apply to this meat.

**Table A2.3. Model Parameters and Market Data: Definitions, Value Specifications, and Descriptions**

| | Parameter definition | Value | Descriptions |
|---|---|---|---|
| $D$ | Total consumption of whole veal meat in California, millions of pounds | 7.7 | See *Consumption* |
| $D_{ret}$ | Whole veal meat purchased at retail in California, millions of pounds | 3.1 | See *Consumption* |
| $D_{rest}$ | Whole veal meat consumed away from home in California, millions of pounds | 4.6 | See *Consumption* |
| $P_\rho$ | Price paid to producers for whole veal meat, dollars per pound | $7 | See *Prices* |
| $P_{ret}$ | Retail price of whole veal meat, dollars per pound | $12.44 | See *Prices* |
| $P_{rest}$ | Restaurant price of whole veal meat, dollars per pound | $21 | See *Prices* |
| $\mu_v$ | Whole veal meat as share of production cost for a restaurant meal | 40% | See *Prices* |
| $\omega_{ret}$ | Producer-to-retail markup | 80% | See *Markup* |
| $\omega_{rest}$ | Producer-to-restaurant markup | 200% | See *Markup* |
| $\kappa$ | Percent change in producer price from policy change | 30% | See *Producer Cost Increase* |
| $\gamma_{ret}, \gamma_{rest}$ | Percent change in retail and restaurant price from labelling and segregation | 0.0 | See *Segregation Cost Increase* |
| $\beta_{ret}, \beta_{rest}$ | Demand shift for whole veal meat from policy change | 0.0 | See *Demand Shift* |
| $\eta_{ret}$ | Demand elasticity of whole veal meat at retail | $(-3.2, -1.4)$ | See *Demand Elasticity* |
| $\eta_{meal}$ | Demand elasticity of restaurant meals containing whole veal meat | $(-1.5, -1.0)$ | See *Demand Elasticity* |
| $\sigma_{meal}$ | Elasticity of substitution between whole veal meat and other meal inputs | 0.0 | See *Demand Elasticity* |
| $\epsilon$ | Supply elasticity of whole veal meat | $(5.0, \text{Inf.})$ | See *Supply Elasticity* |

We estimate whole veal meat production in 2020 to be 63.75 million pounds. To determine expected 2020 whole veal meat consumption in California, we multiply U.S. consumption by California's population share (12.1%), arriving at an estimated 7.7 million pounds.

The majority of veal consumption in California occurs at restaurants. It is necessary to separate the effects of Proposition 12 on retail and restaurant consumption; the two have distinct prices

and price elasticities. Approximately 60% (4.6 million pounds) of whole veal meat in California is consumed at restaurants, and the other 40% (3.1 million pounds) is purchased at retail.

*Prices ($P_\rho, P_{ret}, P_{rest}, \mu_v$)*

Whole veal meat is sold in a variety of cuts. A number of various cuts are imported in California, but the most typical are loins ribs. The average Free on Board (FOB) price per pound paid to producers was approximately $6 for loins and $8.75 for ribs (USDA AMS 1, 2020). Prices have been extremely stable for several years, and we expect them to remain the same in 2020, all else equal. Loins account for 16% of the meat that comes from a veal calf, whereas ribs account for 9% (PSU 2016). Therefore, the weighted average FOB price paid to producers for ribs and loins is $7 per pound.

The USDA Agricultural Marketing Service (AMS) also provides weekly data on retail prices. Although prices of all cuts are not available each week, and there is some degree of price variation, average retail prices are close to $11 per pound for chops and $15 per pound for ribs (USDA AMS 2, 2020). The weighted average of these prices is $12.43 per pound. Restaurant prices are more difficult to ascertain the price per pound, especially since whole veal meat is just one input of a meal, and the quantity of whole veal meat in a meal is typically not provided. We examined veal prices in various meals across a variety of restaurants in a few major cities in California. Assuming restaurants on average markup the price of a meal at a 3:1 ratio, we estimate that the whole veal meat accounts for 40% of the cost of a meal. For the purpose of estimating our model, we then assume that the restaurant price of the whole veal meat would also be 3 times the price paid to producers ($21).

*Markup ($\omega_{ret}, \omega_{rest}$)*

Based on producer price data (USDA AMS 1, 2020) and retail price data (USDA AMS 2, 2020), we expect the producer-to-retail markup to be approximately $5.60 (or 80% of the producer price).[1] In our simulations of the effect of the policy change, we consider three cases for the

---

[1] Actual estimated markup based on producer and retail prices is $5.44, or 78%. However, we round the retail markup to 80% ($5.60) in our simulations, as we do not expect the markup to be exactly 77%, and we do not have the power in our data to estimate with such precision.

markup. In the first case, we assume that there is no increase in the markup; that is, it stays at $5.60. In the second case, we assume that the producer-to-retail price ratio stays constant—that is, the markup increases by 80% of the producer cost increase. In the third case, we assume that the producer-to-retail markup increase is equal to the midpoint of these two extremes—that is, the markup increases by 40% of the producer cost increase. As described in the *Prices* subsection, the producer-to-restaurant markup is approximately 200%. Once again, we consider the same three cases in response to the policy change—no increase in markup dollars (0% of producer cost increase), constant markup ratio (200% of producer cost increase), and the midpoint (100% of producer cost increase).

*Producer Cost Increase (κ)*

Proposition 12 will affect any person that engages in commercial sale of whole veal meat in California. Section 1321.1 of the forthcoming regulation states that "an enclosure shall provide a minimum of 43 square feet of usable floor space per calf." This is a 67% increase in space allotted per calf (AVA, 2019), and will result in roughly a 30% increase in production costs.

To obtain the producer cost increase estimate, we interviewed industry representatives and government regulators and collected data from USDA sources. We found no official public data on cost functions for veal. However, we put our best estimates of farm costs together with estimates of segregation costs from other industries. We use a cost of production increase of approximately 30% for veal that is sold in California as the base case. We also conduct stochastic simulations to put a confidence interval around our estimates.

At the time of our interviews in late 2019, industry representatives stated that no whole veal meat producers had pre-existing production process that would meet the standards set forth in California Proposition 12. Therefore, the regulation would increase production costs by roughly 30% for any producer wishing to meet California's new standards.

*Segregation Cost Increase ($\gamma_{ret}, \gamma_{rest}$)*

Retailers and restaurants may incur additional segregation and labeling costs as a result of Proposition 12. However, this cost is likely close to be small. For our simulations, we assume

86

there is no increase in such costs for either entity. We include the parameter in the model in case we determine that segregation and labeling cost increases are significantly greater than zero in future research.

*Demand Shift ($\beta_{ret}, \beta_{rest}$)*

We incorporate a demand shift parameter in our model, but we set the parameter to zero in our simulations. In general, we do not expect the demand for whole veal meat to increase as a result of the policy change. However, there may be substitution in demand between whole veal meat and other premium meats (such as steak) to consider in the future. For simplicity, we omit other meats from our model, and we assume the net of the substitution effects to be zero.

*Demand Elasticity ($\eta_{ret}, \eta_{rest}, \sigma_{meal}$)*

When we refer to the elasticity of demand, we are specifically referring to the retail and restaurant meal elasticity of demand. Whole veal meat is an extremely small subcategory of beef and meat in general, so there is no recent research that provides demand elasticities for the product. Instead, we look at the demand elasticities of other high-end beef products to inform the parameters for our analysis. Lusk and Tonsor (2016) estimate own-price elasticities of demand for steak ranging from −1.84 to −1.46; Nayga and Capps (1994) estimate the compensated own-price elasticity for veal to be −3.2.[2] Based on these estimates, we vary the own-price elasticity of demand for whole veal meat at retail between −1.4 and −3.2 in our simulations.

Research estimating the elasticity of demand for food away from home is sparse, and research that estimates the elasticity of demand for food away from home that includes veal is nonexistent. Lusk (2017) estimates the own-price elasticity of demand for food away from home to be −1.116; Okrent and Alston (2012) find that across their own and several other studies, the own-price elasticity of demand for food away from home ranges between −1.50 and −0.69 with a mean of −1.02. Based on the generally more elastic own-price elasticity of demand for veal and

---

[2] Other estimates of veal or high-end beef cuts are available in Heien and Pompelli (1989), Capps (1989), and Wohlgenant (1989), but these studies are dated relatively to Lusk and Tonsor (2016) and Nayga and Capps (1994). Hence, we focus on the estimates provided by Lusk and Tonsor (2016) and Nayga and Capps (1994).

high-end beef we cited from other studies, we allow the own-price elasticity of demand for restaurant meals containing veal to range from −1.5 to −1.0.

As described below in Section II, whole veal meat is an input for a restaurant meal. We consider the own-price elasticity of demand for the entire meal, not just the whole veal meat input. The own-price elasticity of demand for whole veal meat at restaurants can be decomposed into an elasticity for the entire meal and an elasticity of substitution with other inputs. For simplicity, we assume that whole veal meat cannot be substituted for other inputs as it is the primary component of most meals that contain veal. Therefore, we set the elasticity of substitution to zero in our simulations.

*Supply Elasticity ($\epsilon$)*

We assume that producers of whole veal meat to have an extremely high own-price elasticity of supply. Calves that are slaughtered for whole veal meat could potentially be raised to be full-grown cows slaughtered for beef.[3] Conversely, calves that are chosen to be raised and slaughtered as adults could instead be chosen to be slaughtered as calves for whole veal meat. Therefore, producers can adjust the quantity of whole veal meat they produce with relative ease. For this reasoning, we allow the own-price elasticity of supply for whole veal meat to range between 5.0 and infinity in our simulations.

**Economic Model of the California Veal Industry**

The data just presented are used in an economic model to assess implications for changes in prices and quantities, and therefore implications for revenues and expenditures.

We use an equilibrium displacement model, comprised of a set of demand and supply equations in log-linear form as well as market-clearing conditions, to determine the effects of the regulations on prices and quantities in California, as well as the effect on consumer and producer

---

[3] Most calves that are slaughtered for whole veal meat are males—females are typically raised as dairy cows, but they could potentially be slaughtered for whole veal meat.

surpluses. We use our simulation model to project the impacts of the regulations under a range of cost shifts and market conditions.

We consider a simple set of demand and supply equations in log-linear form for whole veal meat in California. Equation (A2.1) represents demand in California markets for whole veal meat, equation (A2.2) represents demand in California for whole veal meat at retail, and equation (A2.3) represents demand in California for whole veal meat away from home (restaurants).

$$(A2.1) \ dlnD = \tau dlnD_{ret} + (1 - \tau)dlnD_{rest},$$

$$(A2.2) \ dlnD_{ret} = \eta_{ret}dlnP_{ret} + \eta_{ret,rest}dlnP_{rest} + \beta_{ret},$$

$$(A2.3) \ dlnD_{rest} = \eta_{rest}dlnP_{ret} + \eta_{rest,ret}dlnP_{rest} + \beta_{rest},$$

where the term $D$ is the quantity demanded of whole veal meat at both retail and restaurants, the term $D_{ret}$ is the quantity demanded of whole veal meat at retail, and the term $D_{rest}$ is the quantity demanded of whole veal meat at restaurants. The term $\tau$ is the share of whole veal meat sold in California at retail, $\eta_{ret}$ is the own-price elasticity of demand for whole veal meat at retail, $\eta_{ret,rest}$ the cross-price elasticity of demand for whole veal meat at retail and restaurants, and $P_{ret}$ is the retail price of whole veal meat; $\eta_{rest}$ is the own-price elasticity of demand for veal meat at restaurants, and $P_{rest}$ is the restaurant price of whole veal meat; $\beta_{ret}$ and $\beta_{rest}$ are parameters describing an exogenous shock in demand. For simplicity, we assume that the cross-price elasticities between retail and restaurant whole veal meat are 0 moving forward. It is important to note that veal at restaurants is an input factor for an entire meal. We assume consumers have a measurable own-price elasticity of demand for their entire meal, from which the own-price elasticity of veal can be derived. Using Marshall's Rule, the own-price elasticity of demand for veal at restaurants can be decomposed into an output and substitution effect. That is,

$$(A2.4) \ \eta_{rest} = \mu_v\eta_{meal} - (1 - \mu_v)\sigma_{meal},$$

where $\mu_v$ is the share of whole veal meat in the total production cost of the restaurant meal, $\eta_{meal}$ is the own-price elasticity of demand for a restaurant meal containing whole veal meat,

and $\sigma_{meal}$ is the elasticity of substitution between whole veal meat and other inputs to the meal. We assume $\sigma_{meal} = 0$, that is, whole veal meat cannot be substituted for other inputs in a meal.

Equation (A2.5) represents the supply of whole veal meat in California,

$$(A2.5)\ dlnS = \epsilon\big(dlnP_\rho - \kappa\big),$$

where $\epsilon$ is the price elasticity of supply, $P_\rho$ is the FOB price paid to producers, and $\kappa$ is the change in cost from increasing enclosure space to 43 square feet in terms of the percentage of the price producers receive. In addition to these supply and demand equations, equations (A2.6) and (A2.7) represents the relationship between producer prices and retail prices,

$$(A2.6)\ dlnP_{ret} = \omega_{ret}dlnP_\rho + \gamma_{ret},$$
$$(A2.7)\ dlnP_{rest} = \omega_{rest}dlnP_\rho + \gamma_{rest}$$

where $\omega$ ($\omega_{rest}$) is the producer-to-retailer (producer-to-restaurant) multiplicative margin, and $\gamma_{ret}$ ($\gamma_{rest}$) is an additional segregation and labeling cost at retail (restaurant) in terms of the percentage of the retail (restaurant) price.

The equilibrium solution to the model for the producer price of whole veal meat is solved using the market clearing condition:

$$(A2.8)\ dlnD = dlnS = dlnQ^*.$$

The solution for the producer price is:

$$(A2.8)\ dlnP_\rho^* = \frac{\epsilon\kappa + \tau(\eta_{ret}\gamma_{ret} + \beta_{ret}) + (1-\tau)(\eta_{rest}\gamma_{rest} + \beta_{rest})}{\epsilon - \omega\eta_{ret}\omega_{ret} - (1-\tau)\mu_\nu\eta_{meal}\omega_{rest}}.$$

Other solutions can be directly derived using the solution for the producer price. For example, the equilibrium solution for percent change in the quantity of whole veal meat in California becomes:

90

$$(A2.9)\ dlnQ^* = \tau\big(\eta_{ret}\big(\omega_{ret}dlnP_\rho^* + \gamma_{ret}\big) + \beta_{ret}\big) + (1-\tau)(\eta_{rest}\big(\omega_{rest}dlnP_\rho^* + \gamma_{rest}\big) + \beta_{rest}).$$

**Economic Impacts of Proposition 12 Veal Calf Space Regulations**

In constructing our model, we consider increased production costs as well as segregation costs that affect market intermediaries. We allow for potential demand shifts resulting from consumer responses to the change in farm practices. We incorporate data on cost shares and expected cost changes provided to us from industry experts. We borrow supply and demand elasticity estimates from prior research to establish model parameters. Model simulations are based on current data for prices and quantities, and we project outcomes for 2020 and beyond.

The increase in the cost of production of whole veal meat of 30% ($2.10 per pound) affects retail and restaurant prices and thereby the quantity of whole veal meat demanded in California. In turn, that affects quantity produced of whole veal meat to meet California standards.

We use a retail demand elasticity (the percentage reduction in quantity demand for each percentage increase in price) of -2.3 and a restaurant meal demand elasticity of -1.25. A range of elasticities are used in other economic studies of veal and high-end meats—the values we use are close to the average. With these elasticities, a 10% increase in the retail price of whole veal meat would cause a 22.3% decline in quantity purchased at retail; likewise, a 10% increase in the restaurant price of a meal containing whole veal meat would cause a 12.5% decline in the quantity of such meals purchased at restaurants.

We use a supply elasticity of 10 for whole veal meat marketed in California. The supply elasticity implies that the marginal costs of supplying whole veal meat to the market fall by 1% if the quantity of whole veal meat produced for and delivered to the California market declines by 10%. The supply elasticity is highly elastic, as producers of whole veal meat may easily choose to raise the calves to adulthood and eventually slaughter them for beef.

We also apply an assumption about how retail and restaurant prices respond to producer price increases. Two forms of models of food cost markups are common. First, the percentage markup approach assumes that the retail price changes by the same percentage as the producer price change, thus a 30% increase in the delivered producer price would entail a 30% increase in the retail price. This approach is appropriate when per unit retailing costs rise in proportion to the product cost to the retailer. The second approach is that the producer price increase passes through to the retail price in dollars per unit. In that approach, a producer price increase of, say, $2.10 per pound would cause an increase in the retail price of $2.10 per pound, and the dollars of retail markup would not change. This approach is appropriate when retail costs do not necessarily rise when wholesale costs rise. That is, in the present case, the cost of retailing, labor, rents, etc. are not related directly to the producer costs of whole veal meat delivered to the retailer. Under this approach, the percentage change in retail price would be smaller than the percentage change in producer price. For the estimates presented here, we use an assumption between these two approaches. We assume the retail markup rises by an amount halfway between zero and the same percentage change as the producer price.

We use CDFA income per capita forecasts to adjust California veal consumption combined with an income elasticity of 1.0. This elasticity estimate is consistent with the decline in veal production thus far in 2020 (USDA NASS 2020). Furthermore, as restaurants close their doors, consumers have increased spending on meat at grocery and decreased spending away from home (Lusk 2020). Therefore, the typical split of veal consumption, 40% at retail and 60% at restaurants, is not realistic for the next few years. To account for this shift in spending, we change the retail-restaurant split of veal consumption to 60-40 in 2020, 50-50 in 2021, 45-55 in 2022, and 40-60 in 2023.

One other feature of the simulation is important to highlight. We assume that consumers do not respond to the new veal calf space regulation by buying more whole veal meat. That is, the new regulations do not cause the demand curve to shift out.

*Proposed Regulations*

Based on the assumptions described above, we first estimate the effects of Proposition 12 under CDFA's proposed regulations (as defined in section I). Simulation results for 2020 are provided in Table A2.4; simulation results for 2021 are provided in Table A2.5; simulation results for 2022 are provided in Table A2.6; simulation results for 2023 are provided in Table A2.7.

The proposed regulations raise whole veal meat prices (producer price, retail price, and restaurant price) but reduce the quantity consumed of whole veal meat in California from 2020 to 2023, although the magnitudes differ across those years. Those price and quantity changes result in decreases in consumer expenditure across those years.

*Higher-Cost Regulations*

We next estimate the effects of Proposition 12 under a set of higher-cost regulations. For this scenario we extend the proposed regulations to include an additional segregation cost, $\gamma = 0.01$, at restaurants/retail to allow products to be scannable by consumers to see a record of Proposition 12 animal confinement certification.

Although ground veal meat is not directly affected by the proposed regulations, extending the higher-cost regulations to apply to ground veal meat does not increase costs. Little, if any, ground veal comes from animals over 21 days or 150 pounds. Ground veal meat does not substitute for other chops produce from veal calves. Therefore, if Californians consume a proportional amount of ground veal to the amount produced by a veal calf, we do not expect there to be an increase in the cost of regulations.

Simulation results for 2020 are provided in Table A2.8; simulation results for 2021 are provided in Table A2.9; simulation results for 2022 are provided in Table A2.10; simulation results for 2023 are provided in Table A2.11.

Like the proposed regulations, the higher-cost regulations raise whole veal meat prices (producer price, retail price, and restaurant price) but reduce the quantity consumed of whole veal meat in California from 2020 to 2023. These price and quantity changes result in decreases in consumer

93

expenditure across those years. The higher-cost regulations reduce consumer expenditure more than the proposed regulations.

*Lower-Cost Regulations*

We briefly discuss the effects of Proposition 12 on whole veal meat under a set of lower-cost regulations. We modify the proposed regulations to only include whole veal meat that is sold at retail. Doing so excludes restaurant consumption, 60% of total whole veal meat consumption, from our model. We assume for simplicity that there is no substitution between whole veal meat consumption at home and at restaurants.

Simulation results for 2020 are provided in Table A2.12; simulation results for 2021 are provided in Table A2.13; simulation results for 2022 are provided in Table A2.14; simulation results for 2023 are provided in Table A2.15.

Like the proposed regulations, the lower-cost regulations raise whole veal meat prices (producer price, retail price, and restaurant price) but reduce quantity consumed of whole veal meat in California from 2020 to 2023. Those price and quantity changes result in decreases in consumer expenditure across those years.

**Table A2.4. Impacts of Proposed Regulations in 2020 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 4.1 | 2.1 | -2.0 | -48.4% |
| Restaurant | Mil. lbs. | 2.8 | 2.5 | -0.2 | -8.9% |
| Total | Mil. lbs. | 6.9 | 4.7 | -2.3 | -32.6% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.87 | 1.87 | 26.7% |
| Retail price | $/lb | 12.44 | 15.06 | 2.62 | 21.1% |
| Restaurant price | $/lb | 21.00 | 24.74 | 3.74 | 17.8% |
| Producer revenue and retail, restaurant, and total consumer expenditure | | | | | |
| Producer revenue | Million $ | 48.3 | 41.3 | -7.1 | -14.6% |
| Retail expenditure | Million $ | 51.5 | 32.2 | -19.4 | -37.6% |
| Restaurant expenditure | Million $ | 58.0 | 62.2 | 4.2 | 7.3% |
| Consumer expenditure | Million $ | 109.5 | 94.4 | -15.1 | -13.8% |

**Table A2.5. Impacts of Proposed Regulations in 2021 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 3.4 | 1.7 | -1.6 | -49.1% |
| Restaurant | Mil. lbs. | 3.4 | 3.1 | -0.3 | -9.0% |
| Total | Mil. lbs. | 6.7 | 4.8 | -2.0 | -29.1% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.90 | 1.90 | 27.1% |
| Retail price | $/lb | 12.44 | 15.10 | 2.66 | 21.3% |
| Restaurant price | $/lb | 21.00 | 24.79 | 3.79 | 18.1% |
| Producer revenue and retail, restaurant, and total consumer expenditure | | | | | |
| Producer revenue | Million $ | 47.0 | 42.4 | -4.6 | -9.8% |
| Retail expenditure | Million $ | 41.8 | 25.8 | -16.0 | -38.2% |
| Restaurant expenditure | Million $ | 70.5 | 75.8 | 5.2 | 7.4% |
| Consumer expenditure | Million $ | 112.3 | 101.6 | -10.8 | -9.6% |

**Table A2.6. Impacts of Proposed Regulations in 2022 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 3.1 | 1.5 | -1.5 | -49.4% |
| Restaurant | Mil. lbs. | 3.7 | 3.4 | -0.3 | -9.1% |
| Total | Mil. lbs. | 6.8 | 4.9 | -1.8 | -27.2% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.91 | 1.91 | 27.3% |
| Retail price | $/lb | 12.44 | 15.11 | 2.67 | 21.5% |
| Restaurant price | $/lb | 21.00 | 24.82 | 3.82 | 18.2% |
| Producer revenue and retail, restaurant, and total consumer expenditure | | | | | |
| Producer revenue | Million $ | 47.5 | 44.0 | -3.5 | -7.4% |
| Retail expenditure | Million $ | 38.0 | 23.3 | -14.6 | -38.6% |
| Restaurant expenditure | Million $ | 78.4 | 84.2 | 5.8 | 7.4% |
| Consumer expenditure | Million $ | 116.4 | 107.5 | -8.8 | -7.6% |

**Table A2.7. Impacts of Proposed Regulations in 2023 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 2.8 | 1.4 | -1.4 | -49.8% |
| Restaurant | Mil. lbs. | 4.1 | 3.8 | -0.4 | -9.2% |
| Total | Mil. lbs. | 6.9 | 5.2 | -1.8 | -25.4% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.92 | 1.92 | 27.5% |
| Retail price | $/lb | 12.44 | 15.13 | 2.69 | 21.6% |
| Restaurant price | $/lb | 21.00 | 24.84 | 3.84 | 18.3% |
| Producer revenue and retail, restaurant, and total consumer expenditure | | | | | |
| Producer revenue | Million $ | 48.4 | 46.0 | -2.4 | -4.9% |
| Retail expenditure | Million $ | 34.4 | 21.0 | -13.4 | -38.9% |
| Restaurant expenditure | Million $ | 87.1 | 93.6 | 6.5 | 7.5% |
| Consumer expenditure | Million $ | 121.5 | 114.7 | -6.9 | -5.6% |

**Table A2.8. Impacts of Higher-Cost Regulations in 2020 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 4.1 | 2.1 | -2.1 | -50.5% |
| Restaurant | Mil. lbs. | 2.8 | 2.5 | -0.3 | -9.4% |
| Total | Mil. lbs. | 6.9 | 4.6 | -2.4 | -34.0% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.86 | 1.86 | 26.6% |
| Retail price | $/lb | 12.44 | 15.17 | 2.73 | 22.0% |
| Restaurant price | $/lb | 21.00 | 24.93 | 3.93 | 18.7% |
| Producer revenue and retail, restaurant, and total consumer expenditure | | | | | |
| Producer revenue | Million $ | 48.3 | 40.4 | -8.0 | -16.5% |
| Retail expenditure | Million $ | 51.5 | 31.1 | -20.4 | -39.6% |
| Restaurant expenditure | Million $ | 58.0 | 62.4 | 4.4 | 7.6% |
| Consumer expenditure | Million $ | 109.5 | 93.5 | -16.0 | -14.6% |

**Table A2.9. Impacts of Higher-Cost Regulations in 2021 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 3.4 | 1.6 | -1.7 | -51.2% |
| Restaurant | Mil. lbs. | 3.4 | 3.0 | -0.3 | -9.5% |
| Total | Mil. lbs. | 6.7 | 4.7 | -2.0 | -30.3% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.89 | 1.89 | 27.0% |
| Retail price | $/lb | 12.44 | 15.21 | 2.77 | 22.2% |
| Restaurant price | $/lb | 21.00 | 24.99 | 3.99 | 19.0% |
| Producer revenue and retail, restaurant, and total consumer expenditure | | | | | |
| Producer revenue | Million $ | 47.0 | 41.6 | -5.4 | -11.5% |
| Retail expenditure | Million $ | 41.8 | 24.9 | -16.8 | -40.3% |
| Restaurant expenditure | Million $ | 70.5 | 76.0 | 5.4 | 7.7% |
| Consumer expenditure | Million $ | 112.3 | 100.9 | -11.4 | -10.2% |

**Table A2.10. Impacts of Higher-Cost Regulations in 2022 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 3.1 | 1.5 | -1.6 | -51.5% |
| Restaurant | Mil. lbs. | 3.7 | 3.4 | -0.4 | -9.6% |
| Total | Mil. lbs. | 6.8 | 4.9 | -1.9 | -28.4% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.90 | 1.90 | 27.2% |
| Retail price | $/lb | 12.44 | 15.23 | 2.79 | 22.4% |
| Restaurant price | $/lb | 21.00 | 25.01 | 4.01 | 19.1% |
| Producer revenue and retail, restaurant, and total consumer expenditure | | | | | |
| Producer revenue | Million $ | 47.5 | 43.2 | -4.3 | -9.0% |
| Retail expenditure | Million $ | 38.0 | 22.5 | -15.4 | -40.6% |
| Restaurant expenditure | Million $ | 78.4 | 84.4 | 6.1 | 7.7% |
| Consumer expenditure | Million $ | 116.4 | 107.0 | -9.4 | -8.1% |

**Table A2.11. Impacts of Higher-Cost Regulations in 2023 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 2.8 | 1.3 | -1.4 | -51.9% |
| Restaurant | Mil. lbs. | 4.1 | 3.7 | -0.4 | -9.6% |
| Total | Mil. lbs. | 6.9 | 5.1 | -1.8 | -26.5% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.91 | 1.91 | 27.3% |
| Retail price | $/lb | 12.44 | 15.24 | 2.80 | 22.5% |
| Restaurant price | $/lb | 21.00 | 25.04 | 4.04 | 19.2% |
| Producer revenue and retail, restaurant, and total consumer expenditure | | | | | |
| Producer revenue | Million $ | 48.4 | 45.3 | -3.1 | -6.4% |
| Retail expenditure | Million $ | 34.4 | 20.3 | -14.1 | -41.0% |
| Restaurant expenditure | Million $ | 87.1 | 93.9 | 6.8 | 7.8% |
| Consumer expenditure | Million $ | 121.5 | 114.2 | -7.3 | -6.0% |

**Table A2.12. Impacts of Lower-Cost Regulations in 2020 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 4.1 | 2.2 | -1.9 | -46.0% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.78 | 1.78 | 25.4% |
| Retail price | $/lb | 12.44 | 14.93 | 2.49 | 20.0% |
| Producer revenue and consumer expenditure | | | | | |
| Producer revenue | Million $ | 29.0 | 19.6 | -9.4 | -32.3% |
| Consumer expenditure | Million $ | 51.5 | 33.4 | -18.1 | -35.2% |

**Table A2.13. Impacts of Lower-Cost Regulations in 2021on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 3.4 | 1.8 | -1.5 | -46.0% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.78 | 1.78 | 25.4% |
| Retail price | $/lb | 12.44 | 14.93 | 2.49 | 20.0% |
| Producer revenue and consumer expenditure | | | | | |
| Producer revenue | Million $ | 23.5 | 15.9 | -7.6 | -32.3% |
| Consumer expenditure | Million $ | 41.8 | 27.1 | -14.7 | -35.2% |

**Table A2.14. Impacts of Lower-Cost Regulations in 2022 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 3.1 | 1.6 | -1.4 | -46.0% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.78 | 1.78 | 25.4% |
| Retail price | $/lb | 12.44 | 14.93 | 2.49 | 20.0% |
| Producer revenue and consumer expenditure | | | | | |
| Producer revenue | Million $ | 21.4 | 14.5 | -6.9 | -32.3% |
| Consumer expenditure | Million $ | 38.0 | 24.6 | -13.4 | -35.2% |

**Table A2.15. Impacts of Lower-Cost Regulations in 2023 on Whole Veal Meat**

| | Unit | Without regulations | With regulations (43 sq. ft.) | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of whole veal meat | | | | | |
| Retail | Mil. lbs. | 2.8 | 1.5 | -1.3 | -46.0% |
| Whole veal meat prices | | | | | |
| Producer price | $/lb | 7.00 | 8.78 | 1.78 | 25.4% |
| Retail price | $/lb | 12.44 | 14.93 | 2.49 | 20.0% |
| Producer revenue and consumer expenditure | | | | | |
| Producer revenue | Million $ | 19.4 | 13.1 | -6.3 | -32.3% |
| Consumer expenditure | Million $ | 34.4 | 22.3 | -12.1 | -35.2% |

**Appendix 3. Data and Economic Modelling on the Proposition 12 Regulation of New Hen Housing Requirements for Shell Eggs Supplying the California Market**

California Proposition 12 was passed in November 2018. Among its provisions, Proposition 12 imposed minimum housing requirements for egg layers. California businesses are banned from engaging in the sale within California of covered egg products if those products are ones of egg-laying hens that were confined in a cruel manner.

CDFA proposed a set of regulations for implementing Proposition 12. In the proposed regulations based on statute, the requirement beginning in January 2022 is that all shell eggs can only come from hens kept in cage-free compliant spaces. This appendix analyzes the economic implications of this cage-free requirement for California businesses and consumers. To analyze the economic implications of the regulations, we use a carefully calibrated simulation model.

In this appendix, we first describe the regulations proposed by CDFA. Second, we present a baseline that describes the California shell egg market if there were no regulations. In the analysis, we use the baseline for comparison to the California market with the proposed regulations. Third, we explain the data and parameters used for developing the simulation model. Fourth, we describe the simulation model for analyzing the likely economic effects of the proposed regulations. Fifth, we report and discuss the simulation results.

**Regulations**

In this section, we describe the regulations of Proposition 12, proposed by CDFA. Besides the proposed package of regulations, CDFA considers two alternative packages of regulations for comparison with and evaluation of the proposed regulations: a package of lower-cost regulations and a package of higher-cost regulations. In this section, after we describe the proposed regulations, we compare those two alternative packages of regulations with the proposed regulations. We focus on the regulations that directly relate to the analysis of this appendix, and we do not provide the full description of regulations proposed by CDFA.

*Proposed Regulations*

Under the package of proposed regulations, no egg producer or egg handler shall knowingly sell or contract to sell within the state a shell egg for human consumption if it is the product of an egg-laying hen that was confined in an enclosure that fails to comply with certain standards. Specifically, "commencing January 1, 2022, an enclosure shall be a cage-free housing system."

*Lower-Cost Regulations*

The lower-cost regulations include only raw or pasteurized eggs in the shell, and include only shell eggs sold at the retail level. The lower-cost regulations exempt shell eggs sold in California intended for further processing, preparation, or manufacturing into a combination food product or prepared meal.

*Higher-Cost Regulations*

Under the higher-cost regulations, covered shell eggs are not exempted even when those products only move through California for sale in another state or country. Moreover, the higher-cost regulations require "consumer-facing labeling for all covered products or prepared foods containing a covered product allowing the end customer to scan a QR code and see record of Prop 12 animal confinement certification and traceability of product back to farm of origin."

**Baselines: Quantities and Prices of Shell Eggs in California if There Were No Proposed Regulations**

In this section, we use quantities and retail price data to describe the California shell egg market if there were no regulations proposed by CDFA. We use this counterfactual California market as a baseline in comparison to the California market with the proposed regulations. We discuss how we obtain baseline quantities and prices in the Data and Parameters section below.

In 2019, about 656 million dozen eggs were consumed in California. About 80% (or 525 million dozen) of in-shell consumption was from conventional eggs, and the remaining 20% (or 131 million dozen) was from cage-free eggs. We assess that the quantities would increase from 2019 to 2023, considering a mild increasing trend in per capita egg consumption and population

growth in California. We expect an additional increase in in-shell consumption in 2020 because of the effects of COVID-19. Because of COVID-19, many restaurants and other food service businesses have temporarily or permanently closed. Hence, more people buy shell eggs at groceries and consume those eggs at home, resulting in an increase in in-shell consumption in 2020. For more discussion, see *Data on Quantity Consumed in California* in the following section.

In 2019, the conventional egg retail price was $2.20 per dozen, and the cage-free egg retail price was $4.75 per dozen. We expect a price increase in conventional eggs in 2020 because of the interim expansion requirement on usable floor space for hens in egg production (144 square inches per hen). We expect that annual average retail prices would be stable through 2023, although retail prices would vary within each year. For more discussion, see *Prices* in the following section.

This appendix analyzes the effects of proposed regulations that will be implemented from 2022. We see the economic effects of the proposed regulations by 2022 and 2023. We use the 2022 and 2023 baseline quantities and prices to measure the economic effects of the proposed regulations. For discussion of economic effects, see the "Simulation Results" section below.

**Table A3.1. Quantities and Retail Prices of Shell Eggs in California, 2019 - 2023**

|  | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | | |
| Conventional | Mil. dozen | 525 | 548 | 562 | 576 | 590 |
| Cage-free | Mil. dozen | 131 | 138 | 142 | 145 | 149 |
| Total | Mil. dozen | 656 | 686 | 704 | 721 | 739 |
| Retail prices in California | | | | | | |
| Conventional | $/dozen | 2.20 | 2.32 | 2.32 | 2.32 | 2.32 |
| Cage-free | $/dozen | 4.75 | 4.75 | 4.75 | 4.75 | 4.75 |

**Data and Parameters**

In this section, we describe the data and parameters used in the simulation model. Before describing data and parameters, we explain how we use them in developing the simulation model (see *Calibration Method* below). We then categorize data and parameters into several groups and describe those groups one by one.

*Calibration Method*

To analyze the likely effects of proposed regulations, we consider two markets: (a) a market without the proposed regulations and (b) a market with the proposed regulations. The former is a reference market to evaluate outcomes (such as prices and quantities) of the market with the proposed regulations. We measure the likely effects by comparing outcomes between the two markets with and without the proposed regulations.

To project market outcomes without the proposed regulations, we use the most recent available data for quantities and prices. To consider income and population changes from 2019 to 2023, we use the California Department of Finance projections for income and population. We provide a detailed explanation of these data.

To simulate market outcomes without the proposed regulations, we consider the interim expansion requirement in the hen housing space before the cage-free requirement. On January 1, 2020, the space minimum for hens supplying eggs to California was increased from 116 to 144 square inches. But this change only applies until January 1, 2022, at which point hens must be in cage-free housing. To reflect the effects of the interim expansion requirement, we use the findings of Sumner et al. (2019). Sumner et al. (2019) developed a simulation model that projected a market equilibrium displacement for the interim expansion requirement. We use their market equilibrium displacement projections to obtain reference values for analysis in this appendix. For more discussion on the simulation model for the interim expansion requirement, see the *Reflection of the Effects of the Interim Expansion Requirement* section below.

To summarize, we project market outcomes without the proposed regulations in the following three steps. First, we collect the most recent egg industry data. Second, we consider changes in

income and population in California over 2019 to 2023. Third, we consider the effects of the interim expansion requirement.  The rest of this section focuses on describing how data were obtained.

*Data on Quantity Consumed in California*

We estimate quantities consumed of conventional (caged) eggs and cage-free eggs in California as follows: we estimate total in-shell consumption of conventional eggs to be 721 million dozen in 2022 and 739 million dozen in 2023 if there were no proposed regulations. The value comes from the following formula. U.S. total egg disappearance is 8,019 million dozen in 2019, as reported by USDA ERS (USDA ERS, 2020a).  U.S. total egg disappearance for liquid eggs is about 2.6 billion dozen in 2019 (see Appendix 1). Multiplying in-shell egg disappearance by the share of California population in the United States, estimated at 12.1%, in-shell egg consumption totals 727 million dozen. We assess an increasing trend in in-shell egg consumption (5% from 2019 to 2020, and 2% per year for other years). We also assess population growth in California (0.4% from 2019 to 2020 and 0.5% per year for other years). We also incorporate the effects of the interim expansion requirement implemented in 2020. Then, we obtain the quantities of all shell eggs without the proposed regulations. For research purposes, we need to decompose all shell egg quantity into conventional egg quantity and cage-free egg quantity. We estimate 20 percent of total in-shell egg consumption in California are cage-free eggs, with the remaining 80 percent of shell eggs consumed being standard produced eggs. Specifically, we estimate 145 million dozen eggs in 2022 and 149 million dozen eggs in 2023 are cage-free eggs, and 576 million dozen eggs in 2022 and 590 million dozen eggs in 2023 are conventional eggs.

For our egg consumption projections, we use statistics measuring the growth rates of shell egg consumption, the growth rates of California population, the share of in-shell consumption, and the share of cage-free eggs in total in-shell egg consumption. We obtain those statistics as follows. First, we assess the growth rates of shell egg consumption, considering historical U.S. average per capita consumption of eggs per year (USDA ERS, 2020) and the effects of COVID-19 in 2020. The U.S. average per capita disappearance of eggs has gradually risen for decades. During the period of COVID-19 lockdown in California (after March 15, 2020), people have been reported to consume eggs more frequently at home rather than away from home because

many restaurants and other food service businesses have temporarily or permanently closed in California. Considering these two factors, we assess a 5% increase in in-shell consumption from 2019 to 2020 and a 2% increase per year from 2021 to 2023. Second, we obtain the growth rates of the California population from population projections reported by Department of Finance in California (DoF, 2020). Third, we estimate the share of cage-free eggs in total in-shell egg consumption is 20% in California and 15% outside of California, based on our reviews of hen housing data from USDA AMS and discussions with egg industry members.

*Data on Quantity Produced in California*

We obtain our estimate of 366 million dozen eggs for California table-egg production as follows: according to the Egg Safety and Quality Management Program within the California Department of Food and Agriculture (CDFA), the egg-laying hen population in California was 15.41 million in 2019 (CDFA ESGM, 2019). Also, according to the CDFA 2017-2018 California Agricultural Statistics Review, the average number of eggs produced per layer is about 23.75 eggs per month (CDFA, 2018). Those two values imply that total annual egg production in California is about 366 million dozen.

Among table eggs produced in California, annually, about 4.6 million dozen are used for liquid eggs, according to CDFA. After considering the liquid egg use, about 361.4 million dozen are used for in-shell consumption in 2019.

For research purposes, we need to decompose the total shell egg quantity into conventional and cage-free eggs. Data from USDA and CDFA support the simplifying assumption that California produces cage-free eggs in the same proportion as California consumption (20%).

Based on the procedure described, we estimate that California will produce about 317 million dozen conventional eggs in 2022 and 325 million dozen in 2023. We estimate that California will produce 80 million dozen cage-free eggs in 2022 and 82 million dozen in 2023. Notice that these values reflect the market situation without implementation of proposed regulations.

106

In 2019 production was 361.4 million dozen and consumption was 656 million dozen. We obtain our market share estimates based on the 2019 data.

*Prices*

We assess the farm price for conventional eggs at $1.28 per dozen and the farm price for cage-free eggs at $1.55 per dozen in 2022 and 2023. We also assess the retail price for conventional eggs at $2.32 per dozen and the retail price for cage-free eggs at $4.75 per dozen. Those are average annual prices, and we expect them to remain stable through 2023.

To estimate farm prices, we use historical farm and retail data from the Egg Industry Center (Ibarburu, 2019) and wholesale prices from the USDA AMS (AMS 3). The retail prices are our best estimates after discussions with industry people. We also reflect the likely effects of the interim expansion requirement (from 116 to 144 square inches of usable floor space per hen).

**Table A3.2. Assessed Quantities and Prices in the California Market in 2022 and 2023 if Proposed Regulations Were Not Implemented**

| | Unit | 2022 | 2023 |
|---|---|---|---|
| Quantity consumed of shell eggs in California | | | |
|   Conventional | Mil. dozen | 576 | 590 |
|   Cage-free | Mil. dozen | 145 | 149 |
|   Total | Mil. dozen | 721 | 739 |
| Quantity produced of shell eggs in California | | | |
|   Conventional | Mil. dozen | 317 | 325 |
|   Cage-free | Mil. dozen | 80 | 82 |
|   Total | Mil. dozen | 397 | 407 |
| Farm prices in California | | | |
|   Conventional | $/dozen | 1.28 | 1.28 |
|   Cage-free | $/dozen | 1.55 | 1.55 |
| Retail prices in California | | | |
|   Conventional | $/dozen | 2.32 | 2.32 |
|   Cage-free | $/dozen | 4.75 | 4.75 |

Note: For detailed calculations, interpretation, and source, see the subsections about quantities and prices in the text.

*Farm-to-Retail Markup*

Differencing the farm and retail prices described above, we assess the farm-to-retail markup of conventional eggs at $1.04 per dozen and that of cage-free eggs at $3.20 per dozen eggs.

When we discuss simulation results below, we consider several cases when the farm-to-retail markup of cage-free eggs falls after the proposed regulations (the cage-free housing requirement) are implemented. Specifically, we consider three cases: no change, a 10% decrease ($0.32 per dozen), and a 20% decrease ($0.64 per dozen). We expect that the retail cost for cage-free eggs might decrease based on the following reasoning: first, retailers would avoid additional costs caused by labeling and segregating cage-free eggs separately from conventional eggs. Second, shelf spacing costs for cage-free eggs may decrease when only cage-free eggs are available. Retailers often allocate more shelf space per unit quantity for cage-free eggs than conventional eggs. Cage-free eggs are typically packaged in quantities of 6 or 12 eggs, while conventional eggs are often packaged in quantities of 18 or more eggs. When cage-free eggs become a new standard type of eggs, cage-free eggs would be packaged in larger quantities, resulting in a decrease in shelf spacing costs per unit quantity of eggs.

*Demand Elasticities*

We use own- and cross-price elasticities of demand for conventional eggs and cage-free eggs in our simulation model. When the proposed regulations are implemented, many consumers who used to buy conventional eggs must switch to cage-free eggs and pay a higher price. In response to a higher price of eggs, some consumers would replace egg consumption with consumption of other meat products. Such behavioral changes among consumers who face a price change by the proposed regulations are reflected in the model through own- and cross-price elasticities of demand for conventional eggs and cage-free eggs. For more discussion, see the modeling section below.

We assess adjust elasticities in 2022 and 2023 to reflect that consumers would not be able to adjust fully to a price change by the proposed regulations in the first year of implementation

(2022), but would be able to adjust to a price change in the second year of implementation (2023).

For demand elasticities in 2022, we assess the own-price elasticity of demand for conventional eggs at -0.2 and for cage-free eggs at -0.29. We use 0.1 for the cross-price elasticity of demand for conventional eggs in response to cage-free egg price changes. We use 0.19 for the corresponding cross-price elasticity of demand for cage-free eggs in response to conventional egg price changes.

For demand elasticities in 2023, our model reflects that consumers have more opportunities to adjust to a price change by the proposed regulations. Specifically, we assess the own-price elasticity of demand for conventional eggs at -0.3 and for cage-free eggs at -0.39. We use 0.1 for the cross-price elasticity of demand for conventional eggs in response to cage-free egg price changes. We use 0.19 for the corresponding cross-price elasticity of demand for cage-free eggs in response to conventional egg price changes.

To obtain estimates of demand elasticities, we begin with the own-price elasticity of demand for all eggs from Sumner et al. (2011), who reviewed existing estimates and suggested an own-price elasticity of demand for all eggs of -0.2. Second, we assess the value of -0.3 for the own-price elasticity of demand for conventional eggs based on our review of the relevant literature. In the evaluation, we also consider that the demand for conventional eggs and cage-free eggs would be more elastic than the demand for all eggs as an aggregate category because consumers can substitute between the two types of eggs in response to a relative price change. Third, given elasticity estimates of all eggs and conventional eggs, we obtain other own- and cross-price elasticities of demand, implied by the relationship between individual product demands and aggregate demand. The relationship is based on a weakly separable preference assumption, which comes from consumer theory in economics.

The simulation model also reflects a change in egg demand when cage-free becomes the new standard for eggs. When cage-free eggs become the new standard egg category, consumers must pay a higher price for egg consumption than before the proposed regulations. In response to such

109

a high egg price, consumers would substitute other meat products (beef, pork, and chicken) for eggs more frequently. Hence, we expect that demand for eggs would become more elastic when cage-free becomes the new standard eggs. Specifically, for egg category demand, we use an own-price elasticity of demand of -0.2 in 2022 and -0.3 in 2023. We allow consumers to have more opportunities to adjust to the proposed regulations in 2023 than in 2022.

*Supply Elasticities*

We expect that supply elasticities for conventional and cage-free eggs would be highly elastic, based on the following reasons. First, producers have adequate time to adjust to the proposed regulations. Second, in egg production, most costs are feed, pullets, and labor (Matthews and Sumner, 2015), and farms can adjust the quantities of those inputs from the well-established markets in response to the proposed regulations. Third, California accounts for a minor proportion of the U.S. market, which implies that the supply-side of the U.S. market could flexibly adjust to the proposed regulations in California. Based on the reasoning above, we expect that an infinitely elastic supply to the California market would be a good approximation for both conventional and cage-free eggs.

*Reflection of the Effects of the Interim Expansion (144-square-inch) Requirement*

As mentioned at the beginning of this section, to complete the calibration of the model that describes the market without the proposed regulations, we consider the interim expansion requirement in hen housing space.

To reflect the effects of the interim expansion requirement, we use the findings of Sumner et al. (2019). Sumner et al. (2019) developed a simulation model that projected an equilibrium displacement of the California shell egg market for the interim expansion requirement. The simulation results indicate a 6.8% increase in farm price, a 5.4% increase in the retail price, and a 1% decrease in the quantity of conventional eggs. These changes in prices and quantities result in a 4.1% increase in retailer revenue and consumer expenditure. For a more detailed discussion about the simulation model and results, see Sumner et al. (2019).

We use simulation results of the interim expansion requirement to calibrate market outcomes that reflect the California shell egg market with the interim expansion requirement but without the cage-free housing requirement. The calibrated market outcomes for quantities and prices are reported in Table A3.2.

**Table A3.3. Parameters: Definitions and Value Specifications**

| Definition | Year | Value |
|---|---|---|
| Farm-to-retail markup of conventional eggs | | $1.04/dozen |
| Farm-to-retail markup of cage-free eggs | | $3.20/dozen |
| Own-price elasticity of demand for conventional eggs | 2022 | -0.2 |
| Own-price elasticity of demand for conventional eggs | 2023 | -0.3 |
| Cross-price elasticity of demand for conventional eggs in response to cage-free eggs price changes | 2022 | 0.1 |
| Cross-price elasticity of demand for conventional eggs in response to cage-free eggs price changes | 2023 | 0.1 |
| Own-price elasticity of demand for cage-free eggs | 2022 | -0.29 |
| Own-price elasticity of demand for cage-free eggs | 2023 | -0.39 |
| Cross-price elasticity of demand for cage-free eggs in response to conventional egg price changes | 2022 | 0.19 |
| Cross-price elasticity of demand for cage-free eggs in response to conventional egg price changes | 2023 | 0.19 |
| Own-price elasticity of demand for cage-free eggs when only cage-free eggs are available | 2022 | -0.2 |
| Own-price elasticity of demand for cage-free eggs when only cage-free eggs are available | 2023 | -0.3 |
| Supply elasticity to the California market of conventional eggs | | ∞ |
| Supply elasticity to the California market of cage-free eggs | | ∞ |

Note: For detailed calculations, interpretation, and source, see the subsections about farm-to-retail markup, demand elasticities, and supply elasticities in the text.

**Simple Model for Analyzing the Likely Effects of Proposed Regulations on the California Shell Egg Market**

The simulation model traces how the California market for shell eggs adjusts to a new market equilibrium following the proposed regulations. Beginning January 1, 2022, the proposed regulations, and the Prop 12 statutes, require California farms to raise egg-laying hens in cage-

111

free housing, as well as out-of-state farms when those farms' eggs are sold in California. Moreover, the regulations require other agents in the supply chain of shell eggs not to engage in the sale of shell eggs within California if those eggs come from farms that do not comply with the housing restrictions.

The option of purchasing of conventional eggs will reduce to zero after December 31, 2021. Although many California consumers would make the switch to buying cage-free eggs, we expect that California retailers would not pay a significantly higher price for cage-free eggs, considering that California accounts for only a small proportion of total U.S. egg sales. That is, the retail cage-free egg price ($P_r^{CF*}$) would be the farm price ($P_f^{CF*}$) plus per-unit retailing cost ($c_r^{CF}$):

$$(A3.1)\ P_r^{CF*} = P_f^{CF*} + c_r^{CF}.$$

The superscript *CF* denotes cage-free eggs. The subscript *r* denotes retail, and *f* denotes farms. We put an asterisk on farm price to emphasize the flexible supply response to price changes, described above. Similarly, we put an asterisk on retail price to underline that the retail price changes mainly by a retailing cost change rather than a farm price change.

Retailing costs include labeling, stocking, and displaying cage-free eggs. We expect retailing costs for cage-free eggs might decrease when the proposed regulations are implemented, based on the following reasoning: first, retailers would avoid additional costs caused by labeling and segregating cage-free eggs separately from conventional eggs. Second, shelf spacing costs for cage-free eggs may decrease when only cage-free eggs are available. Retailers often allocate more shelf space per unit quantity for cage-free eggs than conventional eggs. Mostly, cage-free eggs are packaged in quantities of 6 or 12 eggs, while conventional eggs are often packaged in quantities of 18 eggs or more. When cage-free eggs become the new standard type of eggs, cage-free eggs would have a larger package size, resulting in a decrease in shelf spacing costs per unit quantity of eggs. Before the proposed regulations are implemented, it is uncertain how much the retailing costs would change, so we consider several scenarios in terms of the retailing cost changes by the proposed regulations in the Simulation Results section, below.

Equation (A3.2) represents demand in California markets for conventional eggs,

$$(A3.2) \begin{cases} d \ln Q_d^C = \eta^C \cdot d \ln P_r^C + \eta^{C,CF} \cdot d \ln P_r^{CF} & \text{if } P_r^C < P_r^{CF}, \\ Q_d^C = 0 & \text{if } P_r^C \geq P_r^{CF}. \end{cases}$$

The superscript $C$ denotes conventional eggs, and $CF$ denotes cage-free eggs. The subscript $d$ denotes a demand relationship, and $r$ denotes retail. The variable $Q$ is quantity, and $P$ is price. The coefficient $\eta^C$ reflects the own-price elasticity of demand for conventional eggs. The coefficient $\eta^{C,CF}$ reflects the cross-price elasticity of demand for conventional eggs in response to a price change of cage-free eggs. For the sake of simplicity, we assume that demand elasticities are stable within a reasonable price range. However, the demand for conventional eggs reduces to zero if the retail price of conventional eggs equals or is higher than the retail price of cage-free eggs. That is, we assume that California consumers would prefer cage-free eggs to conventional eggs, given the same prices.

Equation (A3.3) represents demand in California markets for cage-free eggs,

$$(A3.3) \begin{cases} d \ln Q_d^{CF} = \eta^{CF,0} \cdot d \ln P_r^{CF} + \eta^{CF,C} \cdot d \ln P_r^C & \text{if } P_r^C < P_r^{CF} \\ Q_d^{CF,1} = Q_d^{CF,type1} + Q_d^{CF,type2} & \text{if } P_r^C = P_r^{CF} \\ d \ln Q_d^{CF} = \eta^{CF,1} \cdot d \ln P_r^{CF} & \text{if } P_r^C > P_r^{CF} \end{cases}$$

The notation is consistent with the previous equations. The coefficient $\eta^{CF,0}$ reflects the own-price elasticity of demand for cage-free eggs when both conventional eggs and cage-free eggs are available. The coefficient $\eta^{CF,C}$ is the cross-price elasticity of demand for cage-free eggs in response to conventional egg price changes. The coefficient $\eta^{CF,1}$ reflects the own-price elasticity of demand for cage-free eggs when only cage-free eggs are available owing to the proposed regulations based on Prop 12 statute.

The first relation in (A3.3) reflects cage-free egg demand without the proposed regulations. However, the third relation reflects cage-free egg demand when only cage-free eggs are available

at retail owing to the proposed regulations. For the sake of simplicity, we assume that demand elasticities are robust within a reasonable price range.

The second relation in (A3.3) reflects that consumers who used to buy conventional eggs begin buying cage-free eggs when the proposed regulations are implemented. The term $Q_d^{CF,type1}$ is the quantity demanded of cage-free eggs by consumers who would buy conventional eggs if the retail price of conventional eggs were lower than that of cage-free eggs. The quantity is determined by the first relation in (A3.3) when the two types of eggs become priced identically, given the assumption that consumers prefer cage-free eggs to conventional eggs at the same prices. The term $Q_d^{CF,type2}$ is the quantity demanded of cage-free eggs, determined by the first relation in (A3.3).

Combining the relations above, we can determine the market equilibrium prices and quantities when the proposed regulations are implemented. As we discussed (A3.1) above, considering that California accounts for a small proportion of the U.S. egg sales, farm price and added retailing costs determine the market equilibrium prices and, therefore, quantities. Comparing the market equilibrium outcomes without the proposed regulations, we can measure the effects of the proposed regulations on the market prices and quantities. Given the differences in market prices and quantities, we can measure changes in revenue and expenditure.

**Simulation Results**

In this section, we simulate the likely effects of the regulations proposed by CDFA.

For the analysis in this appendix, we look at the impacts of the regulations for two specific 12-month periods: January to December for calendar years 2022 and 2023. In response to the proposed regulations, producers and consumers would behave differently in 2022 and 2023. In 2022, the first year of implementation, producers would have fewer opportunities to adjust fully to new hen housing regulations. Similarly, one year would not be long enough for consumers to adjust fully to the new egg market in which they must buy cage-free eggs and pay a substantially higher price for egg consumption. However, in 2023, the second year of implementation, producers, and consumers would have more opportunities to adjust to the proposed regulations.

114

To consider potential differences in behaviors of producers and consumers, we perform separate simulations for 2022 and 2023.

Besides the proposed package of regulations, CDFA considers two additional packages of regulations: a package of lower-cost regulations and a package of higher-cost regulations. We simulate the effects of other packages after we discuss the proposed package of regulations.

*Proposed Regulations*

Under the proposed regulations, and Prop 12 statute, no egg producer or egg handler shall knowingly sell or contract to sell within the state a shell egg or liquid egg for human consumption if it is the product of an egg-laying hen that was confined in an enclosure that fails to comply with certain standards. Specifically, "commencing January 1, 2022, an enclosure shall be a cage-free housing system." Hence, the economic effects of proposed regulations come mainly from producers being unable to supply conventional eggs to the California market, and consumers being unable to buy conventional eggs at retail.

Table A3.4 reports the likely effects of the proposed regulations in 2022. From 2022, the quantity consumed and quantity produced of conventional eggs become zero in California. Many consumers who used to buy conventional eggs now buy cage-free eggs. However, some consumers who used to buy conventional eggs do not buy cage-free eggs because of a much higher retail price of cage-free eggs, resulting in about a 13% decrease in the total quantity consumed of all eggs. More California farms begin producing cage-free eggs, but the total quantity of eggs produced falls by about 13% because conventional egg production is not allowed. These changes in quantities and prices result in an estimated 1.3% (or $7 million) increase in farm revenue, a 1.3% (or $12 million) increase in retailer expenditure, and a 47.4% (or $960 million) increase in consumer expenditure in California.

Table A3.5 reports the likely effects of the proposed regulations in 2023. The proposed regulations require that shell eggs used in food manufacturing or restaurants must be Prop 12 compliant. As in 2022, conventional eggs are not available at retail and food service in California in 2023. However, compared to 2022 (13% decrease in the quantity consumed of all eggs),

consumers have more opportunities to adjust to a high price increase owing to the proposed regulations, resulting in a 21% decrease in the total quantity consumed of all eggs. The total quantity of eggs produced falls by about 21%. These changes in quantities and prices result in an 8.4% (or $46 million) decrease in farm revenue, an 8.4% (or $83 million) decrease in retailer expenditure, and a 33.2% (or $691 million) increase in consumer expenditure in California. Farm revenue and retailer expenditure fall despite higher farm and retail prices for eggs because consumers substantially reduce egg consumption in response to such a high price increase.

In the modeling section, we discuss that the farm-to-retail markup of cage-free eggs may fall when the proposed regulations are implemented. Retailers potentially reduce labeling, stocking, and displaying costs for cage-free eggs because conventional eggs are not available. However, it is uncertain how much the farm-to-retail markup would fall, so we consider several scenarios. The farm-to-retail markup is $3.20 per dozen, as we saw in Table A3.3. Now we allow changes in the farm-to-retail markup to be either -10% (-$0.32 per dozen) or -20% (-$0.64 per dozen). When determining the change in quantities, prices, revenue, and expenditure, we use the same estimates for other parameters provided above (Table A3.3).

Tables A3.6 and A3.7 report the simulation results when the farm-to-retail markup falls by 10% owing to the proposed regulations. Table A3.6 is for 2022, and Table A3.7 is for 2023. In comparison with the case of no change in absolute markup (Table A3.4), the changes in directions for quantities and prices are the same, but relatively more cage-free eggs are produced and consumed.

Tables A3.8 and A3.9 report the simulation results when the farm-to-retail markup falls by 20% owing to the proposed regulations. Table A3.8 is for 2022, and Table A3.9 is for 2023. The results are similar to the cases of a 10% decrease in markup. However, consumers face a much lower cage-free egg price.

*Lower-Cost Regulations*

The lower-cost regulations differ in the exemption policy. That is, while the proposed regulations include shell eggs used in food manufacturing or restaurants, the lower-cost regulations exempt

shell eggs sold in California intended for further processing, preparation, or manufacturing into a combination food product or prepared meal or sold at a restaurant. For simplicity, we assume no demand substitution between consumption at home and consumption away from home, which results in a robust egg quantity demanded at food service in response to price changes at retail.

To reflect the change in the exemption policy, we need data on the share of food service in quantity of shell eggs consumed. We obtain the share of food service in shell egg consumption of 10.5% from Urner Barry (2020).

Table A3.10 reports the 2022 simulation results under the lower-cost regulations. Notice that the quantity consumed and the quantity produced of conventional eggs do not reduce to zero in California because conventional eggs are sold in food service. However, the quantity consumed of conventional eggs falls by about 89.5% because conventional eggs are not available at retail. The quantity produced of conventional eggs falls by about 89.5%, but the quantity produced of cage-free eggs rises by about three times. These changes in quantities and prices result in a 1.1% (or about $6 million) increase in farm expenditure, a 1.1% (or about $11 million) increase in retailer expenditure, and a 42.4% (or about $859 million) increase in consumer expenditure in California.

Table A3.11 reports the 2023 simulation results under the lower-cost regulations. As in 2022, conventional eggs are available at food service in 2023. Compared to 2022, consumers have more opportunities to adjust to a high price increase owing to the regulations, resulting in a 19% decrease in the total quantity consumed of eggs. The total quantity of eggs produced falls by about 19%. These changes in quantities and prices result in a 7.6% (or $41 million) decrease in farm revenue, a 7.6% (or $75 million) decrease in retailer expenditure, and a 29.8% (or $618 million) increase in consumer expenditure in California. Farm revenue and retailer expenditure fall despite the higher farm and retail prices for eggs because consumers substantially reduce egg consumption in response to such a high price increase.

As in the previous subsection (*Proposed Regulations*), we provide additional simulation results when the farm-to-retail markup falls with the lower-cost regulations.

117

Tables A3.12 and A3.13 report the simulation results when the farm-to-retail markup falls by 10% ($0.32 per dozen) owing to the lower-cost regulations. Table A3.12 is for 2022, and Table A3.13 is for 2023. The changes in directions for quantities and prices are the same as the case of no change in absolute farm-to-retail markup, but more cage-free eggs are produced and consumed.

Tables A3.14 and A3.15 report the simulation results when the farm-to-retail markup falls by 20% ($0.64 per dozen) owing to the lower-cost regulations. Table A3.14 is for 2022, and Table A3.15 is for 2023. The results are similar to the cases of a 10% decrease in markup. However, consumers face a much lower cage-free egg price.

*Higher-Cost Regulations*

The first cost-relevant difference between the higher-cost regulations and the proposed regulations is that, under the higher-cost regulations, covered shell eggs are not exempt even when those products only move through California for sale in another state or country. We estimate that the quantity of shell eggs moving through California would be very small, roughly 13.6 million dozen (and about $9.1 million export revenue), based on the quantity of exported shell eggs from California to other countries. Under the higher-cost regulations, these exported shell eggs must be cage-free eggs. To our knowledge, proper data are not available to identify the share of cage-free eggs in total exported eggs. We expect that the share of cage-free eggs in exported shell eggs would be very small, considering that cage-free eggs are not popular in other countries. If the higher-cost regulations were implemented, we expect that the quantity exported of shell eggs from California would reduce to close to zero because (a) the farm price of cage-free eggs is substantially higher than that of conventional eggs and (b) California accounts for a very small proportion of world shell egg trade.

The second cost-relevant difference between the higher-cost regulations and the proposed regulations is that the higher-cost package requires "consumer-facing labeling for all covered products or prepared foods containing a covered product allowing the end customer to scan a QR code and see record of Prop 12 animal confinement certification and traceability of product back

to farm of origin." For such labeling, certification, and traceability, we assess all the aggregate costs through the supply chain at about a 1% increase in retail price. In this subsection, we focus on the cost effects from labeling, certification, and traceability, additionally required by the higher-cost regulations package.

Table A3.16 reports the 2022 simulation results under the higher-cost regulations. Under the higher-cost regulations, as in the proposed regulations, conventional eggs are not sold at retail and food service. The other results are also close to those of the proposed regulations. However, the magnitude of the effects of the higher-cost regulations on farm revenue, retailer expenditure, and consumer expenditure becomes slightly different because of additional labeling, certification, and traceability costs. That is, additional costs raise cage-free egg retail prices, which causes a decrease in farm revenue and retailer expenditure and an increase in consumer expenditure, compared to the corresponding proposed regulations. Specifically, the quantity consumed and produced of cage-free eggs more than triples, and the retail price of cage-free eggs rises by 0.7%. Compared to the case without regulations, farm revenue rises by 1.1% (or $6 million), and retailer revenue rises by 1.1% (or $11 million). Consumer expenditure increases by 48.2% (or about $976 million).

Table A3.17 reports the 2023 simulation results under the higher-cost regulations. Compared to 2022, consumers have more opportunities to adjust to a high price. When we see the regulation effects (that is, compared to the case without regulations), farm revenue falls by 8.6% (or $47 million), retailer revenue falls by 8.6% (or $85 million), and consumer expenditure rises by 33.9% (or about $704 million).

As we did in the previous subsection (*Proposed Regulations*), here we provide additional simulation results when the farm-to-retail markup falls with the higher-cost regulations.

Tables A3.18 and A3.19 report the simulation results when the farm-to-retail markup falls by 10% ($0.32 per dozen) with the higher-cost regulations. Table A3.18 is for 2022, and Table A3.19 is for 2023. The changes in directions for quantities and prices are the same as the case of

119

no change in absolute farm-to-retail markup, but more cage-free eggs are produced and consumed.

Tables A3.20 and A3.21 report the simulation results when the farm-to-retail markup falls by 20% ($0.64 per dozen) with the lower-cost regulations. Table A3.20 is for 2022, and Table A3.21 is for 2023. The results are similar to the cases of a 10% decrease in markup. However, consumers face a, even lower cage-free egg price.

**Table A3.4. Impacts of Proposed Shell Egg Regulations in 2022: No Change in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 576 | 0 | -576 | -100.0% |
| Cage-free | Mil. dozen | 145 | 629 | 483 | 332.4% |
| Total | Mil. dozen | 721 | 629 | -92 | -12.8% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 317 | 0 | -317 | -100.0% |
| Cage-free | Mil. dozen | 80 | 346 | 266 | 332.4% |
| Total | Mil. dozen | 397 | 346 | -51 | -12.8% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.75 | 0.00 | 0.0% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 530 | 537 | 7 | 1.3% |
| Retailer expenditure | Million $ | 962 | 975 | 12 | 1.3% |
| Consumer expenditure | Million $ | 2,026 | 2,986 | 960 | 47.4% |

**Table A3.5. Impacts of Proposed Shell Egg Regulations in 2023: No Change in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 590 | 0 | -590 | -100.0% |
| Cage-free | Mil. dozen | 149 | 583 | 434 | 291.0% |
| Total | Mil. dozen | 739 | 583 | -157 | -21.2% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 325 | 0 | -325 | -100.0% |
| Cage-free | Mil. dozen | 82 | 321 | 239 | 291.0% |
| Total | Mil. dozen | 407 | 321 | -86 | -21.2% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.75 | 0.00 | 0.0% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 543 | 497 | -46 | -8.4% |
| Retailer expenditure | Million $ | 986 | 903 | -83 | -8.4% |
| Consumer expenditure | Million $ | 2,077 | 2,768 | 691 | 33.2% |

**Table A3.6. Impacts of Proposed Shell Egg Regulations in 2022: 10% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 576 | 0 | -576 | -100.0% |
| Cage-free | Mil. dozen | 145 | 637 | 492 | 338.3% |
| Total | Mil. dozen | 721 | 637 | -84 | -11.6% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 317 | 0 | -317 | -100.0% |
| Cage-free | Mil. dozen | 80 | 351 | 271 | 338.3% |
| Total | Mil. dozen | 397 | 351 | -46 | -11.6% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.43 | -0.32 | -6.7% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 530 | 544 | 14 | 2.6% |
| Retailer expenditure | Million $ | 962 | 988 | 25 | 2.6% |
| Consumer expenditure | Million $ | 2,026 | 2,823 | 797 | 39.3% |

**Table A3.7. Impacts of Proposed Shell Egg Regulations in 2023: 10% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 590 | 0 | -590 | -100.0% |
| Cage-free | Mil. dozen | 149 | 594 | 445 | 298.9% |
| Total | Mil. dozen | 739 | 594 | -145 | -19.6% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 325 | 0 | -325 | -100.0% |
| Cage-free | Mil. dozen | 82 | 327 | 245 | 298.9% |
| Total | Mil. dozen | 407 | 327 | -80 | -19.6% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.43 | -0.32 | -6.7% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 543 | 507 | -36 | -6.6% |
| Retailer expenditure | Million $ | 986 | 921 | -65 | -6.6% |
| Consumer expenditure | Million $ | 2,077 | 2,633 | 556 | 26.8% |

124

**Table A3.8. Impacts of Proposed Shell Egg Regulations in 2022: 20% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 576 | 0 | -576 | -100.0% |
| Cage-free | Mil. dozen | 145 | 646 | 500 | 344.1% |
| Total | Mil. dozen | 721 | 646 | -75 | -10.5% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 317 | 0 | -317 | -100.0% |
| Cage-free | Mil. dozen | 80 | 355 | 275 | 344.1% |
| Total | Mil. dozen | 397 | 355 | -42 | -10.5% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.11 | -0.64 | -13.5% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 530 | 551 | 21 | 4.0% |
| Retailer expenditure | Million $ | 962 | 1,001 | 38 | 4.0% |
| Consumer expenditure | Million $ | 2,026 | 2,654 | 627 | 31.0% |

**Table A3.9. Impacts of Proposed Shell Egg Regulations in 2023: 20% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 590 | 0 | -590 | -100.0% |
| Cage-free | Mil. dozen | 149 | 606 | 457 | 306.8% |
| Total | Mil. dozen | 739 | 606 | -133 | -18.0% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 325 | 0 | -325 | -100.0% |
| Cage-free | Mil. dozen | 82 | 334 | 252 | 306.8% |
| Total | Mil. dozen | 407 | 334 | -73 | -18.0% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.11 | -0.64 | -13.5% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 543 | 517 | -26 | -4.7% |
| Retailer expenditure | Million $ | 986 | 940 | -47 | -4.7% |
| Consumer expenditure | Million $ | 2,077 | 2,491 | 414 | 20.0% |

**Table A3.10. Impacts of Lower-Cost Shell Egg Regulations in 2022: No Change in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 576 | 60 | -515 | -89.5% |
| Cage-free | Mil. dozen | 145 | 578 | 433 | 297.5% |
| Total | Mil. dozen | 721 | 638 | -83 | -11.5% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 317 | 33 | -284 | -89.5% |
| Cage-free | Mil. dozen | 80 | 318 | 238 | 297.5% |
| Total | Mil. dozen | 397 | 351 | -46 | -11.5% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | 1.28 | 0.00 | 0.0% |
| Retail price | $/dozen | 2.32 | 2.32 | 0.00 | 0.0% |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.75 | 0.00 | 0.0% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 530 | 536 | 6 | 1.1% |
| Retailer expenditure | Million $ | 962 | 973 | 11 | 1.1% |
| Consumer expenditure | Million $ | 2,026 | 2,886 | 859 | 42.4% |

**Table A3.11. Impacts of Lower-Cost Shell Egg Regulations in 2023: No Change in Absolute Farm-to-Retail Markup**

|  | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 590 | 62 | -528 | -89.5% |
| Cage-free | Mil. dozen | 149 | 537 | 388 | 260.4% |
| Total | Mil. dozen | 739 | 599 | -140 | -19.0% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 325 | 34 | -291 | -89.5% |
| Cage-free | Mil. dozen | 82 | 296 | 214 | 260.4% |
| Total | Mil. dozen | 407 | 330 | -77 | -19.0% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | 1.28 | 0.00 | 0.0% |
| Retail price | $/dozen | 2.32 | 2.32 | 0.00 | 0.0% |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.75 | 0.00 | 0.0% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 543 | 502 | -41 | -7.6% |
| Retailer expenditure | Million $ | 986 | 912 | -75 | -7.6% |
| Consumer expenditure | Million $ | 2,077 | 2,695 | 618 | 29.8% |

**Table A3.12. Impacts of Lower-Cost Shell Egg Regulations in 2022: 10% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 576 | 60 | -515 | -89.5% |
| Cage-free | Mil. dozen | 145 | 586 | 440 | 302.7% |
| Total | Mil. dozen | 721 | 646 | -75 | -10.4% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 317 | 33 | -284 | -89.5% |
| Cage-free | Mil. dozen | 80 | 322 | 242 | 302.7% |
| Total | Mil. dozen | 397 | 356 | -41 | -10.4% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | 1.28 | 0.00 | 0.0% |
| Retail price | $/dozen | 2.32 | 2.32 | 0.00 | 0.0% |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.43 | -0.32 | -6.7% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 530 | 542 | 12 | 2.4% |
| Retailer expenditure | Million $ | 962 | 985 | 23 | 2.4% |
| Consumer expenditure | Million $ | 2,026 | 2,734 | 708 | 34.9% |

**Table A3.13. Impacts of Lower-Cost Shell Egg Regulations in 2023: 10% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 590 | 62 | -528 | -89.5% |
| Cage-free | Mil. dozen | 149 | 548 | 399 | 267.5% |
| Total | Mil. dozen | 739 | 610 | -130 | -17.5% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 325 | 34 | -291 | -89.5% |
| Cage-free | Mil. dozen | 82 | 301 | 219 | 267.5% |
| Total | Mil. dozen | 407 | 336 | -71 | -17.5% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | 1.28 | 0.00 | 0.0% |
| Retail price | $/dozen | 2.32 | 2.32 | 0.00 | 0.0% |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.43 | -0.32 | -6.7% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 543 | 511 | -32 | -5.9% |
| Retailer expenditure | Million $ | 986 | 928 | -58 | -5.9% |
| Consumer expenditure | Million $ | 2,077 | 2,570 | 493 | 23.7% |

**Table A3.14. Impacts of Lower-Cost Shell Egg Regulations in 2022: 20% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 576 | 60 | -515 | -89.5% |
| Cage-free | Mil. dozen | 145 | 593 | 448 | 308.0% |
| Total | Mil. dozen | 721 | 654 | -68 | -9.4% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 317 | 33 | -284 | -89.5% |
| Cage-free | Mil. dozen | 80 | 327 | 246 | 308.0% |
| Total | Mil. dozen | 397 | 360 | -37 | -9.4% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | 1.28 | 0.00 | 0.0% |
| Retail price | $/dozen | 2.32 | 2.32 | 0.00 | 0.0% |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.11 | -0.64 | -13.5% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 530 | 549 | 19 | 3.6% |
| Retailer expenditure | Million $ | 962 | 997 | 34 | 3.6% |
| Consumer expenditure | Million $ | 2,026 | 2,578 | 552 | 27.2% |

**Table A3.15. Impacts of Lower-Cost Shell Egg Regulations in 2023: 20% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs in California | | | | | |
| Conventional | Mil. dozen | 590 | 62 | -528 | -89.5% |
| Cage-free | Mil. dozen | 149 | 558 | 409 | 274.6% |
| Total | Mil. dozen | 739 | 620 | -119 | -16.1% |
| Quantity produced of eggs in California | | | | | |
| Conventional | Mil. dozen | 325 | 34 | -291 | -89.5% |
| Cage-free | Mil. dozen | 82 | 307 | 225 | 274.6% |
| Total | Mil. dozen | 407 | 341 | -66 | -16.1% |
| Conventional egg prices in California | | | | | |
| Farm price | $/dozen | 1.28 | 1.28 | 0.00 | 0.0% |
| Retail price | $/dozen | 2.32 | 2.32 | 0.00 | 0.0% |
| Cage-free egg prices in California | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.11 | -0.64 | -13.5% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 543 | 520 | -23 | -4.2% |
| Retailer expenditure | Million $ | 986 | 945 | -42 | -4.2% |
| Consumer expenditure | Million $ | 2,077 | 2,438 | 361 | 17.4% |

**Table A3.16. Impacts of Higher-Cost Shell Egg Regulations in 2022: No Change in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs | | | | | |
| CA standard | Mil. dozen | 576 | 0 | -576 | -100.0% |
| Cage-free | Mil. dozen | 145 | 628 | 482 | 331.9% |
| Total | Mil. dozen | 721 | 628 | -93 | -12.9% |
| Quantity produced of eggs | | | | | |
| CA standard | Mil. dozen | 317 | 0 | -317 | -100.0% |
| Cage-free | Mil. dozen | 80 | 346 | 266 | 331.9% |
| Total | Mil. dozen | 397 | 346 | -51 | -12.9% |
| Conventional egg prices | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.78 | 0.03 | 0.7% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 530 | 536 | 6 | 1.1% |
| Retailer expenditure | Million $ | 962 | 973 | 11 | 1.1% |
| Consumer expenditure | Million $ | 2,026 | 3,003 | 976 | 48.2% |

**Table A3.17. Impacts of Higher-Cost Shell Egg Regulations in 2023: No Change in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs | | | | | |
| CA standard | Mil. dozen | 590 | 0 | -590 | -100.0% |
| Cage-free | Mil. dozen | 149 | 581 | 432 | 290.2% |
| Total | Mil. dozen | 739 | 581 | -158 | -21.3% |
| Quantity produced of eggs | | | | | |
| CA standard | Mil. dozen | 325 | 0 | -325 | -100.0% |
| Cage-free | Mil. dozen | 82 | 320 | 238 | 290.2% |
| Total | Mil. dozen | 407 | 320 | -87 | -21.3% |
| Conventional egg prices | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.78 | 0.03 | 0.7% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 543 | 496 | -47 | -8.6% |
| Retailer expenditure | Million $ | 986 | 901 | -85 | -8.6% |
| Consumer expenditure | Million $ | 2,077 | 2,781 | 704 | 33.9% |

**Table A3.18. Impacts of Higher-Cost Shell Egg Regulations in 2022: 10% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs | | | | | |
| CA standard | Mil. dozen | 576 | 0 | -576 | -100.0% |
| Cage-free | Mil. dozen | 145 | 636 | 491 | 337.7% |
| Total | Mil. dozen | 721 | 636 | -85 | -11.8% |
| Quantity produced of eggs | | | | | |
| CA standard | Mil. dozen | 317 | 0 | -317 | -100.0% |
| Cage-free | Mil. dozen | 80 | 350 | 270 | 337.7% |
| Total | Mil. dozen | 397 | 350 | -47 | -11.8% |
| Conventional egg prices | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.46 | -0.29 | -6.1% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 530 | 543 | 13 | 2.5% |
| Retailer expenditure | Million $ | 962 | 986 | 24 | 2.5% |
| Consumer expenditure | Million $ | 2,026 | 2,839 | 813 | 40.1% |

**Table A3.19. Impacts of Higher-Cost Shell Egg Regulations in 2023: 10% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs | | | | | |
| CA standard | Mil. dozen | 590 | 0 | -590 | -100.0% |
| Cage-free | Mil. dozen | 149 | 593 | 444 | 298.1% |
| Total | Mil. dozen | 739 | 593 | -146 | -19.7% |
| Quantity produced of eggs | | | | | |
| CA standard | Mil. dozen | 325 | 0 | -325 | -100.0% |
| Cage-free | Mil. dozen | 82 | 327 | 245 | 298.1% |
| Total | Mil. dozen | 407 | 327 | -80 | -19.7% |
| Conventional egg prices | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.46 | -0.29 | -6.1% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 543 | 506 | -37 | -6.8% |
| Retailer expenditure | Million $ | 986 | 920 | -67 | -6.8% |
| Consumer expenditure | Million $ | 2,077 | 2,647 | 570 | 27.4% |

136

**Table A3.20. Impacts of Higher-Cost Shell Egg Regulations in 2022: 20% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs | | | | | |
| CA standard | Mil. dozen | 576 | 0 | -576 | -100.0% |
| Cage-free | Mil. dozen | 145 | 645 | 499 | 343.5% |
| Total | Mil. dozen | 721 | 645 | -76 | -10.6% |
| Quantity produced of eggs | | | | | |
| CA standard | Mil. dozen | 317 | 0 | -317 | -100.0% |
| Cage-free | Mil. dozen | 80 | 355 | 275 | 343.5% |
| Total | Mil. dozen | 397 | 355 | -42 | -10.6% |
| Conventional egg prices | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.14 | -0.61 | -12.8% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 530 | 550 | 20 | 3.9% |
| Retailer expenditure | Million $ | 962 | 999 | 37 | 3.9% |
| Consumer expenditure | Million $ | 2,026 | 2,671 | 645 | 31.8% |

**Table A3.21. Impacts of Higher-Cost Shell Egg Regulations in 2023: 20% Decrease in Absolute Farm-to-Retail Markup**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed of eggs | | | | | |
| CA standard | Mil. dozen | 590 | 0 | -590 | -100.0% |
| Cage-free | Mil. dozen | 149 | 605 | 456 | 306.0% |
| Total | Mil. dozen | 739 | 605 | -134 | -18.1% |
| Quantity produced of eggs | | | | | |
| CA standard | Mil. dozen | 325 | 0 | -325 | -100.0% |
| Cage-free | Mil. dozen | 82 | 333 | 251 | 306.0% |
| Total | Mil. dozen | 407 | 333 | -74 | -18.1% |
| Conventional egg prices | | | | | |
| Farm price | $/dozen | 1.28 | not available | not applicable | not applicable |
| Retail price | $/dozen | 2.32 | not available | not applicable | not applicable |
| Cage-free egg prices | | | | | |
| Farm price | $/dozen | 1.55 | 1.55 | 0.00 | 0.0% |
| Retail price | $/dozen | 4.75 | 4.14 | -0.61 | -12.8% |
| Farm revenue, retailer expenditure, and consumer expenditure in California | | | | | |
| Farm revenue | Million $ | 543 | 516 | -27 | -4.9% |
| Retailer expenditure | Million $ | 986 | 938 | -49 | -4.9% |
| Consumer expenditure | Million $ | 2,077 | 2,506 | 429 | 20.7% |

**Appendix 4. Data and Economic Modelling on the Proposition 12 Proposed Regulations for Breeding Sows Supplying the California Market**

California Proposition 12 was passed in November 2018. According to Proposition 12, California businesses will be banned from engaging in the sale within California of whole pork meat that is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner.

CDFA proposed a set of regulations for implementing Proposition 12. This report focuses on the economic implications for Californian businesses and consumers of those regulations proposed by CDFA. To analyze the economic implications of the proposed regulations, we use a carefully calibrated simulation model.

In this appendix, we begin by describing the regulations proposed by CDFA. Second, we present a baseline that describes the California pork market if there were no proposed regulations. In the analysis, we use the baseline for comparison to the California market with the proposed regulations. Third, we explain the data and parameters used for the simulation model. Fourth, we describe the simulation model for analyzing the likely economic effects of the proposed regulations. Fifth, we report and discuss the simulation results.

**Regulations**

In this section, we describe the regulations proposed by CDFA. Besides the proposed package of regulations, CDFA considers two alternative packages of regulations for comparison with and evaluation of the proposed regulations: a package of lower-cost regulations and a package of higher-cost regulations. In this section, first, we describe the proposed regulations on pork supply to California. Second, we compare the two alternative packages of regulations with the proposed regulations. In this section, we focus on the regulations that directly relate to the analysis of this appendix, and we do not provide the full description of regulations proposed by CDFA.

*Proposed Regulations*

Under the proposed regulations, based on Prop 12 statute, neither the pork producer, nor pork handler shall knowingly sell or contract to sell whole pork meat for human consumption in the state if it is the product or offspring of a breeding sow that was confined in an enclosure that fails to comply with certain standards. The standards include "the enclosure shall not prevent a breeding pig from lying down, standing up, fully extending its limbs, or turning around freely" and "an enclosure shall provide a minimum of 24 square feet of usable floor space per pig."

Here "whole pork meat" means any uncooked cut of pork that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Here the word "uncooked" means not ready-to-eat in the condition sold, offered for sale, or otherwise distributed. In this appendix, for convenience, we define "other pork meat" as pork meat that does not satisfy the definition of "whole pork meat" under the corresponding regulations. Under the proposed regulations, based on Prop 12 statute, other pork meat includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than pork meat.

*Lower-Cost Regulations*

The lower-cost regulations differ from the proposed regulations in their exemption policy. That is, the lower-cost regulations exempt raw pork meat sold in California intended for further processing, preparation, or manufacturing into a combination food product or prepared meal.

*Higher-Cost Regulations*

First, under the higher-cost regulations, covered pork products include ground pork and their products. Hence, under the higher-cost regulations, "whole pork meat" includes ground pork. Second, under the higher-cost regulations, covered pork products are not exempted even when those products only move through California for sale in another state or country. Third, the higher-cost package requires "consumer facing labeling for all covered products or prepared foods containing a covered product allowing the end customer to scan a QR code and see record of Prop 12 animal confinement certification and traceability of product back to farm of origin."

**Baselines: Quantities and Prices of Pork in California if There Were No Regulations**

In this section, we use quantity and retail price data to describe the California pork market if there were no regulations proposed by CDFA. We use this counterfactual California pork market as a baseline in comparison to the California pork market with the proposed regulations. We discuss how we obtain baseline quantities and prices in the Data and Parameters section.

In this section, we provide two baselines. First, we provide one baseline when whole pork meat does not include ground pork. Second, we provide another baseline when whole pork meat includes ground pork. In the previous section, we describe three packages of regulations: proposed regulations, lower-cost regulations, and higher-cost regulations. The former definition of whole pork meat is for the proposed regulations and lower-cost regulations. The latter definition of whole pork meat is for the higher-cost regulations.

Table A4.1 reports the baseline quantities when whole pork meat does not include ground pork. In 2019, 2,094 million pounds of pork were consumed in California. About 58% (or 1,205 million pounds) of pork consumption was from whole pork meat, and the remaining 42% (or 889 million pounds) of pork consumption was from other pork meat. As defined in the previous section, here, other pork meat is pork meat that does not satisfy the definition of whole pork meat under Prop 12 statute. For example, other pork meat includes cooked pork and combination food products using pork meat as an ingredient.

Table A4.2 reports the baseline quantities when whole pork meat includes ground pork. Under the revised definition, in 2019, about 77% (or 1,618 million pounds) of pork consumption was from whole pork meat, and the remaining 23% (or 476 million pounds) of pork consumption was from other pork meat.

We assess that the quantities would change from 2019 to 2023, considering income and population variations in California. Specifically, we expect a substantial decrease in pork consumption in 2020 because of the effects of COVID-19. For more discussion, see *Quantity Consumed* in the following section.

Table A4.1 reports the baseline retail prices when whole pork meat does not include ground pork. In 2019, the average annual retail price was about $3.30 per pound for whole pork meat and $3.78 per pound for other pork meat.

Table A4.2 reports the baseline retail prices when whole pork meat includes ground pork. Retail prices of whole pork meat and other pork meat depend on the definition of whole pork meat. Specifically, under the revised definition, in 2019, the average annual retail price was about $3.35 per pound for whole pork meat and $4.00 per pound for other pork meat.

We expect that annual average retail prices would be stable through 2023 based on related data and pork industry information, although retail prices would vary within each year. For more discussion, see *Prices* in the following section.

**Table A4.1. Annual Quantities and Average Retail Prices of Pork in California When Whole Pork Meat Does Not Include Ground Pork, 2019 – 2023**

|  | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Quantity consumed of pork in California | | | | | | |
| Whole pork meat | Mil. lbs. | 1,205 | 1,149 | 1,137 | 1,145 | 1,159 |
| Other pork meat | Mil. lbs. | 889 | 847 | 838 | 844 | 854 |
| Total | Mil. lbs. | 2,094 | 1,996 | 1,975 | 1,989 | 2,013 |
| Retail prices in California | | | | | | |
| Whole pork meat | $/lb. | 3.30 | 3.30 | 3.30 | 3.30 | 3.30 |
| Other pork meat | $/lb. | 3.78 | 3.78 | 3.78 | 3.78 | 3.78 |

Note: Here "other pork meat" is defined as pork meat that does not satisfy the definition of "whole pork meat" under Prop 12 statute. For example, "other pork meat" includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than pork meat. For detailed calculation and sources, see the subsections *Quantities Consumed* and *Prices* in the text.

**Table A4.2. Annual Quantities and Average Retail Prices of Pork in California When Whole Pork Meat Includes Ground Pork, 2019 – 2023**

|  | Unit | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Quantity consumed of pork in California | | | | | | |
| Whole pork meat | Mil. lbs. | 1,618 | 1,543 | 1,526 | 1,537 | 1,556 |
| Other pork meat | Mil. lbs. | 476 | 454 | 449 | 452 | 457 |
| Total | Mil. lbs. | 2,094 | 1,996 | 1,975 | 1,989 | 2,013 |
| Retail prices in California | | | | | | |
| Whole pork meat | $/lb. | 3.35 | 3.35 | 3.35 | 3.35 | 3.35 |
| Other pork meat | $/lb. | 4.00 | 4.00 | 4.00 | 4.00 | 4.00 |

Note: Here "other pork meat" is defined as pork meat that does not satisfy the definition of "whole pork meat" under Prop 12 statute. For example, "other pork meat" includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than pork meat. For detailed calculations and sources, source see the subsections *Quantities Consumed* and *Prices* in the text.

**Data and Parameters**

In this section, we describe the data and parameters used in the simulation model.

*Quantity Consumed*

The CDFA regulations, and Prop 12 statute, require that no pork producer or pork handler shall knowingly sell or contract to sell whole pork meat for human consumption in the state if it is the product of a breeding pig that was confined in an enclosure that prevents a breeding pig from lying down, standing up, fully extending its limbs, or turning around freely or shall not provide a minimum of 24 square feet of usable floor space per pig.

Whole pork meat means any uncooked cut of pork that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Here the word, "uncooked" means not ready-to-eat in the condition sold, offered for sale, or otherwise distributed. As discussed in the previous section, for convenience, we use the term "other pork meat" to indicate pork meat that does not satisfy the definition of whole pork meat under the Prop 12 statute. For example, "other pork meat" includes cooked pork meat and combination food products that use pork meat as an ingredient. Although there are many pork products, for our research purposes it suffices to aggregate those products into two categories: whole pork meat and other pork meat.

143

We assess the total quantity consumed of all pork at about 1,989 million pounds in 2022 and 2,013 million pounds in 2023. The quantity estimates come from the following formula. We assess per capita consumption of pork in California at 52.4 pounds per Californian per year, using the corresponding U.S. value in 2019 (USDA ERS, 2020a). Given the 2019 value, we project per capita consumption of pork in 2022 and 2023 using income projection data, reported by California Department of Finance (DoF, 2020). Finally, multiplying by the CA population each year (DoF, 2020), we obtain the total quantity of all pork in 2022 and 2023.

Given the quantity estimates of all pork, we estimate quantities of whole pork meat and other pork meat. Notice that we consider two definitions of whole pork meat. Under the proposed regulations and the lower-cost regulations, whole pork meat does not include ground pork. However, under the higher-cost regulations, whole pork meat includes ground pork. Based on discussion with industry members, we assess the share of whole pork meat in pork consumption is about 58% when whole pork meat does not include ground pork and 77% when whole pork meat includes ground pork.

Under the definition that whole pork meat does not include ground pork, we assess the total quantity consumed of whole pork meat is about 1,145 million pounds in 2022 and 1,159 million pounds in 2023. We also assess the total quantity consumed of other pork meat is about 844 million pounds in 2022 and 854 million pounds of 2023.

Under the definition that whole pork meat includes ground pork, we assess the total quantity consumed of whole pork meat is about 1,537 million pounds in 2022 and 1,556 million pounds in 2023. We also assess the total quantity consumed of other pork meat is about 452 million pounds in 2022 and 457 million pounds of 2023.

*Prices*

The simulation model (we will see in the next section) needs data for hog prices, wholesale prices of whole pork meat and other pork meat, and retail prices of whole pork meat and other pork meat.

Based on the 2018 value in USDA ERS (2020b), we assess the average annual price per pound of hogs to be $0.79. Notice that the quantity unit is based on retail weight rather than hog weight. We assess that annual average hog prices will remain stable from 2018 to 2023, based on related data and discussion with pork industry members.

We assess the wholesale price of whole pork meat is $1.20 per pound and that of other pork meat is $1.68 per pound in 2022 and 2023, under the definition that whole pork meat does not include ground pork. We also assess the wholesale price of whole pork meat is $1.26 per pound and that of other pork meat is $1.91 per pound in 2022 and 2023, under the definition that whole pork meat includes ground pork. Notice that, as discussed above, under the proposed regulations and the lower-cost regulations, whole pork meat does not include ground pork. However, under the higher-cost regulations, whole pork meat includes ground pork.

We assess wholesale prices as follows: to our knowledge, there are no proper statistics for wholesale prices for whole pork meat and other pork meat separately, although the wholesale price of all pork is available from USDA ERS (2020b). Hence, we assume a reasonable relationship among wholesale prices of all pork, whole pork meat, and other pork meat, and we use the relationship to estimate the wholesale prices of whole pork meat and other pork meat, given the wholesale price of all pork (2018 value), as follows: first, we consider the wholesale price of all pork as an average of wholesale prices of whole pork meat and other pork meat, weighted by quantity shares. Second, we assume that the retail price is the sum of the corresponding wholesale price and the retailing costs. Third, we assume that the retailing costs per pound are identical between whole pork meat and other pork meat.

Notice that each of the three assumptions above can be expressed as an equation, which implies that we have a system of three equations with three unknowns (wholesale price of whole pork meat, wholesale price of other pork meat, and retailing costs per pound). Solving the system of equations, we obtain annual average wholesale prices for whole pork meat and other pork meat. We assess that annual average wholesale prices will remain stable in from 2018 to 2023, based on our review of related data and discussion with pork industry members.

145

We estimate the retail price for whole pork meat to be $3.30 per pound and for other pork meat to be $3.78 per pound when whole pork meat does not include ground pork under the proposed regulations. However, we estimate the price to be $3.35 per pound for whole pork meat and $4.00 per pound for other pork meat when whole pork meat includes ground pork under the higher-cost regulations. These prices are our current best estimates based on a review of USDA retail data and discussion with industry members. We assess that annual average retail prices will remain stable from 2018 to 2023.

**Table A4.3. Assessed Annual Quantities and Average Prices in the California Market in 2022 and 2023 if Whole Pork Meat Does Not Include Ground Pork**

|  | Unit | 2022 | 2023 |
|---|---|---|---|
| Quantity consumed in California |  |  |  |
| Whole pork meat | Million lbs. | 1,145 | 1,159 |
| Other pork meat | Million lbs. | 844 | 854 |
| Total | Million lbs. | 1,989 | 2,013 |
| Farm Price of Hogs | $/lb. | 0.79 | 0.79 |
| Wholesale prices in California |  |  |  |
| Whole pork meat | $/lb. | 1.20 | 1.20 |
| Other pork meat | $/lb. | 1.68 | 1.68 |
| Retail prices in California |  |  |  |
| Whole pork meat | $/lb. | 3.30 | 3.30 |
| Other pork meat | $/lb. | 3.78 | 3.78 |

Note: Under the proposed regulations and the lower-cost regulations, whole pork meat does not include ground pork. Here "other pork meat" is defined as pork meat that does not satisfy the definition of "whole pork meat" under Prop 12 statute. For example, "other pork meat" includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than pork meat. For detailed calculations and sources, see the subsections about quantities and prices in the text.

**Table A4.4. Assessed Annual Quantities and Average Prices in the California Market in 2022 and 2023 if Whole Pork Meat Includes Ground Pork**

|  | Unit | 2022 | 2023 |
|---|---|---|---|
| Quantity consumed in California |  |  |  |
| Whole pork meat | Million lbs. | 1,537 | 1,556 |
| Other pork meat | Million lbs. | 452 | 457 |
| Total | Million lbs. | 1,989 | 2,013 |
| Farm Price of Hogs | $/lb. | 0.79 | 0.79 |
| Wholesale prices in California |  |  |  |
| Whole pork meat | $/lb. | 1.26 | 1.26 |
| Other pork meat | $/lb. | 1.91 | 1.91 |
| Retail prices in California |  |  |  |
| Whole pork meat | $/lb. | 3.35 | 3.35 |
| Other pork meat | $/lb. | 4.00 | 4.00 |

Note: Under the higher-cost regulations, whole pork meat includes ground pork. Here "other pork meat" is defined as pork meat that does not satisfy the definition of "whole pork meat" under Prop 12 statute. For example, "other pork meat" includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than pork meat. For detailed calculations and sources, see the subsections about quantities and prices in the text.

*Farm Cost Increase*

According to the housing regulations, hog farms shall not prevent a breeding pig from lying down, standing up, fully extending its limbs, or turning around freely, which prevents hog farms from using gestation crates if offspring from those sows supply meat destined to the California market. Farrowing crates are still allowed to be used for breeding sow housing during the five days before expected farrowing date and while the sow is nursing piglets.  Hog farms must allow breeding pigs at least 24 square feet per pig of usable floor space and therefore hog farms may adopt a group housing system to meet housing regulations. Based on discussion with farmers and industry members, we assess that currently, most farms use gestation crates or allow about 20 square feet of usable floor space for group-housed breeding sows, and it would be costly to meet the Prop 12 requirements. In this sub-section, we describe how we assess farm cost increases that compliant farms would face on average.

To estimate farm cost increases owing to the housing regulations, we begin with capital recovery costs for converting operations. We assess the capital recovery costs at about 16% of the total cost of producing weanling pigs, based on USDA data (USDA, 2019) and the production cost

data from the Ontario Ministry of Agriculture, Food and Rural Affairs. To achieve an increase of usable floor space per sow from 20 to 24 square feet, facility costs per sow would rise by about 20%, accounting for a reduction of the number of sows in housing systems. Hence, we assess an increase in capital costs owing to the regulations of about 4% of the total cost of producing weanling pigs. Next, we assess an increase in feed cost per pig of approximately 6% of the total cost of producing weanling pigs, which is our best estimate after discussion with farmers and industry members. The increase in feed cost per pig would mainly come from higher sow mortality and less efficient breeding in new housing systems. Finally, we assess an increase in other costs of about 5% of the total cost of producing weanling pigs because of the need for more labor and health care per sow, which is our best estimate based on discussion with farmers and industry members. Combining all three components above, we obtain a 15% increase in total costs per weanling pig for converting housing systems. Using an average cost of about $33 per weanling pig, we obtain a cost increase of approximately $5 per weanling pig. Using an average retail weight of 160.8 pounds of pork per pig, we obtain a cost increase of about $0.03 per pound of pork (retail weight).

Hogs from compliant farms must be identified to assure that whole pork meat from compliant hogs can be segregated and labeled separately from whole pork meat from non-compliant hogs. We expect that such identification of compliant hogs would minimally affect farm production costs because there is little difference in housing and feeding between compliant and non-compliant hogs.

Overall, we assess the total additional costs to farms owing to the proposed regulations are about $0.03 per pound of pork (retail weight).

*Processing Cost Increase*

Because California accounts for only a small proportion of the total U.S. and Canada pork consumption, we expect that most processors would acquire and process both compliant and non-compliant hogs if processors acquire compliant hogs. These processors would have additional costs to assure that whole pork meat from compliant hogs can be sold in the California market. Given realities of pork processing in the industry, processors would need to segregate

and process compliant hogs in groups at different times from non-compliant hogs to assure that only compliant hogs are used in processing for whole pork meat destined to the California market.

The additional processing costs come from separating holding pens, having more complicated but less flexible schedules of processing, having time intervals between processing compliant hogs and processing non-compliant hogs, requiring more storage space for stocking compliant whole pork meat separately from other pork meat, and labeling and shipping compliant whole pork meat separately from other pork meat. Based on discussion with farmers and industry members, we estimate all additional processing costs are about $15 per compliant hog slaughtered. For comparison, see Sumner and Zuijdwijk (2019), who discuss segregation costs and implications in the context of Country of Origin Labeling.

This processing cost increase would apply to whole pork meat from the compliant hogs. We assess the total retail meat weight to be 160.8 pounds per hog (Pork Checkoff, 2017). If whole pork meat does not include ground pork (then 57.6% of retail meat is whole pork meat), the added processing cost is $15/93 = $0.16 per pound of a compliant hog. However, if whole pork meat includes ground pork (then 77.3% of retail meat is whole pork meat), the added processing cost is $15/124 = $0.12 per pound of a compliant hog. These costs add to the wholesale price of whole pork meat in California.

Besides additional processing costs for slaughtering hogs and producing pork products, we expect that extra costs would occur during handling and distributing pork products throughout the downstream of the pork supply chain. After discussions with industry members, we assess these additional costs through the downstream to be about $0.05 per pound of pork (retail weight).

Overall, we assess the total additional costs from farms to retail by the proposed regulations to be $0.21 per pound of pork (retail weight) if whole pork meat does not include ground pork and $0.17 per pound of pork (retail weight) if whole pork meat includes ground pork.

149

*Demand Elasticities*

The proposed regulations will raise production costs in the pork supply chain, and retailers would raise retail prices to reflect such additional production costs. In response to a higher pork price, consumers would give up pork consumption or substitute other meat products (beef and chicken, for example) for pork products. Such behavioral changes among consumers who face a price change by the proposed regulations are reflected in the model through own- and cross-price elasticities of demand for whole pork meat and other pork meat. For more discussion, see the modeling section below.

We assess elasticities for 2022 and 2023 to reflect that consumers would not be able to adjust fully to a price change by the proposed regulations in the first year of implementation (2022) but would be able to adjust to the price change in the second year of implementation (2023).

We also assess elasticities for two definitions of whole pork meat. Under the proposed regulations and the lower-cost regulations, whole pork meat does not include ground pork. However, under the higher-cost regulations, whole pork meat includes ground pork. We expect that whole pork meat demand would be less elastic when whole pork meat includes ground pork because consumers have fewer opportunities to substitutes for whole pork meat.

When whole pork meat does not include ground pork, first, for demand elasticities in 2022, we assess the own-price elasticity of demand for whole pork meat to be -0.45 and for other pork meat to be -0.47. We use 0.11 for the cross-price elasticity of demand for whole pork meat in response to other pork meat price changes. We also use 0.13 for the corresponding cross-price elasticity of demand for other pork meat in response to whole pork meat price changes. Second, for demand elasticities in 2023, we assess the own-price elasticity of demand for whole pork meat to be -0.9 and for other pork meat to be -0.94. We use 0.22 for the cross-price elasticity of demand for whole pork meat in response to other pork meat price changes. We also use 0.26 for the corresponding cross-price elasticity of demand for other pork meat in response to whole pork meat price changes.

When whole pork meat includes ground pork, first, for demand elasticities in 2022, we assess the own-price elasticity of demand for whole pork meat to be -0.4 and for other pork meat to be -0.51. We use 0.06 for the cross-price elasticity of demand for whole pork meat in response to other pork meat price changes. We also use 0.17 for the corresponding cross-price elasticity of demand for other pork meat in response to whole pork meat price changes. Second, for demand elasticities in 2023, we assess the own-price elasticity of demand for whole pork meat to be -0.8 and for other pork meat to be -1.02. We use 0.12 for the cross-price elasticity of demand for whole pork meat in response to other pork meat price changes. We also use 0.34 for the corresponding cross-price elasticity of demand for other pork meat in response to whole pork meat price changes.

We assess elasticities above as follows. First, we begin with an own-price elasticity of demand of -0.68 for all pork products from the study by Okrent and Alston (2011). The value of -0.68 is close to values used by Buhr (2005) and Wohlgenant and Haidacher (1989). Next, based on our review of the relevant literature, we assess the own-price elasticity of demand for whole pork meat to be about -0.9 if whole pork meat does not include ground pork. The demand for whole pork meat would be more elastic than that for all pork products because consumers could substitute between whole pork meat and other pork meat in response to a price change of whole pork meat. For other demand elasticities, we use a relationship among demand elasticities. According to consumer theory in economics, demand elasticities of individual goods can be characterized by the corresponding aggregate good's demand elasticity, the elasticity of substitution among individual goods, and revenue shares of individual goods. In our context, demand elasticities of whole pork meat and other pork meat can be characterized by demand for all pork products, the elasticity of substitution between whole pork meat and other pork meat, and the corresponding revenue shares. Given demand elasticities of all pork and whole pork meat and revenue shares calculated by price and quantity data, we obtain an own-price elasticity of -0.94 for other pork meat, a cross-price elasticity of 0.22 for whole pork meat in response to other pork meat price, and a cross-price elasticity of 0.26 for other pork meat in response to whole pork meat price if whole pork meat does not include ground pork.

We expect that the own-price elasticity of whole pork meat would become more elastic when whole pork meat includes ground pork because consumers would have fewer opportunities to substitute other pork meat for whole pork meat. To reflect the change in demand elasticity, we assess the own-price elasticity of whole pork meat to be -0.8 when whole pork meat includes ground pork. Similar to the procedure described in the previous paragraph, we obtain an own-price elasticity -1.02 for other pork meat, a cross-price elasticity of 0.12 for whole pork meat in response to other pork meat price, and a cross-price elasticity of 0.34 for other pork meat in response to whole pork meat price if whole pork meat does not include ground pork.

**Table A4.5. Parameters When Whole Pork Meat Does Not Include Ground Pork**

| Definition | Year | Value |
|---|---|---|
| Farm cost increase by the housing regulations | 2022 and 2023 | $0.03/lb. |
| Cost increase in processing whole pork meat by the regulations | 2022 and 2023 | $0.21/lb. |
| Own price elasticity of demand for whole pork meat | 2022 | -0.45 |
| Own price elasticity of demand for whole pork meat | 2023 | -0.9 |
| Cross price elasticity of demand for whole pork meat in response to other pork meat price changes | 2022 | 0.11 |
| Cross price elasticity of demand for whole pork meat in response to other pork meat price changes | 2023 | 0.22 |
| Own price elasticity of demand for other pork meat | 2022 | -0.47 |
| Own price elasticity of demand for other pork meat | 2023 | -0.94 |
| Cross price elasticity of demand for other pork meat in response to whole pork meat price changes | 2022 | 0.13 |
| Cross price elasticity of demand for other pork meat in response to whole pork meat price changes | 2023 | 0.26 |
| Price elasticity of compliant hog supply | 2022 | 4 |
| Price elasticity of compliant hog supply | 2023 | 9 |
| Elasticity of transformation at the processing stage between whole pork meat and other pork meat | 2022 and 2023 | 1 |

Note: Under the proposed regulations and the lower-cost regulations, whole pork meat does not include pork. Here "other pork meat" is defined as pork meat that does not satisfy the definition of "whole pork meat" under Prop 12 statute. For example, "other pork meat" includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hot dogs, or similar processed or prepared food products) that are comprised of more than pork meat. For detailed calculations and sources, see the subsections about farm cost increase, processing cost increase, demand elasticities, and supply elasticities in the text.

**Table A4.6. Parameters When Whole Pork Includes Ground Pork**

| Definition | Year | Value |
|---|---|---|
| Farm cost increase by the housing regulations | 2022 and 2023 | $0.03/lb. |
| Processing cost increase by the regulations | 2022 and 2023 | $0.17/lb. |
| Own price elasticity of demand for whole pork meat | 2022 | -0.4 |
| Own price elasticity of demand for whole pork meat | 2023 | -0.8 |
| Cross price elasticity of demand for whole pork meat in response to other pork meat price changes | 2022 | 0.06 |
| Cross price elasticity of demand for whole pork meat in response to other pork meat price changes | 2023 | 0.12 |
| Own price elasticity of demand for other pork meat | 2022 | -0.51 |
| Own price elasticity of demand for other pork meat | 2023 | -1.02 |
| Cross price elasticity of demand for other pork meat in response to whole pork meat price changes | 2022 | 0.17 |
| Cross price elasticity of demand for other pork meat in response to whole pork meat price changes | 2023 | 0.34 |
| Price elasticity of compliant hog supply | 2022 | 4 |
| Price elasticity of compliant hog supply | 2023 | 9 |
| Elasticity of transformation at the processing stage between whole pork meat and other pork meat | 2022 and 2023 | 1 |

Note: Under the higher-cost regulations, whole pork meat includes ground pork. Here other pork meat is defined as pork meat that does not satisfy the definition of whole pork meat under Prop 12 statute. For example, other pork meat includes cooked pork meat and combination food products (including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products) that are comprised of more than pork meat. For detailed calculations, interpretation and source see the subsections about farm cost increase, processing cost increase, demand elasticities, and supply elasticities in the text.

*Supply Elasticities*

To obtain the estimate of price elasticity of hogs whose pork is destined to the California market, first, we consider the price elasticity of supply of all hogs in North America (the United States and Canada). The price elasticity of hogs depends on the length of time that hog farms are allowed to adjust to a price change. As the time horizon is expanded, hog supply becomes more elastic because hog farms have more opportunities to adjust hog production to a price change. Second, we also consider that the supply of hogs whose pork is destined to the California market would be more elastic than the supply for all hogs in North America because California accounts for only a small proportion of the total quantity demanded of hogs in North America.

Combining two points in the previous paragraph, we assess the supply elasticity of hogs destined to the California market to be about 4 in 2022 and 9 in 2023. These assessed supply elasticities

are consistent with a range of estimates suggested and used by existing papers studying the pork industry in the literature of agricultural economics (for example, Lemieux and Wohlgenant, 1989; Wohlgenant, 1993; Brester, Marsh, and Atwood, 2004; Lusk and Anderson, 2004; Saitone, Sexton, and Sumner, 2015).

Pork processors produce whole pork meat and other pork meat using compliant hogs. In the model described in the following section, pork processors are allowed to adjust production proportions of whole pork meat in response to a relative price change of whole pork meat. We assume the elasticity of transformation between whole pork meat and other pork meat is 1.0. It is uncertain how much pork processors could adjust production proportions of whole pork meat when the regulations are implemented. However, we find the simulation results are robust to a range of changes in the elasticity of transformation, although we do not report those results in this appendix.

**Simulation Model for Analyzing the Likely Effects of Sow Housing Regulations**

We develop a simulation model for analyzing the likely effects of the regulations proposed by CDFA. The simulation model traces how the California market for pork adjusts to a new market equilibrium following the forthcoming proposed regulations. We characterize the market equilibrium using supply and demand functions of pork and market equilibrium conditions. We also characterize the housing restrictions of the proposed regulations as a farm cost increase and a processing cost increase in the pork supply chain.

Equation (A4.1) represents the supply of hogs that comply with the housing restrictions, written in a log-differential form:

$$\text{(A4.1)} \ d \ln Q_f^s = \epsilon \cdot \left( d \ln P_f - \kappa \right),$$

where the subscript $f$ denotes a relationship about farms, and the superscript $s$ denotes a relationship about supply. The variable $Q_f^s$ is the quantity supplied of compliant hogs, and $P_f$ is the farm price of compliant hogs. The quantity is converted to a per pound of pork basis (retail weight). The parameter $\epsilon$ is the price elasticity of compliant hog supply, and the parameter $\kappa$ is

154

the change in farm costs derived from allowing for 24 square feet per pig of usable floor space in terms of a percentage of the farm price.

Pork processors produce pork products from compliant hogs. Equation (A4.2) represents the supply of aggregate pork products. Equation (A4.3) represents a relationship between compliant hog price and the aggregate pork price:

$$(A4.2) \; d \ln Q_p^s = d \ln Q_f^d,$$
$$(A4.3) \; d \ln P_p = sh_f \cdot d \ln P_f.$$

The notations are consistent with those above. The subscript $p$ denotes pork processors (all intermediary agents between farms and retailers, including slaughter plants and further processors). The superscript $d$ denotes a demand relationship. The variable $Q_p^s$ is the quantity supplied of aggregate pork products (retail weight equivalent), and $Q_f^d$ is the quantity demanded for compliant hogs (retail weight equivalent). The variable $P_p$ is the price of aggregate pork products. The term $sh_f$ is the share of hog price in the aggregate pork price.

Pork processors usually produce multiple pork products. Although multiple pork products are produced, for our research purposes, it suffices to aggregate those products into two categories such as whole pork meat and other pork meat because the proposed regulations restrict sales of only whole pork meat along the pork supply chain. Hence, in modeling, pork processors are assumed to produce whole pork meat and other pork meat, given compliant hogs. Equation (A4.4) represents the supply of whole pork meat, and Equation (A4.5) represents the supply of other pork meat from slaughtered compliant hogs. Equation (A4.6) represents a relationship among prices of slaughtered hog carcass, whole pork meat, and other pork meat.

$$(A4.4) \; d \ln Q_p^{F,s} = d \ln Q_p^d + \sigma \cdot \left( d \ln P_p^F - d \ln P_p \right),$$
$$(A4.5) \; d \ln Q_p^{N,s} = d \ln Q_p^d + \sigma \cdot \left( d \ln P_p^N - d \ln P_p \right),$$
$$(A4.6) \; d \ln P_p = sh_{rev}^F \cdot d \ln P_p^F + sh_{rev}^N \cdot d \ln P_p^N.$$

The superscript $F$ denotes whole pork meat, and $N$ denotes other pork meat. The variable $Q_p^{F,S}$ is the quantity supplied of whole pork meat, and $Q_p^{N,S}$ is the quantity supplied of other pork meat from processors. The variable $P_p^F$ is the wholesale price of whole pork meat, and $P_p^N$ is the wholesale price of other pork meat. The variable $Q_p^d$ is the quantity demanded of processors for aggregate pork. The term $sh_{rev}^F$ is the share of whole pork meat in total revenue, and $sh_{rev}^N$ is the corresponding share of other pork meat. The parameter $\sigma$ is the elasticity of transformation between whole pork meat and other pork meat.

Although pork processors can reorganize proportions of whole pork meat and other pork meat produced, we expect that these two types of products are not perfectly transformable into each other because of at least two reasons. First, processing facilities for whole pork meat differ from those for other pork meat, and it would be costly to transform different types of facilities into each other. Second, characteristics differ across parts of a hog carcass, and some parts would be more appropriate for whole pork meat than other pork meat (or more appropriate for other pork meat than whole pork meat). Such imperfect transformation between whole pork meat and other pork meat is represented by the elasticity of transformation parameter, $\sigma$, in Equations (A4.4) and (A4.5) above. For simplicity, we assume a constant elasticity (specifically, 1) of transformation within a reasonable production range. Before the housing restrictions are implemented, it is uncertain how flexibly pork processors may adjust production proportions of whole pork meat and other pork meat in response to the effects of the regulations. However, we find the simulation results are robust to a range of changes in elasticity of transformation, although we do not report those results in this appendix.

We expect that whole pork meat from compliant hogs would be provided only within California because (a) it is costly to comply with the housing restrictions, and (b) there is little evidence that consumers would be willing to pay more for compliant whole pork meat than non-compliant whole pork meat. Formally, Equation (A4.7) represents the demand for compliant whole pork meat:

$$(A4.7) \quad d \ln Q_p^{F,d} = d \ln Q_r^{F,s}.$$

The notations are consistent with those above. The variable $Q_p^{F,d}$ is the quantity demanded for compliant whole pork meat, and $Q_r^{F,s}$ is the quantity supplied of whole pork meat at retail and food service in California. For simplicity, we assume no loss at the retailing stage.

Contrary to the case of compliant whole pork meat, we expect that a substantial proportion of other pork meat from compliant hogs would be provided outside California. As mentioned above, because of imperfect transformation in processing between whole pork meat and other pork meat, at least a substantial proportion of hog carcass from a compliant hog must be used for other pork meat. Also, the proposed regulations will not restrict sales in California of other pork meat from non-compliant hogs if that other pork meat is made outside California. Because there is little evidence that final consumers are willing to pay more for other pork meat (for example, cooked pork) from compliant hogs than those from non-compliant hogs, retailers would not differentiate other pork meat in terms of compliant hogs or non-compliant hogs. Hence, we expect that other pork meat would be distributed across the United States regardless of whether other pork meat comes from compliant hogs, which implies that a proportion of other pork meat from compliant hogs would be supplied outside California.

As mentioned above, pork production costs would rise because the housing restrictions would raise hog production costs and, sequentially, would raise the farm price of hogs. In addition to a higher hog price, we expect that the proposed regulations would raise pork processing costs for compliance (See *Processing Cost Increase* above).

Processors would attempt to transfer costs to retailers by raising pork prices. However, we expect that compliant pork processors would hardly raise other pork meat price because (a) California accounts for only a small proportion of the U.S. total other pork meat consumption and (b) there is little evidence that consumers would be willing to pay more for compliant other pork meat than non-compliant one. In modeling, for simplicity, we assume that the wholesale price of other pork meat would not change, which is written as $d \ln P_p^N = 0$. Hence, pork processors would transfer those production costs increments by raising only wholesale price of whole pork meat.

Formally, Equation (A4.8) represents the relationship between retail price and wholesale price of whole pork meat. Equation (A4.9) is the corresponding one of other pork meat:

$$(A4.8) \; d \ln P_r^F = s^F \cdot \left( d \ln P_p^F + \gamma \right),$$
$$(A4.9) \; d \ln P_r^N = s^N \cdot d \ln P_p^N = 0.$$

The notations are consistent with those above. The variable $P_p^F$ is the wholesale price of whole pork meat and $P_r^F$ is the wholesale price of other pork meat at retail and food service. The price paid by consumers at restaurants and other food service is an implicit price that reflects the cost of a meal and is unobservable. We assume that (a) the cost of pork as an ingredient is equivalent to the corresponding retail pork price, and (b) consumers' response to pork price changes is identical at retail and food service. The term $s^F$ is the share of the wholesale price of whole pork meat in the corresponding retail price. The term $s^N$ is the share of the wholesale price of other pork meat in the corresponding retail price. The parameter $\gamma$ represents the production costs increments in processing by the proposed regulations, written as a percentage change in the wholesale price.

Equation (A4.9) represents the demand for whole pork meat at retail and food service, while Equation (A4.10) represents the demand for other pork meat at retail and food service in California:

$$(A4.9) \; d \ln Q_r^{F,d} = \eta^F \cdot d \ln P_r^F + \eta^{FN} \cdot d \ln P_r^N,$$
$$(A4.10) \; d \ln Q_r^{N,d} = \eta^N \cdot d \ln P_r^N + \eta^{NF} \cdot d \ln P_r^F.$$

The notations are consistent with those above. The variable $Q_r^{F,d}$ is the quantity demanded for whole pork meat, and $Q_r^{N,d}$ is the quantity demanded for other pork meat at retail and food service in California. The variable $P_r^F$ is the retail price of whole pork meat, and $P_r^N$ is the retail price of other pork meat in California. The parameter $\eta^F$ is the own-price elasticity of demand for whole pork meat. The parameter $\eta^N$ is the own-price elasticity of demand for other pork meat. The parameter $\eta^{FN}$ is the cross-price elasticity of demand for whole pork meat in response

to other pork meat price changes. The parameter $\eta^{NF}$ is the cross-price elasticity of demand for other pork meat in response to whole pork meat price changes.

Combining the relations above and market clearing conditions, we determine the market equilibrium displacement of prices and quantities when the proposed regulations are implemented. Given the equilibrium displacement in market prices and quantities, we can measure changes in producer revenues and consumer expenditures.

**Simulation Results**

In this section, we simulate the likely effects of the regulations proposed by CDFA for implementing Proposition 12.

For the simulations, we look at the effects of the regulations for two specific years: 2022 and 2023. We provide simulation results for 2022 and 2023 because producers and consumers would have different opportunities to adjust to the proposed regulations. In 2022, the first year of implementation, producers would have fewer opportunities to adjust to the proposed regulations. Similarly, one year would not be long enough for consumers to adjust fully to a substantially higher price for pork consumption. However, in 2023, the second year of implementation, producers and consumers would have more opportunities to adjust to the proposed regulations. To consider such potential differences in behaviors of producers and consumers, we provide simulation results separately for 2022 and 2023.

Besides the proposed regulations, CDFA considers two alternative packages of regulations: a package of lower-cost regulations and a package of higher-cost regulations. We simulate the effects of other packages after we discuss the effects of the proposed regulations.

*Proposed Regulations*

Under the proposed regulations, neither the pork producer nor pork handler shall knowingly sell or contract to sell whole pork meat for human consumption in the state if it is the product of a breeding pig that was confined in an enclosure that fails to comply with certain standards. The standards include "the enclosure shall not prevent a breeding pig from lying down, standing up,

159

fully extending its limbs, or turning around freely" and "an enclosure shall provide a minimum of 24 square feet of usable floor space per pig." Here "whole pork meat" means any uncooked cut of pork, excluding ground pork, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Here the word, "uncooked" means not ready-to-eat in the condition sold, offered for sale, or otherwise distributed.

As discussed above, we assess $0.03 per pound of farm cost increase and $0.21 of whole pork meat processing cost increase owing to these regulations (See the subsections *Farm Cost Increase* and *Processing Cost Increase* above).

Table A4.7 reports the likely effects of the proposed regulations in 2022. The quantity consumed of whole pork meat falls (by -3.3%), and the retail price of whole pork meat rises by 7.4% due to the proposed regulations. However, the quantity consumed of other pork meat slightly rises by 1.0% due to the proposed regulations because consumers substitute other pork meat for whole pork meat in response to the price increase of whole pork meat. As discussed in the modeling section above, the prices of other pork meat would not change because California accounts for only a small proportion of the total U.S. market and the prices of other pork meat would be determined by supplies from other regions unaffected by the regulations.

The changes in whole pork meat dominate the changes in other pork meat, so, in terms of all pork, the quantity consumed falls due to the regulations. These changes in quantities and prices result in an 8.5% increase in retailer and food service expenditure in California and a 2.5% increase in consumer expenditure in California.

We assess that the proposed regulations would barely affect hog production in California, because the hog farming industry is very small. Most pork products consumed in California come from hogs raised outside of California. In California, the small hog farming industry is specialized to serve certain specific pockets of demand. Therefore, we expect that the proposed regulations will have minimal effects on the California small hog farming industry.

Table A4.8 reports the likely effects of the proposed regulations in 2023. Consumers now have more opportunities to reduce whole pork meat consumption in response to higher whole pork prices from the proposed regulations. Specifically, the quantity consumed of whole pork meat falls by 6.7%, and the retail price of whole pork meat rises by 7.5%. The changes in whole pork meat dominate the changes in other pork meat, so, in terms of all pork, the quantity consumed falls due to the regulations. These changes in quantities and prices result in a 7.3% increase in retailer and food service expenditure in California and a 1.2% increase in consumer expenditure in California.

As discussed in the subsections *Farm Cost Increase* and *Processing Cost Increase* above, we assess that the proposed regulations raise farm cost by $0.03 per pound of a hog (retail weight) and raise processing costs by $0.21 per pound of whole pork meat. Although these estimates are our best ones after reviewing related data and discussion with industry members, it is uncertain how much farm costs would increase before regulations are implemented.

Hence, we consider two more cases: first, we consider the case that the regulation-driven farm cost increase is realized at $0.04 per pound of a hog (retail weight) rather than our best estimate ($0.04 per pound of a hog, retail weight). In percentage terms, $0.04 per pound of a hog is a 33% higher farm cost increase than our best estimate ($0.03 per pound of a hog, retail weight). Tables A4.9 and A4.10 report the simulation results. Table A4.9 is for 2022, and Table A4.10 is for 2023. The changes in directions for quantities and prices are the same as the simulation results under our best estimate of the farm cost increase, but Californians consume less whole pork meat. Specifically, consumer expenditure now rises by about 2.6% (or $184 million) in 2022 and 1.2% (or $87 million) in 2023. The increase in consumer expenditure is smaller in 2023 because consumers have more opportunities to adjust to price changes.

Second, we consider the case that the regulation-driven processing cost increase is realized at $0.28 per pound of whole pork meat rather than our best estimate ($0.21 per pound of whole pork meat). In percentage terms, $0.28 per pound of whole pork meat is a 33% higher processing cost increase than our best estimate ($0.21 per pound of whole pork meat). Tables A4.11 and A4.12 report the simulation results. Table A4.11 is for 2022, and Table A4.12 is for 2023. The

changes in directions for quantities and prices are the same as the simulation results under our best estimate of the farm cost increase, but the magnitudes change. Specifically, consumer expenditure now rises by about 3.2% (or $220 million) in 2022 and 1.4% (or $100 million) in 2023. The increase in consumer expenditure is smaller in 2023 because consumers have more opportunities to adjust to price changes.

*Lower-Cost Regulations*

From the proposed regulations, the lower-cost regulations differ in the exemption policy. That is, the lower-cost regulations exempt raw pork meat sold in California intended for further processing, preparation or manufacturing into a combination food product or prepared meal. Hence, under the change in the definition of covered pork products, the lower-cost regulations would affect the sales of whole pork meat at retail (grocery stores) rather than at food service. For simplicity, we assume that changes at retail would rarely affect food service.

To reflect the lower-cost regulations, we need the share of food service in quantity consumed of whole pork meat and that of other pork meat. We obtain the share of food service in pork consumption, from USDA ERS (Lin et al., 2016), and we assess the share of food service in whole pork meat consumption at 24% and that in other pork meat at 19%.

Table A4.13 reports the simulation results in 2022 under the lower-cost regulations. The retail price of whole pork meat rises by 7.4% at grocery stores due to the lower-cost regulations. As a result, the quantity consumed of whole pork meat (at grocery stores and food service, in total) falls by 2.5%. The changes in directions for quantities and prices are the same as those of the proposed regulations, but the change magnitudes (absolute values) are smaller. Changes in quantities and prices result in a 6.5% increase in retailer and food service expenditure in California and a 2.1% increase in consumer expenditure in California.

Table A4.14 reports the simulation results in 2023 under the lower-cost regulations. The retail price of whole pork meat rises by 7.5% at groceries due to the lower-cost regulations. As a result, the quantity consumed of whole pork meat (at groceries and food service, in total) falls by 5.1%. The changes in directions for quantities and prices are the same as those of the proposed

regulations, but the changes in magnitudes (absolute values) are smaller. Changes in quantities and prices result in a 5.4% increase in retailer and food service expenditure in California and a 0.8% increase in consumer expenditure in California.

As we did in the previous subsection (*Proposed Regulations*), we additionally provide simulation results when the regulation-driven farm cost increase is realized at $0.04 per pound of a hog (retail weight) rather than our best estimate ($0.03 per pound of a hog, retail weight). In percentage terms, $0.04 per pound of a hog is a 33% higher farm cost increase than our best estimate ($0.03 per pound of a hog, retail weight). Tables A4.15 and A4.16 report the simulation results. Table A4.15 is for 2022, and Table A4.16 is for 2023. The changes in directions for quantities and prices are the same as the simulation results under our best estimate of the farm cost increase, but Californians consume less whole pork meat.

As we did in the previous subsection (*Proposed Regulations*), we provide simulation results when the regulation-driven processing cost increase is realized at $0.28 per pound of whole pork meat rather than our best estimate ($0.21 per pound of whole pork meat). In percentage terms, $0.28 per pound of whole pork meat is a 33% higher processing cost increase than our best estimate ($0.21 per pound of whole pork meat). Tables A4.17 and A4.18 report the simulation results. Table A4.17 is for 2022, and Table A4.18 is for 2023. The changes in directions for quantities and prices are the same as the simulation results under our best estimate of the processing cost increase, but Californians consume less whole pork meat.

*Higher-Cost Regulations*

From the proposed regulations, the first difference under higher-cost regulations is that now covered pork products include ground pork and their products. Because of this difference, whole pork meat now accounts for about 77.3% (from 57.6% before) in total consumption. As discussed in the modeling section above, pork processors transfer production cost increments through raising only whole pork meat. Hence, the quantity increase of whole pork meat results in a lower processing cost increase in terms of per quantity unit basis (from $0.21 to $0.17 per pound of whole pork meat).

163

The second difference is that, under the higher-cost regulations, covered pork products are not exempted even when those products only move through California for sale in another state or country. We understand that some pork may come to California to be redistributed to other regions, and one main channel would be exports to other countries through California ports. In 2019, pork product exports through California ports were about $2.44 billion (or about 822 thousand metric tons), which is equivalent to about 85% of the total California retailer expenditure on pork products in terms of value.

Pork exporters facing the higher-cost regulations would have two likely strategies. The first strategy would be to comply with California rules. For pork exporters who decide to comply with California rules, exporting costs would increase substantially. The second strategy would be to divert exports from California ports to ports in other west coast U.S. states. We expect that pork exporters would be much more likely to choose the second strategy (diverting to other ports) in order to avoid the substantially higher costs of complying with California regulations versus neighboring states' regulations.

Although pork product exports through California may change under the higher-cost regulations, we expect that the export change would minimally affect pork distribution within California. By diverting exports to other west-coast ports, pork exporters could face a small change in exporting costs, which would result in minimal changes to the retail pork distribution market in California. Hence, we do not include the effects of the higher-cost regulations on retail pork distribution in California.

The third difference is that the higher-cost package requires "consumer facing labeling for all covered products or prepared foods containing a covered product allowing the end customer to scan a QR code and see record of Prop 12 animal confinement certification and traceability of product back to farm of origin." For such labeling, certification, and traceability, we assess all aggregate costs through the supply chain to be about a 1% increase in retail price.

Table A4.19 reports the simulation results in 2022 under the higher-cost regulations. The quantity consumed of whole pork meat falls (by 2.8%), and the retail price of whole pork meat

rises (by 6.9%) owing to the production cost increases from the regulations. The changes in directions for quantities and prices are the same as the case of the proposed regulations, while the changes in magnitudes (absolute values) increase. Changes in quantities and prices result in a 9.1% increase in retailer and food service expenditure in California and a 3.2% increase in consumer expenditure in California.

Table A4.20 reports the simulation results in 2023 under the higher-cost regulations. The quantity consumed of whole pork meat falls (by 5.6%), and the retail price of whole pork meat rises (by 7.0%) owing to the production cost increases from the regulations. The changes in directions for quantities and prices are the same as the case of the proposed regulations, while the changes in magnitudes (absolute values) increase. Changes in quantities and prices result in a 7.3% increase in retailer and food service expenditure in California and a 1.4% increase in consumer expenditure in California.

As we did in the previous subsection (*Proposed Regulations*), we additionally provide simulation results when the regulation-driven farm cost increase is realized at $0.04 per pound of a hog (retail weight) rather than our best estimate ($0.03 per pound of a hog, retail weight). In percentage terms, $0.04 per pound of a hog is a 33% higher farm cost increase than our best estimate ($0.03 per pound of a hog, retail weight). Tables A4.21 and A4.22 report the simulation results. Table A4.21 is for 2022, and Table A4.22 is for 2023. The changes in directions for quantities and prices are the same as the simulation results under our best estimate of the farm cost increase, but Californians consume less whole pork meat.

As we did in the previous subsection (*Proposed Regulations*) we also provide simulation results when the regulation-driven processing cost increase is realized at $0.23 per pound of whole pork meat rather than our best estimate ($0.17 per pound of whole pork meat). In percentage terms, $0.23 per pound of pork is a 33% higher processing cost increase than our best estimate ($0.17 per pound of pork). Tables A4.23 and A4.24 report the simulation results. Table A4.23 is for 2022, and Table A4.24 is for 2023. The changes in directions for quantities and prices are the same as the simulation results under our best estimate of processing cost increase, but Californians consume less whole pork meat.

165

**Table A4.7. Impacts of Proposed Pork Regulations in 2022**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,145 | 1,107 | -38 | -3.3% |
| Other pork meat | Million lbs. | 844 | 852 | 8 | 1.0% |
| Total | Million lbs. | 1,989 | 1,959 | -30 | -1.5% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.20 | 1.44 | 0.24 | 20.3% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.30 | 3.54 | 0.24 | 7.4% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,793 | 3,030 | 237 | 8.5% |
| Consumer expenditure | Million $ | 6,964 | 7,138 | 174 | 2.5% |

**Table A4.8. Impacts of Proposed Pork Regulations in 2023**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,159 | 1,081 | -78 | -6.7% |
| Other pork meat | Million lbs. | 854 | 874 | 20 | 2.3% |
| Total | Million lbs. | 2,013 | 1,955 | -58 | -2.9% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.20 | 1.45 | 0.25 | 20.5% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.30 | 3.55 | 0.25 | 7.5% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,827 | 3,032 | 206 | 7.3% |
| Consumer expenditure | Million $ | 7,048 | 7,131 | 83 | 1.2% |

**Table A4.9. Impacts of Proposed Pork Regulations in 2022: 33% Higher Farm Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,145 | 1,105 | -40 | -3.5% |
| Other pork meat | Million lbs. | 844 | 853 | 9 | 1.0% |
| Total | Million lbs. | 1,989 | 1,958 | -32 | -1.6% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.20 | 1.46 | 0.26 | 21.4% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.30 | 3.55 | 0.26 | 7.8% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,793 | 3,043 | 250 | 8.9% |
| Consumer expenditure | Million $ | 6,964 | 7,148 | 184 | 2.6% |

Note. Table A4.7 reports the corresponding simulation results under our best estimate of farm cost increase.

**Table A4.10. Impacts of Proposed Pork Regulations in 2023: 33% Higher Farm Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,159 | 1,076 | -82 | -7.1% |
| Other pork meat | Million lbs. | 854 | 875 | 21 | 2.4% |
| Total | Million lbs. | 2,013 | 1,952 | -62 | -3.1% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.20 | 1.46 | 0.26 | 21.7% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.30 | 3.56 | 0.26 | 7.9% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,827 | 3,043 | 216 | 7.7% |
| Consumer expenditure | Million $ | 7,048 | 7,135 | 87 | 1.2% |

Note. Table A4.8 reports the corresponding simulation results under our best estimate of farm cost increase.

**Table A4.11. Impacts of Proposed Pork Regulations in 2022: 33% Higher Processing Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,145 | 1,097 | -49 | -4.2% |
| Other pork meat | Million lbs. | 844 | 855 | 10 | 1.2% |
| Total | Million lbs. | 1,989 | 1,951 | -38 | -1.9% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.20 | 1.51 | 0.31 | 25.9% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.30 | 3.61 | 0.31 | 9.4% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,793 | 3,093 | 300 | 10.7% |
| Consumer expenditure | Million $ | 6,964 | 7,184 | 220 | 3.2% |

Note. Table A4.7 reports the corresponding simulation results under our best estimate of farm cost increase.

170

**Table A4.12. Impacts of Proposed Pork Regulations in 2023: 33% Higher Processing Cost Increase by Regulations than Our Best Estimate**

|  | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,159 | 1,060 | -99 | -8.6% |
| Other pork meat | Million lbs. | 854 | 879 | 25 | 2.9% |
| Total | Million lbs. | 2,013 | 1,939 | -74 | -3.7% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.20 | 1.51 | 0.31 | 26.1% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.30 | 3.61 | 0.31 | 9.5% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,827 | 3,082 | 255 | 9.0% |
| Consumer expenditure | Million $ | 7,048 | 7,147 | 100 | 1.4% |

Note. Table A4.8 reports the corresponding simulation results under our best estimate of farm cost increase.

**Table A4.13. Impacts of Lower-Cost Pork Regulations in 2022**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,145 | 1,116 | -29 | -2.5% |
| Other pork meat | Million lbs. | 844 | 850 | 6 | 0.7% |
| Total | Million lbs. | 1,989 | 1,967 | -23 | -1.1% |
| Wholesale prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 1.20 | 1.44 | 0.24 | 20.3% |
| Whole pork meat at food service | $/lb. | 1.20 | 1.20 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 3.30 | 3.54 | 0.24 | 7.4% |
| Whole pork meat at food service | $/lb. | 3.30 | 3.30 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,793 | 2,974 | 181 | 6.5% |
| Consumer expenditure | Million $ | 6,964 | 7,097 | 133 | 1.9% |

**Table A4.14. Impacts of Lower-Cost Pork Regulations in 2023**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,159 | 1,100 | -59 | -5.1% |
| Other pork meat | Million lbs. | 854 | 867 | 13 | 1.5% |
| Total | Million lbs. | 2,013 | 1,966 | -47 | -2.3% |
| Wholesale prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 1.20 | 1.45 | 0.25 | 20.6% |
| Whole pork meat at food service | $/lb. | 1.20 | 1.20 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 3.30 | 3.54 | 0.25 | 7.5% |
| Whole pork meat at food service | $/lb. | 3.30 | 3.30 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,827 | 2,979 | 153 | 5.4% |
| Consumer expenditure | Million $ | 7,048 | 7,103 | 55 | 0.8% |

**Table A4.15. Impacts of Lower-Cost Pork Regulations in 2022: 33% Higher Farm Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,145 | 1,115 | -31 | -2.7% |
| Other pork meat | Million lbs. | 844 | 851 | 7 | 0.8% |
| Total | Million lbs. | 1,989 | 1,965 | -24 | -1.2% |
| Wholesale prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 1.20 | 1.46 | 0.26 | 21.5% |
| Whole pork meat at food service | $/lb. | 1.20 | 1.20 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 3.30 | 3.55 | 0.26 | 7.8% |
| Whole pork meat at food service | $/lb. | 3.30 | 3.30 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,793 | 2,984 | 191 | 6.8% |
| Consumer expenditure | Million $ | 6,964 | 7,104 | 140 | 2.0% |

Note. Table A4.13 reports the corresponding simulation results under our best estimate of farm cost increase.

174

**Table A4.16. Impacts of Lower-Cost Pork Regulations in 2023: 33% Higher Farm Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,159 | 1,096 | -63 | -5.4% |
| Other pork meat | Million lbs. | 854 | 868 | 13 | 1.6% |
| Total | Million lbs. | 2,013 | 1,964 | -50 | -2.5% |
| Wholesale prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 1.20 | 1.46 | 0.26 | 21.8% |
| Whole pork meat at food service | $/lb. | 1.20 | 1.20 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 3.30 | 3.56 | 0.26 | 7.9% |
| Whole pork meat at food service | $/lb. | 3.30 | 3.30 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,827 | 2,988 | 161 | 5.7% |
| Consumer expenditure | Million $ | 7,048 | 7,105 | 57 | 0.8% |

Note. Table A4.14 reports the corresponding simulation results under our best estimate of farm cost increase.

**Table A4.17. Impacts of Lower-Cost Pork Regulations in 2022: 33% Higher Processing Cost Increase by Regulations than Our Best Estimate**

|  | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,145 | 1,108 | -37 | -3.2% |
| Other pork meat | Million lbs. | 844 | 852 | 8 | 0.9% |
| Total | Million lbs. | 1,989 | 1,960 | -29 | -1.5% |
| Wholesale prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 1.20 | 1.51 | 0.31 | 25.9% |
| Whole pork meat at food service | $/lb. | 1.20 | 1.20 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 3.30 | 3.61 | 0.31 | 9.4% |
| Whole pork meat at food service | $/lb. | 3.30 | 3.30 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,793 | 3,021 | 228 | 8.2% |
| Consumer expenditure | Million $ | 6,964 | 7,131 | 167 | 2.4% |

Note. Table A4.13 reports the corresponding simulation results under our best estimate of farm cost increase.

**Table A4.18. Impacts of Lower-Cost Pork Regulations in 2023: 33% Higher Processing Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,159 | 1,083 | -76 | -6.5% |
| Other pork meat | Million lbs. | 854 | 870 | 16 | 1.9% |
| Total | Million lbs. | 2,013 | 1,954 | -60 | -3.0% |
| Wholesale prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 1.20 | 1.51 | 0.31 | 26.2% |
| Whole pork meat at food service | $/lb. | 1.20 | 1.20 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 1.68 | 1.68 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat at groceries | $/lb. | 3.30 | 3.61 | 0.31 | 9.5% |
| Whole pork meat at food service | $/lb. | 3.30 | 3.30 | 0.00 | 0.0% |
| Other pork meat | $/lb. | 3.78 | 3.78 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,827 | 3,016 | 190 | 6.7% |
| Consumer expenditure | Million $ | 7,048 | 7,112 | 65 | 0.9% |

Note. Table A4.14 reports the corresponding simulation results under our best estimate of farm cost increase.

177

**Table A4.19. Impacts of Higher-Cost Pork Regulations in 2022**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,537 | 1,495 | -43 | -2.8% |
| Other pork meat | Million lbs. | 452 | 457 | 5 | 1.2% |
| Total | Million lbs. | 1,989 | 1,952 | -37 | -1.9% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.26 | 1.45 | 0.20 | 15.8% |
| Other pork meat | $/lb. | 1.91 | 1.91 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.35 | 3.59 | 0.23 | 6.9% |
| Other pork meat | $/lb. | 4.00 | 4.00 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,793 | 3,046 | 253 | 9.1% |
| Consumer expenditure | Million $ | 6,964 | 7,189 | 225 | 3.2% |

**Table A4.20. Impacts of Higher-Cost Pork Regulations in 2023**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,556 | 1,469 | -87 | -5.6% |
| Other pork meat | Million lbs. | 457 | 468 | 11 | 2.4% |
| Total | Million lbs. | 2,013 | 1,938 | -76 | -3.8% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.26 | 1.46 | 0.20 | 15.9% |
| Other pork meat | $/lb. | 1.91 | 1.91 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.35 | 3.59 | 0.23 | 7.0% |
| Other pork meat | $/lb. | 4.00 | 4.00 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,827 | 3,032 | 205 | 7.3% |
| Consumer expenditure | Million $ | 7,048 | 7,144 | 96 | 1.4% |

179

**Table A4.21. Impacts of Higher-Cost Pork Regulations in 2022: 33% Higher Farm Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,537 | 1,493 | -45 | -2.9% |
| Other pork meat | Million lbs. | 452 | 458 | 6 | 1.2% |
| Total | Million lbs. | 1,989 | 1,950 | -39 | -2.0% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.26 | 1.47 | 0.21 | 16.7% |
| Other pork meat | $/lb. | 1.91 | 1.91 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.35 | 3.60 | 0.24 | 7.2% |
| Other pork meat | $/lb. | 4.00 | 4.00 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,793 | 3,060 | 267 | 9.6% |
| Consumer expenditure | Million $ | 6,964 | 7,200 | 236 | 3.4% |

Note. Table A4.19 reports the corresponding simulation results under our best estimate of farm cost increase.

**Table A4.22. Impacts of Higher-Cost Pork Regulations in 2023: 33% Higher Farm Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,556 | 1,465 | -91 | -5.8% |
| Other pork meat | Million lbs. | 457 | 469 | 11 | 2.5% |
| Total | Million lbs. | 2,013 | 1,934 | -79 | -3.9% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.26 | 1.47 | 0.21 | 16.8% |
| Other pork meat | $/lb. | 1.91 | 1.91 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.35 | 3.60 | 0.24 | 7.3% |
| Other pork meat | $/lb. | 4.00 | 4.00 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,827 | 3,044 | 217 | 7.7% |
| Consumer expenditure | Million $ | 7,048 | 7,147 | 100 | 1.4% |

Note. Table A4.20 reports the corresponding simulation results under our best estimate of farm cost increase.

**Table A4.23. Impacts of Higher-Cost Pork Regulations in 2022: 33% Higher Processing Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,537 | 1,485 | -53 | -3.4% |
| Other pork meat | Million lbs. | 452 | 459 | 7 | 1.5% |
| Total | Million lbs. | 1,989 | 1,943 | -46 | -2.3% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.26 | 1.51 | 0.25 | 20.2% |
| Other pork meat | $/lb. | 1.91 | 1.91 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.35 | 3.64 | 0.29 | 8.6% |
| Other pork meat | $/lb. | 4.00 | 4.00 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,793 | 3,116 | 323 | 11.6% |
| Consumer expenditure | Million $ | 6,964 | 7,240 | 276 | 4.0% |

Note. Table A4.19 reports the corresponding simulation results under our best estimate of farm cost increase.

**Table A4.24. Impacts of Higher-Cost Pork Regulations in 2023: 33% Higher Processing Cost Increase by Regulations than Our Best Estimate**

| | Unit | Without regulations | With regulations | Change (level) | Change (%) |
|---|---|---|---|---|---|
| Quantity consumed in California | | | | | |
| Whole pork meat | Million lbs. | 1,556 | 1,449 | -107 | -6.9% |
| Other pork meat | Million lbs. | 457 | 471 | 13 | 2.9% |
| Total | Million lbs. | 2,013 | 1,920 | -94 | -4.7% |
| Wholesale prices in California | | | | | |
| Whole pork meat | $/lb. | 1.26 | 1.51 | 0.25 | 20.3% |
| Other pork meat | $/lb. | 1.91 | 1.91 | 0.00 | 0.0% |
| Retail prices in California | | | | | |
| Whole pork meat | $/lb. | 3.35 | 3.64 | 0.29 | 8.6% |
| Other pork meat | $/lb. | 4.00 | 4.00 | 0.00 | 0.0% |
| Retail expenditure and consumer expenditure in California | | | | | |
| Retail expenditure | Million $ | 2,827 | 3,087 | 260 | 9.2% |
| Consumer expenditure | Million $ | 7,048 | 7,160 | 113 | 1.6% |

Note. Table A4.20 reports the corresponding simulation results under our best estimate of farm cost increase.

## Appendix 5. Economy-wide Impact of the Proposed Regulations Using IMPLAN

### Modeling and Measuring the Economic Linkages and Contributions

This SRIA utilizes well-known input-output (I-O) analysis to quantify the potential economic impacts of Proposition-12-related regulations on the included animal protein product industries in California. I-O analysis is the most common and straightforward methodology for estimating the effects of an economic event occurring on a set of sectors over the entire economy of a region. I-O analysis uses quantitative data of an economic event affecting, in this case the California shell-egg, veal and pork industries, to determine how this external shock interacts with the other industries, sectors and institutions (such as households and government) within a region's economy. The methodology accounts for the array of economic transactions between each industry and other sectors of the economy, and the magnitude of impact these transactions have on the rest of the economy.

I-O analysis is useful because of its ability to reach beyond the direct economic effects of an external economic event, in this case Proposition 12, over included animal protein producing sectors, and incorporates the ripple effects that occur within California's economy. I-O models trace the effects of an industry to the economy and account for economy-wide responses to changes in industry output that may be caused by any sort of influence such as regulatory change, a shift in production technology and methods, or other quantitative changes in sector's output demand.

The ripple effects within I-O analysis are computed as multipliers and reflect the magnitude of an impact in the economy from a unit change in output from an industry. In this report, multipliers identify the interdependence between the included animal protein product industries in California and other parts of the California economy. By employing a series of fixed ratios from the I-O model, it is possible to create a set of multipliers that quantify a range of economic impacts from industry output to the number of jobs supported, income paid to labor, and state GDP, for example.

184

**Four types of multipliers by economic measures**

For the California animal protein product industries regulated under Proposition 12, our analysis focuses on four multipliers for specific economic measures namely; (1) value of output (measured by sales revenue), (2) labor income, (3) total value added to state GDP, and (4) employment or the number of jobs supported. Each of these measures has a specific technical definition.

The value of output multiplier constitutes the base multiplier from which all other multipliers are derived (IMPLAN 2020). The value of output is comprised by the product between the unit price and a number of units produced. And its multiplier represents the overall increase of value of output in the economy as a result of an increase in the output of a target sector, which is the sector that experiences the economic event or external shock. Such sectors, in this study would be egg, pork and veal production. For example, an increase in value of shell-egg output by California egg farms is comprised of either an increase in on-farm egg production at the farm price, an increase in the farm price for the quantity produced, or both. Likewise, changes in the value of output for egg-processing plants is comprised of the prices of processed products multiplied by the quantities of each product manufactured, where the prices of produced products are affected by the costs of inputs including eggs from the farm. A limitation of the value of output measure for the California animal protein industries is the potential for double counting the value of farm production by California farms. Obviously, the output value of processed animal protein products includes the value of commodities purchased from California farms along with the value of all other inputs used in manufacturing animal protein products.

The labor income to sector output ratio provides the ratio of what is paid out as compensation to a) hired labor, b) contracted labor and c) earnings of business proprietors, to total value of output. The employment income multiplier represents the share of output value earned by labor and management employed in an industry, whether hired employees or owner-operators. The labor income multiplier indicates the amount of labor expenses in the entire economy as a result of each dollar spent on labor income in the target sector, namely shell eggs, pork and veal.

Value added is that portion of output value not used to purchase inputs from other sectors of the economy. In the case of California animal protein industries, purchased inputs include feed, equipment or veterinary services. That means value added is the output value that is contributed by the workers and capital within the industries above the value of what is purchased and therefore contributed by other sectors. The animal protein industries' value added is its economic contribution above the cost of goods and services that were purchased from other sectors and were therefore already measured as the outputs of those sectors. For example, this methodology recognizes that hogs purchased from farms is the major input cost item for pork processors. So, when measuring the value added contribution of processing we must "net-out" the value of the hogs purchased (and other purchases such as equipment and packaging materials) before assigning the value that was added in the processing stage. Value added is an industry's contribution to the size of the California economy, with no double counting of output that is transferred from one link of the supply chain to the next. The value added to value of output ratio provides the share of sector output that is value added. The value-added multiplier is the amount supported (or generated) of value added for every dollar spent in the target sector(s).

The employment direct multiplier estimates the number of jobs in an industry per million dollars in value of output.  It includes all jobs and does not distinguish between part-time or seasonal employment within an industry. These jobs include business owners and family members who share in entrepreneurial income as well as full-time and part-time hired workers and contracted workers. The employment total multiplier provides the number of jobs supported (or generated) in the economy as a result of one additional job in the target sectors.

**Direct, Indirect and Induced Effects**

Besides using data to establish the four categories of multipliers described, I-O analysis classifies economy-wide impacts for each of the multipliers as direct, indirect or induced. Each of these concepts apply to each industry and to each of the four categories of multipliers described above.

Direct impacts are changes in economic measures that occur directly within the industry being examined. For example, when California shell-egg gross output (sales) rises by $1 million, the direct effect is to add $1 million to the value of output for the state's economy. When a pork

186

processing plant adds a shift of another 200 workers, the direct employment effect is 200 jobs, that is the direct multipliers are 1.0 for each category.

Indirect impacts are the changes that occur through purchases of input goods and services from supporting industries. For example, if hog farms produce more hogs, farms also likely buy more feed, use more electricity and hire additional hauling services. For the industries that sell to hog farms, these impacts cause increases in output, jobs, worker compensation and value added. Then each of these industries all buy more goods and services from yet further sectors and so forth. Our economy-wide data set has quantitative measures of all these relationships, as the effects of purchases ripple through the California economy.

Induced impacts measure changes in the economy caused by changes in consumption expenditures that result from changes in labor income in the California animal protein industry and supporting industries. The induced impacts are considered a second-round effect, and measure how each other industry is affected by added consumption purchases by people earning additional income caused by the direct and indirect effects. For example, egg, pork or veal producers that receive a higher price may pay employees higher wages or offer more work hours. These workers, including the entrepreneur, spend some of their added incomes at local grocery stores, barbershops, car dealers and so on. These local firms have workers of their own who may also earn more and spend their additional income on goods and services. Workers also pay more taxes and provide more support for government services such as schools. Thus, as with indirect effects, the induced effects from egg, hog and veal economic activity ripple through the whole economy of California.

Total impacts are the sum of direct, indirect and induced impacts. These apply to all four multipliers types: value of output, labor income, value added and employment. Box 5.1 concisely defines each of the multipliers measured and the classification of impacts across the economy.

I-O modeling and analysis is not without limitations. Like all economic modeling, the I-O model used to produce this report represents an abstraction of the real world and depends upon assumptions that may be imperfect. Furthermore, the accuracy of results and analysis hinges on

the reliability of the raw data used to model economic activity. The I-O modeling system used for this report is IMPLAN (IMpact analysis for PLANning), originally developed by the USDA Forest Service. Using multiple data sources, the IMPLAN group develops a comprehensive model of the U.S economy and the economies of each U.S. state, county and other geographic and political boundaries. Although the IMPLAN group provides a valuable tool for conducting economic impact assessment and provides good insight on the U.S. national economy, the representation of specific industries in smaller, more localized geographic areas within the IMPLAN database is challenging. To increase the accuracy of modeling specific industries in specific locations IMPLAN allows users to modify the model with locally available data to better represent the industry and geographic region under study.

**Economy-wide Impacts of the Proposed Regulations and Alternatives**

Impacts for eggs are assessed by applying multipliers in Table 5.1 of the main SRIA to the simulation results above in Appendix Chapters 1.

We also assess the economy-wide impact of reduced exports of pork in the high cost regulations on jobs and economic activity in California ports.

Other economy-wide impacts from changes in cost of veal and pork produced outside California are limited. They are assessed by recognizing that higher retail revenue is offset by payments for wholesale product shipped into California. Moreover, higher costs to consumers for pork and veal are offset by lower expenditures on other food. This indirect consumer impact is beyond the scope of our economy-wide assessment. Overall food expenditures will be roughly unchanged and could result in slightly lower expenditures but higher quantities purchase of food other than pork and veal. We note that more than half of substitute meats, such as beef, are also shipped into California from other states.

**Box 5.1. Using Input-Output Models to Measure
Economy-wide Impacts and Contributions**

Input-output models link the magnitude of changes in an industry or segment of the economy to the associated changes in all the other industries and institutions such as households and government throughout the economy. Moreover, income generated by this economic expansion will be spent on other services from groceries to new cars to schoolteachers. Input-output models and the associated data on economic linkages in the economy provide the tools and information to quantify these impacts as "multiplier effects" without leaving out impacts or double counting. Impacts are generally classified as direct, indirect and induced effects.

**Direct Effects**: Direct effects are impacts directly within the affected industry. For example, hiring 10 workers to feed hogs has a direct employment effect of 10 jobs.

**Indirect Effects:** Indirect effects are the changes in industries outside the directly affected industry through purchases from supporting industries of input goods and services. For example, producing more hogs may entail purchase of additional feed, buying more transport services, and these input suppliers have purchases of their own that ripple further.

**Induced Effects:**  Induced effects are economic ripples that result from added consumption generated by the added income spent by those with income from the direct and indirect effects. For example, pork processor employees spend their incomes at local grocery stores, auto dealerships and barbershops and these local firms have workers whose expenditures ripple further, creating additional economic activity.  The sum of direct, indirect and induced impacts comprises the full impact or contribution of an industry on the California economy. We report the contributions using four economic measures.

**Value of Output**: The value of direct output or service contribution of an industry or segment. For example, the direct value of dairy farm output is simply the market value of milk produced and for milk processors it is the total market value for the dairy products they sell.

**Labor Income:** The compensation received by hired employees, contract workers and entrepreneurs (owner-operators) who work in an industry.

**Value Added:** Value added is the measure of salaries and wages, proprietor income and profit minus business taxes. It is that proportion of value of output contributed by labor and capital within the sector. An industry's value added is the economic contribution of a sector above the cost of goods and services purchased from other sectors. Value added is the industry's contribution to the size of the California economy.

**Employment:** Employment is defined as the number of jobs including part-time or seasonal employment. This includes self-employment and unpaid family workers.

**Appendix 6. Text of Proposition 12**

**Health and Safety Code - HSC DIVISION 20. MISCELLANEOUS HEALTH AND SAFETY PROVISIONS [24000 -26250] (Division 20 enacted by Stats. 1939, Ch. 60.) CHAPTER 13.8. Farm Animal Cruelty [25990 -25994] (Chapter 13.8 added November 4, 2008, by initiative Proposition 2, Sec. 3.)**

Section 25990. Prohibitions. In addition to other applicable provisions of law:

(a) A farm owner or operator within the state shall not knowingly cause any covered animal to be confined in a cruel manner.

(b) A business owner or operator shall not knowingly engage in the sale within the state of any of the following:

(1) Whole veal meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner.

(2) Whole pork meat that the business owner or operator knows or should know is the meat of a covered animal who was confined in a cruel manner, or is the meat of immediate offspring of a covered animal who was confined in a cruel manner.

(3) Shell egg that the business owner or operator knows or should know is the product of a covered animal who was confined in a cruel manner.

(4) Liquid eggs that the business owner or operator knows or should know are the product of a covered animal who was confined in a cruel manner. (Amended November 6, 2018, by initiative Proposition 12, Sec. 3. Effective December 19, 2018.)

Section 25991. Definitions. For the purposes of this chapter, the following terms have the following meanings:

(a) "Breeding pig" means any female pig of the porcine species kept for the purpose of commercial breeding who is six months or older or pregnant.

(b) "Business owner or operator" means any person who owns or controls the operations of a business.

(c) "Cage-free housing system" means an indoor or outdoor controlled environment for egg-laying hens within which hens are free to roam unrestricted; are provided enrichments that allow them to exhibit natural behaviors, including, at a minimum, scratch areas, perches, nest boxes, and dust bathing areas; and within which farm employees can provide care while standing within the hens' usable floorspace. Cage-free housing systems include, to the extent they comply with the requirements of this subdivision, the following:

(1) Multitiered aviaries, in which hens have access to multiple elevated platforms that provide hens with usable floorspace both on top of and underneath the platforms.

(2) Partially slatted systems, in which hens have access to elevated flat platforms under which manure drops through the flooring to a pit or litter removal belt below.

(3) Single-level all-litter floor systems bedded with litter, in which hens have limited or no access to elevated flat platforms.

(4) Any future systems that comply with the requirements of this subdivision.

(d) "Calf raised for veal" means any calf of the bovine species kept for the purpose of producing the food product described as veal.

(e) "Confined in a cruel manner" means any one of the following acts:

(1) Confining a covered animal in a manner that prevents the animal from lying down, standing up, fully extending the animal's limbs, or turning around freely.

(2) After December 31, 2019, confining a calf raised for veal with less than 43 square feet of usable floorspace per calf.

(3) After December 31, 2021, confining a breeding pig with less than 24 square feet of usable floorspace per pig.

(4) After December 31, 2019, confining an egg-laying hen with less than 144 square inches of usable floorspace per hen.

(5) After December 31, 2021, confining an egg-laying hen with less than the amount of usable floorspace per hen required by the 2017 edition of the United Egg Producers' Animal Husbandry

Guidelines for U.S. Egg-Laying Flocks: Guidelines for Cage-Free Housing or in an enclosure other than a cage-free housing system.

(f) "Covered animal" means any calf raised for veal, breeding pig, or egg-laying hen who is kept on a farm.

(g) "Egg-laying hen" means any female domesticated chicken, turkey, duck, goose, or guineafowl kept for the purpose of egg production.

(h) "Enclosure" means a structure used to confine a covered animal or animals.

(i) "Farm" means the land, building, support facilities, and other equipment that are wholly or partially used for the commercial production of animals or animal products used for food or fiber; and does not include live animal markets, establishments at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.), or official plants at which mandatory inspection is maintained under the federal Egg Products Inspection Act (21 U.S.C. Sec. 1031 et seq.).

(j) "Farm owner or operator" means any person who owns or controls the operations of a farm.

(k) "Fully extending the animal's limbs" means fully extending all limbs without touching the side of an enclosure, or another animal.

(l) "Liquid eggs" means eggs of an egg-laying hen broken from the shells, intended for human food, with the yolks and whites in their natural proportions, or with the yolks and whites separated, mixed, or mixed and strained. Liquid eggs do not include combination food products, including pancake mixes, cake mixes, cookies, pizzas, cookie dough, ice cream, or similar processed or prepared food products, that are comprised of more than liquid eggs, sugar, salt, water, seasoning, coloring, flavoring, preservatives, stabilizers, and similar food additives.

(m) "Person" means any individual, firm, partnership, joint venture, association, limited liability company, corporation, estate, trust, receiver, or syndicate.

(n) "Pork meat" means meat, as defined in Section 900 of Title 3 of the California Code of Regulations as of August 2017, of a pig of the porcine species, intended for use as human food.

(o) "Sale" means a commercial sale by a business that sells any item covered by this chapter, but does not include any sale undertaken at an establishment at which mandatory inspection is provided under the Federal Meat Inspection Act (21 U.S.C. Sec. 601 et seq.), or any sale undertaken at an official plant at which mandatory inspection is maintained under the federal Egg Products Inspection Act (21 U.S.C. Sec. 1031 et seq.). For purposes of this section, a sale shall be deemed to occur at the location where the buyer takes physical possession of an item covered by Section 25990.

(p) "Shell egg" means a whole egg of an egg-laying hen in its shell form, intended for use as human food.

(q) "Turning around freely" means turning in a complete circle without any impediment, including a tether, and without touching the side of an enclosure or another animal.

(r) "Uncooked" means requiring cooking prior to human consumption.

(s) "Usable floorspace" means the total square footage of floorspace provided to each covered animal, as calculated by dividing the total square footage of floorspace provided to the animals in an enclosure by the number of animals in that enclosure. In the case of egg-laying hens, usable floorspace shall include both groundspace and elevated level flat platforms upon which hens can roost, but shall not include perches or ramps.

(t) "Veal meat" means meat, as defined in Section 900 of Title 3 of the California Code of Regulations as of August 2017, of a calf raised for veal intended for use as human food.

(u) "Whole pork meat" means any uncooked **cut** of pork, including bacon, ham, chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet, that is comprised entirely of pork meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Whole pork meat does not include combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products, that are comprised of more than pork meat, seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives.

(v) "Whole veal meat" means any uncooked cut of veal, including chop, ribs, riblet, loin, shank, leg, roast, brisket, steak, sirloin, or cutlet, that is comprised entirely of veal meat, except for seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. Whole veal meat does not include combination food products, including soups, sandwiches, pizzas, hotdogs, or similar processed or prepared food products, that are comprised of more than veal meat, seasoning, curing agents, coloring, flavoring, preservatives, and similar meat additives. (Amended November 6, 2018, by initiative Proposition 12, Sec. 4. Effective December 19, 2018.)

Section 25992. Exceptions. This chapter shall not apply:

(a) During medical research.

(b) During examination, testing, individual treatment, or operation for veterinary purposes.

(c) During transportation.

(d) During rodeo exhibitions, state or county fair exhibitions, 4-H programs, and similar exhibitions.

(e) During the slaughter of a covered animal in accordance with the provisions of Chapter 6 (commencing with Section 19501) of Part 3 of Division 9 of the Food and Agricultural Code, relating to humane methods of slaughter, and other applicable law and regulations.

(f) To a breeding pig during the five-day period prior to the breeding pig's expected date of giving birth, and any day that the breeding pig is nursing piglets.

(g) During temporary periods for animal husbandry purposes for no more than six hours in any 24-hour period, and no more than 24 hours total in any 30-day period. (Amended November 6, 2018, by initiative Proposition 12, Sec. 5. Effective December 19, 2018.)

Section 25993. Enforcement.

(a) The Department of Food and Agriculture and the State Department of Public Health shall jointly promulgate rules and regulations for the implementation of this act by September 1, 2019.

(b) Any person who violates any of the provisions of this chapter is guilty of a misdemeanor, and upon conviction thereof shall be punished by a fine not to exceed one thousand dollars ($1,000) or by imprisonment in the county jail for a period not to exceed 180 days or by both such fine and imprisonment. In addition, a violation of subdivision (b) of Section 25990 constitutes unfair competition, as defined in Section 17200 of the Business and Professions Code, and is punishable as prescribed in Chapter 5 (commencing with Section 17200) of Part 2 of Division 7 of the Business and Professions Code.

(c) The provisions of this chapter relating to cruel confinement of covered animals and sale of products shall supersede any conflicting regulations, including conflicting regulations in Chapter 6 (commencing with Section 40601) of Subdivision 6 of Division 2 of Title 22 of the California Code of Regulations. (Amended November 6, 2018, by initiative Proposition 12, Sec. 6. Effective December 19, 2018.)

Section 25993.1.

It shall be a defense to any action to enforce subdivision (b) of Section 25990 that a business owner or operator relied in good faith upon a written certification by the supplier that the whole veal meat, whole pork meat, shell egg, or liquid eggs at issue was not derived from a covered

animal who was confined in a cruel manner, or from the immediate offspring of a breeding pig who was confined in a cruel manner. (Added November 6, 2018, by initiative Proposition 12, Sec. 7. Effective December 19, 2018.)

Section 25994. Construction of Chapter.

The provisions of this chapter are in addition to, and not in lieu of, any other laws protecting animal welfare, including the California Penal Code. This chapter shall not be construed to limit any state law or regulations protecting the welfare of animals, nor shall anything in this chapter prevent a local governing body from adopting and enforcing its own animal welfare laws and regulations. (Added November 4, 2008, by initiative Proposition 2, Sec. 3. Operative January 1, 2015, by Sec. 5 of Prop. 2.)

## References

Agriculture and Agri-Food Canada. 2019. *Red Meat and Livestock Slaughter Reports*. Government of Canada. Available at: http://www.agr.gc.ca/eng/industry-markets-and-trade/canadian-agri-food-sector-intelligence/red-meat-and-livestock/red-meat-and-livestock-market-information/slaughter/?id=1415860000003.

American Health Board. (AEB). (2020). Thinking About Converting from Shell Eggs to Liquid or Dried Eggs? https://www.aeb.org/food-manufacturers/formulations/conversion-liquid-dried-eggs.

American Veal Association (AVA). 2019. *AVA Updates.* Available from: http://www.americanveal.com/ava-policies/tag/California.

Brester, G. W., J. M. Marsh, and J. A. Atwood. 2004. Distributional Impacts of Country-of-Origin Labeling in the U.S. Meat Industry. Journal of Agricultural and Resource Economics, 29(2), 206-227.

Buhr, B. 2005. U.S. Pork, Beef, and Chicken Sector Economic Simulation Model with International Trade and Probability-Based Sensitivity Analysis. Report prepared for the National Pork Board.

California Department of Finance. (DoF). 2020. *State Population Projections*. Projections. Available at: http://www.dof.ca.gov/forecasting/demographics/projections/.

California Department of Food and Agriculture (CDFA ESQM). 2019. Egg Safety and Quality Management Program Annual Report. https://www.cdfa.ca.gov/AHFSS/mpes/pdfs/ESQM_AnnualReport_FY18-19.pdf.

California Department of Food and Agriculture (CDFA). 2018. California Agricultural Statistics Review, 2017-2018. https://www.cdfa.ca.gov/statistics/PDFs/2017-18AgReport.pdf

Canada, Statistics Canada. 2019. *Trade Data Online*. Available at: https://www.ic.gc.ca/eic/site/tdo-dcd.nsf/eng/Home.

Capps Jr, O. 1989. Utilizing Scanner Data to Estimate Retail Demand Functions for Meat Products. *American journal of agricultural Economics*, *71*(3), 750-760.

ERS. USDA. 2019. *Livestock and Poultry Slaughter*. Available at: https://www.ers.usda.gov/data-products/livestock-meat-domestic-data/.

ERS. USDA. 2019. *Meat Price Spreads*. Available at: https://www.ers.usda.gov/data-products/meat-price-spreads/.

Heien, D., & Pompelli, G. 1988. The Demand for Beef Products: Cross-Section Estimation of Demographic and Economic Effects. *Western Journal of Agricultural Economics*, 37-44.

Ibarburu, M. (2019). U.S. Egg Costs of Production and Prices. Egg Industry Center. October 4, 2019. https://www.eggindustrycenter.org/browse/files/categories/26b2be3f446d4e56b0c72b587c4058ee.

IMPLAN Group, LLC. 2020. "IMPLAN 2018 data and application." Huntersville, NC. Available at: http://implan.com. Accessed June 2020.

Lemieux, C., and M. Wohlgenant. 1989. ""Ex Ante" Evaluation of the Economic Impact of Agricultural Biotechnology: The Case of Porcine Somatotropin." *American Journal of Agricultural Economics* 71(4): 903-914.

Lin, B-H., T. D. Anekwe, J. C. Buzby, and J. T. Bentley. 2016. *U.S. Food Commodity Availability by Food Source, 1994-2008*. ERR-221. U.S. Department of Agriculture, Economic Research Service. December 2016. Additional In-hands Data from Authors.

Lusk, J. L. 2020. Meat and egg prices following the COVID-19 outbreak. *Jayson Lusk Food and Agricultural Economist*. April 7, 2020. Available at: http://jaysonlusk.com/blog/2020/4/5/food-sales-and-prices-following-covid-19-outbreak

Lusk, J. L. 2017. Consumer Research With Big Data: Applications from the Food Demand Survey (FooDS). *American Journal of Agricultural Economics*, *99*(2), 303-320.

Lusk, J. L., and J. D. Anderson. 2004. Effects of Country-of-Origin Labeling on Meat Producers and Consumers. Journal of Agricultural and Resource Economics, 29(2), 185-205.

Lusk, J. L., & Tonsor, G. T. 2016. How meat demand elasticities vary with price, income, and product category. *Applied Economic Perspectives and Policy*, *38*(4), 673-711.

Malone, T., and J. L. Lusk. 2016. Putting the Chicken Before the Egg Price: An *Ex Post* Analysis of California's Battery Cage Ban. *Journal of Agricultural and Resource Economics,* 41(3), 518-532.

Matthews, W. A., and D. A. Sumner. 2015. Effects of Housing System on the Costs of Commercial Egg Production. *Poultry Science* 94: 552-557.

Mullally, C., and J. L. Lusk. 2018. The Impact of Farm Animal Housing Restrictions on Egg Prices, Consumer Welfare, and Production in California. *American Journal of Agricultural Economics,* 100(3), 649-669.

National Health and Nutrition Examination Survey. (USDA ARS).

Nayga Jr, R. M., & Capps Jr, O. 1994. Tests of Weak Separability in Disaggregated Meat Products. *American Journal of Agricultural Economics*, *76*(4), 800-808.

Nielsen Company. 2019. *Nielsen Answers*. Available at: https://www.nielsen.com/us/en/client-login/.

O'Keefe, T. (2013). New study details egg products usage in the US. *WATTAgNet.com*. https://www.wattagnet.com/articles/17175-new-study-details-egg-products-usage-in-the-us.

Okrent, A. M., and J. M. Alston. 2012. The Effects of Farm Commodity and Retail Food Policies on Obesity and Economic Welfare in the United States. *American Journal of Agricultural Economics,* 94(3), 611-646.

Okrent, A., and J. M. Alston, 2012. The Demand for Disaggregated Food-Away-From-Home and Food-At-Home Products in the United States. *USDA-ERS Economic Research Report*, (139).

Okrent, A., and J. M. Alston. 2011. Demand for Food in the United States: A Review of the Literature, Evaluation of Previous Estimates and Presentation of New Estimates of Demand. Berkeley, CA: Giannini Foundation of Agricultural Economics Monograph 48. Available at: http://giannini.ucop.edu/Monographs/48- FoodDemand.pdf.

PennState Extension (PSU). 2016. *Understanding Beef Carcass Yields and Losses During Processing*. Available from: https://extension.psu.edu/understanding-beef-carcass-yields-and-losses-during-processing.

Pork Checkoff. National Pork Board. 2017. *Typical Market Pig Today*. Available at: https://www.pork.org/facts/stats/consumption-and-expenditures/typical-market-pig-today/.

Rembrandt Foods. (2015). Shell to Liquid Eggs. https://www.rembrandtfoods.com/wp-content/uploads/2015/03/RF-Shell-to-Liquid-FINAL.pdf

Saitone, T. L., R. J. Sexton, and D. A. Sumner. 2015. "What Happens When Food Marketers Require Restrictive Farming Practices?" *American Journal of Agricultural Economics* 97(4):1021-1043.

Statistics Canada. 2019. *Population Estimates on July 1st, by Age and Sex*. Table 17-10-0005-01. Available at: https://doi.org/10.25318/1710000501-eng.

Sumner, D. A., and T. Zuijdwijk. 2019. "The Law and Economics of Canada's WTO Litigation Contesting U.S. Country-of-Origin Labeling (COOL)." *Canadian Journal of Agricultural Economics* 67(4): 327-347.

Sumner, D. A., Gow, H., Hayes, D., Matthews, W., Norwood, B., Rosen-Molina, J. T., & Thurman, W. (2011). Economic and Market Issues on the Sustainability of Egg Production in the United States: Analysis of Alternative Production Systems. *Poultry Science*, 90(1), 241-250. https://doi.org/10.3382/ps.2010-00822

Sumner, D. A., J. T. Rosen-Molina, W. A. Matthews, J. A. Mench, and K. R. Richter. 2008. Economic Effects of Proposed Restrictions on Egg-Laying Hen Housing in California. University of California Agricultural Issues Center. Available at: https://aic.ucdavis.edu/publications/eggs/egginitiative.pdf.

Sumner, D. A., W. A. Matthews, J. A. Mench, and J. T. Rosen-Molina. 2010. The Economics of Regulations on Hen Housing in California. *Journal of Agricultural and Applied Economics,* 42(3), 49-438.

Sumner, D. A., W. A. Matthews, J. D. Hart, and H. Lee. 2019. Economic Impacts of New Hen Housing Requirements for Eggs Supplying the California Market. Report for the California Department of Food and Agriculture. November 2019.

U.S. Census Bureau. 2019a. *QuickFacts: California*. Available at: https://www.census.gov/quickfacts/CA.

U.S. Census Bureau. 2019b. *QuickFacts: United States*. Available at: https://www.census.gov/quickfacts/fact/table/US/IPE120218.

U.S. Department of Agriculture Agricultural Marketing Service (USDA AMS 1). 2020. Weekly Veal Market Summary. Available from: https://www.ams.usda.gov/mnreports/lswveal.pdf.

U.S. Department of Agriculture Agricultural Marketing Service (USDA AMS 2). 2020. National Retail Report – Lamb/Veal. Available from: https://www.ams.usda.gov/mnreports/lswlnvfeatures.pdf.

U.S. Department of Agriculture Agricultural Marketing Service. (AMS 1). 2019. Shell Egg Demand Indicator. https://www.ams.usda.gov/market-news/egg-market-news-reports.

U.S. Department of Agriculture Agricultural Marketing Service. (AMS 2). 2019. Monthly USDA Cage-Free Shell Egg Report. https://www.ams.usda.gov/market-news/egg-market-news-reports.

U.S. Department of Agriculture Agricultural Marketing Service. (AMS 3). 2019. Egg Market News Report. https://www.ams.usda.gov/market-news/egg-market-news-reports.

U.S. Department of Agriculture Agricultural Marketing Service. (AMS 1). (2019.). Weekly Processed Egg Data.

U.S. Department of Agriculture Agricultural Marketing Service. (AMS 2). (2020.). Shell Eggs: USDA Egg Market News Report (PYBSHELLEGG). https://mymarketnews.ams.usda.gov/viewReport/2876.

U.S. Department of Agriculture Natural Agricultural Statistics Service. (USDA NASS). 2020. Livestock Slaughter. Available from: https://usda.library.cornell.edu/concern/publications/rx913p88g?locale=en#release-items.

U.S. Department of Agriculture, Economic Research Service. (2020).. Livestock & Meat Domestic Data. Available at: https://www.ers.usda.gov/data-products/livestock-meat-domestic-data/livestock-meat-domestic-data/.

U.S. Department of Agriculture, Economic Research Service. 2019. *Commodity Costs and Returns.* Available at: https://www.ers.usda.gov/data-products/commodity-costs-and-returns/commodity-costs-and-returns/#Historical%20Costs%20and%20Returns:%20Hogs,%20allU.S. International Trade Commission. 2019. *USITC DataWeb*. Available at: https://dataweb.usitc.gov/.

U.S. Department of Agriculture, Economic Research Service. 2020. All Supply and Disappearance. Livestock and Poultry Slaughter. Available at: https://www.ers.usda.gov/data-products/livestock-meat-domestic-data/.

U.S. Department of Agriculture, Economic Research Service. 2020a. All Supply and Disappearance. Livestock and Poultry Slaughter. Available at: https://www.ers.usda.gov/data-products/livestock-meat-domestic-data/.

U.S. Department of Agriculture, Economic Research Service. 2020b. *Pork Values and Spreads*. Meat Price Spreads. Available at: https://www.ers.usda.gov/data-products/meat-price-spreads/.

U.S. Department of Agriculture. 2019a. *Livestock and Poultry Slaughter*. Available at: https://www.ers.usda.gov/data-products/livestock-meat-domestic-data/.

U.S. Department of Agriculture. 2019b. *Meat Price Spreads*. Available at: https://www.ers.usda.gov/data-products/meat-price-spreads/.

U.S. International Trade Commission. 2019. *USITC DataWeb*. Available at: https://dataweb.usitc.gov/.

Urner, B. 2020. Coronavirus Special Report. *Urner Barry Market Prices, News, and Analysis,* (2). Available from: www.urnerbarry.com.

Wohlgenant, M. K. 1989. Demand for Farm Output in a Complete System of Demand Functions. *American Journal of Agricultural Economics, 71*(2), 241-252.

Wohlgenant, M. K. 1993. Distribution of Gains from Research and Promotion in Multi-Stage Production Systems: The Case of the U.S. Beef and Pork Industries. American Journal of Agricultural Economics, 75(3), 642-651.

Wohlgenant, M. E., and R. C. Haidacher. 1989. *Retail to Farm Linkage for a Complete Demand System of Food Commodities*. Washington DC: U.S. Department of Agriculture, Economic Research Service, Technical Bulletin 1775.

EXHIBIT C

# AUTHORITIES

- Kansas State University Agricultural Economics. "Glynn Tonsor." *Kansas State University,* 2021, https://www.agmanager.info/contributors/tonsor. Accessed November 9, 2021.

- Wallace, Alicia. "Bacon prices have skyrocketed to record levels, and they might not go down anytime soon." *CNN Business*, September 30, 2021, https://www.cnn.com/2021/09/29/economy/bacon-prices-skyrocketing-pork/index.html Accessed November 9, 2021.

- Egan, Matt. "$24 billion in goods is floating outside California's biggest ports." *CNN Business*, October 25, 2021, https://www.cnn.com/2021/10/25/business/supply-chain-ports-inflation/index.html Accessed November 9, 2021.

- Franken, Jason R.V., Parcell, Joe L., Tonsor, Glynn T. "Impact of Mandatory Price Reporting on Hog Market Integration." *Cambridge University Press,* January 26, 2015, https://www.cambridge.org/core/journals/journal-of-agricultural-and-applied-economics/article/abs/impact-of-mandatory-price-reporting-on-hog-market-integration/E15342512AFFBA856463CDAB3D79B1D0 Accessed November 9, 2021.

- Mullally, Connor, Lusk, Jayson L. "The Impact of Farm Animal Housing Restrictions on Egg Prices, Consumer Welfare, and Production in California." *American Journal of Agricultural Economics,* September 13, 2017, https://onlinelibrary.wiley.com/doi/full/10.1093/ajae/aax049 Accessed November 9, 2021.

- Sumner, Daniel A., Goldstein, Robin, Hart, Jarrett D., Lee, Hanbin, Matthews, William A., Medellin-Asuara, Josue. (2020) "Standardized Regulatory Impact of Proposed Regulations to Implement Proposition 12." *University of California, Davis and the UC Agricultural Issues Center*, July 2, 2020 https://dof.ca.gov/Forecasting/Economics/Major_Regulations/Major_Regulations_Table/documents/CDFA_Proposition_12_SRIA.pdf Accessed November 9, 2021.

- Iowa State University. "Estimated Livestock Returns" *Iowa State University*, 2014, http://www2.econ.iastate.edu/estimated-returns/ November 9, 2021.

- National Agricultural Statistics Service, Agricultural Statistics Board, United States Department of Agriculture. "Quarterly Hogs and Pigs." *United States Department of Agricultures*, March 25, 2021, https://downloads.usda.library.cornell.edu/usda-esmis/files/rj430453j/7p88db205/mw22w1890/ hgpg0321.pdf Accessed June 29, 2021.

- MetaFarms, Inc. "Production Analysis Summary for U.S. Pork Industry: 2017-2019." July 9, 2020, https://library.pork.org/media/?mediaId=4D0CDE8D-9898-44F4-A2FB321F87DE331D Accessed November 9, 2021.

**EXHIBIT C**

- Olick, Diana.  "Soaring lumber prices add $36,000 to the cost of a new home, and a fierce land grab is only making it worse." *CNBC*, April 30, 2021, https://www.cnbc.com/2021/04/30/soaring-lumber-prices-add-36000-to-the-cost-of-a-new-home.html Accessed November 9, 2021.

- Trading Economics. https://tradingeconomics.com/commodity/steel Accessed November 9, 2021.

- Macrotrends.  https://www.macrotrends.net/2532/corn-prices-historical-chart-data Accessed November 9, 2021.

- National Agricultural Statistics Service, Agricultural Board, United States Department of Agriculture. "Overview of the United States Hog Industry." *USDA*, October 29, 2015, https://downloads.usda.library.cornell.edu/usda-esmis/files/rr171x21v/cz30pw658/js956j577/hogview-10-29-2015.pdf Accessed November 9, 2021.

- Tonsor, Dr. Glynn T., Lusk, Dr. Jayson L. "Consumer Sensitivity to Pork Prices: A Comparison of 51 U.S. Retail Markets and 6 Pork Products." *AgManager.info*, March 5, 2021, https://www.agmanager.info/livestock-meat/meat-demand/meat-demand-research-studies/consumer-sensitivity-pork-prices-comparison Accessed November 9, 2021.

- McCracken, Christine.  "US Pork Supply Chain Locked in Limbo as Producers Await Legal Ruling." *RaboResearch*, March 2021, https://research.rabobank.com/far/en/sectors/animal-protein/us-pork-supply-chain-locked-in-limbo-as-producers-await-legal-ruling.html Accessed November 9, 2021.

# EXHIBIT G

1   TRENTON H. NORRIS (SBN 164781)
    PEG CAREW TOLEDO (SBN 181227)
2   WILLIS M. WAGNER (SBN 310900)
    Arnold & Porter Kaye Scholer LLP
3   Three Embarcadero Center, 10th Floor
    San Francisco, California 94111
4   Telephone: +1 415.471.3100
    Facsimile: +1 415.471.3400
5   E-mail: Trent.Norris@arnoldporter.com
            Peg.Toledo@arnoldporter.com
6           Will.Wagner@arnoldporter.com

7   *Additional Counsel Shown on Signature Page*

8   Attorneys for Plaintiff
    IOWA PORK PRODUCERS ASSOCIATION
9

E-FILED
11/12/2021 4:35 PM
Superior Court of California
County of Fresno
By: Louana Peterson, Deputy

10

11              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

12                          **COUNTY OF FRESNO**

13

14

15  IOWA PORK PRODUCERS              Case No.  21CECG03339
    ASSOCIATION,
16                                   Assigned to Honorable Rosemary T. McGuire
                Plaintiff,           Department 502
17
                                     **PLAINTIFF'S EX PARTE APPLICATION**
18       v.                          **FOR LEAVE TO FILE MEMORANDUM IN**
                                     **SUPPORT OF MOTION FOR**
19                                   **PRELIMINARY INJUNCTION IN EXCESS**
                                     **OF LOCAL RULE REQUIREMENTS**
20  ROB BONTA, in his official capacity as
    Attorney General of California, KAREN
21  ROSS, in her official capacity as Secretary
    of the California Department of Food and    [Declaration of Ryann A. Glenn in Support;
22  Agriculture, and TOMAS ARAGON, in his       Declaration of Janeen Salak-Johnson, Ph.D. in
    official capacity as Director of the        Support; Declaration of Glynn T. Tonsor, Ph.D. in
23  California Department of Public Health,      Support; and [Proposed] Order Re Application to
                                                Advance Hearing filed concurrently herewith.]
24              Defendants.
                                     Action:      November 9, 2021
25                                   Trial Date:  None Set

26

27

28

                                        1
_____
PLAINTIFF'S EX PARTE APPLICATION FOR LEAVE TO FILE MPO IN EXCESS OF LOCAL RULE REQUIREMENTS

**TO DEFENDANTS:**

Plaintiff Iowa Pork Producers Association, in a representative capacity for its members, ("IPPA"), pursuant to Cal. Rules of Court 3.1113 and Local Rule 2.7 and for good cause shown, respectfully requests that this Court grant Plaintiff's leave to file its Memorandum and Points of Authorities in Support of its Motion for Preliminary Injunction under Local Rule 3.113(e) in excess of fifteen (15) pages.  In support of this Ex Parte Application for Leave to File Memorandum in Support of Motion for Preliminary Injunction in Excess of Local Rule Requirements, Plaintiff states as follows:

1.      Plaintiff filed a Complaint for Declaratory and Injunctive Relief in the Superior Court of the State of California in and for Fresno County, on November 9, 2021.

2.      Plaintiffs' Complaint seeks injunctive relief to prohibit California Defendants from enforcing a California the Farm Animal Confinement Act's ("Proposition 12" or the "Act") confinement requirements on breeding pigs.

3.      On November 12, 2021, Plaintiff filed a Notice of Motion and Motion for Preliminary Injunction to address the irreparable harm that Defendants' actions pose on Plaintiff's members.

4.      Plaintiff files this Application for Leave to File Memorandum of Points and Authorities in Support of Motion for Preliminary Injunction in Excess of the Length Prescribed in the Local Rules, with the proposed Memorandum attached hereto and incorporated by reference herein.

5.      Plaintiff has contacted Defendants' counsel and has sought consent to this Ex Parte Application, but at this time has not obtained the Defendants' consent to this Motion.

6.      When determining whether to grant a Motion for Preliminary Injunction, one factor that district courts must consider is whether Plaintiffs are likely to succeed on the merits of their claims. *Rogers Group v. City of Fayetteville*, 629 F.3d 784, 787 (8th Cir. 2010).

7.      Plaintiff's Complaint asserts six counts against Defendants based on claims arising under the United States Constitution, including the Dormant Commerce Clause, the Due Process

Clause, the Privileges and Immunities Clause, the Supremacy Clause and provides for a separate Declaratory Judgment cause of action.

8.      Due to the number of constitutional issues at stake in the Motion for Preliminary Injunction, good cause exists for Plaintiff to have a full and fair opportunity to demonstrate that they are likely to succeed on the merits of each of their constitutional claims against Defendants.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.      INTRODUCTION

Plaintiff Iowa Pork Producers Association ("Plaintiff" or "IPPA") filed a Verified Complaint for Preliminary and Permanent Injunctive and Declaratory Relief against Defendants Rob Bonta, in his official capacity as Attorney General of California ("Bonta"), Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture ("Ross"), and Tomas Aragon, in his official capacity as Director of the California Department of Public Health ("Aragon") (collectively, "Defendants"), on November 9, 2021, challenging the constitutionality of California's Proposition 12 Farm Animal Confinement Initiative ("Proposition 12" or "Prop 2" or the "Act"), which imposes confinement requirements on out-of-state pork producers and prohibits the sale of whole pork meat within the state of California derived from animals confined in a manner inconsistent with California's requirements, regardless of where in the nation the animal was raised. Complaint, ¶ 1.  Plaintiff has also filed a Notice of Motion and Motion for Preliminary Injunction on November 12, 2021. The earliest date by which Plaintiff was able to secure a hearing date on its Motion for Preliminary Injunction and Expedited Relief and Hearing ("Motion for Preliminary Injunction") was May 18, 2022.  The Turn Around Requirements provided in Proposition 12 are in effect now, making Plaintiff's members and the entire pork industry who sells whole pork meat into California at immediate risk of criminal prosecution. Complaint, ¶ 123. Further, the Square Footage Requirements provided in Proposition 12 are set to go into effect January 1, 2022 and Defendants have publicly stated they cannot extend that date. Complaint, ¶¶ 150, 171. Therefore, Plaintiff makes this ex parte application to advance that hearing date.

1        II.      **FACTUAL BACKGROUND**

2        Proposition 12 poses a current and imminent risk of criminal prosecution and civil

3    enforcement against Plaintiff's members, as the Act imposes both criminal and civil penalties on

4    any non-compliant business owner or operator who is "engaged in the sale" of Proposition 12 non-

5    compliant whole pork meat within California that does not meet the confinement restrictions

6    standards set forth within Proposition 12 that was passed by California voters on November 6,

7    2018. Complaint, ¶¶ 2, 189, 204. A portion of these confinement restrictions stem from the passage

8    of Proposition 2. Complaint, ¶¶ 176, 205.

9        On November 6, 2008, California voters passed Proposition 2. Proposition 2 created

10   confinement requirements for in-state producers in California.  Proposition 2 required that breeding

11   pigs in California be housed in a manner that permits the animals to "turn around freely, lie down,

12   stand up, and fully extend their limbs," subject to limited exceptions (the "Turn Around

13   Requirements"). Complaint, ¶ 6. On November 6, 2018, California voters passed Proposition 12

14   ("Proposition 12" or the "Act") and extended the Turn Around Requirements that California

15   producers were subject to since January 1, 2015, to be now effective upon out-of-state producers,

16   making them effective on December 19, 2018 (six weeks after passage of Proposition 12).

17   Complaint, ¶¶ 7, 37.  Accordingly, any whole pork meat that is derived from a breeding pig not

18   confined in accordance with the Turn Around Requirements after December 19, 2018, and is sold

19   into California, is prohibited by the terms of Proposition 12. Complaint, ¶¶ 38, 189.

20       Proposition 12 also added a second requirement, the square footage requirements, and

21   specified an effective date of "after December 31, 2021" for breeding pigs.  These separate

22   requirements state that a breeding pig must be provided with at least 24 square feet of usable

23   floorspace per pig (the "Square Footage Requirements"). Complaint, ¶ 8.

24       Proposition 12 allows for criminal and civil penalties for any person found to be in violation

25   of either the Turn Around Requirements or the Square Footage Requirements, or any provisions of

26   the Act, including criminal misdemeanor convictions, with penalties of a fine of up to $1,000 or

27   180 days imprisonment.  These criminal penalties can be assessed against both business owners

28

4

and operators who are non-compliant with Proposition 12 who "engage in a sale" of non-compliant pork meat within California. Complaint, ¶ 14.

Recognizing the vagueness of the Act, Proposition 12 required that California's Department of Food and Agriculture ("CDFA") and Department of Public Health ("CDPH") jointly promulgate rules and regulations to implement Proposition 12 and provide adequate notice of compliance requirements to those subject to Proposition 12 by September 1, 2019 ("Final Regulations"). Complaint, ¶ 9. However, while Proposition 12 mandated Final Regulations for the *entirety* of the Act, the December 19, 2018 effective date of the Turn Around Requirements was immediate and left no time for the CDFA and CDPH to promulgate the Final Regulations and certainly no time for out-of-state producers to comply. Complaint, ¶ 10. Further, Proposition 12's mandated deadline of September 19, 2019 for the Final Regulations passed without even draft regulations issued, let alone Final Regulations. Complaint, ¶ 11. Just this year, on May 28, 2021, the CDFA finally published draft rules and regulations to consider for Proposition 12, one year and nine months past the voters' statutory deadline (the "Proposed Regulations"). Complaint, ¶ 12. After a public comment period and required public hearing, CDFA now has stated that Proposed Regulations will not be finalized.  According to Defendant CDFA, *new* proposed draft rules and regulations are forthcoming again and will not be finalized until, at the earliest, sometime into later 2022.   Thus now, the second provision of Proposition 12, the Square Footage Requirements, will go into effect on January 1, 2022 without the Final Regulations and without any of the clarification needed for the underlying vague Act. Complaint, ¶ 13.

Proposition 12's Turn Around Requirements and Square Footage Requirements are inconsistent with pork industry practices and standards, generations of producer experience, scientific research, and the consensus standards of other states. Proposition 12 will impose costly mandates that substantially interfere with commerce among the states in hogs and whole pork meat markets. It will impose enormous costs on Iowa pork producers, ultimately having a direct impact on the price of pork for all Americans, the vast majority of whom had no say in Proposition 12. Complaint, ¶ 17.

Nearly one-third of the nation's hogs are raised in Iowa—more than twice the amount of its

5

runner up state—and Iowa has more than 5,400 hog farms, with producers in nearly every county. Complaint, ¶ 71. California residents consume an estimated 13-15% of the overall national pork consumption in the U.S. Complaint, ¶ 4. Despite its behemoth status as a consumer of pork, California has as few as 8,000 breeding pigs in the entire state. Only approximately 1,500 of these breeding pigs are used in commercial breeding in the state and are situated in a handful of very small farms. This equates to California production making up less than 1% of the total U.S. pork production. If California were to meet its own in-state pork demand, it would require production from approximately 673,000 breeding pigs annually. In other words, California cannot feed itself without massive agricultural imports from other states, including, most importantly, from Iowa and Plaintiff's members. Complaint, ¶ 5.

The vast majority of Plaintiff's members are currently raising breeding pigs that do not meet Proposition 12's requirements. Complaint, ¶ 119. Plaintiff's members cannot realistically change the confinement of these breeding pigs to come into compliance with Proposition 12's Square Footage Requirements or Turn Around Requirements as required on or before December 31, 2021. Complaint, ¶ 120. Plaintiff's members thus face imminent and irreparable Hobson's choice of: (1) being forced to harvest their breeding pigs in order to enter the California market, which makes up 13-15% of the national market, (2) ceasing operations, or (3) being forced to forgo one of the largest pork consumption markets in the nation at crippling expense. Complaint, ¶ 122.

Those who do not have the means to restructure their facilities may need to decrease their overall herd size, by culling breeding pigs early, and the devastating financial costs of doing so may force many producers into bankruptcy. *See* Ex. 1, Declaration of Dr. Glynn T. Tonsor, ¶ 19. Absent a preliminary injunction, this early culling will occur and result in substantial loss of property. *Id.*

There are significant effects that will be felt throughout the pork industry if Proposition 12 goes into effect, as potentially as early as December 31, 2021. Johnson Decl., ¶ 29. Many of the offspring that exist now will not be finished for market until after January 1, 2022. *Id.* The lack of guidance on this specific issue is extremely problematic, because enforcement of these provisions in an arbitrary manner could bring serious harm to those in the pork supply chain, causing

6

1    unnecessary early culling of breeding pigs before December 31, 2021, so that their offspring may

2    be sold following January 1, 2022. *Id.*  It is also plausible that the breeding pig's female progeny

3    that may be used for replacement gilts may also have to be sacrificed through early culling in 2021.

4    *Id.*

5    **III.  GOOD CAUSE EXISTS TO ALLOW PLAINTIFF TO FILE ITS**

6    **MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR**

7    **PRELIMINARY INJUNCTION IN EXCESS OF LOCAL RULE REQUIREMENTS**

8         Because the referenced Memorandum is in support of a Motion for Preliminary Injunction,

9    Plaintiff must detail why it is likely to prevail on the merits and why the balance of harms weighs

10   in favor of granting the interim injunctive relief, including analysis of the inadequacy of other

11   remedies, the irreparable harm that Plaintiff's members will face if preliminary relief is not granted,

12   and the necessity of preserving the status quo. *See White v. Davis*, 30 Cal. 4th 528, 554, 68 P.3d

13   74, 91 (2003); *Donahue Schriber Realty Grp., Inc. v. Nu Creation Outreach*, 232 Cal. App. 4th

14   1171, 1177, 181 Cal. Rptr. 3d 577, 581–82 (2014). This case involves multiple complex

15   constitutional and legislative issues, and Plaintiff has alleged six claims against Defendants. The

16   case law analysis, on its own, as to why the Court should grant Plaintiff its Motion for Preliminary

17   Injunction is significant. *See* Ex. 3, Declaration of Ryann A. Glenn, ¶ 6.

18        The Memorandum also requires facts and analysis regarding standard breeding pig

19   confinement practices, background regarding the implementation of Proposition 12, and the effects

20   of Proposition 12 nationally and on Plaintiff itself. These facts are all highly relevant to whether

21   Defendants should be enjoined from enforcing Proposition 12's onerous requirements. *Id.* In short,

22   Plaintiff's Memorandum must analyze and summarize multiple different areas of constitutional law

23   and facts regarding Proposition 12 and its history, as well as current breeding pig practices and

24   Proposition 12's effects on pork producers in order to support its arguments for the granting of its

25   Motion for Preliminary Injunction.

26        Based on the relevant facts and claims, and to avoid prejudice to Plaintiff should the page

27   limitation not be extended, Plaintiff respectfully requests the Court grant permission to exceed the

28   20-page limitation for the Memorandum in Support of its Motion for Preliminary Injunction and

7

1    allow Plaintiff to file its Memorandum as attached and incorporated by reference herein. Cal. Rules

2    of Court 3.1113. *Id.*, ¶ 7.

3        This application is made pursuant to California Rules of Court, Rules 3.1113(d) and (e),

4    and 3.1200-3.1207, and compliance has been made with the notice provisions of Rules 3.1203 and

5    3.1204.

6        This *ex parte* application is based upon this application, upon the accompanying

7    Memorandum of Points and Authorities, the Declaration of Ryann A. Glenn, the documents on file

8    in this action, and upon any further written or oral evidence which may be presented at the time of

9    hearing on this application.

10       Plaintiff's counsel contacted Defendants' counsel on November 12, 2021, to request

11   consent to its Application for Leave to File a Memorandum in Support of Motion for Preliminary

12   Injunction in Excess of Local Rule Requirements. As of the time of this filing, Plaintiff has not

13   received a response from counsel. *Id.,* ¶ 8.

14                              <u>**CONCLUSION**</u>

15       Because good cause exists, Plaintiff respectfully requests that this Court enter an Order

16   granting Plaintiff leave to file its Memorandum of Points and Authorities in Support of its Motion

17   for Preliminary Injunction in excess of fifteen (15) pages and permitting Plaintiff to file its opening

18   Memorandum pertaining to the Preliminary Injunction Motion that is attached hereto.

19
20   Dated: November 12, 2021.

21                                    IOWA PORK PRODUCERS
                                      ASSOCIATION,  Plaintiff.
22

23
24   By: _____
                                      Trenton H. Norris (SBN 164781)
25                                    Peg Toledo (SBN 181227)
                                      Willis M. Wagner (SBN 310900)
26                                    Arnold & Porter Kaye Scholer LLP
                                      Three Embarcadero Center, 10th Floor
27                                    San Francisco, California 94111
                                      Telephone: +1 415.471.3100
28                                    Facsimile: +1 415.471.3400

8

1   Trent.Norris@arnoldporter.com
Peg.Toledo@arnoldporter.com

2   Will.Wagner@arnoldporter.com

3   and

4   Marnie A. Jensen (NE 22380)

5   (*pro hac vice pending*)
Ryann A. Glenn (NE 26160)

6   (*pro hac vice pending*)
HUSCH BLACKWELL LLP

7   13330 California Street, Suite 200
Omaha, NE 68154

8   Telephone:  (402) 964-5000

9   Facsimile:  (402) 964-5050
marnie.jensen@huschblackwell.com

10  ryann.glenn@huschblackwell.com

11  and

12  Eldon L. McAfee (AT0004987)
(*pro hac vice pending*)

13  Julie L. Vyskocil (AT0009711)
(*pro hac vice pending*)

14  BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100

15  West Des Moines, IA 50266
Telephone: (515) 271-5916

16  Facsimile: (515) 274-1488
eldon.mcafee@brickgentrylaw.com

17  julie.vyskovil@brickgentrylaw.com

18  *Attorneys for Iowa Pork Producers
Association*

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S EX PARTE APPLICATION FOR LEAVE TO FILE MPO IN EXCESS OF LOCAL RULE REQUIREMENTS

TRENTON H. NORRIS (SBN 164781)
PEG CAREW TOLEDO (SBN 181227)
WILLIS M. WAGNER (SBN 310900)
Arnold & Porter Kaye Scholer LLP
Three Embarcadero Center, 10th Floor
San Francisco, California 94111
Telephone: +1 415.471.3100
Facsimile: +1 415.471.3400
E-mail: Trent.Norris@arnoldporter.com
        Peg.Toledo@arnoldporter.com
        Will.Wagner@arnoldporter.com

E-FILED
11/12/2021 4:35 PM
Superior Court of California
County of Fresno
By: Louana Peterson, Deputy

ELDON MCAFEE (*pro hac vice pending*)
JULIE VYSKOCIL(*pro hac vice pending*)
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, Iowa 50266
Telephone: 515.271.5916
Facsimile: 515.274.1488
E-mail: eldon.mcafee@brickgentrylaw.com
        julie.vyskocil@brickgentrylaw.com

MARNIE A. JENSEN (*pro hac vice pending*)
RYANN A. GLENN (*pro hac vice pending*)
Husch Blackwell LLP
13330 California Street, Suite 200
Omaha, Nebraska 68154
Telephone: 402.964.5000
Facsimile: 402.964.5050
E-mail: marnie.jensen@huschblackwell.com
        ryann.glenn@huschblackwell.com

Attorneys for Plaintiff
IOWA PORK PRODUCERS ASSOCIATION

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF FRESNO

IOWA PORK PRODUCERS
ASSOCIATION,

            Plaintiff,

    v.

ROB BONTA, in his official capacity as
Attorney General of California, KAREN
ROSS, in her official capacity as Secretary
of the California Department of Food and
Agriculture, and TOMAS ARAGON, in his
official capacity as Director of the
California Department of Public Health,

            Defendants.

Case No. 21CECG03339

**DECLARATION OF RYANN A. GLENN IN SUPPORT OF PLAINTIFF'S EX PARTE APPLICATION FOR LEAVE TO FILE MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION IN EXCESS OF LOCAL RULE REQUIREMENTS**

Action:      November 9, 2021
Trial Date:  None Set

I, Ryann A. Glenn, hereby state and declare as follows:

1.     I am over the age of majority and am competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I could have would competently testify to the same.

2.     I represent Plaintiff Iowa Pork Producers Association ("Plaintiff" or "IPPA"). My *pro hac vice* application is currently pending before this Court.

3.     Plaintiff filed a Verified Complaint for Preliminary and Permanent Injunctive and Declaratory relief against Defendants Rob Bonta, in his official capacity as Attorney General of California ("Bonta"), Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture ("Ross"), and Tomas Aragon, in his official capacity as Director of the California Department of Public Health ("Aragon") (collectively, "Defendants"), on November 9, 2021, challenging the constitutionality of California's Proposition 12 Farm Animal Confinement Initiative ("Proposition 12" or "Prop 12" or the "Act"), which imposes confinement requirements on out-of-state pork producers and prohibits the sale of pork meat within the state of California from animals confined in a manner inconsistent with California's requirements, regardless of where in the nation the animal was raised.

4.     Plaintiff filed a Notice of Motion and Motion for Preliminary Injunction and Expedited Relief and Hearing, concurrently with its Memorandum of Points and Authorities, Declaration of Pat McGonegle, Declaration of Dr. Janeen Salak-Johnson, Declaration of Dr. Glynn T. Tonsor, and [proposed] Order on November 12, 2021. In addition, Plaintiff filed an Application for Leave to File a Memorandum in Support of Motion for Preliminary Injunction in Excess of Local Rule Requirements, concurrently with its separate Memorandum of Points and Authorities, on November 12, 2021.

5.     Plaintiff has also filed an Ex Parte Application for Leave to File Memorandum in Support of Motion for Preliminary Injunction in Excess of Local Rule Requirements on November 12, 2021, requesting the Court grant permission to exceed the 15-page limitation.

6.     Plaintiff's Memorandum in Support of Motion for Preliminary Injunction involves multiple complex constitutional and legislative issues, and Plaintiff has alleged six claims against

Defendants. The case law analysis, on its own, as to why the Court should grant Plaintiff its Motion for Preliminary Injunction is significant. The Memorandum also requires facts and analysis regarding standard breeding pig confinement practices, background regarding the implementation of Proposition 12, and the effects of Proposition 12 nationally and on Plaintiff itself. These facts are all highly relevant to whether Defendants should be enjoined from enforcing Proposition 12's onerous requirements.

7.      Plaintiff would be prejudiced should the page limitation not be extended. Based on the relevant facts and claims, and to avoid prejudice to Plaintiff should the page limitation not be extended, Plaintiff respectfully requests the Court grant permission to exceed the 15-page limitation for the Memorandum in Support of its Motion for Preliminary Injunction and allow Plaintiff to file its Memorandum as attached and incorporated by reference herein. Cal. Rules of Court 3.1113.

8.      I contacted Defendants' counsel on November 12, 2021, to request consent to this Application.  I have not received a response from counsel at the time of this filing other than Defendant Bonta does not oppose our request to file an overlength brief. Defendant Bonta's counsel could not confirm the same for the remaining Defendants at this time.

9.      I declare under penalty of perjury and pursuant to the laws of the state of California that the preceding is true and correct and that this declaration was made on this 12th day of November 2021, at Council Bluffs, Iowa.

_____
RYANN A. GLENN

DECLARATION OF RYANN A. GLENN

1

2

3

4

5

6

7

    RECEIVED
    11/12/2021 4:35 PM
    FRESNO COUNTY SUPERIOR COURT
    By: Louana Peterson, Deputy

8

### SUPERIOR COURT OF THE STATE OF CALIFORNIA

9

### COUNTY OF FRESNO

10

11

12

IOWA PORK PRODUCERS
ASSOCIATION,

13

          Plaintiff,

14

    v.

15

16

ROB BONTA, in his official capacity as
Attorney General of California, KAREN
ROSS, in her official capacity as Secretary
of the California Department of Food and
Agriculture, and TOMAS ARAGON, in his
official capacity as Director of the
California Department of Public Health,

17

18

19

          Defendants.

20

21

22

Case No.  21CECG03339

**[PROPOSED] ORDER GRANTING
PLAINTIFF'S EX PARTE APPLICATION
FOR LEAVE TO FILE ITS
MEMORANDUM OF POINTS AND
AUTHORITIES IN SUPPORT OF ITS
MOTION FOR PRELIMINARY
INJUNCTION IN EXCESS OF THE
LOCAL RULE REQUIREMENT**

[Filed concurrently with: Declaration of Ryann
A. Glenn; Ex Parte Application for Leave to File
its Memorandum of Points and Authorities in
Support of its Motion for Preliminary Injunction
in Excess of the Local Rule Requirement]


Action Filed:  November 9, 2021
Trial:          None Set

23

24

25

26

27

28

1

1

**TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:**

2

Plaintiff filed its Ex Parte Application for Leave to File its Memorandum of Points and

3

Authorities in Support of its Motion for Preliminary Injunction in Excess of the Local Rule

4

Requirements (the "Overlength Application") on November 12, 2021.  After consideration of the

5

memoranda and arguments of counsel, the evidence, and being fully advised, the Court finds that

6

the Ex Parte Application should be GRANTED.  The Clerk is directed to detach the Memorandum

7

of Points and Authorities in Support of Motion for Preliminary Injunction from Plaintiff's Ex Parte

8

Application and file it of record.

9

10

**IT IS SO ORDERED** this ___ day of November, 2021.

11

12

_____
Honorable Rosemary T. McGuire

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

# EXHIBIT H

1   TRENTON H. NORRIS (SBN 164781)
    PEG CAREW TOLEDO (SBN 181227)
2   WILLIS M. WAGNER (SBN 310900)
    Arnold & Porter Kaye Scholer LLP
3   Three Embarcadero Center, 10th Floor
    San Francisco, California 94111
4   Telephone: +1 415.471.3100
    Facsimile: +1 415.471.3400
5   E-mail: Trent.Norris@arnoldporter.com
              Peg.Toledo@arnoldporter.com
6             Will.Wagner@arnoldporter.com

7   *Additional Counsel Shown on Signature Page*

8   Attorneys for Plaintiff
    IOWA PORK PRODUCERS ASSOCIATION
9

E-FILED
11/12/2021 11:49 PM
Superior Court of California
County of Fresno
By: Louana Peterson, Deputy

10              **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

11                          **COUNTY OF FRESNO**

12   IOWA PORK PRODUCERS                    Case No.  21CECG03339
     ASSOCIATION,
13                                          Assigned to Honorable Rosemary T. McGuire
                                            Department 502
14                 Plaintiff,
                                            **PLAINTIFF'S EX PARTE APPLICATIONS:**
15                                          **(1) TO ADVANCE HEARING REGARDING**
            v.                              **MOTION FOR PRELIMINARY**
16                                          **INJUNCTION AND REQUEST FOR**
                                            **EXPEDITED RELIEF AND HEARING; AND**
17   ROB BONTA, in his official capacity as **(2) TO ADVANCE HEARING ON PRO HAC**
     Attorney General of California, KAREN  **VICE APPLICATIONS, WHICH ARE**
18   ROSS, in her official capacity as Secretary **UNOPPOSED**
     of the California Department of Food and
19   Agriculture, and TOMAS ARAGON, in his
     official capacity as Director of the     **Ex Parte Hearing**
20   California Department of Public Health,
                                            Date: November 17, 2021
21                 Defendants.              Time: 3:30pm
                                            Dept.: 502
22

23                                          [Declaration of Ryann A. Glenn In Support;
                                            Declaration of Janeen Salak-Johnson, Ph.D. In
24                                          Support; Declaration of Glynn T. Tonsor, Ph.D. In
                                            Support; and [Proposed] Order Re. Application to
25                                          Advance Hearing filed concurrently herewith.]

26
                                            Action:  November 9, 2021
27                                          Trial Date:

28

                                    1
    PLAINTIFF'S EX PARTE APPLICATION TO ADVANCE HEARING AND MPA IN SUPPORT

**TO DEFENDANTS:**

PLEASE TAKE NOTICE that on November 17, 2021 at 3:30 pm or as soon thereafter as this matter may be heard in Department 502 of the above-entitled Court, before the Honorable Rosemary T. McQuire, located at 1120 O Street, Fresno, California 93724, Plaintiff Iowa Pork Producers Association ("IPPA") will and hereby does apply ex parte to the Court for an order advancing the hearing date of IPPA's Motion for Preliminary Injunction and Request for Expedited Relief and Hearing (the "Motion for Preliminary Injunction"), the Applications to Appear Pro Hac Vice of Marnie A. Jensen, Ryann A. Glenn, Eldon McAfee and Julie Vyskocil (the "Pro Hac Applications") currently set for hearing on May 18, 2022 (Motion for Preliminary Injunction) and May 24, 2022, 2021 (Pro Hac Applications), to December 21, 2021 or as soon thereafter as possible before January 1, 2022, and hopefully as soon as possible, as the Turn Around Requirements[1] provided in Proposition 2 are in effect now and the Square Footage Requirements provided in Proposition 12 are set to go into effect January 1, 2022.

This Application is made pursuant to California Rules of Court 2.550, 2.551, and 3.1200 *et seq.* Good cause exists for the granting of this Application.

Pursuant to California Rule of Court 3.1220, Plaintiffs, through its counsel, Ryann Glenn, e-mailed Attorney General Deputy Nelson Richards and Assistant Attorney General Marla Weston November 10, 2021, at 4:30 p.m. PDT requesting consent to advancing the hearing date to before the end of the year. Ryann Glenn also personally conferred with Ben Glickman, Supervising Deputy Attorney General November 10, 2021 at 5:00 p.m. PDT. Mr. Glickman stated that the Attorney General's Office was considering consenting to Plaintiff's request for an advancement of the hearing as he understood Plaintiff's need to have this matter heard before the end of the year due to the Turn Around Requirements currently being in effect and the second portion of Proposition 12, the Square Footage Requirements, going into effect January 1, 2022, but was conferring with the Plaintiff agencies.

Mr. Glickman further stated that Defendants would not oppose Plaintiff's Application for

---

[1] Any defined term herein shall have the same meaning and effect as that stated within Plaintiff's Complaint filed on November 9, 2021.

PLAINTIFF'S EX PARTE APPLICATION TO ADVANCE HEARING AND MPA IN SUPPORT

1  Pro Hac Vice Admission. (Declaration of Ryann A. Glenn, ¶ 8.)

2          This Application is based upon this notice and application, the Declarations of Ryann A.

3  Glenn, Janeen Salak-Johnson, Ph.D., and Glynn T. Tonsor, Ph.D., Memorandum and Points and

4  Authorities in Support of this Application and the proposed order, filed concurrently herewith, the

5  pleadings on file in this action which are incorporated by reference herein, including Plaintiff's

6  Memorandum in Support of its Motion for Preliminary Injunction, and on such oral and

7  documentary evidence that may be presented at or before the hearing on this Application.

8

9          Dated: November 12, 2021.

10                                               IOWA PORK PRODUCERS
                                                ASSOCIATION, Plaintiff.
11
                                         By: /s/ *Willis M. Wagner*
12                                           Trenton H. Norris (SBN 164781)
                                             Peg Toledo (SBN 181227)
13                                           Willis M. Wagner (SBN 310900)
                                             Arnold & Porter Kaye Scholer LLP
14                                           Three Embarcadero Center, 10th Floor
                                             San Francisco, California 94111
15                                           Telephone: +1 415.471.3100
                                             Facsimile: +1 415.471.3400
16                                           Trent.Norris@arnoldporter.com
                                             Peg.Toledo@arnoldporter.com
17                                           Will.Wagner@arnoldporter.com

18                                           and

19
                                             Marnie A. Jensen (NE 22380)
20                                           (*pro hac vice pending*)
                                             Ryann A. Glenn (NE 26160)
21                                           (*pro hac vice pending*)
                                             HUSCH BLACKWELL LLP
22                                           13330 California Street, Suite 200
                                             Omaha, NE 68154
23                                           Telephone: (402) 964-5000
                                             Facsimile: (402) 964-5050
24                                           marnie.jensen@huschblackwell.com
25                                           ryann.glenn@huschblackwell.com

26                                           and

27                                           Eldon L. McAfee (AT0004987)
                                             (*pro hac vice pending*)
28                                           Julie L. Vyskocil (AT0009711)

                                               3

PLAINTIFF'S EX PARTE APPLICATION TO ADVANCE HEARING AND MPA IN SUPPORT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

(*pro hac vice pending*)
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
Telephone: (515) 271-5916
Facsimile: (515) 274-1488
eldon.mcafee@brickgentrylaw.com
julie.vyskovil@brickgentrylaw.com

*Attorneys for Iowa Pork Producers*
*Association*

4

<center>**MEMORANDUM OF POINTS AND AUTHORITIES**</center>

## I.    INTRODUCTION

Plaintiff Iowa Pork Producers Association ("Plaintiff" or "IPPA") filed a Verified Complaint for Preliminary and Permanent Injunctive and Declaratory Relief against Defendants Rob Bonta, in his official capacity as Attorney General of California ("Bonta"), Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture ("Ross"), and Tomas Aragon, in his official capacity as Director of the California Department of Public Health ("Aragon") (collectively, "Defendants"), on November 9, 2021, challenging the constitutionality of California's Proposition 12 Farm Animal Confinement Initiative ("Proposition 12" or "Prop 2" or the "Act"), which imposes confinement requirements on out-of-state pork producers and prohibits the sale of whole pork meat within the state of California derived from animals confined in a manner inconsistent with California's requirements, regardless of where in the nation the animal was raised. Complaint, ¶ 1.  Plaintiff has also filed a Notice of Motion and Motion for Preliminary Injunction on November 12, 2021. The earliest date by which Plaintiff was able to secure a hearing date on its Motion for Preliminary Injunction and Expedited Relief and Hearing ("Motion for Preliminary Injunction") was May 24, 2022.  The Turn Around Requirements provided in Proposition 12 are in effect now, making Plaintiff's members and the entire pork industry who sells whole pork meat into California at immediate risk of criminal prosecution. Complaint, ¶ 123. Further, the Square Footage Requirements provided in Proposition 12 are set to go into effect January 1, 2022, further raising the imminent harm against Plaintiff's and the out of state industry. Despite the failure to promulgate the mandated Final Regulations, it is undisputed that the Defendants do not have the authority to extend the effective dates of the Proposition 12 requirements. Complaint, ¶¶ 150, 171. Therefore, Plaintiff makes this ex parte application to advance that hearing date to seek immediate relief from the court.

## II.    FACTUAL BACKGROUND

Proposition 12 poses a current and imminent risk of criminal prosecution and civil enforcement against Plaintiff's members, as the Act imposes both criminal and civil penalties on any non-compliant business owner or operator who is "engaged in the sale" of Proposition 12 non-

<center>1</center>
<center>MEMORANDUM OF POINTS AND AUTHORITIES</center>

compliant whole pork meat within California that does not meet the confinement requirements set forth within Proposition 12 that was passed by California voters on November 6, 2018. Complaint, ¶¶ 2, 189, 204. A portion of these confinement restrictions stem from the passage of Proposition 2. Complaint, ¶¶ 176, 205.

On November 6, 2008, California voters passed Proposition 2.  Proposition 2 created confinement requirements for in-state producers in California.  Proposition 2 required that breeding pigs in California be housed in a manner that permits the animals to "turn around freely, lie down, stand up, and fully extend their limbs," subject to limited exceptions (the "Turn Around Requirements"). Complaint, ¶ 6. On November 6, 2018, California voters passed Proposition 12 ("Proposition 12" or the "Act") and extended the Turn Around Requirements that California producers were subject to since January 1, 2015, to be now effective upon out-of-state producers, making them effective on December 19, 2018 (but just six weeks after passage of Proposition 12). Complaint, ¶¶ 7, 37.  Accordingly, any whole pork meat that is derived from a breeding pig not confined in accordance with the Turn Around Requirements after December 19, 2018, and is sold into California, is prohibited by the terms of Proposition 12. Complaint, ¶¶ 38, 189.

Proposition 12 also added a second requirement, the square footage requirements, and specified an effective date of "after December 31, 2021" for breeding pigs.  These separate requirements state that a breeding pig must be provided with at least 24 square feet of usable floorspace per pig (the "Square Footage Requirements"). Complaint, ¶ 8.

Proposition 12 allows for criminal and civil penalties for any person found to be in violation now of the Turn Around Requirements or in violation after January 1, 2022 of the Square Footage Requirements, or any provisions of the Act, including criminal misdemeanor convictions, with penalties of a fine of up to $1,000 or 180 days imprisonment.  These criminal penalties can be assessed against both business owners and operators who are non-compliant with Proposition 12 who "engage in a sale" of non-compliant pork meat within California. Complaint, ¶ 14.

Recognizing the vagueness of the Act, Proposition 12 required that California's Department of Food and Agriculture ("CDFA") and Department of Public Health ("CDPH") jointly promulgate rules and regulations to implement Proposition 12 and provide adequate notice of compliance

requirements to those subject to Proposition 12 by September 1, 2019 ("Final Regulations"). Complaint, ¶ 9. However, while Proposition 12 mandated Final Regulations for the *entirety* of the Act, the December 19, 2018 effective date of the Turn Around Requirements was immediate and left no time for the CDFA and CDPH to promulgate the Final Regulations and certainly no time for out-of-state producers to comply. Complaint, ¶ 10. Further, Proposition 12's mandated deadline of September 19, 2019 for the Final Regulations passed without even draft regulations issued, let alone Final Regulations. Complaint, ¶ 11. Just this year, on May 28, 2021, the CDFA finally published draft rules and regulations to consider for Proposition 12, one year and nine months past the voters' statutory deadline (the "Proposed Regulations"). Complaint, ¶ 12. After a public comment period and required public hearing, CDFA now has stated that Proposed Regulations will not be finalized.  According to Defendant CDFA, *new* proposed draft rules and regulations are forthcoming again and will not be finalized until, at the earliest, sometime into later 2022.   Thus now, the second provision of Proposition 12, the Square Footage Requirements, will go into effect on January 1, 2022 without the Final Regulations and without any of the clarification needed for the underlying vague Act. Complaint, ¶ 13.  Plaintiff's and the industry have no time to comply and no guidance from the required regulations to know how to comply.

Further, Proposition 12's Turn Around Requirements and Square Footage Requirements are inconsistent with pork industry practices and standards, generations of producer experience, scientific research, and the consensus standards of other states. Proposition 12 will impose costly mandates that substantially interfere with commerce among the states in hogs and whole pork meat markets. It will impose enormous costs on Iowa pork producers, ultimately having a direct impact on the price of pork for all Americans, the vast majority of whom had no say in Proposition 12. Complaint, ¶ 17.

Nearly one-third of the nation's hogs are raised in Iowa—more than twice the amount of its runner up state—and Iowa has more than 5,400 hog farms, with producers in nearly every county. Complaint, ¶ 71. California residents consume an estimated 13-15% of the overall national pork consumption in the U.S. Complaint, ¶ 4. Despite its behemoth status as a consumer of pork, California has as few as 8,000 breeding pigs in the entire state. Only approximately 1,500 of these

breeding pigs are used in commercial breeding in the state and are situated in a handful of very small farms. This equates to California production making up less than 1% of the total U.S. pork production. If California were to meet its own in-state pork demand, it would require production from approximately 673,000 breeding pigs annually. In other words, California cannot feed itself without massive agricultural imports from other states, including, most importantly, from Iowa and Plaintiff's members. Complaint, ¶ 5.

The vast majority of Plaintiff's members are currently raising breeding pigs that do not meet Proposition 12's requirements. Complaint, ¶ 119. Plaintiff's members cannot realistically change the confinement of these breeding pigs to come into compliance with Proposition 12's Square Footage Requirements or Turn Around Requirements as required on or before December 31, 2021. Complaint, ¶ 120. Plaintiff's members thus face imminent and irreparable Hobson's choice of: (1) being forced to harvest their breeding pigs in order to enter the California market, which makes up 13-15% of the national market, (2) ceasing operations, or (3) being forced to forgo one of the largest pork consumption markets in the nation at crippling expense. Complaint, ¶ 122.

Those who do not have the means to restructure their facilities may need to decrease their overall herd size, by culling breeding pigs early, and the devastating financial costs of doing so may force many producers into bankruptcy. Tonsor Decl. ¶ 19. Due to Proposition 12 and the Proposed Regulations' ambiguities, it is possible that producers will be required to engage in early culling of breeding pigs on December 31, 2021 that are potentially at the prime of their productivity in order to comply with Proposition 12's requirements. *Id.* at ¶ 23; *see* Ex. 2, Declaration of Dr. Janeen Salak-Johnson, ¶ 29. Absent a preliminary injunction, this early culling will occur and result in substantial loss of property. *Id.*

Further, CDFA's Animal Care Program (ACP), which was formed to implement Proposition 12, issued FAQs on March 5, 2021, in an attempt to try to clarify some of the confusion created by Proposition 12's underlying vague statute ("FAQs"). *See* CDFA AHFSS Animal Care Program Prop 112 FAQ, (March 5, 2021), https://www.cdfa.ca.gov/AHFSS/pdfs/Prop_12_FAQ_March_2021.pdf.

CDFA's FAQs state that pork in inventory is legal to sell through to California after January

4

1, 2022 that is not otherwise complaint with the Square Footage Requirements. Specifically, the FAQs state: Q. "Will inventory of shell eggs, liquid eggs and pork meat already in stock prior to January 1, 2022 need to be discarded if this covered product originated from animals not raised according to the confinement standards of cage-free for hens a*nd twenty-four square feet per breeding pig*?" A. "No. The definition of "confined in a cruel manner" changes at the end of the day on December 31, 2021 for egg-laying hens and breeding pigs. Therefore, the shell eggs, liquid eggs and pork meat already in inventory or commerce on December 31, 2021 will still be legal to sell in California." *Id.* at Question/Answer 4 (emphasis added).

While this FAQ provides relief for the sale of pork inventory not otherwise compliant with the Square Footage Requirements, it does provide relief for the same pork that is not compliant with the Turn Around Requirements. CDFA's position is that pork not compliant with the Turn Around Requirements cannot be sold now or after January 1, 2022 because the effective date for the Turn Around Requirements was December 19, 2018. Complaint, ¶ 58. Thus, this sell through allowed for existing inventory that is not compliant with the Square Footage Requirements is meaningless to Plaintiff's members, as only California in-state producers are in compliance with the Turn Around Requirements after enjoying their six years before the Turn Around Requirements went into effect after Proposition 2 was passed on November 6, 2008 for California producers -- and fourteen years since then.

As a result, Proposition 12 and CDFA have rendered all pork non-compliant for sell through o*ther than for California producers* who are already in compliance with the Turn Around Requirements. Thus, the only legal pork that can be sold in California now or after January 1, 2022 is pork produced within the state of California. Plaintiff's members and out-of-state producers, who were faced with an immediate effective date of the Turn Around Requirements and have not been given a chance to comply with even the Turn Around Requirements, are not allowed the same sell through as California in-state producers and processors. Yet, contractually required sales within the supply chain are already in route and will continue through January 1, 2022. This renders the vast majority of the industry's pork illegal to sell into California and exposes Plaintiff's members and out-of-state producers and processors to criminal exposure and penalties that in-state

1  California producers and processors will not face.

2      Proposition 12 threatens the nation's food supply. America's agriculture industry and the

3  public at large have a vital interest in maintaining the status quo on pork production methodologies

4  in Iowa during the pendency of this action. Plaintiff's Motion for Preliminary Injunction enjoining

5  California from the enforcement of Proposition 12 is therefore just and necessary.  And Plaintiff

6  needs such an order prior to December 31, 2021.

7  **III.    GOOD CAUSE EXISTS TO ADVANCE THE HEARING ON ALL PENDING**

8  **MOTIONS**

9      California courts possess inherent authority to control their own calendars and dockets.

10  *Walker v. Superior Court* (1991) 53 Cal.3d 257, 266-267; *see also Rutherford v. Owens-Illinois,*

11  *Inc.* 16 Cal.4th 953, 967 (1997). While Code of Civil Procedure § 1005 generally prescribes the

12  normal time for service, filing and notice of motion papers, and setting a hearing date, a court may

13  prescribe a shorter time, either *sua sponte* or on application supported by a showing of good cause.

14  Cal. Rules of Court, Rule 3.1300(b).

15      In addition, Plaintiff's primary counsel Husch Blackwell LLP and Brick Gentry, P.C. have

16  the relevant information necessary for full and complete representation at the hearing on its Motion

17  for Preliminary Injunction. Plaintiff believes it is in its best interest to have Husch Blackwell LLP

18  and Brick Gentry, P.C. represent them at the hearing. Good cause exists to advance the hearing date

19  on Plaintiff's Pro Hac Vice Applications so that Plaintiff may have the counsel of their choice

20  represent them at the Motion for Preliminary Injunction hearing. Further, and as referenced herein,

21  Defendants' counsel has stated he does not oppose Plaintiff's pro hac admission for purposes of

22  representing Plaintiff in this matter.

23      Good cause exists for an order advancing the hearing date for Plaintiff's Motion for

24  Preliminary Injunction and further for Plaintiff's Pro Hac Applications. First, the Turn Around

25  Requirements provided in Proposition 2 are in effect now and the Square Footage Requirements

26  provided in Proposition 12 are set to go into effect January 1, 2022, placing Plaintiff's members

27  who sell whole pork meat into California at immediate risk of irreparable harm by facing criminal

28  prosecution, civil penalties and the decision of whether to voluntarily reduce their herd size prior

6

MEMORANDUM OF POINTS AND AUTHORITIES

1   to December 31, 2021 so that breeding pig's offspring may be sold into California after January 1,

2   2022.

3       Second, On May 28, 2021, CDFA and CDPH issued draft Proposed Regulations.  However,

4   CDFA stated just this month that these will not be finalized and that new draft Proposed Regulations

5   will be issued and *if* these can be finalized, the Final Regulations will not be published and

6   promulgated until later in 2022. Complaint, ¶ 164. CDFA and CDPH failed to promulgate the Final

7   Regulations by the statutory deadline and failed to do so as of the date of this filing or issue the

8   updated revised Proposed Regulations. Complaint, ¶ 165. Because of the failure to promulgate the

9   Final Regulations, California has failed to cure the unconstitutional vagueness of Proposition 12

10   with the promulgation of the Final Regulations.  Due to CDFA and CDPH's failure to promulgate

11   the rules as mandated by Proposition 12, and due to the length of time involved in the breeding

12   cycle for sows and the time from farrowing to finish for pork processing, a person of ordinary

13   intelligence does not have adequate notice of or time to comply with the vague statute. Complaint,

14   ¶ 152.

15       Third, the catastrophic effects of what pork consumers themselves may face are known,

16   immediate and ascertainable, deserving immediate treatment before January 1, 2022. For example,

17   A study by Tonsor and Lusk (2021) used data from 2016-2020 on 51 different U.S. market to

18   quantify how sensitive consumer pork purchase are to changes in retail pork prices.  All four of the

19   examined California markets (Los Angeles, Sacramento, San Diego, and San Francisco/Oakland)

20   are more price elastic than the median market. Based on this study, Dr. Tonsor concluded that pork

21   consumption in California will change more in response to retail price changes than most markets

22   outside of California. Tonsor Dec. at ¶ 25. California residents may initially see a 73.33% reduction

23   in pork available for purchase. *Id.* at ¶ 29. The significant reduction of 73.33% in pork available to

24   California residents would correspond with an estimated 40-47% increase in retail pork prices face

25   by California consumers. *Id* at ¶ 30.

26       The current hearing date for the Motion for Preliminary Injunction of May 18, 2022 does

27   not allow this Court to issue a preliminary injunction to prevent the immediate, irreparable harm

28   that exists caused by the enforcement of Proposition 12, its policies, practices and customs by

<div align="center">7</div>

1  Defendants, employees and agents, and all persons acting in privity and/or in concert with them

2  (including private enforcers bringing claims pursuant to the Unfair Competition Law or any other

3  applicable law).

4      Plaintiff, through its counsel, personally conferred with Ben Glickman, Supervising Deputy

5  Attorney General telephonically on November 10, 2021 at 5:00 p.m. PDT. Mr. Glickman indicated

6  that he would confer with this clients, and would consider consenting to Plaintiff's request to move

7  the hearing date for the Motion for Preliminary Injunction before January 1, 2022. Mr. Glickman

8  additionally indicated that the Attorney General's office understood Plaintiff's need to have this

9  matter heard as soon as possible, and certainly before the end of the year.  Mr. Glickman also

10  indicated Defendants would not oppose Plaintiff's Applications to Appear as Counsel Pro Hac

11  Vice. *See* Ex. 3, Declaration of Ryann A. Glenn, ¶ 8.)

12  **IV.**   **CONCLUSION**

13      For all of the foregoing reasons, Plaintiff respectfully requests that the Court grant this

14  Application.

15

16      Dated: November 12, 2021.

17  IOWA PORK PRODUCERS
   ASSOCIATION,  Plaintiff.

18

19  By: */s/ Willis M. Wagner*
   Trenton H. Norris (SBN 164781)
   Peg Toledo (SBN 181227)

20     Willis M. Wagner (SBN 310900)
   Arnold & Porter Kaye Scholer LLP

21     Three Embarcadero Center, 10th Floor
   San Francisco, California 94111

22     Telephone: +1 415.471.3100
   Facsimile: +1 415.471.3400

23     Trent.Norris@arnoldporter.com
   Peg.Toledo@arnoldporter.com

24     Will.Wagner@arnoldporter.com

25     and

26     Marnie A. Jensen (NE 22380)

27     (*pro hac vice pending*)
   Ryann A. Glenn (NE 26160)

28     (*pro hac vice pending*)

MEMORANDUM OF POINTS AND AUTHORITIES

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HUSCH BLACKWELL LLP
13330 California Street, Suite 200
Omaha, NE 68154
Telephone:  (402) 964-5000
Facsimile:  (402) 964-5050
marnie.jensen@huschblackwell.com
ryann.glenn@huschblackwell.com

and

Eldon L. McAfee (AT0004987)
(*pro hac vice pending*)
Julie L. Vyskocil (AT0009711)
(*pro hac vice pending*)
BRICK GENTRY, P.C.
6701 Westown Parkway, Suite 100
West Des Moines, IA 50266
Telephone: (515) 271-5916
Facsimile: (515) 274-1488
eldon.mcafee@brickgentrylaw.com
julie.vyskovil@brickgentrylaw.com

*Attorneys for Iowa Pork Producers
Association*

9

1   TRENTON H. NORRIS (SBN 164781)
    PEG CAREW TOLEDO (SBN 181227)
2   WILLIS M. WAGNER (SBN 310900)
    Arnold & Porter Kaye Scholer LLP
3   Three Embarcadero Center, 10th Floor
    San Francisco, California 94111
4   Telephone: +1 415.471.3100
    Facsimile: +1 415.471.3400
5   E-mail: Trent.Norris@arnoldporter.com
           Peg.Toledo@arnoldporter.com
6          Will.Wagner@arnoldporter.com

7   ELDON MCAFEE (*pro hac vice pending*)
    JULIE VYSKOCIL(*pro hac vice pending*)
8   BRICK GENTRY, P.C.
    6701 Westown Parkway, Suite 100
9   West Des Moines, Iowa 50266
    Telephone: 515.271.5916
10  Facsimile: 515.274.1488
    E-mail: eldon.mcafee@brickgentrylaw.com
11         julie.vyskocil@brickgentrylaw.com

    MARNIE A. JENSEN (*pro hac vice pending*)
    RYANN A. GLENN (*pro hac vice pending*)
    Husch Blackwell LLP
    13330 California Street, Suite 200
    Omaha, Nebraska 68154
    Telephone: 402.964.5000
    Facsimile: 402.964.5050
    E-mail: marnie.jensen@huschblackwell.com
            ryann.glenn@huschblackwell.com

E-FILED
11/12/2021 11:49 PM
Superior Court of California
County of Fresno
By: Louana Peterson, Deputy

12  Attorneys for Plaintiff
    IOWA PORK PRODUCERS ASSOCIATION

13

14          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                      **COUNTY OF FRESNO**

16  IOWA PORK PRODUCERS                 Case No. 21CECG03339
    ASSOCIATION,
17                                      Action Filed:   November 9, 2021
                                        Assigned to Honorable Rosemary T. McGuire
18              Plaintiff,

19                                      **DECLARATION OF RYANN A. GLENN IN**
        v.                              **SUPPORT OF PLAINTIFF'S EX PARTE**
20                                      **APPLICATIONS: (1) TO ADVANCE**
                                        **HEARING REGARDING MOTION FOR**
21  ROB BONTA, in his official capacity as   **PRELIMINARY   INJUNCTION AND**
    Attorney General of California, KAREN    **REQUEST FOR EXPEDITED RELIEF AND**
22  ROSS, in her official capacity as Secretary   **HEARING; AND (2) TO ADVANCE**
    of the California Department of Food and   **HEARING ON PRO HAC VICE**
23  Agriculture, and TOMAS ARAGON, in his   **APPLICATIONS, WHICH ARE**
    official capacity as Director of the      **UNOPPOSED**
24  California Department of Public Health,
25              Defendants.             Date: November 17, 2021
                                        Time: 3:30pm
26                                      Dept.: 502

27

28

                        DECLARATION OF RYANN A. GLENN

I, Ryann A. Glenn, hereby state and declare as follows:

1.      I am over the age of majority and am competent to make this Declaration. I have personal knowledge of the facts set forth in this Declaration. If called as a witness, I could have would competently testify to the same.

2.      I represent Plaintiff Iowa Pork Producers Association ("Plaintiff" or "IPPA"). My *pro hac vice* application is currently pending before this Court.

3.      Plaintiff filed a Verified Complaint for Preliminary and Permanent Injunctive and Declaratory relief against Defendants Rob Bonta, in his official capacity as Attorney General of California ("Bonta"), Karen Ross, in her official capacity as Secretary of the California Department of Food and Agriculture ("Ross"), and Tomas Aragon, in his official capacity as Director of the California Department of Public Health ("Aragon") (collectively, "Defendants"), on November 9, 2021, challenging the constitutionality of California's Proposition 12 Farm Animal Confinement Initiative ("Proposition 12" or "Prop 12" or the "Act"), which imposes confinement requirements on out-of-state pork producers and prohibits the sale of pork meat within the state of California from animals confined in a manner inconsistent with California's requirements, regardless of where in the nation the animal was raised.

4.      Plaintiff filed a Notice of Motion and Motion for Preliminary Injunction and Expedited Relief and Hearing, concurrently with its Memorandum of Points and Authorities, Declaration of Pat McGonegle, Declaration of Dr. Janeen Salak-Johnson, Declaration of Dr. Glynn T. Tonsor, and [proposed] Order on November 12, 2021. In addition, Plaintiff filed an Application for Leave to File a Memorandum in Support of Motion for Preliminary Injunction in Excess of Local Rule Requirements, concurrently with its separate Memorandum of Points and Authorities, on November 12, 2021.

5.      Plaintiff's counsel of record filed Applications for Pro Hac Vice Admission, concurrently with their Memoranda of Points of Authorities and supporting Declarations, on November 12, 2021.

6.      A hearing has been set on Plaintiff's Motion for Preliminary Injunction on May 18, 2022, at 3:30 pm.

1

7. Pursuant to California Rule of Court 3.1220, I conferred via e-mail with Attorney General Deputy Nelson Richards and Assistant Attorney General Marla Weston November 10, 2021, at 4:30 p.m. PDT requesting consent to moving the hearing date to before December 31, 2021. Within the same correspondence, I requested whether Defendants would oppose the Applications for Pro Hac Vice Admission filed by Plaintiff's counsel, Marnie Jensen, Ryann Glenn, Eldon McAfee and Julie Vyskocil.  At that time, I provided counsel with a courtesy copy of the Verified Complaint and Summons for review.

8. I also personally conferred with Ben Glickman, Supervising Deputy Attorney General telephonically on November 10, 2021 at 5:00 p.m. PDT.  Mr. Glickman indicated that he would confer with his clients, and would consider Plaintiff's request to move the hearing date for the Motion for Preliminary Injunction before January 1, 2022.  Mr. Glickman additionally indicated the Attorney General's office is reasonable in understanding Plaintiff wanting this matter heard before the end of the year.  Mr. Glickman also indicated Defendants would not oppose Plaintiff's Applications to Appear as Counsel Pro Hac Vice. Plaintiff's counsel contacted Defendants' counsel on November 12, 2021, to request consent to its Application for Leave to File a Memorandum in Support of Motion for Preliminary Injunction in Excess of Local Rule Requirements. As of the time of this filing, Plaintiff has not received a response from counsel.

9. I declare under penalty of perjury and pursuant to the laws of the state of California that the preceding is true and correct and that this declaration was made on this 12th day of November 2021, at Council Bluffs, Iowa.

RYANN A. GLENN

DECLARATION OF RYANN A. GLENN

1   TRENTON H. NORRIS (SBN 164781)
    PEG CAREW TOLEDO (SBN 181227)
2   WILLIS M. WAGNER (SBN 310900)
    Arnold & Porter Kaye Scholer LLP
3   Three Embarcadero Center, 10th Floor
    San Francisco, California 94111
4   Telephone: +1 415.471.3100
    Facsimile: +1 415.471.3400
5   E-mail: Trent.Norris@arnoldporter.com
          Peg.Toledo@arnoldporter.com
6         Will.Wagner@arnoldporter.com

**RECEIVED**
11/12/2021 11:49 PM
FRESNO COUNTY SUPERIOR COURT
By: Louana Peterson, Deputy

7   ELDON MCAFEE (*pro hac vice pending*)    MARNIE A. JENSEN (*pro hac vice pending*)
    JULIE VYSKOCIL(*pro hac vice pending*)    RYANN A. GLENN (*pro hac vice pending*)
8   BRICK GENTRY, P.C.                   Husch Blackwell LLP
    6701 Westown Parkway, Suite 100      13330 California Street, Suite 200
9   West Des Moines, Iowa 50266         Omaha, Nebraska 68154
    Telephone: 515.271.5916             Telephone: 402.964.5000
10  Facsimile: 515.274.1488              Facsimile: 402.964.5050
    E-mail: eldon.mcafee@brickgentrylaw.com  E-mail: marnie.jensen@huschblackwell.com
11         julie.vyskocil@brickgentrylaw.com        ryann.glenn@huschblackwell.com

12  Attorneys for Plaintiff
    IOWA PORK PRODUCERS ASSOCIATION
13

14          **SUPERIOR COURT OF THE STATE OF CALIFORNIA**

15                  **COUNTY OF FRESNO**

16  IOWA PORK PRODUCERS        Case No.  21CECG03339
    ASSOCIATION,
17                       **[*PROPOSED*] ORDER GRANTING**
            Plaintiff,         **PLAINTIFF'S EX PARTE APPLICATIONS:**
18                       **(1) TO ADVANCE HEARING REGARDING**
       v.                  **MOTION FOR PRELIMINARY**
19                       **INJUNCTION AND REQUEST FOR**
    ROB BONTA, in his official capacity as    **EXPEDITED RELIEF AND HEARING;**
20  Attorney General of California, KAREN    **AND**
    ROSS, in her official capacity as Secretary  **(2) TO ADVANCE HEARING ON PRO**
21  of the California Department of Food and   **HAC VICE APPLICATIONS, WHICH ARE**
    Agriculture, and TOMAS ARAGON, in his  **UNOPPOSED**
22  official capacity as Director of the
    California Department of Public Health,
23                        Action Filed:  November 9, 2021
           Defendants.
24

25      Plaintiff's Ex Parte Application to Advance Hearing Regarding Motion For Preliminary

26  Injunction And Request For Expedited Relief And Hearing and To Advance Hearing on Pro Hac

27  Vice Applications, Which Are Unopposed (the "Ex Parte Application") came on for hearing before

28

[PROPOSED] ORDER TO ADVANCE HEARING DATE

this Court on November 17 2021, at 3:30 pm. After consideration of the memoranda and arguments of counsel, the evidence, and being fully advised, the Court finds that the Ex Parte Application should be GRANTED as follows:

1.      Upon finding that Plaintiff has shown good cause to advance the hearing date on Plaintiff's Motion for Preliminary Injunction and Request for Expedited Relief and Hearing, this Court shall set the time and place for hearing on Plaintiff's Motion for Preliminary Injunction for _____, 2021 at _____ p.m.

2.      Upon finding that Plaintiff has shown good cause to advance the hearing date on Plaintiff's Unopposed Applications to Appear as Counsel Pro Hac Vice, this Court finds that Plaintiff's Unopposed Applications to Appear as Counsel Pro Hac Vice do not require a hearing as they are unopposed, and shall be GRANTED.

**IT IS SO ORDERED** this ___ day of November, 2021.

_____
Honorable Rosemary T. McGuire

2

## DECLARATION OF SERVICE BY E-MAIL

Case Name:   ***Iowa Pork Producers v. Rob Bonta, et al.***
Case No.:      **21-1044**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is: 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004.

On <u>November 16, 2021</u>, I served the attached

1. **NOTICE OF REMOVAL OF ACTION UNDER 28 U.S.C. SECTION 1441(a)**
2. **CIVIL COVER SHEET**

by transmitting a true copy via electronic mail, addressed as follows:

| | |
|---|---|
| **ELDON MCAFEE**<br>**JULIE VYSKOCIL**<br>**Brick Gentry, P.C.**<br>**E-mail: eldon.mcafee@brickgentrylaw.com**<br>        **julie.vyskocil@brickgentrylaw.com** | **MARNIE A. JENSEN**<br>**RYANN A. GLENN**<br>**Husch Blackwell LLP**<br>**E-mail: marnie.jensen@huschblackwell.com** |
| *Attorneys for Plaintiff* | *Attorneys for Plaintiff* |

**TRENTON H. NORRIS**
**PEG CAREW TOLEDO**
**WILLIS M. WAGNER**
**Arnold & Porter Kaye Scholer LLP**
**E-mail: Trent.Norris@arnoldporter.com**
        **Peg.Toledo@arnoldporter.com**
        **Will.Wagner@arnoldporter.com**

*Attorneys for Plaintiff*

I declare under penalty of perjury under the laws of the State of California and the United States of America the foregoing is true and correct and that this declaration was executed on November 16, 2021, at San Francisco, California.

| M. Mendiola | *M. Mendiola* |
|---|---|
| Declarant | Signature |

SA2021305217
42963768.docx